# Exhibit A

1  Joseph W. Cotchett (#36324; jcotchett@cpmlegal.com)
   Steven N. Williams (#175489; swilliams@cpmlegal.com)
2  Nanci E. Nishimura (#152621; nnishimura@cpmlegal.com)
   Aron K. Liang (#228936; aliang@cpmlegal.com)
3  Douglas Y. Park (#233398;dpark@cpmlegal.com)
   **COTCHETT, PITRE & McCARTHY**
4  San Francisco Airport Office Center
   840 Malcolm Road, Suite 200
5  Burlingame, CA 94010
   Telephone: (650) 697-6000
6  Facsimile: (650) 697-0577

7  Walter J. Lack (#57550; wlack@elllaw.com)
   Elizabeth L. Crooke (#90305 ecrooke@elllaw.com)
8  Richard P. Kinnan (#123170; rkinnan@elllaw.com)
   **ENGSTROM LIPSCOMB & LACK**
9  10100 Santa Monica Blvd., 16th Floor
   Los Angeles, CA 90067
10 Telephone: (310) 552-3800
   Facsimile: (310) 552-9434

11

*Attorneys for Plaintiffs and the Class*

12

**UNITED STATES DISTRICT COURT**

13

**IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA**

14

| | |
|---|---|
| 15  **DONALD WORTMAN, WILLIAM ADAMS, MARGARET GARCIA**, individually and on behalf of all others similarly situated, | ) Case No. **CV 07 5634** |
| 16 | ) |
| 17  Plaintiffs, | ) **CLASS ACTION COMPLAINT** |
| 18  vs. | ) **COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT 15 U.S.C. § 1** |
| 19  **AIR NEW ZEALAND, ALL NIPPON AIRWAYS,** | ) **JURY TRIAL DEMANDED** |
| 20  **CATHAY PACIFIC AIRWAYS,** | ) |



15  **DONALD WORTMAN,**
    **WILLIAM ADAMS,**
    **MARGARET GARCIA**, individually
16  and on behalf of all others similarly
    situated,
17              Plaintiffs,
18      vs.
19  **AIR NEW ZEALAND,**
    **ALL NIPPON AIRWAYS,**
20  **CATHAY PACIFIC AIRWAYS,**
21  **CHINA AIRLINES,**
    **EVA AIRWAYS,**
22  **JAPAN AIRLINES INTERNATIONAL,**
    **MALAYSIA AIRLINES,**
23  **NORTHWEST AIRLINES,**
24  **QANTAS AIRWAYS,**
    **SINGAPORE AIRLINES,**
25  **THAI AIRWAYS,**
    **UNITED AIRLINES,**
26              Defendants.

Case No. **CV 07 5634**

**CLASS ACTION COMPLAINT**

**COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT 15 U.S.C. § 1**

**JURY TRIAL DEMANDED**

27

28

Class Action Complaint

# TABLE OF CONTENTS

                                                                          **Page**

NATURE OF THE ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

MULTI-DISTRICT LITIGATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     A.    Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     B.    Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     C.    Unnamed Co-Conspirators . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     D.    Agents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

TRADE AND COMMERCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

PLAINTIFFS AND THE CLASS SUFFERED INJURY THROUGH
COLLUSIVE PRICE INCREASES AND SURCHARGES . . . . . . . . . . . . 6

CLASS ACTION ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

DEFENDANTS AND THE PASSENGER FLIGHT MARKET . . . . . . . . . . . . 9

DEFENDANTS' CONCERTED FUEL SURCHARGES . . . . . . . . . . . . . . . . . 10

CARTEL-LIKE TRADE ORGANIZATIONS . . . . . . . . . . . . . . . . . . . . . . . . 14

CODE SHARING BUSINESS PARTNERSHIPS . . . . . . . . . . . . . . . . . . . . . . 17

CARTEL ACTIVITY MEETINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

THE INVESTIGATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

ADMISSIONS BY CO-CONSPIRATORS . . . . . . . . . . . . . . . . . . . . . . . . . . 23

VIOLATIONS ALLEGED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

FRAUDULENT CONCEALMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

INJURY TO PLAINTIFFS AND THE CLASS . . . . . . . . . . . . . . . . . . . . . . . 27

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

JURY TRIAL DEMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

1   Pursuant to the Federal Rules of Civil Procedure, Plaintiffs, on behalf of
2   themselves and all others similarly situated, hereby bring this action for treble
3   damages and injunctive relief under the federal antitrust laws of the United States,
4   Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 1 ("Sherman Act")
5   and Sections 4 and 26 of the Clayton Antitrust Act of 1914, 15 U.S.C. §§ 15, 26
6   ("Clayton Act") against Defendants.  Plaintiffs complain and allege upon
7   information and belief except as to those paragraphs applicable to the named
8   Plaintiffs, which are based on personal knowledge, as follows:

9   ## NATURE OF THE ACTION

10   1.   This action arises from a global conspiracy among certain airlines to
11   fix, raise, maintain, and/or stabilize prices for long haul passenger transpacific
12   flights to and from the United States ("Passenger Air Transportation"), and for
13   fixed fuel surcharges on this transportation ("Fuel Surcharges").  Fuel surcharges
14   are fees charged to passengers by airlines purportedly to compensate the airlines
15   for increased fuel costs.

16   2.   Plaintiffs, on behalf of all persons and entities that purchased
17   Passenger Air Transportation, to and from the United States, from any of the
18   Defendants and their co-conspirators or any predecessor, subsidiary, or affiliate of
19   each, at any time during the period from 2004 to August 2007 (the "Class
20   Period"), bring this action to recover treble damages and injunctive relief for
21   violations of the United States antitrust laws.

