Daniel C. Girard (CA Bar No. 114826); dcg@girardgibbs.com
Elizabeth C. Pritzker (CA Bar No. 146267); ecp@girardgibbs.com
Aaron M. Sheanin (CA Bar No. 214472); ams@girardgibbs.com
Steven G. Tidrick (State Bar No. 224760); sgt@girardgibbs.com
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, California 94104
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

Attorneys for Individual and Representative Plaintiff Mark Foy

FILED
DEC - 7 2007
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
E-filing

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| MARK FOY, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>AIR NEW ZEALAND, ALL NIPPON AIRWAYS, CATHAY PACIFIC AIRWAYS, CHINA AIRLINES, EVA AIRWAYS, JAPAN AIRLINES INTERNATIONAL, MALAYSIA AIRLINES, NORTHWEST AIRLINES, QANTAS AIRWAYS, SINGAPORE AIRLINES, THAI AIRWAYS and UNITED AIRLINES,<br><br>Defendants. | Case No. CV 07 6219 EDL<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Mark Foy ("Plaintiff") on behalf of himself and all others similarly situated, brings this action under the federal antitrust laws, Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 1 *et seq.* ("Sherman Act"), and Sections 4 and 16 of the Clayton Antitrust Act of 1914, 15 U.S.C. § 15 and 26 ("Clayton Act"), against Defendants Air New Zealand, All Nippon Airways, Cathay Pacific Airways, China Airlines, EVA Airways, Japan Airlines International, Malaysia Airlines, Qantas Airways, Singapore Airlines, Thai Airways and United Airlines (collectively "Defendants").

**JURISDICTION AND VENUE**

1. Plaintiff brings this suit against Defendants for antitrust violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 *et seq.* in connection with the sale of international air passenger transportation services. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. §§ 15, 22, and 26.

2. This Court has personal jurisdiction over each of the Defendants because each was engaged in an unlawful price-fixing scheme and conspiracy that was directed at and/or caused injury to persons and entities residing in, located in, or doing business within this District.

3. Venue is proper in this District under 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. §1391 (b) and (c) because Defendants transact substantial business in this District, and because thousands of Class members are located in this District. Additionally, a substantial part of the interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was carried on in part within this District. The acts complained of have had substantial anticompetitive effects in this District. A substantial part of the acts giving rise to Plaintiff's claims occurred within this District. Venue also is proper in this District, as the Honorable Charles R. Breyer of this Court presides over the multi-district litigation *In re International Air Transportation Litigation*, MDL No. 1793.

**THE PARTIES**

4. Plaintiff Mark Foy is a citizen of California, Alameda County. Between 2004 and August 2007 ("Class Period"), Plaintiff bought air passenger transportation services between San Francisco and Shanghai, China, and paid for fuel surcharges on such services, from one or more of the Defendants. Plaintiff was injured and suffered damages by reason of the antitrust violations alleged herein.

5. Defendant Air New Zealand is a New Zealand company with its principal place of business at Quay Tower, 29 Customs St. West, Auckland, 1020, New Zealand. Air New Zealand conducts substantial business within this District and transports passengers throughout the world, including into California and the United States.

6. Defendant All Nippon Airways ("ANA") is a Japanese company with its principal place of business at Shidome-City Center, 1-5-2, Higashi-Shimbashi, Minato-ku, Tokyo 105-7133, Japan. ANA conducts substantial business within this District and transports passengers throughout the world, including into California and the United States.

7. Defendant Cathay Pacific Airways ("Cathay Pacific") is a Hong Kong-based company with its principal place of business at 9 Connaught Road, Central Swirel Housepox Box 1 GPO, Hong Kong K3. Cathay Pacific conducts substantial business within this District and transports passengers throughout the world, including into California and the United States.

8. Defendant China Airlines is a Taiwanese company with its principal place of business at 131 Nanking E Rd., Section 3, Taipei, Taiwan. China Airlines conducts substantial business within this District and transports passengers throughout the world, including into California and the United States.

9. Defendant EVA Airways ("EVA") is a Taiwanese company with its principal place of business at 16F.-1, No. 207, Fusing Road, Taoyuan City, Taoyuan County, Taiwan. EVA conducts substantial business within this District and transports passengers throughout the world, including into California and the United States.

