Exhibit A

1   JACK W. LEE, Esq. [SBN 71626]
    BRAD YAMAUCHI, Esq. [SBN 73245]
2   SEAN TAMURA-SATO, Esq. [SBN 254092]
    MINAMI TAMAKI LLP
3   360 Post Street, 8th Floor
    San Francisco, California  94108-4903
4   Tel:   (415) 788-9000
5   Fax:   (415) 398-3887
    jlee@MinamiTamaki.com
6
7   Attorney for Plaintiff Dickson Leung
    and the Proposed Class

8           UNITED STATES DISTRICT COURT

9           NORTHERN DISTRICT OF CALIFORNIA

10                                          CV  08      1616

11  DICKSON LEUNG, on behalf of himself and all    )    CASE NO: _____
    others similarly situated,                     )
12                                                  )
                    Plaintiff,                      )    CLASS ACTION COMPLAINT
13                                                  )
            vs.                                     )    JURY TRIAL DEMANDED   VRW
14                                                  )
    EVA AIRWAYS CORPORATION,                        )
15  AIR NEW ZEALAND LIMITED,                        )
    ALL NIPPON AIRWAYS CO., LTD.,                   )
16  CATHAY PACIFIC AIRWAYS LTD.,                    )
    CHINA AIRLINES, LTD.,                           )
17  JAPAN AIRLINES INTERNATIONAL                    )
    COMPANY, LTD.,                                  )
18  MALAYSIA AIRLINE SYSTEM BERHAD,                 )
    QANTAS AIRWAYS LIMITED,                         )
19  SINGAPORE AIRLINES LIMITED,                     )
    THAI AIRWAYS INTERNATIONAL, LTD.,               )
20  UNITED AIRLINES,                                )
                                                    )
21                  Defendants.                     )
                                                    )
22  _____   )

23

24

25

26

27

28

MINAMI TAMAKI LLP
360 Post Street, 8th Floor
San Francisco, CA 94108
Tel (415) 788-9000
Fax (415) 398-3887


BY FAX

Dickson Leung ("Plaintiff"), on behalf of himself and all others similarly situated, hereby brings this action for treble damages and injunctive relief under the federal antitrust laws, Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 1 ("Sherman Act") and Sections 4 and 16 of the Clayton Antitrust Act of 1914, 15 U.S.C. §§ 15 and 26 ("Clayton Act") against Defendants. Plaintiff complains and alleges upon information and belief except as to those paragraphs applicable to the named Plaintiff, which are based on personal knowledge, as follows:

## I.    NATURE OF THE CASE

1.    This action arises from an unlawful price-fixing conspiracy among certain airlines to fix, raise, maintain, and/or stabilize prices for trans-Pacific air transportation services to and from the United States ("Passenger Air Transportation"), and for fixed fuel surcharges on this transportation ("Fuel Surcharges"). Fuel Surcharges are fees charged to passengers by airlines purportedly to compensate the airlines for increased fuel costs.

2.    Plaintiff, on behalf of all persons and entities that purchased Passenger Air Transportation, to and from the United States, from any of the defendants and their co-conspirators or any predecessor, subsidiary, or affiliate of each, at any time during the period between January 1, 2004 through at least November, 2007 ("the Class Period"), brings this action to recover treble damages and injunctive relief for violations of the United States antitrust laws.

3.    At all relevant times herein, Defendants were airlines that conducted and sold Passenger Air Transportation, and charged fixed Fuel Surcharges on that transport, to airline passengers in the United States and throughout the world, including but not limited to flights to and from Los Angeles, CA, and San Francisco, CA. Defendants and their co-conspirators participated in an unlawful combination and conspiracy to fix, raise, stabilize, and/or maintain Fuel Surcharges, the purpose and effect of which was to artificially inflate said prices and cause damage to Plaintiff and the Class members.

4.    Los Angeles International Airport ("LAX") and San Francisco International Airport ("SFO") are considered the international U.S. gateways to Asia and the Pacific Rim. The U.S. Department of Transportation reported that in 2005, LAX and SFO were the top U.S. international

- 2 -

MINAMI TAMAKI, LLP
360 Post Street, 8th Floor
San Francisco, CA 94108
Tel. (415) 788-9000
Fax (415) 398-3887

gateways in terms of scheduled passenger service. In that year, LAX and SFO had 24.6 million gateway passengers, with the foreign share of the passenger market at an average of 67%.

## II.    JURISDICTION AND VENUE

5.    This Complaint is brought under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26 against Defendants for the injuries sustained by Plaintiff and the members of the Class by reason of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. §1.

6.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

7.    This Court has personal jurisdiction over each of the Defendants because each was engaged in an unlawful price-fixing scheme and conspiracy that was directed at and/or caused injury to persons and entities residing in, located in, or doing business in the Northern District of California and throughout the United States.

8.    Venue is proper in this judicial district pursuant to 15 U.S.C. §15, 22, and 26, and 28 U.S.C. §1391(b), (c), and (d) because during the Class Period Defendants resided, transacted business, were found, or had agents in this district, and because a substantial part of the events giving rise to Plaintiff's claims occurred, and a substantial portion of the affected trade and commerce described below has been carried out, in this district.

## III.    PARTIES

### A.    Plaintiff

9.    Plaintiff DICKSON LEUNG is a U.S. citizen residing in the State of California, San Francisco County. Plaintiff Leung purchased Passenger Air Transportation and paid Fuel Surcharges thereon from Defendants All Nippon Airways, EVA Airways, Japan Airlines International, and Singapore Airlines during the Class period and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

### B.    Defendants

10.    Defendant EVA Airways Corporation ("EVA") is a Taiwanese company with its principal place of business at 16F.-I, No. 207, Fusing Road, Taoyuan City, Taoyuan County,

MINAMI TAMAKI, LLP
360 Post Street, 8th Floor
San Francisco, CA 94108
Tel. (415) 788-9000
Fax (415) 398-3887

1
2

Taiwan. EVA Airways conducts substantial business within this district and transports passengers throughout the world, including into California and the United States.

3
4
5
6

11.    Defendant Air New Zealand Limited ("Air New Zealand") is a New Zealand company with its principal place of business at Quay Tower, 29 Customs St. West, Auckland, 1020, New Zealand. Air New Zealand conducts substantial business within this district and transports passengers throughout the world, including into California and the United States.

7
8
9
10

12.    Defendant All Nippon Airways Co., Ltd. ("ANA") is a Japanese company with its principal place of business at Shidome-City Center, 1-5-2, Higashi-Shimbashi, Minato-ku, Tokyo 105-71 33, Japan. ANA conducts substantial business within this district and transports passengers throughout the world, including into California and the United States.

11
12
13
14

13.    Defendant Cathay Pacific Airways Ltd. ("Cathay Pacific") is a Hong Kong-based company with its principal place of business at 9 Connaught Road, Central Swirel Housepox Box 1 GPO, Hong Kong K3. Cathay Pacific Airways conducts substantial business within this district and transports passengers throughout the world, including into California and the United States.

