Exhibit B

1  Joseph W. Cotchett (#36324; jcotchett@cpmlegal.com)
   Steven N. Williams (#175489; swilliams@cpmlegal.com)
2  Nanci E. Nishimura (#152621; nnishimura@cpmlegal.com)
   Aron K. Liang (#228936; aliang@cpmlegal.com)
3  Douglas Y. Park (#233398;dpark@cpmlegal.com)
   **COTCHETT, PITRE & McCARTHY**
4  San Francisco Airport Office Center
   840 Malcolm Road, Suite 200
5  Burlingame, CA 94010
   Telephone: (650) 697-6000
6  Facsimile: (650) 697-0577

7  Walter J. Lack (#57550; wlack@elllaw.com)
   Elizabeth L. Crooke (#90305 ecrooke@elllaw.com)
8  Richard P. Kinnan (#123170; rkinnan@elllaw.com)
   **ENGSTROM LIPSCOMB & LACK**
9  10100 Santa Monica Blvd., 16th Floor
   Los Angeles, CA 90067
10 Telephone: (310) 552-3800
   Facsimile: (310) 552-9434

11
12 *Attorneys for Plaintiffs and the Class*

**UNITED STATES DISTRICT COURT**

**IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DONALD WORTMAN, **WILLIAM ADAMS**, **MARGARET GARCIA**, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> **AIR NEW ZEALAND,** **ALL NIPPON AIRWAYS,** **CATHAY PACIFIC AIRWAYS,** **CHINA AIRLINES,** **EVA AIRWAYS,** **JAPAN AIRLINES INTERNATIONAL,** **MALAYSIA AIRLINES,** **NORTHWEST AIRLINES,** **QANTAS AIRWAYS,** **SINGAPORE AIRLINES,** **THAI AIRWAYS,** **UNITED AIRLINES,** <br> Defendants. | Case No. **CV 07     5634** <br><br> **CLASS ACTION COMPLAINT** <br><br> **COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT 15 U.S.C. § 1** <br><br> **JURY TRIAL DEMANDED** |

**Class Action Complaint**

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ........................................ 1

JURISDICTION AND VENUE .................................... 2

MULTI-DISTRICT LITIGATION .................................. 3

PARTIES ....................................................... 3

    A.    Plaintiffs ........................................... 3

    B.    Defendants .......................................... 4

    C.    Unnamed Co-Conspirators ............................ 6

    D.    Agents .............................................. 6

TRADE AND COMMERCE ...................................... 6

PLAINTIFFS AND THE CLASS SUFFERED INJURY THROUGH
COLLUSIVE PRICE INCREASES AND SURCHARGES ............. 6

CLASS ACTION ALLEGATIONS ................................. 7

DEFENDANTS AND THE PASSENGER FLIGHT MARKET ............. 9

DEFENDANTS' CONCERTED FUEL SURCHARGES ................. 10

CARTEL-LIKE TRADE ORGANIZATIONS ........................ 14

CODE SHARING BUSINESS PARTNERSHIPS ..................... 17

CARTEL ACTIVITY MEETINGS ................................ 19

THE INVESTIGATION ......................................... 22

ADMISSIONS BY CO-CONSPIRATORS .......................... 23

VIOLATIONS ALLEGED ...................................... 24

FRAUDULENT CONCEALMENT ................................ 26

INJURY TO PLAINTIFFS AND THE CLASS ....................... 27

PRAYER FOR RELIEF ........................................ 28

JURY TRIAL DEMAND ....................................... 29

1    Pursuant to the Federal Rules of Civil Procedure, Plaintiffs, on behalf of
2  themselves and all others similarly situated, hereby bring this action for treble
3  damages and injunctive relief under the federal antitrust laws of the United States,
4  Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 1 ("Sherman Act")
5  and Sections 4 and 26 of the Clayton Antitrust Act of 1914, 15 U.S.C. §§ 15, 26
6  ("Clayton Act") against Defendants. Plaintiffs complain and allege upon
7  information and belief except as to those paragraphs applicable to the named
8  Plaintiffs, which are based on personal knowledge, as follows:

9                           **NATURE OF THE ACTION**

10    1.    This action arises from a global conspiracy among certain airlines to
11  fix, raise, maintain, and/or stabilize prices for long haul passenger transpacific
12  flights to and from the United States ("Passenger Air Transportation"), and for
13  fixed fuel surcharges on this transportation ("Fuel Surcharges"). Fuel surcharges
14  are fees charged to passengers by airlines purportedly to compensate the airlines
15  for increased fuel costs.

16    2.    Plaintiffs, on behalf of all persons and entities that purchased
17  Passenger Air Transportation, to and from the United States, from any of the
18  Defendants and their co-conspirators or any predecessor, subsidiary, or affiliate of
19  each, at any time during the period from 2004 to August 2007 (the "Class
20  Period"), bring this action to recover treble damages and injunctive relief for
21  violations of the United States antitrust laws.

22    3.    At all relevant times herein, Defendants were airlines that conducted
23  and sold Passenger Air Transportation, and charged fixed Fuel Surcharges on that
24  transport, to airline passengers in the United States and throughout the world,
25  including but not limited to flights to and from Los Angeles and to and from San
26  Francisco, California. Los Angeles International Airport ("LAX") and San
27  Francisco International Airport ("SFO") are considered the international U.S.
28  gateways to Asian and Pacific countries. The U.S. Department of Transportation

reported that in 2005 LAX and SFO were ranked in the top U.S. passenger gateways to the world in scheduled passenger service. That year LAX and SFO had 24.6 million gateway passengers, with the foreign share of the passengers at an average 67%.

