COPY

E-filing

1  Susan G. Kupfer (Bar No. 141724)
   Kathleen S. Rogers (Bar No. 122853)
2  GLANCY BINKOW & GOLDBERG LLP
   One Embarcadero Center, Suite 760
3  San Francisco, CA  94111
   Telephone: (415) 972-8160
4  Facsimile:   (415) 972-8166
   skupfer@glancylaw.com
5

6

7                    UNITED STATES DISTRICT COURT

8                   NORTHERN DISTRICT OF CALIFORNIA

9
   RUFUS BROWNING, on behalf of himself and          Case No.    CV-08      1458
10 all others similarly situated,
                                                      CLASS ACTION COMPLAINT FOR
11                Plaintiff,                           DAMAGES

12         vs.                                        **JURY TRIAL DEMANDED**

13 AIR NEW ZEALAND, LTD.; ALL NIPPON
   AIRWAYS CO., LTD.; CATHAY PACIFIC
14 AIRWAYS, LTD.; CHINA AIRLINES, LTD.;
   EVA AIRWAYS CORPORATION; JAPAN
15 AIRLINES CORPORATION; QANTAS
   AIRWAYS, LTD.; SINGAPORE AIRLINES,
16 LTD.; and THAI AIRWAYS
   INTERNATIONAL PUBLIC COMPANY,
17 LTD.,
                  Defendants.
18

19

20

21

22

23

24

25

                                                      CLASS ACTION COMPLAINT

**INTRODUCTION**

1.     Plaintiff Rufus Browning brings this action on behalf of himself individually and on behalf of a plaintiff class of all persons and entities who purchased air passenger transportation services for transpacific flights to or from the United States (other than between the United States and Korea) from one of the named defendants between January 1, 2004 and the present (the "Class Period"), (the "Class").

2.     Defendants are among the largest airlines in the world, each flying millions of passengers a year.  Defendants service many of the same transpacific routes and are competitors of each other.  Plaintiff alleges that during the Class Period, defendants conspired, combined and contracted to fix, raise, maintain, and stabilize the prices at which they sold air passenger transportation services, including base fares and/or fuel surcharges, for transpacific flights to or from the United States other than between the United States and Korea ("Transpacific Air Services").

3.     As a result of the defendants' unlawful conduct, plaintiff and the other members of the Class paid artificially inflated prices for such Transpacific Air Services.  The prices they paid exceeded the amount they would have paid in a competitive market.

**JURISDICTION AND VENUE**

4.     Plaintiff brings this action under Sections 4, 12 and 16 of the Clayton Act (15 U.S.C. §§15, 22 and 26) for treble damages and injunctive relief, arising from violations by defendants of the antitrust laws, including Section 1 of the Sherman Antitrust Act (15 U.S.C. §1).

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1337(a).

6.     Venue is proper in this judicial district pursuant to 15 U.S.C. §§15, 22 and 26, and 28 U.S.C. §§1391(b), (c) and (d) in that defendants reside, transact business, are found and/or have agents within this judicial district, and a substantial part of the events giving rise to

CLASS ACTION COMPLAINT

1    plaintiff's claims occurred and a substantial portion of the affected interstate trade and commerce

2    described below has been carried out in this district.

3          7.     This Court has personal jurisdiction over defendants because each (1) transacted

4    business in this district; (b) directly or indirectly sold and delivered Transpacific Air Services in

5    this district; (c) has substantial aggregate contacts with this district; and (d) engaged in an illegal

6    price-fixing conspiracy that was directed at, and had the intended effect of causing injury to,

7    persons and entities residing in, located in, or doing business in this district.

8                               **INTRADISTRICT ASSIGNMENT**

9          8.     As indicated on the Civil Cover Sheet accompanying this complaint, related

10   multi-district litigation ("MDL") is pending in this Court before the Honorable Charles R.

11   Breyer, M:08-cv-1913-CRB, *In re Transpacific Air Passenger Transportation Antitrust*

12   *Litigation*.  The defendants, the industry, the geography and the basic allegations of the

13   conspiracy alleged in this complaint substantially overlap the allegations in the complaints

14   already consolidated before the Honorable Charles R. Breyer in M:08-cv-1913-CRB.  This

15   complaint expressly does not include allegations regarding flights between the United States and

16   Korea, or allegations against Korean Air Lines Co., Ltd. ("Korean Air") and Asiana Airlines,

17   Inc., ("Asiana") which are the subject of a separate MDL proceeding pending in the Central

18   District of California before the Honorable James S. Otero, MDL No. 1891 (Master File No. CV

19   07-05107 SJO (AGRx), *In re Korean Air Lines Co., Ltd. Antitrust Litigation*.

20                                      **PARTIES**

21   **A.    Plaintiff**

22         9.     Plaintiff Rufus Browning is a resident of Alameda County, California.  During the

23   Class Period, plaintiff purchased Transpacific Air Services from one or more of the defendants.

24

25

CLASS ACTION COMPLAINT

**B.     Defendants**

10.     Defendant Air New Zealand, Ltd. ("Air New Zealand") is a New Zealand company headquartered at Level 19, Quay Tower, 29 Customs St. West, Auckland, 1020, New Zealand. Air New Zealand is considered the South Pacific's largest international carrier with a focus on Australia and the South Pacific. The airline provides service within New Zealand, as well as to and from Australia, the South Pacific, Asia, North America and the United Kingdom. It has hubs in Auckland and Los Angeles. During the Class Period, Air New Zealand sold Transpacific Air Services.

