Michael P. Lehmann (77152; mlehmann@hausfeldllp.com)
Christopher L. Lebsock (184546; clebsock@hausfeldllp.com)
Jon T. King (205073; jking@cmht.com)
**HAUSFELD LLP**
44 Montgomery Street, Suite 3400
San Francisco, CA  94104
Telephone:  (415) 633-1908
Facsimile:  (415) 358-4980

Michael D. Hausfeld (mhausfeld@hausfeldllp.com)
**HAUSFELD LLP**
1700 K Street, NW, Suite 650
Washington, DC 20006
Telephone:  (202) 540-7200
Facsimile:    (202) 540-7201

Joseph W. Cotchett (36324; jcotchett@cpmlegal.com)
Nanci E. Nishimura (152621; nnishimura@cpmlegal.com)
Steven N. Williams (175489; swilliams@cpmlegal.com)
Aron K. Liang (228936; aliang@cpmlegal.com)
Matthew K. Edling (250940; medling@cpmlegal.com)
**COTCHETT, PITRE & MCCARTHY**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone:  (650) 697-6000
Facsimile:    (650) 697-0577

*Interim Class Counsel For The Putative Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TRANSPACIFIC PASSENGER AIR TRANSPORTATION ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | No. 07-CV-5634-CRB<br><br>MDL 1913<br><br><u>CLASS ACTION</u><br><br>**PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

1

# TABLE OF CONTENTS

2   NATURE OF THE ACTION.................................................................................................. 1

3   JURISDICTION AND VENUE ........................................................................................... 2

4   PLAINTIFFS ...................................................................................................................... 3

5   DEFENDANTS ................................................................................................................... 5

6   AGENTS ............................................................................................................................ 21

7   NON-DEFENDANT, NAMED CO-CONSPIRATORS ...................................................... 21

8   UNNAMED CO-CONSPIRATORS ................................................................................... 22

9   INTERSTATE TRADE AND COMMERCE....................................................................... 22

10  THE FOREIGN TRADE AND ANTITRUST IMPROVEMENT ACT IS INAPPLICABLE .... 22

11  FACTUAL ALLEGATIONS .............................................................................................. 24

12         A.   Aspects Of The Airline Industry That Facilitate The Alleged Conspiracy.............. 24

13              1.   The Airline Industry's Use Of Airline Alliances ......................................... 24

14              2.   The Industry's Use Of Trade Associations .................................................. 27

15         B.   The Conspiracy ...................................................................................................... 30

16              1.   Base Passenger Fares Are Set In An Anticompetitive Environment ........... 31

17                   a.   Immunized IATA Fares .................................................................... 31

18                   b.   The Use Of Immunized IATA Fares As A Benchmark For Non-
                          Immunized Fares.............................................................................. 35

19

20                   c.   Lockstep Pricing Is Not To Be Expected In A Competitive Market 36

21                   d.   Specific Examples Of Base Fare Coordination................................. 39

22              2.   Fuel Surcharges ......................................................................................... 53

23                   a.   Defendants' Unsuccessful Effort To Obtain Immunity For Fuel
                          Surcharge Agreements .................................................................... 53

24                   b.   Defendants' Fuel Surcharges Which Commenced In 2004 Contrast
                          With Their Conduct In The Preceding Years.................................... 55

25

26                   c.   Fuel Surcharges Were Implemented And Raised Through Collective
                          Action ............................................................................................ 66

27                   d.   Coordination Of Fuel Surcharge Increases Are Not An Expected By-
                          Product Of Competition .................................................................. 76

28

e.    Substantial Increases In Profitability Are Not An Expected By-Product Of Competition ................................................................. 76

3.    Additional Evidence Establishes That There Was A Wide-Ranging Conspiracy To Impose Fuel Surcharges In The Closely Related Cargo Market During the Class Period ..................................................................... 78

GOVERNMENT INVESTIGATIONS INTO THE AIR PASSENGER INDUSTRY AND THE CLOSELY RELATED AIR CARGO INDUSTRY ................................................................. 79

ACCRUAL OF CLAIM, EQUITABLE TOLLING, EQUITABLE ESTOPPEL, AND FRAUDULENT CONCEALMENT ........................................................................................ 87

CLASS ACTION ALLEGATIONS ........................................................................................ 89

COUNT I: VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1 .............. 91

PRAYER FOR RELIEF.............................................................................................................. 93

JURY DEMAND ........................................................................................................................ 94

Appendix A ................................................................................................................................ 102

Appendix B ................................................................................................................................ 104

Appendix C ................................................................................................................................ 105

Appendix D ................................................................................................................................ 107

Appendix E ................................................................................................................................ 108

Appendix F................................................................................................................................. 110

Appendix G ................................................................................................................................ 111

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NATURE OF THE ACTION

1.      This action arises out of a long-running, international conspiracy by the defendants named herein (collectively, "Defendants") and their co-conspirators which began no later than January 1, 2000, and continues to the present (the "Class Period"), to fix, raise, maintain, and/or stabilize air passenger travel, including associated surcharges, for international flights involving at least one flight segment between the United States and Asia/Oceania[1] in violation of Section 1 of the Sherman Antitrust, 15 U.S.C. § 1.

2.      As set forth in greater detail below, beginning no later than January 1, 2000, the Defendants and their unnamed co-conspirators began imposing air fare increases, including fuel surcharge increases, on international air passengers that were in substantial lockstep both in their timing and amount.  The close timing and amount of Defendants' increases were not coincidences, but rather were the product of a collusive agreement to fix, raise, maintain, and stabilize the prices of base passenger fares and fuel surcharges on international flights.

3.      This complaint is based upon the investigation of counsel and information provided by a participant in the conspiracy.  The participant has provided Interim Class Counsel with the dates on which meetings took place to initiate and coordinate the conspiracy and the identities of those who participated in these meetings and communications.  The participant has substantiated these descriptions by identifying pertinent documents.

4.      The complaint is filed during the pendency of various on-going enforcement actions taken by competition authorities around the world concerning anticompetitive conduct in the air passenger transportation industry.  The actions taken so far include, but are not limited to:

- Korean Air Lines, Ltd.'s ("KAL") guilty plea in the United States for participating in a conspiracy with others to fix the prices of passenger travel, including certain fares and surcharges. "Plea Agreement," (Aug. 1, 2007) in *United States v. Korean Air Lines, Ltd.*, No.Cr. 07-184 JDB (D.D.C.).

- Asiana Airlines, Inc.'s ("Asiana") guilty plea in the United States for participating in a conspiracy with others to fix the prices of certain air passenger fares. "Plea

---

[1]/      Oceania is defined as Australia, New Zealand, and the Pacific Islands.  *See* http://www.airnewzealand.com/gateway.jsp.

Agreement" (April 9, 2009) in *United States v. Asiana Airlines, Inc.*, Cr. No. 09-Cr-00009 JDB (D.D.C.)

● The grant of conditional immunity from the United States Department of Justice ("DOJ") to at least one of the Defendants in exchange for its agreement to cooperate with an investigation concerning price-fixing of passenger travel, including surcharges.

● Virgin Atlantic's receipt of leniency from the DOJ and British competition authorities after disclosing its participation in a conspiracy to fix the prices of long-haul international passenger travel, including surcharges.

● British Airways PLC's ("British Airways") guilty plea in the United States and admission to British competition authorities concerning its involvement in a conspiracy to fix the price of long-haul international air transportation, including surcharges. "Plea Agreement" (July 31, 2007) in *United States v. British Airways PLC*, No. Cr 07183 (D.D.C.)

## **JURISDICTION AND VENUE**

5.    This complaint is filed under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to obtain injunctive relief for violation of Section 1 of the Sherman Act (15 U.S.C. § 1). The Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

6.    Venue is proper in this District pursuant to Sections 4(a) and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22), and 28 U.S.C. § 1391(b), (c), and (d) because Defendants reside, transact business, are found within, and/or have agents within this District and a substantial part of the events giving rise to Plaintiffs' claims occurred and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

7.    This Court has personal jurisdiction over Defendants because, *inter alia,* each: (a) transacted business in this District; (b) directly or indirectly sold and/or delivered passenger air transportation in this District; (c) has substantial aggregate contacts with this District; and/or (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

**PLAINTIFFS**

8.      Plaintiff Meor Adlin is a California resident.  During the Class Period, Plaintiff purchased air transportation services from one of more of the Defendants that included at least one flight segment between the United States and Asia/Oceania and has suffered pecuniary injury as a result of the antitrust violation alleged herein.

9.      Plaintiff Franklin Ajaye is a California resident.  During the Class Period, Plaintiff purchased air transportation services from one of more of the Defendants that included at least one flight segment between the U.S. and Asia/Oceania and has suffered pecuniary injury as a result of the antitrust violation alleged herein.

10.     Plaintiff Andrew Barton is a California resident.  During the Class Period, Plaintiff purchased air transportation services from one of more of the Defendants that included at least one flight segment between the U.S. and Asia/Oceania and has suffered pecuniary injury as a result of the antitrust violation alleged herein.

11.     Plaintiff Lori Barrett is a resident of Ontario, Canada.  During the Class Period, Plaintiff purchased air transportation services from one of more of the Defendants that included at least one flight segment between the U.S. and Asia/Oceania and has suffered pecuniary injury as a result of the antitrust violation alleged herein.

12.     Plaintiff Larry Chen is a California resident.  During the Class Period, Plaintiff purchased air transportation services from one of more of the Defendants that included at least one flight segment between the U.S. and Asia/Oceania and has suffered pecuniary injury as a result of the antitrust violation alleged herein.

13.     Plaintiff Rachel Diller is a California resident.  During the Class Period, Plaintiff purchased air transportation services from one of more of the Defendants that included at least one flight segment between the U.S. and Asia/Oceania and has suffered pecuniary injury as a result of the antitrust violation alleged herein.

14.     Plaintiff Scott Frederick is a Washington resident.  During the Class Period, Plaintiff purchased air transportation services from one of more of the Defendants that included

1   at least one flight segment between the U.S. and Asia/Oceania and has suffered pecuniary injury

2   as a result of the antitrust violation alleged herein.

3       15.     Plaintiff David Kuo is a California resident.  During the Class Period, Plaintiff

4   purchased air transportation services from one of more of the Defendants that included at least

5   one flight segment between the U.S. and Asia/Oceania and has suffered pecuniary injury as a

6   result of the antitrust violation alleged herein.

7       16.     Plaintiff Dickson Leung is a California resident.  During the Class Period,

8   Plaintiff purchased air transportation services from one of more of the Defendants that included

9   at least one flight segment between the U.S. and Asia/Oceania and has suffered pecuniary injury

10   as a result of the antitrust violation alleged herein.

11      17.     Plaintiff Brendan Maloof is a New York resident.  During the Class Period,

12   Plaintiff purchased air transportation services from one of more of the Defendants that included

13   at least one flight segment between the U.S. and Asia/Oceania and has suffered pecuniary injury

14   as a result of the antitrust violation alleged herein.

15      18.     Plaintiff David Murphy is a resident of Tokyo, Japan.  During the Class Period,

16   Plaintiff purchased air transportation services from one of more of the Defendants that included

17   at least one flight segment between the U.S. and Asia/Oceania and has suffered pecuniary injury

18   as a result of the antitrust violation alleged herein.

19      19.     Plaintiff Trong Nguyen is a Washington resident.  During the Class Period,

20   Plaintiff purchased air transportation services from one of more of the Defendants that included

21   at least one flight segment between the U.S. and Asia/Oceania and has suffered pecuniary injury

22   as a result of the antitrust violation alleged herein.

23      20.     Plaintiff Titi Tran is a California resident.  During the Class Period, Plaintiff

24   purchased air transportation services from one of more of the Defendants that included at least

25   one flight segment between the U.S. and Asia/Oceania and has suffered pecuniary injury as a

26   result of the antitrust violation alleged herein.

27      21.     Plaintiff Donald Wortman is a California resident.  During the Class Period,

28   Plaintiff purchased air transportation services from one of more of the Defendants that included

1    at least one flight segment between the U.S. and Asia/Oceania and has suffered pecuniary injury

2    as a result of the antitrust violation alleged herein.

**DEFENDANTS**

4        22.      Defendant Air France is a French company with its principal place of business

5    located at 45, rue de Paris, Roissy CDG cedex , France F-95747.  Air France conducts passenger

6    air transportation throughout the world, including flights to and from the United States and this

7    District.  Defendant Air France participated in the conspiracy alleged herein by, among other

8    things, sharing commercially sensitive information through its code-sharing agreements with

9    competitors (*see* ¶¶54-65), participating directly or indirectly in industry meetings that have been

10   deemed by antitrust officials in the U.S., Europe, and Australia to be inherently anticompetitive

11   and not in the best interests of competitive airline markets (*see* ¶¶66-71, 85, 89-99), participating

12   in meetings hosted by regional trade associations in which anticompetitive conduct is encouraged

13   and/or tolerated (*see* ¶¶72-76), participating directly or indirectly in meetings with its

14   competitors at which coordinating increased base passenger fares were agreed upon (*see* ¶¶111-

15   180), participating directly or indirectly in meetings with competitors at which passenger fare

16   pricing was discussed and then benchmarking fares off of the prices agreed upon at those

17   meetings (*see* ¶¶83-105), participating directly or indirectly in meetings with competitors at

18   which collectively increasing fuel surcharges was agreed upon as a means of dealing with rising

19   fuel costs (*see* ¶¶185, 188, 204-235), raising fares and surcharges more than necessary to offset

20   increased fuel costs even though such actions are not consistent with economic theory (*see*

21   ¶¶237-244), instituting surcharges in close proximity to those of its competitors in sharp contrast

22   to conduct that occurred prior to the Class Period (*see* ¶¶191-203), and participating directly or

23   indirectly in anticompetitive meetings with other Defendants concerning the fixing of prices in

24   the closely related air-cargo market (*see* ¶¶245-293).  Industry analysts based in Asia/Oceania

25   acknowledge that anticompetitive conduct "overhangs" the airline passenger transportation

26   industry, particularly in light of lax antitrust enforcement in Asia (*see* ¶105).

27       23.      Defendant Air New Zealand Limited ("Air New Zealand") is a New Zealand

28   company with its principal place of business located at Quay Tower, 29 Customs Street West,

1    Auckland, 1020, New Zealand.  Air New Zealand conducts passenger air transportation

2    throughout the world, including flights to and from the United States and this District.

3    Defendant Air New Zealand participated in the conspiracy alleged herein by, among other

4    things, sharing commercially sensitive information through its code-sharing agreements with

5    competitors (*see* ¶¶54-65), participating directly or indirectly in industry meetings that have been

6    deemed by antitrust officials in the U.S., Europe, and Australia to be inherently anticompetitive

7    and not in the best interests of competitive airline markets (*see* ¶¶66-71, 85, 89-99), participating

8    in meetings hosted by regional trade associations in which anticompetitive conduct is encouraged

9    and/or tolerated (*see* ¶¶72-76), participating directly or indirectly in meetings with its

10   competitors at which coordinating increased base passenger fares were agreed upon (*see* ¶¶111-

11   180), participating directly or indirectly in meetings with competitors at which passenger fare

12   pricing was discussed and then benchmarking fares off of the prices agreed upon at those

13   meetings (*see* ¶¶83-105), participating directly or indirectly in meetings with competitors at

14   which collectively increasing fuel surcharges was agreed upon as a means of dealing with rising

15   fuel costs (*see* ¶¶185, 188, 204-235), raising fares and surcharges more than necessary to offset

16   increased fuel costs even though such actions are not consistent with economic theory (*see*

17   ¶¶237-244), instituting surcharges in close proximity to those of its competitors in sharp contrast

18   to conduct that occurred prior to the Class Period (*see* ¶¶191-203), and participating directly or

19   indirectly in anticompetitive meetings with other Defendants concerning the fixing of prices in

20   the closely related air-cargo market (*see* ¶¶245-293).  Industry analysts based in Asia/Oceania

21   acknowledge that anticompetitive conduct "overhangs" the airline passenger transportation

22   industry, particularly in light of lax antitrust enforcement in Asia (*see* ¶105).

23        24.        Defendant All Nippon Airways Company, Limited ("ANA") is a Japanese

24   company with its principal place of business located at Shidome-City Center, 1-5-2, Higashi-

25   Shimbashi Minato-ku, Tokyo 105-7133, Japan.  ANA conducts passenger air transportation

26   throughout the world, including flights to and from the United States and this District.

27   Defendant ANA participated in the conspiracy alleged herein by, among other things, sharing

28   commercially sensitive information through its code-sharing agreements with competitors (*see*

1   ¶¶54-65), participating directly or indirectly in industry meetings that have been deemed by

2   antitrust officials in the U.S., Europe, and Australia to be inherently anticompetitive and not in

3   the best interests of competitive airline markets (*see* ¶¶66-71, 85, 89-99), participating in

4   meetings hosted by regional trade associations in which anticompetitive conduct is encouraged

5   and/or tolerated (*see* ¶¶72-76), participating directly or indirectly in meetings with its

6   competitors at which coordinating increased base passenger fares were agreed upon (*see* ¶¶111-

7   180), participating directly or indirectly in meetings with competitors at which passenger fare

8   pricing was discussed and then benchmarking fares off of the prices agreed upon at those

9   meetings (*see* ¶¶83-105), participating directly or indirectly in meetings with competitors at

10  which collectively increasing fuel surcharges was agreed upon as a means of dealing with rising

11  fuel costs (*see* ¶¶185, 188, 204-235), raising fares and surcharges more than necessary to offset

12  increased fuel costs even though such actions are not consistent with economic theory (*see*

13  ¶¶237-244), instituting surcharges in close proximity to those of its competitors in sharp contrast

14  to conduct that occurred prior to the Class Period (*see* ¶¶191-203), and participating directly or

15  indirectly in anticompetitive meetings with other Defendants concerning the fixing of prices in

16  the closely related air-cargo market (*see* ¶¶245-293). Industry analysts based in Asia/Oceania

17  acknowledge that anticompetitive conduct "overhangs" the airline passenger transportation

18  industry, particularly in light of lax antitrust enforcement in Asia (*see* ¶105).

19        25.    Defendant British Airways is a British company with its principal place of

20  business located at Waterside, Harmondsworth, Middlesex, United Kingdom, UB7 0GB. British

21  Airways conducts passenger air transportation throughout the world, including flights to and

22  from the United States and this District. Defendant British Airways participated in the

23  conspiracy alleged herein by, among other things, sharing commercially sensitive information

24  through its code-sharing agreements with competitors (*see* ¶¶54-65), participating directly or

25  indirectly in industry meetings that have been deemed by antitrust officials in the U.S., Europe,

26  and Australia to be inherently anticompetitive and not in the best interests of competitive airline

27  markets (*see* ¶¶66-71, 85, 89-99), participating in meetings hosted by regional trade associations

28  in which anticompetitive conduct is encouraged and/or tolerated (*see* ¶¶72-76), participating

1   directly or indirectly in meetings with its competitors at which coordinating increased base

2   passenger fares were agreed upon (*see* ¶¶111-180), participating directly or indirectly in

3   meetings with competitors at which passenger fare pricing was discussed and then benchmarking

4   fares off of the prices agreed upon at those meetings (*see* ¶¶83-105), participating directly or

5   indirectly in meetings with competitors at which collectively increasing fuel surcharges was

6   agreed upon as a means of dealing with rising fuel costs (*see* ¶¶185, 188, 204-235), raising fares

7   and surcharges more than necessary to offset increased fuel costs even though such actions are

8   not consistent with economic theory (*see* ¶¶237-244), instituting surcharges in close proximity to

9   those of its competitors in sharp contrast to conduct that occurred prior to the Class Period (*see*

10  ¶¶191-203), and participating directly or indirectly in anticompetitive meetings with other

11  Defendants concerning the fixing of prices in the closely related air-cargo market (*see* ¶¶245-

12  293).  Industry analysts based in Asia/Oceania acknowledge that anticompetitive conduct

13  "overhangs" the airline passenger transportation industry, particularly in light of lax antitrust

14  enforcement in Asia (*see* ¶105).

15          26.     Defendant Cathay Pacific Airways Limited ("Cathay Pacific") is a Hong Kong-

16  based company with its principal place of business located at 5/F, South Tower, Cathay Pacific

17  City, 8 Scenic Rd., Hong Kong International Airport, Lantau, Hong Kong.  Cathay Pacific

18  conducts passenger air transportation throughout the world, including flights to and from the

19  United States and this District.  Defendant Cathay Pacific participated in the conspiracy alleged

20  herein by, among other things, sharing commercially sensitive information through its code-

21  sharing agreements with competitors (*see* ¶¶54-65), participating directly or indirectly in

22  industry meetings that have been deemed by antitrust officials in the U.S., Europe, and Australia

23  to be inherently anticompetitive and not in the best interests of competitive airline markets (*see*

24  ¶¶66-71, 85, 89-99), participating in meetings hosted by regional trade associations in which

25  anticompetitive conduct is encouraged and/or tolerated (*see* ¶¶72-76), participating directly or

26  indirectly in meetings with its competitors at which coordinating increased base passenger fares

27  were agreed upon (*see* ¶¶111-180), participating directly or indirectly in meetings with

28  competitors at which passenger fare pricing was discussed and then benchmarking fares off of

1   the prices agreed upon at those meetings (*see* ¶¶83-105), participating directly or indirectly in

2   meetings with competitors at which collectively increasing fuel surcharges was agreed upon as a

3   means of dealing with rising fuel costs (*see* ¶¶185, 188, 204-235), raising fares and surcharges

4   more than necessary to offset increased fuel costs even though such actions are not consistent

5   with economic theory (*see* ¶¶237-244), instituting surcharges in close proximity to those of its

6   competitors in sharp contrast to conduct that occurred prior to the Class Period (*see* ¶¶191-203),

7   and participating directly or indirectly in anticompetitive meetings with other Defendants

8   concerning the fixing of prices in the closely related air-cargo market (*see* ¶¶245-293).  Industry

9   analysts based in Asia/Oceania acknowledge that anticompetitive conduct "overhangs" the

10  airline passenger transportation industry, particularly in light of lax antitrust enforcement in Asia

11  (*see* ¶105).

12          27.      Defendant China Airlines Limited ("China Airlines") is a Taiwanese company

13  with its principal place of business located at 131 Nanking East Rd., Section 3, Taipei, Taiwan.

14  China Airlines conducts passenger air transportation throughout the world, including flights to

15  and from the United States and this District.  Defendant China Airlines participated in the

16  conspiracy alleged herein by, among other things, sharing commercially sensitive information

17  through its code-sharing agreements with competitors (*see* ¶¶54-65), participating directly or

18  indirectly in industry meetings that have been deemed by antitrust officials in the U.S., Europe,

19  and Australia to be inherently anticompetitive and not in the best interests of competitive airline

20  markets (*see* ¶¶66-71, 85, 89-99), participating in meetings hosted by regional trade associations

21  in which anticompetitive conduct is encouraged and/or tolerated (*see* ¶¶72-76), participating

22  directly or indirectly in meetings with its competitors at which coordinating increased base

23  passenger fares were agreed upon (*see* ¶¶111-180), participating directly or indirectly in

24  meetings with competitors at which passenger fare pricing was discussed and then benchmarking

25  fares off of the prices agreed upon at those meetings (*see* ¶¶83-105), participating directly or

26  indirectly in meetings with competitors at which collectively increasing fuel surcharges was

27  agreed upon as a means of dealing with rising fuel costs (*see* ¶¶185, 188, 204-235), raising fares

28  and surcharges more than necessary to offset increased fuel costs even though such actions are

1  not consistent with economic theory (*see* ¶¶237-244), instituting surcharges in close proximity to

2  those of its competitors in sharp contrast to conduct that occurred prior to the Class Period (*see*

3  ¶¶191-203), and participating directly or indirectly in anticompetitive meetings with other

4  Defendants concerning the fixing of prices in the closely related air-cargo market (*see* ¶¶245-

5  293). Industry analysts based in Asia/Oceania acknowledge that anticompetitive conduct

6  "overhangs" the airline passenger transportation industry, particularly in light of lax antitrust

7  enforcement in Asia (*see* ¶105).

8      28. Defendant Continental Airlines, Inc. ("Continental Airlines") is a United States

9  corporation with its principal place of business located at 1600 Smith Street, Houston, Texas

10  77002. Continental Airlines conducts passenger air transportation throughout the world,

11  including flights to and from the United States and this District. Defendant Continental Airlines

12  participated in the participated in the conspiracy alleged herein by, among other things, sharing

13  commercially sensitive information through its code-sharing agreements with competitors (*see*

14  ¶¶54-65), participating directly or indirectly in industry meetings that have been deemed by

15  antitrust officials in the U.S., Europe, and Australia to be inherently anticompetitive and not in

16  the best interests of competitive airline markets (*see* ¶¶66-71, 85, 89-99), participating in

17  meetings hosted by regional trade associations in which anticompetitive conduct is encouraged

18  and/or tolerated (*see* ¶¶72-76), participating directly or indirectly in meetings with its

19  competitors at which coordinating increased base passenger fares were agreed upon (*see* ¶¶111-

20  180), participating directly or indirectly in meetings with competitors at which passenger fare

21  pricing was discussed and then benchmarking fares off of the prices agreed upon at those

22  meetings (*see* ¶¶83-105), participating directly or indirectly in meetings with competitors at

23  which collectively increasing fuel surcharges was agreed upon as a means of dealing with rising

24  fuel costs (*see* ¶¶185, 188, 204-235), raising fares and surcharges more than necessary to offset

25  increased fuel costs even though such actions are not consistent with economic theory (*see*

26  ¶¶237-244), instituting surcharges in close proximity to those of its competitors in sharp contrast

27  to conduct that occurred prior to the Class Period (*see* ¶¶191-203), and participating directly or

28  indirectly in anticompetitive meetings with other Defendants concerning the fixing of prices in

1    the closely related air-cargo market (*see* ¶¶245-293). Industry analysts based in Asia/Oceania

2    acknowledge that anticompetitive conduct "overhangs" the airline passenger transportation

3    industry, particularly in light of lax antitrust enforcement in Asia (*see* ¶105).

4        29.    Defendant Deutsche Lufthansa AG ("Lufthansa") is a German company with its

5    principal place of business located at Von-Gablenz-Strasse 2-6, Cologne, North Rhine-

6    Westphalia, Germany, D-50664. Lufthansa conducts passenger air transportation throughout the

7    world, including flights to and from the United States and this District. Defendant Lufthansa

8    participated in the conspiracy alleged herein by, among other things, sharing commercially

9    sensitive information through its code-sharing agreements with competitors (*see* ¶¶54-65),

10   participating directly or indirectly in industry meetings that have been deemed by antitrust

11   officials in the U.S., Europe, and Australia to be inherently anticompetitive and not in the best

12   interests of competitive airline markets (*see* ¶¶66-71, 85, 89-99), participating in meetings hosted

13   by regional trade associations in which anticompetitive conduct is encouraged and/or tolerated

14   (*see* ¶¶72-76), participating directly or indirectly in meetings with its competitors at which

15   coordinating increased base passenger fares were agreed upon (*see* ¶¶111-180), participating

16   directly or indirectly in meetings with competitors at which passenger fare pricing was discussed

17   and then benchmarking fares off of the prices agreed upon at those meetings (*see* ¶¶83-105),

18   participating directly or indirectly in meetings with competitors at which collectively increasing

19   fuel surcharges was agreed upon as a means of dealing with rising fuel costs (*see* ¶¶185, 188,

20   204-235), raising fares and surcharges more than necessary to offset increased fuel costs even

21   though such actions are not consistent with economic theory (*see* ¶¶237-244), instituting

22   surcharges in close proximity to those of its competitors in sharp contrast to conduct that

23   occurred prior to the Class Period (*see* ¶¶191-203), and participating directly or indirectly in

24   anticompetitive meetings with other Defendants concerning the fixing of prices in the closely

25   related air-cargo market (*see* ¶¶245-293). Industry analysts based in Asia/Oceania acknowledge

26   that anticompetitive conduct "overhangs" the airline passenger transportation industry,

27   particularly in light of lax antitrust enforcement in Asia (*see* ¶105).

