1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3          BEFORE THE HONORABLE CHARLES R. BREYER, JUDGE


4

5      ------------------------------)
                                     )
6      IN RE: TRANSPACIFIC PASSENGER )
       AIR TRANSPORTATION            )
7      ANTITRUST LITIGATION.         )     C 07-5634 (CRB)
                                     )     No. MDL-1913
8                                    )
       THIS DOCUMENT RELATES TO ALL  )     San Francisco, California
9      ACTIONS.                      )     Tuesday, November 2, 2010
                                     )        (58 pages)
10     ------------------------------)

11

12                  TRANSCRIPT OF PROCEEDINGS

13

       APPEARANCES:

14

15

16     FOR CLASS PlaintiffS      HAUSFELD, LLP
       INTERIM CO-LEAD           44 MONTGOMERY STREET, SUITE 3400
       COUNSEL:                  San Francisco, California 94104
17                          BY:  MICHAEL PAUL LEHMANN, ESQUIRE
                                 CHRISTOPHER L. LEBSOCK, ESQUIRE
18                               358-4980

19

20     FOR PLAINTIFF CLASS:      COTCHETT, PITRE & MCCARTHY
                                 SAN FRANCISCO AIRPORT OFFICE CENTER
21                               840 MALCOLM ROAD
                                 BURLINGAME, CALIFORNIA 94010
                            BY:  JOSEPH COTCHETT, ESQUIRE
22                               STEVEN N. WILLIAMS, ESQUIRE
                                 650-697-0577

23

24

25

```
 1    (FURTHER APPEARANCES:)

 2    FOR PLAINTIFF FRANKLYN AJAYE:

 3    PEARSON, SIMON, WARSHAW & PENNY, LLP
      44 MONTGOMERY STREET
 4    SUITE 2450
      San Francisco, California 94104
 5    BY:  BRUCE LEE SIMON, ESQUIRE
      433-9008
 6
      FOR PLAINTIFF BRENDEN G. MALOOF:
 7
      MINAMI TAMAKI, LLP
 8    360 POST STREET, 8TH FLOOR
      San Francisco, California 94108
 9    398-3887
      BY:  DEREK G. HOWARD, ESQUIRE
10
      FOR DEFENDANT CHINA AIRLINES:
11
      SQUIRE, SANDERS & DEMPSEY, LLP
12    SUITE 500
      1201 PENNSYLVANIA AVENUE, N.W.
13    WASHINGTON, D.C. 20004-2401
      202-626-6780
14    BY: JAMES V. DICK, ESQUIRE

15    FOR DEFENDANT SAS AB:

16    CROWELL & MORING
      1001 PENNSYLVANIA AVENUE, N.W.
17    WASHINGTON, D.C. 20004-2401
      BY:  GEORGE DAVID RUTTINGER, ESQUIRE
18
      FOR ALL NIPPON AIRWAYS, ET AL.:
19
      HOLME ROBERTS & OWEN, LLP
20    560 MISSION STREET, SUITE 2500
      San Francisco, California 94105-2994
21    268-1999
      BY:  JESSE WILLIAM MARKHAM, ESQUIRE
22

23
      (FURTHER APPEARANCES ON NEXT PAGE)
24

25
```

```
1   (FURTHER APPEARANCES:)

2   -AND-

3   CONSTANTINE CANNON LLP
    ONE FRANKLIN SQUARE
4   1301 K STREET, N.W., SUITE 1050 EAST
    WASHINGTON, D.C. 20005
5   202-304-3501
    BY:  DOUGLAS E. ROSENTHAL, ESQUIRE
6
    FOR DEFENDANT SINGAPORE AIRLINES:
7
    LATHAM & WATKINS, LLP
8   555 11TH STREET, NW, SUITE 1000
    WASHINGTON, DC 20004
9   BY:  CHARLES R. PRICE, ESQUIRE
         WILLIAM R. SHERMAN, ESQUIRE
10
    FOR DEFENDANT JAPAN AIRLINES INTERNATIONAL:
11
    STEPTOE & JOHNSON LLP
12  1330 CONNECTICUT AVENUE, N.W.
    WASHINGTON, DC 20036
13  202-429-3902
    BY:  KENNETH P. EWING, ESQUIRE
14       WILLIAM KARAS, ESQUIRE

15  FOR DEFENDANT AIR FRANCE:

16  LINKLATERS, LLP
    1345 AVENUE OF THE AMERICAS
17  NEW YORK, NY 10105
    212-903-9100
18  BY:  JAMES R. WARNOT, JR., ESQUIRE

19

20

21  (FURTHER APPEARANCES ON NEXT PAGE)

22

23

24

25
```

```
1    (FURTHER APPEARANCES:)

2    FOR DEFENDANT CATHAY PACIFIC AIRWAYS:

3    DLA PIPER LLP (US)
     500 8TH STREET, NW
4    WASHINGTON, DC 20004
     202-799-5523
5    BY:  DEANA LOUISE CAIRO, ATTORNEY AT LAW
          DAVID H. BAMBERGER, ESQUIRE
6
     FOR DEFENDANT EVA AIRWAYS:
7
     KIRKLAND & ELLIS LLP
8    333 SOUTH HOPE STREET
     LOS ANGELES, CALIFORNIA 90071
9    213-808-8082
     BY:  CHRISTOPHER T. CASAMASSIMA, ESQUIRE
10
     FOR DEFENDANT VIETNAM AIRLINES:
11
     HOGAN LOVELLS US LLP
12   525 UNIVERSITY AVENUE, 4TH FLOOR
     PALO ALTO, CALIFORNIA 94301
13   650-463-4199
     BY:  ROBERT B. HAWK, ESQUIRE
14        J. CHRISTOPHER MITCHELL, ESQUIRE

15   FOR DEFENDANT AIR NEW ZEALAND:

16   CONDON & FORSYTH LLP
     TIMES SQUARE TOWER
17   7 TIMES SQUARE
     NEW YORK, NEW YORK 10036
18   212-370-4453
     BY:  MICHAEL J. HOLLAND, ESQUIRE
19


20
     (FURTHER APPEARANCES ON NEXT PAGE)
21

22

23

24

25
```

```
 1   (FURTHER APPEARANCES:)

 2   FOR DEFENDANT KONINKLIJKE LUCHTVAART MAATSCHAPPIJ N.V.:

 3   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
     1440 NEW YORK AVENUE N.W.
 4   WASHINGTON, D.C. 20005
     202-661-9008
 5   BY:  GARY A. MACDONALD, ESQUIRE

 6   FOR DEFENDANT QANTAS AIRWAYS, LTD.:

 7   BAKER & MILLER PLLC
     SUITE 300
 8   2401 PENNSYLVANIA AVENUE, N.W.
     WASHINGTON, D.C. 20037
 9   202-663-7849
     BY:  W. TODD MILLER, ESQUIRE
10
     FOR DEFENDANT THAI AIRWAYS:
11
     CRAVATH, SWAINE & MOORE LLP
12   WORLDWIDE PLAZA
     825 EIGHTH AVENUE
13   NEW YORK, NEW YORK 10019-7475
     212-474-3700
14   BY:  RONALD S. ROLFE, ESQUIRE

15   FOR DEFENDANT MALAYSIAN AIRLINE SYSTEM:

16   MCBREEN & SENIOR
     2029 CENTURY PARK EAST, THIRD FLOOR
17   LOS ANGELES, CALIFORNIA 90067
     310-552-1205
18   BY:  DAVID ANDREW SENIOR, ESQUIRE

19   FOR PHILIPPINE AIRLINES, INC.:

20   COVINGTON & BURLING LLP
     ONE FRONT STREET, 35TH FLOOR
21   San Francisco, California 94111
     591-6091
22   BY:  ANITA STORK, ATTORNEY AT LAW

23

24

25
```

```
1    (Tuesday, November 2, 2010)

2                                              (9:35 a.m.)

3              (In open court)

4              DEPUTY CLERK:  Calling case MDL 1913, Case C 07-5634,

5    In re: Transpacific Passenger Air Transportation Antitrust

6    Litigation.

7              Appearances, Counsel?

8              MR. WILLIAMS:  Good morning, your Honor.  Steve

9    Williams, Joseph Cotchett, Cotchett, Pitre & McCarthy, for the

10   plaintiff class.

11             MR. BAKER:  Phillip Baker, for the plaintiffs.

12             MR. LEHMANN:  Michael Lehmann and Christopher Lebsock,

13   Hausfeld LLP on behalf of the class.

14             MR. SHERMAN:  Good morning, your Honor.  William

15   Sherman, Latham & Watkins, for Singapore.

16             MR. WARNOT:  James Robert Warnot, Linklaters, for

17   Air France.

18             THE COURT:  Good morning.

19             MR. MacDONALD:  Gary MacDonald, KLM Royal Dutch

20   Airlines.

21             MR. HAWK:  Robert Hawk, Hogan, Lovells, for defendant

22   Vietnam Airlines.

23             THE COURT:  Good morning.

24             MR. ROSENTHAL:  Good morning, your Honor.  Douglas

25   Rosenthal, Constantine, Cannon, for ANA.
```

```
1          THE COURT:  Good morning.  So let's start where -- oh,

2    sorry, Mr. Cotchett.  Good morning.

3          MR. COTCHETT:  Good morning, your Honor, and may I

4    have one second?

5          THE COURT:  Sure.

6          MR. COTCHETT:  On Friday we filed, as you heard

7    yesterday and asked that you take judicial notice of, the ANA

8    press release.  While we were in court yesterday, the Justice

9    Department issued their press release.  And their press

10   release -- I'm going to hand it up to your Honor and counsel --

11   is a little different than the ANA press release.  With your

12   permission, may I hand it up?

13          THE COURT:  Sure.

14          MR. COTCHETT:  You will note there was a lot of

15   colloquy yesterday, discussion by counsel, about what is the

16   Filed-Rate Doctrine what does it include, what is this, what is

17   that, how do you really do it.  Do you publish, do you not

18   publish.  Well, this makes it very clear what they pled guilty

19   to.  They pled guilty to fixing unpublished passenger fares on

20   tickets purchased in the United States.  Just -- I don't want

21   to argue it, but nowhere in their press release do they talk

22   about unpublished.  In fact, ANA authored unpublished passenger

23   fares to travel agents purchased in the United States.  That

24   also goes to the issue of the domestic effects desk.  We will

25   file with the Court the actual indictment and plea.
```