22   3.   At all relevant times herein, Defendants were airlines that conducted
23   and sold Passenger Air Transportation, and charged fixed Fuel Surcharges on that
24   transport, to airline passengers in the United States and throughout the world,
25   including but not limited to flights to and from Los Angeles and to and from San
26   Francisco, California.  Los Angeles International Airport ("LAX") and San
27   Francisco International Airport ("SFO") are considered the international U.S.
28   gateways to Asian and Pacific countries.  The U.S. Department of Transportation

---

1  reported that in 2005 LAX and SFO were ranked in the top U.S. passenger
2  gateways to the world in scheduled passenger service. That year LAX and SFO
3  had 24.6 million gateway passengers, with the foreign share of the passengers at
4  an average 67%.

5      4.     As further alleged herein, during at least the Class Period, Defendants
6  agreed, combined, and/or conspired with each other to fix, raise, maintain, and/or
7  stabilize the prices of Passenger Air Transportation and Fuel Surcharges thereon.
8  As a result of Defendants' unlawful conduct and conspiracy, Plaintiffs and the
9  other members of the Class paid artificially high prices for Passenger Air
10 Transportation and Surcharges thereon, and have been damaged accordingly.

11                            **JURISDICTION AND VENUE**

12     5.     This Complaint is brought under Sections 4 and 16 of the Clayton
13 Act, 15 U.S.C. §§ 15 and 26, to obtain injunctive relief and to recover treble
14 damages and the costs of this suit, including reasonable attorneys' fees, against
15 Defendants for the injuries sustained by Plaintiffs and the members of the Class by
16 reason of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

17     6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§
18 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

19     7.     This Court has *in personam* jurisdiction over each of the Defendants
20 because each was engaged in an illegal price-fixing scheme and conspiracy that
21 was directed at and/or caused injury to persons and entities residing in, located in,
22 or doing business in the Northern District of California and throughout the United
23 States.

24     8.     Venue is proper in this judicial district pursuant to 15 U.S.C. § 22 and
25 28 U.S.C. § 1391(b), (c), and (d) because during the Class Period many of the
26 Defendants resided, transacted business, were found, or had agents in this district,
27 and because a substantial part of the events giving rise to Plaintiffs' claims

28

**Class Action Complaint**                                                    2

1  occurred, and a substantial portion of the affected trade and commerce described
2  below has been carried out, in this district.

3                          **MULTI-DISTRICT LITIGATION**

4        9.    Venue is also proper in the Northern District because that court
5  presides over the multi-district litigation *In re International Air Transportation*
6  *Litigation*, MDL No. 1793. The Hon. Charles R. Breyer presides over the case,
7  and the Court has and will be called upon to address complex issues including
8  jurisdiction, the scope of relief which may be accorded, the application of United
9  States' antitrust and airline law, notice and claims procedures for class members
10  within and outside the United States, and the administration and distribution of
11  any funds which may be obtained through settlement and judgment.

12                                    **PARTIES**

13        **A.    Plaintiffs**

14        10.    Plaintiff **DONALD WORTMAN** is a citizen of the State of
15  California, Los Angeles County. Plaintiff Wortman purchased Passenger Air
16  Transportation and paid Fuel Surcharges thereon from Defendants Japan Airlines
17  International, Northwest Airlines, Singapore Airlines, Thai Airlines, and United
18  Airlines during the class period and has suffered pecuniary injury as a result of the
19  antitrust violations alleged herein.

20        11.    Plaintiff **WILLIAM ADAMS** is a citizen of the State of California,
21  Los Angeles County. Plaintiff Adams purchased Passenger Air Transportation
22  and paid Fuel Surcharges thereon from Defendant Air New Zealand and has
23  suffered pecuniary injury as a result of the antitrust violations alleged herein.

24        12.    Plaintiff **MARGARET GARCIA** is a citizen of the State of
25  California, Los Angeles County. Plaintiff Garcia purchased Passenger Air
26  Transportation and paid Fuel Surcharges thereon from Defendant Cathay Pacific
27  and has suffered pecuniary injury as a result of the antitrust violations alleged
28  herein.

13.    Plaintiffs identified in the preceding three paragraphs are collectively referred to herein as "Plaintiffs."

**B.    Defendants**

14.    Defendant **Air New Zealand** is a New Zealand company with its principal place of business at Quay Tower, 29 Customs St. West, Auckland, 1020, New Zealand. Air New Zealand conducts Passenger Air Transportation throughout the world, including into the U.S. and especially California.

15.    Defendant **All Nippon Airways** is a Japanese company with its principal place of business at Shidome-City Center, 1-5-2, Higashi-Shimbashi, Minato-ku, Tokyo 105-7133, Japan. All Nippon Airways conducts Passenger Air Transportation throughout the world, including into the U.S. and especially California.

16.    Defendant **Cathay Pacific Airways**

Cathay Pacific Airways conducts Passenger Air Transportation throughout the world, including direct transpacific flights into the United States, especially California.

17.    Defendant **China Airlines**

China Airlines conducts Passenger Air Transportation throughout the world, including direct transpacific flights into the United States, especially California.

18.    Defendant **EVA Airways**

EVA Airways conducts Passenger Air Transportation throughout the world, including direct transpacific flights into the United States, especially California.

19.    Defendant **Japan Airlines International** is a Japanese company with its principal place of business at 4-11, Higashi-Shinagawa 2-chrome, Shinagawa-

1  Ku, Tokyo 140-8605, Japan.  Japan Airlines International conducts Passenger Air
2  Transportation throughout the world, including into the United States, especially
3  California.

4      20.    Defendant **Malaysia Airlines** is a Malaysian corporation with its
5  principal place of business at MAS Complex A, Sultan Abdul Azia Shah Airport,
6  47200 Suband, Selangor Darui Ehsan, Malaysia.  Malaysia Airlines conducts
7  Passenger Air Transportation throughout the world, including into the United
8  States, especially California.

9      21.    Defendant **Northwest Airlines** is a Delaware corporation with its
10  principal place of business at 2700 Lone Oak Parkway, Eagan, MN 55121.
11  Northwest Airlines conducts Passenger Air Transportation throughout the world,
12  including into the United States, especially California.