10. Defendant Japan Airlines International ("JAL") is a Japanese company with its principal place of business at 4-11, Higashi-Shinagawa 2-chrome, Shinagawa-Ku, Tokyo 140-8605, Japan. JAL conducts substantial business within this District and transports passengers throughout the world, including into California and the United States.

11. Defendant Malaysia Airlines is a Malaysian corporation with its principal place of business at MAS Complex A, Sultan Abdul Azia Shah Airport, 47200 Suband, Selangor Darui Ehsan, Malaysia. Malaysia Airlines conducts substantial business within this District and transports passengers throughout the world, including into California and the United States.

12. Defendant Northwest Airlines ("Northwest") is a Delaware corporation with its principal place of business at 2700 Lone Oak Parkway, Eagan, MN 55121. Northwest conducts substantial business within this District and transports passengers throughout the world, including into California and the United States.

13. Defendant Qantas Airways ("Qantas") is an Australian company with its principal place of business at 203 Coward Street, Qantas Centre, Mascot NSW 2020 C3. Qantas conducts substantial business within this District and transports passengers throughout the world, including into California and the United States.

14. Defendant Singapore Airlines is a Singapore company with its principal place of business at Airline House, 25 Airline Road, 819829 Singapore. Singapore Airlines conducts substantial business within this District and transports passengers throughout the world, including into California and the United States.

15. Defendant Thai Airways is a Thailand company with its principal place of business at 89 Vibhavadi-Rangsit Road, Bangkok, Thailand 10900. Thai Airways conducts substantial business within this District and transports passengers throughout the world, including into California and the United States.

16. Defendant United Airlines ("United") is a Delaware corporation with its principal place of business at 77 W. Wacker, Chicago, IL 60601. United is one of the largest passenger airlines in the world with more than 3,600 flights a day to more than two hundred destinations. United conducts substantial business within this District and transports passengers throughout the world, including into California and the United States. United operates a hub and maintenance operation center at San Francisco International Airport. United is the largest employer in San Mateo County, California, which is located within this District.

## CO-CONSPIRATORS AND AGENCY

17. Certain other persons, firms, corporations and entities have participated as co-conspirators with Defendants in the violations and conspiracies alleged in this Complaint. In order to engage in the offenses charged and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.

18. At all relevant times, each Defendant was and is the agent of each of the other Defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency. Each Defendant ratified and/or authorized the wrongful acts of each of the Defendants. Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts, plans, schemes, and transactions that are the subject of this Complaint. Defendants, and each of them, have participated as members of the conspiracy or acted with or in furtherance of it, or aided or assisted in carrying out its purposes alleged in this Complaint, and have performed acts and made statements in furtherance of the violations and conspiracy.

## FACTUAL ALLEGATIONS

### A. The Market For Passenger Air Transportation Services

19. The market for passenger air transportation services in the United States and worldwide is highly concentrated. There are substantial barriers to entry in this market.

20. Passenger air transportation services are fungible commodity products. One carrier's air passenger transportation services are just as suitable to a consumer as another carrier's services.

21. Airline ticket fares are the primary factor influencing customer choice between competing airlines. Competition for passengers in the airline industry is so fierce that even when an airline increases its fares, other airlines will not follow.

22. The competition for passengers has sustained low airline ticket fares. As a result, airlines have turned to fuel surcharges and other types of fees to generate revenue.

23. Defendants are among the largest providers of air passenger transportation services in the United States and worldwide. Defendants provide long haul passenger transpacific flights to and from the United States, including to and from Los Angeles International Airport and San Francisco International Airport. Defendants impose fuel surcharges on such flights.

24. Each Defendant has a substantial share of the market for air passenger travel on the routes on which it flies. In general, Defendants are each other's primary competitors in the market for long haul transpacific passenger transportation services.