15
16
17
18

14.    Defendant China Airlines, Ltd. ("China Airlines") is a Taiwanese company with its principal place of business at 13 1 Nanking E Rd., Section 3, Taipei, Taiwan. China Airlines conducts substantial business within this district and transports passengers throughout the world, including into California and the United States.

19
20
21
22

15.    Defendant Japan Airlines International Company, Ltd. ("JAL") is a Japanese company with its principal place of business at 4-11, Higashi-Shinagawa 2-chrome, Shinagawa-Ku, Tokyo 140-8605, Japan. JAL conducts substantial business within this district and transports passengers throughout the world, including into California and the United States.

23
24
25
26
27

16.    Defendant Malaysia Airlines System Berhad ("Malaysia Airlines") is a Malaysian corporation with its principal place of business at MAS Complex A, Sultan Abdul Azia Shah Airport, 47200 Suband, Selangor Darui Ehsan, Malaysia. Malaysia Airlines conducts substantial business within this district and transports passengers throughout the world, including into California and the United States.

28

MINAMI TAMAKI, LLP
360 Post Street, 8th Floor
San Francisco, CA 94108
Tel. (415) 788-9000
Fax (415) 398-3887

- 4 -

17.     Defendant Qantas Airways Limited ("Qantas") is an Australian company with its principal place of business at 203 Coward Street, Qantas Centre, Mascot NSW. 2020 C3. Qantas Airways conducts substantial business within this district and transports passengers throughout the world, including into California and the United States.

18.     Defendant Singapore Airlines Limited ("Singapore Airlines") is a Singapore company with its principal place of business at Airline House, 25 Airline Road, 819829 Singapore. Singapore Airlines conducts substantial business within this district and transports passengers throughout the world, including into California and the United States.

19.     Defendant Thai Airways International, Ltd. ("Thai Airways") is a Thailand company with its principal place of business at 89 Vibhavadi-Rangsit Road, Bangkok, Thailand 10900. Thai Airways conducts substantial business within this district and transports passengers throughout the world, including into California and the United States.

20.     Defendant United Airlines ("United") is a Delaware corporation with its principal place of business at 77 W. Wacker, Chicago, IL 60601. United is one of the largest passenger airlines in the world with more than 3,600 flights a day to more than two hundred destinations. United conducts substantial business within this district and transports passengers throughout the world, including into California and the United States. United operates a hub and maintenance operation center at San Francisco International Airport. United is the largest employer in San Mateo County, California, which is located within this district.

## C.    Co-Conspirators

21.     At all relevant times, other airlines, trade groups, or other entities, willingly conspired with Defendants in the violations and conspiracies alleged herein. All averments herein against named Defendants are also averred against these unnamed co-conspirators as though set forth at length.

## D.    Agents

MINAMI TAMAKI, LLP
360 Post Street, 8th Floor
San Francisco, CA 94108
Tel (415) 788-9000
Fax (415) 398-3887

22.    The acts alleged to have been done by Defendants were authorized, ordered or carried out by their directors, officers, agents, employees, or representatives while actively engaged in the management of each of the Defendants' affairs.

## IV.    CLASS ACTION ALLEGATIONS

23.    Plaintiff brings this action on his own behalf and as a Class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following class (the "Class"):

> All individuals or entities (excluding governmental entities, Defendants, and their parents, predecessors, subsidiaries, affiliates, and their co-conspirators) who purchased passenger air transportation, for long haul transpacific flights and who paid a fuel surcharge on their tickets from any of the defendants and their co-conspirators or any predecessor, subsidiary, or affiliate of each, at any time during the period from 2004 to November 2007.

24.    Class members are so numerous and geographically dispersed that their individual joinder is impossible. Due to the nature of the trade and commerce involved, Plaintiff believes that there are most likely hundreds of thousands, if not millions, of Class members. It is estimated that more than 15 million passengers traveled to Asia and the Pacific Rim from California in 2006. The precise number of Class members and their addresses are unknown to Plaintiff, but can be readily determined from inspection of records maintained by Defendants.

25.    Common questions of law and fact exist as to all Class members. These questions predominate over the questions affecting only individual Class members. These common legal and factual questions include:

> a.    Whether Defendants engaged in a combination or conspiracy among themselves to fix, raise, maintain, and/or stabilize Passenger Air Transportation and Fuel Surcharge prices on long haul trans-Pacific flights that were purchased by the Class;
>
> b.    The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants in furtherance of the conspiracy;
>
> c.    Whether the alleged conspiracy violated Section 1 of the Sherman Act;

CLASS ACTION COMPLAINT

MINAMI TAMAKI, LLP
360 Post Street, 8ᵗʰ Floor
San Francisco, CA 94108
Tel. (415) 788-9000
Fax (415) 398-3887

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

    d.   Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the businesses or property of Plaintiff and the other members of the Class;

    e.   The effect of Defendants' conspiracy on the Passenger Air Transportation and Fuel Surcharge prices charged in the United States and throughout the world during the Class Period; and

    f.   The appropriate measure of damages sustained by Plaintiff and other members of the Class.

26.    Plaintiff's claims are typical of the claims of the Class members because Plaintiff and all Class members bought international air passenger transportation services for long haul trans-Pacific flights and paid surcharges at artificially maintained, non-competitive prices established by the actions of Defendants and their unnamed co-conspirators. Plaintiff and all Class members have sustained damages due to Defendants' conduct in violation of federal law as complained of herein.

27.    The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel. Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent. Plaintiff has retained counsel competent and experienced in class action litigation, including antitrust litigation, and intends to prosecute this action vigorously.

28.    A Class action is superior to other methods for the fair and efficient adjudication of this controversy. Treatment as a Class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without undue duplication of effort and expense.

29.    Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate claims such as those asserted in this Complaint.

30.    This Class action presents no difficulties in management that would preclude maintenance as a Class action.

MINAMI TAMAKI LLP
360 Post Street, 8th Floor
San Francisco, CA 94108
Tel. (415) 788-9000
Fax (415) 398-3887

- 7 -

## V.    INTERSTATE TRADE AND COMMERCE

31.    Throughout the Class Period, there was a continuous and uninterrupted flow of Passenger Air Transportation in international commerce throughout the United States, including Los Angeles and San Francisco. Defendants' unlawful activities, as described herein, have been within the flow of, and have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce.

## VI.    THE PASSENGER AIR TRANSPORTATION MARKET

32.    Passenger Air Transportation is a fungible commodity product. Transportation services provided by one airline are generally as suitable as any other carrier's services. Ticket prices are thus the primary factor influencing the customer's choice of airline.