4.      As further alleged herein, during at least the Class Period, Defendants agreed, combined, and/or conspired with each other to fix, raise, maintain, and/or stabilize the prices of Passenger Air Transportation and Fuel Surcharges thereon. As a result of Defendants' unlawful conduct and conspiracy, Plaintiffs and the other members of the Class paid artificially high prices for Passenger Air Transportation and Surcharges thereon, and have been damaged accordingly.

## JURISDICTION AND VENUE

5.      This Complaint is brought under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain injunctive relief and to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Class by reason of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

7.      This Court has *in personam* jurisdiction over each of the Defendants because each was engaged in an illegal price-fixing scheme and conspiracy that was directed at and/or caused injury to persons and entities residing in, located in, or doing business in the Northern District of California and throughout the United States.

8.      Venue is proper in this judicial district pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(b), (c), and (d) because during the Class Period many of the Defendants resided, transacted business, were found, or had agents in this district, and because a substantial part of the events giving rise to Plaintiffs' claims

1  occurred, and a substantial portion of the affected trade and commerce described
2  below has been carried out, in this district.

3  ### MULTI-DISTRICT LITIGATION

4       9.    Venue is also proper in the Northern District because that court
5  presides over the multi-district litigation *In re International Air Transportation*
6  *Litigation*, MDL No. 1793. The Hon. Charles R. Breyer presides over the case,
7  and the Court has and will be called upon to address complex issues including
8  jurisdiction, the scope of relief which may be accorded, the application of United
9  States' antitrust and airline law, notice and claims procedures for class members
10  within and outside the United States, and the administration and distribution of
11  any funds which may be obtained through settlement and judgment.

12  ### PARTIES

13       **A.    Plaintiffs**

14       10.    Plaintiff **DONALD WORTMAN** is a citizen of the State of
15  California, Los Angeles County. Plaintiff Wortman purchased Passenger Air
16  Transportation and paid Fuel Surcharges thereon from Defendants Japan Airlines
17  International, Northwest Airlines, Singapore Airlines, Thai Airlines, and United
18  Airlines during the class period and has suffered pecuniary injury as a result of the
19  antitrust violations alleged herein.

20       11.    Plaintiff **WILLIAM ADAMS** is a citizen of the State of California,
21  Los Angeles County. Plaintiff Adams purchased Passenger Air Transportation
22  and paid Fuel Surcharges thereon from Defendant Air New Zealand and has
23  suffered pecuniary injury as a result of the antitrust violations alleged herein.

24       12.    Plaintiff **MARGARET GARCIA** is a citizen of the State of
25  California, Los Angeles County. Plaintiff Garcia purchased Passenger Air
26  Transportation and paid Fuel Surcharges thereon from Defendant Cathay Pacific
27  and has suffered pecuniary injury as a result of the antitrust violations alleged
28  herein.

13.    Plaintiffs identified in the preceding three paragraphs are collectively referred to herein as "Plaintiffs."

## B.    Defendants

14.    Defendant **Air New Zealand** is a New Zealand company with its principal place of business at Quay Tower, 29 Customs St. West, Auckland, 1020, New Zealand. Air New Zealand conducts Passenger Air Transportation throughout the world, including into the U.S. and especially California.

15.    Defendant **All Nippon Airways** is a Japanese company with its principal place of business at Shidome-City Center, 1-5-2, Higashi-Shimbashi, Minato-ku, Tokyo 105-7133, Japan. All Nippon Airways conducts Passenger Air Transportation throughout the world, including into the U.S. and especially California.

16.    Defendant **Cathay Pacific Airways** is a Hong Kong-based company with its principal place of business at 9 Connaught Road, Central Swirel Housepox Box 1 GPO, Hong Kong K3. Cathay Pacific Airways conducts Passenger Air Transportation throughout the world, including direct transpacific flights into the United States, especially California.

17.    Defendant **China Airlines** is a Taiwanese company with its principal place of business at 131 Nanking E Rd., Section 3, Taipei, Taiwan. China Airlines conducts Passenger Air Transportation throughout the world, including direct transpacific flights into the United States, especially California.

18.    Defendant **EVA Airways** is a Taiwanese company with its principal place of business at 16F.-1, No. 207, Fusing Road, Taoyuan City, Taoyuan County, Taiwan. EVA Airways conducts Passenger Air Transportation throughout the world, including direct transpacific flights into the United States, especially California.

19.    Defendant **Japan Airlines International** is a Japanese company with its principal place of business at 4-11, Higashi-Shinagawa 2-chrome, Shinagawa-

Ku, Tokyo 140-8605, Japan.  Japan Airlines International conducts Passenger Air Transportation throughout the world, including into the United States, especially California.

20.    Defendant **Malaysia Airlines** is a Malaysian corporation with its principal place of business at MAS Complex A, Sultan Abdul Azia Shah Airport, 47200 Suband, Selangor Darui Ehsan, Malaysia.  Malaysia Airlines conducts Passenger Air Transportation throughout the world, including into the United States, especially California.

21.    Defendant **Northwest Airlines** is a Delaware corporation with its principal place of business at 2700 Lone Oak Parkway, Eagan, MN 55121. Northwest Airlines conducts Passenger Air Transportation throughout the world, including into the United States, especially California.

22.    Defendant **Qantas Airways** is an Australian company with its principal place of business at 203 Coward Street, Qantas Centre, Mascot NSW 2020 C3.  Qantas Airways conducts Passenger Air Transportation throughout the world, including into the United States, especially California.

23.    Defendant **Singapore Airlines** is a Singapore company with its principal place of business at Airline House, 25 Airline Road, 819829 Singapore. Singapore Airlines conducts Passenger Air Transportation throughout the world, including direct transpacific flights into the United States, especially California.