11.     Defendant All Nippon Airways Co., Ltd. ("ANA") is a Japanese company headquartered at Shiodome-City Center, 1-5-2, Higashi-Shimbashi, Minator-Ku, Tokyo 105-7133, Japan. ANA is Japan's second largest domestic and international airline after Japan Airlines Corporation, operating 49 domestic and 22 international routes. During the Class Period, ANA sold Transpacific Air Services.

12.     Defendant Cathay Pacific Airways, Ltd. ("Cathay Pacific") is a Hong Kong-based company with its principal place of business at Cathay Pacific City, 8 Scenic Road, Hong Kong International Airport, Lantau, Hong Kong. Cathay Pacific serves 111 destinations in 35 countries and territories. Cathay Pacific reported in a December 13, 2007 press release on its website that Cathay Pacific and its subsidiary Dragonair combined carried over 2 million passengers during the month of November 2007. During the Class Period, Cathay Pacific sold Transpacific Air Services.

13.     Defendant China Airlines, Ltd. ("China Air") is a Taiwanese company headquartered at 131, Sec. 3, Nanking E. Rd., Taipei, Taiwan. China Air was the first Asian carrier to fly the transpacific route between Taiwan and the United States. It services 68 cities in 25 countries. During the Class Period, China Air sold Transpacific Air Services.

14.    Defendant EVA Airways Corporation ("EVA Air") is a Taiwanese company headquartered at 117, Sec.2, Chang-An E. Rd., Taipei, 104, Taiwan.  EVA Air is the largest privately-owned Taiwanese airline.  It operates passenger service to international destinations in Asia, Australia, New Zealand, Europe and North America.  During the Class Period, EVA Air sold Transpacific Air Services.

15.    Defendant Japan Airlines Corporation ("JAL") is a Japanese company headquartered at 4-11 Higashi-shinagawa 2 chome, Shinagawa-Ku, Tokyo 140-8638, Japan.  JAL is one of the largest air carriers in the world and the largest airline operator in Asia.  During the Class Period, JAL sold Transpacific Air Services.

16.    Defendant Qantas Airways Ltd. ("Qantas") is an Australian company headquartered at 203 Coward Street, Mascot NSW 2020, Australia.  Qantas is the largest domestic and international carrier in Australia.  During the Class Period, Qantas sold Transpacific Air Services.

17.    Defendant Singapore Airlines, Ltd. ("Singapore Air") is a Singapore company headquartered at Airline House, 25 Airline Road, Singapore 819829.  Singapore Air is one of Asia's leading airlines.  During the Class Period, Singapore Air sold Transpacific Air Services.

18.    Defendant Thai Airways International Public Company, Ltd. ("Thai Air") is a Thai company headquartered at 89 Vibhavadi Rangsit Road, Bangkok 10900, Thailand.  Thai Air flies to 74 destinations in 34 countries on four continents.  During the Class Period, Thai Air sold Transpacific Air Services.

C.    **Agents and Co-Conspirators**

19.    The acts alleged against the defendants in this complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of defendants' businesses or affairs.

20.     Certain other persons, firms, corporations and entities have participated as unnamed co-conspirators in the violations and conspiracy alleged.  In order to engage in the offenses charged and violations alleged, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged.

21.     At all relevant times, each defendant was an agent of each of the remaining defendants, and in doing the acts alleged, was acting within the course and scope of such agency. Each defendant ratified and/or authorized the wrongful acts of each of the defendants. Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts and transactions that are the subject of this action.

## TRADE AND COMMERCE

22.     Throughout the Class Period, defendants transported substantial numbers of passengers, in a continuous and uninterrupted flow of interstate and foreign trade and commerce, between various airports in the United States and foreign airports.

23.     Throughout the Class Period, there was a continuous and uninterrupted flow of invoices for payment, payments, and other documents essential to the provision of Transpacific Air Services transmitted in interstate and foreign trade and commerce between and among offices of defendants and their customers located throughout the world, including throughout the United States.

24.     Throughout the Class Period, defendants' unlawful activities, as described in this complaint, took place within, and substantially affected, the flow of interstate and foreign trade and commerce and had a direct, substantial and reasonably foreseeable effect upon commerce in the United States and elsewhere.

## FACTUAL ALLEGATIONS

**A.    The Industry**

25.    Defendants are large, international passenger air carriers.  Each defendant provides passenger air transportation services on transpacific routes to and from the United States.

26.    Some of the defendants operate jointly through marketing alliances and code sharing agreements.  For example, Singapore Air owns 25 percent of Air New Zealand.  Defendants Air New Zealand, ANA, Singapore Air, Thai Air and JAL are members of one of the most visible marketing alliances; the Star Alliance.  Air New Zealand has code share agreements with Qantas and Singapore Air.  Singapore Air also is a code share partner of ANA, and JAL is a code share partner of Thai Air.  Cathay Pacific has codeshare agreements with JAL and Qantas.

27.    These types of operating agreements create the potential for anticompetitive conduct, according to testimony by the Department of Justice's ("DOJ") Antitrust Division before the Senate Committee on Commerce, Science and Transportation:

> [A]irline marketing alliances…are essentially joint ventures between airlines.  These alliances fall somewhere between an outright merger and a traditional arm's-length interline agreement.  Marketing alliances come in all shapes and sizes… Alliances involving code-sharing are in many respects the most controversial.  They have the potential to be pro-competitive- they can create new service, improve existing service, lower costs, and increase efficiency, all to the benefit of the traveling public.  Code sharing agreements also have the potential to be anticompetitive.  They can result in market allocation,  capacity limitations, higher fares, or foreclosure of rivals from markets, all to the injury of the consumers… the greatest threat to competition comes when two of very few airlines that compete in a market enter into a code-sharing agreement in that market.