28

30.     Defendant EVA Airways Corporation ("EVA") is a Taiwanese company with its principal place of business located at 117, Sec. 2, Chang-An E. Rd., Taipei, 104, Taiwan.  EVA conducts passenger air transportation throughout the world, including flights to and from the United States and this District.  Defendant EVA participated in the conspiracy alleged herein by, among other things, sharing commercially sensitive information through its code-sharing agreements with competitors (*see* ¶¶54-65), participating directly or indirectly in industry meetings that have been deemed by antitrust officials in the U.S., Europe, and Australia to be inherently anticompetitive and not in the best interests of competitive airline markets (*see* ¶¶66-71, 85, 89-99), participating in meetings hosted by regional trade associations in which anticompetitive conduct is encouraged and/or tolerated (*see* ¶¶72-76), participating directly or indirectly in meetings with its competitors at which coordinating increased base passenger fares were agreed upon (*see* ¶¶111-180), participating directly or indirectly in meetings with competitors at which passenger fare pricing was discussed and then benchmarking fares off of the prices agreed upon at those meetings (*see* ¶¶83-105), participating directly or indirectly in meetings with competitors at which collectively increasing fuel surcharges was agreed upon as a means of dealing with rising fuel costs (*see* ¶¶185, 188, 204-235), raising fares and surcharges more than necessary to offset increased fuel costs even though such actions are not consistent with economic theory (*see* ¶¶237-244), instituting surcharges in close proximity to those of its competitors in sharp contrast to conduct that occurred prior to the Class Period (*see* ¶¶191-203), and participating directly or indirectly in anticompetitive meetings with other Defendants concerning the fixing of prices in the closely related air-cargo market (*see* ¶¶245-293).  Industry analysts based in Asia/Oceania acknowledge that anticompetitive conduct "overhangs" the airline passenger transportation industry, particularly in light of lax antitrust enforcement in Asia (*see* ¶105).

31.     Defendant Japan Airlines International Company, Limited ("JAL") is a Japanese company with its principal place of business located at 4-11 Higashi-shinagawa 2-chome, Shinagawa-ku, Tokyo, 140-8605, Japan.  JAL conducts passenger air transportation throughout the world, including flights to *and* from the United States and this District.  Defendant JAL

1   participated in the conspiracy alleged herein by, among other things, sharing commercially

2   sensitive information through its code-sharing agreements with competitors (*see* ¶¶54-65),

3   participating directly or indirectly in industry meetings that have been deemed by antitrust

4   officials in the U.S., Europe, and Australia to be inherently anticompetitive and not in the best

5   interests of competitive airline markets (*see* ¶¶66-71, 85, 89-99), participating in meetings hosted

6   by regional trade associations in which anticompetitive conduct is encouraged and/or tolerated

7   (*see* ¶¶72-76), participating directly or indirectly in meetings with its competitors at which

8   coordinating increased base passenger fares were agreed upon (*see* ¶¶111-180), participating

9   directly or indirectly in meetings with competitors at which passenger fare pricing was discussed

10  and then benchmarking fares off of the prices agreed upon at those meetings (*see* ¶¶83-105),

11  participating directly or indirectly in meetings with competitors at which collectively increasing

12  fuel surcharges was agreed upon as a means of dealing with rising fuel costs (*see* ¶¶185, 188,

13  204-235), raising fares and surcharges more than necessary to offset increased fuel costs even

14  though such actions are not consistent with economic theory (*see* ¶¶237-244), instituting

15  surcharges in close proximity to those of its competitors in sharp contrast to conduct that

16  occurred prior to the Class Period (*see* ¶¶191-203), and participating directly or indirectly in

17  anticompetitive meetings with other Defendants concerning the fixing of prices in the closely

18  related air-cargo market (*see* ¶¶245-293).  Industry analysts based in Asia/Oceania acknowledge

19  that anticompetitive conduct "overhangs" the airline passenger transportation industry,

20  particularly in light of lax antitrust enforcement in Asia (*see* ¶105).

21          32.     Defendant KLM Royal Dutch Airline ("KLM") is a Dutch company with its

22  principal place of business located at Amsterdamseweg 55, 11282 GP Amstelveen, The

23  Netherlands.  KLM conducts passenger air transportation throughout the world, including flights

24  to and from the United States and this District.  Defendant KLM participated in the conspiracy

25  alleged herein by, among other things, sharing commercially sensitive information through its

26  code-sharing agreements with competitors (*see* ¶¶54-65), participating directly or indirectly in

27  industry meetings that have been deemed by antitrust officials in the U.S., Europe, and Australia

28  to be inherently anticompetitive and not in the best interests of competitive airline markets (*see*

1    ¶¶66-71, 85, 89-99), participating in meetings hosted by regional trade associations in which

2    anticompetitive conduct is encouraged and/or tolerated (*see* ¶¶72-76), participating directly or

3    indirectly in meetings with its competitors at which coordinating increased base passenger fares

4    were agreed upon (*see* ¶¶111-180), participating directly or indirectly in meetings with

5    competitors at which passenger fare pricing was discussed and then benchmarking fares off of

6    the prices agreed upon at those meetings (*see* ¶¶83-105), participating directly or indirectly in

7    meetings with competitors at which collectively increasing fuel surcharges was agreed upon as a

8    means of dealing with rising fuel costs (*see* ¶¶185, 188, 204-235), raising fares and surcharges

9    more than necessary to offset increased fuel costs even though such actions are not consistent

10   with economic theory (*see* ¶¶237-244), instituting surcharges in close proximity to those of its

11   competitors in sharp contrast to conduct that occurred prior to the Class Period (*see* ¶¶191-203),

12   and participating directly or indirectly in anticompetitive meetings with other Defendants

13   concerning the fixing of prices in the closely related air-cargo market (*see* ¶¶245-293).  Industry

14   analysts based in Asia/Oceania acknowledge that anticompetitive conduct "overhangs" the

15   airline passenger transportation industry, particularly in light of lax antitrust enforcement in Asia

16   (*see* ¶105).

17       33.       Defendant Malaysian Airline System Berhad ("Malaysian Airlines") is a

18   Malaysian company with its principal place of business located at Bangunan MAS, 33rd Fl.,

19   Jalan Sultan Ismail, 50250 Kuala Lumpur, Malaysia.  Malaysian Airlines conducts passenger air

20   transportation throughout the world, including flights to and from the United States and this

21   District.  Defendant Malaysian Airlines participated in the conspiracy alleged herein by, among

22   other things, sharing commercially sensitive information through its code-sharing agreements

23   with competitors (*see* ¶¶58-65), participating directly or indirectly in industry meetings that have

24   been deemed by antitrust officials in the U.S., Europe, and Australia to be inherently

25   anticompetitive and not in the best interests of competitive airline markets (*see* ¶¶66-71, 85, 89-

26   99), participating in meetings hosted by regional trade associations in which anticompetitive

27   conduct is encouraged and/or tolerated (*see* ¶¶72-76), participating directly or indirectly in

28   meetings with its competitors at which coordinating increased base passenger fares were agreed

1   upon (*see* ¶¶111-180), participating directly or indirectly in meetings with competitors at which

2   passenger fare pricing was discussed and then benchmarking fares off of the prices agreed upon

3   at those meetings (*see* ¶¶83-105), participating directly or indirectly in meetings with

4   competitors at which collectively increasing fuel surcharges was agreed upon as a means of

5   dealing with rising fuel costs (*see* ¶¶185, 188, 204-235), raising fares and surcharges more than

6   necessary to offset increased fuel costs even though such actions are not consistent with

7   economic theory (*see* ¶¶237-244), instituting surcharges in close proximity to those of its

8   competitors in sharp contrast to conduct that occurred prior to the Class Period (*see* ¶¶191-203),

9   and participating directly or indirectly in anticompetitive meetings with other Defendants

10  concerning the fixing of prices in the closely related air-cargo market (*see* ¶¶245-293).  Industry

11  analysts based in Asia/Oceania acknowledge that anticompetitive conduct "overhangs" the

12  airline passenger transportation industry, particularly in light of lax antitrust enforcement in Asia

13  (*see* ¶105).

14      34.     Defendant Philippine Airlines, Inc. ("Philippine Airlines") is a Philippine

15  corporation with its principal place of business located at PNB Financial Center, Pres. Diosdado

16  Macapagal Avenue, CCP Complex, Passay City, Philippines.  Philippine Airlines conducts

17  passenger air transportation throughout the world, including flights to and from the United States

18  and this District.  Defendant Philippine Airlines participated in the conspiracy alleged herein by,

19  among other things, sharing commercially sensitive information through its code-sharing

20  agreements with competitors (*see* ¶¶54-65), participating directly or indirectly in industry

21  meetings that have been deemed by antitrust officials in the U.S., Europe, and Australia to be

22  inherently anticompetitive and not in the best interests of competitive airline markets (*see* ¶¶66-

23  71, 85, 89-99), participating in meetings hosted by regional trade associations in which

24  anticompetitive conduct is encouraged and/or tolerated (*see* ¶¶72-76), participating directly or

25  indirectly in meetings with its competitors at which coordinating increased base passenger fares

26  were agreed upon (*see* ¶¶111-180), participating directly or indirectly in meetings with

27  competitors at which passenger fare pricing was discussed and then benchmarking fares off of

28  the prices agreed upon at those meetings (*see* ¶¶83-105), participating directly or indirectly in

1    meetings with competitors at which collectively increasing fuel surcharges was agreed upon as a

2    means of dealing with rising fuel costs (*see* ¶¶185, 188, 204-235), raising fares and surcharges

3    more than necessary to offset increased fuel costs even though such actions are not consistent

4    with economic theory (*see* ¶¶237-244), instituting surcharges in close proximity to those of its

5    competitors in sharp contrast to conduct that occurred prior to the Class Period (*see* ¶¶191-203),

6    and participating directly or indirectly in anticompetitive meetings with other Defendants

7    concerning the fixing of prices in the closely related air-cargo market (*see* ¶¶245-293). Industry

8    analysts based in Asia/Oceania acknowledge that anticompetitive conduct "overhangs" the

9    airline passenger transportation industry, particularly in light of lax antitrust enforcement in Asia

10   (*see* ¶105).

11        35.    Defendant Qantas Airways Limited ("Qantas") is an Australian corporation with

12   its principal place of business located at Qantas Centre, 203 Coward Street, Mascot New South

13   Wales 2020. Qantas conducts passenger air transportation throughout the world, including

14   flights to and from the United States and this District. Defendant Qantas participated in the

15   conspiracy alleged herein by, among other things, sharing commercially sensitive information

16   through its code-sharing agreements with competitors (*see* ¶¶54-65), participating directly or

17   indirectly in industry meetings that have been deemed by antitrust officials in the U.S., Europe,

18   and Australia to be inherently anticompetitive and not in the best interests of competitive airline

19   markets (*see* ¶¶66-71, 85, 89-99), participating in meetings hosted by regional trade associations

20   in which anticompetitive conduct is encouraged and/or tolerated (*see* ¶¶72-76), participating

21   directly or indirectly in meetings with its competitors at which coordinating increased base

22   passenger fares were agreed upon (*see* ¶¶111-180), participating directly or indirectly in

23   meetings with competitors at which passenger fare pricing was discussed and then benchmarking

24   fares off of the prices agreed upon at those meetings (*see* ¶¶83-105), participating directly or

25   indirectly in meetings with competitors at which collectively increasing fuel surcharges was

26   agreed upon as a means of dealing with rising fuel costs (*see* ¶¶185, 188, 204-235), raising fares

27   and surcharges more than necessary to offset increased fuel costs even though such actions are

28   not consistent with economic theory (*see* ¶¶237-244), instituting surcharges in close proximity to

1   those of its competitors in sharp contrast to conduct that occurred prior to the Class Period (*see*

2   ¶¶191-203), and participating directly or indirectly in anticompetitive meetings with other

3   Defendants concerning the fixing of prices in the closely related air-cargo market (*see* ¶¶245-

4   293).  Industry analysts based in Asia/Oceania acknowledge that anticompetitive conduct

5   "overhangs" the airline passenger transportation industry, particularly in light of lax antitrust

6   enforcement in Asia (*see* ¶105).

7        36.      Defendant SAS AB ("SAS") is a company based in Scandinavia with its principal

8   place of business located at Frösundaviks Allé 1, Solna, SE-195 87, Stockholm, Sweden.  SAS

9   conducts passenger air transportation throughout the world, including flights to and from the

10  United States and this District.  Defendant SAS Airlines participated in the conspiracy alleged

11  herein by, among other things, sharing commercially sensitive information through its code-

12  sharing agreements with competitors (*see* ¶¶54-65), participating directly or indirectly in

13  industry meetings that have been deemed by antitrust officials in the U.S., Europe, and Australia

14  to be inherently anticompetitive and not in the best interests of competitive airline markets (*see*

15  ¶¶66-71, 85, 89-99), participating in meetings hosted by regional trade associations in which

16  anticompetitive conduct is encouraged and/or tolerated (*see* ¶¶72-76), participating directly or

17  indirectly in meetings with its competitors at which coordinating increased base passenger fares

18  were agreed upon (*see* ¶¶111-180), participating directly or indirectly in meetings with

19  competitors at which passenger fare pricing was discussed and then benchmarking fares off of

20  the prices agreed upon at those meetings (*see* ¶¶83-105), participating directly or indirectly in

21  meetings with competitors at which collectively increasing fuel surcharges was agreed upon as a

22  means of dealing with rising fuel costs (*see* ¶¶185, 188, 204-235), raising fares and surcharges

23  more than necessary to offset increased fuel costs even though such actions are not consistent

24  with economic theory (*see* ¶¶237-244), instituting surcharges in close proximity to those of its

25  competitors in sharp contrast to conduct that occurred prior to the Class Period (*see* ¶¶191-203),

26  and participating directly or indirectly in anticompetitive meetings with other Defendants

27  concerning the fixing of prices in the closely related air-cargo market (*see* ¶¶245-293).  Industry

28  analysts based in Asia/Oceania acknowledge that anticompetitive conduct "overhangs" the

1    airline passenger transportation industry, particularly in light of lax antitrust enforcement in Asia

2    (*see* ¶105).

3        37.    Defendant Singapore Airlines Limited ("Singapore Airlines") is a Singaporean

4    company with its principal place of business located at Airline House, 25 Airline Rd., 819829

5    Singapore.  Singapore Airlines conducts passenger air transportation throughout the world,

6    including flights to and from the United States and this District.  Defendant Singapore Airlines

7    participated in the conspiracy alleged herein by, among other things, sharing commercially

8    sensitive information through its code-sharing agreements with competitors (*see* ¶¶54-65),

9    participating directly or indirectly in industry meetings that have been deemed by antitrust

10   officials in the U.S., Europe, and Australia to be inherently anticompetitive and not in the best

11   interests of competitive airline markets (*see* ¶¶66-71, 85, 89-99), participating in meetings hosted

12   by regional trade associations in which anticompetitive conduct is encouraged and/or tolerated

13   (*see* ¶¶72-76), participating directly or indirectly in meetings with its competitors at which

14   coordinating increased base passenger fares were agreed upon (*see* ¶¶111-180), participating

15   directly or indirectly in meetings with competitors at which passenger fare pricing was discussed

16   and then benchmarking fares off of the prices agreed upon at those meetings (*see* ¶¶83-105),

17   participating directly or indirectly in meetings with competitors at which collectively increasing

18   fuel surcharges was agreed upon as a means of dealing with rising fuel costs (*see* ¶¶185, 188,

19   204-235), raising fares and surcharges more than necessary to offset increased fuel costs even

20   though such actions are not consistent with economic theory (*see* ¶¶237-244), instituting

21   surcharges in close proximity to those of its competitors in sharp contrast to conduct that

22   occurred prior to the Class Period (*see* ¶¶191-203), and participating directly or indirectly in

23   anticompetitive meetings with other Defendants concerning the fixing of prices in the closely

24   related air-cargo market (*see* ¶¶245-293).  Industry analysts based in Asia/Oceania acknowledge

25   that anticompetitive conduct "overhangs" the airline passenger transportation industry,

26   particularly in light of lax antitrust enforcement in Asia (*see* ¶105).

27       38.    Defendant Swiss International AG ("Swiss International") is a Swiss company

28   with its principal place of business located at Aeschenvorstadt 4, CH-4051 Basel, Switzerland

1    4002.  Swiss International conducts passenger air transportation throughout the world, including

2    flights to and from the United States and this District.  Defendant Swiss International

3    participated in the conspiracy alleged herein by, among other things, sharing commercially

4    sensitive information through its code-sharing agreements with competitors (*see* ¶¶54-65),

5    participating directly or indirectly in industry meetings that have been deemed by antitrust

6    officials in the U.S., Europe, and Australia to be inherently anticompetitive and not in the best

7    interests of competitive airline markets (*see* ¶¶66-71, 85, 89-99), participating in meetings hosted

8    by regional trade associations in which anticompetitive conduct is encouraged and/or tolerated

9    (*see* ¶¶72-76), participating directly or indirectly in meetings with its competitors at which

10    coordinating increased base passenger fares were agreed upon (*see* ¶¶111-180), participating

11    directly or indirectly in meetings with competitors at which passenger fare pricing was discussed

12    and then benchmarking fares off of the prices agreed upon at those meetings (*see* ¶¶83-105),

13    participating directly or indirectly in meetings with competitors at which collectively increasing

14    fuel surcharges was agreed upon as a means of dealing with rising fuel costs (*see* ¶¶185, 188,

15    204-235), raising fares and surcharges more than necessary to offset increased fuel costs even

16    though such actions are not consistent with economic theory (*see* ¶¶237-244), instituting

17    surcharges in close proximity to those of its competitors in sharp contrast to conduct that

18    occurred prior to the Class Period (*see* ¶¶191-203), and participating directly or indirectly in

19    anticompetitive meetings with other Defendants concerning the fixing of prices in the closely

20    related air-cargo market (*see* ¶¶245-293).  Industry analysts based in Asia/Oceania acknowledge

21    that anticompetitive conduct "overhangs" the airline passenger transportation industry,

22    particularly in light of lax antitrust enforcement in Asia (*see* ¶105).

23        39.    Defendant Thai Airways International Public Co., Ltd. ("Thai Airways") is a Thai

24    company with its principal place of business located at 89 Vibhavadi-Rangsit Rd., Bangkok,

25    10900, Thailand.  Thai Airways conducts passenger air transportation throughout the world,

26    including flights to and from the United States and this District.  Defendant Thai Airways

27    participated in the conspiracy alleged herein by, among other things, sharing commercially

28    sensitive information through its code-sharing agreements with competitors (*see* ¶¶54-65),

1   participating directly or indirectly in industry meetings that have been deemed by antitrust

2   officials in the U.S., Europe, and Australia to be inherently anticompetitive and not in the best

3   interests of competitive airline markets (*see* ¶¶66-71, 85, 89-99), participating in meetings hosted

4   by regional trade associations in which anticompetitive conduct is encouraged and/or tolerated

5   (*see* ¶¶72-76), participating directly or indirectly in meetings with its competitors at which

6   coordinating increased base passenger fares were agreed upon (*see* ¶¶111-180), participating

7   directly or indirectly in meetings with competitors at which passenger fare pricing was discussed

8   and then benchmarking fares off of the prices agreed upon at those meetings (*see* ¶¶83-105),

9   participating directly or indirectly in meetings with competitors at which collectively increasing

10  fuel surcharges was agreed upon as a means of dealing with rising fuel costs (*see* ¶¶185, 188,

11  204-235), raising fares and surcharges more than necessary to offset increased fuel costs even

12  though such actions are not consistent with economic theory (*see* ¶¶237-244), instituting

13  surcharges in close proximity to those of its competitors in sharp contrast to conduct that

14  occurred prior to the Class Period (*see* ¶¶191-203), and participating directly or indirectly in

15  anticompetitive meetings with other Defendants concerning the fixing of prices in the closely

16  related air-cargo market (*see* ¶¶245-293).  Industry analysts based in Asia/Oceania acknowledge

17  that anticompetitive conduct "overhangs" the airline passenger transportation industry,

18  particularly in light of lax antitrust enforcement in Asia (*see* ¶105).

19         40.    Defendant Vietnam Airlines ("Vietnam Airlines") is a Vietnamese corporation

20  with its principal place of business located at 200 Nguyen Son Str., Long Bien District, Hanoi

21  City, Vietnam.  Vietnam Airlines conducts passenger air transportation throughout the world,

22  including flights to and from the United States and this District.  Defendant Vietnam Airlines

23  participated in the conspiracy alleged herein by, among other things, sharing commercially

24  sensitive information through its code-sharing agreements with competitors (*see* ¶¶54-65),

25  participating directly or indirectly in industry meetings that have been deemed by antitrust

26  officials in the U.S., Europe, and Australia to be inherently anticompetitive and not in the best

27  interests of competitive airline markets (*see* ¶¶66-71, 85, 89-99), participating in meetings hosted

28  by regional trade associations in which anticompetitive conduct is encouraged and/or tolerated

1   (*see* ¶¶72-76), participating directly or indirectly in meetings with its competitors at which

2   coordinating increased base passenger fares were agreed upon (*see* ¶¶111-180), participating

3   directly or indirectly in meetings with competitors at which passenger fare pricing was discussed

4   and then benchmarking fares off of the prices agreed upon at those meetings (*see* ¶¶83-105),

5   participating directly or indirectly in meetings with competitors at which collectively increasing

6   fuel surcharges was agreed upon as a means of dealing with rising fuel costs (*see* ¶¶185, 188,

7   204-235), raising fares and surcharges more than necessary to offset increased fuel costs even

8   though such actions are not consistent with economic theory (*see* ¶¶237-244), instituting

9   surcharges in close proximity to those of its competitors in sharp contrast to conduct that

10  occurred prior to the Class Period (*see* ¶¶191-203), and participating directly or indirectly in

11  anticompetitive meetings with other Defendants concerning the fixing of prices in the closely

12  related air-cargo market (*see* ¶¶245-293).  Industry analysts based in Asia/Oceania acknowledge

13  that anticompetitive conduct "overhangs" the airline passenger transportation industry,

14  particularly in light of lax antitrust enforcement in Asia (*see* ¶105).

15                                              **AGENTS**

16          41.     The acts alleged to have been done by Defendants were authorized, ordered, or

17  performed by their directors, officers, managers, agents, employees, or representatives while

18  actively engaged in the management of Defendants' affairs.

19                     **NON-DEFENDANT, NAMED CO-CONSPIRATORS**

20          42.     On information and belief, at all relevant times, other airlines, entities, and/or

21  persons, including, but not limited to, Northwest Airlines Corporation ("Northwest"), United

22  Airlines, Inc. ("UAL"), American Airlines, Inc. ("American Airlines"), Delta Airlines, Inc.

23  ("Delta"), KAL, Asiana, Virgin Atlantic Airways Ltd. ("Virgin Atlantic"), and International Air

24  Transport Association ("IATA") willingly conspired with Defendants in their unlawful restraint

25  of trade.  All averments of wrongdoing alleged herein against Defendants are also alleged against

26  these non-defendant co-conspirators.

27

28

1

**UNNAMED CO-CONSPIRATORS**

2      43.      On information and belief, at all relevant times, other airlines, entities, and/or

3   persons willingly conspired with Defendants and the non-defendant, named co-conspirators in

4   their unlawful restraint of trade.  All averments of wrongdoing alleged herein against Defendants

5   and the non-defendant co-conspirators are also alleged against these unnamed co-conspirators as

6   though set forth at length.

7

**INTERSTATE TRADE AND COMMERCE**

8      44.      Throughout the Class Period, there was a continuous and uninterrupted flow of

9   invoices for payment, payments, and other documents essential to the provision of passenger air

10   transportation transmitted in interstate and foreign trade and commerce between and among

11   offices of Defendants and their customers located throughout the world, including throughout the

12   United States.

13      45.      Throughout the Class Period, Defendants transported substantial numbers of

14   passengers, in a continuous and uninterrupted flow of interstate and foreign trade and commerce,

15   between various airports in the United States and foreign airports.

16      46.      Throughout the Class Period, Defendants' unlawful activities, as described herein,

17   took place within and substantially affected the flow of interstate and foreign trade and

18   commerce and had a direct, substantial and reasonably foreseeable effect upon commerce in the

19   United States and elsewhere.

20   **THE FOREIGN TRADE AND ANTITRUST IMPROVEMENT ACT IS INAPPLICABLE**

21      47.      The Foreign Trade And Antitrust Improvement Act ("FTAIA") (15 U.S.C. §6(a))

22   does not shield defendants' conduct here from liability under the Sherman and Clayton Acts.

23      48.      Defendants are engaged in the business of delivering air passengers from place to

24   place, including delivery of air passengers from points in the United States to points in

25   Asia/Oceania and vice versa.  Pursuant to the FTAIA, the delivery of air passengers from

26   airports in Asia/Oceania to airports in the United States and vice versa constitutes or involves

27   import trade or import commerce.  The bargained for service provided by the Defendants is the

28   transportation of people from one place to another, not the ticket.  Indeed, the Defendants

1   themselves acknowledge this by marketing the quality of their passenger flight services and the

2   excitement of international travel.  *See, e.g.* http://www.qantas.com.au/info/flying/qantas-

3   experience ("no matter how far you travel, you'll enjoy superior service from departure to

4   arrival"); http://www.airnewzealand.com/on-the-plane/economy/default.htm ("[o]ur friendly,

5   professional crew will make sure you're comfortable throughout your journey");

6   http://www.singaporeair.com/saa/en_UK/content/exp/cabin/index.jsp? ("[o]ur world-class

7   service, along with our industry leading cabins, and young and modern fleet are cornerstones of

8   our success.  Experience the romance of travel as it should be with our award winning cabins.");

9   http://www.thaiair.com/thai-services/in-the-air/en/Economy%20class/economy-class-

10  services.htm ("the dynamic growth and unrivalled reputation of this airline was inspired

11  especially by one outstanding feature – the superior quality of its Economy Class, offering levels

12  of space, comfort and service unmatched by other airlines").

13      49.     Moreover, pursuant to 15 U.S.C. §6(a)(1)-(2), the delivery of air passengers from

14  airports in Asia/Oceania to airports in the United States and vice versa has a direct, substantial,

15  reasonably foreseeable, and proximate effect: (a) on trade or commerce that is not trade or

16  commerce with foreign nations, and/or on import trade or import commerce with foreign nations,

17  or (b) on export trade or export commerce with foreign nations, of a person engaged in such

18  trade or commerce in the United States.

19      50.     The direct, substantial, reasonably foreseeable, and proximate effect of the

20  anticompetitive conduct set forth below is the type of harm prohibited by the Sherman Act.

21      51.     For example, U.S. residents and citizens paid more for air passenger

22  transportation services, whether those services were purchased in the United States or elsewhere

23  in the world. As another example of the direct, substantial, reasonably foreseeable, and

24  proximate effect that Defendants' alleged conduct has on United States trade and commerce is

25  the fact that travelers using price-fixed air transportation services are able to allocate a smaller

26  fraction of their total travel budget to the purchase of commercial goods and services during their

27  stay in the United States.  The alleged conduct also injures any foreign national that purchased

28  air transportation services in the United States.  In addition, the inflated fares charged by

1    Defendants for air passenger transportation from Asia/Oceania to the United States is

2    inextricably bound up with and dependent upon the fares charged by Defendants for air

3    transportation from the United States to Asia/Oceania.

4         52.    Moreover, as discussed below, a number of price-fixing agreements were reached

5    using United States dollars as the benchmark currency.

6                              **FACTUAL ALLEGATIONS**

7    **A.    Aspects Of The Airline Industry That Facilitate The Alleged Conspiracy**

8         53.    Most of the Defendants are the dominant international airlines based in Asia and

9    Oceania, and provide passenger air transportation services on international routes between the

10   United States and Asia/Oceania.

11            **1.    The Airline Industry's Use Of Airline Alliances**

12        54.    In recent years, the Defendants have established highly integrated alliances that

13   substantially deviate from the norm in most competitive industries.