1          THE COURT:  Thank you.  Mr. Sherman?

2          MR. SHERMAN:  Your Honor, just briefly, we obviously

3   don't object to the Court receiving information about the ANA

4   plea.  As we pointed out in our response to plaintiff's

5   submission on Friday, we don't think that press releases are

6   the best way for the Court to get that information.  It's

7   through the actual Plea Agreement and/or the Information.

8          I note as well that the plaintiffs have highlighted

9   portions of this press release.  There are certainly many

10  things we could say about the ANA plea, and perhaps ANA's

11  counsel will say that.  My point is simply that, to the extent

12  that the Court needs this information as the case goes

13  forward -- and we don't think that the information is relevant

14  to the motions at hand --

15         THE COURT:  Well, it might be.  Let me ask this

16  question:  The charging document, do I have a copy of the

17  charging document, the document to which they pled guilty?

18         MR. COTCHETT:  We will have that this afternoon.

19  That's just coming out.  That's following this announcement.

20         THE COURT:  Okay.  Because it says that they've agreed

21  to plead guilty.  My question is:  Have they pled guilty?

22         MR. SHERMAN:  I'm going to have to let --

23         MR. COTCHETT:  We agree with counsel that look, this

24  is only a press release.  We'll get you the actual --

25         THE COURT:  But maybe the event hasn't happened yet.

1    That's what I'm -- not that it won't happen over some -- in

2    some short order.  But the documents that I think I would look

3    at would be the plea agreement, the charging document, and I'm

4    not sure that I wouldn't look at a statement that a defendant

5    releases in a press release, because it appears to me in some

6    manner it might be an admission.  If the defendant said, Look,

7    I did this, or, I did that, in a press release, in addition to

8    what they say when they enter a plea, I don't know why I

9    wouldn't take notice of that.  What the government says, I'm

10   not quite sure that that's in the same category.

11          MR. COTCHETT:  The bottom line is -- I thought I made

12   it clear -- I just wanted to alert the Court to this, and we

13   will get you the actual charging and plea agreement.

14          THE COURT:  Okay.  Thank you.

15          MR. COTCHETT:  Thank you.

16          MR. ROSENTHAL:  Since I will be speaking --

17          THE COURT:  Do you want to come up so the court

18   reporter can hear you?

19          MR. ROSENTHAL:  Douglas Rosenthal for ANA.  Since I

20   will be speaking shortly for ANA on a motion, I might address

21   our view of what the plea was for -- in fact, I'm prepared to

22   read to the Court -- we don't have a signed plea agreement

23   ourselves -- but I'm prepared to read to the Court what we have

24   agreed to with the Justice Department.

25          THE COURT:  Isn't it better that I take a look -- I

```
 1   mean, I'm not deciding the motion today.  Isn't it better that
 2   I simply get the documents when they are filed, and they speak
 3   for themselves?
 4              MR. ROSENTHAL:  It may be a month before the plea
 5   agreement is released.
 6              THE COURT:  Well, I'm patient.
 7              MR. ROSENTHAL:  Pardon?
 8              THE COURT:  I'm patient.  I have waited 53 years for
 9   the Giants to win a World Series.  I can wait a month.
10              (General laughter)
11              MR. ROSENTHAL:  Absolutely.
12              MR. WARNOT:  James Warnot of Linklaters, and I
13   represent Air France.  And I'm speaking, as you will recall, on
14   behalf of the five European airlines who fly to the United
15   States across the Atlantic ocean, rather than the Pacific
16   ocean, which is the subject matter of this case.
17              Unless you'd like me to, I'm not going to start over
18   again.
19              THE COURT:  Yes.
20              MR. WARNOT:  But let me briefly recap in that, you
21   know, this is the third one of these cases for us.  The other
22   two cases had very similar allegations, but they pertain to
23   markets in which we actually did participate.  And so from our
24   perspective it would be quite ironic if we were to remain in
25   the case in the market where we don't participate.
```

1          But in any event, what I explained to you yesterday is

2     that the complaint does not sufficiently allege that we are in

3     the market and therefore is unsustainable.  It does not

4     sufficiently allege that we service the class as defined in the

5     complaint.

6          Plaintiffs made some efforts to rectify that in their

7     opposing papers.  And what they did is went out and tried to

8     search for whatever they could find that they could throw up

9     and see if it might stick.  And I need to address each of the

10    five airlines separately, and I'll do that very briefly.

11         With respect to Scandinavian and Swiss, they say

12    nothing whatsoever.  So presumably they are conceding that

13    those airlines do not in any way, shape or form service this

14    market.

15         With respect to KLM, they put in a webshot purporting

16    to show a flight from San Francisco to Seoul, South Korea, but

17    what they didn't reveal to the Court is the way you get there,

18    which is in the next page of that screenshot, which we have

19    attached in our request for judicial admission, which shows

20    that the way you get there is you fly from San Francisco back

21    to Amsterdam, switch planes, go from Amsterdam to Seoul, and

22    get there two days later without crossing the Pacific Ocean,

23    and therefore still don't service the class in this case.

24         With respect to Air France, they have dredged up this

25    flight to a piece of France which still exists out in the South

```
1    Pacific Ocean called Tahiti -- Papeete, to be precise.  As an

2    initial matter, we question whether that's even a trans-Pacific

3    flight, given that Tahiti is actually east of Hawaii, and I

4    don't see that anyone is suggesting that Hawaii is -- flights

5    to Hawaii are part of this class.  Check it out.  It is a fact.

6             THE COURT:  East of Hawaii?

7             MR. WARNOT:  Certainly is, by 15 degrees of longitude.

8             THE COURT:  That's like the old thing that Reno is

9    west of Los Angeles.

10            MR. WARNOT:  I just heard that yesterday.

11            (General laughter)

12            MR. WARNOT:  But in fact, it is.  It's nowhere near

13   the rest of the destinations that are purported to be part of

14   this case.

15            But perhaps more importantly, there is not a single

16   allegation anywhere in this complaint that has anything to do

17   with that single route that Air France services.  Even if you

18   assume for a minute that a flight to Tahiti is a trans-Pacific

19   flight, which we do not by any means concede.

20            And then, also importantly, no other coconspirator,

21   named or unnamed, or -- as a defendant, services that route as

22   well.  So there would be no occasion for us, with respect to

23   that route, to conspire with anybody about anything.

24            Then the fifth airline is Lufthansa, and plaintiffs

25   have cited a couple of code shares, and as an initial matter,
```

1    it's our position that a code share is nothing more than an

2    opportunity to conspire and is not evidence of a conspiracy,

3    but perhaps more importantly, with respect to the two code

4    shares that I've identified, Lufthansa has put in some

5    materials from DOT records which are properly noticeable on

6    this motion which demonstrates that as to those flights,

7    they're really just a mechanism for Lufthansa to fill out its

8    global network.  So if they have people who want to go from

9    Frankfort to Auckland, via the states, they can switch to an

10   Air New Zealand plane in LAX, I think it is, but new passengers

11   don't get on the plane there, and the DOT records make that

12   clear.

13           Same thing is true with respect to a United flight

14   from San Francisco to Sydney, I believe it is.  So they haven't

15   demonstrated that we fly those routes.

16           What else do they say?  Well, it's a global conspiracy

17   and you guys were doing something out in Asia and therefore you

18   should be put into this case.

19           As an initial matter, I think if you read the

20   complaint carefully, while that might be one inference that

21   could be drawn, it's not a reasonable one and they certainly

22   don't allege it.  And they've come back in their opposing

23   papers, the thing they point to as an allegation of a global

24   conspiracy is in Paragraph 90 of the complaint, and that is a

25   quote from a DOT press release.  Doesn't say anything about the

1    global conspiracy.

2              But more importantly, what we say about that is, it's

3    really just an attempt to get around the fact that we are not a

4    competitor in the trans-Pacific market.  And if we're not a

5    competitor in the market in question in this case, there's no

6    liability.

7              Now, on top of that, this mantra of global conspiracy

8    has been raised in the FTAIA context as well.  This Enterprise

9    case is a key example.  That's what the plaintiff was trying to

10   allege to keep the defendants in the case for what was purely

11   foreign conduct.  And with respect to us, all our conduct out

12   in Asia is going back to Asia.  None of it's going from Asia to

13   the U.S.