13      22.    Defendant **Qantas Airways** is an Australian company with its
14  principal place of business at 203 Coward Street, Qantas Centre, Mascot NSW
15  2020 C3.  Qantas Airways conducts Passenger Air Transportation throughout the
16  world, including into the United States, especially California.

17      23.    Defendant **Singapore Airlines** is a Singapore company with its
18  principal place of business at Airline House, 25 Airline Road, 819829 Singapore.
19  Singapore Airlines conducts Passenger Air Transportation throughout the world,
20  including direct transpacific flights into the United States, especially California.

21      24.    Defendant **Thai Airways** is a Thailand company with its principal
22  place of business at 89 Vibhavadi-Rangsit Road, Bangkok, Thailand 10900. Thai
23  Airways conducts Passenger Air Transportation throughout the world, including
24  direct transpacific flights into the United States, especially California.

25      25.    Defendant **United Airlines** is a Delaware corporation with its
26  principal place of business at 77 W. Wacker, Chicago, IL 60601. United Airlines
27  is one of the largest passenger airlines in the world with more than 3,600 flights a
28  day to more than two hundred destinations.  United Airlines conducts Passenger

1  Air Transportation throughout the world, including into the United States,

2  especially San Francisco International Airport, where United Airlines operates a

3  hub and maintenance operation center. United Airlines is the largest employer in

4  San Mateo County, California, which is located within this district.

5          **C.**   **Unnamed Co-Conspirators**

6     26.   At all relevant times, other airlines, trade groups, or other entities,

7  willingly conspired with Defendants in their unlawful restraint of trade. All

8  averments herein against named Defendants are also averred against these

9  unnamed co-conspirators as though set forth at length.

10          **D.**   **Agents**

11     27.   The acts alleged to have been done by Defendants were authorized,

12  ordered or done by their directors, officers, agents, employees, or representatives

13  while actively engaged in the management of each of the Defendants' affairs.

14                       **TRADE AND COMMERCE**

15     28.   Throughout the Class Period, there was a continuous and

16  uninterrupted flow of Passenger Air Transportation in international commerce

17  throughout the United States and especially into and out of Los Angeles and San

18  Francisco. Defendants' unlawful activities, as described herein, took place within

19  the flow of commerce to Passenger Flight customers throughout the world, and

20  had a direct, substantial and reasonably foreseeable effect upon interstate and

21  international commerce in the United States.

22       **PLAINTIFFS AND THE CLASS SUFFERED INJURY THROUGH**

23         **COLLUSIVE PRICE INCREASES AND SURCHARGES**

24

25     29.   As Defendants controlled a vast majority of the Passenger Flight

services during the Class Period with their dominant combined market share,

26  Passenger Flight customers were unable to shop for Passenger Air Transportation

27  from other carriers during that period, because of the lack of competition which

28  allowed Defendants to reap enormous profits from the Fuel  Surcharges.

30.    In addition, Fuel Surcharges were often treated by Defendants and other carriers similar to a tax or other surcharge, such as an airport facility charge or a government mandated September 11 security charge. As such, Fuel Surcharges were not always advertised as part of Defendants' fares, and were added on to the base fare as part of the purchase transaction.

31.    Because surcharges generally are designed to compensate for increased external costs, they should bear a relatively constant relationship to external cost levels. Thus, in a competitive market, Fuel Surcharges should rise and fall at relatively constant ratios to the associated jet fuel costs. Since their inception in 2004, the ratio of Defendants' Surcharges to external costs has increased steadily. The Fuel Surcharges bore no relationship to the Defendants' actual fuel costs or fuel cost increases.

32.    The ratio of Defendants' profits to external costs was therefore quite high due to the concerted implementation and maintenance of the agreed-upon Passenger Air Transportation and Fuel Surcharge price levels. So despite increased fuel costs during the Class Period, Defendants' Surcharges were actually responsible for outstanding *profit growth* for Defendants beyond record fuel costs.

<u>**CLASS ACTION ALLEGATIONS**</u>

33.    Plaintiffs bring this action on their own behalf and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following Class:

> All individuals or entities (excluding governmental entities, Defendants, and their parents, predecessors, subsidiaries, affiliates, and their co-conspirators) who purchased passenger air transportation, for long haul transpacific flights and who paid a fuel surcharge on their tickets from any of the Defendants and their co-conspirators or any predecessor, subsidiary, or affiliate of each, at any time during the period from 2004 to August 2007.

34.    Because such information is in the exclusive control of Defendants, Plaintiffs do not know the exact number of Class members. Due to the nature of

1   the trade and commerce involved, however, Plaintiffs believe that Class members
2   number at least in the thousands and are sufficiently numerous and geographically
3   dispersed throughout the United States and the world so that joinder of all Class
4   members is impracticable. It is estimated that there were more than 15 million
5   passengers traveling to the Pacific out of California in 2006.

6       35.     There are questions of law or fact common to the Class, including:

7           a.     Whether Defendants engaged in a combination or conspiracy
8   among themselves to fix, raise, maintain, and/or stabilize Passenger Air
9   Transportation and Surcharge prices charged effecting commerce in the United
10  States and throughout the world;

11          b.     The duration of the conspiracy alleged in this Complaint and
12  the nature and character of the acts performed by Defendants in furtherance of the
13  conspiracy;

14          c.     Whether the alleged conspiracy violated Section 1 of the
15  Sherman Act;

16          d.     Whether the conduct of Defendants, as alleged in this
17  Complaint, caused injury to the businesses or property of Plaintiffs and the other
18  members of the Class;

19          e.     The effect of Defendants' conspiracy on the Passenger Air
20  Transportation and Surcharge prices charged in the United States and throughout
21  the world during the Class Period; and

22          f.     The appropriate measure of damages sustained by Plaintiffs
23  and other members of the Class.

24      36.     Plaintiffs are members of the Class. Plaintiffs' claims are typical of
25  the claims of the Class members. Plaintiffs will fairly and adequately protect the
26  interests of the Class. Plaintiffs purchased Passenger Air Transportation and
27  Surcharges from one or more Defendants, and their interests are coincident with
28  and not antagonistic to those of other members of the Class. Plaintiffs are

1 represented by counsel competent and experienced in the prosecution of antitrust
2 and class action litigation.