**B. Defendants Engaged In A Conspiracy To Fix Prices For Passenger Air Transportation Services**

25. Surcharges are a feature of the market for air transportation services. Surcharges are fees imposed by air carriers on their customers in addition to their basic fares. Surcharges, including fuel surcharges, are intended to compensate air carriers for increased external costs and should maintain a relatively constant relationship to these external costs. In a competitive market, fuel surcharges would track the costs that air carriers pay for jet fuel.

26. Beginning in 2004, Defendants conspired, contracted or combined for the purpose of and with the effect of instituting, raising, fixing, maintaining or stabilizing the price of long haul passenger transpacific flights to and from the United States and of fuel surcharges imposed on such flights.

27. Throughout the Class Period, Defendants maintained a combined dominant market share, controlling the vast majority of long haul transpacific passenger flights. Defendants' market dominance precluded customers from shopping for long haul passenger transpacific flights from other carriers. As a result, Defendants were able to reap substantial profits from the imposition of fuel surcharges on these flights.

28. Defendants often treated fuel surcharges imposed on long haul passenger transpacific flights as if they were mandated taxes or surcharges imposed by government authorities or airport facilities. Accordingly, Defendants often did not advertise fuel surcharges as a part of their fares. Instead, fuel surcharges were often added to the advertised fares when customers purchased their flights.

29. During the Class Period, Defendants' fuel surcharges bore no reasonable relationship to the prices Defendants paid for jet fuel. Instead, Defendants' fuel surcharges increased beyond the prices Defendants paid for jet fuel throughout the Class Period. As a result, while jet fuel costs increased at times during the Class Period, Defendants reaped substantial profits from their fuel surcharges, well in excess of those increased costs.

30. During the Class Period, Defendants entered into agreements amongst themselves and with other co-conspirators to raise fuel surcharges at the same time and in the same amount. In doing so, Defendants ensured that their customers would have no choice but to pay the inflated surcharges, as no other lower-cost flights were available.

31. The collusive behavior of Defendants ANA and JAL is illustrative of the anticompetitive conduct of the other Defendants. During the Class Period, ANA and JAL agreed to change their fares within days of each other and imposed virtually identical fuel surcharges on long haul passenger transpacific flights as follows:

- On June 8, 2004, ANA and JAL filed notices with the Japanese government to raise international fares by 5 percent in the wake of increased fuel prices, effective July 1, 2004. Both airlines increased their fares on business class travel to and from North America, but not on economy class travel.
- On January 5, 2005, ANA announced it would impose fuel surcharges on international flights, effective February 1, 2005. The fuel surcharges were 2,500 yen for transpacific flights. Fifteen days later, JAL announced that it would impose identical fuel surcharges on transpacific flights.
- On June 3, 2005, JAL filed a notice with the Japanese government to increase its international fuel surcharge, effective July 1, 2005. Four days later, ANA similarly filed a notice with the Japanese government to increase its international fuel surcharge, effective July 7, 2005.
- On January 16, 2006, JAL filed a notice with the Japanese government to increase its international fuel surcharge effective March 1, 2006. One week later, ANA followed suit.
- On August 17, 2006, JAL filed a notice with the Japanese government to increase its international fuel surcharge from 8,000 yen to 13,600 yen, effective October 1, 2006. On August 31, 2006, ANA similarly filed a notice of its intent to raise its international fuel surcharge by the same amount, effective October 15, 2006.
- On November 16, 2006, both ANA and JAL filed notices with the Japanese government to reduce their international fuel surcharges from 13,600 yen to 13,000 yen, effective January 1, 2007.
- On March 19, 2007, JAL filed a notice with the Japanese government to reduce its international fuel surcharge to 11,000 yen, effective May 1, 2007. The next day, ANA did the same.

- On May 15, 2007, JAL filed a notice with the Japanese government to raise its international fuel surcharge from 11,000 yen to 12,000 yen, effective July 1, 2007. Ten days later, ANA similarly filed a notice with the Japanese government to raise its international fuel surcharge from 11,000 yen to 12,000 yen, effective July 10, 2007.
- On August 15, 2007, JAL filed a notice with the Japanese government to raise its international fuel surcharge from 12,000 yen to 13,000 yen, effective October 1, 2007. Five days later, ANA filed a similar notice.