33.    The Passenger Air Transportation market is highly concentrated, and there exist substantial barriers to entry in this market. Each Defendant possesses a significant share of the trans-Pacific Passenger Air Transportation market. The Defendants' principal competitors in the market are therefore one another. In addition, there is less competition from low-fare or discount airlines in the international air travel market than in the domestic market. The Defendants' market power is further bolstered for trans-Pacific routes because, unlike short domestic flight routes, there is no reasonable alternative to air travel. These factors facilitate the implementation and maintenance of a horizontal price-fixing cartel such as that perpetrated by Defendants and alleged herein.

34.    Profitability in the airline industry has always been quite low. Even in good years, profits are generally between 2 to 3 percent after interest and taxes. Historically, airlines have survived largely through state support, either in the form of equity or subsidies.

35.    Full service airlines, such as the Defendants, have high operating costs. Operating costs include labor, fuel, aircrafts, spare parts, information technology networks and services, airport equipment, airport handling services, sales distribution, catering, training, and aviation insurance.

MINAMI TAMAKI, LLP
360 Post Street, 8th Floor
San Francisco, CA 94108
Tel. (415) 788-9000
Fax (415) 398-3887

36.    In the past, airlines have attributed anywhere from 10 to 20 percent of their operating costs to jet fuel.  Fuel costs vary considerably among airlines due to a number of unique factors.  These factors include variable currency rates, the efficiency of the aircrafts, air route designs, air traffic control, and the individual airline's conservation efforts.

37.    Fuel costs also vary because of the use of "fuel hedging."  Fuel Hedging is an investment strategy that locks in future fuel costs at a certain price.  Different airlines hedge their fuel costs to different degrees.  For example, in 2005, Thai Air hedged 31 percent of its annual fuel needs.  In 2006, Qantas hedged 70 percent of its 2007 fuel costs.  Air New Zealand hedged 62 percent of its 2007 estimated fuel use.

## VII.    DEFENDANTS ENGAGED IN A CONSPIRACY TO FIX PRICES FOR PASSENGER AIR TRANSPORTATION SERVICES

38.    Generally, surcharges are a feature of the global air transportation market, in which airlines charge extra fees to their customers, in addition to basic flight rate charges, with the intent of defraying certain external costs of the carriers.  Surcharges should thus bear a relatively constant relationship to external cost levels.  In a competitive market, Fuel Surcharges should rise and fall along with associated jet fuel costs.

39.    During the Class period, Defendants entered into agreements amongst themselves and with other co-conspirators to raise Fuel Surcharges at the same time and in the same amount.  Defendants were aware that their imposition of Fuel Surcharges and other surcharges would not be successful if their supposed competitors did not join them, as customers would be free to seek out lower prices.

40.    Defendants' Fuel Surcharges bore no relationship to the actual prices Defendants paid for fuel during the Class Period.  Defendants' Fuel Surcharges were inflated beyond the actual increase in fuel prices paid by Defendants.  Thus, while fuel costs increased at times during the Class period, Defendants reaped substantial profits from their Fuel Surcharges.  Absent these unlawful agreements, Defendants would not have been able to profit from their artificially inflated Fuel Surcharges.

- 9 -

MINAMI TAMAKI, LLP
360 Post Street, 8th Floor
San Francisco, CA 94108
Tel (415) 788-9000
Fax (415) 398-3887

41.    Defendants often treated Fuel Surcharges as if they were mandated taxes or surcharges imposed by government authorities or airports. As such, Defendants often did not advertise Fuel Surcharges as part of their fares. Defendants instead added the Fuel Surcharges to the advertised fares when customers purchased their flights.

42.    Defendants agreed to subscribe to the same index to set fuel surcharges despite having different cost structures. These different cost structures included different fuel hedging strategies. The adoption and adjustment of identical or similar passenger fuel surcharges is thus illogical, but for a price-fixing agreement between the Defendants.

43.    Throughout the Class Period, Defendants maintained a combined dominant market share, controlling the vast majority of long haul trans-Pacific passenger flights. Thus, customers were unable to shop for Passenger Air Transportation from other carriers, and had no choice but to pay the inflated Fuel Surcharges.

44.    Airlines, including the Defendants, use "differentiated pricing" to set fares for Passenger Air Transportation services. "Differentiated pricing" refers to the practice of selling air travel services at different fares, even for the same cabin on the same flight. Fares can vary depending on such factors as days of travel, days of stay, whether the fare is refundable, and seasonal discounts. Airlines often price air travel by dividing each cabin of an aircraft (*e.g.,* first, business, and economy) into a number of travel classes for pricing purposes. This makes fare comparison difficult for travelers.

45.    The fares for Passenger Air Transportation, although not readily available to travelers for comparison, are available to the Defendants. Defendants confirmed that prices of Passenger Air Transportation and Fuel Surcharges were uniformly fixed, raised, maintained and/or stabilized through the use of instant electronic access to price increases. Defendants, other airlines, travel agencies, and related businesses tracked fare information through the Airline Tariff Publishing Company ("ATPC"). The ATPC gets the latest prices from more than 500 airlines and sends them by global distribution systems (GDS) to subscribers. ATPC, with offices in

MINAMI TAMAKI, LLP
360 Post Street, 8th Floor
San Francisco, CA 94108
Tel (415) 788-9000
Fax (415) 398-3887

Washington, D.C., London, Singapore, and Sao Paulo, Brazil, is owned by 24 air carriers, including Defendant JAL.

46.     The collusion between JAL and ANA, for example, is representative of the price-fixing behavior engaged in by all of the Defendants.  JAL and ANA agreed to change their fares within days of each other, and were in lockstep on surcharges for trans-Pacific fares:

- In May 2004, JAL President Isao Kaneko made a public announcement that JAL's plans to raise international fares would be discussed at a May 28, 2004 IATA meeting. On June 8, 2004, ANA and JAL filed notices with the Japanese government to raise international fares by 5 percent in the wake of increased fuel prices, effective July 1, 2004.  Both airlines increased their fares on business class travel to and from North America, but not on economy class travel.

- On January 5, 2005, ANA announced it would impose fuel surcharges on international flights, effective February 1, 2005.  The fuel surcharges were 2,500 yen for trans-Pacific flights.  On January 20, JAL announced that it would also impose 2,500 fuel surcharges on trans-Pacific flights.

- On June 3, 2005, JAL filed a notice with the Japanese government to increase its international fuel surcharge, effective July 1, 2005.  On June 7, ANA also filed a notice with the Japanese government to increase its international fuel surcharge, effective July 7, 2005.

- On January 16, 2006, JAL filed a notice with the Japanese government to increase its international fuel surcharge effective March 1, 2006.  On January 23, ANA also filed a notice with the Japanese government to raise its international fuel surcharge effective March 1.

- On August 17, 2006, JAL filed a notice with the Japanese government to raise its international fuel surcharge from 8,000 yen to 13,600 yen, effective October 1, 2006. On August 31, 2006, ANA similarly filed a notice of its intent to raise its international fuel surcharge from 8,000 yen to 13,600 yen, effective October 15, 2006.