24.    Defendant **Thai Airways** is a Thailand company with its principal place of business at 89 Vibhavadi-Rangsit Road, Bangkok, Thailand 10900. Thai Airways conducts Passenger Air Transportation throughout the world, including direct transpacific flights into the United States, especially California.

25.    Defendant **United Airlines** is a Delaware corporation with its principal place of business at 77 W. Wacker, Chicago, IL 60601. United Airlines is one of the largest passenger airlines in the world with more than 3,600 flights a day to more than two hundred destinations.  United Airlines conducts Passenger

1  Air Transportation throughout the world, including into the United States,
2  especially San Francisco International Airport, where United Airlines operates a
3  hub and maintenance operation center.  United Airlines is the largest employer in
4  San Mateo County, California, which is located within this district.

### C. Unnamed Co-Conspirators

6  26.    At all relevant times, other airlines, trade groups, or other entities,
7  willingly conspired with Defendants in their unlawful restraint of trade.  All
8  averments herein against named Defendants are also averred against these
9  unnamed co-conspirators as though set forth at length.

### D. Agents

11  27.    The acts alleged to have been done by Defendants were authorized,
12  ordered or done by their directors, officers, agents, employees, or representatives
13  while actively engaged in the management of each of the Defendants' affairs.

## TRADE AND COMMERCE

15  28.    Throughout the Class Period, there was a continuous and
16  uninterrupted flow of Passenger Air Transportation in international commerce
17  throughout the United States and especially into and out of Los Angeles and San
18  Francisco.  Defendants' unlawful activities, as described herein, took place within
19  the flow of commerce to Passenger Flight customers throughout the world, and
20  had a direct, substantial and reasonably foreseeable effect upon interstate and
21  international commerce in the United States.

## PLAINTIFFS AND THE CLASS SUFFERED INJURY THROUGH COLLUSIVE PRICE INCREASES AND SURCHARGES

29.    As Defendants controlled a vast majority of the Passenger Flight
services during the Class Period with their dominant combined market share,
Passenger Flight customers were unable to shop for Passenger Air Transportation
from other carriers during that period, because of the lack of competition which
allowed Defendants to reap enormous profits from the Fuel  Surcharges.

30.    In addition, Fuel Surcharges were often treated by Defendants and other carriers similar to a tax or other surcharge, such as an airport facility charge or a government mandated September 11 security charge. As such, Fuel Surcharges were not always advertised as part of Defendants' fares, and were added on to the base fare as part of the purchase transaction.

31.    Because surcharges generally are designed to compensate for increased external costs, they should bear a relatively constant relationship to external cost levels. Thus, in a competitive market, Fuel Surcharges should rise and fall at relatively constant ratios to the associated jet fuel costs. Since their inception in 2004, the ratio of Defendants' Surcharges to external costs has increased steadily. The Fuel Surcharges bore no relationship to the Defendants' actual fuel costs or fuel cost increases.

32.    The ratio of Defendants' profits to external costs was therefore quite high due to the concerted implementation and maintenance of the agreed-upon Passenger Air Transportation and Fuel Surcharge price levels. So despite increased fuel costs during the Class Period, Defendants' Surcharges were actually responsible for outstanding ***profit growth*** for Defendants beyond record fuel costs.

## CLASS ACTION ALLEGATIONS

33.    Plaintiffs bring this action on their own behalf and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following Class:

> All individuals or entities (excluding governmental entities, Defendants, and their parents, predecessors, subsidiaries, affiliates, and their co-conspirators) who purchased passenger air transportation, for long haul transpacific flights and who paid a fuel surcharge on their tickets from any of the Defendants and their co-conspirators or any predecessor, subsidiary, or affiliate of each, at any time during the period from 2004 to August 2007.

34.    Because such information is in the exclusive control of Defendants, Plaintiffs do not know the exact number of Class members. Due to the nature of

the trade and commerce involved, however, Plaintiffs believe that Class members number at least in the thousands and are sufficiently numerous and geographically dispersed throughout the United States and the world so that joinder of all Class members is impracticable. It is estimated that there were more than 15 million passengers traveling to the Pacific out of California in 2006.

35.    There are questions of law or fact common to the Class, including:

a.    Whether Defendants engaged in a combination or conspiracy among themselves to fix, raise, maintain, and/or stabilize Passenger Air Transportation and Surcharge prices charged effecting commerce in the United States and throughout the world;

b.    The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants in furtherance of the conspiracy;

c.    Whether the alleged conspiracy violated Section 1 of the Sherman Act;

d.    Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the businesses or property of Plaintiffs and the other members of the Class;

e.    The effect of Defendants' conspiracy on the Passenger Air Transportation and Surcharge prices charged in the United States and throughout the world during the Class Period; and

f.    The appropriate measure of damages sustained by Plaintiffs and other members of the Class.

36.    Plaintiffs are members of the Class. Plaintiffs' claims are typical of the claims of the Class members. Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs purchased Passenger Air Transportation and Surcharges from one or more Defendants, and their interests are coincident with and not antagonistic to those of other members of the Class. Plaintiffs are

1  represented by counsel competent and experienced in the prosecution of antitrust
2  and class action litigation.

3      37.    The questions of law and fact common to the members of the Class
4  predominate over any questions affecting only individual members.

5      38.    A class action is superior to other methods for the fair and efficient
6  adjudication of this controversy.  Treatment as a class action will permit a large
7  number of similarly situated persons to adjudicate their common claims in a single
8  forum simultaneously, efficiently, and without the duplication of effort and
9  expense that numerous individual actions would engender.