28.    In addition to their marketing relationships, the defendants in this case also have close dealings through their participation in trade organizations.   The defendants all are members of the International Air Transport Association ("IATA").  IATA is an international trade body representing over 240 airlines and has served as a forum for its members to discuss

1  rising fuel costs and the need for measures to mitigate such costs, such as increasing fares or

2  levying fuel surcharges.

3      29.    In addition to their general memberships in the IATA, Singapore Air's Chief

4  Executive Officer, Chew Choon Seng, Qantas' President, Geoff Dixon, Cathay Pacific's Chief

5  Executive Officer, Tony Tyler and JAL's President, Toshiyuki Shinmachi, all serve on IATA's

6  Board.

7      30.    Each defendant also is a member of the Association of Asia Pacific Airlines

8  ("AAPA"). AAPA is a regional trade association representing 17 major airlines based in Asia

9  Pacific. Like IATA, AAPA has served as a forum for its members to discuss rising fuel costs

10  and the need for measures to mitigate such costs, such as increasing fares or levying fuel

11  surcharges.

12  **B.    The Conspiracy**

13      31.    Between 1992 and 2002, profits from air passenger tickets, measured by revenue

14  per passenger mile, declined by over 30% mainly due to increasingly intense price competition.

15      32.    Since 2002, substantial fuel cost increases have put additional pressure on

16  passenger yields and airlines' profitability. After peaking in 2000, fuel prices declined for about

17  two years. In 2002, however, fuel costs began a period of exponential increases. Between 2004

18  and 2005, for example, fuel costs increased 43%. Between 2005 and 2006 fuel costs increased

19  50%.

20      33.    Airlines spend about 10% to 20% of their operating costs on fuel. The impact of

21  rising fuel costs on individual airlines' profits varies widely, depending on criteria such as fleet

22  utilization and efficiency. The impact of rising fuel also varies depending on how much of

23  projected fuel consumption was committed to at a fixed price at the beginning of the year, a

24  practice known as hedging. For example, in 2004 and 2005, Singapore Air hedged about 33% of

25

1  its fuel needs at $32[1] per barrel.  Some carriers, such as China Air, on the other hand, are not

2  allowed to hedge fuel costs, making them more susceptible to swings in the market.

3      34.    In late 2003, some airlines began imposing fuel surcharges, purportedly to cover

4  rising fuel costs.  Previously, cost recovery was built into the base fare for a ticket.

5      35.    Beginning on or about January 1, 2004, notwithstanding the varying effects of

6  rising fuel costs on each defendant, defendants began imposing increases that were lockstep in

7  their timing and amount.  The close timing and amount of defendants' fuel surcharge increases

8  were not coincidences, but rather the product of a collusive agreement to fix, raise, maintain and

9  stabilize prices for Transpacific Air Services.

10     36.    For example, on May 11, 2004, Qantas announced fuel surcharges between $4

11 and $10 for tickets effective May 13, 2004.  The following day, May 12, 2004, Air New Zealand

12 announced a fuel surcharge of $12.2 per sector on long-haul international services, effective May

13 17, 2004.  That same day, Cathay Pacific announced that it was considering a fuel surcharge on

14 ticket prices because of surging oil prices.  On June 7, 2004, China Air began collecting a $7 fuel

15 surcharge.

16     37.    On August 16, 2004, Cathay Pacific announced a fuel surcharge of $19 per

17 passenger for long-haul flights to cover the cost of rising jet fuel prices until November 30, 2004.

18 On August 19, 2004, Singapore Air announced fuel surcharges on tickets for all flights effective

19 September 1, 2004.  The surcharge increases ranged from $4 to $12.  On August 20, 2004,

20 Qantas announced that it would increase its fuel surcharges on international passenger fares to

21 $16. On August 26, 2004, Air New Zealand announced a new fuel surcharge increase of $6 per

22 sector on long-haul flights.

23

24

25

---

[1] All dollar amounts stated are in United States dollars unless otherwise specified.

38.    On October 20, 2004, Air New Zealand announced a fuel surcharge increase of $14 on all flights from New Zealand to Los Angeles, San Francisco and Honolulu as well as on flights from Pacific Island locations to Los Angeles.  On November 1, 2004 EVA Air added a fuel surcharge of $17 on air passenger tickets.  On November 8, 2004, Singapore Air announced that it would again increase prices for air passenger tickets for the second time in less than six months due to increasing fuel prices, effective November 15, 2004.

39.    On February 1, 2005, ANA and JAL added a $24 fuel surcharge on passenger flights between North America and Japan.  On the same day, Singapore Air added a $32 fuel surcharge on international air passenger tickets.

40.    On March 28 2005, Qantas increased its fuel surcharges on international passenger flights to $35.  On April 6, 2005, Air New Zealand announced an $8 increase in fuel surcharges on long-haul passenger flights, effective April 12, 2005.  On April 27, 2005, Singapore Air announced that it would increase its fuel surcharges on air passenger tickets to $15 per sector for travel between Hong Kong and San Francisco and $22 per sector for all other international flights effective May 1, 2005.  That same day, Thai Air announced that it would increase its fuel surcharges by $5, effective May 1, 2005, for all intercontinental flights.

41.    On July 1, 2005, ANA and JAL announced fuel surcharges on passenger air fares between North America and Japan.  On July 7, 2005, Singapore Air announced that it would increase its fuel surcharges on passenger flights to the United States to $45, effective July 20, 2005.