14        55.    The European Competition Authorities ("ECA") recently prepared a working

15   paper entitled "Code-sharing agreements in scheduled passenger air transport—The European

16   Competition Authorities' perspective."  The ECA explained the nature and purpose of code-

17   sharing agreements between airlines:

18              A code-sharing agreement is an agreement between two or more
19              air carriers whereby the carrier operating a given flight allows one
                or more other carriers to market this flight and issue tickets for it as
20              if they were operating the flight themselves.  In practice, these
                other carriers add their own carrier designator code and flight
21              number onto that of the operating carrier.  Code share partners also
22              agree on how they compensate each other for the seats they sell on
                one another's flights.

23
                Code-sharing agreements between airlines may go beyond a mere
24              sharing of the designator codes and may be supplemented by other
                elements of cooperation: *e.g.* coordination of the frequent flyer
25              programmes, route and schedule planning, coordination of
                marketing, sales and distribution networks, joint pricing, sharing of
26              facilities and services at airports, integration and development of
27              information systems etc.

28

56.    These code-sharing agreements blur the line between partner and competitor. Indeed, the ECA continued:

> [A] code-sharing agreement between two previously competing airlines may significantly dampen competition on the routes covered by the agreement which may lead to price increases. **Given the multi-market nature of the airline industry, where airlines compete on various routes, the exchange of commercially sensitive information that might take place in a code-sharing agreement could favour tacit collusion between the code-share partners also with respect to routes not covered by the agreement**. (Emphases added).

57.    Defendants Air New Zealand, ANA, Lufthansa, SAS, Singapore Airlines, and Thai Airways, among others, including non-defendant co-conspirators Asiana and UAL, operate jointly through the Star Alliance, and have established agreements in which they code share seats on each other's flights and share in the revenue generated.

58.    Another major industry alliance, Oneworld, includes Defendants JAL, Cathay Pacific, Qantas, British Airways, and others.  These Defendants have established agreements in which they code share seats on each other's flights and share in the revenue generated. Moreover, during the Class Period, members of Oneworld pressured at least one of the Defendants to combine separate APEX fares into a single APEX (Advanced Purchase Excursion) fare.  (APEX fares are discussed below in greater detail.)

59.    The third major alliance is SkyTeam.  Its members include KAL, Air France, KLM, Continental, and others.  These Defendants and non-defendant co-conspirators have established agreements in which they code share seats on each other's flights and share in the revenue generated.

60.    In addition, many of the Defendants and non-defendant co-conspirators are participants in a multitude of independent code-sharing arrangements outside of their primary alliances, including, but not limited to, the following agreements:  Air New Zealand and JAL; Air New Zealand and Qantas (never implemented because the Australian Competition & Consumer Commission ("ACCC") determined that the agreement was anticompetitive); Cathay Pacific and Malaysian Airlines; EVA and ANA; EVA and Qantas; Malaysian Airlines and ANA;

1   Malaysian Airlines and Singapore Airlines; Malaysian Airlines and Thai Airways; Asiana and

2   Qantas; Thai Airways and China Airlines; Vietnam Airlines and JAL; Vietnam Airlines and

3   China Airlines; Vietnam Airlines and Cathay Pacific; Vietnam Airlines and Qantas; Vietnam

4   Airlines and Philippine Airlines; Philippine Airlines and Cathay Pacific; Philippine Airlines and

5   Malaysian Airlines; Lufthansa and Swiss International; Swiss International and Singapore

6   Airlines; Swiss International and Thai Airways; Swiss International and UAL; Air France and

7   Qantas; Air France and JAL; KLM and JAL; KLM and Malaysian Airlines; KLM and

8   Northwest; KLM and Qantas; Continental Airlines and EVA; Northwest and Air France;

9   Northwest and Continental; Northwest and KLM; and Northwest and Delta.

10          61.     According to testimony by the DOJ's Antitrust Division before the Senate

11   Committee on Commerce, Science and Transportation:

12              [A]irline marketing alliances . . . are essentially joint ventures
                between airlines.  These alliances fall somewhere between an
13              outright merger and a traditional arm's-length interline agreement.
                Marketing alliances come in all shapes and sizes . . . Alliances
14              involving code-sharing are in many respects the most
                controversial . . . .  Code sharing agreements also have the
15              potential to be anticompetitive.  They can result in market
                allocation, capacity limitations, higher fares, or foreclosure of
16              rivals from markets, all to the injury of consumers . . . the greatest
                threat to competition comes when two of very few airlines that
17              compete in a market enter into a code-sharing agreement in that
                market.
18

19          62.     Antitrust regulators have just begun to step up their oversight of these far reaching

20   alliances.  For example, the Directorate General (Competition) for the European Commission has

21   opened a "priority" investigation into the competitive effects of certain agreements between

22   airlines on trans-Atlantic routes.  On or about April 20, 2009, *Bloomberg News* reported that

23   "Jonathan Todd, a commission spokesman, told reporters that the commission doesn't open

24   probes on a 'routine basis.'"  "Based on what commission has seen so far, 'we think that there

25   may be breaches of the antitrust rules because of the very extensive levels of cooperation on

26   trans-Atlantic routes between these airlines,' Todd said."

27

28

63.     On July 1, 2009, Neelie Kroes, the European Commission's Competition Commissioner, raised "serious concerns" about the proposed merger of Lufthansa and Austrian Airlines.

64.     In addition, on June 26, 2009, the DOJ announced that it was opposed to a proposal by the Star Alliance to add Continental as a member.  The DOJ determined that the sweeping request was anticompetitive and asked the United States Department of Transportation ("DOT") to reconsider its tentative approval of the agreement.

65.     The Defendants' extensive use of code-sharing agreements exposes them to each others' commercially sensitive information and therefore reduces strategic uncertainty for each of them within the marketplace.

## 2.     The Industry's Use Of Trade Associations

66.     The Defendants' alliance and code-sharing arrangements are not the only opportunities for close interaction between the Defendants.  Defendants' personnel also participate in various trade associations with each other, including the following trade associations relevant to this litigation: the IATA, the Association of Asia-Pacific Airlines ("AAPA"), and the Bureau of Airline Representatives ("BARs") for Hong Kong, Thailand, Philippines, and Malaysia, among other countries.

67.     Each Defendant is a member of IATA.  IATA is an international trade body representing over 230 airlines.

68.     IATA has served as a forum for its members to discuss rising fuel costs and the need for measures to mitigate such costs, such as increasing fares or levying fuel surcharges.  In fact, as detailed below, IATA has specific committees, such as the IATA Tariff Coordination Conferences, whose express purpose is to collectively set air passenger fares throughout the world, including between the United States and Asia/Oceania.  These Tariff Coordination Conferences have been condemned as anticompetitive.  For example, on November 9, 2006, the ACCC noted that **"IATA Passenger Tariff Coordinating Conferences provide an opportunity for the sharing of knowledge which given the roles of the airline representatives attending, the clearly stated objectives of the conferences and the matters**

1    **being discussed would not be in the interests of competitive air passenger markets."**

2    (Emphases added).

3        69.    During the Class Period, one of IATA's express goals was **"[t]o assist the**

4    **industry to achieve adequate levels of profitability.**"  (Emphases added).  That goal is

5    repeatedly driven home to IATA's members, including Defendants.  Giovanni Bisignani,

6    Director General and CEO of IATA, gave a speech in Paris on June 5, 2006 in which he urged

7    the industry to "manage capacity" in order to increase profitability:

8
9                   Let's start at home. Sometimes we have been our own worst
                    enemy—chasing growth instead of profitability.  As discussed, we
10                  changed after 2001.  But let's be frank.  We are now benefiting
                    from a strong global economy.  And record aircraft orders could be
11                  our Achilles heel if we stop managing capacity carefully.

12       70.    Bisignani made similar comments a year earlier, on May 30, 2005, in Tokyo,

13   when he urged IATA's members to limit seating capacity:  "We focused too much on market

14   share.  We did not effectively match capacity to demand."

15       71.    IATA's goal of assisting the industry achieve "adequate" levels of profitability is

16   not the type of mission statement one would normally expect an industry trade association to

17   adopt in order to enhance competition.  Indeed, Bisignani's comments are patently

18   anticompetitive—he is repeatedly exhorting individual market participants to refrain from

19   vigorous competition with each other in order to facilitate enhanced profitability for all.  And, it

20   is basic microeconomic theory that "managing" supply provides opportunities to increase and/or

21   stabilize prices.

22       72.    In addition to their general memberships in IATA, Singapore Airline's CEO,

23   Chew Choon Seng, and JAL's former President, Toshiyuki Shinmachi, served on IATA's Board

24   during the Class Period.  They are also actively involved in AAPA, as are other Defendants (Air

25   New Zealand, ANA, Cathay Pacific, China Airlines, EVA, KAL, Malaysian Airlines, Philippine

26   Airlines, Qantas, Thai Airways, and Vietnam Airlines).

27

28

73.     Like IATA, the AAPA has served as a forum for its members to discuss rising fuel costs and the need for measures to mitigate such costs, such as increasing fares or levying fuel surcharges.

74.     Like IATA, the AAPA has a long history of emphasizing collusion over competition.  For example, at the AAPA's November 15, 2002, annual meeting, the chief executive officer of Philippine Airlines, Lucio Tan, declared:  "The issues confronting our industry today are critical and pressing."  Tan cited security threats, declining traffic, high insurance premiums and rising fuel costs as among the major challenges facing the industry.  "To effectively address these issues, we need our combined strategies," Tan explained. "We need to direct our efforts towards one goal—survival.  **And in order to survive, competition must be replaced by cooperation.**" (Emphases added).

75.     In anticipation of AAPA's annual meeting, China Airlines similarly stated in November 2004 that:

> The 48th Assembly of Presidents will take place at the Grand Hyatt Taipei November 25 and 26.  Important airline industry issues, such as US regulatory policies, rising fuel costs, hedging strategies, insurance, war risks and low-cost carriers, will be reviewed and discussed. **In the past, the Assembly has helped maintain a mutual understanding and a common purpose among airlines in the Asia Pacific region.** (Emphases added).

76.     In addition, the Defendants are participants in BAR organizations in Hong Kong, Thailand, the Philippines, and Malaysia.  Until very recently, Hong Kong did not have a competition law that prevented Defendants from tacitly or expressly reaching agreements on passenger fares, including surcharges.  Moreover, antitrust regulators in these and other Asian countries have not, until very recently, aggressively enforced their countries' respective competition rules.  These BAR organizations have served as forums for Defendants to discuss and agree on passenger fares and fuel surcharges.  Indeed, the Thailand BAR describes itself as a "forum for member airlines to deal with common interests and issues and represents the interests of member airlines to government, official organizations and other parties interested in the

aviation industry in Thailand.  This includes maintaining close liaison on a regular basis with the International Air Transport Association (IATA), the IATA Billing and Settlement Plan (BSP), the Air Cargo Business Association (ACBA) and other industry bodies."  As of 2006, the Thailand BAR had 56 members and 4 associate members.  The Thailand BAR's executive committee included Thai Airways, Cathay Pacific, Singapore Airlines, Swiss International, SAS, Qantas, British Airways, Northwest, and Emirates.  An executive from Swiss International was appointed president of the Thailand BAR as of 2006.

77.  In November 2007, shortly after the first of these lawsuits was filed, BAR HK uploaded onto its website a new policy prohibiting anticompetitive conduct, which provides in relevant part as follows:

> Participants shall comply with the following general principles in respect of all their activities within BAR HK:
>
> Participants' competitive behaviour should remain independent. Participants' commercial decisions must be made unilaterally and independently from that of their competitors.  Participants will not engage in express or tacit agreements or understandings to reduce competition or any form of collusion.

78.  In summary, the highly integrated economic agreements between the Defendants and their various code-share and alliance partners, and the relationships fostered by Defendants' key employees at industry meetings concerning fares and surcharges reinforce and facilitate the conspiracy alleged below.

## B.     The Conspiracy

79.  Beginning no later than January 1, 2000, the Defendants and their co-conspirators began increasing the price of passenger air transportation on international air passengers that were in substantial lockstep both in their timing and amount.  The close timing and amount of Defendants' increases were not coincidences, but rather the product of a collusive agreement to fix, raise, maintain, and stabilize the prices of base passenger fares and fuel surcharges on international flights.

80.  Base fares for multi-segment travel—*e.g.* a flight from the United States to New Zealand to Western Samoa—are constructed using a methodology established by the Defendants

1    that allows for ready determination of the portion of the total fare allocated to each segment of

2    travel.

3        81.    The fuel surcharges referenced herein are applied "per segment" or "per coupon"

4    —*i.e.*, they apply to a discreet and identifiable segment of travel.  Therefore, these fuel

5    surcharges apply equally, for example, to any passenger traveling from San Francisco to Japan

6    regardless of whether San Francisco was the point of origin for the trip, whether Japan was the

7    final destination, or whether the flight from San Francisco to Japan was only one segment of a

8    multi-segment trip.

9        82.    Neither the DOT nor United States law allows Defendants to participate in

10   coordinated efforts to set the price fares and surcharges for air transportation to and from the

11   United States, except with respect to the limited grants of immunity discussed herein.

12           **1.    Base Passenger Fares Are Set In An Anticompetitive Environment**

13                  **a.    Immunized IATA Fares**

14       83.    IATA and its airline members have historically been the beneficiaries of limited

15   antitrust immunity from a number of worldwide competition authorities, including the DOT, the

16   ACCC, and the European Union.  These grants of immunity allowed IATA and its member

17   airlines to meet and agree on fares for interline (a.k.a. multi-airline) travel throughout the world.

18       84.    Immunized fares (hereinafter referred to as "IATA fares") are set during meetings

19   between member airlines at regularly scheduled IATA Tariff Coordination Conferences and are

20   issued in fare classes P and F (First Class), J and C (Business Class), and Y (Economy Class),

21   although not all fares in each of those service classes are immunized.  Moreover, the agreements

22   reached at IATA Tariff Conferences cannot be implemented until all governmental approvals,

23   including approval from the DOT, have been obtained.

24       85.    Each of the Defendants participates in these Tariff Coordination Conferences.

25   *See* http://www.iata.org/whatwedo/passenger/tariffs/tcparticipants.htm.

26       86.    In a November 9, 2006, Determination by the ACCC concerning IATA's

27   Application for Revocation and Substitution of Authorisation A90435 (the "ACCC

28   Determination"), the ACCC summarized the way in which IATA fares are established:

The interaction of elements which constitute the IATA interline system for the transport of passenger and cargo occurs as follows:

A. Airlines agree between each other that they will accept each others' passenger tickets and cargo air waybills where those tickets and waybills incorporate an IATA interlineable fare or rate (IATA Multilateral Interline Agreements).

B. IATA interline fares for passengers and rates for cargo are determined jointly by airlines at IATA Tariff Coordinating Conferences (Passenger Tariff Coordination and Cargo Tariff Coordination).

C. Airlines agree how revenue from the sale of a passenger ticket with an IATA interlineable fare or a cargo air waybill with an IATA interlineable rate is to be apportioned between the carriers who accept the waybill as part of an interline journey (IATA Prorate System).

D. Revenue from a waybill with an interline rate is nominally attributed to the primary carrier, the carrier undertaking the first leg of the journey, and then distributed amongst other participating carriers using proportions agreed with the Prorate System (IATA Clearing House).

87. Not surprisingly, IATA fares are generally the most expensive fare available in each service class.

88. In recent years, competition authorities in the United States, Europe, and Australia have moved to scale back the limited grant of antitrust immunity provided to IATA due to concerns about the inherently anticompetitive nature of the Tariff Coordination Conferences.

89. In a July 5, 2006 "Order to Show Cause" concerning why IATA's antitrust immunity should not be revoked, the DOT examined a handful of minutes from the Tariff Coordination Conferences and noted that the conference structure has led to substantial anticompetitive abuse by member airlines, including abuse by several Defendants and their co-conspirators.

90. For example, the DOT noted:

**A participating airline will at times urge competing airlines to raise fares in their markets in order to avoid undercutting the fares charged in the airline's own principal markets.** *See, . . .* IATA Application, Docket 2004-20051, Minutes of October 25-November 4, 2004, Conference at para. 147 (Japan Air Lines

asked for higher fares in U.S.-Korean markets because the existing fares were undercutting U.S.-Japan fares).  (Emphases added).

91.    The DOT, in its "Order to Show Cause" concluded:

The chairman [at IATA Tariff Conferences] does not otherwise state that the discussions are subject to any antitrust or competition law restraints, except insofar as our alliance condition bars alliance members from participating in the discussions of fares and rates for alliance markets . . . . **The minutes thus show that the IATA members do not believe that their discussions are subject to the antitrust law prohibitions normally imposed on pricing discussions between competitors.**

* * *

In these circumstances, we think the IATA by-laws reduce competition. This tentative finding is consistent with the established antitrust law principle that, with rare exceptions, discussions and agreements on pricing between competitors reduce competition. (Emphases added).

92.    Moreover, following each Tariff Coordination Conference, IATA publishes and distributes the names, e-mail addresses, and telephone numbers of each of the participants.  This practice facilitates communication between employees of the Defendants outside of the Tariff Coordination Conferences.  It is neither necessary nor appropriate for the various attendees at the Tariff Coordination Conferences—whose express duties are to collectively set fares—to be communicating with each other outside of formal IATA channels.

93.    On June 3, 2005, the ACCC preliminarily concluded that "while there may not be any explicit agreement on market fares between airline representatives at IATA Tariff Coordination Conferences, it is likely given the roles of the representatives, the clearly stated objectives of the conferences and the matters being discussed that the sharing of knowledge that occurs could be conducive to coordinated conduct in relation to market fares and would not be in the interests of competitive airline markets."

94.    On November 9, 2006, the ACCC announced that all immunity for IATA activities will be phased out by June 30, 2008, noting again that **"[t]he ACCC believes that IATA Passenger Tariff Coordinating Conferences provide an opportunity for the sharing of knowledge which given the roles of the airline representatives attending, the clearly**

1  **stated objectives of the conferences and the matters being discussed would not be in the**

2  **interests of competitive air passenger markets."** (Emphases added).

3      95.      Similarly, on or about March 14, 2005, the Directorate General (Competition) of

4  the European Commission found that the IATA Tariff Conferences present a "major risk" for

5  anticompetitive conduct by the member airlines.  The Directorate General stated:

6              To conclude, the organisation of **IATA Tariff Conferences . . .**
               **provides an opportunity for competing undertakings to**
7              **regularly communicate on commercially sensitive**
               **information, in particular pricing and sale conditions.  Such**
8              **regular communication helps to eliminate strategic**
               **uncertainty and thereby raises significantly the risk of**
9              **collusion between airlines.**  Airlines can agree on future conduct
               and generally coordinate tacitly or explicitly their behaviour.
10             IATA Passenger Tariff Conferences therefore appear to present a
               major risk to restrict competition. (Emphases added).
11

12     96.      The Commission further noted:

13             By adopting similar terms and conditions [for non-immunized
               fares], IATA members develop similar tariff structures.  This
14             makes it easier for competing carriers to monitor each other's
               fares.  Detection on deviation from agreed upon conduct is
15             quicker.  This reinforces the stability of possible collusive
               agreements between competing airlines, whether tacit or explicit.
16
               The standardisation of pricing rules is suspicious because it
17             remains unclear how this benefits consumers.

18     97.      On October 3, 2006, the European Commission published (EC) Commission

19  Regulation 1459/2006, which phased out antitrust immunity to IATA and its member airlines,

20  including the elimination of immunity for Tariff Coordination Conferences concerning the routes

21  between Europe and the United States and Australia on June 30, 2007 and between Europe and

22  the rest of the world on October 31, 2007.

23     98.      On March 30, 2007, the DOT entered a final order disapproving IATA's

24  Provisions for the Conduct of the IATA Traffic Coordination Conferences insofar as the

25  agreement authorized United States and foreign carriers to discuss and agree upon fares, rates,

26  conditions of service, and price and rate applicability conditions, either directly or indirectly or

27  through tariff conferences or other related means of information sharing for passenger and cargo

28

1    air services: (i) between the United States and the European Union (together with Iceland,

2    Norway, Switzerland, and Liechtenstein); (ii) between the United States and the overseas

3    territories of the member states of the European Union subject to an air services agreement

4    between the United States and a member state; and (iii) between the United States and Australia

5    (the "Final Order").  *See* IATA Tariff Conference Case, Order 2007-3-23 (Docket OST-2006-

6    25307).

7        99.    The DOT explained that "[t]he tariff conferences are anticompetitive and do not

8    provide important public benefits or meet a serious transportation need.  **Pricing discussions**

9    **among competitors of the kind that take place at the IATA tariff conferences are inherently**

10   **anticompetitive and likely to increase the fares paid by consumers."** (Emphases added).

11            **b.    The Use Of Immunized IATA Fares As A Benchmark For Non-**
                      **Immunized Fares**
12

13       100.    The number of IATA fares sold by airlines is a small fraction of the number of

14   tickets issued to air passengers annually.  However, the effect of the anticompetitive conduct

15   observed in the immunized Tariff Coordination Conferences is not limited to the relatively small

16   market for immunized IATA fares—it also affects the vastly larger market for non-immunized

17   fares as well.

18       101.    For example, the ACCC recently conducted a fare analysis which suggests that

19   immunized IATA fares are used by the airline industry as benchmarks for the fare prices charged

20   for non-immunized air passenger service.

21       102.    The ACCC also noted "that the IATA Tariff Services Handbook, Issue 1 of 1 July

22   1999, specifically identifies as a benefit to airlines from attending IATA Tariff Coordinating

23   Conferences the gaining of 'access to market knowledge': 'Participation in Tariff Coordination

24   opens the door to sharing in the exchange of market and other types of information required to

25   intelligently price passenger and cargo tariffs.'"

26       103.    The DOT similarly noted in its March 30, 2007 Final Order that "an agreement by

27   airlines participating in a tariff conference that IATA fares should be increased by a certain

28   percentage amount can easily represent an industry agreement that equivalent fares for on-line

1    service [i.e., non-immunized fares] should be increased by a similar amount.  DG-Competition

2    and the ACCC showed that in fact this has happened."

3        104.    In connection with its analysis, the ACCC interviewed Qantas personnel, who

4    confirmed the existence of a pricing relationship between IATA fares and Qantas' non-

5    immunized fares.  Indeed, "Qantas indicated in its discussions with the ACCC that it would

6    normally try to apply fare increases agreed at IATA Tariff Coordinating Conferences to Qantas'

7    own published fares for premium classes on all routes on which it operates as the market

8    allows."

9        105.    The ACCC has reported that many other airlines have acknowledged in

10   submissions that IATA fares are used for benchmarking prices for non-immunized fares.  In a

11   recent article, Peter Harbison from the Sydney-based Centre for Asia Pacific Aviation, a

12   consulting organization, noted that fixing prices of passenger fares occurred "fairly openly" at

13   one point in time, and that the culture still "overhangs" today.  Harbison went on to note that

14   [t]here's a lot of interaction at management level between airlines."  Shukor Yusof, an aviation

15   analyst with Standard and Poor's Equity Research, further commented that Asia, in particular,

16   lacks an over-arching anti-trust legal framework.  Yusof was quoted as saying, "There's no one

17   main body to oversee that kind of thing."  Jim Eckes of Indoswiss Aviation Consultancy in Hong

18   Kong noted that talking about prices between competitors has more of a stigma in the United

19   States, where the law is firm.

20                    **c.    Lockstep Pricing Is Not To Be Expected In A Competitive Market**

21       106.    The following chart shows the pricing for a small selection of non-immunized

22   passenger air fares (and surcharges) as of November of 2007, as reported by

23   www.flightstats.com.  There is an obvious pattern of identical or virtually identical pricing by the

24   defendants' closest competitors on routes between the United States and Asia and Oceania:

25

26

27

28

**San Francisco to Auckland**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---|---|---|---|---|
| Air New Zealand | Coach | $918 | $255 | $1173 |
| Qantas | Coach | $918 | $255 | $1173 |

**San Francisco to Sydney**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---|---|---|---|---|
| Air New Zealand | Coach | $818 | $312 | $1130 |
| Qantas | Coach | $818 | $308 | $1126 |

**San Francisco to Bangkok**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---|---|---|---|---|
| ANA | Coach | $650 | $281 | $931 |
| JAL | Coach | $620 | $281 | $901 |

**San Francisco to Hong Kong**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---|---|---|---|---|
| ANA | Coach | $580 | $269 | $849 |
| JAL | Coach | $579 | $269 | $848 |

**San Francisco to Tokyo**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---|---|---|---|---|
| ANA | Coach | $529 | $270 | $799 |
| JAL | Coach | $529 | $270 | $799 |

107.    There are other instances of coordinated base fare pricing. For example, the following charts demonstrate that Defendant ANA and Defendant Thai Airways closely coordinated base fares during portions of the Class Period.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20



21     108.     With respect to ANA's business fare pricing from Bangkok to Los Angeles, the

22  preceding chart identifies a substantial and historically unprecedented change in pricing behavior

23  that commenced in or about September 2004 and continued through the DOJ raids in February

24  2006.  This sharp change in pricing occurred during summer 2004, which is the same time period

25  during which the Defendants and their co-conspirators instituted and quickly raised fuel

26  surcharges.

27

28

109.     Defendants' cost structures are markedly different and vary based in part on the age of their aircraft fleet, their labor costs, and whether and to what extent they hedged input costs, including fuel costs.  Under these circumstances, economic theory suggests that competition would result in varying fare prices.  This is particularly true where, as here, fixed costs, including the acquisition, operation, and maintenance of aircraft, are high and the marginal cost of adding additional passengers to each flight is small.  Under such circumstances, one would expect to see airlines with cost advantages routinely undercutting their competitors' pricing in order to maximize seat occupancy on their planes.  During the Class Period, that has not occurred.

110.     The United States domestic market provides an illustrative example of how economic theory plays out in the real world.  Southwest Airlines—which is not a member of IATA, AAPA, and the various Asian BAR associations and is therefore not exposed to the collective rate-setting culture promoted by these organizations—is well-known to be a vigorous competitor in the domestic markets in which it operates.  Southwest Airlines is able to routinely beat—not simply match—the fares offered by its competition by, among other things, hedging fuel costs, minimizing the diversity of aircraft it operates, and paying close attention to its labor costs.  The difference in cost structure between Southwest and its competitors naturally leads to a variation in fare prices, something that is not seen on routes between the United States and Asia/Oceania—routes that are dominated by the majority of the Defendants.

### d.       Specific Examples Of Base Fare Coordination

111.     Plaintiffs have learned to date of a number of specific examples of collusion among Defendants on base air passenger fares. These are only illustrative; discovery in this case is likely to yield more evidence.

112.     ANA and JAL conspired with one another and with other Defendants to coordinate various non-IATA carrier fares between different city pairs.  ANA and JAL functioned as the primary airlines operating in Japan, and were consistently contacted by non-Japanese Defendant carriers regarding the coordination of carrier fares for all fare categories for

1    flights from Japan to the United States.  In hubs in which ANA and JAL were less prominent

2    players, ANA and JAL remained actively involved in the coordination of carrier fares, often

3    involving the primary Defendant or Defendants operating from any given hub.

4          113.     Airline carriers generally set passenger fares for different fare categories twice a

5    year.  The fare decisions were effective throughout the first and second half of each fiscal year.

6    Carrier fare communications that took place from December through February of a given year set

7    the fare price for the first half of that fiscal year.  Carrier fare communications that took place

8    from June through August of a given year set the fare price for the second half of that fiscal year.

9    Defendants coordinated at least the following fare categories for transpacific flights from Asia to

10   the United States: (a) an APEX (Advanced Purchase Excursion) fare, which is a discounted

11   economy class fare that requires an advanced purchase, and is set based on specific city-pair

12   destinations; (b) a ZONE PEX  (or Z-PEX) fare, which is a discounted economy class fare that

13   does not require an advanced purchase and does not involve specific city-pair destinations

14   (ZONE PEX fares are set based on zone, or regional, destinations as opposed to individual cities

15   (*i.e.,* Narita to a group of United States West Coast cities)); and (c) C-APEX fares, which is  a

16   special form of an APEX fare.