14             So to the extent that they are trying to distinguish

15   *LaFlamme*, for example, in the way they did yesterday by saying,

16   Well, we have all these e-mails about B.A.R. meetings in Hong

17   Kong and B.A.R. meetings in Bangkok and B.A.R. meetings in

18   wherever else -- to the extent that we are mentioned at all, it

19   is not with respect to conduct affecting the United States.

20   It's alleged conduct affecting our flights back to Europe.

21   There could be no way it's with respect to our flights to the

22   United States because we don't have any from Asia.

23             They also try to point to other investigations.  You

24   know the basic rule:  Judge Alsup's decision in Graphics

25   Processing and some of the other cases we've cited, is that

1    other investigations are really not relevant to allegations.

2    When I say other investigations, I mean other conduct.  They

3    come back citing a number of cases, but all the cases they

4    cite, the investigation is with respect to the precise conduct

5    alleged in the complaint.  That's not the case here.  As I said

6    when I started yesterday, as far as we're concerned, for the

7    European carriers, these cases are an attempt to bootstrap

8    problems that we had in our cargo business.

9              With that, I want to briefly turn to the FTAIA and, as

10   Mr. Sherman mentioned yesterday, we're not just going to repeat

11   the argument that was made yesterday, and the reason for that

12   is it's a completely different argument.  We don't have to talk

13   about whether or not our flights are import commerce, because

14   our only flights that emanate and terminate in Asia are flights

15   from Europe.  So it's purely foreign commerce.  You don't cross

16   the boarders of the U.S. in any respect.  As a result, there's

17   no subject matter jurisdiction.  In that regard, this case is

18   much like the *McLafferty* case that Judge Pollack decided in

19   Philadelphia in which the commerce at issue was flights between

20   Europe and Japan.  This, I suppose, could be arguably expanded

21   if you've got other destinations to which we fly, and I can't

22   speak for all the European airlines, but Air France, for

23   example, it goes to Hong Kong, it goes to Bangkok, it goes to

24   Singapore, it goes to Tokyo, etc. from Charles de Gaulle in

25   France.  Not from the U.S.

1          So, as I said, our arguments totally different, but in

2     response what plaintiffs had done is basically take their

3     response to the omnibus motion and cut and paste it into our

4     brief.  That argument is irrelevant to the point we're making.

5     The point we're making is a very simple and very clear one:

6     It's not our market.  That's why we don't belong there.

7          Unless you have any questions, I'll sit down and

8     reserve a few minutes.

9          THE COURT:  Thank you.

10         MR. LEHMANN:  Your Honor, Michael Lehmann, appearing

11    on behalf of the plaintiffs.

12         Let's first talk about Air France.  In Exhibit B to

13    the reply declaration of Thomas McGrath put in by the

14    defendants, it is confirmed that Air France flies directly

15    between Los Angeles and Papeete.  What they don't mention is

16    that the same declaration indicates that Air New Zealand also

17    flies to Los Angeles, Papeete, Auckland route.  Now, they say

18    these aren't trans-Pacific routes.  But consider what happened

19    at the time of the AR meeting.  There the various airlines

20    agreed to impose surcharges across the world on air passenger

21    service with respect to fuel:  $2 for domestic flights, $7.00

22    for regional flights, $15 for intercontinental flights.  That

23    agreement covered flights to Europe, flights to the

24    trans-Pacific, flights to Auckland, flights to Papeete.  It was

25    a global agreement reached there.  So we think the conspiracy

1   that is alleged in the consolidated amended complaint does

2   reach this conduct.

3            Now, we've also alleged that various European

4   characters are in alliance with trans-Pacific carriers and have

5   code sharing agreements with such carriers.  Lufthansa and

6   S.A.S. are part of the Star Alliance.  Air France and KLM,

7   Faster Sky Team.  Air France has code sharing arrangements with

8   Northwest Qantas -- that is JAL.  Lufthansa with Swiss

9   International.  And, according to the McGrath declaration, Air

10  New Zealand.  KLA, JAL.  Northwest, Qantas and Malakes Air.

11  Swiss International as well, Lufthansa, Thai Air and UAL.

12           And I think the DOT reported that have been put before

13  you that show for example a Lufthansa flight originating in

14  Munich and ending in Los Angeles don't quite tell the whole

15  story.  Because you can't tell from those records whether the

16  flight is part of a multi-leg flight where there's a code

17  sharing agreement with an Asian carrier.  And the code sharing

18  agreements are important because what we allege is that the

19  agreement here was to impose these surcharges and fares

20  throughout each leg of the flight.  So when you're buying that

21  ticket in Munich and you want to go to Tokyo, you might fly to

22  Los Angeles and then catch a connecting JAL flight to Tokyo.

23  But the European carrier is charging the surcharge along the

24  entire route.

25           Even if you assume that S.A.S., Swiss International,

1   KLM and these others never flew their own planes or even code

2   shared with others on flights across the Pacific, they're still

3   properly named defendants in the CAC.  Certainly purchases of

4   tickets in the U.S., and these European carriers do fly flights

5   that land in the U.S., are not subject to an FTAIA analysis.

6           And, as we've alleged at length in the complaint, the

7   European carriers were present at these Asian meetings before

8   the imposition of fuel surcharges and fares were the subject of

9   discussion and agreement, and in terms of the FTAIA analysis, I

10  would cite your Honor to Carpet Group International vs.

11  Oriental Rug Importers, cited in our brief.  They're a

12  defendant trade association that did not import any goods into

13  the United States, was nonetheless held to be a proper

14  defendant despite the FTAIA, for conspiring with others who

15  directly did import.

16          I'd like to talk a little bit about what the evidence

17  is with respect to the European careers and these Asian trade

18  associations.  Lufthansa, S.A.S., Air France, KLM and Swiss

19  International were recipients of e-mails concerning the

20  imposition of consensual fueling charges and participated in

21  meetings on May 18th, 2004 and September 1st, 2005, the Thai

22  B.A.R., where those surcharges were set.  Among the

23  participants were Wolfgang Schmidt, Lufthansa, Axel Blom, SAA,

24  Smartchai Tuchinda, Lufthansa, Axel Blom, Ihab Sorial, KLM --

25  they all attended the 2004 meeting.

1          Wolfgang Schmidt, a woman named Christine Seuge, on

2    behalf of Air France, and Brian Sinclair-Thompson, from Swiss

3    International, attended the 2005 meeting.

4          At that latter meeting, the attendees were urged to

5    form a subgroup that would examine base fares and discuss each

6    others fares.

7          European carriers also collectively agreed to fix fuel

8    surcharges with members of the Philippine B.A.R.  An e-mail by

9    Joanne Sotocinal of Philippine Airlines dated May 25th, 2004

10   was sent to representatives of, among others, Air France,

11   mlreyes and Mr. Lovergeon, KLN, Jose Laurente, SSA, Nila Layug,

12   and Swiss International, Paul Schenk, asking for confirmation

13   of the agreement as to the fuel surcharge decided upon in the

14   May 21st meeting of the Philippine B.A.R.

15         The CAC notes that various carriers, including Swiss

16   International, concurred.

17         Swiss International is all part of the -- also part of

18   the Hong Kong B.A.R.  Members of that B.A.R. agreed to

19   coordinate, if you will, surcharge pricing through the

20   organization's airline charges subcommittee.

21         Over and above these BAR's, we have e-mail traffic

22   with European carriers that demonstrate their involvement.  For

23   example, an e-mail dated October 29th, 2004 from JAL confirmed

24   Air France's plans for a 10 Euro fuel surcharge on

25   international flights.  Another e-mail confirms that Lufthansa

1    had increased fuel surcharges on international flights by the

2    exact same amount.  Another e-mail sent in November of 2004

3    illustrate the efforts by JAL to coordinate fuel surcharges

4    with various carriers including Air France, KLM and Lufthansa.

5    An e-mail dated August 18th from Thai airline -- 2005, from

6    Thai Airways -- Carol Faxtufos represented several carriers

7    including S.A.S., Lufthansa, and Swiss International --

8    documents Thai Airways plans for air passenger fuel surcharges,

9    asked that these carriers, quote, "Toe the line with us",

10   unquote.  And informs the recipients that, quote, "We are

11   asking for unity and to be on board with the fuel surcharge."

12          Your Honor, I think there's a question.  If the

13   European carriers have no trans-Pacific flights, and weren't

14   involved in this matter, why were they agreeing to these

15   surcharges at the various Asian BAR's?  I think an answer is

16   provided in the consolidated amended complaint.  We've quoted a

17   finding of the United States Department of Transportation which

18   a participating airline will at times urge competing airlines

19   to raise fares in their market in order to avoid undercutting

20   the fares charged to the airlines own principal markets.

21          And your Honor, this is not just theoretical.  We've

22   alleged more in the complaint.  For example, we allege a JAL

23   e-mail from November of 2004 in which it said it would, quote,

24   "help its competitors implement fuel surcharges in Japan and

25   would then follow the lead of those competitors in their home

1   markets," unquote.

2            This is in the context of previous negotiations on

3   surcharges that JAL had with Air France, KLM and Lufthansa.

4            A Singapore e-mail, Air, e-mail also quoted in the

5   complaint said, "Even if a carrier would not be able to

6   increase the fares from their country, it would benefit from

7   fair increases adopted in other countries.

8            And the minutes of the May 18th 2004 Thai B.A.R.

9   meeting make clear that there was, quote, "stress the

10   importance of having unity among airlines when imposing

11   surcharges for both cargo and passengers."  That document is

12   found at Exhibit A to the declaration of Charles Price put in

13   by defendants.