3      37.    The questions of law and fact common to the members of the Class
4 predominate over any questions affecting only individual members.

5      38.    A class action is superior to other methods for the fair and efficient
6 adjudication of this controversy. Treatment as a class action will permit a large
7 number of similarly situated persons to adjudicate their common claims in a single
8 forum simultaneously, efficiently, and without the duplication of effort and
9 expense that numerous individual actions would engender.

10      39.    Class treatment will also permit the adjudication of relatively small
11 claims by many Class members who otherwise could not afford to litigate an
12 antitrust claim such as is asserted in this Complaint.

13      40.    This class action presents no difficulties in management that would
14 preclude maintenance as a class action. Finally, the Class is readily definable and
15 is one for which records of the names and addresses of the members of the Class
16 exist in the files of Defendants.

17                **DEFENDANTS AND THE PASSENGER FLIGHT MARKET**

18      41.    Each Defendant possesses significant market share on their routes of
19 travel. The principal competitors for the Defendants in the transpacific long haul
20 Passenger Air Transportation market are therefore one another.

21      42.    Passenger Air Transportation is a commodity product that is fungible
22 in the sense that Passenger Air Transportation provided by any one airline is
23 readily substitutable for the Passenger Air Transportation provided by any other
24 airline.

25      43.    Passenger Air Transportation is a homogenous service sold by
26 airlines, including Defendants, to airline customers, including Plaintiffs and the
27 members of the Class, primarily based on price.

28

1    44.    The Passenger Air Transportation market in the United States and
2    worldwide is highly concentrated, and there exists substantial barriers to entry in
3    this market; both factors facilitate the implementation and maintenance of a
4    horizontal price-fixing cartel such as that perpetrated by Defendants and alleged
5    herein.

6                    **DEFENDANTS' CONCERTED FUEL SURCHARGES**

7    45.    Generally, surcharges are a feature of the global air transportation
8    market, in which airlines charge extra fees to their customers, above and beyond
9    basic flight rate charges, with the intent of defraying certain external costs of the
10   carriers.

11   46.    Beginning in 2004, Defendants agreed to act in concert with one
12   another in demanding the Surcharges to defray fuel costs and agreeing when and
13   how much to increase the Surcharges to their Passenger Flight customers.

14   47.    Defendants were aware that their imposition of Fuel Surcharges and
15   other surcharges would not be successful if their supposed competitors did not join
16   them; otherwise, customers would be free to seek out lower prices. For this
17   reason, Defendants entered into agreements to raise surcharges at the same times
18   and in the same amounts.

19   48.    But for Defendants' Passenger Air Transportation conduct,
20   Defendants would have been unable to perpetrate the extent to which they
21   increased the prices of their Fuel Surcharges.

22   49.    The collusion of Japan Airlines International and All Nippon Airways
23   ("ANA") is representative of the behavior of the other Defendants. Japan Airlines
24   International and ANA agreed to raise and lower fares on nearly always the same
25   dates and were in lockstep on surcharges for transpacific fares:

26   ///
27   ///
28   ///

1  June 8, 2004, ANA files a notice with

2  the Japanese government to raise

3  IATA international fares, in the wake

4  of increased fuel prices, to and from

5  Japan, effective **July 1**, 5% hike,

6  exception North America economy

7  fares, but not business class.

8

9  January 5, 2005, ANA announces it

10  will add fuel surcharges on

11  international fares on **February 1**.

12  The surcharges for transpacific flights

13  were 2,500 yen.

14

15  June 3, 2005, Japan Airlines files a

16  notice with the Japanese government

17  to raise its international fuel

18  surcharge effective **July 1**.

19

20  January 16, 2006, Japan Airlines files

21  a notice with the Japanese

22  government to raise its international

23  fuel charge effective **March 1**.

24

25

26

27

28

June 8, 2004, Japan Airlines files a
notice with the Japanese government
to raise international fares, in the
wake of increased fuel prices, to and
from Japan, effective **July 1**, 5% hike,
exception North American economy
fares, but not business class.

January 20, 2005, Japan Airlines
announces it will add fuel surcharges
on international passenger fares on
**February 1**. The surcharges for
transpacific flights were 2,500 yen.

June 7, 2005, ANA files a notice with
the Japanese government to raise its
international fuel surcharge effective
**July 7**.

January 23, 2006, ANA files a notice
with the Japanese government to raise
its international fuel surcharge,
effective **March 1**.

1  August 17, 2006, Japan Airlines files
2  a notice with the Japanese
3  government to raise its international
4  fuel surcharge, effective **October 1,**
5  from 8,000 yen to  13,600 yen ($66 to
6  $113).
7
8  November 16, 2006, Japan Airlines
9  files a notice with the Japanese
10  government to reduce the fuel
11  surcharge on international passenger
12  fares effective **January 1,** lowering
13  the surcharge from 13,600 yen to
14  13,000 yen ($113 to $108).
15
16  March 19, 2007, Japan Airlines files a
17  notice with the Japanese government
18  to reduce the fuel surcharge on
19  international passenger fares effective
20  **May 1,** to 11,000 yen or $91.
21
22  May 15, 2007, Japan Airlines files a
23  notice with the Japanese government
24  to raise the fuel surcharge on
25  international passenger fares effective
26  **July 1,** from 11,000 yen or $91 to
27  12,000 yen or $100.
28

August 31, 2006, ANA files a notice
with the Japanese government to raise
its international fuel surcharge,
effective **October 15**, from 8,000 yen
to 13,600 yen ($66 to $113).

November 16, 2006, ANA files a
notice with the Japanese government
to reduce the fuel surcharge on
international passenger fares effective
**January 1,** lowering the surcharge
from 13,600 yen to 13,000 yen ($113
to $108).