32. During the Class Period, the other Defendants imposed similar, if not identical, fuel surcharges on international passenger flights as those charged by JAL and ANA.

**C. Defendants Facilitated The Conspiracy By Participating In Cartel-Like Trade Organizations**

33. Throughout the Class Period, executives from Defendants and other airlines participated in conferences and meetings of trade associations including the International Air Transport Association ("IATA"), the Association of Asian Pacific Airlines ("AAPA"), oneworld, Star Alliance and SkyTeam Alliance. At one or more of these meetings, Defendants conspired to inflate fuel surcharges on international passenger air transportation services.

34. The AAPA was critical to the facilitation of the conspiracy alleged in this Complaint. Founded in 1965, the AAPA is the most significant trade organization representing Asia/Pacific air carriers. The AAPA is based in Kuala Lampur, Malaysia. According to the AAPA, its 17 member airlines "carry 285 million passengers and 10 million tonnes of cargo representing approximately one-fifth of global passenger traffic and one-third of global air cargo traffic respectively." Ten of the Defendants named in this Complaint are members of AAPA.

35. According to the AAPA, the organization's primary purpose "is to serve as a common forum for the articulation of members' views on matters and issues of common interest, to foster close cooperation and to bring about an atmosphere conducive to the stimulation of the travel and tourism industry. It also serves to enhance the role of major airlines as instruments for international cooperation and growth in the economic, social and cultural fields." The AAPA further states that it, "speaks with a common voice on behalf of the Asia Pacific carriers and puts forward Asian perspectives when dealing

with governments, aircraft manufacturers, airport authorities and other organizations on industry issues. The activities of the Association cover every aspect of civil aviation where the airlines feel they can work together for mutual benefit. In addition, AAPA retains access to specialized legal and aviation consultants in Brussels and Washington, a reflection of the significant impact which the profusion of U.S. and E.U. regulatory developments have on all international carriers including Asia Pacific airlines."

36. The IATA also was critical to the facilitation of the conspiracy. The IATA was founded in 1945 in Havana, Cuba, and is presently based in Geneva, Switzerland. The IATA states that it "represents over 240 airlines comprising 94% of scheduled international air traffic. The organisation also represents, leads and serves the airline industry in general." Each Defendant is a member of the IATA. The IATA also describes itself as "the prime vehicle for inter-airline cooperation." The fuel surcharge conspiracy alleged in this Complaint is traceable to, among other things, an agreement reached at an IATA meeting in Geneva on May 28, 2004.

37. Members of the AAPA include: Air New Zealand, ANA, Cathay Pacific, China Airlines, EVA, JAL, Malaysia Airlines, Qantas, Singapore Airlines, and Thai Airways.

38. Members of the Star Alliance include: Air New Zealand, ANA, Singapore Airlines, Thai Airways, and United.

39. Members of the IATA include: Air New Zealand, ANA, American Airlines, Cathay Pacific, China Airlines, EVA, JAL, Malaysia Airlines, Northwest, Qantas, Singapore Airlines, Thai Airways, and United.

40. Members of oneworld include: American Airlines, Cathay Pacific, JAL, and Qantas.

**D. Defendants Facilitated Their Conspiracy Through "Code Sharing" Business Partnerships**

41. Various Defendants engage in so-called "code sharing" business partnerships with other Defendants and their co-conspirators. Code sharing refers to a practice where a flight operated by one airline is jointly marketed as a flight for other airlines. The term "code sharing" first originated in 1990 when Qantas Airways and American Airlines agreed to provided combined air transportation services between a variety of cities in the United States and Australia. Most major airlines have code sharing

partnerships with others in the industry. Although code sharing is a lawful business arrangement, it provides a mechanism for airlines to engage in anticompetitive conduct.