- 11 -

MINAMI TAMAKI, LLP
360 Post Street, 8th Floor
San Francisco, CA 94108
Tel (415) 788-9000
Fax (415) 398-3887

- On November 16, 2006, both ANA and JAL filed notices with the Japanese government to reduce their international fuel surcharges from 13,600 yen to 13,000 yen, effective January 1, 2007.

- On March 19, 2007, JAL filed a notice with the Japanese government to reduce its international fuel surcharge to 11,000 yen, effective May 1, 2007. The next day, ANA did the same.

- On May 15, 2007, JAL filed a notice with the Japanese government to raise its international fuel surcharge from 11,000 yen to 12,000 yen, effective July 1, 2007. On May 25, ANA similarly filed a notice with the Japanese government to raise its international fuel surcharge from 11,000 yen to 12,000 yen, effective July 10, 2007.

- On August 15, 2007, JAL filed a notice with the Japanese government to raise its international fuel surcharge from 12,000 yen to 13,000 yen, effective October 1, 2007. On August 20, ANA filed a similar notice to raise surcharges from 12,000 yen to 13,000 yen, effective October 1, 2007.

- On January 1, 2007, ANA and JAL lowered Fuel Surcharges on travel between North America and Japan to $108. This decision came after Singapore Air lowered Fuel Surcharges for travel between the United States and Sinapore to US$82 on October 14, 2006.

- On March 19, 2007, JAL filed a notice to reduce Fuel Surcharges on international passenger fares effective May 1, to 11,000 yen. On the next day, ANA filed a notice to reduce Fuel Surcharges on international passenger fares effective May 1 to the same price.

- On May 15, 2007, JAL filed a notice to raise the Fuel Surcharge on international passenger fares effective July 1, to 12,000 yen. On May 25, ANA filed a notice to raise Fuel Surcharges to 12,000 yen effective July 10.

- On October 1, 2007, ANA and JAL both raised their Fuel Surcharges to US$108.

MINAMI TAMAKI, LLP
360 Post Street, 8th Floor
San Francisco, CA 94108
Tel. (415) 788-9000
Fax (415) 398-3887

47.    The other Defendants imposed similar, if not identical, Fuel Surcharges as those charged by JAL and ANA. Examples of Defendants' lockstep increases in Fuel Surcharges include, but are not limited to, the following:

a.    On May 11, 2004, defendant Qantas and several other major airlines announced they would begin imposing Fuel Surcharges on international passenger flights. Qantas' AU$15 Fuel Surcharge was to go into effect on May 17, 2004. The very next day, Air New Zealand announced that it would also begin imposing Fuel Surcharges of NZ$20 on May 17, 2004.

b.    On June 7, 2004, China Air began charging a US$7 Fuel Surcharge on passenger air travel. On the same day, Singapore Air instituted a US$5 Fuel Surcharge on its flights.

c.    On August 20, 2004, Qantas announced the first of several increases in its Fuel Surcharge. This surcharge was AU$22 for international flights. Six days later, Air New Zealand announced it would raise its Fuel Surcharge as well.

d.    On October 20, 2004, Qantas raised Fuel Surcharges for the second time in less than six months, this time to AU$29 for international flights. This was despite the fact that Qantas' fuel costs were fully hedged through the end of the year. The announcement came one day after Qantas reported a record full-year net profit of AU$648 million. Six days after Qantas raised its Fuel Surcharges, Air New Zealand followed suit by raising its own Fuel Surcharges for international flights.

e.    On November 1, 2004, EVA Air began imposing a US$17 Fuel Surcharge on air travel. Singapore Air also raised its Fuel Surcharges on November 15, 2004.

f.    On February 1, 2005, the same day that ANA and JAL implemented Fuel Surcharges for the first time, Singapore Air raised its Fuel Surcharge for international flights to $22.

g.    On March 28, 2005, Qantas raised its Fuel Surcharges on international flights to US$35. On April 6, 2005, Air New Zealand followed Qantas' lead by raising its Fuel Surcharge on long haul flights to NZ$52.

- 13 -

MINAMI TAMAKI, LLP
360 Post Street, 8th Floor
San Francisco, CA 94108
Tel. (415) 788-9000
Fax (415) 398-3887

1    h.    Thai Air implemented a US$25 Fuel Surcharge on international flights on

2  May 1, 2005.

3    i.    On August 1, 2005, Thai Air raised Fuel Surcharges on international flights,

4  including those to and from the United States, to US$35. On August 16, 2005, it raised Fuel

5  Surcharges on international flights to US$50.

6    j.    Air New Zealand raised Fuel Surcharges on August 22, 2005 to NZ$92 for

7  international flights. The next day, Qantas announced it would increase its Fuel Surcharges on

8  international flights to AU$75.

9    k.    On October 13, 2005, Northwest raised its Fuel Surcharges on trans-Pacific

10  flights to US$65.

11    l.    On April 21, 2006, Qantas increased its Fuel Surcharges on international

12  travel to US$65.

13    m.    On May 15, 2006, China Air raised its Fuel Surcharges for travel between

14  Taiwan and the United States to $70 – ten times the original Fuel Surcharge implemented less than

15  two years before. On May 16, 2006, EVA Air also raised its Fuel Surcharges for travel between

16  Singapore and the United States to US$65. On May 19, 2006, Singapore Air raised its Fuel

17  Surcharges for international flights to US$90. By May 22, 2006, Air New Zealand and Qantas

18  were both charging US$65 for Fuel Surcharges for international flights.

19    n.    On June 1, 2006, Thai Air raised its Fuel Surcharges on travel between the

20  United States and Bangkok to US$65, matching the Fuel Surcharges of EVA Air, Air New

21  Zealand, and Qantas.

22    o.    On July 25, 2006, Northwest raised its Fuel Surcharges for travel between

23  the United States and Singapore to $90, the same surcharge implemented by Singapore Air in May.

24    p.    On August 24, 2006, China Air raised its Fuel Surcharges for flights to and

25  from the United States to $95.

26    q.    On August 31, 2006, Qantas raised its Fuel Surcharges again to AU$185,

27  while keeping domestic Fuel Surcharges unchanged.

28

- 14 -

MINAMI TAMAKI, LLP
360 Post Street, 8th Floor
San Francisco, CA 94108
Tel (415) 788-9000
Fax (415) 398-3887

r.    Thai Air increased its Fuel Surcharges on international flights once again on September 1, 2006. Six days later, United Airlines raised Fuel Surcharges on travel between the United States and Singapore to US$90, the same amount that Singapore Air and Northwest were charging. Notably, there was a ten percent decline in prices for crude oil in September 2006, the largest decline in 21 months.

s.    In January 2007, Qantas announced that due to a 25% drop in jet fuel prices over the preceding five months, it would reduce Fuel Surcharges on certain flights. However, Qantas did not reduce the surcharges on any of its long haul flights, including trans-Pacific flights to or from the United States. Consistent with Qantas, Air New Zealand's Fuel Surcharges on trans-Pacific flights remained unchanged in early 2007.

t.    On June 30, 2007, Northwest raised Fuel Surcharges for travel between the United States and Singapore to US$115. On August 10, 2007, EVA Air raised its Fuel Surcharge to US$103 on trans-Pacific flights to and from the United States.

u.    On October 1, 2007, Thai Air increased its Fuel Surcharge for travel between the United States and Thailand to US$140. This increase came on the same day that ANA and JAL raised their Fuel Surcharges. By November 7, 2007, Singapore Air was charging US$104 in Fuel Surcharges for travel between the United States and Singapore.