10     39.    Class treatment will also permit the adjudication of relatively small
11 claims by many Class members who otherwise could not afford to litigate an
12 antitrust claim such as is asserted in this Complaint.

13     40.    This class action presents no difficulties in management that would
14 preclude maintenance as a class action.  Finally, the Class is readily definable and
15 is one for which records of the names and addresses of the members of the Class
16 exist in the files of Defendants.

17              **DEFENDANTS AND THE PASSENGER FLIGHT MARKET**

18     41.    Each Defendant possesses significant market share on their routes of
19 travel.  The principal competitors for the Defendants in the transpacific long haul
20 Passenger Air Transportation market are therefore one another.

21     42.    Passenger Air Transportation is a commodity product that is fungible
22 in the sense that Passenger Air Transportation provided by any one airline is
23 readily substitutable for the Passenger Air Transportation provided by any other
24 airline.

25     43.    Passenger Air Transportation is a homogenous service sold by
26 airlines, including Defendants, to airline customers, including Plaintiffs and the
27 members of the Class, primarily based on price.

28

**Class Action Complaint**                                                          9

44.    The Passenger Air Transportation market in the United States and worldwide is highly concentrated, and there exists substantial barriers to entry in this market; both factors facilitate the implementation and maintenance of a horizontal price-fixing cartel such as that perpetrated by Defendants and alleged herein.

## DEFENDANTS' CONCERTED FUEL SURCHARGES

45.    Generally, surcharges are a feature of the global air transportation market, in which airlines charge extra fees to their customers, above and beyond basic flight rate charges, with the intent of defraying certain external costs of the carriers.

46.    Beginning in 2004, Defendants agreed to act in concert with one another in demanding the Surcharges to defray fuel costs and agreeing when and how much to increase the Surcharges to their Passenger Flight customers.

47.    Defendants were aware that their imposition of Fuel Surcharges and other surcharges would not be successful if their supposed competitors did not join them; otherwise, customers would be free to seek out lower prices. For this reason, Defendants entered into agreements to raise surcharges at the same times and in the same amounts.

48.    But for Defendants' Passenger Air Transportation conduct, Defendants would have been unable to perpetrate the extent to which they increased the prices of their Fuel Surcharges.

49.    The collusion of Japan Airlines International and All Nippon Airways ("ANA") is representative of the behavior of the other Defendants. Japan Airlines International and ANA agreed to raise and lower fares on nearly always the same dates and were in lockstep on surcharges for transpacific fares:

///

///

///

June 8, 2004, ANA files a notice with the Japanese government to raise IATA international fares, in the wake of increased fuel prices, to and from Japan, effective **July 1**, 5% hike, exception North America economy fares, but not business class.

January 5, 2005, ANA announces it will add fuel surcharges on international fares on **February 1**. The surcharges for transpacific flights were 2,500 yen.

June 3, 2005, Japan Airlines files a notice with the Japanese government to raise its international fuel surcharge effective **July 1**.

January 16, 2006, Japan Airlines files a notice with the Japanese government to raise its international fuel charge effective **March 1**.

June 8, 2004, Japan Airlines files a notice with the Japanese government to raise international fares, in the wake of increased fuel prices, to and from Japan, effective **July 1**, 5% hike, exception North American economy fares, but not business class.

January 20, 2005, Japan Airlines announces it will add fuel surcharges on international passenger fares on **February 1**. The surcharges for transpacific flights were 2,500 yen.

June 7, 2005, ANA files a notice with the Japanese government to raise its international fuel surcharge effective **July** 7.

January 23, 2006, ANA files a notice with the Japanese government to raise its international fuel surcharge, effective **March 1**.

August 17, 2006, Japan Airlines files a notice with the Japanese government to raise its international fuel surcharge, effective **October 1**, from 8,000 yen to 13,600 yen ($66 to $113).

August 31, 2006, ANA files a notice with the Japanese government to raise its international fuel surcharge, effective **October 15**, from 8,000 yen to 13,600 yen ($66 to $113).

November 16, 2006, Japan Airlines files a notice with the Japanese government to reduce the fuel surcharge on international passenger fares effective **January 1**, lowering the surcharge from 13,600 yen to 13,000 yen ($113 to $108).

November 16, 2006, ANA files a notice with the Japanese government to reduce the fuel surcharge on international passenger fares effective **January 1**, lowering the surcharge from 13,600 yen to 13,000 yen ($113 to $108).

March 19, 2007, Japan Airlines files a notice with the Japanese government to reduce the fuel surcharge on international passenger fares effective **May 1**, to 11,000 yen or $91.

March 20, 2007, ANA files a notice with the Japanese government to reduce the fuel surcharge on international passenger fares effective **May 1**, to 11,000 yen or $91.

May 15, 2007, Japan Airlines files a notice with the Japanese government to raise the fuel surcharge on international passenger fares effective **July 1**, from 11,000 yen or $91 to 12,000 yen or $100.

May 25, 2007, ANA files a notice with the Japanese government to raise the fuel surcharge on international passenger fares effective **July 10**, from 11,000 yen or $91 to 12,000 yen or $100.

1    August 15, 2007, Japan Airlines files         August 20, 2007, ANA files a notice
                                                    with the Japanese government to raise
2    a notice with the Japanese                     the fuel surcharge on international
                                                    passenger fares effective **October 1**,
3    government to raise the fuel                    from 12,000 yen or $100 to 13,000
                                                    yen or $108.
4    surcharge on international passenger

5    fares effective **October 1**, from

6    12,000 yen or $100 to 13,000 yen or

7    $108.