42.    On August 1, 2005, Thai Air increased its fuel surcharges to $35 on international passenger flights including those to and from the United States.  On August 22, 2005, Air New Zealand raised its fuel surcharges on international passenger flights to $92.  Then next day Qantas raised its surcharges to $75.  That month Thai Air again increased these surcharges by $15.

1   43.     On March 24, 2006, China Air and EVA Air announced that they would increase

2   their fuel surcharges from $32.50 to $39 for long-haul passenger flights effective April 6, 2006.

3   On April 21, 2006, Qantas raised its fuel surcharges to $65 on international passenger flights.

4   44.     On May 4, 2006, Air New Zealand announced that it would increase its fuel

5   surcharges on passenger flights from Australia to the U.S. (excluding Perth, Australia) by $11 to

6   $104 and Perth to the U.S. $16 to $138.  On May 15, 2006, China Air increased its fuel

7   surcharges to $70 on passenger flights between Taiwan and the U.S.  The next day, EVA Air

8   raised its fuel surcharges to $65 on flights between Singapore and the U.S.  On May 19, 2006,

9   Singapore Air increased its fuel surcharges to $90 on international passenger flights.  And on

10  June 1, 2006, Thai Air increased its fuel surcharged to $65 on passenger flights between

11  Bangkok and the U.S.

12  45.     On August 24, 2006, China Air increased its fuel surcharges on air passenger

13  flights to and from the U.S. to $90.  On August 31, 2006, Qantas raised its fuel surcharges to

14  $185 on international passenger flights.  On September 7 of that year, Singapore Air raised its

15  fuel surcharges on international flights to $90.

16  46.     On October 1, 2006, ANA and JAL raised their fuel surcharges to $113 on trans-

17  Pacific passenger flights.

18  47.     On January 1, 2007, ANA and JAL lowered their fuel surcharges on passenger

19  flights between Japan and North America to $108.  On February 1, 2007, Singapore Air

20  decreased its fuel surcharges on passenger flights between Singapore and the U.S. to $91.

21  48.     On May 1, 2007, ANA and JAL again lowered their fuel surcharges to $91 on

22  international passenger flights.

23  49.     Effective August 1, 2007, Cathay Pacific announced fuel surcharges of $54.40 on

24  passenger flights between Hong Kong and North America.  Effective August 10, 2007, EVA Air

25  announced $103 in fuel surcharges on passenger trans-Pacific flights to the U.S.

CLASS ACTION COMPLAINT

- 11 -

50.     On September 27, 2007, Cathay Pacific increased fuel surcharges HK$424 to HK$428 for long distance passenger flights. On October 1, 2007, ANA and JAL raised their fuel surcharges on passenger flights between Japan and the U.S.

51.     On November 7, 2007, Singapore Air began to charge $104 in fuel surcharges on passenger flights between Singapore and the U.S.

52.     Reports from trade association meetings support the existence of a conspiracy to impose and increase these fuel surcharges. For example, on May 27, 2004, Giovanni Bisignani, Director General and CEO of IATA stated:

> On average, fuel accounts for 16% of airline operating costs. Fuel prices are 55% higher than one year ago. This could add between US$8 and US$12 billion to our annual fuel bill and threatens to strangle our modest projected return to profitability. Instead of flying high, we could be left swimming in red ink... The current crisis resulting from sky high fuel prices once again highlights the industry's vulnerability to external shocks... We need to build a new industry structure capable of withstanding external shocks and delivering sustained profitability.

53.     The next day, at an IATA Special Meeting in Geneva, the IATA board agreed to recommend a three percent price increase for intercontinental flights from Europe and five percent for those from other regions to cover rising fuel costs.

54.     In a June 3, 2004 press release, Giovanni Bisignani of IATA again raised the same issue of high fuel prices:

> While record high fuel prices challenge our profitability it is time to put our efforts towards rebuilding the industry... It is appropriate that we meet in Singapore at this critical time in our industry's history. Singapore is a leader of the aviation industry. Singapore's liberal aviation policy and its industry leading airline and airport provide an excellent backdrop for discussing our many challenges. I am confident that this AGM, more than any other, will result in a new direction for the industry.

55.     Between June 6 and 8, 2004, about 150 airlines executives attended IATA's Annual General Meeting and World Air Transport Summit in Singapore. Rising fuel costs and IATA's recommended fare increases were the talk of the meeting. Giovanni Bisignani of IATA

1  told attendees, "Last year we survived the four horsemen of the apocalypse: SARS, conflict in

2  Iraq, terrorism and the economy.  But a fifth horseman, the price of oil, could add up to US$1

3  billion per month to our costs and deny us profitability yet again."

4      56.    A September 20, 2005 IATA press release acknowledged that fuel surcharges

5  were mitigating the impact of increased fuel costs: "Airlines are struggling to deal with a

6  ballooning fuel bill that is expected to reach US$97 billion – more than double the US$44 billion

7  in 2003.  Efficiency gains, high load factors, and fuel surcharges are helping mitigate a portion of

8  the impact of the extraordinary price of fuel."

9      57.    In fact, IATA data demonstrate that the imposition of fuel surcharges was a

10  revenue generator for the airlines, not simply a cost recovery mechanism.  The airlines' use of

11  fuel surcharges has allowed them to reach levels of profitability greater than when fuel prices

12  were much lower.

13      58.    For example, in October 18, 2007 remarks at the World Air Transport Forum,

14  Giovanni Bisignani of IATA stated, "The period since 2001 has been tough.  To survive, airlines

15  have been tough in response. ... The results show in the bottom line:  for the first time since

16  2000 airlines will turn a profit this year of US$5.6 billion."