17         114.     From at least 2004 into the summer of 2006, ANA and JAL coordinated APEX,

18   ZONE PEX and C-APEX carrier fares on flights from Japan to the United States.  ANA and JAL

19   communicated approximately five or six fiscal half-years within the relevant time period.  ANA

20   and JAL communications regarding the coordination of carrier fares occurred in January and

21   February for carrier fares effective during the first half of the fiscal year, and June and July for

22   carrier fares effective during the second half of the fiscal year.  During that time, ANA and JAL

23   illegally set carrier fares for the six month period that followed.  ANA and JAL discussed and

24   agreed upon the level of the fares, fare rules, seasonal discounting, fare finalization and final fare

25   structures.

26         115.     The primary ANA employees who participated in these discussions were Akiko

27   Oyama, Atsushi Yabuki, and Keiji Omae (among others).  The primary JAL employees who

28   participated in these discussions regarding carrier fares were Misato Tanaka, Noboru Hirai,

1   Tomomi Kubota, Takeshi Aoki, Kenichiro Ochi, and Takashi Inagaki.  Although all individuals

2   listed above were not involved in the conspiracy at the same time, during their tenure as

3   employees of ANA and JAL's fare-setting groups, these ANA and JAL employees participated

4   in discussions regarding coordinated rates.

5          116.    Direct communications between ANA and JAL employees regarding seasonality

6   and the coordination of fare levels occurred by e-mail and telephone.

7          117.    In addition, ANA employees and JAL employees also exchanged fare charts and

8   then discussed those charts.

9          118.    Various ANA employees discussed carrier fare levels at least eight times with

10   Takashi Inagaki of JAL.  Similarly, various ANA employees, including Keiji Omae, also

11   discussed carrier fare coordination with Kenichiro Ochi of JAL.  Akiko Oyama and Atsushi

12   Yabuki, both from ANA, also discussed C-APEX carrier fare coordination with Tomomi Kubota

13   and Takashi Inagaki of JAL.

14          119.    Between December of 2005 and January of 2006, ANA employees, including

15   Akiko Oyama, participated in discussions with JAL employees Misato Tanaka, Takeshi Aoki

16   and Takashi Inagaki regarding the coordination of APEX, ZONE PEX and C-APEX fares for

17   flights from Japan, including Japan-U.S. flights for the first half of the 2006 fiscal year.  For

18   example, one e-mail dated December 27, 2005 mentions that JAL prepared APEX pricing that

19   matched ANA's pricing for the first half of the 2006 fiscal year and that the two companies

20   would get together to "talk this over."

21          120.    In July of 2006, ANA employees, including Atsushi Yabuki, participated in

22   communications with JAL employees, including Takeshi Aoki, regarding the coordination of

23   changes to each airline's APEX fare structure.  Prior to the proposed coordination, ANA and

24   JAL offered separate 14 day and 28 day APEX fares.  (The term "14 day and 28 day APEX fare"

25   is defined by the number of days a ticket is bought prior to a given flight).  JAL employees

26   contacted ANA employees, including Atsushi Yabuki, with a proposal for both ANA and JAL to

27   coordinate and combine their APEX fares into a single 21 day APEX fare.

28

121.    Indeed, a number of e-mails that were generated in late 2005 and early 2006 that reflect ANA's agreements with JAL to coordinate certain fares.  One set of examples involved ZONE PEX pricing.  These e-mails showed that ANA proposed that JAL raise such passenger fares during 2006.   Subsequent e-mails reveal that an agreement "probably" could be reached. This agreement was, in fact, reached.  ANA and JAL also exchanged proposals and counter proposals via e-mail throughout the month of January regarding ZONE PEX pricing.

122.    Other passenger fares between the United States and Japan were also set through coordinated agreements between ANA and JAL.  Non-immunized fares are benchmarked off of the IATA "normal" rate.  Thus, for example, one of the fares classes discussed below (the non-immunized "Business Saver" fare) was discounted by 25% off of the IATA fare for routes between Tokyo and New York during 2005 (for weekday service).

123.    Beginning no later than January 1, 2000, ANA and JAL began to coordinate the price of non-immunized passenger fares they offered for travel between the United States and Japan, including, so-called "Yobiyose" economy-class fares, "Satogaeri" economy-class fares, and "Business Saver" business class fares.  All three fare categories are discounted relative to the IATA "normal" rate for seating in the respective class on transpacific flights.

124.    **Yobiyose Fares.**  From at least 2000 or early 2001 until their elimination in October of 2005, ANA and JAL coordinated the setting and eventual elimination of Yobiyose fares.  Yobiyose fares were discount fares for sale in the United States for roundtrip travel from Japan to the United States.  They were established to allow Japanese nationals living in the United States to bring their family members in Japan to visit them in the United States. Yobiyose fares were set semi-annually for the periods between April 1 to September 30 and October 1 through March 31.  When advance purchase published fares were introduced in Japan, however, these Yobiyose fares became a problem for the companies because they were undercutting the companies' published fares.  ANA and JAL began coordinating Yobiyose fares to increase the Yobiyose fares to be more in line with the published fares and then eventually agreed to eliminate Yobiyose fares altogether.

1    125.    The employees that either participated in or had knowledge of the Yobiyose fare

2    agreements between ANA and JAL include:  Yosaku Osumi, ANA's Deputy Director of

3    Marketing and Sales Planning; Aknobu Shibata and Yasushi Omori of JAL's Tokyo office;

4    Shinzo Amagai and his superior at JAL Americas Region El Segundo Headquarters, Fusako

5    Cahill, among others.

6    126.    Every half-year, beginning no later than later 2000 or early 2001, representatives

7    from the United States  head offices of ANA and JAL coordinated on Yobiyose fares for the next

8    six-month rate period.  In-person meetings were usually held at ANA's office in New York.

9    Often, during or before these meetings, ANA and JAL exchanged proposed fare sheets.

10   127.    For example, during a meeting at ANA's New York office on February 16, 2001,

11   ANA and JAL considered proposed coordinated Yobiyose fares for the upcoming six-month

12   period.

13   128.    On March 1, 2002, representatives of ANA and JAL met again at ANA's New

14   York office to discuss revising the Yobiyose rate structure and level.  They discussed whether to

15   introduce a lower price for 14-day advance purchase tickets or to adopt a three-tiered advance

16   purchase structure, in which the ticket price would depend on whether the ticket was purchased

17   more than 28 days in advance, more than 14 days in advance or less than 14 days in advance.

18   129.    Another meeting was held on August 15, 2002.  At that meeting, representatives

19   of ANA and JAL agreed to discontinue the 28-day and 14-day "advance purchase" Yobiyose

20   fares and to offer only the highest-priced fare that did not require any advance purchase.  ANA

21   and JAL also agreed to a formula for setting the non-advance purchase Yobiyose fares.

22   130.    At a lunch meeting in late 2002 or early 2003, representatives of ANA and JAL

23   agreed that the system previously established for Yobiyose fares should be maintained for the

24   upcoming six month period.

25   131.    The two carriers subsequently agreed on the price and terms of Yobiyose fares for

26   each six-month period until October 1, 2005.

27

28

132.     At some point in 2005, a discussion was held between ANA and JAL at which both airlines confirmed that they would discontinue Yobiyose fares beginning with the fare season starting October 1, 2005.

133.     **Satogaeri fares.** Satogaeri, or "homecoming" fares, are discount fares established to allow Japanese people living in the United States to travel to Japan to visit family and friends. Satogaeri fares are discount fares for sale in the United States for roundtrip travel from the United States to Japan. Unlike Yobiyose fares, Satogaeri fares (which are sometimes called "M" class fares) fluctuated in response to changing market conditions.

134.     Beginning no later than late 2000 and continuing through early 2006, ANA and JAL frequently exchanged advance notice of proposed changes in Satogaeri fares. Such communications took place between employees in regional sales offices within the United States, as well as between employees in the two carriers' U.S. headquarters offices.

135.     ANA and JAL employees with knowledge of the conspiracy include Sugi, Yokoyama and Isao Ono of ANA; and Amagai, Sun, Cahill and Michiko Kumataka of JAL.

136.     **Discount Business Class fares.** Discount or "Business Saver" fares are business (or "C") class fares for sale in the United States that are set substantially below immunized IATA tariff rates for business class travel. For example, in 2005, the benchmark for discount business class travel between Tokyo and New York (for weekday travel) was 75% of the IATA immunized business class fare. ANA introduced discount business class fares from the United States to Japan in early 2002, followed soon thereafter by JAL.

137.     In March of 2002, ANA and JAL agreed not to compete with respect to the level of discount business class fares from the United States.

138.     On March 11, 2002, Shuta Saito, JAL's Vice-President of Industry Affairs, reconfirmed JAL's intent not to "compete" with ANA on non-immunized C-class fares. In January 2003, ANA representatives reconfirmed at a lunch meeting with Amagai that they would continue to coordinate those fares with JAL. JAL then requested that ANA raise the fare out of New York (and use as the pretext for doing so a claim that ANA had increased the level of accommodations on its flights).

139.    The parties effectuated and monitored their conspiracy by exchanging proposals concerning the fare levels for non-immunized "C" class fares before these fares were announced to the public.  On March 17, 2004, a JAL employee requested that the ANA-JAL agreements be circulated to all JAL offices in the Americas Region so that all JAL personnel were aware of pricing changes agreed to by JAL and ANA.

140.    On September 1, 2004, an ANA representative e-mailed JAL representatives a fare chart for ANA's discount class fares for the forthcoming six-month period.  That same ANA representative sent JAL another fare chart in February 2006, before the fares in the chart were made public.

141.    Employees of ANA and JAL with knowledge of the conspiracy concerning non-immunized business class fares include:  Mr. Fukuda of ANA, Cahill, Sun, Amagai, Saito, Kaneko, Fujiki, Ono, and Joan Kumai of JAL, among others.

142.    Thai Airways joined ANA and JAL to coordinate APEX, ZONE PEX and C-APEX fares from Japan to the United States.  Beginning in 2001, Thai Airways representatives sought prior approval or "concurrence" of their carrier fares with the carrier fares of ANA and JAL on flights from Japan to the United States.  Concurrence involving routes to and from the United States implicates the antitrust laws of this country and constitutes illegal communication and coordination of prices.

143.    Every fiscal half-year from at least August 2000 through at least August of 2002, Thai Airways e-mailed representatives of ANA and JAL requesting prior approval (concurrence) for the forthcoming six-month period on ZONE PEX, and occasionally also APEX, fares from Japan to various cities in the western United States, including Las Vegas, Los Angeles, Oakland, Portland, San Diego, San Francisco, and Seattle.  In almost all instances, these e-mails attached fare sheets and fare rules for the relevant period.

144.    In an e-mail dated August 20, 2000, Tsuneo Kojima (Thai Airways) wrote to Keeratiroj Sirisap (Thai Airways), Shinji Ono (JAL) and Fukushima (ANA), stating that Thai Airways would send to ANA and JAL its fares and rules of application for the period between October 1, 2000 and March 31, 2001 on certain flights from Tokyo and Osaka to the United

1  States.  In the e-mail, Tsuneo Kojima wrote, "[w]e will send fares/rules for USA from TYO/OSA

2  effective 01OCT00 through 31MAR01 as per attached . . . . We would appreciate if you can

3  obtain concurrence from JL/NH [JAL/ANA] on fares/rules soonest."  The attachment to the e-

4  mail included ZPEX fares that Plaintiffs allege were subject to the conspiratorial agreement, for

5  LAX [Los Angeles], SFO [San Francisco], LAS [Las Vegas], SEA [Seattle], PDX [Portland],

6  SAN [San Diego] and OAK [Oakland].

7        145.    On February 13, 2001, Tsuneo Kojima (Thai Airways) sent an e-mail to

8  Keeratiroj Sirisap (Thai Airways), copying Shinji Ono (JAL) and Akiko Oyama (ANA)

9  regarding concurrence on ZONE PEX fares to the U.S. for the first half of FY 2001.  In that e-

10 mail Tsuneo Kojima wrote: "Now we have completed TG Zpex fares/rules from Japan to USA

11 for S2001 . . . . We would like to ask you to obtain concurrence from JL/NH [JAL/ANA] as soon

12 as possible . . . and would appreciate your usual kind cooperation and support."  Attached to the

13 e-mail was the proposed ZONE PEX fares for Japan to the U.S. and the rules of application

14 about the ZONE PEX fare.

15        146.    On July 25, 2001, Tsuneo Kojima (Thai Airways) sent an e-mail to Keeratiroj

16 Sirisap (Thai Airways), copying Shinji Ono (JAL) and A. Kawaguchi (ANA) regarding ZONE

17 PEX fares for the second half of FY 2001.  Similar to the February 13, 2001 e-mail, Tsuneo

18 Kojima wrote on July 25, 2001 that: "[w]e have now completed the fares for TG [Thai Airways]

19 Zone Pex from Japan to USA for 01Oct01 through 31Mar02.  Applicable rules remain

20 unchanged.  We would like to request you to receive concurrence from JL/NH on our proposal as

21 soon as possible."  Kojima again attached a fare sheet to the e-mail.

22        147.    On July 26, 2001, Keeratiroj Sirisap (Thai Airways) sent an e-mail to Shinji Ono

23 (JAL) and Yasuhiro Nishiyama (ANA), copying Tsuneo Kojima (Thai Airways) and Seree

24 Pipatchaipoom (Thai Airways) asking for concurrence as to the flights on various city pairs,

25 including flights between Japan and the United States.  In his July 26, 2001 e-mail, Keeratiroj

26 Sirisap proposed coordinated fares for the approval of ANA and JAL, writing:  "TG [Thai

27 Airways] proposed Z-PEX/APEX/Special Apex fares from Japan to Thailand/MNL/USA for the

28 period of 01Oct01 – 31Mar02."

1      148.    On January 29, 2002, Tsuneo Kojima (Thai Airways) sent Thai Airways'
2 proposed ZONE PEX fares between Narita/Kansai to Los Angeles for the period between April
3 1, 2002, and September 30, 2002, to Keeratiroj Sirisap (Thai Airways), Shinji Ono (JAL), Akiko
4 Kawaguchi (ANA) and Hajime Kuroiwa (Thai Airways).  The e-mail requested that Thai
5 Airways' proposed ZONE PEX fares be proposed to ANA and JAL and indicated that Thai
6 Airways would like to have concurrence from JL/NH [JAL/ANA] as early as possible.

7      149.    On August 5, 2002, Tsuneo Kojima (Thai Airways) sent an e-mail to Akiko
8 Oyama (ANA) and Shinji Ono (JAL), copying Shingo Komatsu (Thai Airways) and Hajime
9 Kuriowa (Thai Airways) requesting concurrence on ZONE PEX fares on flights to the U.S. for
10 the second half of FY 2002.  In his e-mail, Kojima wrote, "[w]e would like to apply solely for
11 TG [Thai Airways] FLEX fares to the USA for the second half in the same way as for the present
12 term.  We have matched NH's [ANA's] GET price; therefore, please confirm this, and if you are
13 fine with that, we would like to contact TG headquarters."

14     150.    On August 9, 2002, an e-mail from Tsuneo Kojima (Thai Airways) to Keeratiroj
15 Sirisap (Thai Airways), Shingo Komatsu (Thai Air) and Hajime Kuroiwa (Thai Airways),
16 copying Shinji Ono (JAL) and Akiko Oyama (ANA) confirmed that an agreement had been
17 reached between the three airlines regarding carrier fares from Japan to the U.S.: "[p]lease be
18 informed that TG [Thai Airways] Zone Pex fares/rules to USA for W02/03 have been concluded
19 now which fares/rules agreed with JL/NH [JAL/ANA] at our end."

20     151.    On October 24, 2002, Shinji Ono (JAL) sent an e-mail to Keeratiroj Sirisap (Thai
21 Airways) and Tsuneo Kojima (Thai Airways) responding to Thai Airways' ZONE-PEX fares
22 from Japan to the U.S. proposed on July 26, 2001: "Regarding your ZPEX fares from JPN to
23 USA, we have no objection."  In that e-mail, Shinji Ono also discussed with Keeratiroj Sirisap
24 and Tsuneo Kojima the fact that JAL intended to seek agreement with Philippine Airlines
25 regarding coordinated fares to Manila and also indicated a willingness to coordinate with Thai
26 Airways on carrier fares to Thailand.  This is evidence that all coordination efforts from any
27 major airline hub in Asia involved the prior approval of the dominant airline at that hub.

28

1    152.    Singapore Airlines also coordinated carrier fares on flights to the U.S.  On August

2    9, 2002, Takashi Oshima (Singapore Airlines) e-mailed Shinji Ono (JAL), writing that "[f]or Los

3    Angeles and Las Vegas fares, we have matched your fares . . . ."

4    153.    On February 19, 2003, Takashi Oshima (Singapore Airlines) sent an e-mail to

5    Shinji Ono (JAL) asking for concurrence on APEX fares from Tokyo to Los Angeles, writing,

6    "APEX fares in Los Angeles match those of ANA; Taiwan fares match those of Japan Asia

7    Airways; zone fares to Los Angeles and Las Vegas match your company's fares."  Following

8    this exchange, Singapore Airlines matched exactly JAL's APEX fares from Tokyo to Los

9    Angeles.  After communications with ANA and JAL, Singapore Airlines also matched the

10   ZONE PEX fares charged by ANA and JAL for routes from Tokyo to Los Angeles and Las

11   Vegas for the first half of the 2003 fiscal year.

12   154.    KAL also coordinated carrier fares on Japan-U.S. routes.  On July 13, 2004, Si

13   Yeon Lee (KAL) sent an e-mail to Takashi Inagaki (JAL) providing him with proposed APEX

14   fares from Tokyo to Los Angeles for the first half of FY2004.  "Now, due to fare increases, we

15   are about to file Zone Pex fares from Japan to US and need your concurrence on TYO-LAX

16   portion.  All the fares are matching JL fares."  That e-mail included an attachment with

17   agreement upon ZONE PEX prices between Tokyo and Los Angeles.  Eight days later, on July

18   21, 2004, Tomomi Kubota (JAL) responded to Si Yeon Lee, stating, "[a]fter reviewing, we

19   would like to offer our official concurrence to your proposal," indicating JAL's agreement with

20   KAL's proposed coordinated price.

21   155.    On October 31, 2005, KAL provided JAL with the fare levels from Japan to U.S.

22   In the e-mail to JAL, KAL wrote, "[w]e are matching NW's [Northwest] level."

23   156.    In an e-mail dated October 31, 2005, Takashi Inagaki (JAL) discussed KAL's

24   proposed coordinated fares for flights from Japan to the United States and described JAL's

25   relationship with KAL as one premised on a "gentlemen's agreement."  The e-mail also noted

26   that Northwest was matching the fares.

27   157.    In a November 1, 2005 e-mail Takashi Inagaki stated again that KAL always

28   agreed to match JAL's fares pursuant to a "gentlemen's agreement."  The e-mail specifically

1    referenced fares from Tokyo to Los Angeles.

2         158.    China Airlines also sought prior approval from ANA and JAL regarding flights

3    from Tokyo to Honolulu and explicitly sought the coordination of such carrier fares.

4         159.    A January 25, 2000 e-mail from Hidetomi Kadoya (JAL) evidenced discussions

5    with China Airlines regarding the agreement on ZONE PEX prices to Honolulu and that the two

6    companies were finalizing the specifics on ZONE PEX prices to Honolulu after agreeing in

7    principle to coordinate ZONE PEX pricing.

8         160.    On August 19, 2000, Eugene Yi-Ching Lee (China Airlines) sent an e-mail to

9    Shinji Ono (JAL), with a carbon copy to multiple China Airlines employees, stating that he had

10   recently faxed 20 pages with China Airlines' ZONE PEX, APEX and other carrier fares from

11   Japan to Taiwan, S.E. Asia and Honolulu for the period from October 1, 2000 to March 31,

12   2001.  In his e-mail, Eugene Lee asks JAL to review and concur with China Airlines' prices.

13        161.    On October 24, 2000, Shinji Ono (JAL) responded to Eugene Lee: "I reviewed all

14   of your documents and concur your Zpex/Apex/carrier IIT fares" except for APEX fares from

15   Tokoname in Japan to Kaohsiung in Taiwan.  Shinji Ono goes on to ask, for the Tokoname-

16   Kaohsiung route, that China Airlines agree to the fare set by EG (Japan Asia Airways) on that

17   route.  After making that request, Shinji Ono went on to state that "if you will agree with the

18   above matching, EG will concur . . . ."

19        162.    In a July 27, 2001 e-mail, Katsutaka Fujii (China Airlines) wrote to Shinji Ono

20   (JAL) stating that, "We have received the fares for Hong Kong and Honolulu.  Are they final

21   fares?  If they are final, we will match and send them to the head office.  Thank you."

22        163.    On July 30, 2001, Katsutaka Fujii (China Airlines) sent an e-mail to Shinji Ono

23   (JAL), and various China Airlines employees, including Mei-Wen Lin, Yoshihisa Yamamoto

24   and Masaru Kunihiro, notifying JAL employees of China Airlines' intention to match JAL's

25   ZONE PEX and APEX fares from Hong Kong to Honolulu for the second half of FY 2001 and

26   attached fare sheets with pricing for the referenced fares.  Fujii wrote, "[a]s per attached, TYOCI

27   [China Airlines] will match JL's HKG/HNL PEX/APEX Fare."  Amongst the attachments to the

28   e-mail were coordinated carrier fares between Japan and Honolulu.

1    164.    On August 2, 2001, Katsutaka Fujii (China Airlines) e-mailed Shinji Ono (JAL),

2  Choji Nakamura (JAL), Mei-Wen Lin (China Airlines), Tsugio Arasaki (China Airlines), Kengo

3  Tanaka (China Airlines), Yoshihisa Yamamoto (China Airlines) and Masaru Kunihiro (China

4  Airlines), informing JAL that China Airlines was going to match JAL's ZONE PEX and APEX

5  fares between Tokyo and various destinations including Honolulu.  The e-mail identified

6  matching fares between various city pairs, including flights between Asia and Honolulu.

7    165.    On August 7, 2001, Mei-Wen Lin (China Airlines) wrote to Shinji Ono (JAL) and

8  copying various China Airlines employees, requesting coordination with JAL on various city

9  pair routes, including the coordination of ZONE PEX and APEX fares between Tokyo and

10  Honolulu.

11    166.    In an October 31, 2001 e-mail, Katsutaka Fujii (China Airlines) wrote to Choji

12  Nakamura (JAL) and Shinji Ono (JAL) and other China Air employees, stating their proposal for

13  Special APEX fares to Honolulu.  In the e-mail, Katsutaka Fujii wrote, "We will inform you if

14  there is [sic] any changes, but we match fare and rule with JL."

15    167.    In a January 24, 2002 e-mail, Katsutaka Fujii (China Airlines) wrote an internal e-

16  mail, on which both Shinji Ono and Choji Nakamura of JAL were copied, stating that, "[p]lease

17  be advised of the ZPEX/APEX fare for S02, which is matched with JL's fare."

18    168.    On February 18, 2002, Mei-Wen Lin (China Airlines) sent an e-mail to Shinji

19  Ono (JAL), Katsutaka Fujii (China Airlines), Masaru Kunihiro (China Airlines), Kengo Tanaka

20  (China Airlines), Yoshihisa Yamamoto (China Airlines), Tsugio Arasaki (China Airlines) and

21  Kenji Doi (China Airlines) requesting concurrence for ZONE PEX and APEX fares from Tokyo

22  to Honolulu for the first half of FY2002.  The last line of the e-mail stated, "HNL ROUTE

23  (MATCHING WITH JL) TYO-HNL ZPEX/APEX."

24    169.    On July 29, 2002, Kenji Doi (China Airlines) wrote an e-mail to Shinji Ono (JAL)

25  stating that, "As to the HNL route and the South East Asia route, . . . we will match JAL

26  naturally but we have no information [about it]."

27    170.    On August 16, 2002, Mei-Wen Lin (China Airlines) sent an e-mail to Shinji Ono

28  (JAL), copying other China Air employees, requesting concurrence of ZONE PEX, 14 day

1    APEX and 35 day APEX fares from Tokyo to Honolulu for the second half of FY2002.  In the e-

2    mail this is expressed by writing, "TYO [Tokyo] to HNL [Honolulu] –

3    ZPEX/APEX14/APEX35."

4           171.    On October 24, 2002, Shinji Ono (JAL) responded to Mei-Wen Lin (China

5    Airlines), Masaru Kunihiro (China Airlines) and Kenji Doi (China Airlines) on behalf of JAL

6    explaining JAL had "no objection for the captioned fares" between Tokyo and Honolulu

7    proposed by China Airlines.

8           172.    On July 7, 2006, Ai Watanabe (China Airlines) e-mailed Owano Hideo (JAL),

9    copying Kenji Doi (China Airlines),explaining that China Airlines hoped to establish an APEX

10   fare between Tokyo and Honolulu soon.  China Airlines requested concurrence from JAL as

11   soon as JAL's routes became available.  Watanabe's e-mail indicated he wanted to know when

12   JAL's second half FY2006 fare proposal to Honolulu would be provided, writing, "however,

13   because we soon would like to establish APEX fares for HNL routes . . . could you please let me

14   know when your final fare proposal for the second half is finalized?"

15          173.    Northwest and Continental also illegally coordinated carrier fares with other

16   carriers.  During a meeting on October 23, 2002, JAL representatives discussed the coordination

17   of carrier fares with Northwest employees regarding coordination between ANA and JAL on C-

18   APEX fares to North America with advance purchase provisions.

19          174.    On May 31, 2005, Noboru Hirai (Northwest) sent an e-mail to JAL referencing a

20   May 30, 2005 meeting between Northwest and JAL.  The e-mail discussed pricing for fares to

21   Honolulu and Micronesia for the second half of FY2005.  For flights from Osaka to Honolulu,

22   Noboru Hirai wrote that he would "seek to coordinate and consider with branch offices for plus

23   5000 yen."  For flights from Tokyo to Honolulu, Mr. Hirai wrote that he would "seek

24   coordination within a range from about the same as last year to about plus 2000 yen."  For fares

25   from Tokyo to Micronesia, Mr. Hirai wrote, "[d]ecision will be made after CO

26   [Continental]/JAL price coordination.  Desire price increase of about 5% . . . AP [APEX] would

27   continue."

28

175.     The coordination of fares between Japan and the United States alleged herein is just one example of a wide-ranging conspiracy to coordinate passenger fares on flights between Asia/Oceania and the United States.

176.     The airline industry, particularly in Asia, operates through the use of a hub system.  Each airline maintains one or more hubs in which it is the primary airline serving that destination.  For example, Singapore Airlines' hub is at Singapore Changi International Airport and Cathay Pacific's hub is at Hong Kong International Airport.  For each of these hubs, concurrence communications relating to the coordination of carrier fares takes place with the primary airline at each hub for flights between that hub and the United States.  In other words, the coordination of carrier fares from Thailand's Bangkok-Suvarnabhumi Airport to the United States involves communications amongst the Defendant carriers and Thai Airways, the primary airline at that hub.  These coordination efforts are similar to those that occurred for flights from Japan to the United States and involved communications and exchanges of information that allowed the members of the conspiracy to coordinate the carrier fares charged from these international hubs to the United States.

177.      For example, at a September 1, 2005 meeting of the Thailand BAR, the attendees complained that fares to and from Thailand were substantially below fares charged to other regional destinations.  The attendees were urged to support the creation of a subgroup to examine base fare prices and to otherwise discuss each other's fares.

178.     Other airlines have also suggested that the coordination involved in this case extends far beyond routes between the Japan and the United States.  An e-mail from an employee of Singapore Airlines circulated to a number of "Airline Partners"—some of whom have been identified as JAL, Malaysian Airlines, Thai Airways, and Vietnam Airlines—stated that "[e]ven if a carrier would not be able to increase the fares from their country, it would benefit from fare increases adopted ex other countries."