14            Now, we also talked about the various investigations

15   of Air Cargo, and there is a leniency request from Lufthansa;

16   guilty pleas from S.A.S. Air France and KLM.  This is a related

17   industry.  The Thai B.A.R. minutes from May 2, 2004 reflect

18   that the two were discussed at the same time.  And cases like

19   SRAM and Flash Memory in this district say it is proper to look

20   at guilty pleas and investigations in related industries.

21            Let's talk about some of these cases that the

22   defendants have cited.  The *McLafferty vs. Deutsche Lufthansa*

23   case where the plaintiff alleged he purchased a ticket whose

24   price was fixed in the United States for travel solely between

25   Europe and Japan.  No portion of the flight touched down in the

1   United States.   That's not this case.

2          Centerprize, a British company, sues in the U.S. under

3   U.S. antitrust laws for purchases it made abroad.   No contact

4   in the United States other than the choice of forum.   We think

5   that's entirely different.

6          In the KAL case, also which we discussed a little

7   yesterday, we also pointed out that they're a domestic effects

8   exception.   Dismissal motion was denied on June 25th, 2008 on

9   the grounds that plaintiffs had plausibly alleged restraint on

10   a U.S./Korea route.   The court allowed over two years of

11   discovery and then when the motion came up again it did grant

12   the motion to dismiss on the basis of the fact that the

13   defendant's expert had done an insufficient analysis.

14          We think, as in Air Cargo Shipping Services, the

15   relevant issue here is that Air Cargo Services -- and we think

16   this is true for cargo as well as transportation, that are

17   provided are not rendered in one location, rather than they are

18   performed along the entire transportation route, touching both

19   the country of origin and the country of destination.   And we

20   think in a multi-leg flight, it touches the country of origin

21   and each country of destination.

22          So we think that on FTAIA issue, there are questions

23   here that are raised by the complaint that entitle us to go

24   forward.   We've pled a plausible conspiracy.

25          And I think the point that if I will leave your Honor

1   with is to look at what Judge Illston in the TFT—LCD matter,

2   the issue of FTAIA came up in the context of class version as a

3   defense of certification because it mentioned individual

4   issues, and what Judge Illston held was that the FTAIA defense

5   would be resolved on a common basis, and the determination of

6   whether the defendants import goods, whether defendants conduct

7   is foreign and outside the scope of the Sherman Act, and if

8   foreign conduct is involved, whether the foreign conduct

9   sufficiently affects domestic commerce, were all issues that

10  would be decided on a full and evidentiary record, and we think

11  that is the principal that ought to be applied here.

12          Judge Illston's opinions on that can be found at

13  267 F.R.D. 291, at 307 to —08; and 267 F.R.D. 583 at 599.

14          Thank you, your Honor.

15          MR. WARNOT:  Just a couple of points additionally.

16  The initial point I would make, I still did not hear plaintiffs

17  assert, We fly trans—Pacific routes, because they can't.  What

18  I have heard them assert is supposition that, Why would we be

19  attending a Thai B.A.R. meeting, for example, if we didn't fly

20  those routes?  That's very simple, because we fly between

21  Europe and Thailand.

22          And I would also note on that particular B.A.R.

23  meeting in the complaint it indicates that it was agreed that

24  B.A.R. should come up with a proposal, ellipses, "... with a

25  target implementation date of 1st June, 2004."  What's in the

1  ellipses, but not in the complaint, is "and submit it to the

2  department of Civil Aviation," i.e., for approval, i.e.,

3  petitioning the government and therefore for Pennington.

4          That's the first point I would make.

5          Secondly, he argued that purchases of tickets in the

6  U.S. are not subject to the FTAIA argument.  Well, any

7  purchases of tickets in the U.S. for flights that we had

8  between Europe and Asia are very much subject to that argument.

9  That's *McLafferty*.  That was the precise situation that

10 occurred in *McLafferty* in which Judge Pollack threw the claim

11 out.  So in fact, *McLafferty* is this case.

12         We don't have to revisit the whole FTAIA argument that

13 Mr. Sherman made yesterday -- my colleague began to go down

14 that road -- because there are no U.S. effects at all for us.

15 The question, or the -- what plaintiffs are asking the Court to

16 do is basically exercise jurisdiction over alleged conduct that

17 may have occurred in Asia with respect to purely foreign

18 commerce.  That's the job of courts in other countries, as the

19 Supreme Court held in Amergram.

20         Thank you.

21         THE COURT:  Thank you.  I'd like to hear argument on

22 the -- on the regulatory scheme in Japan.

23         MR. ROSENTHAL:  Your Honor, Douglas Rosenthal for ANA.

24 I make this motion on behalf as well of Thai Airways and China

25 Airlines.  And the argument is based on the very distinctive

1   regulatory structure in Japan.  All defendants fly under

2   bilateral air service agreements, but the U.S./Japan treaty was

3   unique.  It's a very mature treaty.  It was signed two years

4   before the Giants last won the World Series.  It was made while

5   the U.S. and Japan were still at war.  We were occupying Japan

6   without a peace treaty.  So the U.S. had disproportionate

7   influence in the drafting of that treaty.  The U.S. decided

8   that it would benefit U.S. strategic and trading interests to

9   have Japan give it and several U.S. airlines gateway rights to

10  Asia to fly from Japan throughout Asia out of Tokyo.  Japan, a

11  defeated, occupied country, reluctantly agreed, but it said

12  there would be a price for its agreement.  The price which

13  continues and has greatly expanded today was Japan's insistence

14  that it control market access and pricing to help Japanese

15  carriers become established and to be able to survive against

16  American competition.  Japan, through its transport ministry,

17  insisted on comprehensive Japanese anticompetitive regulation.

18  And insisted that it extend even into U.S. markets to regulate

19  fares exiting the United States to Japan.

20          In the 1952 treaty, and in official policy meetings

21  thereafter --

22          THE COURT:  Let's assume that I accept all that --

23  I've read your brief.  Let's assume I accept all that.  Tell me

24  the so-what, the legal so-what, to it all?

25          MR. ROSENTHAL:  The legal so-what is the treaty

```
1   preempts the Sherman Act applying in U.S./Japan aviation.  And

2   it preempts because it -- it preempts really for two reasons.

3   But it preempts because it says that it is displacing

4   competition.  It was adopted by the Congress in 1958, which is

5   68 years after the Sherman Act, and therefore it carves out an

6   exception for this arrangement.

7           Now, to cut right to the heart of it --

8           THE COURT:  Has any court held that?

9           MR. ROSENTHAL:  No.  And this issue has never been

10  raised before.  No court has denied it either.  This is a case

11  of first impression.

12          THE COURT:  Well, we don't know whether that's

13  correct.  Maybe.  Maybe.

14          MR. ROSENTHAL:  I think we would know if it was

15  correct.  I'm quite sure that this has not been challenged

16  before, and one reason it's not been challenged before is that

17  the Justice Department has never sought to enforce U.S.

18  antitrust law before -- against a Japanese airline in this

19  situation.

20          And what I would emphasize to your Honor as

21  particularly telling --

22          THE COURT:  You say that the treaty itself --

23  itself -- implies --

24          MR. ROSENTHAL:  And the implementing regulations by

25  both governments.
```

1      THE COURT:  So you think it would probably be a good

2  idea that I ask the State Department whether that's their

3  interpretation of the treaty?  And -- because you think that it

4  will be consistent with your view?

5      MR. ROSENTHAL:  I'd be delighted for you to ask the

6  State Department, but we've also submitted materials which

7  include materials from the Department of Transportation and the

8  State Department at -- in 1998, the one time that this treaty

9  was amended, and this really I think goes to the heart of why

10  there is preemption.

11      In that 1998 treaty, the language was inserted for the

12  first time -- this was a treaty amendment -- it was an

13  amendment which gave the United States more rights than it had

14  had before, but it also reaffirmed the lack of price

15  competition.

16      And this is what the amendment says:  "Nothing in this

17  memorandum of understanding" -- which is the treaty amendment

18  -- "shall be construed to limit the rights of either party to

19  enforce its domestic competition laws against any airline

20  operating services under this 1998 MOU."  So, long as such laws

21  and regulations do not discriminate on the basis of nationality

22  or any other improper or inappropriate basis.

23      Now, we disagree with the plaintiff as to how you read

24  that language.  But let's assume that the plaintiff's reading

25  is correct, and U.S. domestic antitrust law applies.  That

means that defenses under U.S. antitrust laws also applies.

THE COURT:  They've agreed to that.

MR. ROSENTHAL:  No, they don't.

THE COURT:  They don't?

MR. ROSENTHAL:  They argue that *Southern Motor Carriers* and *Credit Suisse*, both strong Supreme Court decisions, that they shouldn't be applied to a foreign country. They say they're only applicable within our federal system.

But the treaty itself, your Honor, says it has to be applied in the Japanese regulatory context as well.  And here you have under *Southern Motor Carriers* clearly articulated policy -- the evidence of that is overwhelming.  And active supervision.

And to focus your Honor, I have two documents which we submitted which we believe are entitled to judicial notice which do show the review process in Japan from the filing of the application up through its seal of approval by the Japanese ministry to raise fares.  These documents also show, because both of them relate to fuel surcharges, that approval had to be obtained from the carriers of -- in competition with the Japanese carriers, in 14 other Asian nations under the Bilateral Air Services Agreements Japan had with these 14 other nations.