March 20, 2007, ANA files a notice
with the Japanese government to
reduce the fuel surcharge on
international passenger fares effective
**May 1,** to 11,000 yen or $91.

May 25, 2007, ANA files a notice
with the Japanese government to raise
the fuel surcharge on international
passenger fares effective **July 10**,
from 11,000 yen or $91 to 12,000 yen
or $100.

1   <u>August 15, 2007</u>, Japan Airlines files

2   a notice with the Japanese

3   government to raise the fuel

4   surcharge on international passenger

5   fares effective **October 1**, from

6   12,000 yen or $100 to 13,000 yen or

7   $108.

<u>August 20, 2007</u>, ANA files a notice with the Japanese government to raise the fuel surcharge on international passenger fares effective **October 1**, from 12,000 yen or $100 to 13,000 yen or $108.

8       50.   Other defendants did likewise.  United Airlines, for example, charged

9   a surcharge in line with Japan Airlines International and All Nippon Airways as

10  evidenced by the following ticket.  From July 10, 2007 to October 1, 2007 Japan

11  Airlines International and All Nippon Airways had their fuel surcharge on

12  international passenger fares transpacific set at 12,000 yen or $100.  The United

13  ticket for August 16, 2007 shows the surcharge fare, marked YQ, at $100.

14

15

16

17

18

19

20

21

22

23



24  ///

25  ///

26  ///

27  ///

28  ///

Class Action Complaint                                                                 13

1

## CARTEL-LIKE TRADE ORGANIZATIONS

2    51.    Defendants' executives, as well as other air carriers' executives, met

3    formally or informally over the years at various trade meetings or meetings of

4    trade associations, such as the International Air Transport Association, the

5    Association of Asian Pacific Airlines, oneworld, Star Alliance and SkyTeam

6    Alliance. At one or more of these meetings Defendants conspired to artificially

7    inflate fuel Surcharges on international passenger air transportation.

8    52.    One of the keys to the conspiracy is the 42-year-old **Association of**

9    **Asia Pacific Airlines** ("AAPA"). The 17-member trade association, based in

10   Kuala Lumpur, Malaysia, is the most significant group representing Asia/Pacific

11   carriers. The AAPA boasts that its "member airlines carry 285 million passengers

12   and 10 million tonnes of cargo representing approximately one-fifth of global

13   passenger traffic and one-third of global air cargo traffic respectively." Ten of the

14   defendants are members of AAPA.

15   53.    The primary purpose of AAPA is to serve as a forum for members'

16   views on issues of common interest and to foster close cooperation. According to

17   the organization, "AAPA speaks with a common voice on behalf of the Asia

18   Pacific carriers and puts forward Asian perspectives when dealing with

19   governments, aircraft manufacturers, airport authorities and other organizations on

20   industry issues. The activities of the Association cover every aspect of civil

21   aviation where the airlines feel they can work together for mutual benefit. In

22   addition, AAPA retains access to specialized legal and aviation consultants in

23   Brussels and Washington, a reflection of the significant impact which the

24   profusion of U.S. and E.U. regulatory developments have on all international

25   carriers including Asia Pacific airlines."

26   54.    AAPA was formed during a meeting of Asian airline executives in

27   1965 to discuss regional cooperation. The following year, Philippine Airlines,

28   China Airlines, Korean Airlines and Malaysian Airlines officially formed the

1  Orient Airlines Research Bureau.  The group evolved into the Orient Airlines
2  Association and in 1996 changed its name to Association of Asia Pacific Airlines.
3      55.    Another key to the conspiracy is the Geneva-based International Air
4  Transport Association.  All of the defendants are members of the IATA, which
5  was founded in 1945 in Havana, Cuba.  IATA represents more than 240 airlines
6  comprising 94% of scheduled international air traffic. It describes itself as "the
7  prime vehicle for inter-airline cooperation."  It was an agreement reached at an
8  IATA meeting in Geneva on May 28, 2004 that played a role in triggering the fuel
9  Surcharge conspiracy.
10     56.    Alliance memberships by airline:
11  **Air New Zealand**
12      •    Member of the Association of Asia Pacific Airlines.
13      •    Member of the Star Alliance.
14      •    Member of the International Air Transport Association.
15  **All Nippon Airways**
16      •    Member of the Association of Asia Pacific Airlines.
17      •    Member of the Star Alliance.
18      •    Member of the International Air Transport Association.
19  **American Airlines**
20      •    Member of oneworld.
21      •    Member of the International Air Transport Association.
22  **Cathay Pacific Airways**
23      •    Member of the Association of Asia Pacific Airlines.
24      •    Member of oneworld.
25      •    Member of the International Air Transport Association.
26  **China Airlines**
27      •    Member of the Association of Asia Pacific Airlines.
28      •    Member of the International Air Transport Association.

**EVA Airlines**

- Member of the Association of Asia Pacific Airlines.
- Member of the International Air Transport Association.

**Japan Airlines International**

- Member of the Association of Asia Pacific Airlines.
- Member of oneworld.
- Member of the International Air Transport Association.

**Malaysia Airlines**

- Member of the Association of Asia Pacific Airlines.
- Member of the International Air Transport Association.

**Northwest Airlines**

- Member of the SkyTeam Alliance.
- Member of the International Air Transport Association.

**Qantas Airways**

- Member of the Association of Asia Pacific Airlines.
- Member of oneworld.
- Member of the International Air Transport Association.

**Singapore Airlines**

- Member of the Association of Asia Pacific Airlines.
- Member of the Star Alliance.
- Member of the International Air Transport Association.

**Thai Airways**

- Member of the Association of Asia Pacific Airlines.
- Member of the Star Alliance.
- Member of the International Air Transport Association.

**United Airlines**

- Member of the Star Alliance.
- Member of the International Air Transport Association.

1    ## CODE SHARING BUSINESS PARTNERSHIPS

2    57.    In addition to the four different alliances/trade groups, various

3    defendants are in effect business partners with each other through what is called

4    code sharing. Code sharing is a business term which was first originated in 1990

5    when Qantas Airways and American Airlines combined services between an array

6    of U.S. and Australian cities. Code sharing is a legal business arrangement.