42. According to the U.S. Department of Transportation and Defendants, Defendants participate in the following code sharing partnerships:

- Air New Zealand maintains code sharing partnerships with EVA, Qantas, JAL, Northwest, Singapore Airlines, Thai Airways, and United.
- ANA maintains code sharing partnerships with Asiana Airlines ("Asiana"), EVA, Malaysia Airlines, Singapore Airlines, and United.
- China Airlines maintains code sharing partnerships with American Airlines ("American") and Thai Airways.
- Cathay Pacific maintains code sharing partnerships with American and JAL.
- EVA maintains code sharing partnerships with Air New Zealand, American, ANA, and Qantas.
- JAL maintains code sharing partnerships with Air New Zealand, American, Cathay Pacific, Korean Air ("Korean"), Northwest, Qantas, Singapore Airlines, and Thai Airways.
- Malaysia Airlines maintains code sharing partnerships with ANA and Thai Airways.
- Northwest maintains code sharing partnerships with Air New Zealand, Asiana, JAL, and Korean.
- Qantas maintains code sharing partnerships with Air New Zealand, American, EVA, and JAL.
- Singapore Airlines maintains code sharing partnerships with Air New Zealand, Asiana, ANA, Malaysian Airlines, and United.
- Thai Airways maintains code sharing partnerships with Air New Zealand, China Airlines, JAL, Malaysia Airlines, and United.
- United maintains code sharing partnerships with Air New Zealand, ANA, Asiana, Singapore Airlines, and Thai Airways.

**E. Defendants Conspired To Fix Prices For Passenger Air Transportation Services At Trade Meetings**

43. During the Class Period, executives of Defendant airlines attended and participated in several meetings in which they discussed and agreed to fix prices on fuel surcharges, as identified below.

44. At a Special Meeting of the IATA, held in Geneva, Switzerland on May 28, 2004, airline executives discussed and agreed upon ways to add fuel surcharges to the price of air transportation services. On June 1, 2004, the *Montreal Gazette* reported that "member carriers of the International Air Transport Association might raise international fares by as much as five percent to help cover a surge in jet fuel costs. The proposed fare increase of between two percent and five percent was agreed at a May 28 meeting of the association, which represents more than 270 airlines worldwide, an IATA spokesperson said."

45. More than 600 airline executives attending the Annual General Meeting of the IATA and World Air Transport Summit, held in Singapore on June 6-8, 2004. In a welcoming statement, Giovanni Bisignani, the Chief Executive Officer of the IATA, said: "While record high fuel prices challenge our profitability it is time to put our efforts toward rebuilding the industry."

46. At the close of this meeting on June 8, 2004, JAL and ANA filed applications with the Japanese government to increase prices on international air passenger services because of high fuel costs. JAL and ANA both announced that a five percent fuel surcharge would take effect on July 1, 2004. A news release by JAL announcing the fuel surcharge increase said: "The application follows a special meeting of the members of the International Air Transport Association in Geneva, May 28, (2004) when a resolution was discussed to raise fares in the wake of increased fuel prices. This resolution has now been adopted."

47. Numerous airline executives attended the 2005 International Flight Services Association, Global Leadership Conference - Asia Pacific, held in Tokyo, Japan from August 30 to September 1, 2005. The theme of this meeting was, "The Challenge of Change." Among the participants were, Makoto Fukada, Managing Director and Senior Vice President International Passenger, JAL; Sandra Pineau, Senior Director of Planning and Design, Continental Airlines; Charles Grossrieder, a manager at

Cathay Pacific; Nikom Raviyan, Vice President, Thai Airways; Sandeep Bahl, General Manager, Northwest; Shigeru Miyata, Vice President, JAL; Kriengsakdi Phatharacharukul, Director, Thai Airways; and Hee Won Jo, Senior Manager, Asiana.

48. Airline executives discussed fuel surcharges again at the 2nd Annual Asia Pacific & Middle East Aviation Outlook Summit 2006, held in Kuala Lampur, Malaysia on December 5-6, 2005. This meeting was entitled, "Towards Best Practice; Maximising Revenues and Minimising Costs." Guests included Willy Boulter, Commercial Director for Virgin Atlantic Airways; Dato Seri Bashir Ahmad, the Chief Executive Officer of Malaysia Airport; and Stanley Kuppusamy, President, International Relations, Singapore Airlines.

49. International airport officials and member executives of the AAPA attended Aviation Emergency Response 2006, held in Bangkok, Thailand on September 19-21, 2006. Participants discussed ways to boost revenues on transpacific flights through increased fuel surcharges and other means.