48.    The close timing and pricing of Defendants' Fuel Surcharge changes were the product of collusive agreements by and among defendants to fix, raise, maintain, and stabilize the prices for trans-Pacific flights.

49.    A recent position paper from the Centre for Asia Pacific Aviation, a provider of aviation market intelligence, supports this conclusion. The paper states that "*Higher fuel prices drove the flag carriers away from the mindless chase after market share into a more considered quest for profitability.*" [Emphasis added.]

50.    Published flight prices and surcharges for November 2007 demonstrate that Defendants' collusive pricing is continuing:

///

MINAMI TAMAKI, LLP
360 Post Street, 8th Floor
San Francisco, CA 94108
Tel: (415) 788-9000
Fax (415) 398-3887

**San Francisco to Auckland**

| Airline | Cabin | Basic Fare | Surcharges | Total |
|---|---|---|---|---|
| Air New Zealand | Coach | $918 | $255 | $1,173 |
| Qantas | Coach | $918 | $255 | $1,173 |

**San Francisco to Bangkok**

| Airline | Cabin | Basic Fare | Surcharges | Total |
|---|---|---|---|---|
| ANA | Coach | $650 | $281 | $931 |
| JAL | Coach | $620 | $281 | $901 |

**San Francisco to Hong Kong**

| Airline | Cabin | Basic Fare | Surcharges | Total |
|---|---|---|---|---|
| ANA | Coach | $580 | $269 | $849 |
| JAL | Coach | $579 | $269 | $848 |

**San Francisco to Seoul**

| Airline | Cabin | Basic Fare | Surcharges | Total |
|---|---|---|---|---|
| ANA | Coach | $620 | $296 | $916 |
| JAL | Coach | $620 | $289 | $909 |

**San Francisco to Sydney**

| Airline | Cabin | Basic Fare | Surcharges | Total |
|---|---|---|---|---|
| Air New Zealand | Coach | $818 | $312 | $1,130 |
| Qantas | Coach | $818 | $308 | $1,126 |

**San Francisco to Taipei**

| Airline | Cabin | Basic Fare | Surcharges | Total |
|---|---|---|---|---|
| EVA Air | Coach | $719 | $274 | $993 |
| JAL | Coach | $620 | $274 | $894 |
| Qantas | Coach | $1,575 | $274 | $1,849 |
| Singapore Air | Coach | $900 | $274 | $1,174 |
| Thai Air | Coach | $1,660 | $274 | $1,934 |

///

///

CLASS ACTION COMPLAINT

MINAMI TAMAKI, LLP
360 Post Street, 8ᵗʰ Floor
San Francisco, CA 94108
Tel. (415) 788-9000
Fax (415) 398-3887

**San Francisco to Tokyo**

| Airline | Cabin | Basic Fare | Surcharges | Total |
|---------|-------|------------|------------|-------|
| ANA | Coach | $529 | $270 | $799 |
| JAL | Coach | $529 | $270 | $799 |

## VIII.  DEFENDANTS PROFITED FROM THE FUEL SURCHARGES

51.    Surcharges are designed to compensate for increases in certain external costs, and thus should be tied to the overall level of costs.  In a competitive market, when the cost of jet fuel falls, Fuel Surcharges should fall as well.

52.    In a truly competitive market, Fuel Surcharges exceeding the actual cost of fuel consumed should create competition from others.  Here, however, Defendants chose not to compete.  The only plausible explanation for that lack of competition is that Defendants were conspiring.

53.    As the following aggregate industry data reported by the IATA in September 2007 demonstrates, the airline industry's operating profits were declining before there was any substantial rise in fuel costs.  This data also shows that the airlines' Fuel Surcharges, which were implemented in 2004, were not a true cost recovery mechanism.  These Surcharges were instead a camouflaged revenue generator.  The Defendants' use of Fuel Surcharges has allowed them to reach higher levels of profitability than when fuel prices were stable.

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007f | 2008f |
|---|------|------|------|------|------|------|------|-------|-------|
| Passenger Revenues in Billions | $256 | $239 | $238 | $249 | $297 | $323 | $355 | $389 | $419 |
| Expenses in Billions | $318 | $319 | $311 | $323 | $376 | $409 | $440 | $473 | $500 |
| Crude Oil Price, Brent, $/barrel | $28.8 | $24.7 | $25.1 | $28.8 | $38.8 | $54.5 | $65.1 | $67.0 | $66.0 |
| Operating Profit in Billions | $1.1 | -$4.2 | -$3.7 | -$2.3 | -$1.5 | -$1.0 | -$0.1 | $1.1 | $1.5 |

MINAMI TAMAKI, LLP
360 Post Street, 8th Floor
San Francisco, CA  94108
Tel. (415) 788-9000
Fax (415) 398-3887

CLASS ACTION COMPLAINT

54.    The fact that Defendants profited from their increasing Fuel Surcharges is further evidenced by the record profits that Defendants have experienced since implementing the surcharges.

55.    In the first quarter of fiscal year 2006, ANA posted a net profit of 7.68 billion yen.

56.    Thai Air posted a profit in the third quarter of 2006, during which it collected nearly US$80 million in Fuel Surcharges. An August 10, 2006 article in *The China Post* quoted a securities analyst as saying that, "[t]he higher fuel surcharge in place was quite effective" in raising Thai Air's revenues.

57.    In the 12 months ending June 30, 2007, Qantas saw a 49.9 percent increase in net profit. The *Sydney Morning Herald* has reported that each AU$1 of Qantas' Fuel Surcharge on international flights translates into AU$10 million in annual revenue.

58.    On August 7, 2007, *The Japan Times* reported that JAL's operating loss shrank from 31.9 billion yen in the prior year to 8.5 billion yen. The article further stated, "Yoshimasa Kanayama, [JAL] executive officer, attributed the improved earnings performance to the carriers' efforts to cut costs, brisk business demand for international flights, higher revenue per passenger achieved through fare hikes on domestic routes and *increased fuel surcharges on international flights.*" [Emphasis added]

59.    On August 28, 2007, Air New Zealand announced its net profit after tax was NZ$214 million, up 123 percent from the previous year. Notably, operating revenue increased 13 percent, while the number of passengers carried only increased 4.9 percent.