8        50.    Other defendants did likewise.  United Airlines, for example, charged

9    a surcharge in line with Japan Airlines International and All Nippon Airways as

10   evidenced by the following ticket.  From July 10, 2007 to October 1, 2007 Japan

11   Airlines International and All Nippon Airways had their fuel surcharge on

12   international passenger fares transpacific set at 12,000 yen or $100.  The United

13   ticket for August 16, 2007 shows the surcharge fare, marked YQ, at $100.

14

15



24   ///

25   ///

26   ///

27   ///

28   ///

1

## **CARTEL-LIKE TRADE ORGANIZATIONS**

2      51.    Defendants' executives, as well as other air carriers' executives, met
3  formally or informally over the years at various trade meetings or meetings of
4  trade associations, such as the International Air Transport Association, the
5  Association of Asian Pacific Airlines, oneworld, Star Alliance and SkyTeam
6  Alliance.  At one or more of these meetings Defendants conspired to artificially
7  inflate fuel Surcharges on international passenger air transportation.

8      52.    One of the keys to the conspiracy is the 42-year-old **Association of**
9  **Asia Pacific Airlines** ("AAPA").  The 17-member trade association, based in
10  Kuala Lumpur, Malaysia, is the most significant group representing Asia/Pacific
11  carriers.  The AAPA boasts that its "member airlines carry 285 million passengers
12  and 10 million tonnes of cargo representing approximately one-fifth of global
13  passenger traffic and one-third of global air cargo traffic respectively."  Ten of the
14  defendants are members of AAPA.

15      53.    The primary purpose of AAPA is to serve as a forum for members'
16  views on issues of common interest and to foster close cooperation.  According to
17  the organization, "AAPA speaks with a common voice on behalf of the Asia
18  Pacific carriers and puts forward Asian perspectives when dealing with
19  governments, aircraft manufacturers, airport authorities and other organizations on
20  industry issues.  The activities of the Association cover every aspect of civil
21  aviation where the airlines feel they can work together for mutual benefit.  In
22  addition, AAPA retains access to specialized legal and aviation consultants in
23  Brussels and Washington, a reflection of the significant impact which the
24  profusion of U.S. and E.U. regulatory developments have on all international
25  carriers including Asia Pacific airlines."

26      54.    AAPA was formed during a meeting of Asian airline executives in
27  1965 to discuss regional cooperation.  The following year, Philippine Airlines,
28  China Airlines, Korean Airlines and Malaysian Airlines officially formed the

Orient Airlines Research Bureau. The group evolved into the Orient Airlines Association and in 1996 changed its name to Association of Asia Pacific Airlines.

55.    Another key to the conspiracy is the Geneva-based International Air Transport Association. All of the defendants are members of the IATA, which was founded in 1945 in Havana, Cuba. IATA represents more than 240 airlines comprising 94% of scheduled international air traffic. It describes itself as "the prime vehicle for inter-airline cooperation." It was an agreement reached at an IATA meeting in Geneva on May 28, 2004 that played a role in triggering the fuel Surcharge conspiracy.

56.    Alliance memberships by airline:

**Air New Zealand**

- Member of the Association of Asia Pacific Airlines.
- Member of the Star Alliance.
- Member of the International Air Transport Association.

**All Nippon Airways**

- Member of the Association of Asia Pacific Airlines.
- Member of the Star Alliance.
- Member of the International Air Transport Association.

**American Airlines**

- Member of oneworld.
- Member of the International Air Transport Association.

**Cathay Pacific Airways**

- Member of the Association of Asia Pacific Airlines.
- Member of oneworld.
- Member of the International Air Transport Association.

**China Airlines**

- Member of the Association of Asia Pacific Airlines.
- Member of the International Air Transport Association.

**EVA Airlines**
- Member of the Association of Asia Pacific Airlines.
- Member of the International Air Transport Association.

**Japan Airlines International**
- Member of the Association of Asia Pacific Airlines.
- Member of oneworld.
- Member of the International Air Transport Association.

**Malaysia Airlines**
- Member of the Association of Asia Pacific Airlines.
- Member of the International Air Transport Association.

**Northwest Airlines**
- Member of the SkyTeam Alliance.
- Member of the International Air Transport Association.

**Qantas Airways**
- Member of the Association of Asia Pacific Airlines.
- Member of oneworld.
- Member of the International Air Transport Association.

**Singapore Airlines**
- Member of the Association of Asia Pacific Airlines.
- Member of the Star Alliance.
- Member of the International Air Transport Association.

**Thai Airways**
- Member of the Association of Asia Pacific Airlines.
- Member of the Star Alliance.
- Member of the International Air Transport Association.

**United Airlines**
- Member of the Star Alliance.
- Member of the International Air Transport Association.

## CODE SHARING BUSINESS PARTNERSHIPS

57.    In addition to the four different alliances/trade groups, various defendants are in effect business partners with each other through what is called code sharing. Code sharing is a business term which was first originated in 1990 when Qantas Airways and American Airlines combined services between an array of U.S. and Australian cities. Code sharing is a legal business arrangement. However, it provides a mechanism to conduct illegal activity.

58.    A code share is part of a "cooperative services" agreement between the two carriers. It refers to the practice where a flight operated by an airline is jointly marketed as a flight for one or more other airlines. Most major airlines today have code sharing partnerships with other airlines. "Code" refers to the identifier used in flight schedule, generally the 2-character International Air Transport Association airline designator code and flight number. For example, YY123, flight 123 operated by the airline YY, could be sold by airline ZZ as ZZ456. It is a business partnership that allows airlines to earn revenue by selling tickets on a partner's flight.