17      59.    ANA reported a net profit of 7.68 billion *yen* for the first quarter of fiscal year

18  2006.  Thai Air collected nearly $80 million in fuel surcharges and reported profits in the third

19  quarter of 2006.  An August 10, 2006 article in *The China Post* quoted a securities analyst as

20  saying that "' [t]he higher fuel surcharge in place was also quite effective'" in raising Thai Air's

21  revenues.  Similarly, on August 28, 2007, Air New Zealand announced a net profit of NZ$214

22  million, up 123% from the previous year.  For the same period, Air New Zealand's operating

23  costs increased by 13% while the number of passengers increased only by 4.9%.

24      60.    A recent position paper from the Centre for Asia Pacific Aviation, a provider of

25  aviation intelligence, supports the conclusion that defendants were engaged in a conspiracy to fix

CLASS ACTION COMPLAINT

1  prices. The paper states, "Higher fuel prices drove the flag carriers away from the mindless

2  chase after market share into a more considered quest for profitability."

3        61.    As the following aggregate industry data reported by the IATA in September

4  2007 demonstrates, the airline industry's operating profits were already declining before there

5  was any substantial rise in fuel costs. These data also show that the airlines' fuel surcharges,

6  which were implemented in 2004, were not a true cost recovery mechanism, but rather a

7  camouflaged revenue generator. Consequently, the airlines' use of fuel surcharges has allowed

8  them to reach levels of profitability greater than when fuel prices were stable.

|  | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007f | 2008f |
|---|---|---|---|---|---|---|---|---|---|
| Passenger Revenues in Billions | $256 | $239 | $238 | $249 | $297 | $323 | $355 | $389 | $416 |
| Expenses in Billions | $318 | $319 | $311 | $323 | $376 | $409 | $440 | $473 | $500 |
| Crude Oil Price, Brent, $/barrel | $28.8 | $24.7 | $25.1 | $28.8 | $38.3 | $54.5 | $65.1 | $67.0 | $66.0 |
| Operating Profits in Billions | $1.1 | -$4.2 | -$3.7 | -$2.3 | -$1.5 | -$1.0 | -$0.1 | $1.1 | $1.5 |

      62.    The fact that defendants' fuel surcharges are revenue generators rather than a cost

recovery mechanism is further evidenced by the record profits that defendants have experienced

since implementing the surcharges.

      63.    ANA reported net income of 26.722 billion *yen* for the fiscal year 2006.

      64.    Thai Air reported third quarter 2007 net income of $260,397,326 (8.327 billion

*Baht*) and fuel surcharge proceeds of $127,152,046 (4.066 billion *Baht*). In the year previous, an

August 10, 2006 article in *The China Post* quoted a securities analyst as saying that "[t]he higher

fuel surcharge in place was also quite effective" in raising Thai Air's revenues.

      65.    In the 12 months ending June 30, 2007, Qantas saw a 49.9 percent increase in net

profit. The *Sydney Morning Herald* reported that each AU$1 of Qantas' fuel surcharge on

CLASS ACTION COMPLAINT

international flights translated to AU$10 million in annual revenue. For the half-year ended December 31, 2007, Qantas reported net income of $518,813,430.13 (AU $618 million).

66.    On August 7, 2007, *The Japan Times* reported that JAL's operating loss shrank from 31.9 billion *yen* the prior year to 8.5 billion *yen*. The article further stated, "Yoshimasa Kanayama, [JAL] executive officer, *attributed the improved earnings performance to* the carrier's efforts to cut costs, brisk business demand for international flights, higher revenue per passenger achieved through fare hikes on domestic routes and *increased fuel surcharges in international flights*." [Emphasis added.]

67.    On August 8, 2007, Cathay Pacific announced that its passenger revenue had increased 14.6% for the first half of the year, compared with same period in the previous year. The total number of passengers increased by only 4.1%, but passenger yield was up 14.6%.

68.    On August 28, 2007, Air New Zealand announced that its net profit after tax was NZ$214 million, up 123 percent from the previous year. Notably, operating revenue increased 13 percent, while the number of passengers carried only increased 4.9 percent.

69.    IATA has reported that whereas in 2002, airlines needed an oil price of less than $20 a barrel to break even, in 2007, they are profitable with oil prices at nearly $70 a barrel.

70.    A January 2007 article in *Air Transport World* reported that "airlines are surfing a wave of earnings momentum" and forecasted that "2007 may well be the peak year in the current airline earnings cycle."

71.    The following fares and surcharges published in November 2007 at *www.flightstats.com* show that defendants' collusive pricing is continuing:

**San Francisco to Auckland**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---|---|---|---|---|
| Air New Zealand | Coach | $918 | $255 | $1173 |
| Qantas | Coach | $918 | $255 | $1173 |

**San Francisco to Bangkok**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---------|-------|-----------|------------|-------|
| All Nippon | Coach | $650 | $281 | $931 |
| Japan Air | Coach | $620 | $281 | $901 |

**San Francisco to Hong Kong**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---------|-------|-----------|------------|-------|
| All Nippon | Coach | $580 | $269 | $849 |
| Japan Air | Coach | $579 | $269 | $848 |

**San Francisco to Sydney**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---------|-------|-----------|------------|-------|
| All Nippon | Coach | $818 | $312 | $1130 |
| Japan Air | Coach | $818 | $308 | $1126 |

| | | | | |
|---------|-------|-----------|------------|-------|
| Air New Zealand[2] | Coach | $718 | $312 | $1030 |
| Qantas | Coach | $718 | $308 | $1026 |

[2] Data for Flights from San Francisco to Sydney on New Zealand Air and Qantas were published on *www.flightstats.com* in March 2008.