179.     Additionally, a JAL e-mail dated November 8, 2004, described the assistance that JAL will provide to other airlines concerning pricing for "arrivals from Europe, the Americas

1    and Asia." At "overseas" hubs of other carriers, JAL said it would "follow" the lead of other

2    carriers.

3        180.    Other examples of coordinated pricing activity throughout Asia are set forth in the

4    following section.

5        **2.    Fuel Surcharges**

6        181.    Defendants' discussions concerning the implementation of and/or amount of fuel

7    surcharges (as opposed to certain base fares) have never been immunized by IATA Tariff

8    Coordination Conferences, though as described below, there was an attempt to obtain immunity

9    for such discussions by the Defendants.  The fuel surcharge conspiracy was facilitated by

10   discussions and agreements reached by the Defendants and others at various IATA, AAPA, and

11   BAR meetings in Hong Kong, Manila, Malaysia, Thailand, and elsewhere.

        **a.    Defendants' Unsuccessful Effort To Obtain Immunity For Fuel**
        **Surcharge Agreements**

12

13

14       182.    As early as December 31, 2000, Defendants, through the Malaysian BAR

15   undertook collective efforts to impose fuel surcharges, though these efforts were short lived and

16   largely unsuccessful.

17       183.    However, during the first half of 2003, Defendants, through the Philippine BAR,

18   again undertook collective efforts to obtain governmental approval of a surcharge from the

19   Philippines Department of Justice.  On May 16, 2003, Defendants' request for approval of fuel

20   surcharges was "declined."

21       184.    Thereafter, during an IATA Special Composite Meeting of Passenger Tariff

22   Coordinating Conferences held in Geneva, Switzerland from July 14 through 18, 2003,

23   participating members adopted Resolution 001w titled "Special Enabling Resolution

24   (Surcharges)."  Resolution 001w would have established a procedure by which IATA members

25   could quickly agree to and then implement fuel, security, and other surcharges on IATA fares.

26   Resolution 001w had an intended effective date of April 1, 2004 so that IATA and its members

27   could obtain approval from various government agencies, including the DOT, which has the

28

1    authority to immunize agreements reached at Tariff Conferences from scrutiny under the

2    Sherman Act.

3        185.    Thirty-six air carriers voiced support "in principle" for a collective fuel surcharge,

4    including Air France, British Airways, China Airlines, JAL, KAL, KLM, Lufthansa, ANA,

5    Northwest, Air New Zealand, Qantas, and Thai Airways.  There was no opposition.  The

6    participants then commenced discussions concerning the specific wording of the proposal.

7    Several air carriers objected to minor details concerning the implementation and operation of the

8    fuel surcharge.  Defendants ultimately voting in favor of Resolution 001w included: Air New

9    Zealand, ANA, China Airlines, EVA, JAL, Qantas, and Thai Airways.  Several members

10   abstained from voting and no member opposed the resolution.

11       186.    On August 25, 2003, IATA filed Resolution 001w with the DOT and sought

12   immunity for the agreements set forth in it.  The DOT did not act on the proposal.

13       187.    On May 27, 2004 Giovanni Bisignani of IATA, stated:

14           On average, fuel accounts for 16% of airline operating costs.  Fuel
             prices are 55% higher than one year ago.  This could add between
15           US$8 and US$12 billion to our annual fuel bill and threatens to
             strangle our modest projected return to profitability.  Instead of
16           flying high, we could be left swimming in red ink . . . The current
             crisis resulting from sky high fuel prices once again highlights the
17           industry's vulnerability to external shocks. . . . We need to build a
             new industry structure capable of withstanding external shocks
18           and delivering sustained profitability.

19

20       188.    On May 28, 2004, IATA held a Special Composite Meeting of Passenger Tariff

21   Coordinating Conferences in Geneva, Switzerland.  Minutes of the meeting reflect that at least

22   seven airlines, including Cathay Pacific and KAL, sought to achieve an agreement with respect

23   to fuel surcharges ranging from US$4 per sector to US$18 for one way travel.  Other airlines

24   proposed raising passenger fares instead.  IATA's Secretary reminded its airline members that

25   Resolution 001w had not been approved by all necessary governmental entities, so collective

26   agreements concerning fuel surcharges were not immunized.  Mr. McEwen, Manager of IATA

27   Ticketing Services, then explained to the meeting's participants that IATA was nonetheless

28   developing a methodology for collection of fuel surcharges.  Thereafter, the airlines agreed to

1    increase immunized IATA base fares on interline tickets to offset increased fuel costs.  Implicit

2    in this change in tactics was an understanding by Defendants that non-immunized base fares

3    would also be raised.

4        189.    On April 29, 2005, another Special Composite Meeting of Passenger Tariff

5    Coordinating Conferences was held in Geneva, Switzerland.  At the meeting, Cathay Pacific, Air

6    France and others again sought agreement on fuel surcharges.  Again, the airlines were advised

7    that Resolution 001w had not been approved by all necessary governmental entities and again the

8    airlines raised base fares for immunized IATA interline tickets to offset increased fuel costs.

9    Again, there was an implicit understanding that non-immunized base fares would also be raised.

10       190.    Despite IATA's efforts to obtain immunity for the collective rate-setting of fuel

11   surcharges, the DOT never acted on IATA's request, and several years later, on March 9, 2007,

12   IATA quietly moved to withdraw the resolution from further consideration by the DOT.

13                     **b.    Defendants' Fuel Surcharges Which Commenced In 2004 Contrast
14                             With Their Conduct In The Preceding Years**

15       191.    Prior to 2004, the Defendants had not successfully imposed fuel surcharges on top

16   of the price of an air passenger ticket.  However, as noted above, collusive efforts to attempt to

17   do so commenced in or about 2000 through the Asian BAR organizations and IATA.  These

18   efforts began to have an effect in May of 2004.

19       192.    On May 11, 2004, Qantas publicly announced that it was introducing a fuel

20   surcharge, effective on May 17, 2004.  The very next day, Qantas' partner in the Oneworld

21   Alliance, British Airways, also announced that it was implementing a fuel surcharge.  On May

22   12, 2004, Air New Zealand announced that it, too, was implementing a fuel surcharge, effective

23   May 17, 2004, and that "numerous other airlines around the world are also considering similar

24   surcharges."   Air New Zealand's announcement was remarkable because it demonstrated that it

25   had material non-public information in its possession about other airlines' internal fuel surcharge

26   discussions before it made its announcement.

27       193.    The decision to introduce fuel surcharges required prior consideration by senior

28   executives and planning committees.  Computers must be programmed to accept fuel surcharges,

1   and marketing and customer service departments must prepare for the change.  The rapid fire

2   introduction of these fuel surcharges over a period of, at most, 24 hours is not consistent with

3   independent, uncoordinated actions by Air New Zealand, Qantas, and British Airways.

4          194.    Thus, in the late-spring/early summer, Air New Zealand imposed a fuel surcharge

5   of approximately US $13.00, Qantas imposed a fuel surcharge of US $15.00, Cathay Pacific

6   imposed a fuel surcharge of approximately US $14.00, Thai Airways imposed a fuel surcharge of

7   approximately US $15.00, and non-Defendant co-conspirator UAL imposed a fuel surcharge of

8   US $15.00.  The surcharge amounts cited herein can and do vary based on differences in the

9   relative valuation of foreign currencies over time and the assumptions underlying currency to

10  currency comparisons.  They also vary based on geography and flight routing as well as on

11  airline perceptions about the tolerance level of regulators and passengers for these surcharges.

12         195.    Discreet examples of contemporaneous fuel surcharge increases exist for other

13  Defendants as well.  In October-November of 2004, Qantas imposed a fuel surcharge of

14  approximately US $21.22, Singapore Airlines imposed a fuel surcharge of approximately US

15  $22.00, and Thai Airways imposed a fuel surcharge of approximately US $20.00.

16         196.    On February 1, 2005, ANA and JAL added a US $24.37 fuel surcharge on

17  passenger flights between North America and Japan.  On the same day, Singapore Airlines added

18  a fuel surcharge of approximately US $22.00 on international air passenger tickets.

19         197.    In March of 2005, co-conspirator Northwest and Qantas introduced fuel

20  surcharges of US $35.00.

21         198.    In July of 2005, ANA and JAL imposed a fuel surcharge of US $48.00 and

22  Singapore Airlines imposed a fuel surcharge of approximately US $45.00, as did non-defendant

23  co-conspirator Northwest.

24         199.    In September-October of 2005, Cathay Pacific imposed a fuel surcharge of

25  approximately US $45.30 and co-conspirator Northwest imposed a fuel surcharge of US $45.00.

26         200.    In the spring of 2006, ANA and JAL increased their respective fuel surcharges to

27  US $66.00. Qantas raised its surcharge to approximately US $65.00, as did Air New Zealand,

28  Thai Airways, and EVA.

201.     During the summer 2006 travel season, Singapore Airlines raised its fuel surcharge to approximately US $60.00 (on long-haul routes between Japan and Los Angeles), Malaysian Airlines raised its fuel surcharge to approximately US $60.00 (on long-haul routes between Taipei and Los Angeles), and Cathay Pacific raised its fuel surcharge to approximately US $61.70.

202.     Later that summer, Thai Airways raised its fuel surcharge to approximately US $90.00 and Malaysian Airlines raised its fuel surcharge to approximately US $92.00 (on routes between Malaysia and the U.S.), non-defendant co-conspirator Northwest raised its fuel surcharge to US $90.00, non-defendant co-conspirator UAL raised its fuel surcharge to US $90.00, China Airlines raised its fuel surcharge to approximately US $95.00, and Singapore Airlines raised its fuel surcharge to approximately US $90.00 (on routes between Singapore and the U.S.).

203.     Moreover, during much of the Class Period, the Defendants repeatedly charged identical fuel surcharges for passenger traffic from Hong Kong, including to the United States:

| Air Carrier | Fuel Surcharge Amount | Effective Date |
|---|---|---|
| Air New Zealand | HKD481 per coupon (long haul) **(approximately US $62.00)** | August 1, 2006 |
| Air France | HKD468 per coupon | August 1, 2006 |
| Qantas | HKD481 per coupon (long haul) | August 1, 2006 |
| British Airways | HKD481 per coupon | August 1, 2006 |
| Cathay Pacific | Short haul:  HKD117 per coupon<br>Long haul:  HKD481 per coupon | August 1, 2006 |
| Singapore Airlines | HK/SIN  HKD117 per coupon (short haul)<br>HK/SFO  HKD481 per coupon (long haul) | August 1, 2006 |
| ANA | HKD117 per coupon (short haul) | August 1, 2006 |
| China Airlines | HKD117 per coupon (short | August 1, 2006 |

| | haul) | |
|---|---|---|
| Continental Airlines | HKD481 per coupon | August 1, 2006 |
| EVA | HKD117 per coupon (short haul) | August 1, 2006 |
| JAL | HKD117 per coupon (short haul) | August 1, 2006 |
| KLM | HKD481 per coupon | August 1, 2006 |
| Lufthansa | HKD481 per coupon | August 1, 2006 |
| Malyasian Airlines | HKD117 per coupon (short haul) | August 1, 2006 |
| Philippine Airlines | HKD481 per coupon | August 1, 2006 |
| Swiss International | HKD481 per coupon | August 1, 2006 |
| Thai Airways | HKD117 per coupon (short haul) | August 1, 2006 |
| Vietnam Airlines | HKD117 per coupon | August 1, 2006 |
| Air France | HKD481 per coupon | October 1, 2006 |
| Qantas | HKD481 per coupon (long haul) | October 1, 2006 |
| Singapore Airlines | HK/SIN  HKD117 per coupon (short haul)<br>HK/SFO  HKD481 per coupon (long haul) | October 1, 2006 |
| ANA | HKD117 per coupon (short haul) | October 1, 2006 |
| British Airways | HKD481 per coupon | October 1, 2006 |
| China Airlines | HKD117 per coupon (short haul) | October 1, 2006 |
| Continental Airlines | HKD481 per coupon | October 1, 2006 |
| EVA | HKD117 per coupon (short haul) | October 1, 2006 |
| JAL | HKD117 per coupon (short haul) | October 1, 2006 |
| KLM | HKD481 per coupon | October 1, 2006 |
| Lufthansa | HKD481 per coupon | October 1, 2006 |
| Malaysian Airlines | HKD117 per coupon (short haul) | October 1, 2006 |
| Philippine Airlines | HKD117 per coupon | October 1, 2006 |
| Swiss International | HKD481 per coupon | October 1, 2006 |
| Thai Airways | HKD117 per coupon (short haul) | October 1, 2006 |
| Vietnam Airlines | HKD481 per coupon | October 1, 2006 |
| | | |
| Air New Zealand | HKD466 per coupon (long haul) | December 1, 2006 |
| Air France | HKD466 per coupon (long haul) | December 1, 2006 |

| British Airways | HKD466 per coupon (long haul) | December 1, 2006 |
|---|---|---|
| China Airlines | HKD113 per coupon (short haul) | December 1, 2006 |
| Continental Airlines | HKD466 per coupon (long haul) | December 1, 2006 |
| KLM | HKD455 per coupon (long haul) | December 1, 2006 |
| Lufthansa | HKD466 per coupon (long haul) | December 1, 2006 |
| Philippine Airlines | HKD113 per coupon (short haul) | December 1, 2006 |
| Qantas | HKD466 per coupon (long haul) | December 1, 2006 |
| Singapore Airlines | HK/SIN  HKD113 per coupon (short haul)<br>HK/SFO  HKD466 per coupon (long haul) | December 1, 2006 |
| Swiss International | HKD466 per coupon (long haul) | December 1, 2006 |
| ANA | HKD113 per coupon (short haul) | December 1, 2006 |
| China Airlines | HKD113 per coupon (short haul) | December 1, 2006 |
| EVA | HKD113 per coupon (short haul) | December 1, 2006 |
| JAL | HKD113 per coupon (short haul) | December 1, 2006 |
| Malaysian Airlines | HKD113 per coupon (short haul) | December 1, 2006 |
| Thai Airways | HKD113 per coupon (short haul) | December 1, 2006 |
| Vietnam Airlines | HKD113 per coupon (short haul) | December 1, 2006 |
|  |  |  |

| Air New Zealand | HKD438 per coupon (long haul) | February 1, 2007 |
|---|---|---|
| Air France | HKD438 per coupon (long haul) | February 1, 2007 |
| British Airways | HKD438 per coupon (long haul) | February 1, 2007 |
| Continental Airlines | HKD438 per coupon (long haul) | February 1, 2007 |
| KLM | HKD438 per coupon (long haul) | February 1, 2007 |

| Lufthansa | HKD438 per coupon (long haul) | February 1, 2007 |
|---|---|---|
| Philippine Airlines | HKD106 per coupon (short haul) | February 1, 2007 |
| Qantas | HKD438 per coupon (long haul) | February 1, 2007 |
| Cathay Pacific | Short haul: HKD106 per coupon (short haul) Long haul: HKD438 per coupon | February 1, 2007 |
| Singapore Airlines | HK/SIN HKD106 per coupon (short haul) HK/SFO HKD438 per coupon | February 1, 2007 |
| Swiss International | HKD438 per coupon (short haul) | February 1, 2007 |
| ANA | HKD106 per coupon | February 1, 2007 |
| China Airlines | HKD106 per coupon (short haul) | February 1, 2007 |
| EVA | HKD106 per coupon (short haul) | February 1, 2007 |
| JAL | HKD106 per coupon (short haul) | February 1, 2007 |
| Malaysian Airlines | HKD106 per coupon (short haul) | February 1, 2007 |
| Thai Airways | HKD106 per coupon (short haul) | February 1, 2007 |
| Vietnam Airlines | HKD438 per coupon (short haul) | February 1, 2007 |
|  |  |  |
| Air New Zealand | HKD420 per coupon (long haul) | April 1, 2007 |
| Air France | HKD420 per coupon (long haul) | April 1, 2007 |
| British Airways | HKD420 per coupon (long haul) | April 1, 2007 |
| Continental Airlines | HKD420 per coupon (long haul) | April 1, 2007 |
|  |  |  |
| Lufthansa | HKD420 per coupon (long haul) | April 1, 2007 |
| KLM | HKD420 per coupon (long haul) | April 1, 2007 |
| Philippine Airlines | HKD102 per coupon (short haul) | April 1, 2007 |
| Qantas | HKD420 per coupon (long haul) | April 1, 2007 |
| Cathay Pacific | Short haul: HKD102 per coupon | April 1, 2007 |

| | | |
|---|---|---|
| | Long haul:  HKD420 per coupon | |
| Singapore Airlines | HK/SIN  HKD102 per coupon (short haul)<br>HK/SFO  HKD420 per coupon (long haul) | April 1, 2007 |
| Swiss International | HKD420 per coupon (long haul) | April 1, 2007 |
| ANA | HKD102 per coupon (short haul) | April 1, 2007 |
| China Airlines | HKD102 per coupon (short haul) | April 1, 2007 |
| EVA | HKD102 per coupon (short haul) | April 1, 2007 |
| Malaysian Airlines | HKD102 per coupon (short haul) | April 1, 2007 |
| Thai Airways | HKD102 per coupon (short haul) | April 1, 2007 |
| Vietnam Airlines | HKD102 per coupon (short haul) | April 1, 2007 |
| Air New Zealand | HKD412 per coupon (long haul) | June 1, 2007 |
| Air France | HKD412 per coupon (long haul) | June 1, 2007 |
| British Airways | HKD412 per coupon (long haul) | June 1, 2007 |
| Continental Airlines | HKD412 per coupon (long haul) | June 1, 2007 |
| KLM | HKD412 per coupon (long haul) | June 1, 2007 |
| Lufthansa | HKD412 per coupon (long haul) | June 1, 2007 |
| Philippine Airlines | HKD100 per coupon (short haul) | June 1, 2007 |
| Qantas | HKD412 per coupon (long haul) | June 1, 2007 |
| Cathay Pacific | Short haul:  HKD100 per coupon<br>Long haul:  HKD412 per | June 1, 2007 |

| | coupon | |
|---|---|---|
| Singapore Airlines | HK/SIN  HKD100 per coupon (short haul)<br>HK/SFO  HKD412 per coupon (long haul) | June 1, 2007 |
| Swiss International | HKD100 per coupon (short haul) | June 1, 2007 |
| ANA | HKD100 per coupon (short haul) | June 1, 2007 |
| China Airlines | HKD100 per coupon (short haul) | June 1, 2007 |
| EVA | HKD100 per coupon (short haul) | June 1, 2007 |
| Malaysian Airlines | HKD100 per coupon (short haul) | June 1, 2007 |
| Thai Airways | HKD100 per coupon (short haul) | June 1, 2007 |
| Vietnam Airlines | HKD100 per coupon (short haul) | June 1, 2007 |
| | | |
| Air New Zealand | HKD424 per coupon (long haul) | August 1, 2007 |
| Air France | HKD424 per coupon (long haul) | August 1, 2007 |
| British Airways | HKD424 per coupon (long haul) | August 1, 2007 |
| Continental Airlines | HKD424 per coupon (long haul) | August 1, 2007 |
| KLM | HKD424 per coupon (long haul) | August 1, 2007 |
| Lufthansa | HKD424 per coupon (long haul) | August 1, 2007 |
| Philippine Airlines | HKD103 per coupon (short haul) | August 1, 2007 |
| Qantas | HKD424 per coupon (long haul) | August 1, 2007 |
| | | |
| Cathay Pacific | Short haul:  HKD103 per coupon<br>Long haul:  HKD424 per coupon | August 1, 2007 |
| Singapore Airlines | HK/SIN  HKD103 per coupon (short haul)<br>HK/SFO  HKD424 per coupon (long haul) | August 1, 2007 |
| Swiss International | HKD424 per coupon (long haul) | August 1, 2007 |

| | | |
|---|---|---|
| ANA | HKD103 per coupon (short haul) | August 1, 2007 |
| China Airlines | HKD103 per coupon (short haul) | August 1, 2007 |
| EVA | HKD103 per coupon (short haul) | August 1, 2007 |
| JAL | HKD103 per coupon (short haul) | August 1, 2007 |
| Malaysian Airlines | HKD103 per coupon (short haul) | August 1, 2007 |
| Thai Airways | HKD103 per coupon (short haul) | August 1, 2007 |
| Air New Zealand | HKD428 per coupon (long haul) | October 1, 2007 |
| Air France | HKD428 per coupon (long haul) | October 1, 2007 |
| British Airways | HKD428 per coupon (long haul) | October 1, 2007 |
| Continental Airlines | HKD428 per coupon (long haul) | October 1, 2007 |
| KLM | HKD428 per coupon (long haul) | October 1, 2007 |
| Lufthansa | HKD428 per coupon (long haul) | October 1, 2007 |
| Philippine Airlines | HKD104 per coupon | October 1, 2007 |
| Qantas | HKD428 per coupon (long haul) | October 1, 2007 |
| Cathay Pacific | Short haul:  HKD104 per coupon<br>Long haul:  HKD428 per coupon | October 1, 2007 |
| Singapore Airlines | HK/SIN  HKD104 per coupon (short haul)<br>HK/SFO  HKD428 per coupon (long haul) | October 1, 2007 |
| Swiss International | HKD428 per coupon (long haul) | October 1, 2007 |
| ANA | HKD104 per coupon (short haul) | October 1, 2007 |
| China Airlines | HKD104 per coupon (short haul) | October 1, 2007 |
| EVA | HKD104 per coupon (short haul) | October 1, 2007 |
| JAL | HKD104 per coupon (short haul) | October 1, 2007 |
| Malaysian Airlines | HKD104 per coupon (short haul) | October 1, 2007 |

| Thai Airways | HKD104 per coupon | October 1, 2007 |
|---|---|---|
| Vietnam Airlines | HKD104 per coupon | October 1, 2007 |
| | | |
| Air New Zealand | HKD466 per coupon (long haul) | December 1, 2007 |
| Air France | HKD466 per coupon (long haul) | December 1, 2007 |
| British Airways | HKD466 per coupon (long haul) | December 1, 2007 |
| Continental Airlines | HKD466 per coupon (long haul) | December 1, 2007 |
| KLM | HKD466 per coupon (long haul) | December 1, 2007 |
| Lufthansa | HKD466 per coupon (long haul) | December 1, 2007 |
| Philippine Airlines | HKD113 per coupon (short haul | December 1, 2007 |
| Qantas | HKD466 per coupon (long haul) | December 1, 2007 |
| Cathay Pacific | Short haul:  HKD113 per coupon<br>Long haul:  HKD466 per coupon | December 1, 2007 |
| Singapore Airlines | HK/SIN  HKD113 per coupon (short haul)<br>HK/SFO  HKD466 per coupon (long haul) | December 1, 2007 |
| Swiss International | HKD466 per coupon (long haul) | December 1, 2007 |
| ANA | HKD113 per coupon (short haul) | December 1, 2007 |
| China Airlines | HKD113 per coupon (short haul) | December 1, 2007 |
| EVA | HKD113 per coupon (short haul) | December 1, 2007 |
| JAL | HKD113 per coupon (short haul) | December 1, 2007 |
| | | |
| Malaysian Airlines | HKD113 per coupon (short haul) | December 1, 2007 |
| Thai Airways | HKD113 per coupon (short haul) | December 1, 2007 |
| Vietnam Airlines | HKD113 per coupon (short haul | December 1, 2007 |
| | | |
| Air New Zealand | HKD508 per coupon (long haul) | February 1, 2008 |

| Air France | HKD508 per coupon (long haul) | February 1, 2008 |
|---|---|---|
| British Airways | HKD508 per coupon (long haul) | February 1, 2008 |
| Continental Airlines | HKD508 per coupon (long haul) | February 1, 2008 |
| KLM | HKD508 per coupon (long haul) | February 1, 2008 |
| Lufthansa | HKD508 per coupon (long haul) | February 1, 2008 |
| Philippine Airlines | HKD123 per coupon (short haul) | February 1, 2008 |
| Qantas | HKD508 per coupon (long haul) | February 1, 2008 |
| Cathay Pacific | Short haul:  HKD123 per coupon (short haul) Long haul:  HKD508 per coupon | February 1, 2008 |
| Singapore Airlines | HK/SIN  HKD123 per coupon (short haul) HK/SFO  HKD508 per coupon (long haul) | February 1, 2008 |
| Swiss International | HKD508 per coupon (long haul) | February 1, 2008 |
| ANA | HKD113 per coupon (short haul) | February 1, 2008 |
| China Airlines | HKD123 per coupon | February 1, 2008 |
| EVA | HKD123 per coupon | February 1, 2008 |
| JAL | HKD113 (2/1/08 – 2/9/08) per coupon (short haul) HKD123 (2/10/08 – 3/31/08) per coupon | February 1, 2008 |
| Malaysian Airlines | HKD123 per coupon (short haul) | February 1, 2008 |
| Thai Airways | HKD123 per coupon (short haul) | February 1, 2008 |
| Vietnam Airlines | HKD123 per coupon (short haul) | February 1, 2008 |
| | | |
| Air New Zealand | HKD518 per coupon (long haul) | April 1, 2008 |
| Air France | HKD518 per coupon (long haul) | April 1, 2008 |
| British Airways | HKD518 per coupon (long haul) | April 1, 2008 |
| Continental | HKD518 per coupon (long haul) | April 1, 2008 |

| KLM | HKD518 per coupon (long haul) | April 1, 2008 |
|---|---|---|
| Lufthansa | HKD518 per coupon (long haul) | April 1, 2008 |
| Philippine Airlines | HKD125 per coupon (short haul) | April 1, 2008 |
| Qantas | HKD518 per coupon (long haul) | April 1, 2008 |
| Cathay Pacific | Short haul:  HKD125 per coupon<br>Long haul:  HKD518 per coupon | April 1, 2008 |
| Singapore Airlines | HK/SIN  HKD125 per coupon (short haul)<br>HK/SFO  HKD518 per coupon (long haul) | April 1, 2008 |
| Swiss International | HKD518 per coupon (long haul) | April 1, 2008 |
| ANA | HKD125 per coupon (short haul) | April 1, 2008 |
| China Airlines | HKD125 per coupon (short haul) | April 1, 2008 |
| EVA | HKD125 per coupon (short haul) | April 1, 2008 |
| JAL | HKD125 per coupon (short haul) | April 1, 2008 |
| Malaysian Airlines | HKD125 per coupon (short haul) | April 1, 2008 |
| Thai Airways | HKD125 per coupon (short haul) | April 1, 2008 |
| Vietnam Airlines | HKD125 per coupon (short haul) | April 1, 2008 |

### c. Fuel Surcharges Were Implemented And Raised Through Collective Action

204.    During and after various BAR meetings in Thailand, the Philippines, Malaysia, and Hong Kong, the Defendants exchanged information about the imposition of fuel surcharges and reached express and tacit agreements about whether to impose fuel surcharges, the amounts of the surcharges, and the timing of their imposition.  These fuel surcharges included surcharges imposed on flights to and from the United States.