Questions were raised yesterday about the Filed-Rate Doctrine.  Well, did anybody pay any attention to it?  Did

1  anybody do anything in the regulatory agency?  You will see

2  here that there is a seal and signature from the Japanese

3  Ministry of Transport in both of these documents

4  affirmatively --

5      THE COURT:  So these documents -- it's your view that

6  these documents confirm your argument that the Japanese

7  ministry, with respect to tariffs, to setting prices, is

8  vigorous in their supervisory capacity or their -- whatever

9  capacity they have, reviewing them and then accepting them?

10      MR. ROSENTHAL:  Yes.

11      THE COURT:  And it's more complicated than that

12  because they actually have to go after all these other

13  entities, countries or other carriers and so forth, and I don't

14  know, did they solicit their views?  Or did they simply try

15  achieve an agreement?  Or what?

16      MR. ROSENTHAL:  It's more interesting than that, your

17  Honor.  They asked the two Japanese flag carriers, JAL and ANA,

18  to go out and talk to Thai Airways and Air Canada and the other

19  airlines in these other bilateral treaties, and they asked them

20  to get their assent and the assent of their governments to an

21  agreed fuel surcharge increase, and if they don't get it, the

22  Japanese government refuses to give them the fuel surcharge

23  that they're seeking.

24      THE COURT:  Do they have -- we have evidence of that?

25      MR. ROSENTHAL:  Yes.  You have it in I think what's

1    been submitted to you, but also is reflected in those

2    documents.

3         So I guess the point I'm making, I'm focusing on, is

4    that, you know, in *Southern Motor Carriers* you have to have the

5    two prongs of the Mid-Cal test, the clear policy.  Well, the

6    policy is extremely clear, as we set out in our briefs, and the

7    active supervision -- and these documents show the active

8    supervision.

9         We've also submitted transcripts of press conferences

10   and meetings between the United States diplomatic officials in

11   the transportation department and from the State Department in

12   which they review the operation of this treaty, and in which

13   they concede that this treaty does not provide price

14   competition in this market.

15        Furthermore, as we heard yesterday, because the

16   Department of Transportation is very aware that it is not a

17   competitive market in Japan, the Department of Transportation

18   until late in 2008 classified Japan as a Category C country

19   where there wasn't market access and sufficient competition.

20   So the Department of Transcportation actively monitors prices

21   and is required to do so because of this -- being commerce with

22   this nation.

23        This also not just meets the *Southern Motor Carriers*

24   test, but it also meets the Credit Suisse four-factor test.

25   Four factors, you may recall, in Credit Suisse, which cites

1    *Gordon vs. New York Stock Exchange*, are –– the conduct at issue

2    is squarely within the heartland of what the two national

3    transport agencies regulate.  It's squarely in the heartland

4    because this is in the basic treaty, and in the implementation

5    of the treaty.

6              Second, there's a clear authority by treaty and

7    national regulatory law to regulate the price of these air

8    fares.  That's also present.

9              Third, as the documents we have given you here show,

10   and other documents we've submitted, there is active and

11   ongoing agency regulation.  And that factor, which was missing

12   in Tyco, which the plaintiffs cite, is just not relevant here.

13             And fourth, there is a serious conflict between the

14   antitrust and regulatory regimes that would exist if the United

15   States was allowed to bring this international treaty

16   arrangement into your court to be challenged under the

17   antitrust laws.

18             The final point I would make, your Honor, is that if

19   you read the language our way, then the treaty preempts

20   domestic U.S. antitrust enforcement, the language they cite in

21   their brief.  If you apply *Southern Motor Carriers* and *Credit*

22   *Suisse* their way, which you have to do because there can't be

23   discrimination against Japanese regulation, it still wins under

24   the proper exemption from U.S. antitrust law.  And either way,

25   you should dismiss.

```
 1          Now, I've been encouraged to address the question of
 2   the plea that ANA made.  And I am going to take my guidance
 3   from you and leave that for --
 4          THE COURT:  I think I have to look at it -- exactly.
 5   And then I think also the parties should be permitted to make a
 6   submission as to what they feel the import of the documents to
 7   be.
 8          MR. ROSENTHAL:  I agree.  I'm only going to make this
 9   point:  That ANA has not pled to price fixing as to published
10   fares that are the subject of this treaty, including fuel
11   surcharges.  At anytime.  And the U.S. Department of Justice
12   has not alleged that ANA would have violated U.S. antitrust law
13   if it had done so.
14          Thank you.
15          THE COURT:  Thank you.
16          MR. ROSENTHAL:  I'd like to reserve a couple of
17   minutes.
18          THE COURT:  Sure.
19          MR. LEBSOCK:  Good morning, your Honor.  Chris Lebsock
20   for the plaintiffs.
21          It is our position that the state action doctrine and
22   the implied preclusion doctrine of Credit Suisse would not
23   apply to foreign nations.  It's never been held -- those
24   doctrines have never been held to apply to foreign nations.
25   And in fact, when we go back and we look at the underpinnings
```

1   of where state action came from, it's a doctrine that is really

2   a doctrine between the states of the United States and the

3   relationship --

4           THE COURT:  There's no application of the state action

5   doctrine to any foreign corporation, is there?

6           MR. LEBSOCK:  There are no cases like that.  In fact,

7   the only case that's out there is a case that goes in our

8   favor.  It's called *Outboard Marine vs. Postel*, and it's a

9   district court case, I think from 1978, out of the District of

10  Delaware.  And there the Court refused to hold that the state

11  action doctrine -- state action doctrine applied to a foreign

12  company.

13          So our position fundamentally is when you look at the

14  underpinnings of the state action doctrine, what it's really

15  saying there is that the states have a right to regulate unless

16  the federal government speaks to the contrary.  And here the

17  federal government has spoke to the contrary.  The United

18  States Congress in 1979 enacted the International Air

19  Transportation Competition Act.

20          THE COURT:  What about the other argument they have

21  which says, essentially, that, look, we have -- there's a

22  treaty, and the treaty has essentially impliedly overruled or

23  spoken on the issue of whether or not antitrust law should be

24  applied to the establishment of these rates.  I mean, I think

25  their first argument isn't very satisfying.  Their second

```
1    argument gives me some pause because they're saying, Look, we

2    have a -- you know, the government, the United States, entered

3    into treaties with Japan to set these prices in an

4    anticompetitive market, and now suddenly they're -- that's what

5    the treaty is, and the treaty is a law of -- that this court

6    must follow, right?  And it impliedly -- it was enacted after

7    the Sherman Act was enacted, and therefore it speaks to

8    competitive markets and the question of competition in

9    particular areas, and it essentially, by implication -- it's

10   not said directly -- by implication, it permits this type of

11   arrangement.  That's -- I think that's their -- I mean, that's

12   the argument that I'm listening to.

13         The other argument, it's a nice argument, but the one

14   I'm actually listening to is that one.  So why don't you

15   address that?

16         MR. LEBSOCK:  You don't need to pause, then, and

17   here's why.

18         THE COURT:  Okay.

19         MR. LEBSOCK:  Mr. Rosenthal has pointed out that there

20   are these 14 or so other air transport agreements with other

21   nations around the world, that Japan has with these other

22   nations around the world.  What it doesn't say is that

23   transportation agreement and the language in them is not part

24   of the transportation agreement between the United States and

25   Japan.  That transportation agreement -- and that 1998 MOU,
```

1   which reinvigorates it, modifies it, and that Mr. Rosenthal

2   read from, explicitly says -- and reserves the right to the

3   United States to enforce its competition laws.  And you can't

4   have an implied preclusion when you have an express statement

5   that the law of the United States is reserved and can apply

6   under the circumstances.

7            THE COURT:  Okay.  So you take this language, both of

8   you take the language and you read it two different ways.  My

9   question to you is:  Should I ask the State Department how they

10  read it?  They're the people who write the treaties.  There's a

11  mechanism for me doing that.

12           MR. LEBSOCK:  We have no objection to that, your

13  Honor.  But we also would note that ANA, as of Friday,

14  announced it was going to plead guilty to price-fixing of air

15  passenger fares.

16           THE COURT:  Then we ought to get a pretty quick

17  response.

18           (General laughter)

19           MR. LEBSOCK:  Our position is we have no objection to

20  that, your Honor.

21           THE COURT:  Thank you.  Anything further on that

22  point?

23           MR. ROSENTHAL:  Your Honor, the *Outboard* case is no

24  relevant precedent.  It was an artifact of the Cold War and

25  involved the standing of a company which was dominated by the

1    State of Poland, and essentially a trade dispute.  It has no

2    relationship to this treaty.

3            What I would respectfully urge you to consider is that

4    if this is an application of U.S. domestic law that is now

5    permitted under the treaty, then we're talking about the

6    domestic law that ought to include these two doctrines, Supreme

7    Court precedent.  There's nothing that indicates that they have

8    to stop at the water's edge.  And remember, the United States

9    signed this 1998 memorandum of understanding.  So it's saying

10   it agrees that whatever is in U.S. domestic law should be

11   applicable to Japan.  I ask you not to -- quickly dismiss it.

12           THE COURT:  So if the defenses are operative, how do

13   they apply in this particular case?

14           MR. ROSENTHAL:  Well, I think *Southern Motor Carriers*,

15   because of the two-step Mid-Cal test, it fits like a glove.