7    However, it provides a mechanism to conduct illegal activity.

8    58.    A code share is part of a "cooperative services" agreement between

9    the two carriers. It refers to the practice where a flight operated by an airline is

10   jointly marketed as a flight for one or more other airlines. Most major airlines

11   today have code sharing partnerships with other airlines. "Code" refers to the

12   identifier used in flight schedule, generally the 2-character International Air

13   Transport Association airline designator code and flight number. For example,

14   YY123, flight 123 operated by the airline YY, could be sold by airline ZZ as

15   ZZ456. It is a business partnership that allows airlines to earn revenue by selling

16   tickets on a partner's flight.

17   59.    According to the U.S. Department of Transportation and Defendants,

18   the following are the code sharing partnerships of the defendants listed

19   alphabetically:

20              Air New Zealand / EVA Airways

21              Air New Zealand / Qantas (Tasman route)

22              Air New Zealand / Japan Airlines International

23              Air New Zealand / Northwest Airlines

24              Air New Zealand / Singapore Airlines

25              Air New Zealand / Thai Airways

26              Air New Zealand / United Airlines

27              All Nippon Airways / Asiana Airlines

28              All Nippon Airways / EVA Airways

1      All Nippon Airways / Malaysia Airlines

2      All Nippon Airways / Singapore Airlines

3      All Nippon Airways / United Airlines

4      China Airlines / American Airlines

5      Cathay Pacific Airways / American Airlines

6      Cathay Pacific Airways / Japan Airlines International

7      China Airlines / Thai Airways

8      EVA Airways / Air New Zealand

9      EVA Airways / American Airlines

10     EVA Airways / All Nippon Airways

11     EVA Airways / Qantas

12     EVA Air / American Airlines

13     Japan Airlines International / Air New Zealand

14     Japan Airlines International / American Airlines

15     Japan Airlines International  / Cathay Pacific

16     Japan Airlines International  / Korean Air

17     Japan Airlines International / Northwest Airlines

18     Japan Airlines International / Qantas Airlines

19     Japan Airlines International / Singapore Airlines

20     Japan Airlines International / Thai Airways

21     Malaysia Airlines / All Nippon Airways

22     Malaysia Airlines / Thai Airways

23     ///

24     ///

25     ///

26     ///

27     ///

28     ///

1    Northwest Airlines / Air New Zealand

2    Northwest Airlines / Asiana Airlines

3    Northwest Airlines / Japan Airlines International

4    Northwest Airlines / Korean Air

5    Qantas Airways / Air New Zealand

6    Qantas Airways / American Airlines

7    Qantas Airways / EVA Airways

8    Qantas Airways / Japan Airlines International

9    Singapore Airlines / Air New Zealand

10    Singapore Airlines / Asiana Airlines

11    Singapore Airlines / All Nippon Airways

12    Singapore Airlines / Malaysian Airlines

13    Singapore Airlines / United Airlines

14    Thai Airways / Air New Zealand

15    Thai Airways / China Airlines

16    Thai Airways / Japan Airlines International

17    Thai Airways / Malaysia Airlines

18    Thai Airways / United Airlines

19    United Airlines / Air New Zealand

20    United Airlines / All Nippon Airways

21    United Airlines / Asiana Airlines

22    United Airlines / Singapore Airlines

23    United Airlines / Thai Airways

24    ## CARTEL ACTIVITY MEETINGS

25    60.    Over the years, executives of Defendant airlines have attended

26    numerous meetings where cartel-like activity was accomplished.  Here are a few

27    examples of meetings where executives discussed and agreed on fuel surcharges:

28

61.  **The International Air Transport Association, Special Meeting, Geneva, May 28, 2004.** Fuel costs were the main topic of this meeting and there were agreements on how to add surcharges for fuel. The Montreal Gazette reported on June 1, 2004, that "member carriers of the International Air Transport Association might raise international fares by as much as five percent to help cover a surge in jet fuel costs. The proposed fare increase of between two percent and five percent was agreed at a May 28 meeting of the association, which represents more than 270 airlines worldwide, an IATA spokesperson said."

62.  **The International Air Transport Association Annual General Meeting and World Air Transport Summit, Singapore, June 6-8, 2004.** More than 600 airline executives attended this annual summit. Giovanni Bisignani, IATA CEO said in a welcoming statement, "While record high fuel prices challenge our profitability it is time to put our efforts toward rebuilding the industry." Immediately following this meeting on June 8, 2004 both Japan Airlines International and All Nippon Airways filed applications with the Japanese government to raise international passenger fares because of high fuel costs. In a news release announcing the Fuel Surcharge hike, Japan Airlines International said:

> **"The application follows a special meeting of the members of the International Air Transport Association in Geneva, May 28, (2004) when a resolution was discussed to raise fares in the wake of increased fuel prices. This resolution has now been adopted."**

Japan Airlines International and All Nippon Airways were in lockstep on June 8, 2004, both announcing on that day that a five percent fuel Surcharge would be go into effect, on the same day for both airlines, July 1, 2004.

63.  **2005 International Flight Services Association, Global Leadership Conference - Asia Pacific, August 30 - September 1, 2005 Tokyo Japan:** This meeting was labeled as "The Challenge of Change." Among the participants

were, Makoto Fukada, Managing Director and Senior Vice President International

Passenger, Japan Airlines; Sandra Pineau, Senior Director of Planning and Design,

Continental Airlines; Charles Grossrieder, a manager at Cathay Pacific Airways;

Nikom Raviyan, Vice President, Thai Airways; Sandeep Bahl, General Manager,

Northwest Airlines, Shigeru Miyata, Vice President, Japan Airlines; Kriengsakdi

Phatharacharukul, Director, Thai Airways;  and Hee Won Jo, Senior Manager,

Asiana Airlines.