50. Executives from most of the Defendant airlines, including Geoff Dixon, Chief Executive Officer of Qantas, and Huang Cheng Eng, Executive Vice President for Singapore Airlines, participated in the 3rd Annual Asia Pacific & Middle East Aviation Outlook Summit, held in Singapore on November 9-10, 2006. One of the issues presented and discussed was "Fighting Costs: Fuel prices and managing risk exposure."

51. Airline executives attended the AAPA Forum, held in Bandar Seri Begawan, Brunei Darussalam on November 28-29, 2006. Defendants and other discussed fuel surcharges at this meeting.

52. Airline officials also met at the Asia Pacific Aviation Summit, held in Sydney, Australia on July 24-25, 2007. The impact of the U.S. Department of Justice's investigation into price fixing within the industry was among the topics discussed at the meeting. Participants also discussed ways of "working together efficiently" to diffuse the investigation of added surcharges.

**F. The U.S. Department Of Justice Investigates Fuel Surcharge Price-Fixing**

53. In 2006, the U.S. Department of Justice ("DOJ") began an investigation into air passenger fuel surcharge conspiracies worldwide. The investigation focused on transatlantic routes and transpacific routes to and from the West Coast.

54. On August 1, 2007, the DOJ announced that British Airways had agreed to plead guilty to conspiring to fix prices over transatlantic passenger routes. British Airways agreed to pay a $300 million fine. According to a DOJ news release: "The Department also charged that between August 2004 and February 2006, British Airways engaged in a conspiracy to suppress and eliminate competition by fixing the fuel surcharge charged to passengers on long-haul international flights, including flights between the United States and the United Kingdom." The DOJ noted that its investigation into worldwide is "ongoing" and includes other Defendants.

55. On August 1, 2007, the DOJ also announced that Korean had agreed to plead guilty to conspiring to fix prices on transpacific passenger routes. Korean agreed to pay a $300 million fine. According to a DOJ news release, Korean has "agreed to cooperate with the Department's ongoing investigation." Korean's unnamed co-conspirator in the price-fixing conspiracy was widely reported to be Asiana, which sought amnesty.

56. Under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004, a company can seek leniency from the DOJ for its participation in activities that violation the federal antitrust laws. Under the Corporate Leniency Program, a company that cooperates in an investigation by the DOJ is eligible for conditional amnesty from prosecution.

57. Korean and Asiana, which are among the world's largest transpacific carriers, have been implicated previously in anticompetitive behavior. Notably, the Korean Fair Trade Commission fined Korean and Asiana in 2001 for conspiring to fix prices for passenger air transportation services in Korea.

58. On November 27, 2007, the DOJ announced that Qantas had agreed to plead guilty to conspiring to fix prices over transpacific cargo shipments. Qantas agreed to pay a $61 million fine. According to a DOJ news release: "Qantas engaged in a conspiracy to eliminate competition by fixing the rates for shipments of cargo to and from the United States and elsewhere from at least January 2000 to February 2006."

59. The DOJ and authorities in the European Union have identified several of the Defendants and unnamed co-conspirators as targets of investigations into air passenger and air cargo fuel surcharge price fixing. These targets include ANA, American, Asiana, JAL, Korean, Northwest, Qantas, and

United. The air passenger and air cargo investigations accuse Defendants and other airlines of conspiring to increase revenues by charging inflated fuel surcharges to their customers.

60. Several of these targets are preparing for possible fines in connection with government investigations. For example, on October 6, 2007, the Japanese daily newspaper *Asahi Shimbun* reported that JAL would book a charge of roughly $171 million for potential fines in connection with price fixing investigations by officials in the United States and the European Union. The article reported: "The company's move comes after the U.S. Justice Department fined British Airways PLC and Korean Air Lines Co. $300 million each in August for fixing the prices of passenger and cargo flights with other airlines. The companies allegedly conspired to set fuel surcharges when oil prices rose."

## INTERSTATE TRADE AND COMMERCE

61. During the Class Period, Defendants were major companies in the air passenger service industry.

62. The global market for air passenger transportation services is in the billions of dollars.

63. Throughout the Class Period, there has been a continuous and uninterrupted flow of transactions in air passenger transportation services in interstate and international commerce throughout the United States and the world, including in this District.