60.    The IATA has reported that whereas in 2002, airlines needed an oil price of less than US$20 a barrel to break even, they were profitable in 2007 with the price of oil at nearly US$70 a barrel.

61.    Through a dominant combined market share, a number of cooperative agreements, and sharing of real-time pricing information, the Defendants controlled a vast majority of airline travel between the United States and the Pacific Rim during the Class Period. The Defendants

MINAMI TAMAKI, LLP
360 Post Street, 8th Floor
San Francisco, CA 94108
Tel (415) 788-9000
Fax (415) 398-3887

1

2

were thus able to fix, raise, maintain, and/or stabilize Fuel Surcharges and reap enormous profits at the expense of the Plaintiff and the Class.

3

## IX.    CARTEL-LIKE TRADE ORGANIZATIONS

4

5

6

7

8

62.    Defendants' executives, as well as other air carriers' executives, met formally or informally over the years at various trade meetings or meetings of trade associations, such as the International Air Transport Association, the Association of Asian Pacific Airlines, oneworld, Star Alliance, and SkyTeam Alliance. At one or more of these meetings, Defendants conspired to artificially inflate Fuel Surcharges on international passenger air transportation.

9

10

11

12

13

14

15

63.    One of the keys to the conspiracy is the 42-year-old Association of Asia Pacific Airlines ("AAPA"). The 17-member trade association, based in Kuala Lumpur, Malaysia, is the most significant group representing Asia/Pacific carriers. The AAPA boasts that its "member airlines carry 285 million passengers and 10 million tonnes of cargo, representing approximately one-fifth of global passenger traffic, and one-third of global air cargo traffic respectively." Members of AAPA include:  Air New Zealand, ANA, Cathay Pacific, China Airlines, EVA, JAL, Malaysia Airlines, Qantas, Singapore Airlines, and Thai Airways.

16

17

18

19

20

21

22

23

24

25

64.    The primary purpose of AAPA is to serve as a forum for members' views on issues of common interest and to foster close cooperation. AAPA was formed during a meeting of Asian airline executives in 1965 to discuss regional cooperation. According to the organization, "AAPA speaks with a common voice on behalf of the Asia Pacific carriers and puts forward Asian perspectives when dealing with governments, aircraft manufacturers, airport authorities and other organizations on industry issues. The activities of the Association cover every aspect of civil aviation where the airlines feel they can work together for mutual benefit. In addition, AAPA retains access to specialized legal and aviation consultants in Brussels and Washington, D.C., a reflection of the significant impact which the profusion of U.S. and E.U. regulatory developments have on all international carriers including Asia Pacific airlines."

26

27

65.    Another key to the conspiracy is the Geneva-based International Air Transport Association ("IATA"). All of the defendants are members of the IATA, which was founded in

28

- 19 -

MINAMI TAMAKI, LLP
360 Post Street, 8ᵗʰ Floor
San Francisco, CA 94108
Tel. (415) 788-9000
Fax (415) 398-3887

1945 in Havana, Cuba. IATA represents more than 240 airlines comprising 94% of scheduled international air traffic. It describes itself as "the prime vehicle for inter-airline cooperation." During IATA conferences, member firms discussed the increasing costs of fuel, passenger fuel surcharges, maintaining yields, and other issues relating to the conservation of fuel. It was an agreement reached at an IATA meeting in Geneva on May 28, 2004 that played a role in triggering the Fuel Surcharge conspiracy. Members of the IATA include: Air New Zealand, ANA, American Airlines, Cathay Pacific, China Airlines, EVA, JAL, Malaysia Airlines, Qantas, Singapore Airlines, Thai Airways, and United.

66.    The Star Alliance is a global integrated airline network founded in 1997. During Star Alliance meetings, member firms discussed the increasing costs of fuel, passenger fuel surcharges, and maintaining yields. Members of the Star Alliance include: Air New Zealand, ANA, Singapore Airlines, Thai Airways, and United.

67.    The oneworld Alliance is a global integrated airline network. Members of oneworld include: American Airlines, Cathay Pacific, JAL, and Qantas.

## X.    CODE SHARING BUSINESS PARTNERSHIPS

68.    In addition to the four different alliances/trade groups, various defendants engage in so-called "code sharing" business partnerships with other Defendants and their co-conspirators. Code sharing is a practice whereby a flight operated by one airline is jointly marketed as a flight for other airlines. "Code" refers to the identifier used in the flight schedule, generally the 2-character International Air Transport Association airline designator code and flight number. For example, YY123, flight 123 operated by the airline YY, could be sold by airline ZZ as ZZ456.

69.    Most major airlines have code sharing partnerships with others in the industry. The term originated in 1990, when Qantas Airways and American Airlines agreed to provide air transportation services between various U.S. and Australian cities. Although code sharing is a legal business arrangement, it provides a mechanism to conduct illegal activity.

70.    According to the U.S. Department of Transportation and Defendants, Defendants participate in the following code sharing partnerships:

CLASS ACTION COMPLAINT

MINAMI TAMAKI, LLP
360 Post Street, 8th Floor
San Francisco, CA 94108
Tel (415) 788-9000
Fax (415) 398-3887

- Air New Zealand maintains code sharing partnerships with EVA Airways, Qantas, JAL, Singapore Airlines, Thai Airways, and United.

- ANA maintains code sharing partnerships with Asiana Airlines, EVA Airways, Malaysia Airlines, Singapore Airlines, and United.

- China Airlines maintains code sharing partnerships with American Airlines and Thai Airways.

- Cathay Pacific maintains code sharing partnerships with American Airlines and JAL.

- EVA maintains code sharing partnerships with Air New Zealand, American Airlines, ANA, and Qantas.

- JAL maintains code sharing partnerships with Air New Zealand, American Airlines, Cathay Pacific, Korean Air, Qantas, Singapore Airlines, and Thai Airways.

- Malaysia Airlines maintains code sharing partnerships with ANA and Thai Airways.

- Qantas maintains code sharing partnerships with Air New Zealand, American Airlines, EVA Airways, and JAL.

- Singapore Airlines maintains code sharing partnerships with Air New Zealand, Asiana Airlines, ANA, Malaysian Airlines, and United.

- Thai Airways maintains code sharing partnerships with Air New Zealand, China Airlines, JAL, Malaysia Airlines, and United.

- United maintains code sharing partnerships with Air New Zealand, ANA, Asiana Airlines, Singapore Airlines, and Thai Airways.

## XI.    CARTEL ACTIVITY MEETINGS

71.     During the Class Period, executives of Defendant airlines have attended and participated in numerous meetings in which they discussed and agreed to fix Fuel Surcharges, as identified below.