59.    According to the U.S. Department of Transportation and Defendants, the following are the code sharing partnerships of the defendants listed alphabetically:

Air New Zealand / EVA Airways

Air New Zealand / Qantas (Tasman route)

Air New Zealand / Japan Airlines International

Air New Zealand / Northwest Airlines

Air New Zealand / Singapore Airlines

Air New Zealand / Thai Airways

Air New Zealand / United Airlines

All Nippon Airways / Asiana Airlines

All Nippon Airways / EVA Airways

All Nippon Airways / Malaysia Airlines

All Nippon Airways / Singapore Airlines

All Nippon Airways / United Airlines

China Airlines / American Airlines

Cathay Pacific Airways / American Airlines

Cathay Pacific Airways / Japan Airlines International

China Airlines / Thai Airways

EVA Airways / Air New Zealand

EVA Airways / American Airlines

EVA Airways / All Nippon Airways

EVA Airways / Qantas

EVA Air / American Airlines

Japan Airlines International / Air New Zealand

Japan Airlines International / American Airlines

Japan Airlines International  / Cathay Pacific

Japan Airlines International  / Korean Air

Japan Airlines International / Northwest Airlines

Japan Airlines International / Qantas Airlines

Japan Airlines International / Singapore Airlines

Japan Airlines International / Thai Airways

Malaysia Airlines / All Nippon Airways

Malaysia Airlines / Thai Airways

///

///

///

///

///

///

1      Northwest Airlines / Air New Zealand

2      Northwest Airlines / Asiana Airlines

3      Northwest Airlines / Japan Airlines International

4      Northwest Airlines / Korean Air

5      Qantas Airways / Air New Zealand

6      Qantas Airways / American Airlines

7      Qantas Airways / EVA Airways

8      Qantas Airways / Japan Airlines International

9      Singapore Airlines / Air New Zealand

10     Singapore Airlines / Asiana Airlines

11     Singapore Airlines / All Nippon Airways

12     Singapore Airlines / Malaysian Airlines

13     Singapore Airlines / United Airlines

14     Thai Airways / Air New Zealand

15     Thai Airways / China Airlines

16     Thai Airways / Japan Airlines International

17     Thai Airways / Malaysia Airlines

18     Thai Airways / United Airlines

19     United Airlines / Air New Zealand

20     United Airlines / All Nippon Airways

21     United Airlines / Asiana Airlines

22     United Airlines / Singapore Airlines

23     United Airlines / Thai Airways

24                    **CARTEL ACTIVITY MEETINGS**

25     60.    Over the years, executives of Defendant airlines have attended

26     numerous meetings where cartel-like activity was accomplished. Here are a few

27     examples of meetings where executives discussed and agreed on fuel surcharges:

28

61.    **The International Air Transport Association, Special Meeting, Geneva, May 28, 2004.** Fuel costs were the main topic of this meeting and there were agreements on how to add surcharges for fuel. The Montreal Gazette reported on June 1, 2004, that "member carriers of the International Air Transport Association might raise international fares by as much as five percent to help cover a surge in jet fuel costs. The proposed fare increase of between two percent and five percent was agreed at a May 28 meeting of the association, which represents more than 270 airlines worldwide, an IATA spokesperson said."

62.    **The International Air Transport Association Annual General Meeting and World Air Transport Summit, Singapore, June 6-8, 2004.** More than 600 airline executives attended this annual summit. Giovanni Bisignani, IATA CEO said in a welcoming statement, "While record high fuel prices challenge our profitability it is time to put our efforts toward rebuilding the industry." Immediately following this meeting on June 8, 2004 both Japan Airlines International and All Nippon Airways filed applications with the Japanese government to raise international passenger fares because of high fuel costs. In a news release announcing the Fuel Surcharge hike, Japan Airlines International said:

> **"The application follows a special meeting of the members of the International Air Transport Association in Geneva, May 28, (2004) when a resolution was discussed to raise fares in the wake of increased fuel prices. This resolution has now been adopted."**

Japan Airlines International and All Nippon Airways were in lockstep on June 8, 2004, both announcing on that day that a five percent fuel Surcharge would be go into effect, on the same day for both airlines, July 1, 2004.

63.    **2005 International Flight Services Association, Global Leadership Conference - Asia Pacific,  August 30 - September 1, 2005 Tokyo Japan:** This meeting was labeled as "The Challenge of Change." Among the participants

were, Makoto Fukada, Managing Director and Senior Vice President International

Passenger, Japan Airlines; Sandra Pineau, Senior Director of Planning and Design,

Continental Airlines; Charles Grossrieder, a manager at Cathay Pacific Airways;

Nikom Raviyan, Vice President, Thai Airways; Sandeep Bahl, General Manager,

Northwest Airlines, Shigeru Miyata, Vice President, Japan Airlines; Kriengsakdi

Phatharacharukul, Director, Thai Airways;  and Hee Won Jo, Senior Manager,

Asiana Airlines.

64.    **2nd Annual Asia Pacific & Middle East Aviation Outlook Summit 2006, December 5-6, 2005 Kuala Lumpur, Malaysia:** The theme of this meeting was "Towards Best Practice; Maximising Revenues and Minimising Costs." On the first day of the meeting,  the guests included  Dato Seri Bashir Ahmad, Malaysia Airport's CEO; Willy Boulter, Commercial Director for Virgin Atlantic Airways; and Stanley Kuppusamy, President, International Relations, Singapore Airlines. Fuel surcharges were a topic of discussion.

65.    **Aviation Emergency Response 2006, AAPA sponsored, September 19-21, 2006 Bangkok, Thailand:** This meeting was attended by international airport officials and AAPA member executives.  Meetings were held on increasing revenues in the transpacific area by way of Fuel Surcharges and other financial means.