CLASS ACTION COMPLAINT

**San Francisco to Taipei**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---|---|---|---|---|
| EVA Air | Coach | $719 | $274 | $993 |
| Japan Air | Coach | $620 | $274 | $894 |
| Qantas | Coach | $1575 | $274 | $1849 |
| Singapore Air | Coach | $900 | $274 | $1174 |
| Thai Air | Coach | $1660 | $274 | $1934 |

**San Francisco to Tokyo**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---|---|---|---|---|
| All Nippon | Coach | $529 | $270 | $799 |
| Japan Air | Coach | $529 | $270 | $799 |

D.    **Investigations by Competition Authorities**

72.    In or around February of 2006, news sources reported that the DOJ, European Union ("EU") and regulators in Asia were investigating possible price-fixing in the air cargo industry. The U.S. and European Commission ("EC") searched and contacted the offices of dozens of airlines around the world in connection with their investigations.   In or around June of 2006, the investigations were reported to have expanded into possible price-fixing of passenger airfares and fuel surcharges. These investigations have resulted thus far in three guilty pleas and fines assessed in the U.S. and Britain against British Air, Korean Air and Qantas.

73.    Following report of investigations into price-fixing of charges for air cargo, numerous lawsuits were filed on behalf of purchasers of air cargo shipping services against all major airlines involved in air cargo shipping, including almost all defendants named in this complaint. Twenty-three of the complaints were ordered consolidated on June 20, 2006 in the

1    Eastern District of New York, *In re Air Cargo Shipping Services Antitrust Litigation*, MDL 06-

2    1775. Thus far, Lufthansa, an amnesty applicant in the British and U.S. regulatory

3    investigations, is the only defendant who has settled with the plaintiffs (pending a fairness

4    hearing). Lufthansa AG was conditionally accepted after disclosing its participation in the

5    international air cargo conspiracy in which both British Air and Korean Air also were

6    participants.

7        74.    On August 1, 2007, the DOJ and the British Office of Fair Trading ("OFT")

8    announced that British Air, which was a shareholder in Qantas when Qantas first implemented

9    fuel surcharges, pleaded guilty to charges of price-fixing in both its air cargo and air passenger

10   operations, and agreed to pay fines of £121.5 million ($246 million) in Britain and $300 million

11   in the U.S. The plea agreements detailed British Air's participation in a conspiracy to fix prices

12   of fuel surcharges on air cargo shipments and passenger long-haul international flights.

13       75.    On August 1, 2007, along with announcement of the plea and fine of British Air,

14   the DOJ filed a criminal information against Korean Air in the United States District Court for

15   the District of Columbia, charging it with violating Section 1 of the Sherman Act for conspiring

16   with an unnamed rival airline in two conspiracies: to fix air cargo rates, and to fix prices of

17   components of passenger airfares and certain wholesale fares, on flights from the United States

18   to Korea. That same day, the DOJ announced that Korean Air had agreed to plead guilty and pay

19   a $300 million fine for its participation in the two charged conspiracies.

20       76.    Civil suits were also filed in connection with the investigations into price-fixing

21   of air passenger fares and fuel surcharges. In or around June of 2006, suits filed in the U.S. by

22   passengers on British Air flights originating in Britain and the United States alleging that British

23   Air and Virgin Atlantic conspired to fix prices of passenger airfares including fuel surcharges,

24   were consolidated in the U.S. District Court for the Northern District of California. British Air

25   and Virgin Atlantic have settled with the two classes of plaintiffs, the U.S. purchasers receiving

CLASS ACTION COMPLAINT

$59 million and the British purchasers receiving £73.5 million or $144.7 million. British Air's long-haul international flights from Britain and the U.S. fly to numerous destinations around the world, including Hong Kong and other Asia-Pacific destinations in Australia, China, Indonesia, Japan, Malaysia, New Zealand, Singapore, South Korea, Thailand and Vietnam. Virgin Air flights from Britain and the U.S. travel to numerous world-wide destinations including Hong Kong, Shanghai, Singapore, Sydney and Tokyo.

77.    U.S. civil suits alleging a price-fixing conspiracy between Korean Air, Asiana and unnamed co-conspirators related to price-fixing of passenger fares and fuel surcharges on flights between the U.S. and Korea have been consolidated in the Central District of California, MDL No. 1891 (Master File No. CV 07-05107 SJO (AGRx)).

78.    In March of 2007, the FBI raided the Los Angeles office of ANA in connection with the DOJ investigation of price-fixing of air cargo shipments and European regulators raided offices of airlines in Europe, including KLM Dutch Airlines.

79.    On November 27, 2007, Qantas pleaded guilty to charges of conspiring with unnamed co-conspirators to fix rates for air cargo shipments, and agreed to pay $61 million in fines. Qantas has agreed to cooperate with the DOJ's "ongoing investigation."

80.    In December 2007, the EU reported that it had charged several airlines with an alleged air-cargo cartel. British Air, SAS and JAL confirmed they had received the formal charges and would study them. The EC also reportedly served Statements of Objection regarding its air cargo price-fixing investigation on Air New Zealand, ANA, Cathay Pacific, Singapore Air and Thai Air, with responses due this month.