205.    Defendants Air New Zealand, Air France, ANA, British Airways, Cathay Pacific, China Airlines, Continental Airlines, EVA, JAL, Lufthansa, Malaysian Airlines, Philippine

1   Airlines, Qantas, Singapore Airlines, Swiss International, Thai Airways, and Vietnam Airlines

2   are all members of BAR HK which facilitated agreements to coordinate fuel surcharge pricing by

3   the Defendants through its "Airline Charges Sub-Committee" on a bi-monthly basis during at

4   least a portion of the Class Period alleged herein.  Additional meetings were facilitated by the

5   BAR organizations in Thailand, Philippines, and Malaysia.  The agreements reached at these

6   formal meetings (which included agreements with respect to flights to and from the United

7   States) were reinforced through additional agreements between the conspirators.

8       206.    For example, on or before May 17, 2004, the exact date of which is unknown to

9   Plaintiffs, a representative of Philippine Airlines (Ida Vinas) circulated a request to its "Airline

10  Partners" in which Philippine Airlines asked:  "Are you considering a fuel-related fare increase

11  or a fixed amount?"  On May 17, 2004, Hary Suhardi of Garuda Airlines responded to this

12  request and copied a number of the "Airline Partners," some of whom have been identified as

13  Kim Lye of Singapore Airlines, "Laurence" of Malaysian Airlines, "Sahhiran" of Malaysian

14  Airlines, "Seree" of Thai Airways, "trangtt.pmd" of Vietnam Airlines and Anzai Yoshharu of

15  JAL.  In his response, the Garuda Airlines employee expressed concern that his government

16  would not like to "see this," referring to implementation of a fuel surcharge.  Singapore Airlines

17  then responded that while it had not taken any action yet, the company "may match national

18  carriers practice" and that "IATA has called for a Special Meeting.  Believe it is beneficial for all

19  carriers to support the IATA Meeting.  Even if a carrier would not be able to increase the fares

20  from their country, it would benefit from fare increases adopted ex other countries."  Vietnam

21  Airlines (Tran Thu Hein) then noted that it had not taken any action yet.  "However, I am not

22  sure that we can maintain the current situation if fuel prices continue to escalate."

23      207.    The next day, Tuesday, May 18, 2004, at the Thai BAR meeting in the Thai

24  Airways office in Bangkok, the Thai BAR chairman, Suthep Suebsantiwongse, advised that

25  implementation of fuel surcharges would not be opposed by Thai regulators so long as the total

26  ticket price remained below IATA immunized fare levels.  Mr. Suebsantiwongse proposed

27  benchmarks and a formula for fuel surcharges.  The participants agreed to "come up with a

28  proposal . . . with a target implementation date of 1st June 2004."  Each of the BAR members

1    was asked to check with their superiors about the palatability of fuel surcharges, with "[r]esults

2    to be collated next Monday, 24 May."  During the meeting, the attendees discussed surcharges

3    for domestic, regional and international (including United States) flights.  The latter was

4    proposed to start at US$15.  The formula proposed was that if fuel costs were up or down by

5    20% over two consecutive weeks, the surcharge would change correspondingly by US$2.50.

6    Mr. Suebsantiwongse stated that success depended on "airline unity in practice."   It was

7    specifically noted that the United States carriers in attendance could participate in discussions

8    about implementing a fuel surcharge, but could not discuss rates.

9         208.      According to the minutes for the May 18 meeting, participants included

10   representatives of Thai Airways (Suthep Suebsantiwongse, Pandit Chanapai), Qantas (Julianne

11   Rogers, J. Louisi Moser), EVA (Thira K.) British Airways (Julianne Rogers, J. Louisi Moser),

12   UAL (Warren Gerig, left meeting before specific fuel surcharges discussed), Air France

13   (Smartchai Tuchinda), China Airlines (Nelson Fang), Cathay Pacific (Yongyut Lujintanon), JAL

14   (Kamol V.), KAL (James K.C. Yeung), KLM (Ihab Sourial), Lufthansa (Wolfgang Schmidt),

15   ANA (Somnuek Asavaveeradej), Northwest (Sarathool M., left meeting before specific fuel

16   surcharges discussed), Asiana (Vorakit Nivatwong), and Philippine Airlines (Dell Merano,

17   Vatchara Silpohevagitja), among others.  A complete list is set forth in Appendix B.

18        209.      On May 24, 2004, Carol Phatoomros (Thai Airways) followed up the May 18

19   Thai BAR meeting with an e-mail to the meeting participants and others, including American

20   Airlines (Prajak Burarak, Chaichan Khongsrithong) and EVA Airways.  The e-mail attached a

21   letter that Thai Airways was sending to the Thai Department of Transport.  The letter stated in

22   part that "[t]he members of the Board of Airlines Representatives at a meeting on 18th May

23   agreed that unless otherwise instructed by their Head Offices . . . they would apply the following

24   fuel surcharges adapting the fuel price index methodology of calculating the surcharge . . . .

25   US15.00 for intercontinental flights.  The fuel surcharge will be on a per sector basis . . . ."

26   These surcharges included surcharges on flights to and from the United States.  The complete list

27   of recipients of this e-mail is set forth in Appendix C.

28

1      210.    A number of Defendants acquiesced to this letter, which was sent out on May 26,

2    2004.

3      211.    On June 7, 2004, Thai Airways sent an e-mail confirming the imposition of fuel

4    surcharges as previously discussed by Thailand BAR members.  The e-mail further noted that

5    "[t]he surcharge amounts are as agreed by BAR members at the BAR meeting on 18May04 . . ."

6      212.    Thailand was not the only country in which collusive action was being taken on

7    fuel surcharges in 2004. On May 21, 2004, at a meeting of the Philippine BAR, the issue of fuel

8    surcharges on passenger fares was again discussed by the meeting's participants.  Philippine

9    Airlines advocated for a US$6.00 per segment, which would include flights to and from the

10   United States.  Other carriers were concerned that this would disadvantage carriers with multiple

11   stops on transpacific routes.  Philippine Airlines was seeking to introduce the fuel surcharge on

12   June 1, 2004.

13     213.    On May 25, 2004, Estrellita O. Inoturan from the Manilla BAR and a manager in

14   Philippine Airlines' Tariffs, Revenue Management Department sent an e-mail to a JAL

15   employee further discussing the intended surcharge, the effective date, and method of

16   implementation (as a separate YQ element on the passenger's bill).  The e-mail asked for

17   confirmation that the recipients would agree to it.   A follow-up e-mail by Joanne Sotocinal of

18   Philippine Airlines noted that Swiss International had agreed to imposition of the surcharge. A

19   complete list of the recipients of this e-mail is set forth in Appendix F.

20     214.    On May 26, 2004, Terada Haruhiku (JAL) indicated in an e-mail that "[w]e do not

21   oppose PR's [Philippine Airlines'] adoption of the fuel Surcharge."

22     215.    Also in May of 2004, the members of the Malaysia BAR exchanged information

23   regarding a fuel surcharge.  Malaysian Airlines wanted a $50 Malay (roughly US $14.00)

24   surcharge per sector (including North America), effective June 1.  EVA proposed a surcharge as

25   well.  These surcharges included surcharges on flights to and from the United States.

26     216.    Various communications reflect collusion among numerous air carriers with

27   respect to fuel surcharges. On October 29, 2004, Hirashi Rie (JAL) sent an e-mail confirming

28   that Air France would begin collection of a 10 Euro fuel surcharge on international flights.  An e-

1  mail earlier in the day confirmed that Lufthansa had increased its fuel surcharge for international

2  carriage from 7 Euros to 17 Euros and that British Airways had increased its fuel surcharge from

3  £6 to £10.

4  217.    Another e-mail of that same date from Liu Zheng  (JAL) to Mr. Yamasaki

5  confirms that China Airlines will start collection of fuel surcharge for the "China-America" route

6  of US$14.00 and that KAL had started imposing a fuel surcharge of US$25.00 for departures

7  from the United States on October 25, 2004.  The same e-mail noted that Qantas had increased

8  its fuel surcharge for the "America routes" to US$21.30, effective October 20, 2004.

9  218.    On November 1, 2004, Naoma Kaori (JAL) sent an e-mail confirming that she

10  had communicated with American Airlines, UAL, Delta, Continental, and Northwest and that

11  these airlines had imposed fuel surcharges of US$25.00 on transpacific routes, except to/from

12  Japan, where the fuel surcharge was US$5.00.  With the exception of Northwest, these

13  surcharges were not expressly described as "fuel surcharges."  The same e-mail noted that

14  Philippine Airlines was also imposing a US$25.00 fuel surcharge, effective for tickets issued on

15  and after October 22, 2004, and that Thai Airways was introducing a fuel surcharge of

16  US$19.00, effective November 1, 2004, for routes to and from the United States.  Ms. Kaori was

17  also able to confirm through ATPCO, a tariff publication company owned by Air France,

18  American Airlines, British Airways, Continental, JAL, Delta, KLM, Lufthansa, Northwest,

19  Swiss International, UAL, and others, that Thai Airways was implementing a fuel surcharge of

20  US$15.00 one way to and from the United States, and that Singapore Airlines was collecting a

21  US$17.00 fuel surcharge to and from the United States.

22  219.    On June 15, 2004, Akira Mori (JAL) responded to an inquiry from Vietnam

23  Airlines (Tran Thu Hien) regarding ANA's fuel surcharge intentions.  Mr. Mori stated that JAL

24  was planning on implementing Vietnam Airlines' "captioned surcharge from July 1, 2004" and

25  that ANA "will most likely match us."  A subsequent JAL e-mail from Nakano Hoshiko dated

26  June 22, 2004 noted that "[w]e have a sensitive relationship with the authority and we do not

27  want to have any arguments about the set-up of carrier fares etc."  On September 21, 2004, Mr.

28  Yamasaki of JAL wrote to Mohamed Habib of Northwest asking why the DOT was reluctant to

1   authorize fuel surcharges for passenger tickets.  Mr. Habib quickly responded that same day and

2   inquired: "Is there interest in your company to implement fuel surcharge?"

3       220.    On October 15, 2004, Inagaki Takashi of JAL wrote to Mohamed Habib of

4   Northwest:  "Have you heard that DOT at last decided to permit the filing of FUEL surcharges

5   by carriers!!?"  Mr. Habib responded, in part, by noting that American Airlines has already

6   undertaken efforts to implement a fuel surcharge.   Mr. Habib stated that Northwest would "most

7   likely match" it.

8       221.    From November 8, 2004 through November 10, 2004, Mr. Yamasaki engaged in

9   an effort on behalf of JAL to coordinate fuel surcharges with other airlines.  Mr. Yamasaki noted

10  that Air France, KLM, Lufthansa, British Airways, Singapore Airlines, Thai Airways, KAL,

11  China Airlines, Qantas, Air New Zealand, American Airlines, UAL, and Northwest, among

12  others, had instituted fuel surcharges.

13      222.    Mamaoru Tsutsumi of JAL concluded in a November 8, 2004 e-mail that JAL

14  would help its competitors implement fuel surcharges in Japan and would then follow the lead of

15  these competitors in their home markets.

16      223.    Mr. Tsutsumi then referenced the second round of fuel surcharges imposed by the

17  industry that occurred in the fall of 2004 and stated that JAL would implement a fuel surcharge

18  of its own "for Japan departures, after secondary fare increase approval, with an eye on levels in

19  Europe and the Americas, we will file C/S at around JPY 1,000 for short distance and JPY 2,000-

20  2,500 for long distance, and other foreign airlines to follow."

21      224.    On November 10, 2004, Mr. Yamasaki  confirmed the following current and

22  future fuel surcharges in the Japanese market (including flights to and from the United States):

23              Carriers that have implemented fuel surcharges:

24          British Airways (USD17)

25          American Airlines (USD25)

26              Carriers that have not yet implemented fuel surcharges:

27          SU (Aeroflot) (USD10)

28          LH (Lufthansa) (USD17)

1       CX (Cathay Pacific) (USD7)

2       NW (USD25)

3       CO (USD25)

4       225.    On November 30, 2004, Hiroko Ueba (Cathay Pacific) e-mailed Yasuhiro

5  Nishiyama (ANA) and Ms. Noma (JAL).  The subject matter of the e-mail was "Fuel

6  Surcharge."  Mr. Ueba opened his e-mail by stating that he thanked JAL for their "continued

7  support."  He continued by explaining that ANA wanted to implement a fuel surcharge:  "I was

8  wondering if I could obtain an agreement from your company."  The requested agreement

9  concerned flight coupons between Hong Kong and North America, among other places around

10 the world effective December 1, 2004.  Ms. Noma obtained the approval of Gen Yamasaki (JAL)

11 through an e-mail dated November 30, 2004.  Mr. Yamasaki wrote, "It is okay to agree."  On

12 December 2, 2004, Ms. Noma confirmed to Mr. Yamasaki that "[y]esterday I told CX [Cathay

13 Pacific] that we would agree to it."

14      226.    On December 26, 2004, Mr. Yamasaki reported in an e-mail to Irie Kesuke of

15 JAL and others that an "airline concordance" was submitted to KE [KAL] today."

16      227.    On January 5, 2005, Kubota Tomomi of JAL wrote to Mr. Yamasaki of JAL and

17 reported that "TG [Thai Airways] has inquired about a fuel surcharge with a view to obtaining an

18 agreement from us.  According to them, it will be USD 20 per leg for international flights.  Is it

19 okay to agree?"  Mr. Yamasaki replied: "Yes, go ahead and agree."  Mr. Tomomi then stated that

20 he has "confirmed with them as follows . . . . Manila International sector: USD 20.00 or

21 equivalent for LAX-bound Kansai departures."

22      228.    On January 7, 2005, Kubota Tomomi of JAL sent an e-mail to Toshiaki Oshima

23 of Singapore Airlines thanking him for his "continuous help" and asking for information about

24 the status of Singapore Airlines' fuel surcharges.  Mr. Tomomi followed up with Mr. Oshima

25 again on January 13, 2005.  Kazuhisa Okamoto of Singapore Airlines' "Alliance dept." then

26 responded to Mr. Tomomi on January 17, 2005 by explaining the details of Singapore Airlines'

27 fuel surcharges.  Mr.Tomomi thanked Mr. Okamoto for the information, promised to be "very

28

1  carefull [sic] with handling", and requested that Singapore Airlines "keep cooperating with us in

2  the future."

3      229.    Also, for a period of time commencing in 2004 and for the next several years

4  thereafter, ANA and JAL held regular meetings (which usually took place at ANA's

5  headquarters in Tokyo) in order to agree on the timing and amount of fuel surcharge increases

6  for flights into and out of Japan, including flights to and from the United States.  ANA and JAL

7  also agreed on the exchange rates that would be used to effectuate their agreements and the

8  trigger points for changes in the surcharges.  For example, ANA and JAL agreed that a February

9  1, 2005 surcharge described below would terminate when the price of crude oil dropped below

10  $40/barrel on the Singapore index and that the surcharge into and out of Japan would be $2,500

11  yen.

12      230.    As of December 24, 2005 JAL proposed implementing the surcharge only on

13  outbound flights.  On January 5, 2005, ANA proposed a surcharge for both inbound and

14  outbound flights.  On January 18, 2005, JAL agreed with ANA's proposal.

15      231.    Participants in the earliest meetings between ANA and JAL included Mr. Shinobe

16  (ANA revenue management); Mr. Kato (ANA revenue management); Mr. Ineda (ANA revenue

17  management); Yugi Saito (JAL international marketing); and Mr. Ishida (JAL revenue

18  management).  Beginning in late-November or early December 2004 and continuing thereafter,

19  additional meetings were held between Mr. Yabuki, Mr. Sato, and Mr. Yakoyama from the ANA

20  tariff group and Ms. Hoshiko, Ms. Nakano, and Mr. Yamasaki from the JAL tariff group to

21  facilitate and implement agreements concerning the timing and amount of fuel surcharges on

22  routes into and out of Japan.

23      232.    ANA and JAL agreed to raise and lower passenger fuel surcharges on nearly

24  always the same dates and in the same amounts:

| January 5, 2005.  ANA announced it would add fuel surcharges on international fares on **February 1**.  The surcharges for transpacific flights were 2,500 yen (approximately US $24.37) | January 20, 2005.  JAL announced it would add fuel surcharges on international passenger fares on **February 1**.  The surcharges for transpacific flights were 2,500 yen (approximately US $24.37). |
|---|---|

| | |
|---|---|
| <u>June 3, 2005</u>.  JAL announced its intention to raise its international fuel surcharge effective **July 1**. | <u>June 7, 2005</u>.  ANA announced its intention to raise its international fuel surcharge effective **July 7.** |
| <u>January 16, 2006</u>.  JAL announced its intention to raise its international fuel charge effective **March 1**. | <u>January 23, 2006</u>.  ANA announced its intention to raise its international fuel surcharge, effective **March 1**. |
| <u>August 17, 2006</u>.  JAL announced its intention to raise its international fuel surcharge, effective **October 1**, from 8,000 yen to 13,600 yen ($66 to $113). | <u>August 31, 2006</u>.  ANA announced its intention to raise its international fuel surcharge, effective **October 15**, from 8,000 yen to 13,600 yen ($66 to $113). |
| <u>November 16, 2006</u>.  JAL announced its intention to reduce the fuel surcharge on international passenger fares effective **January 1**, lowering the surcharge from 13,600 yen to 13,000 yen ($113 to $108). | <u>November 16, 2006</u>.  ANA announced its intention to reduce the fuel surcharge in international passenger fares effective **January 1**, lowering the surcharge from 13,600 yen to 13,000 yen ($113 to $108). |
| <u>March 19, 2007</u>.  JAL announced its intention to reduce the fuel surcharge on international passenger fares effective **May 1**, to 11,000 yen ($91). | <u>March 20, 2007</u>.  ANA announced its intention to reduce the fuel surcharge on international passenger fares effective **May 1**, to 11,000 yen ($91). |
| <u>May 15, 2007</u>.  JAL announced its intention to raise the fuel surcharge on international passenger fares effective **July 1**, from 11,000 yen or $91 to 12,000 yen ($100). | <u>May 25, 2007</u>.  ANA announced its intention to raise the fuel surcharge on international passenger fares effective **July 10**, from 11,000 yen or $91 to 12,000 yen ($100). |
| <u>August 15, 2007</u>.  JAL announced its intention to raise the fuel surcharge on international passenger fares effective **October 1**, from 12,000 yen or $100 to 13,000 yen ($108). | <u>August 20, 2007</u>.  ANA announced its intention to raise the fuel surcharge on international passenger fares effective **October 1**, from 12,000 yen or $100 to 13,000 yen ($108). |

233.    On May 31, 2005, Hirai Noboru of JAL circulated an e-mail with a subject line titled: "[r]egarding meeting with NW (forwarding prohibited read only)."  Mr. Noboru stated that he was providing a summary of his meeting with NW "yesterday" and that the recipients should "delete this after you have finished reading."  The e-mail noted that Northwest was considering matching JAL's application on fuel surcharge increases on routes to Honolulu, but that Northwest had not yet made a determination about North America "because of reasons such as the need to watch the trend in other American companies."  This e-mail also referenced fare coordination between JAL and Northwest, with a final decision to be "made after CO

1  [Continental]/JL [JAL] price coordination." The e-mail concluded: "The environment is such

2  that continued price increases will be desired."

3      234.    Collusion on air passenger surcharges continued in Thailand and other countries

4  as well. For example, on August 18, 2005, Carol Phatoomros of Thai Airways circulated an e-

5  mail on behalf of "Wallop/VP Sales and Distribution." The e-mail was titled: "Message from

6  THAI re Fuel Surcharge." In the e-mail, Thai Airways stated in part: "[w]e also know that we

7  have to be aware of market acceptability of these increases. But most of all, we at THAI are

8  looking for all of your efforts to toe the line with us. All the time we compete absolutely, but

9  this time we ask for unity and to be onboard the fuel surcharge wagon for our future and

10  survival." The e-mail was sent to Singapore Airlines (David Lau), UAL (Eric Wilson), SAS

11  (Axel Blom), Cathay Pacific (Patrick Yeung), British Airways (Julianne Rogers), Lufthansa

12  (Wofgang Schmidt), Air India, Air Canada, Eva Airways, KLM (Jhab Sorial), Northwest

13  ("Sarathool"), Air New Zealand (Panya Silpargam), Asiana, Cathay Pacific (Alan Tang), IATA,

14  KAL, China Airlines (Charlie Fu), American Airlines (Pajack Burarak, Chaichan

15  Khorgsrithong), JAL (Chanchai Wangyuenyong), Qantas (L. Moser), Vietnam Airlines, Air

16  France, Swiss International (Brian Sinclair-Thompson), Alitalia, Vietnam Airlines, Philippine

17  Airlines, and ANA, among others.

18      235.    On September 1, 2005, a meeting of the Thai BAR was held. It was noted at the

19  meeting that Thai Airways was asking for support for higher fuel surcharges, which would

20  encompass surcharges on flights to and from the United States. The meeting minutes indicated

21  that "[i]t was proposed that BAR should write to TG [Thai Airways] noting that all airlines suffer

22  and in principle accept the higher fuel surcharge, but at the same time have to look at market

23  fares in Thailand which are 20-30% below published [IATA] fares." The airlines in attendance

24  at the meeting were upset that the "BKK [Suvarnabhumi Bangkok International Airport] fare

25  was below other regional destinations." Airlines present at this meeting included Thai Airlines

26  (Rangsiman Mokhansasamit), British Airways (Julianne Rogers), Qantas (Julianne Rogers),

27  Cathay Pacific (Patrick Yeung), Northwest (Sarathool), Air France (Christine Seuge), China

28  Airlines (Charlie Fu, Andy Yao), JAL (S. Iwasaki, Chanchai Wangyuengyong), Lufthansa

(Wolfgang Schmidt), Korean Air (Suchon Paleewong), ANA (Kimiya Arima, Somnuk Asava), Philippine Airlines (Monet Trespeses), UAL (Eric Wilson), and Vietnam Airlines (Ngayen Nhu Thang), among others.  The attendees were urged to support the creation of a subgroup to examine base fare prices and to otherwise discuss each other's fares.

**d.  Coordination Of Fuel Surcharge Increases Are Not An Expected By-Product Of Competition**

236.   The coordination of the Defendants' fuel surcharge increases cannot be explained merely as a function of the industry's exposure to fuel cost increases.  The impact of rising fuel costs on individual airline profits varies widely depending on factors such as fleet utilization and efficiency.  Singapore Airlines, for example has newer, more fuel-efficient planes than a number of the Defendants.  The impact of rising fuel also varies depending how much of projected fuel consumption was committed to at a fixed price at the beginning of the year, a practice known as hedging.  In short, the Defendants' cost structures differ widely.  Their desire to coordinate the timing and amount of fuel surcharges is not consistent with a competitive air transportation market.

**e.  Substantial Increases In Profitability Are Not An Expected By-Product Of Competition**

237.   The Defendants and their trade associations encourage a false public perception that the airline industry has been unprofitable in recent years due to increased fuel prices, which have increased substantially during the latter part of the Class Period.

238.   While it is true that some airlines have been recently unprofitable—mainly U.S. airlines whose profitability problems are only tangentially related to fuel prices—the majority of airlines headquartered in the Asia and Oceania have achieved substantial profits throughout the Class Period, as the following AAPA chart indicates:

1
2
3
4
5
6
7
8
9



10    239.    The 2007 financial report produced by the AAPA notes that carriers in Asia

11  Pacific were collectively recording substantially increased profits even as they were experiencing

12  increased fuel costs:

13          **FY2006/2007 saw a significant improvement in profitability
14          for Asia Pacific airlines.  Net income tripled, while operating
15          profit increased by 69% to USD 3.7 billion.  The healthy
            performance was achieved with strong revenue growth, up
            15.4%, outpacing the overall cost increase of 14.1%.**
16          (Emphases added).

17    240.    AAPA's 2008 financial report demonstrated that the Asia Pacific carriers

18  recorded historically high profits again for the year ending 2007.

19          Asia Pacific airlines' net income grew by 38% to USD 5.1 billion
20          while operating profit was USD 7.3 billion, up by 87%. AAPA
            member airline consolidated net income totaled USD 3.9 billion,
21          up by 12.5% or USD 433 million. **Operating profit surged 68%
            to a record high of USD 6.2 billion.**
22
23    241.    Moreover, Defendants' own data demonstrates that the imposition of fuel

24  surcharges was a profit generator for the airlines, not just a cost recovery mechanism.

25    242.    For example, ANA reported a net profit of 7.68 billion Japanese yen for the first

26  quarter of fiscal year 2006.  Thai Airways collected nearly US$80 million in fuel surcharges and

27  reported substantial profits in the third quarter of 2006.  An August 10, 2006 article in the *China

28  Post* quoted a securities analyst as saying that "'[t]he higher fuel surcharge in place was also

1   quite effective'" in raising Thai Airway's revenues.  Similarly, on August 28, 2007, Air New

2   Zealand announced a net profit of NZ$214 million, up 123% from the previous year.  For the

3   same period, Air New Zealand's operating costs increased by 13% while the number of

4   passengers increased only by 4.9%.

5   243.   On August 7, 2007, the *Japan Times* reported that JAL's operating loss shrank

6   from 31.9 billion yen the prior year to 8.5 billion yen.  The article further stated, "JAL's

7   executive officer, attributed the improved earnings performance to the carrier's efforts to cut

8   costs, brisk business demand for international flights, higher revenue per passenger achieved

9   through fare hikes on domestic routes and increased fuel surcharges on international flights."

10  244.   On August 8, 2007, Cathay Pacific announced that its passenger revenue had

11  increased 14.6% for the first half of 2007, compared with the previous year.  The total number of

12  passengers increased by only 4.1%, but passenger yield was up 10.9%.  The Defendants operate

13  within the confines of a highly-competitive, mature industry.  Their ability to substantially affect

14  profitability unilaterally, particularly during a period of turbulent changes in input costs, is not

15  consistent with free and unfettered marketplace competition.

16  **3.    Additional Evidence Establishes That There Was A Wide-Ranging Conspiracy
        To Impose Fuel Surcharges In The Closely Related Cargo Market During the
17      Class Period**

18  245.   Defendants engaged in conspiratorial meetings in Asia, Europe, and the Middle

19  East during and prior to the Class Period in which they reached generalized global agreements to

20  fix prices that were then implemented regionally and on a route-by-route basis.

21  246.   Indeed, in an April 30, 2009 press release from the ACCC, Australian

22  Competition Authorities alleged that "arrangements or understandings were reached in countries

23  including Singapore, Indonesia, Hong Kong, United Arab Emirates, India, Japan and Italy."  The

24  same press release also asserts that Cathay Pacific entered into at least 70 agreements with other

25  air cargo carriers to fix the price of fuel and other surcharges.

26  247.   During the meetings described above, the participants, including the Defendants,

27  agreed to conceal their price-fixing cartel by staggering the dates on which airlines would

28

publicly announce that they would match a fare and/or surcharge increase.

248.     Airline cargo and passenger services are inextricably intertwined markets.  The efficient operation of an airline requires close coordination between its cargo and air passenger operations.  Indeed, much of the cargo that is shipped around the world is carried in the belly of aircraft that is also used to simultaneously transport people.  Accordingly, there is close interaction between cargo and passenger operations to reserve space, coordinate schedules, and maximize revenue of each flight.

## GOVERNMENT INVESTIGATIONS INTO THE AIR PASSENGER INDUSTRY AND THE CLOSELY RELATED AIR CARGO INDUSTRY

249.     The DOJ and competition authorities around the world are investigating anticompetitive conduct by the airline industry.  Indeed, a criminal grand jury has been empanelled in the District Court for the District of Columbia to investigate price-fixing of passenger and cargo air transportation, including related fuel surcharges.

250.     The investigation into passenger fares and cargo began on or before December 31, 2005, when Lufthansa, on behalf of itself and its subsidiaries, approached the DOJ, the European Commission, the ACCC, and other competition authorities, with evidence of illegal price-fixing of air cargo rates.

251.     The DOJ has "a policy of according leniency to corporations reporting their illegal antitrust activity at an early stage, if they meet certain conditions."

252.     Based on its report to the DOJ and consistent with and pursuant to the DOJ leniency policy, Lufthansa was accepted into the leniency program.

253.     Thereafter, Virgin Atlantic sought (and was granted) amnesty from the DOJ and British competition authorities after disclosing its participation in a conspiracy to fix the prices of international passenger fares, including surcharges.

254.     On August 1, 2007, the DOJ filed criminal information against KAL in the United States District Court for the District of Columbia, charging it with violating Section 1 of the Sherman Act for engaging in the price fixing of *inter alia*, air passenger fuel surcharges.

255.    That same day, the DOJ announced that KAL had agreed to plead guilty and pay a $300 million fine for its participation in the passenger and cargo conspiracy.  In confirming that it had agreed to plead guilty, KAL attorney Ahn Yong-Seok announced that the company "apologises to shareholders and customers for causing trouble."  He further stated that KAL's compliance officer would attempt to ensure future compliance with U.S. and global fair trade rules.  Subsequent news reports indicated that Asiana may also be subject to potential fines.