16           And *Credit Suisse* meets -- hits all of the four

17   criteria of *Gordon*.

18           THE COURT:  *Credit Suisse* has never been implied in

19   this context, has it?

20           MR. ROSENTHAL:  No.  But here we have the help of the

21   United States signing a treaty saying, We have no problem with

22   it applying, and I'm happy to have you go to the State

23   Department on this issue.

24           But Mr. Lebsock I don't think heard me.  What I said

25   was, ANA has not pled guilty to any violation of any

```
1  price-fixing of any air fares that are the subject of these
2  treaties.  It has made no admission that is relevant to this
3  motion to dismiss.
4           THE COURT:  My guess is after this hearing, there may
5  be some discussions as to exactly what's going to be ultimately
6  in the plea agreement, unless it's already been negotiated.
7           MR. ROSENTHAL:  The plea agreement has been
8  negotiated.  And I would be happy if your Honor would indulge
9  me to read to you exactly what ANA has pled to.
10           THE COURT:  We'll wait on that.
11           MR. ROSENTHAL:  Okay.  Fine.  Thank you.
12           THE COURT:  Let's go to the next motion.
13           MR. HAWK:  I'd like to go to Act of State, your Honor,
14  if that's where you're going.
15           THE COURT:  That's fine.  Sure.  Yeah.
16           MR. HAWK:  Good morning, your Honor.  Robert Hawk from
17  Hogan, Lovells arguing on behalf of Vietnam Airlines.
18           We will -- do want to make some arguments a bit later
19  about our own individual motion to dismiss.  But this, what I
20  would like to speak a few moments on now is the Act of State
21  motion to dismiss that's brought on behalf of both Vietnam
22  Airlines and Thai Airways.
23           And your Honor, the essential question posed by the
24  Act of State for this motion is should this Court sit in
25  judgment on the conduct of the sovereign nations of Vietnam and
```

1   Thailand with respect to their conduct in setting international

2   fares as exercised through their state-owned and-managed

3   national airlines, Thai Airways and Vietnam Airlines.

4          To answer this question, really, the logical place to

5   start is:  Who are the defendants here?  And the defendants in

6   this case, your Honor, are both the single national airlines of

7   these two countries.  Both -- they're both state-owned.

8   They're both managed under the direct direction of the

9   government, and according to specific, detailed law in each

10   country.

11          The analogues to these airlines in the United States,

12   your Honor, if you will, would be the National Park Service,

13   the National Forestry service, the U.S. Post Office.  Where the

14   United States has seen that particular otherwise commercial,

15   arguably, activity, important enough in the United States to

16   own it and to direct it.  And that's what -- that's the

17   judgment that Thailand and Vietnam have made about their

18   national airlines.

19          The next question, of course, is whether the claims

20   asserted by these plaintiffs would require this court to sit in

21   judgment on sovereign conduct.  And the answer to that

22   question, your Honor, is indisputably yes.  Just as if it was

23   going to sit in judgment on the conduct of any other agency or

24   organ of the states of Vietnam or Thailand.  Vietnamese law,

25   which we've submitted to your Honor and asked you to take

```
1   judicial notice of, makes that absolutely clear.  Vietnamese

2   law provides that the managers and the chief of Vietnam

3   airlines are chosen by and responsible to the prime minister of

4   the country of Vietnam.  The prime minister himself is

5   designated as responsible for setting airline policies and

6   practices, specifically with regard to the setting of fares,

7   international airline fares.  National law even spells out the

8   particular policies that the prime minister is supposed to give

9   weight to in deciding what the fares are going to be.

10           THE COURT:  Let me go back to yesterday's motion.

11           MR. HAWK:  What, your Honor?

12           THE COURT:  Yesterday's motion.  If I granted the

13  foreign injury claims, injury, you know, outside the United

14  States, would there be anything left in your case?  Would there

15  be anything left for you to defend against?

16           MR. HAWK:  If I'm understanding your -- I'm not sure

17  I'm understand your question.

18           THE COURT:  The allegation is that there's a foreign

19  injury.  That may impact -- it may be domestic injury with

20  respect to the foreign injury, but if I granted the defendant's

21  motion with respect to the FT -- what is it?

22           MR. HAWK:  FTAIA.

23           THE COURT:  Is there anything left against you?

24           MR. HAWK:  No, your Honor.

25           THE COURT:  If I get to this issue.
```

1          MR. HAWK:  I don't think so.  I think there would be

2     nothing left, in the case of Vietnam Airlines.  Because in the

3     case of Vietnam Airlines, like the European carriers, in a

4     sense, Vietnam Airlines does not operate flights into or out of

5     the United States.  It might like to, but it doesn't have the

6     requisite approvals to operate those flights.  So, by

7     definition, we make a separate FTAIA argument to get us out

8     entirely.

9          THE COURT:  Shouldn't I get the state defendant's view

10    as to the applicable of the state doctrine?

11         MR. HAWK:  I don't think it's necessary, your Honor.

12    Obviously if your Honor wants to do, that -- it's fine, and we

13    don't object to it.  But I would make the point that's actually

14    made in the Sabbatino case, the *Banco National de Cuba vs.*

15    *Sabbatino*, where it was, one of the parties raised, you know,

16    shouldn't we find out what the executive branch thinks, should

17    we find out what the state department thinks?  And the Supreme

18    Court said, "Often, the state department will wish to refrain

19    from taking an official position, particularly at a moment that

20    would be dictated by the development of private litigation but

21    might be inopportune diplomatically."

22         THE COURT:  That's right.  I can't require them to

23    state a position.  It's up to them.  There are these things I

24    think they could say other than just ignoring me.  One is --

25    they could always do that, they can do that.  But they can say,

1   We think "X"; We think "Y"; or, We don't wish to take a

2   position at this time.  And they don't have to say why they

3   don't want to take a position.

4           And there's a fourth.  They can come in here anyway.

5   I mean, if they know about the litigation, and I've had that on

6   other occasions, but generally it's with the United States as a

7   party.  Or somehow very much interested in the litigation,

8   clearly they're following it.

9           But that's why I don't find that argument terribly

10  persuasive.  I understand there may be very good reasons for

11  them not to do it.

12          MR. HAWK:  But you're kind of putting them on the

13  spot, if you will, your Honor.

14          THE COURT:  I'm just a district court judge.  Not

15  putting them that much on the spot.

16          MR. HAWK:  I guess the only point is, I don't think

17  you need to do that.

18          THE COURT:  I understand that.

19          MR. HAWK:  Because --

20          THE COURT:  Let me hear from the other side, because I

21  want to see whether --

22          UNIDENTIFIED MAN:  May I say a word on behalf of Thai

23  airways.

24          THE COURT:  Thank you.

25          MR. ROLFE:  Ron Rolfe for Thai Airways Public

1    International Company, Ltd.   Long name.

2           Thai Airways is 51 percent owned by the government of

3    Thailand and it's board of directors.   It's populated by

4    officials of the government.   The only reason I raise this is

5    that Thai does have flights out of the United States.   So -- to

6    Thailand.   So that even if you were to grant the FTAIA

7    motion --

8           THE COURT:  You'd still be in it.

9           MR. ROLFE:  We would still have the Act of State

10   defense which would need to be argued.

11          THE COURT:  I appreciate that.  That was my question

12   to your colleague, and I see there's a difference.

13          Yes.  Come forward.

14          First, a question.  There's no dispute, is there, that

15   both the Vietnam and Thai Airways are sovereigns?

16          MR. LEBSOCK:  We're not going to contest that for

17   purposes of the motion.

18          THE COURT:  And is there any dispute as to whether the

19   acts that are complained about occurred outside the United

20   States or occurred -- basically occurred in their territories

21   as distinct from our territories?

22          MR. LEBSOCK:  Well, most of the conduct that we have

23   alleged in the complaint has occurred in Asia.

24          THE COURT:  Now, is there any Ninth Circuit authority

25   for the proposition that somehow the Act of State Doctrine

1     doesn't apply to commercial transactions?

2            MR. LEBSOCK:  There is, your Honor.

3            THE COURT:  And what is that?

4            MR. LEBSOCK:  It's *Northrup vs. McDonnell Douglas*.

5     The cite is 725 F.2d 1030.  The pin is 1048.  And it's in

6     Footnote 25.  It's a Ninth Circuit case from 1983.  It follows

7     the IAM case, the *International Association of Machinists vs.*

8     *OPEC* case.  And what it says specifically is that purely

9     commercial activity, ordinarily, does not require judicial

10    forbearance under the Act of State Doctrine.  It leaves open

11    the possibility that in some cases, including the case that

12    was -- the IAM case or the OPEC case, where we are talking

13    about a mineral that creates dispute amongst countries, has

14    created war, and is the precious natural resource of many of

15    the states that OPEC constitutes -- in those types of very

16    unusual cases, there is no, even though there is commercial

17    activity involved, the courts have decided that in those types

18    of unusual cases it's better that they do not get involved.

19            That is not this case.  This is a case involving

20    purely commercial activity, where these two defendants and

21    everyone else has reached out to the United States, has

22    obtained permission to land their planes here, and in exchange

23    for that, as is said in the Lake Airways case cited in our

24    case, they agreed to be bound by our laws.  They agree, as the

25    foreign sovereigns to sue and be sued in the United States for

1  transportation, both ways, between the United States and their

2  countries.  And they are operating under a regime where the

3  Congress has said that the Sherman Act shall remain fully

4  applicable -- those are their words -- to foreign air

5  transportation.