64.    **2nd Annual Asia Pacific & Middle East Aviation Outlook Summit
2006, December 5-6, 2005 Kuala Lumpur, Malaysia:** The theme of this
meeting was "Towards Best Practice; Maximising Revenues and Minimising
Costs." On the first day of the meeting,  the guests included  Dato Seri Bashir
Ahmad, Malaysia Airport's CEO; Willy Boulter, Commercial Director for Virgin
Atlantic Airways; and Stanley Kuppusamy, President, International Relations,
Singapore Airlines.  Fuel surcharges were a topic of discussion.

65.    **Aviation Emergency Response 2006, AAPA sponsored,
September 19-21, 2006 Bangkok, Thailand:** This meeting was attended by
international airport officials and AAPA member executives.  Meetings were held
on increasing revenues in the transpacific area by way of Fuel Surcharges and
other financial means.

66.    **3rd Annual Asia Pacific & Middle East Aviation Outlook Summit,
November 9-10, 2006 Singapore:** Participating in this meeting were executives
from most of the Defendant airlines, including Geoff Dixon, CEO of Qantas and
Huang Cheng Eng, Executive VP for Singapore Airlines.  One of the issues
presented and discussed was *"Fighting Costs: Fuel prices and managing risk
exposure."*

///

///

///

67.    **AAPA Forum, November 28-29, 2006 Bandar Seri Begawan, Brunei Darussalam:** More than 120 aviation industry stakeholders attended this meeting, organized by AAPA.  At this meeting, Defendants and others discussed surcharges.

68.    **Asia Pacific Aviation Summit, July 24-25, 2007 Sydney, Australia:** This meeting was put on by the Asia Pacific aviation industry.  Some of the issues discussed included the impact of the investigation by the U.S. Department of Justice into fare price fixing.  Another topic was "working together efficiently" to diffuse the investigation of added surcharges.

## THE INVESTIGATION

69.    The U.S. Department of Justice ("DOJ") started investigating air passenger fuel surcharge conspiracies worldwide in 2006, particularly transatlantic routes and transpacific routes to and from the West Coast.  The DOJ announced on August 1, 2007 a $300 million settlement with British Airways and it cited passenger transatlantic routes.  In its news release, the DOJ said: "The Department also charged that between August 2004 and February 2006, British Airways engaged in a conspiracy to suppress and eliminate competition by fixing the Fuel Surcharge charged to passengers on long-haul international flights, including flights between the United States and the United Kingdom."

70.    The DOJ also focused on **transpacific flights** to and from the United States, noting that investigation is "ongoing" and includes other Defendants named herein.

71.    The DOJ also announced a settlement with Korean Air for fare price fixing on flights from the United States to Korea.  The DOJ stated that Korean Air has "agreed to cooperate with the Department's ongoing investigation."  Korean Air's unnamed co-conspirator in the passenger fare price fixing via Fuel Surcharges was widely reported to be Asiana Airlines, which sought amnesty.

1    72.    Under the Antitrust Criminal Penalty Enhancement and Reform Act
2    of 2004, a company can apply for leniency from the Department of Justice for its
3    participation in antitrust activities.  Under the so-called Corporate Leniency
4    Program, if a company comes forward with information about antitrust activities
5    and cooperates in the investigation, it is eligible for conditional amnesty from
6    prosecution.

7    73.    Both Korean Air and Asiana Airlines are among the top transpacific
8    carriers in the world.  It was not the first time Korean Air and Asiana Airlines have
9    been implicated in collusion and anticompetitive behavior.  The Korean Fair Trade
10   Commission fined Korean Air and Asiana in 2001 for conspiring to set passenger
11   air transportation services in Korea.

12   74.    In addition, several of the Defendants and unnamed co-conspirators
13   have been identified as targets and or subjects in international investigations by
14   the U.S. Department of Justice and the European Union into air cargo fuel
15   surcharge price fixing.  The targets, many of which are also named in civil suits,
16   include Defendant All Nippon Airways, Defendant American Airlines, Asiana
17   Airlines, Defendant Japan Airlines, Korean Airlines, Defendant Northwest
18   Airlines, Defendant Qantas Airways and Defendant United Airlines.  In both the
19   air passenger and cargo investigations, Defendants and other airlines are accused
20   of developing and participating in conspiracies to increase revenue by assessing
21   inflated Fuel Surcharges.

22                    **ADMISSIONS BY CO-CONSPIRATORS**

23   75.    On August 13, 2007, Qantas Chief Executive Officer Geoff Dixon
24   announced that **Qantas Airways** would set aside $40 million to cover a potential
25   fine in the United States as a result of Fuel Surcharges and price fixing in its
26   freight division.  In a news release, Dixon was quoted as saying:
27   ///
28   ///

1    "On 1 August 2007, the U.S. Department of Justice announced

2    that British Airways and Korean Air had agreed to plead guilty

3    and pay separate US$300 million criminal fines for their roles in

4    *conspiracies to fix prices of passenger and cargo flights.* British

5    Airways subsequently announced that US$200 million of its fine

6    related to cargo. Based on these developments, a decision has

7    been made to make a US$40 million (A$47 million) provision in

8    the 2006/07 Financial Accounts."

9    Dixon also was quoted as saying:

10    "We have investigated this issue thoroughly and are confident

11    that the unacceptable conduct was limited to a small number of

12    people."

13    76.    On October 6, 2007, the Japanese daily newspaper *Asahi Shimbun*

14    reported that **Japan Airlines International** would book a roughly $171 million

15    charge for potential fines from a global price fixing probe by U.S. and European

16    Union officials. The newspaper said:

17    "The company's move comes after the U.S. Justice Department

18    fined British Airways PLC and Korean Air Lines Co. $300

19    million each in August for fixing the prices of passenger and

20    cargo flights with other airlines. The companies allegedly

21    conspired to set fuel surcharges when oil prices rose."

22    <u>VIOLATIONS ALLEGED</u>

23    77.    During the Class Period Defendants engaged in a continuing

24    agreement, understanding, and conspiracy in restraint of trade to artificially raise,

25    fix, maintain, and/or stabilize the prices of Passenger Air Transport and Fuel

26    Surcharges in the United States and throughout the world in violation of Section 1

27    of the Sherman Act, 15 U.S.C. § 1.