64. The unlawful activities of Defendants and the unnamed co-conspirators have been within the flow of, and have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce.

## CLASS ACTION ALLEGATIONS

65. Plaintiff brings this action on behalf of himself and all others similarly situated, as members of a proposed plaintiff class (the "Class"), initially defined as follows:

> All persons who purchased international air passenger transportation services for long haul transpacific flights from any of the Defendants and their co-conspirators or any predecessors, subsidiaries, or affiliates of each, at any time from 2004 to August 2007, and who paid a surcharge on their tickets. Excluded from the Class are Defendants, any subsidiaries or affiliates of Defendants, other providers of international air passenger transportation services, and any of Defendants, co-conspirators, whether or not named as a Defendant in this Complaint.

66. This action has been brought and may properly be maintained, pursuant to Federal Rules of Civil Procedure 23(a)(1)-(4), 23(b)(1), (2) or (3), and case law thereunder.

67. **Numerosity of the Class -- Fed. R. Civ. P. 23(a)(1):** Class members are so numerous that their individual joinder herein is impracticable. The Class includes thousands of consumers. It is estimated that more than 15 million passengers traveled to the Pacific from California in 2006. The precise number of Class members and their addresses are unknown to Plaintiff but can be readily determined from inspection of records maintained by Defendants. Class members may be notified of the pendency of this action by mail, supplemented (if deemed necessary or appropriate by the Court) by published notice.

68. **Existence and Predominance of Common Questions of Fact and Law -- Fed. R. Civ. P. 23(a)(2); 23(b)(3):** Common questions of law and fact exist as to all Class members. These questions predominate over the questions affecting only individual Class members. These common legal and factual questions include:

(a) Whether Defendants conspired, contracted or combined for the purpose of and with the effect of instituting, raising, fixing, maintaining, or stabilizing the price, including surcharges, of air passenger transportation services on long haul transpacific flights that were purchased by the Class.

(b) The duration and extent of any such combination or conspiracy alleged;

(c) The nature and the characteristics of the acts performed by Defendants in furthering the conspiracy;

(d) Whether Defendants and the unnamed co-conspirators took actions to conceal the unlawful conspiracy, contract or combination alleged herein;

(e) Whether the conduct of Defendants and the unnamed co-conspirators violated Section 1 of the Sherman Act; and

(f) Whether the conduct of Defendants and the unnamed co-conspirators caused injury to the business and property of Plaintiff and the Class and, if so, the proper measure of damages.

69. **Typicality -- Fed. R. Civ. P. 23(a)(3):** Plaintiff's claims are typical of the claims of the Class members because Plaintiff and all Class members bought international air passenger transportation services for long haul transpacific flights and paid surcharges at artificially maintained, non-competitive prices established by the actions of Defendants and their unnamed co- conspirators in connection with the restraint of trade alleged herein. Plaintiff and all Class members have all sustained damage in that they paid inflated prices for the transportation services at issue due to Defendants' conduct in violation of federal law as complained of herein.

70. **Adequacy -- Fed. R. Civ. P. 23(a)(4):** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent. Plaintiff has retained counsel competent and experienced in class action litigation and intends to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

71. **Superiority -- Fed. R. Civ. P. 23(b)(3):** The class action is superior to other available means for the fair and efficient adjudication of Plaintiff's and Class members' claims. The damages suffered by each individual Class member are small given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. Further, it would be virtually impossible for the Class members individually to redress effectively the wrongs done to them. Even if the Class members themselves could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

72. In the alternative, the Class may be certified under the provisions of Fed. R. Civ. P. 23(b)(1) and/or 23(b)(2) because:

(a) the prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for Defendants;

(b) the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

(c) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

**ANTITRUST**

**INJURY TO PLAINTIFF AND THE CLASS**

73. The conspiracy alleged herein had and is having the following effects, among others:

(a) Prices, including surcharges, charged to Plaintiff and the Class for international air passenger transportation services on long haul transpacific flights have been raised, fixed, maintained and stabilized at higher, artificially derived, non-competitive levels throughout the United States;

(b) Plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for international air passenger transportation services; and

(c) Competition in establishing the prices paid in the United States and worldwide for international air passenger transportation services has been unlawfully restrained, suppressed and/or eliminated.