72.     The International Air Transport Association, Special Meeting, Geneva, May 28, 2004: Fuel costs were the main topic of this meeting and there were agreements on how to add

MINAMI TAMAKI LLP
360 Post Street, 8ᵗʰ Floor
San Francisco, CA 94108
Tel. (415) 788-9000
Fax (415) 398-3887

CLASS ACTION COMPLAINT

surcharges for fuel. The Montreal Gazette reported on June 1, 2004, that "member carriers of the International Air Transport Association might raise international fares by as much as five percent to help cover a surge in jet fuel costs. The proposed fare increase of between two percent and five percent was agreed at a May 28 meeting of the association, which represents more than 270 airlines worldwide, an IATA spokesperson said."

73.    The International Air Transport Association Annual General Meeting and World Air Transport Summit, Singapore, June 6-8, 2004: More than 600 airline executives attended this annual summit. Giovanni Bisignani, ATA CEO said in a welcoming statement, "While record high fuel prices challenge our profitability it is time to put our efforts toward rebuilding the industry." Immediately following this meeting on June 8, 2004 both JAL and ANA filed applications with the Japanese Government to raise international passenger fares because of high fuel costs. In a news release announcing the Fuel Surcharge hike, JAL said:

> "The application follows a special meeting of the members of the International Air Transport Association in Geneva, May 28, (2004) when a resolution was discussed to raise fares in the wake of increased fuel prices. This resolution has now been adopted."

JAL and ANA were in lockstep on June 8, 2004, both announcing on that day that a five percent fuel Surcharge would be go into effect, on the same day for both airlines, July 1, 2004.

74.    2005 International Flight Services Association, Global Leadership Conference - Asia Pacific, Tokyo, Japan, August 30 - September 1, 2005: This meeting was labeled as "The Challenge of Change." Among the participants were: Makoto Fukada, Managing Director and Senior Vice President International Passenger, JAL; Sandra Pineau, Senior Director of Planning and Design, Continental Airlines; Charles Grossrieder, a manager at Cathay Pacific; Nikom Raviyan, Vice President, Thai Airways; Shigeru Miyata, Vice President, JAL; Kriengsakdi Phatharacharukul, Director, Thai Airways; and Hee Won Jo, Senior Manager, Asiana Airlines.

75.    2nd Annual Asia Pacific & Middle East Aviation Outlook Summit 2006, Kuala Lumpur, Malaysia, December 5-6, 2005: The theme of this meeting was 'Towards Best Practice;

MINAMI TAMAKI, LLP
360 Post Street, 8th Floor
San Francisco, CA 94108
Tel. (415) 788-9000
Fax (415) 398-3887

Maximising Revenues and Minimising Costs." On the first day of the meeting, the guests included Dato Seri Bashir Ahmad, Malaysia Airport's CEO; Willy Boulter, Commercial Director for Virgin Atlantic Airways; and Stanley Kuppusamy, President, International Relations, Singapore Airlines. Fuel surcharges were a topic of discussion.

76.     Aviation Emergency Response 2006, AAPA sponsored, Bangkok, Thailand, September 19-21, 2006: This meeting was attended by international airport officials and AAPA member executives. Meetings were held on increasing revenues in the trans-Pacific area by way of Fuel Surcharges and other financial means.

77.     3rd Annual Asia Pacific & Middle East Aviation Outlook Summit, Singapore, November 9-10, 2006: Participating in this meeting were executives from most of the Defendant airlines, including Geoff Dixon, CEO of Qantas and Huang Cheng Eng, Executive VP for Singapore Airlines. One of the issues presented and discussed was *"Fighting Costs: Fuel prices and managing risk exposure."*

78.     AAPA Forum, Bandar Seri Begawan, Brunei Darussalam, November 28-29, 2006: More than 120 aviation industry stakeholders attended this meeting, organized by AAPA. At this meeting, Defendants and others discussed surcharges.

79.     Asia Pacific Aviation Summit, Sydney, Australia, July 24-25, 2007: This meeting was put on by the Asia Pacific aviation industry. Some of the issues discussed included the impact of the investigation by the U.S. Department of Justice into fare price-fixing. Another topic was "working together efficiently" to diffuse the investigation of added surcharges.

## XII.    THE U.S. DEPARTMENT OF JUSTICE'S INVESTIGATIONS

80.     In 2006, the U.S. Department of Justice ("DOJ") began an ongoing worldwide investigation into air passenger fuel surcharge conspiracies. On August 1, 2007, the DOJ announced a $300 million fine on British Airways for involvement in fixing Fuel Surcharge prices. In its news release, the DOJ said: "The Department also charged that between August 2004 and February 2006, British Airways engaged in a conspiracy to suppress and eliminate competition by

MINAMI TAMAKI, LLP
360 Post Street, 8th Floor
San Francisco, CA  94108
Tel. (415) 788-9000
Fax (415) 398-3887

CLASS ACTION COMPLAINT

fixing the Fuel Surcharge charged to passengers on long-haul international flights, including flights between the United States and the United Kingdom."

81.     The DOJ also announced a settlement with Korean Air for price-fixing on flights from the United States to Korea.  The DOJ stated that Korean Air has "agreed to cooperate with the Department's ongoing investigation."  Korean Air's unnamed co-conspirator in the price-fixing of Fuel Surcharges was widely reported to be Asiana Airlines, which sought amnesty.

82.     Under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004, a company can apply for leniency from the Department of Justice for its participation in activities that violate federal antitrust laws.  Under the Corporate Leniency Program, a company that cooperates in a DOJ investigation is eligible for conditional amnesty from prosecution.

83.     Korean Air and Asiana Airlines, which are among the top trans-Pacific carriers in the world, have previously been implicated in collusion and anticompetitive behavior.  In 2001, the Korean Fair Trade Commission fined Korean Air and Asiana Airlines for conspiring to set passenger air transportation services in Korea.

84.     On November 27, 2007, the DOJ announced that Qantas had agreed to plead guilty and pay a $61 million fine for conspiring to fix trans-Pacific cargo prices.  According to a DOJ news release, "Qantas engaged in a conspiracy to eliminate competition by fixing the rates for shipments of cargo to and from the United States and elsewhere from at least January 2000 to February 2006."  In a news release, Qantas Chief Executive Officer Geoff Dixon was quoted as saying:  "We have investigated this issue thoroughly and are confident that the unacceptable conduct was limited to a small number of people."

85.     The DOJ and authorities in the European Union have identified several of the Defendants and unnamed co-conspirators as targets of investigations into air passenger and air cargo Fuel Surcharge price-fixing.  The targets, many of which are also named in civil suits, include Defendant ANA, Defendant American Airlines, Asiana, Defendant JAL, Korean Airlines, Defendant Qantas, and Defendant United.  The air passenger and cargo investigations accuse

MINAMI TAMAKI, LLP
360 Post Street, 8th Floor
San Francisco, CA  94108
Tel. (415) 788-9000
Fax (415) 398-3887

Defendants and other airlines of developing and participating in conspiracies to increase revenue by assessing inflated Fuel Surcharges.

86.    At a IATA Cargo Network Service Conference in May 2007, the United States Federal Bureau of Investigations ("FBI") served subpoenas on various airlines. FBI agents also interviewed various airline managers at their hotel rooms.