66.    **3rd Annual Asia Pacific & Middle East Aviation Outlook Summit, November 9-10, 2006 Singapore:** Participating in this meeting were executives from most of the Defendant airlines, including Geoff Dixon, CEO of Qantas and Huang Cheng Eng, Executive VP for Singapore Airlines.  One of the issues presented and discussed was *"Fighting Costs: Fuel prices and managing risk exposure."*

///

///

///

67.    **AAPA Forum, November 28-29, 2006 Bandar Seri Begawan, Brunei Darussalam:** More than 120 aviation industry stakeholders attended this meeting, organized by AAPA.  At this meeting, Defendants and others discussed surcharges.

68.    **Asia Pacific Aviation Summit, July 24-25, 2007 Sydney, Australia:** This meeting was put on by the Asia Pacific aviation industry.  Some of the issues discussed included the impact of the investigation by the U.S. Department of Justice into fare price fixing.  Another topic was "working together efficiently" to diffuse the investigation of added surcharges.

## THE INVESTIGATION

69.    The U.S. Department of Justice ("DOJ") started investigating air passenger fuel surcharge conspiracies worldwide in 2006, particularly transatlantic routes and transpacific routes to and from the West Coast.  The DOJ announced on August 1, 2007 a $300 million settlement with British Airways and it cited passenger transatlantic routes.  In its news release, the DOJ said: "The Department also charged that between August 2004 and February 2006, British Airways engaged in a conspiracy to suppress and eliminate competition by fixing the Fuel Surcharge charged to passengers on long-haul international flights, including flights between the United States and the United Kingdom."

70.    The DOJ also focused on **transpacific flights** to and from the United States, noting that investigation is "ongoing" and includes other Defendants named herein.

71.    The DOJ also announced a settlement with Korean Air for fare price fixing on flights from the United States to Korea.  The DOJ stated that Korean Air has "agreed to cooperate with the Department's ongoing investigation."  Korean Air's unnamed co-conspirator in the passenger fare price fixing via Fuel Surcharges was widely reported to be Asiana Airlines, which sought amnesty.

1    72.    Under the Antitrust Criminal Penalty Enhancement and Reform Act
2  of 2004, a company can apply for leniency from the Department of Justice for its
3  participation in antitrust activities. Under the so-called Corporate Leniency
4  Program, if a company comes forward with information about antitrust activities
5  and cooperates in the investigation, it is eligible for conditional amnesty from
6  prosecution.

7    73.    Both Korean Air and Asiana Airlines are among the top transpacific
8  carriers in the world. It was not the first time Korean Air and Asiana Airlines have
9  been implicated in collusion and anticompetitive behavior. The Korean Fair Trade
10  Commission fined Korean Air and Asiana in 2001 for conspiring to set passenger
11  air transportation services in Korea.

12    74.    In addition, several of the Defendants and unnamed co-conspirators
13  have been identified as targets and or subjects in international investigations by
14  the U.S. Department of Justice and the European Union into air cargo fuel
15  surcharge price fixing. The targets, many of which are also named in civil suits,
16  include Defendant All Nippon Airways, Defendant American Airlines, Asiana
17  Airlines, Defendant Japan Airlines, Korean Airlines, Defendant Northwest
18  Airlines, Defendant Qantas Airways and Defendant United Airlines. In both the
19  air passenger and cargo investigations, Defendants and other airlines are accused
20  of developing and participating in conspiracies to increase revenue by assessing
21  inflated Fuel Surcharges.

22              **ADMISSIONS BY CO-CONSPIRATORS**

23    75.    On August 13, 2007, Qantas Chief Executive Officer Geoff Dixon
24  announced that **Qantas Airways** would set aside $40 million to cover a potential
25  fine in the United States as a result of Fuel Surcharges and price fixing in its
26  freight division. In a news release, Dixon was quoted as saying:
27  ///
28  ///

> **"On 1 August 2007, the U.S. Department of Justice announced**
> **that British Airways and Korean Air had agreed to plead guilty**
> **and pay separate US$300 million criminal fines for their roles in**
> **_conspiracies to fix prices of passenger and cargo flights._  British**
> **Airways subsequently announced that US$200 million of its fine**
> **related to cargo.  Based on these developments, a decision has**
> **been made to make a US$40 million (A$47 million) provision in**
> **the 2006/07 Financial Accounts."**

Dixon also was quoted as saying:

> **"We have investigated this issue thoroughly and are confident**
> **that the unacceptable conduct was limited to a small number of**
> **people."**

76.    On October 6, 2007, the Japanese daily newspaper *Asahi Shimbun*
reported that **Japan Airlines International** would book a roughly $171 million
charge for potential fines from a global price fixing probe by U.S. and European
Union officials.  The newspaper said:

> **"The company's move comes after the U.S. Justice Department**
> **fined British Airways PLC and Korean Air Lines Co. $300**
> **million each in August for fixing the prices of passenger and**
> **cargo flights with other airlines. The companies allegedly**
> **conspired to set fuel surcharges when oil prices rose."**

## VIOLATIONS ALLEGED

77.    During the Class Period Defendants engaged in a continuing
agreement, understanding, and conspiracy in restraint of trade to artificially raise,
fix, maintain, and/or stabilize the prices of Passenger Air Transport and Fuel
Surcharges in the United States and throughout the world in violation of Section 1
of the Sherman Act, 15 U.S.C. § 1.