81.    Recent reports state that the EU has begun an antitrust probe into possible price-fixing by international airlines flying between EU countries and Japan. German carrier Lufthansa, KLM Royal Dutch Airlines, a unit of Air France-KLM, have confirmed that their

CLASS ACTION COMPLAINT

1  offices in Frankfurt and Amsterdam were raided.  A spokesman for an EU Competition

2  Commissioner stated that the investigation would not be limited to European airlines.

3      82.    On or about March 12, 2008, three months after Qantas' guilty plea regarding

4  price-fixing on air cargo shipments, the DOJ has summoned several senior Qantas freight

5  managers to San Francisco to appear at an investigation into illegal price-fixing between

6  international airlines.  As reported, the Qantas interviews come as international regulators

7  continue to investigate one of the biggest cartel-breaking operations in history.  Court documents

8  stemming from a court battle between the Australian Competition and Consumer Commission

9  ("ACCC") and Korean Air – which has refused to hand over documents- revealed that the ACCC

10  investigations are in their final stages and that the ACCC is poised to act, 19 months after

11  launching its own inquiry.

12      83.    The admissions of culpability by certain airlines and the widespread and

13  concerted investigations of regulatory authorities demonstrate that the structure of the

14  international airline industry is conducive to anticompetitive conduct and that the conspiracy

15  alleged is plausible.

16  **FRAUDULENT CONCEALMENT**

17      84.    Throughout the Class Period, defendants affirmatively and fraudulently concealed

18  their unlawful conduct against plaintiff and the Class.

19      85.    Plaintiff and the members of the Class did not discover, and could not have

20  discovered through the exercise of reasonable diligence, that defendants were violating the

21  antitrust laws as alleged in this complaint until August 3, 2007, when it was reported that Qantas

22  was involved in the investigation by competition authorities into price-fixing of passenger and

23  cargo flights.

24      86.    Plaintiff could not have discovered the existence of the combination and

25  conspiracy alleged at an earlier date by the exercise of reasonable due diligence because of the

CLASS ACTION COMPLAINT

1  deceptive practices and techniques of secrecy employed by the defendants and their co-

2  conspirators to avoid detection and affirmatively conceal such violations, including without

3  limitation, falsely attributing price increases to increased operating costs. The conspiracy by its

4  nature was self-concealing.

5      87.    Plaintiff had no reason to disbelieve defendants' statements which on their face

6  appeared to be reasonable explanations for the pricing of Transpacific Air Services.

7  Furthermore, most of the explanations provided by defendants involved non-public and/or

8  proprietary information completely in defendants' control such that plaintiff and members of the

9  Class could not verify their accuracy. Defendants' purported reasons for the price increases of

10 Transpacific Air Services were materially false and misleading and were made for the purpose of

11 concealing defendants' anti-competitive scheme as alleged. In truth, at all relevant times, the

12 price of Transpacific Air Services was artificially inflated and maintained as a direct result of the

13 defendants' anti-competitive scheme, the operation of which was a substantial, but undisclosed,

14 factor in the pricing of Transpacific Air Services during the Class Period.

15     88.    Defendants further affirmatively concealed their conspiracy by agreeing among

16 themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and

17 communications in furtherance of their illegal scheme and by engaging in secret meetings,

18 telephone calls, and other communications in order to further their illicit cartel.

19     89.    As a result of defendants' fraudulent concealment of their conspiracy, plaintiff

20 and the members of the Class assert the tolling of any applicable statutes of limitations affecting

21 the rights of action of Plaintiff and the members of the Class.

22                    **CLASS ACTION ALLEGATIONS**

23     90.    Plaintiff brings this action on behalf of himself individually, and as a class action

24 pursuant to Federal Rules of Procedure, Rule 23(a) and (b) on behalf of the following class (the

25 "Class"):

CLASS ACTION COMPLAINT

1
2
3
4

All persons and entities that purchased passenger air transportation services that included at least one transpacific flight segment to or from the United States (other than between the United States and Korea) from one or more defendant(s) between January 1, 2004 and the present. The Class does not include: (1) defendants; (2) defendants' parents, subsidiaries, of affiliates; (3) any governmental entities; (4) any co-conspirators; or (5) any judicial officer to whom this case is assigned.

5
6    91.    Plaintiff does not know the exact number of Class members because such

information is in the exclusive control of defendants. Plaintiff believes that, due to the nature of

7
8    the trade and commerce involved, there are most likely hundreds of thousands, if not millions, of

Class members in the United States and the world such that joinder of all Class members is

9
10   impracticable.

92.    Plaintiff's claims are typical of the claims of the Class in that plaintiff purchased

11   Transpacific Air Services from one or more defendants, all Class members were damaged by the

12   same wrongful conduct, and the relief sought is common to the Class.

13   93.    Numerous questions of law or fact arise from defendants' anti-competitive

14   conduct that are common to the Class. These common questions include:

15           a.    whether defendants engaged in a contract, combination or conspiracy with

16                 their co-conspirators to fix, raise, maintain, and/or stabilize the prices for

17                 Transpacific Air Services;

18           b.    whether the purpose and/or effect of the acts and omissions alleged was to

19                 restrain trade, or to affect, fix, control, and/or maintain the prices for

20                 Transpacific Air Services;

21           c.    the existence and duration of the horizontal agreements alleged to fix,

22                 raise, maintain, and/or stabilize the prices for Transpacific Air Services;

23           d.    whether defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

24

25

CLASS ACTION COMPLAINT

e.    whether defendants fraudulently concealed their conspiracy so as to equitably toll any applicable statutes of limitations;

f.    whether defendants' agents, officers, employees, or representatives participated in correspondence and meetings in furtherance of the illegal conspiracy alleged in this complaint and if so, whether such agents, officers, employees or representatives were acting within the scope of their authority and in furtherance of defendants' business interests;

g.    whether, and to what extent, the conduct of defendants caused injury to plaintiff and members of the Class, and if so, the appropriate measure of damages; and

h.    whether plaintiff and members of the Class are entitled to injunctive relief to prevent he continuance or furtherance of the violation of Section 1 of the Sherman Act alleged.