256.    On August 23, 2007, British Airways pled guilty and was sentenced to pay a $300 million criminal fine for conspiring to fix cargo rates for international air shipments, including to and from the United States, and to fix passenger fuel surcharges for long-haul international air transportation, including between the United States and United Kingdom.

257.    On November 27, 2007, it was announced that Qantas had agreed to plead guilty to fixing prices for cargo shipments to and from the U.S. and elsewhere, in violation of Section 1 of the Sherman Act.

258.    On November 28, 2007, Qantas' CEO, Geoff Dixon, apologized for his company's behavior and confirmed:

> Similar investigations to those being carried out by the US Department of Justice (DOJ) are being undertaken by antitrust regulators in other countries, including Australia.  We understand more than 30 other airlines are included in these investigations.

259.    In an April 29, 2009 press release by the DOJ announcing the guilty plea of Frank De Jong of Martinair in connection with the price-fixing of air cargo rates, the DOJ summed up its efforts in this area as follows:

> The 15 airlines that have pleaded guilty or agreed to plead guilty to date as a result of the Department's ongoing investigation into the air transportation industry are: British Airways Plc, Korean Air Lines Co. Ltd., Qantas Airways Limited, Japan Airlines International Co. Ltd., Martinair, Cathay Pacific Airways Limited, SAS Cargo Group A/S, Société Air France, Koninklijke Luchtvaart Maatschappij N.V. (KLM Royal Dutch Airlines), EL AL Israel Airlines Ltd., LAN Cargo S.A., Aerolinhas Brasileiras S.A., Cargolux Airlines International S.A., Nippon Cargo Airlines Co. Ltd., and Asiana Airlines Inc. Airline executives who have already pleaded guilty for their involvement in the illegal activity

are Bruce McCaffrey of Qantas, Timothy Pfeil of SAS and Keith Packer of British Airways.

260.     On December 22, 2007, ANA announced that it had received a statement of objections from the European Commission regarding ANA's participation in the fixing of prices of air freight.

261.     Other air carriers, including a number of Defendants and their co-conspirators, have also announced that in late-December 2007 they, too, received formal charges from the European Commission for conspiring to fix cargo rates, including, Air New Zealand, Air France, Lufthansa, Qantas, co-conspirator KAL, Malaysian Airlines, British Airways, Cathay Pacific, JAL, Thai Airways, and Singapore Airlines, among others.  According to Thai Airways, a total of 26 airlines have received "Statements of Objection" from the European Commission.

262.     Thai Airways has further disclosed that it is being investigated by competition authorities in Europe, the United States, New Zealand, South Korea, and Australia concerning its participation in anticompetitive conduct involving the global airline industry.

263.     In their 2007 Annual Reports, China Airlines and EVA acknowledged that the DOJ is investigating price-fixing of cargo rates.  Both China Airlines and EVA stated that they were cooperating with the investigation, but were unable to assess their financial exposure at the time the reports were published.

264.     On January 14, 2008, Qantas pled guilty and was sentenced to pay a $61 million criminal fine for its role in a conspiracy to fix the rates of shipments of cargo to and from the United States and elsewhere.

265.     News reports indicated that during the week of March 10, 2008, the DOJ ordered a number of Qantas employees to appear in San Francisco for further questioning in the ongoing price-fixing investigations.

266.     On March 11, 2008, the European Commission raided the offices of Lufthansa (the DOJ's air cargo amnesty candidate), Air France, KLM, and Alitalia for evidence of price-fixing on air passenger tickets for international flights.

267.     The European Commission confirmed the raids by its personnel:

The European Commission can confirm that on 11th March 2008 Commission officials carried out unannounced inspections at the premises of a number of international airline passenger carriers. These airline carriers provide scheduled passenger air transport services on long-haul routes between Europe and a third country. The Commission has reason to believe that the companies concerned may have violated EC Treaty rules on restrictive business practices (Article 81).

268.     Following the raids, Lufthansa stated that "[a]ccording to information from the investigation decision, the commission has information that passenger aviation companies including Lufthansa in Europe and in Japan may have taken part in anticompetitive price-fixing and collusive behavior in traffic between the EU and Japan."

269.     On March 12, 2008, the European Commission announced that the Japanese competition authorities also have an investigation underway concerning price-fixing of passenger fares on routes between Japan and Europe.

270.     On April 16, 2008, the DOJ announced that JAL agreed to plead guilty to fixing the rates for international cargo shipments and to pay a $110 million fine.

271.     On April 30, 2008, ANA announced that it had recorded an "extraordinary loss" of $156 million, which it noted is a preliminary estimate of the fines it is facing from the European Commission for anti-competitive conduct related to the fixing of prices for air freight. ANA noted that "[t]he allegations are based on evidence held by the European Commission and provided to them by other companies."

272.     On May 8, 2008, the DOJ announced that Bruce McCaffrey, a Qantas executive, agreed to plead guilty to price-fixing cargo fares.  He will serve 8 months in federal prison.  The announcement explained:

McCaffrey is the first individual to be charged, and this is the fifth case to arise, in the wide-ranging investigation into the air transportation industry.

273.     Also on May 8, 2008, Air Canada disclosed that it, too, had received a statement of objections from the European Commission concerning its participation in a conspiracy to fix air cargo rates.  Air Canada also disclosed that it was reserving Cdn. $125 million to resolve its antitrust problems.

274.     On June 17, 2008, the *Business Spectator* reported as follows:

> Qantas Airways has reached a confidential settlement agreement with the Australian Competition and Consumer Commission, in a deal expected to see the airline pay a multi-million dollar penalty for its alleged role in illegally fixing fuel surcharges as part of a global cartel, reports The Australian Financial Review.

> According to the paper, the European Commission is also in the final stages of its price-fixing investigations and is ready to take action against 26 airlines.

> Qantas has signaled to the European regulators that it will admit liability and is expected to pay a hefty fine, the paper said.

275.     On June 26, 2008, the DOJ announced that it had filed informations against KLM, Air France, Cathay Pacific, and others for fixing cargo rates on international flights to and from the United States.  Air France and KLM, which have now merged their operations, have agreed to admit guilt and will pay a $350 million fine.  Cathay Pacific has also agreed to admit guilt and will pay a fine of $60 million.

276.     Cathay Pacific's CEO has admitted that Cathay Pacific's actions "were in conflict with US antitrust laws, and we very much regret this."

277.     On July 18, 2008, the New Zealand Commerce Commission announced that it had filed criminal charges against Singapore Airlines' Cargo Division, Cathay Pacific, and another airline for failing to provide relevant documents and information in response to the Commission's investigation into an international cartel to fix cargo rates, including surcharges. Paula Rebstock, the chairwoman of the New Zealand Commerce Commission stated: "Any failure to comply with . . . statutory notices that form part of a commission investigation is a serious enforcement issue."

278.     In July of 2008, Air France agreed to plead guilty to fixing cargo fares in the United States.  As part of its guilty plea, Air France agreed to a criminal fine of US $210 million.

279.     In August of 2008, Timothy Pfeil, the former highest-ranking cargo executive in the United States for SAS, pleaded guilty to conspiring to fix the rates charged to U.S. and international customers on air cargo shipments.

280.     On September 30, 2008, the DOJ announced that Keith Packer, former Commercial General Manager for British Airways World Cargo, had agreed to plead guilty to fixing air cargo rates charged to customers for international air shipments, including to and from the U.S., in violation of the Sherman Act. Under the plea agreement, which is subject to court approval, Packer has agreed to serve eight months in jail, pay a $20,000 criminal fine and cooperate with the DOJ's ongoing investigation.

281.     On October 28, 2008, the ACCC announced that British Airways had agreed to a fine of AU$5,000,000.00 to resolve price-fixing claims lodged against its cargo division.  The ACCC also announced that Qantas had similarly agreed to a fine of AU$20,000,000.00 for its participation in the cargo conspiracy.  The ACCC Chairman, Graeme Samuel stated, "There are some other airlines who are not cooperating with us and we will pursue our investigations there, with a view to bringing them to account as soon as we possibly can.  We regard any cartel activity—particularly those that are engaged in by large businesses and are of a price fixing nature—as very serious in terms of consumers, they are nothing more than theft.  They steal from consumers potentially millions if not tens of millions of dollars; there's no way that consumers can recover what it has cost them."

282.     On December 15, 2008, the New Zealand Commerce Commission announced that it had filed an action in the High Court in Auckland against 13 airlines and 10 senior executives, including Air New Zealand, Air France, Cathay Pacific, British Airways, JAL, KAL, Malaysian Airlines, Singapore Airlines, Qantas, Thai Airways, and co-conspirators KAL and UAL, for violations of New Zealand's Commerce Act.  The New Zealand Commerce Commission also noted that other airlines were cooperating with the investigation.  The Commission alleged "that airlines throughout the world colluded to raise the price of freighting cargo by imposing fuel surcharges for more than seven years."  The Commerce Commission further noted that the conspiracy "affected the price of cargo both into and out of New Zealand.  It is alleged that airlines first entered into an illegal global agreement in 1999/2000 under the auspices of the trade organization International Air Transport Association (IATA).  The airlines imposed the fuel

surcharges between 2000 and 2006.  The allegations also involve a series of regional price fixing agreements."

283.    On December 22, 2008, the ACCC announced that it had instituted proceedings against Singapore Airline's cargo division in Federal Court in Sydney.  "The ACCC alleges that Singapore Airlines Cargo Pte Ltd, between 2001 and 2005, entered into arrangements or understandings with other international air cargo carriers that had the purpose or effect of fixing the price of a fuel surcharge and a security surcharge that was applied to air cargo carried by Singapore Airlines Cargo Pte Ltd and other airlines including to and from Australia."  The ACCC further noted that a number of additional airlines were not cooperating with its investigation.  In a related proceeding, on or about April 3, 2009, Australia's Federal Court in Melbourne ordered Singapore Airlines and its subsidiary, Singapore Cargo, and Emirates to turn over documents to the ACCC.

284.    On January 22, 2009, El Al, Aerolinhas Brasileiras, and Lan Cargo agreed to plead guilty to price-fixing air cargo charges.

285.    On February 16, 2009, a federal court in Australia ordered Air France to pay a AU $6 million penalty for participating in a conspiracy to fix cargo fuel surcharges.

286.    On March 31, 2009, Air France agreed to pay a penalty to antitrust authorities in Canada of Cdn. $4 million.

287.    On April 9, 2009, Asiana, Nippon Cargo (an affiliate of ANA), and Cargolux agreed to plead guilty to price-fixing air cargo charges in the United States.  Asiana also admitted to fixing the price of wholesale and passenger fares and has agreed to pay a $50 million fine.

288.    On or about April 20, 2009, the European Commission announced that it has opened a "priority" investigation into certain airline alliance agreements on trans-Atlantic routes. According to Jonathan Todd, a Commission spokesperson, "we think that there may be breaches of the antitrust rules because of the very extensive levels of cooperation on trans-Atlantic routes between these airlines."

1      289.     On April 30, 2009, the ACCC announced that it had filed suit against Cathay

2  Pacific for fixing the prices of fuel and other surcharges.  The ACCC noted that it had evidence

3  of at least 70 agreements between Cathay Pacific and its conspirators to fix cargo fares during

4  the period from 2000 to 2006.  The ACCC also stated that it is continuing to investigate the

5  airline industry and "further actions are expected over the next few months."

6      290.     Also on April 30, 2009, the DOJ announced that a Martinair Holland executive

7  had agreed to plead guilty to fixing air cargo fares, pay a $20,000 criminal fine and spend 8

8  months in jail.

9      291.     On June 26, 2009, the Canadian Competition Bureau announced that Air France,

10  KLM, and Martin Air pled guilty to fixing the price of air cargo shipments during the period

11  from April 2002 to February 2006 and were fined Cdn. $10 million.

12      292.     On July 7, 2009, the Canadian Competition Bureau announced that Qantas had

13  agreed to plead guilty to fixing the price of air cargo shipments during the period from May 2002

14  to February 2006.

15      293.     Total fines levied by the DOJ to date in this wide-ranging investigation exceed

16  $1.6 billion and collectively constitute the largest fines ever imposed by the DOJ as a result of a

17  criminal antitrust investigation.  As of April of 2009, fifteen airlines and four executives have

18  admitted (or have agreed to admit) guilt in US courts for their involvement in the worldwide

19  cargo conspiracy.  Five airlines have either admitted guilt in fixing the prices of passenger fares

20  or have sought leniency from the DOJ for doing so.  The DOJ has stated that its investigation of

21  the industry is continuing.  Appendix G summarizes the status of the DOJ investigation with

22  respect to the Defendants named in this complaint.

23      294.     It is significant that Defendants' anticompetitive behavior is the subject of a

24  criminal grand jury investigation by the DOJ.  In order for the DOJ to institute a grand jury

25  investigation, a DOJ Antitrust Division attorney must believe that a crime has been committed

26  and prepare a detailed memo to that effect.  *See Antitrust Grand Jury Practice Manual*, Vol. 1,

27  Ch. I.B.1 ("[i]f a Division attorney believes that a criminal violation of the antitrust laws has

28  occurred, he should prepare a memorandum requesting authority to conduct a grand jury

1   investigation.").  Furthermore, following a review of the memorandum, the request for a grand

2   jury must be approved by the Assistant Attorney General for the Antitrust Division, based on the

3   standard that a criminal violation may have occurred.  *See id*.  In addition, the fact that the DOJ

4   Antitrust Division investigation is criminal, as opposed to civil, is significant as well.  The

5   Antitrust Division's "Standards for Determining Whether to Proceed by Civil or Criminal

6   Investigation" state: "[i]n general, current Division policy is to proceed by criminal investigation

7   and prosecution in cases involving horizontal, per se unlawful agreements such as price fixing,

8   bid rigging and horizontal customer and territorial allocations."  *See Antitrust Division Manual*,

9   Chapter III.C.5.

## ACCRUAL OF CLAIM, EQUITABLE TOLLING, EQUITABLE ESTOPPEL, AND FRAUDULENT CONCEALMENT

10  295.    Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or

12  of facts sufficient to place them on inquiry notice of the antitrust claims set forth in this

13  Complaint, until shortly before the initial class action complaint was filed in this multi-district

14  litigation.

16  296.    Nor could Plaintiffs and the members of the Class have discovered the violations

17  through the exercise of reasonable diligence earlier than that time because Defendants conducted

18  their conspiracy in secret, concealed the nature of their unlawful conduct and acts in furtherance

19  thereof, and fraudulently concealed their activities through various other means and methods

20  designed to avoid detection.  The conspiracy was by its nature self-concealing.

21  297.    Only on or about August 1, 2007, when the DOJ announced the charges against

22  KAL for fixing passenger fares and wholesale fares was the existence of the conspiracy disclosed

23  to the public.

24  298.    As an example of Defendants' concealment, Plaintiffs have alleged herein an

25  instance in which the author of an e-mail about fuel surcharge communications asked the

26  recipients to destroy it.

27  299.    Moreover, following the February 2006 raids by competition regulators,

28  directions were given by senior management of one of the Defendants to destroy all documents

1    concerning communications with competitors regarding fare and rate-setting activities.  Plaintiffs

2    believe that a substantial number of documents relevant to the claims made in this litigation were

3    destroyed pursuant to that directive.

4          300.    Plaintiffs have also alleged an instance in which one of the Defendants suggested

5    that another Defendant conceal a collusive fare increase by falsely stating that it was due to the

6    enhanced in-flight services provided to passengers.

7          301.    Further, Mr. Suebsantiongse referred to fuel surcharges as a "sensitive" issue

8    when the Thailand BAR met and agreed to joint imposition of such charges.  JAL also referred to

9    the sensitive nature of the imposition of fuel surcharges.  A JAL response to Singapore Airlines

10   in January 2005 references an understanding that JAL must be "careful" with confidential

11   information supplied to it by Singapore Airlines.

12         302.    The existence of coordinated activity was further concealed by the way in which

13   the implementation of surcharges were staggered, both in timing and amount—such as was done

14   by JAL, ANA and other Defendants in Japan in early 2005.

15         303.    Indeed, the existence, timing and amount of fuel surcharges are often difficult to

16   detect by a lay person.  Fuel surcharges were often identified on an airline ticket only as the

17   "YQ" portion of an airline fare, a designation that is totally unintelligible to those outside of the

18   airline industry.

19         304.    Accordingly, Defendants engaged in a successful, illegal price-fixing conspiracy

20   with respect to passenger air transportation, which they affirmatively concealed in at least the

21   following respects:

22              (a)    By agreeing among themselves not to discuss publicly, or otherwise
                       reveal, the nature and substance of the acts and communications in
23                     furtherance of the illegal scheme;

24              (b)    By engaging in secret meetings, telephone calls, and other
25                     communications in order to further their illicit cartel;

26              (c)    By staggering the dates on which changes to fares, including surcharges,
27                     became effective and/or were announced to the public;

28              (d)    By generating e-mails which recipients were told to destroy after reading;

(e)    By destroying documentary evidence of the alleged conspiracy after the regulatory raids described above; and/or

(f)    By giving false and pretextual reasons for their pricing of passenger fares and for the increases in those prices during the relevant period, and by describing such pricing and increases falsely as being a result of external costs, including the cost of fuel, rather than collusion.

305.    As a result of the foregoing, Plaintiffs and the members of the Class assert the tolling of any applicable statute of limitations affecting the rights of action of Plaintiffs and the members of the Class during the Class Period.

## CLASS ACTION ALLEGATIONS

306.    The Plaintiffs bring this action on their own behalf and as a class action pursuant to Rule 23(a) and (b) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons and entities that purchased passenger air transportation at rates that were not immunized by the United States Department of Transportation and which included at least one flight segment between the United States and Asia or Oceania from Defendants or their co-conspirators, or any predecessor, subsidiary or affiliate thereof, at any time between January 1, 2000 and the present. Excluded from the class are purchases of passenger air transportation directly between the United States and the Republic of South Korea purchased from Korean Air Lines, Ltd. and/or Asiana Airlines, Inc..  Also excluded from the class are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, and Defendants' officers, directors, employees and immediate families.

307.    Plaintiffs do not know the exact number of members of the Class because such information is in the exclusive control of Defendants.  Due to the nature of the trade and commerce involved, however, Plaintiffs believe that members of the Class number at least in the hundreds of thousands and are sufficiently numerous and geographically dispersed throughout the United States and the world so that joinder of all Class members is impracticable.

308.    There are questions of law and fact which are common to the claims of Plaintiffs and the Class they seek to represent, including, but are not limited to:

(a)    Whether Defendants engaged in a combination or conspiracy with their co-conspirators to fix, raise, maintain, and/or stabilize the prices for passenger air transportation, including surcharges;

(b)   Whether the purpose and/or effect of the acts and omissions alleged herein was to restrain trade, or to affect, fix, control, and/or maintain the prices for passenger air transportation, including surcharges;

(c)   The existence and duration of the horizontal agreements alleged herein to fix, raise, maintain, and/or stabilize the prices for passenger air transportation, including surcharges;

(d)   Whether Defendants violated Section 1 of the Sherman Act (15 U.S.C. § 1);

(e)   Whether Defendants fraudulently concealed the alleged conspiracy so as to equitably toll any applicable statute of limitations;

(f)   Whether Defendants' agents, officers, employees, or representatives participated in correspondence and meetings in furtherance of the illegal conspiracy alleged herein, and, if so, whether such agents, officers, employees, or representatives were acting within the scope of their authority and in furtherance of Defendants' business interests;

(g)   Whether, and to what extent, the conduct of Defendants caused injury to Plaintiffs and members of the Class, and, if so, the appropriate measure of damages; and

(h)   Whether Plaintiffs and members of the Class is entitled to injunctive relief to prevent the continuation or furtherance of the violation of Section 1 of the Sherman Act and/or the foreign laws alleged.

309.   Plaintiffs' claims are typical of the claims of the members of the Class they seek to represent.

310.   Plaintiffs will fairly and adequately assert and protect the interests of the Class members.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of Class they seek to represent.

311.   Plaintiffs are represented by counsel competent and experienced in the prosecution of antitrust and class action litigation.

312.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

313.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

      (a)     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

      (b)     The Class is readily definable and one for which records should exist in the files of Defendants.

      (c)     Prosecution as a class action will eliminate the possibility of repetitious litigation.

      (d)     Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require.

      (e)     Class treatment will permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this complaint on an individual basis.

314.     This class action presents no difficulties of management that would preclude its maintenance as a class action.

## COUNT I

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

315.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

316.     Defendants and their co-conspirators engaged in a continuing contract, combination, and conspiracy to artificially fix, raise, maintain, and/or stabilize the prices of passenger air transportation, including surcharges for flights between the United States and Asia

1    and between the United States and Oceania, in violation of Section 1 of the Sherman Act, 15

2    U.S.C. § 1.

3            317.    Defendants and their co-conspirators agreed to, and did in fact, restrain trade or

4    commerce by fixing, raising, maintaining, and/or stabilizing at artificial and non-competitive

5    levels, the prices of passenger air transportation, including surcharges.  Their illegal activities

6    involved import trade or import commerce with foreign nations.

7            318.    In formulating and effectuating their contract, combination or conspiracy,

8    Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and

9    effect of which were to artificially fix, raise, maintain and/or stabilize passenger air

10   transportation, including surcharges.  These activities included the following:

11                   (a)    Agreeing to charge prices for passenger air transportation, including

12                          surcharges, at certain levels and otherwise fix, raise, maintain and/or

13                          stabilize prices for passenger air transportation, including surcharges; and

14                   (b)    Charging for passenger air transportation, including surcharges at agreed

15                          upon levels.

16           319.    The illegal combination and conspiracy alleged herein had the following effects,

17   among others:

18                   (a)    The prices charged by Defendants to, and paid by Plaintiffs and members

19                          of the Class for passenger air transportation, including surcharges were

20                          fixed, raised, maintained and/or stabilized at artificially high and non-

                            competitive levels;

21                   (b)    Plaintiffs and members of the Class have been deprived of free and open

22                          competition in the purchase of passenger air transportation;

23                   (c)    Plaintiffs and members of the Class have been required to pay more for

24                          passenger air transportation, including surcharges, than they would have

                            paid in a competitive marketplace absent Defendants' price-fixing

25                          conspiracy;

26                   (d)    Competition in the sale of passenger air transportation has been restrained,

27                          suppressed or eliminated.

28

1    320.    As noted above, Defendants' conduct as alleged herein constitutes or involves

2    import trade or import commerce.  Additionally, this conduct both had a direct, substantial, and

3    reasonably foreseeable effect on American domestic, import and export commerce, and had an

4    effect of a kind that antitrust law considers harmful.  Higher U.S. prices brought about by

5    Defendants' conspiracy proximately caused injury to residents and citizens of the United States,

6    whether Defendants' air passenger transportation services were purchased in the United States or

7    elsewhere in the world.  As another example of direct, substantial, reasonably foreseeable, and

8    proximate effect that Defendants' alleged conduct has on the United States trade and commerce

9    is the fact that travelers using price-fixed air transportation services are able to allocate a smaller

10   fraction of their total travel budget to the purchase of commercial goods and services during their

11   stay in the United States.  The alleged conduct also injures any foreign national that purchased

12   air transportation services in the United States.  In addition, the inflated fares charged by

13   Defendants for air passenger transportation from Asia/Oceania to the United States is

14   inextricably bound up with and dependent upon the fares charged by Defendants for air

15   transportation from the United States to Asia/Oceania.

16   321.    As a direct and proximate result of Defendants' conduct, the Plaintiffs and

17   members of the Class have been injured and damaged in their business and property in an

18   amount to be determined according to proof.

19                                **PRAYER FOR RELIEF**

20       WHEREFORE, Plaintiffs pray:

21       A.    That the Court determine that this action may be maintained as a class action

22   under  Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable

23   notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be

24   given to members of the Class;

25       B.    That the Court adjudge and decree that the contract, combination and conspiracy

26   alleged herein is a *per se* unreasonable restraint of trade in violation of Section 1 of the Sherman

27   Act;

28

1    C.    That the Court enter judgment against Defendants, jointly and severally, in favor

2    of Plaintiffs and the Class;

3    D.    That the Court award Plaintiffs and the Class treble damages;

4    E.    That the Court award Plaintiffs and the Class attorneys' fees and costs as well as

5    pre-judgment and post-judgment interest as permitted by law;

6    F.    That Defendants and their co-conspirators, their respective successors, assigns,

7    parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and

8    employees, and all other persons acting or claiming to act on behalf of Defendants or their co-

9    conspirators, or in concert with them, be permanently enjoined and restrained from, in any

10   manner, directly or indirectly, continuing, maintaining or renewing the combination, conspiracy,

11   agreement, understanding or concert of action, or adopting any practice, plan, program or design

12   having a similar purpose or affect in restraining competition; and

13   G.    That the Court award Plaintiffs and the Class such other and further relief as may

14   be deemed necessary and appropriate.