6          Congress has followed that up by enacting U.S. 49 USC,

7  Section 49308, and that section provides for immunity to the

8  extent that the airlines, including Mr. Rosenthal's clients,

9  come to the United States, apply to the Department of

10  Transcportation, and receive approval to engage in

11  anticompetitive collective agreements.

12          And what none of these airlines have done, including

13  Thai Airways, including Vietnam Airways, is come to the United

14  States and get that approval for this conduct that's involved

15  in this case.

16          So we do think that this is a -- the typical type of

17  case where the commercial exception applies.

18          Now, it is controversial in some respects.  There's

19  been discussion in the case about whether there is a commercial

20  activity exception to the Act of State Doctrine that's

21  analogous to what's in the Foreign Sovereign Immunities Act.

22  Even if it is true that there is, standing alone, a pure

23  commercial activity exception -- and we think *Northrup* stands

24  for that proposition -- there is no official action here.  And

25  what we're talking about is a governmental decree, a

1    legislative decree, or a formal order of repudiation.  And what

2    we know is that the evidence that's been submitted by these

3    defendants does not say that the states of Thailand and Vietnam

4    approve of price-fixing.  That's not at all what they're

5    saying, and there has been no official approval or decree

6    endorsing that.

7            They also do not repudiate, officially -- or

8    unofficially, even -- their bilateral air transport agreements

9    with the United States.  And those agreements that were agreed

10   upon between the governments of the United States and Thailand

11   and Vietnam say, in Section 12 on pricing, that pricing shall

12   be governed by commercial considerations in the marketplace.

13   It is not governed by state decrees about what the price should

14   be or orders of price-fixing or anything like that.

15           So at bottom, there is no Act of State concern here.

16   Okay.

17           THE COURT:  Okay, thank you.

18           MR. HAWK:  Just to respond to the points made:  First

19   of all, with regard to the commercial and -- so-called

20   commercial exception, in the context of foreign sovereign

21   immunities, it's one thing.  It exists by virtue of the statute

22   itself.

23           With regard to the Act of State doctrine, the Supreme

24   Court has spoken on it once, and when the Supreme Court spoke

25   on it, five justices declined to accept it.  Four justices did.

1    Five declined not to accept a commercial exception.

2              In the *IAM* case in the Ninth Circuit, the Ninth

3    Circuit was explicit:  There is no commercial exception for Act

4    of State doctrine in the Ninth Circuit.

5              The *Northrup* case does not remotely reverse what *IAM*

6    had to say, your Honor.  It does not apply a commercial

7    exception as the basis of a ruling in that case.  The -- with

8    regard to the notion the plaintiff's counsel brings up aboutu

9    Vietnam or Thailand agreeing to be bound by U.S. law, that is

10   all in the context of foreign sovereign immunity or other

11   specific statutory wavers.  That is not what the Act of State

12   doctrine is about.  That is a straw man argument.  It has

13   nothing to do with what we're arguing.

14             With regard to counsel's argument that, Well, Vietnam

15   and Thailand, they haven't really adopted price-fixing as a

16   national policy, so you're not really sitting in conduct on

17   that -- sitting in judgment on that kind of conduct, that

18   ignores reality, your Honor.  Under Vietnamese law, there are

19   four -- there are three directives on what the prime minister

20   and the civil aviation department are supposed to consider in

21   setting prices:

22             One is the development of Vietnam's air service, which

23   is just getting off the ground, so to speak, your Honor, it's

24   not -- and it hasn't been around for that many years.

25             Second of all, consistency with a social and economic

```
1   policies of the communist party and the state.
2              Third, discharge of obligations with regard to the
3   State budget.  What's not there is compliance with the U.S.
4   Sherman Act.  Your Honor, if you would continue to have Vietnam
5   and Thailand in this case, you would necessarily be sitting in
6   judgment on the conduct of sovereigns.  And for that reason
7   alone, regardless of what the State Department might say or not
8   say, these two defendants should be dismissed.
9              With regard to the ATA agreements, which was the last
10  point brought up by counsel, a separate argument on that, I'd
11  like to defer to when we argue about that, if that's okay.
12             THE COURT:  Okay.  Thank you.
13             MR. SHERMAN:  With respect to the next two motions on
14  our list, the relation back motion and the fraudulent
15  concealment motion, I believe that the parties have made those
16  motions, are prepared to submit on the papers, unless you have
17  specific questions.
18             THE COURT:  I don't.  Submitted.
19             MR. SHERMAN:  And similarly, on the individual motions
20  to dismiss, as Mr. Hawk mentioned, he may have a few comments.
21  I don't know if any other counsel have particular points.
22             THE COURT:  I mean, many of the issues have already
23  been addressed.  So there's no reason to.
24             MR. SHERMAN:  As we said in the beginning yesterday,
25  we don't intend to have anybody go over, but counsel certainly
```

1    want to go over any questions you might have.

2                THE COURT:  I don't have any questions.

3                MR. SHERMAN:  If I may turn it back over to Mr. Hawk

4    for the brief comments that he wanted to make.

5                MR. HAWK:  Your Honor, two points really to make

6    individually on behalf of Vietnam Airlines, additional points:

7                One would be the argument that we made with regard to

8    the ATA, the treaty, the executive agreement.  And there, all

9    Vietnam Airlines is asking this Court is to have its agreement

10   with the United States enforced according to its plain terms.

11   There are three bits of protocol language in that air transport

12   agreement.  The first is that each party should allow prices

13   for air transportation to be established by the designated

14   airlines based upon commercial considerations in the

15   marketplace.  It's mandatory language.  It says:  This is how

16   we're going to treat pricing, as an agreement between these two

17   countries.

18               It also contemplates intervention, that one side or

19   the other's going to have some problems with a price

20   established by one of the national -- by one of the designated

21   airlines.  In that event, intervention by the United States

22   government or the Vietnamese government is limited to three

23   specific situations:

24               One of those three circumstances is the protection of

25   consumers from unreasonably high prices or prices due to abuse

1    of a dominant position.  So there is some contemplation that

2    there might be an issue, an antitrust issue, a price-fixing

3    issue, perhaps, but with regard to such unilateral

4    intervention, it is specifically limited to what the treaty,

5    what the executive agreement says.  That is the only way that

6    we're going to permit unilateral intervention by either side is

7    through diplomatic consultations.  And if those diplomatic

8    consultations don't work, what the agreement says is that the

9    price shall go into effect or remain in effect.

10           And so if you just read the -- I mean, if this was a

11   contract between two parties in a contract case, there would

12   really be no issue.  The plain language of this agreement is

13   absolutely irreconcilable with plaintiff's claims here, because

14   plaintiff's claims want to have you as the judiciary, one of

15   the three branches of the U.S. government under the

16   Constitution, to tell the government of Vietnam that, No, I

17   don't care what the treaty says, I have some parties before me

18   that are complaining about these prices and so I'm going to

19   enter judgment against you, Vietnam Airlines.

20           That is absolutely irreconcilable with this executive

21   agreement, your Honor.  The only argument they have is that the

22   Court is not the same thing, we really have private parties,

23   the Court is not part of the United States government.  That's

24   just not right, your Honor, under the -- it's a basic

25   constitutional precept, of course.  And we cite authorities

1   from international law and other authorities.

2           THE COURT:  Am I bound to follow the treaty?

3           MR. HAWK:  You are.

4           THE COURT:  Supreme law of the land, isn't it?  Like

5   the Constitution?  And when I looked at it last -- I have a

6   copy of the constitution.

7           MR. HAWK:  It was passed after this treaty was entered

8   into, long after the Sherman Act, your Honor, and so by that

9   token trumps the Sherman Act, if you will.

10          THE COURT:  Okay.  Thank you.

11          MR. HAWK:  The only other thing that I wanted to

12  mention, your Honor -- and I can do it while I'm standing up

13  here.

14          THE COURT:  Okay.

15          MR. HAWK:  Is *Twombly*.

16          THE COURT:  Pardon me?

17          MR. HAWK:  The only other --

18          THE COURT:  Is what?

19          MR. HAWK:  *Twombly*.  I just wanted to point out, our

20  particular circumstance --

21          THE COURT:  I don't want to hear about *Twombly*.  I've

22  heard enough about *Twombly* already.

23          MR. HAWK:  How we're different, your Honor.

24          THE COURT:  If you want to make an argument --

25          MR. HAWK:  I appreciate it, your Honor.  Vietnam

```
1    Airlines is different, all right, in very important ways.
2    Number 1, there is no parallel conduct alleged against Vietnam
3    Airlines.  You've had plaintiffs stand up here and tell you
4    that, Well, if we have parallel conduct and we have a little
5    sprinkling of something else, we have enough, we have enough
6    for a plausible claim.  With regard to Vietnam Airlines, there
7    is no parallel conduct.  There are no fares, no lockstep fares
8    alleged.  And the only table -- the only thing they point to is
9    this table of surcharges where it shows -- and I've forgotten
10   what paragraph it is; I bet plaintiffs will remind me, in the
11   complaint -- but those are all surcharges out of Hong Kong.
12   And the critical point, your Honor, is that out of Hong Kong,
13   Vietnam Airlines does not fly to the United States.  They don't
14   fly to the United States in any event, but they also don't --
15   there's no code share out of Hong Kong into the United States.
16   There is no parallel conduct.
17          Second of all, your Honor, the talk about pleas, plea
18   agreements and criminal investigations.  Attached to their
19   complaint is a table that sets out who that covers, and in
20   fact, they affirmatively allege that Vietnam Airlines is not
21   implicated in any of that, your Honor.
22          So, because Vietnam Airlines doesn't fly to the United
23   States or from the United States, and because of these other
24   issues, we think we're -- there's not a plausible claim against
25   Vietnam Airlines.
```

1          MR. WILLIAMS:  Your Honor, Steve Williams for the

2     plaintiffs.