28

Class Action Complaint                                                        24

78.    In formulating and effectuating the alleged contract, combination, or conspiracy, Defendants engaged in anti-competitive activities, the purpose and effect of which were to artificially raise, fix, maintain, and/or stabilize the prices of Passenger Air Transport and Fuel Surcharges.  These activities included the following:

a.    agreeing to charge prices of Passenger Air Transport and Fuel Surcharges at certain levels and otherwise to fix, raise, maintain, and/or stabilize the prices of Passenger Air Transport and Fuel Surcharges charged in the United States and throughout the world;

b.    charging Passenger Air Transport and Fuel Surcharges at the agreed-upon rates;

c.    signaling increases in the price of Passenger Air Transport and Fuel Surcharges by, *inter alia*, publicly announcing their increases;

d.    moving prices of their Passenger Air Transport and Fuel Surcharges in lockstep; and

e.    announcing new Passenger Air Transport and Fuel Surcharges prices nearly simultaneously or within days of each other.

79.    During the Class Period, the Defendants increased, as a ratio to external costs – and profits – the Passenger Air Transport and Fuel Surcharges they charged.  These increases in Passenger Air Transport and Fuel Surcharges cannot be explained by actual increases in fuel prices or supply/demand forces, but rather were the result of anticompetitive conduct.

80.    During the Class Period, Plaintiffs and members of the Class purchased Passenger Air Transportation directly from Defendants (or their agents, subsidiaries, and/or controlled affiliates).

81.    The illegal combination and conspiracy alleged herein has had the following effects, among others:

---

1          a.      Price competition in the pricing of Passenger Air

2 Transportation and Fuel Surcharges thereon has been restrained, suppressed,

3 and/or eliminated;

4          b.      Price competition in the contracting of Passenger Air

5 Transportation has been restrained, suppressed, and/or eliminated;

6          c.      Prices for Passenger Air Transportation and Fuel Surcharges

7 thereon charged by Defendants have been fixed, raised, maintained, and/or

8 stabilized at artificially high, non-competitive levels; and

9          d.      Members of the Class have been deprived of the benefit of free

10 and open competition.

11
## FRAUDULENT CONCEALMENT

12      82.    Throughout the relevant period, Defendants affirmatively and

13 fraudulently concealed their unlawful conduct from Plaintiffs and the Class.

14      83.    Plaintiffs and the members of the Class did not discover, and could

15 not discover through the exercise of reasonable diligence, that Defendants were

16 violating the antitrust laws as alleged herein until shortly before this litigation was

17 commenced. Nor could Plaintiffs and the members of the Class have discovered

18 the violations earlier than that time because Defendants conducted their

19 conspiracy in secret, concealed the nature of their unlawful conduct and acts in

20 furtherance thereof, and fraudulently concealed their activities through various

21 other means and methods designed to avoid detection. The conspiracy was by its

22 nature self-concealing.

23      84.    Plaintiffs and the members of the Class could not have discovered the

24 unlawful conduct at an earlier date through the exercise of reasonable diligence

25 because of Defendants' active and purposeful concealment of their unlawful

26 activities.

27

28

85.    Defendants engaged in a successful, illegal price-fixing conspiracy with respect to Surcharges and other fees, which they affirmatively concealed, in at least the following respects:

a.    By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;

b.    By engaging in secret meetings and telephone calls in order to further their illicit Passenger Air Transportation and Fuel Surcharges cartel; and/or

c.    By giving false and pretextual reasons for their pricing for Passenger Air Transportation and Fuel Surcharges thereon, and their increases, during the relevant period and by describing such pricing and increases falsely as being the result of external costs rather than collusion.

86.    As a result of Defendants' fraudulent concealment of their conspiracy, Plaintiffs and the Class assert the tolling of any applicable statute of limitations affecting the rights of action of Plaintiffs and the members of the Class.

## INJURY TO PLAINTIFFS AND THE CLASS

87.    During the Class Period, Plaintiffs and the members of the Class, because of Defendants' antitrust violations, paid Surcharges and other fees they would not have paid absent such violations.

88.    As a result, Plaintiffs and the members of the Class it seeks to represent have been injured and damaged in their business and property in an amount to be determined according to proof.

89.    As a direct and proximate result of the illegal conspiracy, Plaintiffs and the members of the Class have been injured and financially damaged in their respective businesses and property, in that they have paid Surcharges and other fees during the Class Period they would not have paid in the absence of the illegal conspiracy.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that:

A.      The Court determine that this action may be maintained as a class action under Rule 23(a) and (b) (3) of the Federal Rules of Civil Procedure;

B.      The Court adjudge and decree that the contract, combination and conspiracy alleged herein is a per se unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

C.      Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiffs and the Class for damages as allowed by law as determined to have been sustained by them;

D.      Each of the Defendants, successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding or concert of action, or adopting any practice, plan, program or design having a similar purpose or effect in restraining competition;

E.      The Court award Plaintiffs and the Class attorneys' fees and costs, and pre-judgment and post-judgment interest as permitted by law; and

F.      The Court award Plaintiffs and the Class such other and further relief as may be necessary and appropriate.

DATED: November 6, 2007

COTCHETT, PITRE & McCARTHY
ENGSTROM LIPSCOMB & LACK

By: _____

JOSEPH W. COTCHETT

*Attorneys for Plaintiffs and the Class*

1                               **JURY TRIAL DEMAND**

2        Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial

3 by jury of all of the claims asserted in this Complaint so triable.

4

  DATED: November 6, 2007

5

6                               **COTCHETT, PITRE & McCARTHY**

7                               **ENGSTROM LIPSCOMB & LACK**

8

9                By:

10                             **JOSEPH W. COTCHETT**

11                         *Attorneys for Plaintiffs and the Class*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Class Action Complaint**                                           29