74. By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiff and the members of the Class have sustained injury to their business or property. The injury sustained by the Plaintiff and the Class is the payment of supercompetitive prices and surcharges for international air passenger transportation services on long haul transpacific flights as a result of Defendants illegal contact, combination or conspiracy to restrain trade as alleged. This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

**DAMAGES**

75. During the Class Period, Plaintiff and Class members bought international air passenger transportation services for long haul transpacific flights from Defendants, or their subsidiaries, agents, and/or co-conspirators, and, by reason of the antitrust violations herein alleged, paid more for such

services including surcharges than they would have paid in the absence of such antitrust violations. As a direct and proximate result of Defendants' unlawful contract, combination or conspiracy, Plaintiff and Class members have sustained damages to their businesses and property in an amount to be determined at trial.

**COUNT I**

**(Violation of Section 1 of the Sherman Act)**

76. Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

77. Defendants entered into and engaged in a contract, combination or conspiracy in unreasonable restrain of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

78. The contract, combination or conspiracy has resulted in an agreement, understanding or concerted action between and among Defendants in furtherance of which Defendants instituted, fixed, maintained, raised or stabilized prices, including surcharges, for international air passenger transportation services on long haul transpacific flights. Such contract, combination, or conspiracy constitutes a per se violation of the federal antitrust laws and an unreasonable and unlawful restraint of trade.

79. Defendants' contract, combination, agreement, understanding or concerted action occurred in or affected interstate and international commerce. Defendants' unlawful conduct was through mutual understanding or agreements by, between and among Defendants.

80. During the Class Period, the Defendants increased, as a ratio to external costs – and profits – the passenger air transport and fuel surcharges they charged. These relative increases in passenger air transport and fuel surcharges were the result of anti-competitive conduct and cannot be explained by actual increases in fuel prices or supply and demand forces.

81. During the Class Period, Plaintiff and Class members bought international air passenger transportation services for long haul transpacific flights directly from Defendants (or their agents, subsidiaries and/or controlled affiliates), and paid surcharges on their tickets.

82. The illegal contract, combination or conspiracy has had the following effects:

(a) Prices, including surcharges, charged to Plaintiff and the Class for international air passenger transportation services for long haul transpacific flights were raised, fixed, maintained or stabilized at higher, artificially derived, non-competitive levels;

(b) Plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for international air passenger transportation services; and

(c) Competition in establishing the prices paid for international air passenger transportation services has been unlawfully restrained, suppressed and eliminated.

83. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the Class have suffered injury in that they have paid supracompetitive prices for international air passenger transportation services.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following:

(a) That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiff be appointed as class representative and Plaintiff's counsel be appointed as counsel for the Class;

(b) That the unlawful contract, combination or conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section I of the Sherman Act;

(c) That Plaintiff and the Class recover compensatory damages, as provided by law, determined to have been sustained as to each of them, and that judgment be entered against Defendants on behalf of Plaintiff and of the Class;

(d) That Plaintiff and the Class recover treble damages, as provided by law;

(e) That Plaintiff and the Class recover their costs of the suit, including attorneys' fees, as provided by law; and

(f) That the Court award such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial as to all issues triable by a jury.

DATED: December 7, 2007

**GIRARD GIBBS LLP**

By: /s/ Aaron M. Sheanin
Aaron M. Sheanin

Daniel C. Girard
Elizabeth C. Pritzker
Steven G. Tidrick
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

Counsel for Individual and Representative Plaintiff Mark Foy

**CERTIFICATION OF INTERESTED ENTITIES OR PERSONS**

Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the named parties, there is no such interest to report.

DATED: December 7, 2007

**GIRARD GIBBS LLP**

By: /s/ Aaron M. Sheanin
Aaron M. Sheanin

Daniel C. Girard
Elizabeth C. Pritzker
Steven G. Tidrick
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

Counsel for Individual and Representative Plaintiff Mark Foy