87.    Several Defendants are preparing for possible fines in connection with government investigations. For example, on October 6, 2007, the Japanese daily newspaper *Asahi Shimbun* reported that JAL would book a charge of roughly $171 million for potential fines in connection with price-fixing investigations by U.S. and European Union officials. The newspaper reported:

> "The company's move comes after the U.S. Justice Department fined British
> Airways PLC and Korean Air Lines Co. $300 million each in August for fixing
> the prices of passenger and cargo flights with other airlines. The companies
> allegedly conspired to set fuel surcharges when oil prices rose."

## XIII.    VIOLATIONS OF THE SHERMAN ACT

88.    During the Class Period, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize the prices of Passenger Air Transport and Fuel Surcharges in the United States and throughout the world in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

89.    In formulating and effectuating the alleged contract, combination, or conspiracy, Defendants engaged in anti-competitive activities, the purpose and effect of which were to artificially raise, fix, maintain, and/or stabilize the prices of Passenger Air Transport and Fuel Surcharges. These activities included the following:

> a.    Agreeing to charge prices of Passenger Air Transport and Fuel Surcharges at
>        certain levels and otherwise to fix, raise, maintain, and/or stabilize the prices of
>        Passenger Air Transport and Fuel Surcharges charged in the United States and
>        throughout the world;
>
> b.    Charging Passenger Air Transport and Fuel Surcharges at the agreed-upon

MINAMI TAMAKI, LLP
360 Post Street, 8th Floor
San Francisco, CA 94108
Tel. (415) 788-9000
Fax (415) 398-3887

CLASS ACTION COMPLAINT

rates;

   c.   Signaling increases in the price of Passenger Air Transport and Fuel Surcharges by, *inter alia,* publicly announcing their increases;

   d.   Moving prices of their Passenger Air Transport and Fuel Surcharges in lockstep; and

   e.   Announcing new Passenger Air Transport and Fuel Surcharges prices nearly simultaneously or within days of each other.

90.   During the Class Period, the Defendants increased, as a ratio to external costs - and profits - the Passenger Air Transport and Fuel Surcharges they charged. These increases in Passenger Air Transport and Fuel Surcharges cannot be explained by actual increases in fuel prices or supply/demand forces, but rather were the result of anticompetitive conduct.

91.   During the Class Period, Plaintiff and members of the Class purchased Passenger Air Transportation directly from Defendants (or their agents, subsidiaries, and/or controlled affiliates).

92.   The conspiracy alleged herein has had the following effects, among others:

   a.   Price competition in the pricing of Passenger Air Transportation and Fuel Surcharges thereon has been restrained, suppressed, and/or eliminated;

   b.   Price competition in the contracting of Passenger Air Transportation has been restrained, suppressed, and/or eliminated;

   c.   Prices for Passenger Air Transportation and Fuel Surcharges thereon charged by Defendants have been fixed, raised, maintained, and/or stabilized at artificially high, non-competitive levels; and

   d.   Members of the Class have been deprived of the benefit of free and open competition.

## XIV.   FRAUDULENT CONCEALMENT

93.   Throughout the relevant period, Defendants affirmatively and fraudulently

MINAMI TAMAKI, LLP
360 Post Street, 8th Floor
San Francisco, CA 94108
Tel. (415) 788-9000
Fax (415) 398-3887

concealed their unlawful conduct from Plaintiff and the Class. By its very nature the unlawful activity, as alleged herein, that Defendants and their co-conspirators engaged in was self-concealing.

94.    Plaintiff and the members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or of any facts that could or would have led to the discovery thereof, until it became public.

95.    Plaintiff and the members of the Class could not have discovered the unlawful conduct at an earlier date through the exercise of reasonable diligence because of Defendants' active and purposeful concealment of their unlawful activities.

96.    Defendants engaged in a successful, illegal price-fixing conspiracy with respect to Surcharges and other fees, which they affirmatively concealed, in at least the following respects:

        a.    By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;

        b.    By engaging in secret meetings and telephone calls in order to further their illicit Passenger Air Transportation and Fuel Surcharges cartel; and/or

        c.    By giving false and pretextual reasons for their pricing for Passenger Air Transportation and Fuel Surcharges thereon, and their increases, during the relevant period and by describing such pricing and increases falsely as being the result of external costs rather than collusion.

97.    As a result of Defendants' fraudulent concealment of their conspiracy, Plaintiff and the Class assert the tolling of any applicable statute of limitations affecting the rights of action of Plaintiff and the members of the Class.

**XV.    INJURY TO PLAINTIFF AND THE CLASS**

98.    During the Class Period, Plaintiff and the members of the Class, because of Defendants' antitrust violations, paid Fuel Surcharges and other fees they would not have paid absent such violations.

- 27 -

MINAMI TAMAKI, LLP
360 Post Street, 8th Floor
San Francisco, CA 94108
Tel. (415) 788-9000
Fax (415) 398-3887

99.     As a result, Plaintiff and the members of the Class it seeks to represent have been injured and damaged in their business and property in an amount to be determined according to proof.

100.    As a direct and proximate result of the illegal conspiracy, Plaintiff and the members of the Class have been injured and financially damaged in their respective businesses and property, in that they have paid Surcharges and other fees during the Class Period they would not have paid in the absence of the illegal conspiracy.

## XVI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff pray for the following:

A.      That the Court determine that this action may be maintained as a Class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B.      That the Court adjudge and decree that the contract, combination and conspiracy alleged herein is a per se unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

C.      That Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiff and the Class for damages as allowed by law as determined to have been sustained by them;

D.      That Each of the Defendants, successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding or concert of action, or adopting any practice, plan, program or design having a similar purpose or effect in restraining competition;

E.      That the Court award Plaintiff and the Class attorneys' fees and costs, and pre-judgment and post-judgment interest as permitted by law; and

F.      That the Court award Plaintiff and the Class such other and further relief as may be necessary and appropriate.

- 28 -

MINAMI TAMAKI, LLP
360 Post Street, 8th Floor
San Francisco, CA 94108
Tel. (415) 788-9000
Fax (415) 398-3887

## XVII.  JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

DATED: March 25, 2008

JACK W. LEE, Esq. [SBN 71626]
BRAD YAMAUCHI, Esq. [SBN 73245]
SEAN TAMURA-SATO, Esq. [SBN 254092]
MINAMI TAMAKI LLP
360 Post Street, 8th Floor
San Francisco, California  94108-4903
Tel:    (415) 788-9000
Fax:    (415) 398-3887
jlee@MinamiTamaki.com

Attorney for Plaintiff Dickson Leung
and the Proposed Class

CLASS ACTION COMPLAINT

MINAMI TAMAKI, LLP
360 Post Street, 8th Floor
San Francisco, CA 94108
Tel. (415) 788-9000
Fax (415) 398-3887