78.    In formulating and effectuating the alleged contract, combination, or conspiracy, Defendants engaged in anti-competitive activities, the purpose and effect of which were to artificially raise, fix, maintain, and/or stabilize the prices of Passenger Air Transport and Fuel Surcharges.  These activities included the following:

    a.    agreeing to charge prices of Passenger Air Transport and Fuel Surcharges at certain levels and otherwise to fix, raise, maintain, and/or stabilize the prices of Passenger Air Transport and Fuel Surcharges charged in the United States and throughout the world;

    b.    charging Passenger Air Transport and Fuel Surcharges at the agreed-upon rates;

    c.    signaling increases in the price of Passenger Air Transport and Fuel Surcharges by, *inter alia*, publicly announcing their increases;

    d.    moving prices of their Passenger Air Transport and Fuel Surcharges in lockstep; and

    e.    announcing new Passenger Air Transport and Fuel Surcharges prices nearly simultaneously or within days of each other.

79.    During the Class Period, the Defendants increased, as a ratio to external costs – and profits – the Passenger Air Transport and Fuel Surcharges they charged.  These increases in Passenger Air Transport and Fuel Surcharges cannot be explained by actual increases in fuel prices or supply/demand forces, but rather were the result of anticompetitive conduct.

80.    During the Class Period, Plaintiffs and members of the Class purchased Passenger Air Transportation directly from Defendants (or their agents, subsidiaries, and/or controlled affiliates).

81.    The illegal combination and conspiracy alleged herein has had the following effects, among others:

1    a.    Price competition in the pricing of Passenger Air
2  Transportation and Fuel Surcharges thereon has been restrained, suppressed,
3  and/or eliminated;

4    b.    Price competition in the contracting of Passenger Air
5  Transportation has been restrained, suppressed, and/or eliminated;

6    c.    Prices for Passenger Air Transportation and Fuel Surcharges
7  thereon charged by Defendants have been fixed, raised, maintained, and/or
8  stabilized at artificially high, non-competitive levels; and

9    d.    Members of the Class have been deprived of the benefit of free
10  and open competition.

11                     **FRAUDULENT CONCEALMENT**

12    82.    Throughout the relevant period, Defendants affirmatively and
13  fraudulently concealed their unlawful conduct from Plaintiffs and the Class.

14    83.    Plaintiffs and the members of the Class did not discover, and could
15  not discover through the exercise of reasonable diligence, that Defendants were
16  violating the antitrust laws as alleged herein until shortly before this litigation was
17  commenced.  Nor could Plaintiffs and the members of the Class have discovered
18  the violations earlier than that time because Defendants conducted their
19  conspiracy in secret, concealed the nature of their unlawful conduct and acts in
20  furtherance thereof, and fraudulently concealed their activities through various
21  other means and methods designed to avoid detection.  The conspiracy was by its
22  nature self-concealing.

23    84.    Plaintiffs and the members of the Class could not have discovered the
24  unlawful conduct at an earlier date through the exercise of reasonable diligence
25  because of Defendants' active and purposeful concealment of their unlawful
26  activities.

27
28

85.    Defendants engaged in a successful, illegal price-fixing conspiracy with respect to Surcharges and other fees, which they affirmatively concealed, in at least the following respects:

a.    By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;

b.    By engaging in secret meetings and telephone calls in order to further their illicit Passenger Air Transportation and Fuel Surcharges cartel; and/or

c.    By giving false and pretextual reasons for their pricing for Passenger Air Transportation and Fuel Surcharges thereon, and their increases, during the relevant period and by describing such pricing and increases falsely as being the result of external costs rather than collusion.

86.    As a result of Defendants' fraudulent concealment of their conspiracy, Plaintiffs and the Class assert the tolling of any applicable statute of limitations affecting the rights of action of Plaintiffs and the members of the Class.

## INJURY TO PLAINTIFFS AND THE CLASS

87.    During the Class Period, Plaintiffs and the members of the Class, because of Defendants' antitrust violations, paid Surcharges and other fees they would not have paid absent such violations.

88.    As a result, Plaintiffs and the members of the Class it seeks to represent have been injured and damaged in their business and property in an amount to be determined according to proof.

89.    As a direct and proximate result of the illegal conspiracy, Plaintiffs and the members of the Class have been injured and financially damaged in their respective businesses and property, in that they have paid Surcharges and other fees during the Class Period they would not have paid in the absence of the illegal conspiracy.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that: .

A.    The Court determine that this action may be maintained as a class action under Rule 23(a) and (b) (3) of the Federal Rules of Civil Procedure;

B.    The Court adjudge and decree that the contract, combination and conspiracy alleged herein is a per se unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

C.    Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiffs and the Class for damages as allowed by law as determined to have been sustained by them;

D.    Each of the Defendants, successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding or concert of action, or adopting any practice, plan, program or design having a similar purpose or effect in restraining competition;

E.    The Court award Plaintiffs and the Class attorneys' fees and costs, and pre-judgment and post-judgment interest as permitted by law; and

F.    The Court award Plaintiffs and the Class such other and further relief as may be necessary and appropriate.

DATED: November 6, 2007

COTCHETT, PITRE & McCARTHY

ENGSTROM LIPSCOMB & LACK

By: _____

JOSEPH W. COTCHETT

*Attorneys for Plaintiffs and the Class*

1

## JURY TRIAL DEMAND

2    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial

3  by jury of all of the claims asserted in this Complaint so triable.

4

DATED: November 6, 2007

5

6                                    COTCHETT, PITRE & McCARTHY

7                                    ENGSTROM LIPSCOMB & LACK

8                                    By: _____

9

10                                        JOSEPH W. COTCHETT

11                                    *Attorneys for Plaintiffs and the Class*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28