94.    These questions of law or fact are common to the Class and predominate over any other questions affecting only individual Class members.

95.    Plaintiff will fairly and adequately represent the interests of the Class in that he is a typical purchaser of Transpacific Air Services from defendants and his claims are coincident and not in conflict with the claims of any other member of the Class.

96.    Plaintiff is represented by counsel competent and experienced in the prosecution of antitrust and class action litigation.

97.    A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy because:

CLASS ACTION COMPLAINT

a.    The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

b.    The Class is readily definable and one for which records should exist in the files of defendants.

c.    Prosecution as a class action will eliminate the possibility of repetitious litigation.

d.    Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require.

e.    Class action treatment will permit the adjudications of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this complaint on an individual basis.

## COUNT I

### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1

98.    Plaintiff incorporates by reference the preceding allegations of this Complaint as if fully set forth.

99.    Although the exact start date of the conspiracy is unknown to plaintiff, he believes that beginning on or about January 1, 2004, defendants, by and through their officers, directors, employees, agents, or other representatives, entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

CLASS ACTION COMPLAINT

100.    Defendants and their co-conspirators agreed to and did restrain trade or commerce by fixing, raising, maintaining, and/or stabilizing at artificial and non-competitive levels, the prices of Transpacific Air Services.

101.    Upon information and belief, for the purpose of formulating and effectuating their contract, combination or conspiracy, defendants and their co-conspirators did those things they contracted, combined or conspired to do, including:

      a.    participating in meetings, conversations, and communications to discuss the prices of Transpacific Air Services;

      b.    agreeing to the prices that would be charged for Transpacific Air Services;

      c.    issuing price announcements and price quotations in accordance with the agreements reached;

      d.    charging plaintiff and the members of the Class for Transpacific Air Services at agreed-upon levels; and

      d.    engaging in meetings, conversations, and communications for the purpose of monitoring, enforcing and adhering to the agreed-upon prices.

102.    As a direct result of the unlawful conduct of defendants and their co-conspirators in furtherance of their continuing contract, combination or conspiracy, plaintiff and the other members of the Class have been injured in their business and property in that they have paid more for Transpacific Air Services than they would have paid in the absence of defendants' price fixing.

**EFFECTS**

103.    The above combination and conspiracy has had the following effects, among others:

a.    price competition in the sale of Transpacific Air Services by defendants and their co-conspirators has been restrained, suppressed, and eliminated throughout the United States;

b.    prices for Transpacific Air Services sold by defendants have been raised, fixed, maintained and stabilized at artificially high and non-competitive levels throughout the United States and the areas of the world defendants serve on transpacific flights; and

c.    purchasers of Transpacific Air Services from defendants have been deprived of the benefit of free and open competition in the purchase of such services; and

d.    competition in the sale of Transpacific Air Services has been restrained, suppressed or eliminated.

104.    As a direct and proximate result of the unlawful conduct of defendants, plaintiff and the other members of the Class have been injured in their business and property in that they paid more for Transpacific Air Services than they otherwise would have paid in a competitive marketplace absent the unlawful conduct of defendants.

## DAMAGES

105.    During the Class Period, plaintiff and the other members of the Class purchased Transpacific Air Services directly from defendants or their subsidiaries, agents, and/or affiliates, and as a direct and proximate result of the antitrust violations alleged, paid more for such services than they would have paid in the absence of such antitrust violations. As a result, plaintiff and the other members of the Class have sustained damages to their business and property in an amount to be determined at trial.

CLASS ACTION COMPLAINT

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays as follows:

A.      that the Court determine that this action may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3) on behalf of the Class defined, and issue an order directing that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to each member of the Class;

B.      that the Court adjudge and decree that the unlawful combination and conspiracy alleged is an unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. §1);

C.      that the Court enter judgment against defendants, jointly and severally, in favor of plaintiff and the Class;

D.      that the Court award plaintiff and the Class treble damages;

E.      that the Court award plaintiff and the Class attorneys' fees and costs as well as pre-judgment and post-judgment interest as permitted by law;

F.      that defendants and their co-conspirators, their respective successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees and all other persons acting or claiming to act on behalf of defendants or their co-conspirators, or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combination , conspiracy, agreement, understanding or concert of action, or adopting any practice, plan, program or design having a similar purpose or effect in restraining competition; and

G.      that the Court award plaintiff and the Class such other and further relief as it may deem necessary and appropriate.

CLASS ACTION COMPLAINT

1

## JURY DEMAND

2    Plaintiff demands a jury trial, pursuant to Federal Rule of Civil Procedure 38(b), of all

3    triable issues.

4    DATED: March 14, 2008

5

*Susan G. Kupfer*

Susan G. Kupfer (Bar No. 141724)

6    Kathleen S. Rogers (Bar No. 122853)
GLANCY BINKOW & GOLDBERG LLP

7    One Embarcadero Center, Suite 760
San Francisco, CA  94111

8    Telephone: (415) 972-8160
Facsimile:  (415) 972-8166

9    skupfer@glancylaw.com
krogers@glancylaw.com

10

11    *Attorneys for Plaintiff and the Proposed Class*

12

13

14

15

16

17

18

19

20

21

22

23

24

25