## JURY TRIAL DEMANDED

16       Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of the

17   Sherman Act claims and any other claims so triable asserted in this Complaint.

18   Dated:  August 5, 2009              Respectfully submitted,

19                                      By:     */s/ Michael P. Lehmann*
                                        Michael P. Lehmann (77152; mlehmann@hausfeldllp.com)
20                                      Christopher L. Lebsock (184546;
                                                clebsock@hausfeldllp.com.com)
21                                      Jon T. King (205073; jking@hausfeldllp.com.com)
                                        **HAUSFELD LLP**
22                                      44 Montgomery Street, Suite 3400
                                        San Francisco, CA  94104
23                                      Telephone:  (415) 633-1908
                                        Facsimile:  (415) 358-4980
24
                                        Michael D. Hausfeld (mhausfeld@hausfeldllp.com)
25                                      **HAUSFELD LLP**
                                        1700 K Street, NW, Suite 650
26                                      Washington, DC 20006
                                        Telephone:  (202) 540-7200
27                                      Facsimile:    (202) 540-7201

28

Dated:  August 5, 2009                     Respectfully submitted,

By:     /s/ *Joseph W. Cotchett*
Joseph W. Cotchett (36324; jcotchett@cpmlegal.com)
Nanci E. Nishimura (152621; nnishimura@cpmlegal.com)
Steven N. Williams (175489; swilliams@cpmlegal.com)
Aron K. Liang (228936; aliang@cpmlegal.com)
Matthew K. Edling (250940; medling@cpmlegal.com)
**COTCHETT, PITRE & MCCARTHY**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone:  (650) 697-6000
Facsimile:    (650) 697-0577

Aaron M. Sheanin
**GIRARD GIBBS LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
415-981-4800
Fax: 415-981-4846
E-mail: ams@girardgibbs.com

Walter J. Lack
Elizabeth Lane Crooke
Richard Pollard Kinnan
**ENGSTROM, LIPSCOMB & LACK**
10100 Santa Monica Boulevard, 12th Floor
Los Angeles, CA 90067
310-552-3800
Fax: 310-552-9434
E-mail: wlack@elllaw.com
E-mail: bcrooke@elllaw.com
E-mail: rkinnan@elllaw.com

Steven A. Kanner
**FREED, KANNER, LONDON & MILLEN, LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL  60015
Telephone:     (224) 632-4500
Facsimile:      (224) 632-4519

Derek G. Howard
**MURRAY & HOWARD LLP**
900 Larkspur Landing Circle, Suite 900
Larkspur, CA 94904
415-461-3200
Fax: 415-461-3208
E-mail: dhoward@murrayhowardlaw.com

1

Reginald Von Terrell
**THE TERRELL LAW GROUP**

2

223 25th Street
Richmond, CA 94804

3

510-237-9700
Fax: 510-237-4616

4

E-mail: reggiet2@aol.com

5

Craig C. Corbitt
**ZELLE HOFMANN VOELBEL & MASON LLP**

6

44 Montgomery Street, Suite 3400
San Francisco, CA 94104

7

415-693-0700
Fax: 415-693-0770

8

E-mail: ccorbitt@zelle.com

9

Jennie Lee Anderson
**ANDRUS ANDERSON LLP**

10

155 Montgomery Street, Suite 900
San Francisco, CA 94104

11

415-986-1400
Fax: 415-986-1474

12

E-mail: jennie@andrusanderson.com

13

Mario Nunzio Alioto
Lauren Clare Russell

14

**TRUMP ALIOTO TRUMP & PRESCOTT LLP**
2280 Union Street

15

San Francisco, CA 94123
415-563-7200

16

Fax: 415-346-0679
E-mail: malioto@tatp.com

17

E-mail: laurenrussell@tatp.com

18

Joseph Marid Patane
**LAW OFFICE OF JOSEPH M. PATANE**

19

2280 Union Street
San Francisco, CA 94123

20

415-563-7200
Fax: 415-346-0679

21

E-mail: jpatane@tatp.com

22

Sherman Kassof
**LAW OFFICES OF SHERMAN KASSOF**

23

954 Risa Road, Suite B
Lafayette, CA 94549

24

510-652-2554
Fax: 510-652-9308

25

E-mail: heevay@att.net

26

Jeff S. Westerman
**MILBERG LLP**

27

One California Plaza
300 S. Grand Avenue, Suite 3900

28

Los Angeles, CA 90071

213-617-1200
Fax: 213-617-1975
E-mail: jwesterman@milberg.com

Peter G.A. Safirstein
Andrew J. Morganti
**MILBERG LLP**
One Pennsylvania Plaza, 49th Floor
New York, NY 10119-0165
212-594-5300
Fax: 212-868-1229
E-mail: psafirstein@milberg.com
E-mail: amorganti@milberg.com

Phillip Alden Baker
**BAKER, KEENER & NAHRA**
633 W 5th Street, Suite 5400
Los Angeles, CA 90071
213-241-0900
Fax: 213-241-0990
E-mail: pbaker@bknlawyers.com

Guido Saveri
Richard Alexander Saveri
Cadio R. Zirpoli
William John Heye
**SAVERI & SAVERI, INC.**
706 Sansome Street
San Francisco, CA 94111
415-217-6810
Fax: 415-217-6813
E-mail: guido@saveri.com
E-mail: rick@saveri.com
E-mail: zirpoli@saveri.com
E-mail: william@saveri.com

Robert Kaplan
Laurence D. King
**KAPLAN FOX & KILSHEIMER LLP**
350 Sansome Street. Suite 400
San Francisco, CA 94104
415-772-4700
Fax: 415-772-4707
E-mail: lking@kaplanfox.com

Daniel J Walker
**SUSMAN GODFREY LLP**
1201 Third Avenue, Suite 3800
Seattle, WA 98101
206-516-3880
Fax:  206-516-3883
E-mail: dwalker@susmangodfrey.com

Marc M. Seltzer
**SUSMAN GODFREY LLP**
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
310-789-3100
Fax: 310-789-3150
E-mail: mseltzer@susmangodfrey.com

Jack Wing Lee
**MINAMI TAMAKI LLP**
360 Post Street, 8th Floor
San Francisco, CA 94108
415/788-9000
Fax: 415-398-3887
E-mail: jlee@MinamiTamaki.com

Terry Gross
**GROSS & BELSKY LLP**
180 Montgomery Street, Suite 2200
San Francisco, CA 94104
415-544-0200
Fax: 415-544-0201
E-mail: terry@gba-law.com

Susan Gilah Kupfer
**GLANCY BINKOW & GOLDBERG LLP**
One Embarcadero Center, Suite 760
San Francisco, CA 94111
415-972-8160
Fax: 415-972-8166
E-mail: skupfer@glancylaw.com

B. J. Wade
**GLASSMAN EDWARDS WADE & WYATT PC**
26 N. Second Street
Memphis, TN 38103
(901) 527-4873
Fax: (901) 521-0940
E-mail: bwade@gewwlaw.com

John G. Emerson
**EMERSON POYNTER LLP**
830 Apollo Lane
Houston, TX 77058
281-488-8854
Fax: 281-488-8867
E-mail: jemerson@emersonpoynter.com

Scott E. Poynter
**EMERSON POYNTER LLP**
The Museum Center
500 President Clinton Avenue, Suite 305
Little Rock, AR 72201
501-907-2555
Fax: 501-907-2556

E-mail: scott@emersonpoynter.com

Lawrence D. McCabe
**MURRAY FRANK & SAILER LLP**
275 Madison Avenue, Suite 801
New York, NY 10016
212 682-1818
Facsimile: 212-682-1892
E-mail: lmccabe@murrayfrank.com

Graham Bruce LippSmith
**GIRARDI & KEESE**
1126 Wilshire Boulevard
Los Angeles, CA 90017
213-977-0211
Fax: 213-481-1554
E-mail: glippsmith@girardikeese.com

Brian Joseph Barry
**LAW OFFICES OF BRIAN BARRY**
1801 Avenue of The Stars, Suite 307
Los Angeles, CA 90067
310-788-0831
Fax: 310-788-0841
E-mail: bribarry1@yahoo.com

Brian Stephen Kabateck
**KABATECK BROWN KELLNER LLP**
644 South Figueroa Street
Los Angeles, CA 90017
(213) 217-5000
Fax: (213) 217-5010
E-mail: bsk@kbklawyers.com

Cheryl Hamer Mackell
**POMERANTZ HAUDEK BLOCK GROSSMAN & GROSS LLP**
840 Malcolm Road
Burlingame, CA 94010
415-241-1480
Fax:  800-211-7194
E-mail: chmackell@pomlaw.com

Eugene A. Spector
**SPECTOR ROSEMAN KODROFF & WILLIS PC**
1818 Market Street, 25th Floor
Philadelphia, PA 19103
215-496-0300
Fax: 215-496-6611
E-mail: espector@srkw-law.com

Christopher T. Heffelfinger
**BERMAN DE VALERIO**
425 California Street, Suite 2100
San Francisco, CA 94104
415-433-3200

1   Fax: 415-433-6382
    E-mail:heffelfinger@bermandevalerio.com

2
    Daniel E. Gustafson
3   **GUSTAFSON GLUEK PLLC**
    650 Northstar East
4   608 Second Avenue South
    Minneapolis, MN 55402
5   612-333-8844
    Fax: 612-339-6622
6   E-mail: dgustafson@gustafsongluek.com

7
    Dianne M. Nast
8   **RODA & NAST PC**
    801 Estelle Drive
9   Lancaster, PA 17601
    717-892-3000
10  Fax: 717-892-1200
    E-mail: dnast@rodanast.com

11
    Joseph Goldberg
12  **FREEDMAN BOYD HOLLANDER GOLDBERG & IVES PA**
    20 First Plaza, Suite 700
13  Albuquerque, NM 87102
    505-842-9960
14  Fax: 505-842-0761
    E-mail: jg@fbdlaw.com

15
    Richard J. Arsenault
16  **NEBLETT, BEARD & ARSENAULT**
    P.O. Box 1190
17  2220 Bonaventure Court
    Alexandria, LA 71309
18  318-487-9874
    Fax: 318-561-2591
19  E-mail: rarsenault@nbalawfirm.com

20  W. Joseph Bruckner
    **LOCKRIDGE GRINDAL NAUEN PLLP**
21  100 Washington Avenue S, Suite 2200
    Minneapolis, MN 55401
22  612-339-6900
    Fax: 612-339-0981
23  E-mail: wjbruckner@locklaw.com

24  Daniel Cohen
    **CUNEO GILBERT & LADUCA, LLP**
25  507 C Street NE
    Washington DC  20002
26  202-789-3960
    Fax: 202-789-1813
27  E-mail: danielc@cuneolaw.com

28

Steven J. Greenfogel
**MEREDITH COHEN GREENFOGEL & SKIRNICK, P.C.**
1521 Locust Street
8th Floor, Philadelphia, PA  19102
215-564-5182
Fax: 215-569-0958

Vincent J. Esades
**HEINS MILLS & OLSON, P.L.C.**
310 Clifton Avenue
Minneapolis, MN 55403
Tel:  (612) 338-4605
Fax:  (612) 338-4692
E-mail:  vesades@heinsmills.com

Hollis L. Salzman
Bernard Persky
Gregory S. Asciolla
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile:  (212) 818-0477
E-mail: hsalzman@labaton.com
         bpersky@labaton.com
         gasciolla@labaton.com

Allan Steyer
Simon Goodfellow
**STEYER LOWENTHAL BOODROOKAS ALVAREZ & SMITH LLP**
One California Street, 3d Floor
San Francisco, CA 94111
Telephone: (415) 421-3400
Facsimile:  (415) 421-2234

# Appendix A

## Members of the Hong Kong Board of Airline Representatives

Aer Lingus
Aeroflot
Aerolineas Argentinas
Aeromexico Airlines
Aeromexpress Cargo Airlines
Air Astana
AirBridge Cargo Airlines Limited
Air Canada
Air France
Air Hong Kong
Air India
Air Mauritius
Air New Zealand
Air Niugini
Alitalia
All Nippon Airways
Aloha Airlines
American Airlines
Asiana Airlines
Austrian Airlines
Bangkok Airways
Biman Bangladesh Airlines
BMI British Midland
British Airways
Cargolux Airlines
Cathay Pacific Airways
Cebu Pacific
China Airlines
China National Aviation Corporation
Continental Airlines
CSA Czech Airlines
Delta Airlines
Egypt Air
Emirates
El Al Israel Airlines
Ethiopian Airlines
Etihad Airways
Eva Airways
Evergreen Int'l Airlines
Federal Express Corporation
Finnair
Garuda Indonesia
Gulf Air

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Hahn Air
Hong Kong Airlines Limited
Hong Kong Dragon Airlines
Hong Kong Express Airways Ltd
Japan Airlines
Japan Asia Airways
Jet Airways (India) Ltd
Kalitta Air
Kenya Airways
KLM Royal Dutch Airlines
Korean Air
Lanchile Airlines
Lufthansa Cargo AG
Lufthansa German Airlines
Malaysian Airlines
Martinair Cargo
Myanmar Airways
Nippon Cargo Airlines
Northwest Airlines
Oasis Hong Kong Airlines Ltd
Ocean Airlines Hong Kong Limited
Orient Thai Airlines
Pakistan Int'l Airlines
Philippine Airlines
Polar Air Cargo
Qantas Airways
Qatar Airways
Royal Brunei Airlines
Royal Jordanian
Royal Nepal Airlines
Saudi Arabian Airlines
Scandinavian Airlines System
Singapore Airlines
Sky Express S.A.
South African Airways
SriLankan Airlines
Swiss International
Thai Airways
Transmile Air Services Sdn. Bhd.
Turkish Airlines Inc.
United Airlines
United Parcel Service
US Airways
Varig Brazilian Airlines
Vietnam Airlines
Virgin Atlantic

1

## Appendix B

2

## List of Attendees at May 18, 2004 Meeting of the Thailand

3

## Board of Airline Representatives

4

Mr. Suthep Suebsantiwongse (TG-Chairman)

5

Mr. Axel Blom (SK-Chairman EXCOM)

Ms. J. Rogers (QF/BA(EXCOM Australia))

6

Mr. Pandit Chanapai (TG(EXCOM/Thailand))

Mr. Warren Gerig (UA(EXCOM/N.America))

7

Mr. Kachornsak V. (JL-Chairman AC BA)

Mr. Louis Moser (QF/BA-Chairman AOC)

8

Mr. Smartchai Tuchinda (AF)

9

Ms. Ujala tham (Al)

Mr. Shafiwar Rahman (BG)

10

Mr. Thira K. (BR)

Mr. Nelson Fang (CI)

11

Mr. Yongyut Lujintanon (CX)

Mr. Soonthorn Suree (EK)

12

Ms. Aree H. (GA)

13

Mr. Rakesh Bhatia (IC)

Mr. Kamol V. (JL)

14

Mr. James K. C. Yeung (KA)

Mr. Suchon Paleewong (KE)

15

Ms. Merita Ombuor (KQ)

16

Mr. Ihab Sourial (KL)

Mr. Hamed Almatoq (KU)

17

Mr. Wolfgang Schmidt (LH)

Mr. Ashrat Osmen (MS)

18

Mr. Somnuek Asavaveeradej (NH)

Mr. Sarathool M. (NW)

19

Mr. Buranut Limjitti (OS)

20

Mr. Vorakit Nivatwong (OZ)

Mr. Suchard Buranakarn (PG)

21

Ms. Dell Merano (PR)

Ms. Vatchara Silpohevagitja (PR)

22

Mr. Taleb Hadidi (RJ)

Ms. Wantip Piyamalmas (RJ)

23

Mr. Chokchai Ittipanuvat (TK)

Mr. Esra Pehlivangogli (TK)

24

Mr. Rohan Seneviratne (UL)

25

Ms. Vannasiri (8M)

Guest Mr. Prakobkiat Ninnad (TG (VP, Petroleum Management))

26

27

28

## Appendix C

## List of Recipients of Carol Phatoomros May 24, 2004 E-mail

## Re: Fuel Surcharges

Singapore Air (Tuckwah Tang)
Thai (BAR Chairman Suthep Suebsantiwongse, pandit.c@thaiairways.com)
US (Warren Gerig)
SAS (Alex Blom)
CX (Ivan Chu)
BA (Julianne M. Rogers)
LH (Wolfgang Schmidt)
Emirates (Soonthorn Suree)
Dragon Air (Sutthisak Pungtamawatthanakun, James Yeung)
KLM (Ihab Sorial)
Air New Zealand (Panya Silparjarn)
South Aftican Airways (Annie Tsima)
American Airlines (Prajak Burarak, Chaichan Khongsrithong)
Airline Cargo Busines Association (kachornsak@jalcargobkk.com)
Druk Air (drukair@loxinfo.co.th)
Aloha Airlines (malai@plt.co.th)
Air India (airindia@loxinfo.co.th)
Angel Airlines (info@angelairlines.com)
Air Canada (airagcy@asiaaccess.net.th)
Air France (joroutier@airfrance.fr, potulyaanukij@airfrance.fr)
Finnair (Finnair.Thailand@finnair.com)
Eva Airways (gsiamair@loxinfo.co.th)
Air China (cabkk@asianet.co.th)
China Southern Airlines (bkkcsn@ksc.th.com)
Ethiopian Airlines (bkkam@ethiopianairlines.com)
Indian Airlines (smicbkk@ksc.th.com)
ANA (bkksg@ana.co.th, asava@ana.co.jp)
NWA (sarathool@nwa.com)
Air Macau (deksth@asiaaccess.net.th)
Czech Airlines (prae@guetravel.com)
Asiana (aabkksmz@flyasiana.com)
Bangkok Air (pwiesner@bangkokair.co.th)
Qatar Air (qatarair@loxinfo.co.th)
Varig (varigbkk@federal.co.th)
China Southwest Airlines (szbkk@bkk3.loxinfo.co.th)
Turkish Airlines (tkacct@thy.co.th)
Myanmar Airways (maibkk@asiaaccess.net.th)
Sri Lankan (bkkadmin@srilankan.lk, bkksales@srilankan.lk)
Egypt Air (bkkdm@egyptair-bangkok.th.com)
Korean Air (bkksm@koreanair.co.kr)
Air-MPA (hhansen@mpa-security.com)
Royal Brunei Airlines (bkkprapat@rba.com.bn, bkkwatans@rba.com.bn)

JAL (bkkssm.jal@jal.com)
Gulf Air (bkkszgf@gulfair.co.th)
China Airlines (lin-sen_fang@e-mail.china-airlines.com)
Bangladesh Biman (bimanbkk@loxinfo.co.th)
El Al (elalbkk@hotmail.com)
Qantas (Lmoser@qantas.com.au)
Federal Express (cliftonchua@fedex.com, phaswan@fedex.com)
Lauda Air (sirichanyaW@laudaair.com)
Kuwait Airways (bkk@kuwait-airways.net, airkuwait@yahoo.com)
British Midland (dtwm@lox info.co.th)
Vietnam Air (admin.bkk@vietnam-air.com, Sale.bkk@vietnam-air.com)
Lao Aviation (bkkrrqv@ksc.th.com)
Swiss International Airlien (bsinclai@mail.swiss.com)
Bangkok Airways (suchard@bangkokair.co.th)
Alitalia (korn@bravox.net)
Phillipine Airliens (palphstar@hotmail.com)
Austrian Airilines (Buranut.Limjitti@aua.com)
Kenya Air (kenyaair@loxinfo.co.th)
Air Berlin (Raymond Honings, Markus Moschner)
Silkair (silkair@upc1.loxinfo.co.th)
China Eastern Airlines (musales@ksc.th.com)
Pakistan International Airlines (piabkk@ji-net.com)
Royal Jordanian (bkktbrj@rja.com.jo)
Malaysia Airlines (bkkzqmh@samart.co.th)
LOT (preecha@wondervacation.com)
Garuda Indonesia (secrdmga@box1.a-net.net.th)
Tarom (tarombkk@yahoo.com)
Royal Nepal Airlines (rabkk@cscoms.com)

# Appendix D

## List of Attendees at September 1, 2005 Meeting of the Thailand

## Board of Airline Representatives

Mr. Brian Sinclair-Thompson (LX – President)
Ms. Julianne Rogers (BA/QF – Board)
Mr. Patrick Yeung (CX – Board)
Mr. Soonthorn Suree (EK – Board)
Mr. Sarathool M. (NW – Board)
Mr. Rangsiman Mokkhanasamit (TG – Board)
Ms. Christine Seuge (AF)
Mrs. Ujala Tham (Al)
Mr. A. V. Trindade (Al)
Ms. Neeramun Namalee (Al)
Mr. Malai Sakolviphak (AQ)
Mr. Markku Dravainen (AY)
Mr. Vorakit Nivatvongs (BI)
Mr. Charlie Fu (CI)
Mr. Andy Yao (CI)
Mr. Billy Chomsakorn (EY)
Mr. Teguh Subandrio (GA)
Mr. Comson Leelalumlert (GA)
Mr. John Evans (GF)
Mr. Somporn K. Utasiri (GF)
Mr. S. Iwasaki (JL)
Mr. Chanchai Wangyuenyong (JL)
Mr. Sutthisak P. (KA)
Mr. Suchon Paleewong (KE)
Mr. Nieon Suddhidhanaroq (KQ)
Mr. Wolfgang Schmidt (LH)
Mr. Raymond Honings (LT)
Mr. Howard Noble (MD)
Mr. Kimiya Artma (NH)
Mr. Somnuck Asava (NH)
Mr. Suchard Buranakorn (PG)
Ms. Monet Trespeses (PR)
Mr. Taleb Hadidi (RJ)
Ms. Wantip Piyamalamas (RJ)
Mr. Chokchai Ittipanuvat (SA)
Ms. Punthip Issarungura (SK)
Mr. Eric Wilson (VA)
Mr. Ngayen Nhu Than (VN)
Mr. Gilmore Soe Min (8M)
Mr. Prakit Trongkarmonmas (EY/ACBA Chairman)
Ms. Sopin Daengteth (LX/AOC Chairperson)
Mr. Chitvee Leelasiri (IATA)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Appendix E

## List of Recipients of Carol Phatoomros August 18, 2005

## E-mail Re: Fuel Surcharges

Singapore Air (David Lau)
Thai Airways (vasing.k@thaiairways.com, nn.office@thaiairways.com, wallop.b@thaiairways.com)
United Airlines (Eric Wilson)
SAS (Axel Blom)
CX (Patrick Yeung,
BA (Julianne M. Rogers)
LH (Wolfgang Schmidt)
Tarom (tarombkk@yahoo.com)
JAL (kachornsak@jalcargobkk.com)
Druk Air (drukair@loxinfo.co.th)
Aloha Airlines (malai@plt.co.th)
Air India (airindia@loxinfo.co.th)
Angel Airlines (info@angelairlines.com)
Air Canada (airagcy@asiaaccess.net.th)
Air France (joroutier@airfrance.fr)
Finnair (Finnair.Thailand@finnair.com)
Eva Airways (gsiamair@loxinfo.co.th)
Air China (cabkk@asianet.co.th)
China Southern Airlines (bkkcsn@ksc.th.com)
Emirates (Soonthorn Suree)
Ethiopian Airlines (bkkam@ethiopianairlines.com)
Garuda (secrdmga@box1.a- net.net.th)
Indian Airlines (smicbkk@ksc.th.com)
Dragon Air (Sutthisak Pungtamawatthanakun)
KLM (Ihab Sorial)
LOT (preecha@wondervacation.com)
Malaysia Airlines (bkkzqmh@samart.co.th, mohdali@samart.co.th)
Silkair (silkair@upc1.loxinfo.co.th)
China Eastern Airlines (musales@ksc.th.com)
NW (sarathool@nwa.com)
Air Macau (deksth@asiaaccess.net.th)
Air New Zealand (Panya Silparjarn)
Asiana (aabkksmz@flyasiana.com)
Bangkok Airways (pwiesner@bangkokair.co.th)
Pia (piabkk@ji- net.com)
Qatar Airways (jer@th.qatarairways.com)
China Southwest Airlines (szbkk@bkk3.loxinfo.co.th)
SAA (Nely Kusmin)
Royal Jordanian (thadidi@rja.com.jo)
Cathay Pacific (Alan Tang)
LH (Vanida Charoensombud, lhbkk@samart.co.th)

Dragon Air (Stephen TK Chang)
Turkish Airlines (tkacct@thy.co.th)
Myanmar Airways (bkk.cm@maiair.com)
Sri Lankan Airlines (bkkadmin@srilankan.lk, hussainj@srilankan.aero)
KAL (bkksm@koreanair.co.kr)
Royal Nepal Airlines (rabkk@cscoms.com)
Air- MPA (hhansen@mpa- security.com)
American Airlines (Prajak Burarak, Chaichan Khongsrithong)
Japan Airlines (chanchai.wangyuenyong@jal.com)
Gulf Air (bkkszgf@gulfair.co.th)
China Airlines (Charlie Fu)
Bangladesh Biman (bimanbkk@loxinfo.co.th)
El Al (elalbkk@hotmail.com)
Qantas (Lmoser@qantas.com.au)
Fedex (cliftonchua@fedex.com)
Kuwait Airways (bkk@kuwait- airways.net, airkuwait@yahoo.com)
Srilankan (bkksales@srilankan.aero)
British Midland (dtwm@loxinfo.co.th)
Vietnam Airlines (admin.bkk@vietnam- air.com)
Lao Aviation (bkkrrqv@ksc.th.com)
Lauda Air (TantiprasutP@laudaair.com)
Swiss International (Brian Sinclair-Thompson)
Air France (potulyaanukij@airfrance.fr)
Bangkok Airways (suchard@bangkokair.co.th)
Federal Express (phaswan@fedex.com, ichand@fedex.com)
Alitalia (korn@bravox.net)
Vietnam Airlines (Sale.bkk@vietnam- air.com)
Philippine Airlines (palphstar@hotmail.com)
Austrian Airlines (Buranut Limjitti)
Royal Brunei (vorakitn@rba.com.bn)
ANA (asava@ana.co.jp, k.arima@ana.co.jp, Kuniko Ito)
Air Berlin (Raymond Honings, Markus Moschner)
Myanmar Airways (bkk.cm@maiair.com)
Malaysia Airlines (mohdali@samart.co.th)
Etihad Airways (kalbrow@etihadairways.co.th, asomjaiwongse@etihadairways.co.th)
Kenya Air (Merita Ombour, kenyaair@loxinfo.co.th)
Qatar Airways (mkoleilat@qatarairways.com.qa)
Phuket Airlines (kavida@phuketairlines.com)
Kuwait Airways (bkk@kuwaitairways.com, airkuwait@yahoo.com)
Phuket Airlines (dwpatana@phuketairlines.com)
AOC (sborisut@mail.swiss.com)
JAL (bkkss.jal@jal.com)
Air Madagascar (Howard Noble)
IATA (LEELASIRIC@iata.org)

## Appendix F

### Recipients of Joanne Sotocinal E-mail of May 25, 2004

### Re The Philippines BAR Fuel Surcharge Proposal

China airlines (Yuchih@china-airlines.com)
Royal Brunei Airlines (Mnlagnes@rba.com.bn)
Federal Express (Alex Brandes, Ssdavid@fedex.com)
Korean (koreanmnl@hotmail.com)
Asiana (Hyunil Kim, aamnlsmz@flyasiana.com, Rene01@flyasiana.com)
Air France (mlreyes@airfrance.fr, Lovergeon@airfrance.fr)
Gulf Airways (Bobby Hukom)
DLH (Darryl Modelo, Dietmar Kramer, Jo Portugal)
Singapore Air (David Lau, Nenita Dy, Eugene Chew)
Felix Cruz (PAL)
Kuwait Airways (Manager@kuwaitairways.com.ph, Sales@kuwaitairways.com.ph)
Emirates (Gigie Baroa)
Malaysia Airlines (Malaysia@skyinet.net)
Pakistan International Airlines (Mnluupk@piac.com.pk)
EVA (Jackyu@asia-pacific.evaair.com, Nenitachan@asia-pacific.evaair.com)
PAL (Jing Javier, Tillit Inoturan, Rol_legal)
KLM  (Jose Laurente)
Cebu Pacific Air (Jose Inez, Roland Nunez)
Qatar Airways (manolo@qatarairways.com.ph)
Cathay Pacific (Mark Sutch, Vickie Yue)
American Airways (Mary Ann Marcias)
JAL (Kubo Masanobu)
Alitalia (Benini Mauro)
SAS (Nila Layug)
Swiss (Paul Schenk)
NCA (Tetsuo Sugiyama)
mnlaa@thaimnl.com.ph
Sales@thaimnl.com.ph
czenarosa@globenet.com.ph
svcm@twasp.com
kalkts@hanmail.net
HKVNPH@qinet.net
msadmin@info.com.ph
Mcabanto@mozcom.com
Jcting@info.com.ph
Safaisal@skyinet.net

# Appendix G

# Summary of DOJ Investigation With Respect to Defendants Named in the Transpacific Litigation

| DEFENDANT | AIR CARGO[1] AND/OR AIR PASSENGER[2] DEFENDANT | PLED GUILTY TO US DOJ CRIMINAL CHARGES | US DOJ FINE | FOREIGN INVESTIGATIONS | | | |
|---|---|---|---|---|---|---|---|
| | | | | EC[3] | NZCC[4] | ACCC[5] | CCB[6] |
| AIR NEW ZEALAND | X | | | X | X | | |
| AIR FRANCE/KLM | X | X | $350 million | X | X | X | X |
| ALL NIPPON AIRWAYS CO. LTD | X | | | X | | | |
| BRITISH AIRWAYS | X | X | $300 million | X | X | X | |
| CATHAY PACIFIC AIRWAYS LTD | X | X | $60 million | X | X | X | |
| CHINA AIRLINES | | | | X | | | |
| CONTINENTAL AIRLINES | | | | | | | |
| EVA (TAIWAN) | | | | X | | | |
| JAL (JAPAN AIRLINES INT'L) | X | X | $110 million | X | X | | |
| LUFTHANSA/ SWISS INTERNATIONAL | X | Amnesty Applicant[7] | | X | | X | |
| MALAYSIAN AIRLINES | | | | X | X | | |
| PHILIPPINE AIRLINES | | | | | | | |
| QANTAS (AUSTRALIA) | X | X | $61 million | X | X | X | X |
| SAS (SCANDINAVIAN) | X | X | $52 million | X | | | |
| SINGAPORE AIRLINES | X | | | X | X | X | |
| THAI AIRWAYS | X | | | X | X | X | |
| VIETNAM AIRLINES | | | | | | | |
| | | TOTAL | $933 million | | | | |

[1]**AIR CARGO**
*In re Air Cargo Shipping Services Antitrust Litigation*; US District Court, ED New York, Case no. 06-MD-1775
[2]**AIR PASSENGER**
[3]**EC** - European Commission
[4]**NZCC** - New Zealand Commerce Commission
[5]**ACCC**- Australian Competition and Consumer Commission
[6]**CCB** - Canadian Competition Bureau
leniency and agreed to cooperate with prosecutors in their ongoing investigation.