3          I want to briefly respond on the air transport

4     agreement argument.  I believe Mr. Lehmann will briefly respond

5     on that small *Twombly* argument.

6          In terms of the air transport agreement, as with most

7     or many of the arguments that you've heard from defendants in

8     these two days, there's no cases that support what they're

9     asking you to do.  And the closest cases that there are go

10    against them.  And the closest cases that you're going to find

11    is the *Laker* case, which looked at the same type of treaty and

12    with the same type of arguments, and said, "As to the parties

13    there, you're not immune from the domestic antitrust laws of

14    the United States; you're subject to them."

15         In the *Airline Pilots* case, which again involved an

16    argument that the air transport agreements just like these ones

17    at issue here, precluded labor laws, the Court said no.

18         In a case Vietnam didn't cite, but Philippine and Thai

19    cited -- I don't know if they're going to get a chance to

20    argue -- called Leminster, they both cited this case in their

21    reply brief and they say the ATA's preempt U.S. labor laws.

22    Cited a case by Judge Jenson.  They didn't tell your Honor that

23    the Ninth Circuit reversed that and said, No, that's not true,

24    their transport agreements don't preempt U.S. labor laws.

25         So they don't preempt labor laws, they don't preempt

1   Title VII discrimination laws, and they don't preempt

2   competition laws.  That's what the courts who have looked at

3   this have said.  And what Congress has said is that the

4   antitrust laws are fully applicable to air transportation.

5          What the Supreme Court says is that prices are to be

6   set by competition, as Congress has said, and limitations from

7   that, exceptions from that, are to be narrowly construed.

8          What the Braniff case that we cited to you says is

9   grants of immunity are extremely rare, and antitrust exposure

10  is a normal risk of doing business in an unregulated

11  competitive environment, consistent with everything that we've

12  been telling you that DOT and Congress has said when they

13  passed these laws.  They've not given you a basis to conclude

14  that the conduct at issue here is preempted.  And they say,

15  Well, your Honor, if you act, if this court acts, then you're

16  violating this agreement.

17         The cases they've cited to don't say that.  They cite

18  a case where the Russian federation is sued and judgment is

19  held against it, and then the Russian government comes and

20  says, That's not us.  And the case says, in that context,

21  you're the same thing.  To say that private parties suing to

22  vindicate their rights under the Sherman Act in this court are

23  the same thing --

24         THE COURT:  Focusing more -- I'm going back and

25  thinking about your argument about the labor laws as an

```
1   example.  And let's say Vietnam or Vietnamese Airlines has a
2   policy that would clearly violate the labor laws of the United
3   States.  They employ underage people or they work 22 hours or
4   something.  I mean, some violation of labor law.  Are you
5   saying that -- and it's set by a sovereign.  That is to say,
6   it's owned by the country, so the country sets those
7   regulations and so forth.  Are you saying that somehow that's
8   actionable in the United States?
9          MR. WILLIAMS:  In Airline Pilots 748 F.2d at Page 969,
10  the Fifth Circuit -- I think that's the exact issue they looked
11  at.  And they said, "We are not persuaded that parties to the
12  air transportation agreement intended that a dispute between
13  private parties was to be arbitrable under the agreements
14  provisions that involve labor laws."
15         And the case, the Judge Jensen case, the Leminster
16  case, that was a discrimination case where they said, We can
17  just use our own people.  And they said, No, you have to comply
18  with U.S. laws.
19         They're asking you to go further than the cases permit
20  you.
21         THE COURT:  Let me find out how counsel distinguishes
22  that.
23         MR. WILLIAMS:  Thank you.
24         THE COURT:  I don't want to hear about Twombly
25  anymore.
```

1          MR. HAWK:  Noted, your Honor.

2          Just with respect to the case citations that

3    plaintiff's counsel referred to, the *Laker* case, if the Court

4    can divine any principal out of the *Laker* case, it's doing a

5    lot better than I have been able to do.  It is a case in a very

6    complicated procedural situation that really does not bear

7    on -- it makes some comments about the -- makes some comments

8    about the Act of State doctrine; makes some comments about

9    ATA's, but there's nothing in that case inconsistent with the

10   proposition that we have put before your Honor, which is:

11          If you look at the plain language of what is in this

12   treaty and then you look at what these plaintiffs, what their

13   claims are and what they are focused on, that's enough.  I

14   mean, these other cases -- the same thing with Liminster, ATA's

15   don't preclude labor laws.  Some court found that and looked at

16   the provisions and came to that conclusion, but that's not

17   what's before this court.

18          MR. ROLFE:  I have one thing, if I might.  And that is

19   with respect to the airline transport case -- Ron Rolfe for

20   Thai Airways, forgive me.

21          With respect to the Airline Pilots Association case,

22   the Court found that there was an explicit subjugation of the

23   ATA, there was an express exemption of the ATA for the Railway

24   Labor Act and other domestic employment statutes.  And what the

25   Court says is, quote, "The express language of the ATA and

1   airline pilots reflects that the parties did not intend the

2   agreement to replace relevant domestic labor law."

3          Here what you have is a comprehensive scheme, as

4   Mr. Hawk says, in Thailand for regulation, for consultation

5   between the governments, and pricing.  The Vietnam statute is

6   almost identical to the Thai statute.

7          THE COURT:  Thank you.

8          MR. WILLIAMS:  If I may, very briefly, I'm reminded on

9   the issue of ATA that we're all talking about right now, the

10  decision that we submitted to this Court after briefing was

11  done, that came out of the Eastern District of Brooklyn in the

12  *Air Cargo* case that Magistrate Judge Poresky issued, Judge

13  Gleeson yesterday affirmed, considered this issue, and it

14  addresses the same arguments that this Court is addressing.

15  We'd like the Court to note that.

16         MR. SHERMAN:  Your Honor, I just want to check and

17  make sure whether there are any other defendants who want to

18  speak.  I don't see anyone.

19         That concludes our arguments on the motion.  As you

20  know, we've submitted a case management conference with

21  plaintiffs.

22         THE COURT:  What I'm going to do -- don't you think

23  it's better for me to -- before you do anything, other than I'd

24  like a submission on the pleas of --

25         MR. COTCHETT:  On the DOJ.

```
1          THE COURT:  I'd like that.  I don't know to what
2    extent, and I think I have to go through things, that I want
3    inquiries or I'm going to suggest that inquiries be made to the
4    State Department or the Department of Transcportation.  I mean,
5    that's a -- you know, that causes a certain amount of
6    inconvenience to all sorts of people.  And maybe it's warranted
7    and maybe it isn't.  And it may depend on how I answer other
8    things.
9          And so I want to go through some analysis, and then
10   I'll write something, and then we'll all get together again to
11   discuss what I've written.
12         MR. SHERMAN:  We agree completely, your Honor.  Thank
13   you.
14         THE COURT:  Nobody wants to go in and start taking
15   more depositions.
16         MR. COTCHETT:  No.  That makes sense, your Honor.
17         THE COURT:  All right.  Well, obviously, it's been
18   very interesting.
19         MR. LEBSOCK:  Just one other thing, though:  I think
20   we did have an agreement that 15 days after the motion to stay
21   was denied, that we would do some initial, you know, initial
22   disclosures and that sort of thing.  And I think from the
23   plaintiff's perspective we are prepared to go forward with
24   that, if there's no objection from Mr. Sherman.  At least that
25   limited stuff should happen.
```

1          MR. SHERMAN:  With the Court's guidance.

2          THE COURT:  Well, you know, I always take the position

3   that these -- the Rule 26 disclosures and so forth? -- that

4   it's a good idea to do that.

5          MR. SHERMAN:  All right, your Honor.  We did say we'd

6   do those.

7          THE COURT:  Then I think you should honor that, and I

8   think that's important.  But it won't -- obviously doesn't

9   impact anything that I have before me.  At least, I don't think

10  so.

11         MR. SHERMAN:  Thank you, your Honor.

12         THE COURT:  Thank you very much for coming.

13         MR. COTCHETT:  Thank you, your Honor.

14         MR. SHERMAN:  Thank you.  Thank you.

15         MR. LEHMANN:  Thank you.

16         MR. LEBSOCK:  Thank you.

17         MR. WILLIAMS:  Thank you.

18         (Adjourned)

19                           oOo

20

21

22

23

24

25

1

2

3

4

5                    <u>CERTIFICATE OF REPORTER</u>

6

7          I, Connie Kuhl, Official Reporter for the United
     States Court, Northern District of California, hereby certify
           that the foregoing proceedings were reported by me, a certified
8    shorthand reporter, and were thereafter transcribed under my
     direction into written form.

9

10   _____

11                    Connie Kuhl, RMR, CRR
                  Monday, November 22, 2010

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Connie Kuhl, Certified Realtime Reporter
Official Reporter - USDC  (415) 431-2020