PAGES 1 – 87

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CHARLES R. BREYER, JUDGE

IN RE: TRANSPACIFIC PASSENGER AIR       )
TRANSPORTATION ANTITRUST LITIGATION,    ) C 07-5634 CRB
                                        ) NO. MDL-1913
                                        )
                                        )SAN FRANCISCO, CALIFORNIA
THIS DOCUMENT RELATES TO ALL            )MONDAY
ACTIONS.                                )NOVEMBER 1, 2010
_____)1:00 O'CLOCK P.M.


**TRANSCRIPT OF PROCEEDINGS**


**APPEARANCES:**

**FOR CLASS PLAINTIFF**S       HAUSFELD, LLP
INTERIM CO-LEAD                44 MONTGOMERY STREET, SUITE 3400
COUNSEL:                       SAN FRANCISCO, CALIFORNIA 94104
                        BY:    **MICHAEL PAUL LEHMANN, ESQUIRE**
                               **CHRISTOPHER L. LEBSOCK, ESQUIRE**
                               358-4980


**FOR PLAINTIFF CLASS:**       **COTCHETT, PITRE & MCCARTHY**
                               SAN FRANCISCO AIRPORT OFFICE CENTER
                               840 MALCOLM ROAD
                               BURLINGAME, CALIFORNIA 94010
                        BY:    **JOSEPH COTCHETT, ESQUIRE**
                               **STEVEN N. WILLIAMS, ESQUIRE**
                               650-697-0577

FURTHER APPEARANCES ON NEXT PAGE.

*REPORTED BY:    KATHERINE WYATT, CSR 9866, RMR, RPR*

*OFFICIAL REPORTER - US DISTRICT COURT*

```
1   FURTHER APPEARANCES:

2   FOR PLAINTIFF FRANKLYN AJAYE:

3   PEARSON, SIMON, WARSHAW & PENNY, LLP
    44 MONTGOMERY STREET
4   SUITE 2450
    SAN FRANCISCO, CALIFORNIA 94104
5   BY:  BRUCE LEE SIMON, ESQUIRE
    433-9008
6

7   FOR PLAINTIFF BRENDEN G. MALOOF:

8   MINAMI TAMAKI, LLP
    360 POST STREET, 8TH FLOOR
9   SAN FRANCISCO, CALIFORNIA 94108
    398-3887
10  BY:  DEREK G. HOWARD, ESQUIRE

11

12  FOR DEFENDANT CHINA AIRLINES:

13  SQUIRE, SANDERS & DEMPSEY, LLP
    SUITE 500
14  1201 PENNSYLVANIA AVENUE, N.W.
    WASHINGTON, D.C. 20004-2401
15  202-626-6780
    BY: JAMES V. DICK, ESQUIRE
16

17  FOR DEFENDANT SAS AB:

18  CROWELL & MORING
    1001 PENNSYLVANIA AVENUE, N.W.
19  WASHINGTON, D.C. 20004-2401
    BY:  GEORGE DAVID RUTTINGER, ESQUIRE
20

21  FOR ALL NIPPON AIRWAYS, ET AL.:

22  HOLME ROBERTS & OWEN, LLP
    560 MISSION STREET, SUITE 2500
23  SAN FRANCISCO, CALIFORNIA 94105-2994
    268-1999
24  BY:  JESSE WILLIAM MARKHAM, ESQUIRE

25  FURTHER APPEARANCES ON NEXT PAGE.
```

```
 1   FURTHER APPEARANCES:

 2   AND

 3   CONSTANTINE CANNON LLP
     ONE FRANKLIN SQUARE
 4   1301 K STREET, N.W., SUITE 1050 EAST
     WASHINGTON, D.C. 20005
 5   202-304-3501

 6   BY:  DOUGLAS E. ROSENTHAL, ESQUIRE

 7   FOR DEFENDANT SINGAPORE AIRLINES:

 8   LATHAM & WATKINS, LLP
     555 11TH STREET, NW, SUITE 1000
 9   WASHINGTON, DC 20004
     BY:  CHARLES R. PRICE, ESQUIRE
10        WILLIAM R. SHERMAN, ESQUIRE

11

12   FOR DEFENDANT JAPAN AIRLINES INTERNATIONAL:

13   STEPTOE & JOHNSON LLP
     1330 CONNECTICUT AVENUE, N.W.
14   WASHINGTON, DC 20036
     202-429-3902
15   BY:  KENNETH P. EWING, ESQUIRE
          WILLIAM KARAS, ESQUIRE
16

17   FOR DEFENDANT AIR FRANCE:

18   LINKLATERS, LLP
     1345 AVENUE OF THE AMERICAS
19   NEW YORK, NY 10105
     212-903-9100
20
     BY:  JAMES R. WARNOT, JR., ESQUIRE
21

22   FURTHER APPEARANCES ON NEXT PAGE.

23

24

25
```

 1    **FURTHER APPEARANCES:**

 2    **FOR DEFENDANT CATHAY PACIFIC AIRWAYS:**

 3    **DLA PIPER LLP (US)**
      500 8TH STREET, NW
 4    WASHINGTON, DC 20004
      202-799-5523
 5    **BY:  DEANA LOUISE CAIRO, ATTORNEY AT LAW**
      **      DAVID H. BAMBERGER, ESQUIRE**
 6

 7    **FOR DEFENDANT EVA AIRWAYS:**

 8    **KIRKLAND & ELLIS LLP**
      333 SOUTH HOPE STREET
 9    LOS ANGELES, CALIFORNIA 90071
      213-808-8082
10    **BY:  CHRISTOPHER T. CASAMASSIMA, ESQUIRE**

11

12    **FOR DEFENDANT VIETNAM AIRLINES:**

13    **HOGAN LOVELLS US LLP**
      525 UNIVERSITY AVENUE, 4TH FLOOR
14    PALO ALTO, CALIFORNIA 94301
      650-463-4199
15    **BY:  ROBERT B. HAWK, ESQUIRE**
      **      J. CHRISTOPHER MITCHELL, ESQUIRE**
16

17    **FOR DEFENDANT AIR NEW ZEALAND:**

18    **CONDON & FORSYTH LLP**
      TIMES SQUARE TOWER
19    7 TIMES SQUARE
      NEW YORK, NEW YORK 10036
20    212-370-4453
      **BY:  MICHAEL J. HOLLAND, ESQUIRE**
21

22    FURTHER APPEARANCES ON NEXT PAGE

23

24

25

```
 1    FURTHER APPEARANCES:

 2    FOR DEFENDANT KONINKLIJKE LUCHTVAART MAATSCHAPPIJ N.V.:

 3    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
      1440 NEW YORK AVENUE N.W.
 4    WASHINGTON, D.C. 20005
      202-661-9008
 5    BY:  GARY A. MACDONALD, ESQUIRE

 6

 7    FOR DEFENDANT QANTAS AIRWAYS, LTD.:

 8    BAKER & MILLER PLLC
      SUITE 300
 9    2401 PENNSYLVANIA AVENUE, N.W.
      WASHINGTON, D.C. 20037
10    202-663-7849
      BY:  W. TODD MILLER, ESQUIRE
11

12    FOR DEFENDANT THAI AIRWAYS:

13    CRAVATH, SWAINE & MOORE LLP
      WORLDWIDE PLAZA
14    825 EIGHTH AVENUE
      NEW YORK, NEW YORK 10019-7475
15    212-474-3700
      BY:  RONALD S. ROLFE, ESQUIRE
16

17    FOR DEFENDANT MALAYSIAN AIRLINE SYSTEM:

18    MCBREEN & SENIOR
      2029 CENTURY PARK EAST, THIRD FLOOR
19    LOS ANGELES, CALIFORNIA 90067
      310-552-1205
20    BY:  DAVID ANDREW SENIOR, ESQUIRE

21    FURTHER APPEARANCES ON NEXT PAGE

22

23

24

25
```

```
 1    FURTHER APPEARANCES:

 2    FOR PHILIPPINE AIRLINES, INC.:

 3    COVINGTON & BURLING LLP
      ONE FRONT STREET, 35TH FLOOR
 4    SAN FRANCISCO, CALIFORNIA 94111
      591-6091
 5    BY:  ANITA STORK, ATTORNEY AT LAW

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1   NOVEMBER 1, 2010                            1:00 O'CLOCK  P.M.

2

3                        P R O C E E D I N G S

4        THE CLERK:  CALLING MDL 1913, CASE C07-5634, IN RE:

5   TRANSPACIFIC PASSENGER AIR TRANSPORTATION ANTITRUST LITIGATION.

6        APPEARANCES, COUNSEL.  IF YOU WOULD COME FORWARD AND

7   MAKE YOUR APPEARANCES.

8        MR. WILLIAMS:  GOOD AFTERNOON, YOUR HONOR.  STEVE

9   WILLIAMS, JOSEPH COCHETTE, COCHETTE, PITRE & MCCARTHY FOR THE

10  CLASS.

11       THE COURT:  OKAY.

12       MR. LEHMANN:  GOOD AFTERNOON, YOUR HONOR.  MICHAEL

13  LEHMANN AND CHRIS LEBSOCK OF HAUSFELD LLP FOR THE CLASS MEMBERS.

14       MR. SHERMAN:  GOOD AFTERNOON, YOUR HONOR.  WILLIAM

15  SHERMAN, LATHAM & WATKINS, FOR SINGAPORE AIRLINES.

16       MR. BAMBERGER:  GOOD AFTERNOON, YOUR HONOR.  DAVID

17  BAMBERGER DLA PIPER, FOR CATHAY PACIFIC AIRWAYS.

18       MR. MILLER:  YOUR HONOR, I'M TODD MILLER, BAKER &

19  MILLER, FOR QANTAS AIRWAYS.

20       THE COURT:  ALL RIGHT.

21       GOOD AFTERNOON. I HAVE RECEIVED A PROPOSAL BY MR.

22  SHERMAN FOR DIVIDING THE ARGUMENT.  AND IT APPEARED TO ME TO BE

23  A REASONABLE ONE, UNLESS SOMEBODY HAS SOME CONCERN.

24       THERE'S ONLY ONE DIFFERENCE.  MAYBE THERE ARE MORE.

25  BUT THE ONE I WANTED TO ADDRESS IMMEDIATELY IS THE ISSUE OF THE
```

1    STAY.

2            DOES ANYBODY HAVE ANYTHING TO SAY IN ADDITION TO WHAT

3    HAS BEEN FILED IN CONNECTION WITH THE STAY?

4            **MR. SHERMAN:** CAN I ADDRESS THAT BRIEFLY, YOUR HONOR?

5            **THE COURT:** SURE.

6            **MR. SHERMAN:** WILLIAM SHERMAN FOR SINGAPORE AIRLINES.

7            YOUR HONOR, IN ADDITION TO WHAT IS IN THE PAPERS THAT

8    WERE SUBMITTED TO YOU BACK IN THE SPRING ON THE STAY, THERE HAVE

9    BEEN IMPORTANT DEVELOPMENTS WITH RESPECT TO WHY THE STAY IS

10   APPROPRIATE IN OUR VIEW, SPECIFICALLY, JAL'S SETTLEMENT WITH THE

11   PLAINTIFFS IN WHICH JAL AGREES TO PROVIDE QUITE A BIT OF

12   INFORMATION, INTERVIEWS, PROFFERS AND OTHER INFORMATION TO THE

13   PLAINTIFFS.

14           NOW, THIS IS IN THE CONTEXT OF JAL AT THE SAME TIME

15   SAYING:

16               "WELL, WE ARE PROTECTED BY THIS INJUNCTION FROM

17           THE BANKRUPTCY COURT, AND, THEREFORE, CANNOT BE

18           SUBJECT TO DISCOVERY."

19           AND, IN FACT, UPON THE SETTLEMENT AND READING THE

20   SETTLEMENT PAPERS, WE SENT JAL'S COUNSEL A LETTER FROM THE

21   DEFENDANTS.

22           **THE COURT:** WELL, WHAT I DON'T UNDERSTAND, SO JAPAN

23   AIRLINES IS GOING TO PROVIDE CERTAIN DOCUMENTATION TO THE

24   PLAINTIFFS.

25           AND ARE YOU SAYING -- THAT DOCUMENTATION I ASSUME YOU

1  HAVEN'T SEEN; IS THAT RIGHT?

2          **MR. SHERMAN:**  WELL, SOME WE HAVE, CORRECT.

3          **THE COURT:**  SOME YOU HAVE SEEN.  SOME YOU HAVEN'T.

4          AND YOUR ARGUMENT IS BECAUSE JAPAN AIRLINES IS UNDER

5  THE PROTECTION OF THE INJUNCTION THAT WOULD PROHIBIT DISCOVERY

6  AGAINST THEM, THEREFORE IT WOULD BE UNFAIR TO PROCEED OR

7  CONTINUE IN THESE PROCEEDINGS BECAUSE OF THAT FACT?

8          **MR. SHERMAN:**  CORRECT, YOUR HONOR.  AND IT'S NOT JUST

9  DOCUMENTS.  IT'S DOCUMENTS.  IT'S INTERVIEWS.  IT'S PROFFERS.

10  IT'S DISCUSSIONS.  SO WE DON'T --

11          **THE COURT:**  WE DON'T KNOW WHAT IT IS, THOUGH.  WE

12  HAVEN'T SEEN IT.

13          **MR. SHERMAN:**  WELL, WE DON'T KNOW THE SPECIFICS OF

14  WHAT THEY ARE GIVING, BUT WE DO KNOW FROM THE SETTLEMENT

15  AGREEMENT WHAT THEY HAVE AGREED, THE INFORMATION THEY AGREED TO

16  GIVE.

17          AND AT THE SAME TIME THAT THEY HAVE AGREED TO GIVE

18  THAT, THEY HAVE SAID TO US -- AND WE'VE WRITTEN THEM A LETTER

19  SAYING:

20          "IN LIGHT OF YOUR AGREEMENT TO PROVIDE THIS

21          INFORMATION TO PLAINTIFFS IN THE SETTLEMENT

22          AGREEMENT, DO YOU ALSO AGREE THAT YOU WILL PROVIDE TO

23          DEFENDANTS PARTICIPATING DISCOVERY OR OTHERWISE

24          PROVIDE TO US THE SAME SORT OF INFORMATION?"

25          **THE COURT:**  YES.

1    **MR. SHERMAN:** AND JAL'S LAWYERS WROTE BACK, AND NOT

2  SURPRISINGLY SAID:

3            "AS LONG AS THERE'S AN INJUNCTION, NO, WE DON'T

4            INTEND TO DO THAT."

5    **THE COURT:** BUT IS IT YOUR VIEW THAT THE INFORMATION

6  THAT THEY PROVIDE TO THE PLAINTIFFS IS INFORMATION THAT YOU

7  WOULD NOT HAVE ACCESS TO?

8    **MR. SHERMAN:** WELL, THERE ARE TWO CATEGORIES, WE

9  THINK, YOUR HONOR. ONE IS INFORMATION THEY PROVIDED PLAINTIFFS,

10  WHICH WE CERTAINLY THINK WE SHOULD BE TITLED TO FROM EITHER JAL

11  OR PLAINTIFFS. BUT THE LARGER POINT IS --

12    **THE COURT:** I THINK THAT'S PROBABLY RIGHT.

13    **MR. SHERMAN:** THAT WE'RE ENTITLED?

14    **THE COURT:** WELL, I DON'T KNOW. IT DEPENDS ON WHAT IT

15  IS, OBVIOUSLY. BUT I WOULD BE SURPRISED TO SEE A SITUATION IN

16  WHICH JAPAN AIRLINES GIVES INFORMATION TO THE PLAINTIFFS, AND

17  THIS INFORMATION IS NOT ACCESSIBLE TO YOU IN ONE FORM OR

18  ANOTHER.

19    **MR. SHERMAN:** AND IT'S NOT CLEAR TO US AT THIS POINT

20  WHETHER THAT WILL BE. BUT --

21    **THE COURT:** WELL, THAT SHOULD BE ADDRESSED. THAT

22  SHOULD BE ADDRESSED WHEN WE FIND OUT WHAT THE INFORMATION IS,

23  AND YOU MAKE A JUDGMENT.

24            YES, MY GUESS IS THAT THE PLAINTIFFS MAY VERY WELL

25  GIVE IT TO YOU, ESPECIALLY IF IT'S FAVORABLE TO THEIR SIDE.

1          **MR. SHERMAN:**  WELL, THAT'S THE RUB, YOUR HONOR.  AND

2    NOW YOU'VE HIT ON THE REAL IMPORTANT PART.

3          **THE COURT:**  THEY MAY KEEP OTHER THINGS.

4          **MR. SHERMAN:**  THEY MAY.  AND NOT ONLY THAT, BUT

5    FAIRNESS IS NOT JUST ALLOWING US TO GET WHAT PLAINTIFFS HAVE

6    GOTTEN FROM JAL.  BUT IN FAIRNESS, ESPECIALLY GIVEN THE

7    CENTRALITY OF JAL TO THIS LITIGATION, THAT WE BE ABLE TO DEVELOP

8    OUR CASE THROUGH JAL, AS WELL.

9          **THE COURT:**  WELL, THAT MAY BE TRUE. BUT I THINK I

10   WOULD HAVE TO ADDRESS IT.  I THINK I WOULD HAVE TO ADDRESS IT ON

11   A -- I DON'T KNOW IF IT WOULD BE AN ITEM-BY-ITEM

12   CATEGORY-BY-CATEGORY PROCESS.

13          WHEN WE SEE WHAT THEY HAVE GIVEN THEM, AND WHEN WE

14   SEE WHAT THEY GIVE YOU, AND WHEN WE SEE WHAT YOU WANT FROM JAPAN

15   AIRLINES, WHEN WE SEE ALL THAT, THEN I THINK SOME DETERMINATIONS

16   NEED TO BE MADE AS TO HOW TO PROCEED, WHETHER OR NOT YOU CAN GET

17   THAT INFORMATION, WHETHER THAT INFORMATION IS CRUCIAL, WHETHER

18   IT'S CRUCIAL TO YOUR DEFENSE, AND WHAT THE REMEDIES ARE.

19          I MEAN, THE REMEDIES MAY VERY WELL BE:  I CAN ISSUE A

20   STAY AT THAT POINT. I HAVE THAT OPTION.

21          **MR. SHERMAN:**  ABSOLUTELY, YOUR HONOR.  I GUESS I'M

22   NOT ENTIRELY CLEAR HOW YOU WOULD SUGGEST THAT WE PROCEED.

23          **THE COURT:**  WELL, THE WAY I WOULD SUGGEST THAT WE

24   PROCEED IS TO DENY THE STAY.  I MEAN, ACTUALLY, GETTING TO THE

25   NUB OF THE MATTER.

1          I JUST THINK IF I WERE GOING TO GRANT THE STAY I

2     WOULDN'T DEAL WITH THESE 2,000 MOTIONS THAT I HAVE IN FRONT OF

3     ME, SO -- OR AT LEAST SOME SUBSET OF IT.

4          SO I THINK IN LIGHT OF WHAT THE BANKRUPTCY COURT HAS

5     RULED, IN LIGHT OF THE FACT JAPAN HAS SETTLED, IN LIGHT OF THE

6     FACT THAT THEY ARE PROVIDING INFORMATION, I THINK THAT A STAY IS

7     INAPPROPRIATE AT THIS POINT.

8          HOWEVER, AS EVENTS MAY UNFOLD, DEPENDING ON

9     EVERYTHING ELSE, I MAY GRANT THE STAY.

10          **MR. SHERMAN:**  MY QUESTION IS:  IN TERMS OF THE EVENTS

11     UNFOLDING, YOU SAID IT WILL BE -- THE POINT AT WHICH IT WILL BE

12     APPROPRIATE FOR YOU TO MAKE THE DETERMINATION IS WHEN YOU SEE

13     WHAT JAL WILL PROVIDE AND WON'T PROVIDE.

14          ARE YOU ANTICIPATING, THEN, THAT WE WOULD SERVE JAL

15     WITH DISCOVERY REQUESTS, AND IF THEY THEN SAY:

16          "NO, WE'RE PROTECTED BY THE INJUNCTION," THEN WE

17     SHOULD COME BACK TO YOU AND SAY:

18          "WELL, IN LIGHT OF THIS, JUDGE BREYER, THEN

19          THERE OUGHT TO BE A STAY," BECAUSE THEY HAVE ALREADY

20     TOLD US THAT THAT'S THE POSITION THEY ARE GOING TO TAKE.

21          **THE COURT:**  "THEY" BEING JAPAN?

22          **MR. SHERMAN:**  JAPAN, YES.

23          **THE COURT:**  I GUESS WHAT I WANT TO DO IF WE PROCEED

24     FURTHER ON THESE ROADS IS TO SEE WHAT INFORMATION THE PLAINTIFFS

25     HAVE, FOR STARTERS.  OR MAYBE SEE WHAT YOU WANT, WHAT YOU NEED

1   TO KNOW, AND WHETHER OR NOT THE PLAINTIFFS HAVE THAT

2   INFORMATION.

3           THEY MAY OR MAY NOT. MAY OR MAY NOT GIVE IT TO YOU.

4   BUT I CAN'T DEAL WITH THESE AS ABSTRACT CONCEPTS, BECAUSE WHEN

5   YOU DEAL WITH THAT, YOU GO NOWHERE IN LITIGATION.

6           IN LITIGATION I'VE FOUND IT ALWAYS OUGHT TO BE

7   TETHERED TO -- BECAUSE NO CASES ARE EXACTLY THE SAME -- OUGHT TO

8   BE TETHERED TO PARTICULAR DEMANDS, PARTICULAR NEEDS, PARTICULAR

9   RESPONSES, PARTICULAR REMEDIES.

10          AND SO THAT'S HOW I SORT OF FOCUS ON IT.

11          I SEE A LOT OF ISSUES THAT VERY GOOD LAWYERS CAN

12  RAISE THAT MAY NEVER NEED TO BE ADDRESSED BECAUSE EITHER THEY

13  ARE ADDRESSED BY THE PARTIES WORKING OUT AN UNDERSTANDING, OR

14  THEY ARE NOT OF GREAT CONSEQUENCE. THEY ARE NOT OF GREAT

15  CONSEQUENCE IN THE OUTCOME OF THE LITIGATION.

16          SO I LOOKED AT THE ORIGINAL ISSUE AS TO WHETHER OR

17  NOT A BANKRUPTCY OF A MAJOR PLAYER HERE OUGHT TO STOP

18  EVERYTHING. AND I THINK THE ANSWER TO THAT IS "NO."

19          AND I APPRECIATE YOUR ARGUMENTS, AND I UNDERSTAND

20  THEM.  AND IT'S BASICALLY THAT I'M DENYING YOUR MOTION TO STAY

21  THE PROCEEDINGS WITHOUT PREJUDICE TO YOUR RAISING IT AT A TIME

22  THAT YOU FEEL THAT YOU ARE PREJUDICED BY THE COURSE OF THE

23  LITIGATION, OKAY?

24          **MR. SHERMAN:**  VERY WELL.

25          **THE COURT:**  OKAY.  THANK YOU VERY MUCH.

1          **MR. SHERMAN:**  THANK YOU, YOUR HONOR.

2          **THE COURT:**  ALL RIGHT.  SO LET'S GO TO THE  -- WELL,

3   TO THE MAJOR MOTION THAT'S BEING ADDRESSED.

4          HOWEVER YOU WANT TO PROCEED IS FINE WITH ME.

5          **MR. LEBSOCK:**  YOUR HONOR, IF I MAY, CHRIS LEBSOCK

6   FOR THE PLAINTIFFS.

7          WITH RESPECT TO THE MOTIONS THERE ARE A NUMBER OF

8   DEFENDANTS HERE THAT I THINK ARE GOING TO RAISE THE FTAIA, FOR

9   EXAMPLE.  WE'VE GOT THE MAIN MOTION ON THAT.  AND THE EUROPEAN

10  CARRIERS HAVE THEIR SEPARATE LITTLE GLOSS ON THAT.

11         AND OUR POSITION IS WE THINK THAT IT MAKES SENSE FOR

12  THE DEFENDANTS TO GET UP AND SAY EVERYTHING THEY WANT TO SAY

13  ABOUT EACH ONE OF THESE ARGUMENTS THAT THEY ARE GOING MAKE, AND

14  THEN WE WILL RESPOND TO THEM, RATHER THAN HAVING US DO THIS

15  SERATIM.

16         **THE COURT:**  I DON'T REALLY CARE.  I THINK IT'S

17  WHATEVER YOU WANT TO DO.

18         **MR. SHERMAN:**  YOUR HONOR, THE --

19         **THE COURT:**  I CAN PROBABLY HOLD MOST OF THE ARGUMENTS

20  IN MY MIND FOR TWO HOURS.  AFTER THEN, I CAN'T PREDICT WHERE

21  THINGS WILL GO.

22         SO ANY WAY YOU WANT TO DO IT IS OKAY BY ME.

23         **MR. SHERMAN:**  AND WE'VE SPOKEN TO PLAINTIFFS ABOUT

24  THIS.  AND TO THE EXTENT THAT OTHER SMALLER GROUPS OF DEFENDANTS

25  ARE GOING TO ARGUE FOR THE MOTION THEY HAVE MADE, THEY HAVE NO

KATHERINE WYATT, OFFICIAL REPORTER, RPR, RMR  925-212-5224

```
 1   INTENTION OF GETTING UP AND REPEATING THE ARGUMENTS THAT WE'VE

 2   MADE TODAY.

 3            SO I DON'T THINK THAT WILL BE OF CONCERN.

 4            AGAIN, WILLIAM SHERMAN, YOUR HONOR.  AND I WILL BE

 5   ARGUING FOR DEFENDANTS ON THE FTAIA ISSUE.  AND ASSUMING THAT

 6   THE TIME IS GOING TO BE DIVIDED THE WAY WE HAVE SUGGESTED TO THE

 7   COURT, WE'VE GIVEN OURSELVES 20 MINUTES ON THIS.  AND I WOULD

 8   LIKE TO RESERVE ABOUT FIVE MINUTES FOR THE REBUTTAL.

 9            THE COURT:  SURE.  I THINK YOU OUGHT TO TAKE MY

10   SUGGESTION AND GIVE YOURSELF 15 MINUTES AND RESERVE TEN MINUTES.

11            I THINK I'M MORE INTERESTED IN YOUR RESPONSE TO THEIR

12   ARGUMENTS --

13            MR. SHERMAN:  ALL RIGHT.

14            THE COURT:  -- THAN I AM IN YOUR PRESENTATION OF YOUR

15   POSITION. I MEAN, YOUR PRESENTATION OF YOUR POSITION IS SET OUT

16   IN THE MOTION.

17            BUT GO AHEAD.

18            MR. SHERMAN:  WELL, IF IT'S EASIER, I'M HAPPY TO

19   LET --

20            THE COURT:  NO.  NO.  NO. WE'RE NOT GOING TO UPSET

21   THAT APPLE CART.  NO.

22            MR. SHERMAN:  WELL, LET ME JUST --

23            THE COURT:  BUT YOU UNDERSTAND WHAT I'M SAYING.

24            MR. SHERMAN:  ABSOLUTELY DO, YOUR HONOR. I APPRECIATE

25   THAT GUIDANCE.
```

1          AND I WILL TRY TO STREAMLINE MY ARGUMENT, THEN,

2   BECAUSE THE REAL POINT OF ALL OUR FTAIA ARGUMENT IS THAT

3   ALTHOUGH AT SOME POINT AFTER THE PASSAGE OF THAT STATUTE THERE

4   WAS SOME CONFUSION ABOUT HOW IT OUGHT TO BE APPLIED, RECENTLY A

5   NUMBER OF DECISIONS HAVE REALLY MADE THE PATH MUCH CLEARER.

6          AND, INDEED, FOR THE ISSUES IN THIS CASE UNDER THE

7   FTAIA, THERE ARE THREE CASES WHICH ARE GUIDEPOSTS FOR THIS

8   DECISION.

9          AND THEY ARE THE EMPAGRAN DECISIONS OF THE SUPREME

10  COURT AND THE FOLLOW-UP FOR THE D.C. CIRCUIT.  AND THEN, LAST

11  YEAR'S 2009'S DECISION BY THE NINTH CIRCUIT IN THE CENTERPRISE

12  CASE.

13         AND THEN, THIS SUMMER, JUDGE OTERO IN THE CENTRAL

14  DISTRICT OF CALIFORNIA IN THE IN RE: KOREAN LITIGATION DECIDED

15  AN FTAIA ISSUE THAT IS ON ALL FOURS WITH THE ONE THAT IS IN

16  FRONT OF YOU TODAY.

17         THERE'S REALLY NO WAY TO DISTINGUISH THE ISSUES THAT

18  JUDGE OTERO DECIDED AND THE ONES THAT FACE YOU HERE. IT'S AN

19  IDENTICAL ALLEGATION OF A CONSPIRACY OF PASSENGERS FLYING FROM

20  ASIA TO THE U.S.

21         IT'S A DIFFERENT CONSPIRACY ALLEGED THERE, BUT THE

22  SAME ISSUES FOR THE FTAIA.

23         AND SO WE THINK THAT THERE'S -- NOW, THE

24  PLAINTIFFS -- OBVIOUSLY, I'LL LET MR. LEBSOCK GET UP AND DO THAT

25  AND RESPOND LATER -- BUT THEY THROW UP A BUNCH OF SORT OF

1   ROADBLOCKS OR TRY TO MUDDLE THE ISSUE, INCLUDING GOING BACK TO

2   CASES PRE-FTAIA, CERTAINLY PRE-EMPAGRAN.

3           WE DON'T THINK THERE'S ANY REASON FOR YOU TO DEVIATE

4   WHERE THE PATH THAT EMPAGRAN, CENTERPRISE AND IN RE: KOREAN

5   LEADS YOU.

6           NOW, THE BASIC PRINCIPLE, OF COURSE, OF THE FTAIA IS

7   THAT FOREIGN INJURY IS GENERALLY BEYOND THE SCOPE OF THE SHERMAN

8   ACT.  AND CLAIMS HERE AT ISSUE ARE THE ALLEGATIONS THAT BECAUSE

9   OF THE DEFENDANTS' ALLEGED CONSPIRACY PLAINTIFFS PAID TOO MUCH

10  FOR AIRLINE TICKETS THAT THEY PURCHASED IN MARKETS OUTSIDE OF

11  THE U.S.

12          THAT'S EXACTLY THE SORT OF THING THAT THE FTAIA IS

13  AIMED AT.  AND SO UNLESS PLAINTIFFS CAN MEET ONE OF THE TWO

14  EXCEPTIONS TO THE FTAIA, THEY CAN'T ESTABLISH SUBJECT MATTER

15  JURISDICTION HERE.

16          AND WE SUBMIT THEY SIMPLY CANNOT.

17          THE FIRST EXCEPTION IS WHETHER THE DEFENDANTS'

18  ALLEGED CONDUCT INVOLVES IMPORT TRADE OR IMPORT COMMERCE.

19          THERE'S ONLY ONE CASE TO DECIDE THAT ISSUE IN THE

20  CONTEXT OF AIRLINE PASSENGERS.  THAT IS JUDGE OTERO'S DECISION

21  IN IN RE: KOREAN.  HE HAD NO PROBLEM WITH THAT ISSUE AT ALL.

22          HE SAID IT'S NOT IMPORT COMMERCE. IN FACT, HE SAID:

23              "PLAINTIFFS' ARGUMENT CONTENDED THAT PASSENGERS

24              TRAVELING FROM KOREA TO THE U.S. ARE A TYPE OF

25              IMPORT.  AND, THUS, A PRICE-FIXING AGREEMENT

1              TARGETING THE COSTS OF AIR TRAVEL INTO THE U.S.

2              INVOLVES IMPORT COMMERCE. THIS ARGUMENT IS

3              UNCONVINCING.  AIR PASSENGERS ARE NOT PRODUCTS.

4              PLAINTIFFS' LARGELY UNSUPPORTED ASSERTION THAT AIR

5              PASSENGERS ARE A TYPE OF IMPORT IS INSUFFICIENT TO

6              ESTABLISH JURISDICTION."

7              NOW, THIS IS THE ONE CASE THAT DEALS WITH THE

8     SPECIFIC ISSUE HERE. BUT ANY OF THE CASES -- ALL OF THE CASES

9     THAT DEAL WITH THE QUESTION OF IMPORT COMMERCE IN THE CONTEXT OF

10    THE FTAIA GIVES SUPPORTING SORT OF LANGUAGE AND SUPPORTING

11    DECISIONS.

12             FIRST, ON THE ISSUE OF:  WHAT ARE IMPORTS?  ARE

13    PASSENGERS IMPORTS?  AND THE CONSENSUS IS IN THE CASES, NO.

14    IMPORTS MEAN WHAT IMPORTS MEAN.  THEY ARE GOODS, SOMETIMES

15    SERVICES, BROUGHT INTO THE U.S. USUALLY FOR RESALE.

16             THIS WAS THE -- THIS IS LANGUAGE QUOTED NOT ONLY BY

17    JUDGE ORTERO, BUT BY THE TURICENTRO COURT IN THE THIRD CIRCUIT,

18    BY MAGISTRATE JUDGE POHORELSKY IN THE CARGO ISSUE, AND BY JUDGE

19    POLLAK IN THE MCLAFFERTY CASE.

20             SO IT'S PRETTY UNIFORM ON THE FTAIA QUESTION OF

21    WHETHER THIS IS IMPORT COMMERCE.

22             A COUPLE OF THE OTHER FACTORS THAT HAVE BEEN CITED BY

23    SOME OF THE COURTS:  DO THE DEFENDANTS IDENTIFY THEMSELVES,

24    SELF-IDENTIFY AS IMPORTERS?

25             DEFENDANTS HERE DO NOT. A COUPLE OF COURTS HAVE MADE

1    THE POINT THAT THE IMPORT COMMERCE SECTION THAT LEADS OFF THE

2    FTAIA HAS TO BE NARROWLY CONSTRUED IN ORDER TO GIVE EFFECT TO

3    THE DOMESTIC EFFECTS TEST THAT FOLLOWS IT.

4         ALL THESE THINGS ARGUE IN FAVOR OF THE FACT THAT

5    THESE AIR PASSENGERS ARE NOT IMPORT COMMERCE.

6         **THE COURT:**  ALL RIGHT.  SO IT'S YOUR VIEW THAT THE

7    TERM "IMPORTS" REFERS TO NOUNS.  IT'S THEIR VIEW THAT IT REFERS

8    TO VERBS.  IS THAT IT?

9         **MR. SHERMAN:**  WELL, I THINK THAT'S GETTING TO PART OF

10   THE ARGUMENT, YES, BECAUSE THEY DO SUPPLY DICTIONARY DEFINITIONS

11   FROM THE OXFORD ENGLISH DICTIONARY, AND THEY QUOTE THE NOUN

12   VERSION -- I MEAN, THE VERB VERSION. YOU ARE RIGHT.

13        BUT THERE IS A MORE RELEVANT DECISION EVEN WITHIN THE

14   OXFORD ENGLISH DICTIONARY WHERE THE OXFORD ENGLISH DICTIONARY IN

15   ANOTHER PART OF THE SAME DEFINITION SAYS:

16             "TO BRING IN OR CAUSE TO BE BROUGHT IN GOODS OR

17             MERCHANDISE FROM A FOREIGN COUNTRY."

18        AND, YES.  EACH OF THE COURTS, EACH OF THE JUDGES

19   THAT HAS LOOKED AT THE QUESTION OF WHAT DOES "IMPORT COMMERCE"

20   MEAN SAYS YOU TAKE A COMMON SENSE APPROACH BASED ON WHAT WE

21   GENERALLY UNDERSTAND "IMPORTS" TO BE.

22        PEOPLE ARE NOT IMPORTS.

23        NOW, WE CITED A SUPREME COURT CASE.  WE ACTUALLY

24   CITED TWO.  WE CITED ONE THAT WAS DECIDED BY JUDGE ORTERO.  WE

25   CITED ANOTHER ONE.

1          THERE ARE A NUMBER OF CASES THAT DEAL WITH THIS

2   PERIPHERALLY, INCLUDING THE MCCAFFERTY CASE, AND NONE OF THEM

3   SUGGEST THAT PASSENGERS ARE IMPORTS.

4          NOW, YOU ARE RIGHT. PLAINTIFFS ADDRESS IT AS A NOUN.

5   AND THEY ALSO CITE -- THE CASES THEY CITE ARE CASES WHERE THE

6   WORD "IMPORT" AND THE WORD "PERSON" HAPPEN TO APPEAR IN THE SAME

7   SENTENCE.

8          USUALLY THESE ARE CASES WHERE THIS HAPPENS EARLY ON

9   IN THE DESCRIPTION OF THE CASE WITHOUT ANY ANALYSIS, WITHOUT ANY

10  INDICATION THAT WHAT THE COURT IS TRYING TO SAY -- FORGET ABOUT

11  WHETHER IT'S IN THE CONTEXT OF THE FTAIA, BUT AT ALL -- IS THAT

12  PERSONS ARE IMPORTS.  NOT AT ALL.

13         IT HAPPENS TO BE THAT THEY -- IN ONE CASE THEY DEAL

14  WITH A STATUTE THAT HAS TO DO WITH BRINGING PERSONS INTO THE

15  UNITED STATES.

16         AND THE JUDGE SAID, WELL, WITH RESPECT TO IMPORTING

17  OF PERSONS, THERE ARE A COUPLE OF CASES WHERE THERE'S A STATUTE

18  ABOUT IT BEING ILLEGAL TO IMPORT A PERSON FOR THE PURPOSES OF

19  PROSTITUTION.

20         SO THERE ARE CASES WHERE THE TWO TERMS APPEAR IN THE

21  SAME SENTENCE, BUT NOT IN ANY WAY SUGGESTING THAT THAT MEANS

22  THAT PEOPLE ARE IMPORTS OR THAT THE FLYING OF PASSENGERS INTO

23  THE UNITED STATES IS IMPORT COMMERCE.

24         LET ME JUST TALK ABOUT A COUPLE OF THE OTHER THINGS

25  THAT THE PLAINTIFFS THROW UP TO TRY TO CONVINCE THE COURT THAT

 1    THIS IS IMPORT COMMERCE.

 2            THEY CITE THE PLEA AGREEMENTS, BRITISH AIRWAYS AND

 3    THE TRANSATLANTIC CASE, WHICH I KNOW YOU'RE FAMILIAR WITH, AND

 4    THE KOREAN PLEA.  BUT IN BOTH OF THOSE PLEAS THE DEFENDANTS

 5    DISPUTED AND SAID THEY DID NOT AGREE THAT OUTBOUND -- INBOUND

 6    COMMERCE WAS PART OF THE PLEA.  AND, IN FACT, THE PLEA -- THE

 7    AMOUNT OF THE FINE DID NOT REFLECT ANY CHARGES FOR INBOUND.

 8            SO THOSE ARE CERTAINLY NOT AUTHORITY FOR THE

 9    PROPOSITION.

10            AND, FINALLY, THEY ALSO CITE THE CARGO CASE THAT I

11    MENTIONED. MAGISTRATE JUDGE POHORELSKY IN THE CARGO LITIGATION

12    DECIDED THAT THERE THE ALLEGATIONS DID INVOLVE IMPORT COMMERCE.

13            BUT HE COULDN'T HAVE BEEN CLEARER THAT THE REASON

14    THAT HE DID WAS BECAUSE HE WAS LOOKING AT WHAT WAS BEING BROUGHT

15    IN.

16            AND THE FACT THAT THERE WERE GOODS BEING BROUGHT

17    IN -- IN FACT HIS -- THE DEFINITION THAT HE CITES WAS WEBSTER'S:

18                    "'IMPORT' IS SOMETHING BEING BROUGHT IN. AN

19                    IMPORT IS A PRODUCT MANUFACTURED IN A FOREIGN

20                    COUNTRY, THEN SHIPPED TO AND SOLD IN THIS COUNTRY."

21            AND IF YOU LOOK AT THE LANGUAGE OF HIS DECISION, HE

22    EMPHASIZED THAT THE CONSPIRACY TARGETED THE TRANSPORTATION OF

23    GOODS BY AIR FREIGHT, A PRIMARY VEHICLE OF MODERN COMMERCE.

24            AND HE CITED THE INSEPARABLE CONNECTION BETWEEN AIR

25    FREIGHT AND THE COMMERCE IN IMPORTED GOODS.

1      THERE'S REALLY NO QUESTION, I THINK, THAT MAGISTRATE

2  JUDGE POHORELSKY WOULD NOT HAVE COME TO THE SAME CONCLUSION WITH

3  RESPECT TO AIR PASSENGERS.

4      SO WE REALLY DON'T THINK THAT THAT IS HELPFUL

5  AUTHORITY FOR THE PLAINTIFFS.

6      NOW, IF IT'S NOT IMPORT COMMERCE, THEN WE GET TO THE

7  SECOND PART OF THE TEST.  AND THE SECOND PART OF THE TEST IS TWO

8  PARTS.  AND THE PLAINTIFFS MUST SHOW IN ORDER FOR THIS COURT TO

9  HAVE JURISDICTION FIRST, THAT THE CONDUCT HAS A DIRECT,

10 SUBSTANTIAL AND REASONABLY FORESEEABLE EFFECT ON DOMESTIC

11 COMMERCE.

12     AND, SECOND -- THE IMPORTANT PART.  AND THIS IS THE

13 PART THAT CENTERPRISE ESTABLISHED AFTER EMPAGRAN --  SECOND:

14 THAT THAT DOMESTIC EFFECT GIVES RISE TO, THAT IS, IT'S THE

15 PROXIMATE CAUSE OF THE ALLEGED FOREIGN INJURY.

16     YOUR HONOR --

17     **THE COURT:**  I'D LIKE TO TALK ABOUT THE SECOND PART.

18     **MR. SHERMAN:**  OKAY.

19     **THE COURT:**  THAT, I THINK, ACTUALLY READING THROUGH

20 ALL THE PAPERS, THAT'S THE THING THAT INTRIGUED ME ABOUT THE

21 MOTION.

22     I WAS TRYING TO FIGURE OUT IF YOU ALLEGE A GLOBAL

23 CONSPIRACY, PRICE-FIXING CONSPIRACY, WHICH IS WHAT IS ALLEGED

24 HERE, HOW DOES THE PLAINTIFF EVER MEET THAT BURDEN?

25     **MR. SHERMAN:**  WELL --

```
 1          THE COURT:  IN A SET OF CIRCUMSTANCES THAT ARE NOT

 2   COMPLETELY DISSIMILAR TO THESE, HOW WOULD THAT EVER BE SHOWN

 3   THAT THE PROXIMATE CAUSE -- THAT IT PROXIMATELY CAUSED THE

 4   FOREIGN INJURY?

 5          I HAVE TRIED TO THINK OF SOME TYPES OF CASES, AND I

 6   DIDN'T COME UP WITH ANY.

 7          MR. SHERMAN:  WELL, AND THERE'S A REASON FOR THAT,

 8   YOUR HONOR. BECAUSE, IN FACT, NO CASE HAS FOUND THAT PLAINTIFFS

 9   GET JURISDICTION BY SATISFYING THE DOMESTIC EFFECTS TEST SINCE

10   EMPAGRAN WAS DECIDED.

11          AND, IN FACT, THE EMPAGRAN DECISIONS SHOW WHY THAT'S

12   THE CASE, BECAUSE IT REALLY WAS THE INTENT OF THIS STATUTE TO

13   FOCUS ON DOMESTIC INJURY AND --

14          THE COURT:  SO IT'S YOUR VIEW -- IS IT FAIR TO SAY

15   IT'S YOUR VIEW THAT JUST ISN'T GOING HAPPEN?

16          MR. SHERMAN:  WELL --

17          THE COURT:  THAT IT'S ALMOST THE STATUTE AS IT'S

18   DRAFTED AND HAS BEEN INTERPRETED -- AND HAS BEEN INTERPRETED --

19   IS TRULY A NULLITY WITH RESPECT TO -- WITH RESPECT TO BRINGING

20   THESE TYPES OF CLAIMS?

21          MR. SHERMAN:  WELL, I DON'T THINK IT'S A NULLITY,

22   NECESSARILY, BECAUSE --

23          THE COURT:  WELL, CAN YOU GIVE ME AN EXAMPLE?

24          MR. SHERMAN:  WELL --

25          THE COURT:  CAN YOU GIVE ME AN EXAMPLE WHERE YOU
```

1    THINK THAT THIS COULD VERY WELL APPLY TO A GLOBAL PRICE-FIXING

2    CONSPIRACY?

3              **MR. SHERMAN:**  WELL, THE GLOBAL PRICE-FIXING PART IS

4    GOING TO BE DIFFICULT TO DO, BECAUSE, AT MOST, WHAT PLAINTIFFS

5    HAVE BEEN ABLE TO SHOW IN ALL OF THESE CASES, IN THE CENTERPRISE

6    CASE, IN THE TURICENTRO CASE, IN ALL OF THE CASES WHERE THIS HAS

7    COME UP IN THE CONTEXT OF A GLOBAL PRICE-FIXING CONSPIRACY

8    PLAINTIFFS HAVE BEEN ABLE TO SHOW A CONNECTION.

9              AND, IN FACT, IN SOME OF THESE CASES THEY HAD AN

10   ALLEGATION, INCLUDING SUPPORTED BY EXPERT WITNESSES, THAT SAID:

11                 "WELL, LOOK. THE DOMESTIC EFFECT ACTUALLY DOES

12                 CAUSE OUR FOREIGN INJURY FOR THIS REASON. THEY ARE

13                 FUNGIBLE PRODUCTS."

14            FOR EXAMPLE, VITAMINS.  FUNGIBLE, EASILY

15   TRANSPORTABLE, OKAY?

16                 "IN ORDER TO BE ABLE TO CHARGE OUR HIGHER

17                 PRICES, TO BE ABLE TO CHARGE THE HIGHER PRICES IN

18                 FOREIGN JURISDICTIONS, WE HAVE TO HAVE THE HIGHER

19                 PRICES IN THE U.S. THEREFORE, THE HIGHER U.S. PRICES

20                 ARE A BUT-FOR CAUSE OF THE FOREIGN INJURY."

21            AND UNIFORMLY THE COURTS HAVE SAID THAT'S NOT ENOUGH.

22   IT HAS TO BE THE CAUSE, THE PROXIMATE CAUSE.

23            **THE COURT:**  WELL --

24            **MR. SHERMAN:**  I KNOW.  I'M NOT ANSWERING YOUR

25   QUESTION.

1          **THE COURT:**  -- THAT'S EXACTLY MY POINT.

2          **MR. SHERMAN:**  I KNOW.  SO --

3          **THE COURT:**  I MEAN, IT CAN'T EVEN BE DONE THERE.

4          **MR. SHERMAN:**  WELL --

5          **THE COURT:**  IT CAN'T EVEN BE DONE WHERE, YOU KNOW,

6     THEY GET TOGETHER IN BOLIVIA, AND THEY SET THE PRICE OF TIN.

7          **MR. SHERMAN:**  RIGHT.

8          **THE COURT:**  AND TIN IS AN INGREDIENT OF SOMETHING IN

9     THE UNITED STATES, AND THEY PUT IT INTO THEIR MACHINES IN THE

10    UNITED STATES.  AND SO IT'S A HIGHER PRICE AND SO FORTH IN THE

11    UNITED STATES.

12          AND YOU SAY:

13              "WELL, THE PRICE OF TIN, YOU KNOW, IN THIS

14              PRODUCT HAS BEEN FIXED. AND, THEREFORE, YOU KNOW,

15              THESE PEOPLE IN THE UNITED STATES ARE PAYING A HIGHER

16              PRICE."

17          BUT THEY ARE LOOKING AT -- WE'RE LOOKING AT WHAT

18    HAPPENS IN THE FOREIGN MARKET. EVEN THEN THAT'S NOT A BUT-FOR,

19    IS IT?

20          **MR. SHERMAN:**  WELL, I THINK UNDER THE CASE LAW

21    PROBABLY NOT.

22          **THE COURT:**  SO, THEN, YOU'RE REALLY TELLING ME THAT

23    AS YOU STAND THERE YOU CAN'T THINK OF A CASE.

24          **MR. SHERMAN:**  WELL, LET ME GIVE YOU AN EXAMPLE WHERE

25    IT MIGHT HAVE WORKED.

1      **THE COURT:**  AND THAT DOESN'T MEAN -- BY THE WAY, IF

2    YOU CAN'T THINK OF A CASE IN MY VIEW DOESN'T NECESSARILY

3    DEFEATS --

4      **MR. SHERMAN:**  WELL, I WOULD HOPE ACTUALLY IT DEFEATS

5    THE PLAINTIFFS' ARGUMENT, NOT OURS, BECAUSE A FORTIORI, IF THE

6    CASES THAT YOU ARE IDENTIFYING DON'T GIVE THE PLAINTIFFS

7    JURISDICTION, THEN THEIR CASE DOESN'T FOR SURE.

8      **THE COURT:**  RIGHT.

9      **MR. SHERMAN:**  THE ONE CASE WHERE THERE'S SOME

10   QUESTION ABOUT IS A CASE THAT PRECEDED THE EMPAGRAN DECISION.

11   IT'S A CASE THAT THE PLAINTIFFS CITE.  AND THE CENTERPRISE

12   DECISION BY THE NINTH CIRCUIT ACTUALLY DISCUSSED IT.  IT'S THE

13   CARIBBEAN BROADCASTING SYSTEM CASE.

14      AND WHAT HAPPENED IN THAT CASE WAS THERE WAS A

15   CONSPIRACY MORE MONOPOLISTIC THAN PRICE-FIXING.  MONOPOLISTIC

16   ALLEGATION OF A CONSPIRACY TO DRIVE THE CARIBBEAN BROADCASTING

17   SYSTEM OUT OF BUSINESS.

18      SO THEY WERE -- THEY WERE PREVENTED FROM ADVERTISING

19   ON THE AIRWAVES IN A MARKET THAT ALSO SERVED U.S. CUSTOMERS.

20      NOW, THE IMPACT IN THE U.S. WAS THAT THE U.S.

21   ADVERTISERS WHO WISHED TO ADVERTISE ON THE RADIO NETWORK OF THE

22   CARIBBEAN BROADCASTING SYSTEM WERE UNABLE TO DO SO.  AND AS A

23   RESULT THEY HAD AN INJURY OF BOTH BEING UNABLE TO ADVERTISE AND

24   PAYING HIGHER PRICES FOR THOSE ADVERTISERS WHERE THEY WERE ABLE

25   TO ADVERTISE.

1          THAT WAS THE U.S. EFFECT.

2          AND THE COURT SAID:

3               "WELL, IN FACT, THAT'S ALSO THE FOREIGN INJURY,

4          BECAUSE THE CARIBBEAN BROADCASTING SYSTEM IS

5          COMPLAINING THAT VERY THING.  THEY ARE NOT ABLE TO

6          SELL THEIR ADVERTISING TO THOSE ADVERTISERS."

7          NOW, THE CENTERPRISE CASE SAYS:

8               "WELL, WAIT A MINUTE.  THIS REALLY DOESN'T

9          ANALYZE UNDER THE FTAIA, SO WE DON'T KNOW IF THAT

10         WOULD FIT."

11         PLAINTIFFS CITE A CASE THAT SAYS:

12              "WELL, MAYBE IT WILL."

13         IT'S A POSSIBILITY.  IT'S A VERY DIFFERENT

14    CIRCUMSTANCE THAN THE ONE HERE, I GRANT YOU.  AND, IN FACT, FOR

15    THAT REASON I THINK IT'S PROBABLY THE CASE THAT IT'S MORE THAT

16    MONOPOLISTIC SORT OF ALLEGATIONS ARE GOING TO HAVE THE

17    POSSIBILITY OF SATISFYING THAT DOMESTIC EFFECTS.

18         FOR EXAMPLE, IF THE PLAINTIFFS HERE ALLEGE NOT JUST

19    OUR PRICE-FIXING CONSPIRACY, BUT ALLEGE THAT, IN ADDITION, THE

20    DEFENDANTS HAVE SOMEHOW CONSPIRED TO KEEP -- TO DRIVE -- TO KEEP

21    ANY CANADIAN -- FLIGHTS BETWEEN CANADA AND ASIA.

22         CONCEIVABLY LOOKING AT THE CARIBBEAN BROADCASTING

23    SYSTEM CASE, CONCEIVABLY THERE MIGHT BE AN ALLEGATION THAT

24    CANADIAN CONSUMERS WERE INJURED BY THAT BECAUSE THEY WEREN'T

25    ABLE TO FLY TO ASIA.  THEY HAD TO COME TO THE U.S. AND PAY A

1    HIGHER PRICE TO FLY FROM THE U.S. TO ASIA. THAT'S A DOMESTIC

2    EFFECT.  ALSO THEIR FOREIGN INJURY.  HYPOTHETICAL, OBVIOUSLY,

3    BUT I THINK THERE ARE POSSIBILITIES WHERE IT COULD BE SATISFIED.

4              BUT NONE OF THE CASES HAVE DONE IT YET.  AND, AS I

5    SAID TO YOU, I SUBMIT THAT IF NONE OF THE CASES HAVE DONE IT, IT

6    MUST BE THAT THE PLAINTIFFS CAN'T DO IT HERE.

7              I SHOULD MENTION TO YOU THAT ONE OF THE -- ONE OF THE

8    POSSIBILITIES THAT PLAINTIFFS RAISE IS THE NOTION THAT THE

9    DOMESTIC EFFECT IS THAT WHEN PASSENGERS ARRIVED IN THE U.S. THEY

10   DIDN'T HAVE ENOUGH MONEY TO SPEND ON GOODS --

11             **THE COURT:**  WELL, NO --

12             **MR. SHERMAN:**  ALL RIGHT. THAT'S REALLY ALL I HAVE,

13   YOUR HONOR, EXCEPT FOR ONE COMMENT ON SEVERAL COURTS HAVE, IN

14   ADDITION TO THE LOOKING AT THE FTAIA ANALYSIS, SAID:

15             "WELL, IF WE FIND THAT THEY ARE NOT BARRED UNDER

16             THE FTAIA, WE SHOULD ALSO LOOK AT WHETHER THEY HAVE

17             ANTITRUST STANDING UNDER ASSOCIATED GENERAL

18             CONTRACTORS."

19             I'M HAPPY TO DISCUSS THAT MORE. THERE'S CERTAINLY

20   OVERLAP BETWEEN THE TWO.  AND WE CERTAINLY DON'T THINK IT'S

21   NECESSARY FOR THE COURT TO GO THERE, BECAUSE WE DON'T THINK THE

22   PLAINTIFFS HAVE OR COULD ESTABLISH THEIR JURISDICTION UNDER THE

23   FTAIA. BUT --

24             **THE COURT:**  WILL YOU CONCEDE THAT IF, IN FACT, I

25   DISMISS THEIR FOREIGN CLAIMS, WOULD THERE BE ANYTHING LEFT IN

1    THEIR CASE?

2            **MR. SHERMAN:** I BELIEVE THERE WOULD, YOUR HONOR, YES,

3    BECAUSE WE'RE NOT CONTESTING UNDER -- WELL, I SAY THAT SUBJECT,

4    OF COURSE, TO MY COLLEAGUES' ARGUMENTS ABOUT OTHER PIECES OF --

5            **THE COURT:** PUTTING THAT ASIDE.

6            **MR. SHERMAN:** PUTTING THAT ASIDE, YES, UNDER THE

7    FTAIA, ABSOLUTELY. THEIR ALLEGATIONS WITH RESPECT TO OUTBOUND

8    FROM THE U.S. I THINK UNDER THE CASE LAW CLEARLY ARE OUTSIDE THE

9    FTAIA'S PROHIBITIONS.

10           **THE COURT:** ALL RIGHT.

11           **MR. SHERMAN:** THANK YOU VERY MUCH.

12           **THE COURT:** THANK YOU.

13           **MR. LEBSOCK:** GOOD AFTERNOON, YOUR HONOR. CHRIS

14   LEBSOCK, AGAIN, FOR THE PLAINTIFFS.

15           YOU KNOW, I THINK THAT THE DISCUSSION ABOUT PEOPLE AS

16   IMPORTS IS SORT OF A RED HERRING HERE. WHEN WE LOOK AT A CASE

17   LIKE AIR CARGO, WHAT JUDGE -- THE JUDGES IN THE EASTERN DISTRICT

18   OF NEW YORK WERE TALKING ABOUT WAS REALLY THE PROVISION OF A

19   TRANSPORTATION SERVICE.

20           AND THAT TRANSPORTATION SERVICE IS SIMILAR WHETHER

21   IT'S CARGO OR PEOPLE THAT ARE BEING BROUGHT INTO THE UNITED

22   STATES.

23           AND THAT IS CONSISTENT WITH THE WAY THAT THE SHERMAN

24   ACT HAS BEEN INTERPRETED SINCE ALMOST THE TIME WHEN IT WAS

25   ENACTED. IN ARCTIC RAILWAY BACK IN 1913, THE SUPREME COURT HELD

1   THAT THE SHERMAN ACT APPLIED WHEN WE WERE TALKING ABOUT

2   TRANSPORTATION ROUTES AND CONDUCT INVOLVING TRANSPORTATION

3   ROUTES FOR BOTH CARGO AND PEOPLE, BOTH WAYS, BETWEEN THE UNITED

4   STATES AND CANADA.

5           AND WHEN WE LOOK AT A CASE LIKE EMPAGRAN WHERE THE

6   SUPREME COURT MADE SOME FINDINGS WITH RESPECT TO THE DOMESTIC

7   EFFECTS TEST, THEY ALSO SAID THAT IT IS IMPORTANT TO LOOK AT THE

8   HISTORY OF THE WAY THE SHERMAN ACT HAS BEEN INTERPRETED WHEN WE

9   DECIDE HOW WE'RE GOING TO INTERPRET THE FTAIA.

10          AND WHAT WE KNOW FROM CASES LIKE ARCTIC RAILWAY,

11  WHICH IS NEARLY A HUNDRED YEARS OLD, IS THAT THE COURT HAS NOT

12  HAD ANY REAL PROBLEM ESTABLISHING JURISDICTION WHEN WE'RE

13  TALKING ABOUT TRANSPORTATION WITH ONE END CONNECTED FIRMLY IN

14  THE UNITED STATES.

15          SO THE IDEA THAT WE HAVE TO FOCUS ON THIS NOTION OF

16  PEOPLE AS IMPORTS I THINK IS A RED HERRING IN THAT REGARD. AND

17  IF YOU HEARD MR. SHERMAN SAY -- AND IT'S TRUE -- THERE ARE A

18  NUMBER OF CASES INTERPRETING THE FTAIA WHERE THE NOTION THAT YOU

19  CAN IMPORT NOT JUST GOODS, BUT A SERVICE WILL ALSO SATISFY THE

20  IMPORT TRADE EXCEPTION.

21          NOW, WITH RESPECT TO THE IDEA OF PEOPLE BEING

22  IMPORTS, WE RECOGNIZE THAT THAT'S WHAT JUDGE OTERO HELD. HE

23  WOULD ALSO NOTE THAT JUDGE OTERO WAS NOT GIVEN THE FULL RECORD

24  THAT WE HAVE PROVIDED TO YOUR HONOR IN THIS CASE.

25          AND IT WAS ALSO DONE BEFORE AIR CARGO WAS -- THE

1   ORDERS IN AIR CARGO WERE GIVEN.

2            I THINK THE POINT WE WANT TO MAKE HERE IS THERE ARE

3   SOME CASES FROM THE 1800'S IN THE SUPREME COURT THAT TALK ABOUT

4   THIS IDEA OF IMPORTS NOT BEING PEOPLE.

5            BUT WHAT THEY ARE TALKING ABOUT IS A VERY SPECIFIC

6   SECTION OF THE CONSTITUTION.  I MEAN, IT'S ARTICLE ONE, SECTION

7   TEN. AND IT TALKS THERE ABOUT RESERVING TO THE CONGRESS THE

8   NOTION THAT THERE'S -- THE TAX POWER IS FOR THE CONGRESS. AND IT

9   TALKS ABOUT IMPORTS.

10           AND WHAT THEY DO IS THEY GO BACK AND THEY CHECK --

11  THEY CHECK A SURVEY OF ALL OF THE PREVIOUS CASES.  AND THEY

12  DECIDE WITH RESPECT TO THIS ONE SECTION OF THE CONSTITUTION,

13  PEOPLE HAVE NEVER BEEN CONSIDERED IMPORTS IN THAT CONTEXT.

14           BUT WHAT WE'VE DONE IN OUR PAPERS, YOUR HONOR, IS

15  SHOW YOU THAT OVER THE LAST HUNDRED YEARS PEOPLE AND IMPORTS ARE

16  COMMONLY DISCUSSED TOGETHER. AND THE IDEA THAT YOU CAN BRING A

17  PERSON INTO THE UNITED STATES IS AN IMPORT ACTIVITY.

18           THAT'S CONSISTENT WITH THE DICTIONARY DEFINITION.

19           NOW, THE DEFENDANTS WANTS TO FOCUS VERY SPECIFICALLY

20  ON ONE DEFINITION OF WHAT AN IMPORT IS. BUT THE IDEA IS IMPORTS

21  CAN BE DATA.  THEY CAN BE SERVICES, CARGO.  AND AS THE CONGRESS

22  OF THE UNITED STATES HAS SAID IN SOME OF ITS STATUTES, AS THE

23  CASE LAW, INCLUDING THE CASE LAW IN THE NINTH CIRCUIT SAY,

24  IMPORTS CAN ALSO MEAN PEOPLE.

25           AND WE DON'T HAVE TO GET THERE, I THINK, BECAUSE THE

 1    IDEA OF TRANSPORTATION ROUTES IS THE KEY HERE, AND WHAT WAS DONE

 2    IN <u>ARCTIC RAILWAY</u> AND THE INTERPRETATION OF THE FTAIA.

 3              WITH RESPECT TO THE DOMESTIC EFFECTS TEST, YOUR

 4    HONOR, WE HAVE PLED THAT PEOPLE HAVE TRAVEL BUDGETS.  AND THAT

 5    INCLUDES THE IDEA THAT IF THE AIR FARE IS FIXED AND IS HIGHER

 6    THAN SOMEBODY WOULD OTHERWISE BE ABLE TO PAY, THAT IS GOING TO

 7    HAVE A DOMESTIC EFFECT ON THE UNITED STATES WHEN THEY COME TO

 8    THE UNITED STATES, AND THEY DON'T HAVE THAT MONEY.

 9              **THE COURT:**  I THINK YOU DID PLEAD IT.  I THINK YOU

10    PLED IT.  I UNDERSTAND THAT.  THE QUESTION IS WHETHER IT'S SO

11    CONCLUSORY, THE WAY YOU PLED IT, THAT IT'S TOO CONCLUSORY.

12              AND MY QUESTION TO YOU IS:  IF I WERE TO GRANT YOU

13    LEAVE TO AMEND, DO YOU BELIEVE THAT YOU HAVE FACTS THAT YOU

14    COULD PLEAD IT WITH GREATER PARTICULARITY THAT WOULD OVERCOME AN

15    OBJECTION THAT YOU HAVE PLED IT IN A CONCLUSORY MANNER?

16              **MR. LEBSOCK:**  WELL, I THINK THAT WE COULD PLEAD MORE

17    CAREFULLY AND MORE FULSOMELY THAT PEOPLE HAVE BUDGETS, AND THAT

18    IF ONE PART OF THE BUDGET -- WHEN YOU'RE TALKING ABOUT A TRIP,

19    AN ITINERARY TO SOMEWHERE, AND YOU ARE GOING TO PAY MORE FOR THE

20    AIR FARE, THAT MEANS YOU ARE CORRESPONDINGLY GOING TO BE PAYING

21    LESS FOR OTHER SERVICES AND GOODS.

22              **THE COURT:**  I REALLY HAVE A HARD TIME NOT LIVING -- I

23    GUESS WE ALL LIVE ON SOME KIND OF BUDGET.  BUT I HAD A HARD TIME

24    TRYING TO FIGURE OUT IF IT'S $3 MORE OR $5 MORE THAT REALLY IS

25    GOING TO IMPACT THE REST OF THEIR BUDGET.

1          I MEAN, ARE YOU REALLY SAYING THAT YOU THINK YOU CAN

2   PLEAD A SET OF FACTS WHICH WOULD IN GOOD FAITH THAT WOULD

3   DEMONSTRATE THIS BUDGETARY ARGUMENT?

4          **MR. LEBSOCK:**  WELL, I THINK WE CAN PLEAD MORE, YOUR

5   HONOR.

6          **THE COURT:**  WELL, I KNOW YOU CAN PLEAD MORE.  THE

7   QUESTION IS -- AND IF YOU'RE TELLING ME:

8               "LOOK, IF AT THE END OF THE DAY YOU SUBSCRIBE TO

9               THE ARGUMENT THAT IT'S TOO CONCLUSORY, WHICH WE DON'T

10              BELIEVE IT IS, GIVE US ANOTHER SHOT AT IT. WE THINK

11              THAT WE CAN PLEAD FACTS WHICH WOULD OVERCOME THAT

12              PARTICULAR PROBLEM, THOUGH ARGUABLY WE DON'T HAVE TO

13              DO IT. BUT IF YOU -- WE WANT LEAVE TO AMEND, IN ANY

14              EVENT, BECAUSE WE THINK WE CAN DO IT."

15          IS THAT WHAT YOU'RE SAYING TO ME?

16          **MR. LEBSOCK:**  I'M SAYING WE WILL GIVE IT A SHOT, YOUR

17   HONOR.

18          **THE COURT:**  OKAY.  WELL, THAT'S FAIR ENOUGH.  I DON'T

19   THINK I COULD ASK ANY MORE THAN THAT, IF I GET THERE.  BUT I'M

20   NOT --

21          **MR. LEBSOCK:**  I WOULD ALSO SAY THIS, YOUR HONOR, WITH

22   RESPECT TO THE DOMESTIC EFFECTS TEST.  JUDGE OTERO MADE HIS

23   DECISION AFTER GIVING THE PLAINTIFFS LEAVE TO TAKE FULL

24   DISCOVERY. AND THAT IS SOMETHING THAT WE THINK IS APPROPRIATE

25   HERE, TOO.

1              IN FACT, THERE ARE OTHER CASES THAT TALK ABOUT THIS

2      IN THE CONTEXT OF THE FTAIA.  AND, IN FACT, THERE WAS A FOURTH

3      CIRCUIT OPINION CALLED DK ENTERPRISES VERSUS VIVAFILM.

4              AND THERE THE COURT LEFT IT TO THE JURY, ACTUALLY, TO

5      DECIDE WHETHER THERE WAS A SUBSTANTIAL EFFECT ON U.S. COMMERCE.

6      AND I'M NOT SUGGESTING THAT WE GO THERE NOW, BUT I'M SAYING THAT

7      I THINK THERE'S ROOM HERE FOR US TO TAKE DISCOVERY ON THIS

8      ISSUE.  AND THEN, THE DEFENDANTS, IF THEY THINK THAT WE HAVEN'T

9      SATISFIED IT, CAN COME BACK ON SOME SORT OF MOTION FOR SUMMARY

10     JUDGMENT, OR IF IT'S AN ISSUE OF MATERIAL FACT, FOR THE JURY TO

11     DECIDE.  WE WILL TAKE IT UP IN THOSE CONTEXTS.

12             OKAY.

13             **THE COURT:**  THANK YOU.

14             **MR. SHERMAN:**  JUST A FEW THINGS, YOUR HONOR.

15             MR. LEBSOCK STARTED BY SAYING THIS ISSUE OF PEOPLE AS

16     IMPORTS IS A RED HERRING, AND THEN IMMEDIATELY STARTED CITING

17     THE CASES FROM A HUNDRED YEARS AGO ABOUT WHETHER PLAINTIFFS ARE

18     IMPORTS OR NOT.

19             **THE COURT:**  WELL, I THINK YOU'RE SKIPPING A STEP. I

20     MEAN, IN DEFERENCE TO PLAINTIFFS' ARGUMENT, PLAINTIFF IS SAYING:

21             "LOOK" -- AS I UNDERSTAND IT, AND CORRECT ME IF

22             I'M WRONG -- "TRANSPORTATION, A TRANSPORTATION

23             SERVICE WHERE YOU TRANSFER OR TRANSPORT PEOPLE INTO

24             THE UNITED STATES IS ACTUALLY A FORM OF AN IMPORT.

25             IT, IN AND OF ITSELF IS AN IMPORT BECAUSE IT'S -- OH,

1          IT'S BRINGING THE PERSON HERE. THE GOOD IT IS

2          DELIVERING, IT IS DELIVERING A SERVICE. THE SERVICE

3          BEING PICKING THE PERSON UP IN EUROPE, OR WHEREVER,

4          AND BRINGING THE PERSON TO THE UNITED STATES."

5          AND THAT'S VERY MUCH -- IF YOU LOOK AT COMMERCE,

6   THAT'S A VERY IMPORTANT PART OF COMMERCE, ESPECIALLY AS ONE GETS

7   TO A GLOBAL ECONOMY.  IT'S A VERY VALUABLE SERVICE.  AND WHY

8   ISN'T IT THEORETICALLY OR LOGICALLY, SO FORTH, WHY ISN'T IT AN

9   IMPORT?

10          THAT IS WHAT IS HAPPENING. YOU ARE -- THE SERVICE

11  ITSELF IS AN IMPORT BECAUSE IT BRINGS THE PEOPLE HERE.

12          I THINK THAT'S THEIR ARGUMENT.  THEN, THEY SAY:

13          "BY THE WAY, SECONDARILY, TAKE A LOOK AT THESE

14          CASES A HUNDRED YEARS BACK," AND BLAH, BLAH, BLAH.

15          **MR. SHERMAN:**  YES.

16          **THE COURT:**  BUT I THINK THAT'S THEIR FIRST ARGUMENT.

17          **MR. SHERMAN:**  FAIR ENOUGH.  I THINK YOU ARE RIGHT.

18  IT IS THEIR ARGUMENT.  BUT IT'S WRONG.

19          IT IS A SERVICE BEING PROVIDED.  NO QUESTION.  BUT

20  IT'S A SERVICE OF MOVING PEOPLE FROM POINT A TO POINT B.  THE

21  SERVICE IS NOT BEING IMPORTED AS A SERVICE.  FOR INSTANCE, AS AN

22  OUTSOURCING OF I.T. OR SOME SERVICE THAT MIGHT BE ACTUALLY

23  IMPORTED.

24          THIS IS -- AND, IN FACT, JUDGE OTERO ADDRESSED THIS

25  VERY ARGUMENT WHEN HE SAID:

```
 1                   "NO.  NO.  NO. YOU CAN'T MAKE THAT ARGUMENT.

 2              IT'S NOT -- THE TICKET THAT YOU ARE SELLING HAS NO

 3    VALUE IN AND OF ITSELF.  IT'S MOVING THE PEOPLE.  BUT YOU ARE

 4    MOVING THEM HERE.  YOU'RE NOT IMPORTING THE SERVICE.

 5              AND, IN FACT, THE ATTEMPT TO USE CARGO, THERE IS A

 6    VERY DIFFERENT SITUATION IN CARGO.

 7              THE COURT:  SO YOU'RE SAYING IT WOULD BE -- LET'S SAY

 8    THE GOVERNMENT REQUIRED VISAS TO COME TO THE UNITED STATES.

 9              MR. SHERMAN:  YES.

10              THE COURT:  AND A PERSON WOULD HAVE TO GO TO A

11    COUNCIL OR SOMEPLACE TO GET A VISA TO COME HERE.  YOU'RE SAYING

12    THAT THAT MAY BE A SINE QUA NON OF COMING INTO THE UNITED

13    STATES, BUT THAT WOULDN'T BE A SERVICE.  IT WOULD BE VIEWED AS

14    AN IMPORT.

15              MR. SHERMAN:  CORRECT, YOUR HONOR.  ABSOLUTELY. AND

16    ESPECIALLY LOOKING AT -- IF YOU LOOK AT THE LEGISLATIVE HISTORY

17    OF THE FTAIA, THIS IS CLEARLY THE CONGRESS -- CONGRESS'S CONCERN

18    WAS IMPORT COMMERCE, NOT THE FACT THAT SOMETHING -- THAT A

19    PERSON MIGHT END UP IN THE UNITED STATES.

20              I MEAN, WE'VE CITED TO THE COURT CFR DEFINITION OF

21    IMPORTS AND VARIOUS GOVERNMENT STATISTICS. PASSENGERS COMING IN

22    AND OUT OF THE U.S. ARE NOT INCLUDED IN THE TRADE DEFICIT

23    IMPORTS AND EXPORTS.  THEY ARE NOT CONSIDERED IMPORTS OR

24    EXPORTS.

25              AND, IN FACT, IF, INDEED, THE SERVICE OF BRINGING
```

```
 1   THEM IN IS AN IMPORT, THEN LOGICALLY THE SERVICE OF BRINGING

 2   THEM OUT WOULD BE AN EXPORT. AND NOW WE HAVE A BIG CONUNDRUM

 3   UNDER THE FTAIA.  BECAUSE THE TWO THINGS THAT THE FTAIA DID WAS

 4   PROVIDE GREATER PROTECTION FOR EXPORTERS TO BE ABLE TO EXPORT

 5   THEIR GOODS WITHOUT BEING HINDERED AND SHACKLED BY THE AMERICAN

 6   ANTITRUST LAWS.

 7            AND SO IF PLAINTIFFS' ARGUMENTS WERE TO BE ACCEPTED

 8   WE'D BE IN AN ODD SITUATION WHERE THE OPPOSITE OF WHAT I JUST

 9   SAID IN RESPONSE TO YOUR LAST QUESTION WERE THE CASE.  WHERE

10   THEY COULD -- THIS COURT COULD ENTERTAIN JURISDICTION OVER

11   PASSENGERS WHO BOUGHT A FARE IN KUALA LUMPUR TO FLY TO SINGAPORE

12   TO FLY TO HONG KONG TO FLY TO TORONTO.  THEY ARRIVE IN NEW YORK.

13   THEY STEP OFF THE PLANE, AND THEY SAY:

14                "I'M AN IMPORT.  I'M READY TO SUE."

15            WHEREAS, OUTBOUND FROM THE U.S., TICKETS BOUGHT IN

16   THE UNITED STATES, YOU KNOW, FOR SERVICE OUTBOUND IS BEYOND THE

17   REACH OF THIS COURT.

18            IF WE'RE GOING TO PLAY THE IMPORT/EXPORT GAME, THE

19   PLAINTIFFS CAN'T HAVE THEM BOTH.  IF THE PEOPLE COMING IN ARE

20   IMPORTS, THE PEOPLE GOING OUT MUST BE EXPORTS.

21            IT'S NOT A LOGICAL CONCLUSION, LOGICAL READING OF THE

22   STATUTE.

23            IN TERMS OF CARGO, THE CARGO CASE IS DIFFERENT

24   BECAUSE IN CARGO WHAT MAGISTRATE JUDGE POHORELSKY LOOKED AT WAS

25   THERE ARE SERVICES THAT ARE PROVIDED IN ADDITION TO JUST
```

```
1   BRINGING THE CARGO FROM ONE COUNTRY TO ANOTHER. THERE'S THE

2   OFFLOADING.  A LOT OF TIMES THERE'S THE GROUND TRANSPORTATION.

3   BECAUSE IN CARGO YOU WON'T NECESSARILY BE FLYING TO YOUR EXACT

4   DESTINATION. ENTIRELY DIFFERENT SITUATION WHEN YOU'RE DEALING

5   WITH GOODS AND THE SERVICES PROVIDED WITH RESPECT TO GOODS.

6           MR. LEBSOCK IS JUST WRONG ABOUT WHETHER JUDGE OTERO'S

7   DECISION WAS BEFORE OR AFTER THE CARGO DECISION.  THE MAGISTRATE

8   JUDGE'S RECOMMENDATION WAS IN SEPTEMBER, 2008. IT WAS ACCEPTED

9   BY JUDGE GLEASON IN 2009.

10          JUDGE OTERO'S DECISION WAS THIS SUMMER.

11          HE SAYS -- MR. LEBSOCK SAYS:

12              "WELL, MR. -- JUDGE OTERO DIDN'T HAVE A FULL

13              RECORD."

14          BUT THEN HE TOLD YOU ACTUALLY JUDGE ORTERO DID HAVE A

15  MUCH FULLER RECORD BECAUSE HE'D HAD DISCOVERY.  BUT JUDGE ORTERO

16  SAID VERY CLEARLY:

17              "I LET YOU HAVE DISCOVERY, BUT IN LIGHT OF

18              CENTERPRISE I DIDN'T NEED IT. YOU WIN, DEFENDANTS,

19              AFTER CENTERPRISE ON EITHER A FACIAL OR A FACTUAL

20              BASIS."

21          SO HE DID ALLOW DISCOVERY, BUT IT WASN'T NECESSARY TO

22  HIS DECISION, JUST AS IT'S NOT NECESSARY HERE.

23          THE COURT:  WHAT ABOUT IN TERMS OF THE EFFECTS?

24          MR. SHERMAN:  YES.

25          THE COURT:  THE DOMESTIC EFFECTS.
```

1      **MR. SHERMAN:**  I SHARE, OBVIOUSLY, YOUR SKEPTICISM

2    ABOUT WHETHER PLAINTIFFS CAN REPLEAD ON THIS THEORY. BUT EVEN IF

3    THEY DO, IT DOESN'T MATTER, BECAUSE WHAT THEY ARE ALLEGING IS

4    THAT THE EFFECT IN THE UNITED STATES IS WHEN PEOPLE GET HERE

5    THEY HAVE LESS MONEY TO SPEND.

6          BUT, REMEMBER, THE EFFECTS EXCEPTION REQUIRES THAT

7    THAT BE THE CAUSE OF THEIR FOREIGN INJURY. AND THERE'S NO

8    CONCEIVABLE -- THEY DON'T ALLEGE IT, AND I CAN'T IMAGINE THAT

9    THEY WOULD HAVE ANY FACTUAL BASIS TO ALLEGE THE PERSON WHO HAS

10   LESS MONEY TO SPEND ON SOUVENIRS IN THE U.S., HOW DID THAT CAUSE

11   THEIR FOREIGN INJURY OF PAYING TOO MUCH FOR THE TICKET THAT GOT

12   THEM HERE?

13         SO THE LEAVE TO AMEND WOULD BE FUTILE HERE ON THE

14   DOMESTIC EFFECTS EXCEPTION.  IT'S BACKWARDS. IT'S BACKWARDS.

15   THAT THEORY, EVEN IF THEY WERE ABLE TO PLEAD FACTS, IT WOULDN'T

16   SATISFY, IT COULDN'T SATISFY THE DOMESTIC EFFECTS EXCEPTION.

17         THEN, LET ME JUST FINISH WITH ASSOCIATED GENERAL

18   CONTRACTORS, AGAIN, BECAUSE IF THAT IS THEIR THEORY OF HARM, NOT

19   ONLY IS IT GOING TO BE DIFFICULT FOR THEM, I THINK, TO PLEAD

20   FACTS TO SUPPORT IT, BUT THEN THE ISSUE OF PROOF OF PROVING THE

21   ANTITRUST VIOLATION BY SHOWING THAT SOMEONE WHO HAD FLOWN TO

22   THIS COUNTRY HAD LESS MONEY TO SPEND HERE BECAUSE OF WHATEVER

23   THEY PAID TOO MUCH FOR THEIR TICKET OVERSEAS?

24         I THINK THAT'S EXACTLY WHAT ASSOCIATED GENERAL

25   CONTRACTORS SAYS.  THAT'S TOO ATTENUATED AN INJURY FOR ANTITRUST

1    LAWS.

2              THANK YOU, YOUR HONOR.

3         **THE COURT:**  SO LET'S MOVE ON TO THE NEXT ARGUMENT.

4         **MR. BAMBERGER:**  GOOD AFTERNOON, AGAIN, YOUR HONOR.

5    DAVID BAMBERGER FOR CATHAY PACIFIC.  AND I WILL BE ADDRESSING

6    THE ISSUE OF THE FILED RATE DOCTRINE.

7              YOUR HONOR, THE PLAINTIFFS IN THIS CASE CLAIM DAMAGES

8    BASED UPON THE PROPOSITION THAT BUT-FOR THE CONSPIRACY THEY

9    ALLEGE THEY WOULD HAVE PAID SOME HYPOTHETICAL LOWER RATES FOR

10   TRANSPACIFIC AIR TRAVEL.

11             THAT IS PRECISELY THE SORT OF CLAIM THAT THE SUPREME

12   COURT, THE NINTH CIRCUIT AND NUMEROUS OTHER COURTS HAVE

13   DISALLOWED FOR NEARLY A HUNDRED YEARS UNDER THE FILED RATE

14   DOCTRINE.

15             I WANT TO BE CLEAR AT THE OUTSET --

16        **THE COURT:**  WELL, I WOULD BE INTERESTED IN HOW YOU

17   DEAL WITH THE EXCEPTIONS TO THE FILED RATE DOCTRINE.  THAT IS,

18   YOU KNOW, THEY HAVE ABDICATED THEIR RESPONSIBILITIES OR

19   SOMETHING ALONG THAT LINE.

20        **MR. BAMBERGER:**  SURE.

21        **THE COURT:**  YES.  I THINK IF IT APPLIES, IT APPLIES.

22        **MR. BAMBERGER:**  SURE.

23        **THE COURT:**  AND I DON'T THINK THAT -- THEIR ARGUMENT

24   IS THAT THERE'S A REASON THAT YOU DON'T APPLY IT.

25        **MR. BAMBERGER:**  UNDERSTOOD, YOUR HONOR.  AND IF THE

1    COURT WILL INDULGE ME, I WILL GET THERE, AND WE WILL FOCUS ON

2    IT.  BUT I THINK --

3              **THE COURT:**  WELL, LET'S GET THERE RIGHT NOW.

4              **MR. BAMBERGER:**  OKAY. WE WILL DO THAT.

5              YOUR HONOR, IN THE AREA OF FOREIGN AIR

6    TRANSPORTATION, UNTIL 1999, ALL RATES WERE FILED. THERE WERE NO

7    EXCEPTIONS. AND THE STATUTE FOR FIFTY YEARS NOW -- THE FEDERAL

8    AVIATION ACT HAS REQUIRED AND WAS NEVER CHANGED -- IT HAS

9    REQUIRED THAT ALL TARIFFS BE FILED.

10             BUT THE DEPARTMENT OF TRANSPORTATION IN 1999 BEGAN A

11   PROGRAM OF GRANTING CERTAIN EXEMPTIONS FROM THE FILING

12   REQUIREMENT. AND WE'VE BRIEFED THAT.  BUT IF I MAY JUST TAKE A

13   MOMENT TO GO OVER THAT, YOUR HONOR.

14             THE DEPARTMENT HAS CERTAIN CRITERIA THAT HAVE BEEN

15   SET OUT IN THE REGULATIONS, AND THE DEPARTMENT OF TRANSPORTATION

16   REVIEWS THE INTERNATIONAL AIR MARKETS PERIODICALLY IN A PROGRAM

17   OF CONTINUING OVERSIGHT AND MAKES DETERMINATIONS FROM TIME TO

18   TIME ABOUT WHICH JURISDICTIONS OR COUNTRIES OUGHT TO BE EXEMPT

19   FROM THE FILING REQUIREMENT.

20             AND THAT'S BASED ON CRITERIA THAT ARE SET OUT IN THE

21   REGULATIONS.  AND THERE HAVE BEEN THREE NOTICES OF EXEMPTION TO

22   DATE. THE FIRST IN 1999, THEN IN 2005, AND THEN IN 2008.

23             AND SO WHEN WE LOOK AT THE ISSUE OF EXEMPTIONS AND

24   WHAT HAS BEEN FILED AND WHAT HASN'T BEEN FILED, WE HAVE TO LOOK

25   AT THOSE THREE CATEGORIES OF, OR CLASSIFICATIONS, IF YOU WILL,

```
1    OF JURISDICTIONS.

2              I THINK IT MIGHT BE HELPFUL, YOUR HONOR -- IF YOU'LL

3    PERMIT ME, I HAVE A VERY SHORT POWERPOINT HANDOUT THAT I CAN

4    HAND UP AND CAN WALK THE COURT THROUGH THAT VERY QUICKLY. AND I

5    THINK IT WILL BE HELPFUL IN ADDRESSING YOUR QUESTION.

6              AND I UNDERSTAND WHAT YOUR HONOR'S QUESTION IS.

7              I DON'T THINK THESE ARE CONTROVERSIAL, BUT IF I MAY

8    HAND THEM UP, I'LL HAND THEM TO OPPOSING COUNSEL.

9              THE COURT:  I HAD LUNCH WITH JUDGE HENDERSON TODAY.

10   HE'S TRYING A CASE, AND JUDGE HENDERSON SAID THAT HE RECEIVED --

11   IT'S IN FRONT OF HIM -- AND HE RECEIVED IN HIS PRETRIAL BRIEFS A

12   LIST OF UNDISPUTED FACTS.

13             THEN, AS THE TRIAL STARTED, THE PLAINTIFF'S COUNSEL

14   CAME IN AND SAID:

15                  "HERE IS A SECOND LIST OF UNDISPUTED FACTS, SOME

16             OF WHICH MAY BE DISPUTED."

17             SO WHEN YOU SAY TO ME THAT THERE MAY BE NO DISPUTE --

18             MR. BAMBERGER:  WELL, I WOULD BE SURPRISED, YOUR

19   HONOR, BUT I GUESS WE WILL FIND OUT.

20             SO THERE ARE JUST ESSENTIALLY FIVE PAGES.  AND I

21   THINK THIS WILL BE ILLUSTRATIVE.

22             THE COURT:  I CAN DEAL WITH FIVE PAGES. OKAY.  GO

23   AHEAD.

24             MR. BAMBERGER:  THE FIRST PAGE REALLY IS JUST AN

25   EXCERPT TO GIVE THE COURT A SENSE OF WHAT THE DEPARTMENT OF
```

1  TRANSPORTATION'S MINDSET WAS, WHAT THEIR INTENT WAS IN GRANTING

2  THESE EXEMPTIONS.

3          AND AS IT SAYS THERE:

4              "THIS RULE WILL NOT MATERIALLY LESSEN THE

5          DEPARTMENT'S ABILITY TO INTERVENE IN PASSENGER

6          PRICING MATTERS, SHOULD IT BE NECESSARY.  THE

7          DEPARTMENT HAS ALWAYS HAD THE STATUTORY AUTHORITY TO

8          TAKE ACTION DIRECTLY AGAINST UNFILED PASSENGER FARES

9          AND RULES UNDER A VARIETY OF CIRCUMSTANCES."

10         AND THEN, IF WE GO TO THE NEXT PAGE, THESE ARE THE

11 THREE CLASSIFICATIONS THAT I REFERRED TO AS PROVIDED UNDER THE

12 REGULATIONS. AND IT ACTUALLY IS SIMPLER TO START AT THE BOTTOM

13 OF THE PAGE WITH THE CATEGORY C:

14             "IN COUNTRIES AND JURISDICTIONS THAT HAVE BEEN

15         PLACED IN CATEGORY C," SUCH AS HONG KONG, WHERE OUR

16         CLIENT IS HEADQUARTERED, "ARE ONES AS TO WHICH THE

17         DEPARTMENT OF TRANSPORTATION REQUIRES THE FILING OF

18         ALL FARES BY ALL CARRIERS.  THERE'S NO EXEMPTION

19         GRANTED."

20         AND THE SAME IS TRUE FOR JAPAN FOR MOST OF THE PERIOD

21 OF TIME IN QUESTION.

22         THE B COUNTRIES ARE ONES WHERE CERTAIN FARES HAVE TO

23 BE FILED, ONE-WAY ECONOMIC CLASS FARES, EXCEPT THAT CATEGORY C

24 CARRIERS HAVE TO FILE ALL FARES, BECAUSE THEY HAVE NO EXEMPTION.

25             EVERYTHING ELSE THERE'S AN EXEMPTION IN CATEGORY B.

1          AND IN CATEGORY A, OTHER THAN CATEGORY C COUNTRY

2    CARRIERS, THERE IS NO FILING REQUIRED.

3          AND SO THE NET EFFECT, IF YOU LOOK ON THE NEXT PAGE,

4    PAGE THREE, IS THAT ALL TRAVEL ON ANY CARRIER BETWEEN THE U.S.

5    AND HONG KONG AT ANY TIME REQUIRED FILING OF TARIFFS WITH FARES

6    AND CHARGES WITH THE DEPARTMENT OF TRANSPORTATION.

7          AND THE SAME WAS TRUE WITH RESPECT TO JAPAN FOR AS

8    LONG AS JAPAN WAS A CATEGORY C COUNTRY.  LIN OTHER WORDS, UNTIL

9    APRIL, 2008.

10          MOREOVER, ALL TRAVEL ON CATHAY PACIFIC AND ANA,

11    BECAUSE THEY ARE CARRIERS OF C JURISDICTIONS, EVEN TO POINTS

12    BEYOND THEIR HOME COUNTRIES, REQUIRED FILING WITH THE DOT.

13          CATEGORY B ON PAGE FOUR DEALS WITH B JURISDICTIONS.

14    AND THAT'S WHAT JAPAN BECAME AFTER APRIL, 2008.

15          THE U.S. AND PHILIPPINES WAS A B JURISDICTION

16    THROUGHOUT.  AND THE U.S. AND THAILAND -- EXCUSE ME -- THAILAND,

17    VIETNAM AND AUSTRALIA WERE B JURISDICTIONS THROUGH APRIL, 2008.

18          SO FOR THOSE PERIODS OF TIME ONE-WAY ECONOMY FARES

19    HAD TO BE FILED WITH THE DEPARTMENT OF TRANSPORTATION.

20          I WOULD JUST NOTE HAS INDICATED ON THE LAST PAGE --

21    AND WE'VE BRIEFED THIS.  I DON'T INTEND TO DWELL ON IT, BUT I

22    WOULD BE HAPPY TO ANSWER ANY OF THE COURT'S QUESTIONS.

23               **THE COURT:**  WELL, MY QUESTION IS --

24               **MR. BAMBERGER:**  SURE.

25               **THE COURT:**  ONE QUESTION I HAD WAS BASICALLY THE

KATHERINE WYATT, OFFICIAL REPORTER, RPR, RMR  925-212-5224

1  ARGUMENT IS THAT DEPARTMENT OF TRANSPORTATION BY THE EXCEPTIONS

2  TO THE FILED RATE DOCTRINE AS IT'S BEEN ENUNCIATED ESSENTIALLY

3  GIVES PROTECTION TO THE DEFENDANTS HERE.  THAT'S THE ARGUMENT,

4  RIGHT?

5          **MR. BAMBERGER:**  YES, YOUR HONOR.

6          **THE COURT:**  OKAY. SO THE QUESTION MIGHT BE:  WELL,

7  WHY DON'T WE ASK THE DEPARTMENT OF TRANSPORTATION WHAT THEIR

8  VIEW IS?

9          AND I THINK THE FERC LITIGATION IN THE NINTH CIRCUIT

10  FERC WAS ASKED, WEREN'T THEY, WHAT THEIR VIEWS WERE?

11          IN A NUMBER OF STATE DEPARTMENT CASES I'VE HAD, WE'VE

12  SOLICITED THE VIEWS OF THE STATE DEPARTMENT.  SHOULD WE SOLICIT

13  THE VIEWS OF THE DEPARTMENT OF TRANSPORTATION?

14          **MR. BAMBERGER:**  THAT COULD BE DONE, YOUR HONOR.  IN

15  FERC I'M NOT SURE WHETHER THEY WERE ASKED OR WHETHER THEY SIMPLY

16  ANNOUNCED --

17          **THE COURT:**  MAYBE THEY ANNOUNCED. I DON'T KNOW.  I

18  WASN'T PART OF THAT LITIGATION.

19          **MR. BAMBERGER:**  RIGHT.

20          **THE COURT:**  I THINK THAT THEIR POSITION WAS KNOWN.

21  HOW IT WAS KNOWN, I'M NOT SURE WHETHER IT WAS INVITED OR NOT.

22          **MR. BAMBERGER:**  RIGHT.

23          **THE COURT:**  SOMETIMES IN CASES INVOLVING STATE

24  DEPARTMENTS, FOREIGN COUNTRIES, AND SO FORTH, EITHER THEY

25  UNSOLICITED GIVE THE VIEWS OR WHERE THE COURT -- THERE'S A

1    MECHANISM, I THINK, IN STATE CASES WHERE THE COURT CAN SOLICIT

2    THE VIEWS OF THE DEPARTMENT OF STATE AS PART OF THE EXECUTIVE

3    BRANCH.

4           SHOULD I DO THE SAME THING HERE?

5           **MR. BAMBERGER:**  YOUR HONOR, I THINK IT COULD BE DONE.

6    WE'RE DEALING WITH THE ALLEGATIONS IN A COMPLAINT, AND THE STATE

7    OF THE RECORD AS IT IS, AND --

8           **THE COURT:**  BUT THE ISSUE IS, IS NOT NECESSARILY, I

9    UNDERSTAND, EITHER THE COMPLAINT OR ALLEGATIONS. THE QUESTION

10   IS:  IS THAT -- ARE YOU ENTITLED TO ENJOY THE PROTECTION THAT

11   HAS BEEN AFFORDED TO COMPANIES THAT FILE THEIR RATES?

12          **MR. BAMBERGER:**  I WOULD SAY, YOUR HONOR, WE ARE. AND

13   IN ALL OF THE CASES THAT WE CITED THERE WAS NO PREREQUISITE

14   OR --

15          **THE COURT:**  SO YOU WOULD NOT BE ADVERSE TO

16   SOLICITING THE VIEWS OF THE DEPARTMENT OF TRANSPORTATION?

17          **MR. BAMBERGER:**  WE WOULD NOT BE ADVERSE, NOR DO WE

18   THINK IT'S REQUIRED FOR PURPOSES OF DETERMINING WHETHER THE

19   COMPLAINT OUGHT TO BE DISMISSED ON THIS BASIS OR NOT.

20          I'M NOT FAMILIAR WITH ANY CASE OF ALL THE MANY THAT

21   WERE CITED WHERE THAT OCCURRED.

22          **THE COURT:**  NOR AM I.

23          **MR. BAMBERGER:**  RIGHT.

24          **THE COURT:**  THAT SUGGESTS MAYBE I'M ASKING THE

25   QUESTION --

KATHERINE WYATT, OFFICIAL REPORTER, RPR, RMR  925-212-5224

1        **MR. BAMBERGER:**  I GUESS THE OTHER --

2        **THE COURT:**  -- WHICH I SHOULDN'T BE ASKING, BUT --

3        **MR. BAMBERGER:**  I GUESS THE OTHER REACTION THAT I

4    HAVE -- AND I DON'T KNOW WHAT THE DEPARTMENT OF TRANSPORTATION

5    WOULD SAY, BUT --

6        **THE COURT:**  WELL, I DON'T KNOW THAT THERE'S

7    NECESSARILY A MECHANISM.  YOU KNOW, YOU COULD ASK THEM A

8    QUESTION AND NEVER GET AN ANSWER.   THEY HAVE THAT RIGHT. BUT,

9    ON THE OTHER HAND, SOMETIMES -- I MEAN, MAYBE THEY WOULD ANSWER.

10   MAYBE THEY WOULD STATE WHAT THEIR POSITION IS. MAYBE THEY DON'T

11   WANT TO.

12       **MR. BAMBERGER:**  YOU KNOW, I CAN'T PREDICT WHAT THAT

13   WOULD BE.  BUT I GUESS WHAT I WOULD SAY IS THAT GIVEN THAT THE

14   SUPREME COURT HAS ANNOUNCED ON TWO OCCASIONS THAT THE FILED RATE

15   DOCTRINE IS THE LAW OF THE LAND, I DON'T KNOW THAT IT'S UP TO

16   THE DEPARTMENT OF TRANSPORTATION TO SAY WHETHER IT APPLIES OR

17   NOT.

18            I DON'T KNOW THAT AN AGENCY'S VIEW OF HOW THE FILED

19   RATE DOCTRINE MIGHT APPLY HAS ANY ACTUAL LEGAL SIGNIFICANCE. IT

20   MIGHT BE INTERESTING. BUT IF THE FILED RATE DOCTRINE IS THE LAW

21   OF THE LAND, IF THE RATES ARE FILED AND THEY ARE AUTHORIZED AS

22   THEY CLEARLY ARE HERE, AND THEY ARE WITHIN THE JURISDICTION OF

23   THE DEPARTMENT, I GUESS IT'S MY POSITION, THINKING ABOUT IT

24   OFF-HAND, IS THAT THAT SHOULD BE ENOUGH.

25            AND THAT WHILE IT WOULD BE INTERESTING, I SUPPOSE

1    COULD BE INTERESTING WHAT THE DEPARTMENT MIGHT HAVE TO SAY, I

2    DON'T THINK IT WOULD BE BINDING OR CONTROLLING.

3            AGAIN, JUST THE FINAL PAGE OF THE POWERPOINT DEALS

4    WITH THE ISSUE OF FOREIGN FILING REQUIREMENTS.  AND AS WE

5    EXPLAINED IN OUR BRIEF IT'S NOT ONLY THE U.S. DEPARTMENT OF

6    TRANSPORTATION THAT REQUIRES THE FILING OF FARES, BUT EACH OF

7    THESE JURISDICTIONS LISTED ON THIS PAGE:  HONG KONG, JAPAN AND

8    THE PHILIPPINES THROUGHOUT THE PERIOD REQUIRED THE FILING BY ALL

9    CARRIERS WHO FLEW TO AND FROM THEIR JURISDICTIONS OF ALL FARES.

10   EVERY SINGLE ONE OF THEM.

11           AND JUST BY WAY OF EXAMPLE, IN HONG KONG, THERE'S

12   SOMETHING LIKE 54 CARRIERS THAT OVER THE COURSE OF THIS TIME --

13           **THE COURT:**  COULD I GET ONE BACK TO ONE THING?  IF

14   THE DEPARTMENT OF TRANSPORTATION SAID THAT THEY DON'T BELIEVE

15   THAT MARKET-BASED RATES, WHICH WE'RE TALKING ABOUT HERE, ARE

16   COVERED BY THE FILED-FIRST DOCTRINE, OR THE FILED DOCTRINE,

17   WOULDN'T THAT BE SOME EVIDENCE OF ABROGATION OF THEIR AUTHORITY

18   IN THIS FIELD?

19           I MEAN, IF THEY TAKE THE POSITION:

20               "LOOK, YOU KNOW, WE DON'T THINK IT'S -- WE DON'T

21           THINK IT'S COVERED," WOULDN'T THAT BE SOME INDICATION

22   OF WHETHER OR NOT THEY HAVE ACTUALLY ABROGATED THEIR

23   RESPONSIBILITY?

24           **MR. BAMBERGER:**  YOUR HONOR, I'M NOT SURE HOW TO

25   RESPOND ON BEHALF OF ALL THE DIFFERENT DEFENDANTS HERE THAT I'M

1    SPEAKING FOR.

2                AND I GUESS WHAT I WOULD -- IF THAT'S A SUBJECT ON

3    WHICH THE COURT WOULD LIKE SOME FEEDBACK, I WOULD WANT TO HAVE

4    AN OPPORTUNITY TO CONFER WITH THEM.

5                **THE COURT:**  FAIR ENOUGH.  SURE.  I'LL LEAVE IT ALONE.

6                **MR. BAMBERGER:**  OKAY.

7                YOUR HONOR, WITH RESPECT TO THE RATES THAT WERE

8    ACTUALLY FILED, TO THE EXTENT THAT THEY ARE NOT EXEMPT BECAUSE

9    THEY ARE IN CATEGORY C OR IN CATEGORY B, AS TO THOSE RATES WE

10   SUBMIT THERE'S JUST NO QUESTION THAT THE FILED RATE DOCTRINE

11   APPLIES.

12               EVERY SINGLE RATE IS FILED WITH THE DEPARTMENT OF

13   TRANSPORTATION, AND THERE'S A SLEW OF REGULATIONS, SOMETHING

14   CLOSE TO A HUNDRED REGULATIONS THAT GOVERN WHAT THE DEPARTMENT

15   SHOULD TAKE INTO ACCOUNT IN DETERMINING IF THOSE RATES ARE

16   REASONABLE.  AND SOMEBODY WHO IS PAYING THE FILED RATE, BY

17   VIRTUE OF KEOUGH AND SQUARE D, DOES NOT HAVE A LEGAL RIGHT TO

18   PAY LESS THAN THAT.

19               IT'S AS SIMPLE AS THAT. THEY HAVE NOT SUFFERED INJURY

20   OF THE SORT THAT THE ANTITRUST LAWS PROVIDE IN THE FORM OF

21   TREBLE DAMAGES IN A CIVIL ACTION.

22               WITH RESPECT TO THE EXEMPT RATES WHICH ARE DETERMINED

23   ON A MARKET BASIS, IN THE NINTH CIRCUIT, AS YOUR HONOR KNOWS,

24   THERE HAVE BEEN A SERIES OF CASES OVER THE LAST TEN YEARS OR SO

25   WHERE MARKET-BASED RATES HAVE BEEN FOUND TO BE -- TO QUALIFY FOR

1    APPLICATION OF THE FILED RATE DOCTRINE.

2              THERE HAVE BEEN SEVERAL IN THE ELECTRIC AREA, THE

3    GRAYS HARBOR, SNOHOMISH, AND WAH CHANG CASE.

4              BUT THE ONE I WOULD SUBMIT, YOUR HONOR, IS REALLY

5    MOST ON POINT AND REALLY DESERVES SOME CLOSE SCRUTINY IS THE

6    GALLO CASE, BECAUSE THERE ARE SOME VERY CLOSE PARALLELS BETWEEN

7    THAT CASE, WHICH WAS IN THE NATURAL GAS AREA, AND THIS CASE

8    BEFORE YOUR HONOR.

9              IN THE GALLO CASE, THE COURT RECITED THE FACT THAT

10   THERE HAD BEEN WHAT THE COURT DESCRIBED AS A, QUOTE,

11   "SUBSTANTIAL DEREGULATION" OF THE NATURAL GAS MARKET.

12             AND THAT INCLUDED SUSPENSION OF THE AGENCY'S -- IN

13   THAT CASE FERC'S -- RATE-FILING REQUIREMENTS AND ALLOWING

14   COMPANIES TO CHARGE MARKET-BASED RATES.

15             AND FERC'S POSITION WAS THAT IT WOULD SIMPLY MONITOR

16   THE MARKET. AND IT WOULD THEN ACT ONLY IF THERE WAS A COMPLAINT.

17   IT WORKED ON THE COMPLAINT PROCESS.  AND THAT'S EXACTLY WHAT DOT

18   HAS DONE WITH RESPECT TO THE EXEMPT FILING IN CONNECTION WITH

19   FOREIGN AIR TRANSPORTATION.

20             IN THE GALLO CASE THE BUYERS AND SELLERS DETERMINED

21   RATES BY REFERRING TO INDICES, AND THOSE INDICES WERE PUBLISHED,

22   AND THEY WERE NOT SUBJECT TO -- THAT PROCESS OF DEVELOPING THE

23   INDICES WAS NOT SUBJECT TO FERC'S OVERSIGHT.

24             AND THE COURT EVEN NOTED THAT IT WAS DONE IN A --

25   WHAT THE COURT CALLED "LESS THAN METICULOUS MANNER."

 1          NOW, IN THAT CASE, GALLO, THE PLAINTIFF, CONCEDED AS

 2   WE SUBMIT THE PLAINTIFFS SHOULD HAVE DONE HERE, THAT RATES

 3   ACTUALLY FILED WERE SUBJECT TO THE FILED RATE DOCTRINE. BUT

 4   GALLO SAID THAT IT WAS NOT APPROPRIATE TO APPLY THAT DOCTRINE TO

 5   MARKET-BASED RATES.

 6          AND THE NINTH CIRCUIT DISAGREED WITH THAT LIMITATION,

 7   AND SAID THAT THE STATUTE WHICH WAS THERE, THE NATURAL GAS ACT,

 8   DID NOT REQUIRE FERC TO USE ANY PARTICULAR FORM OF REGULATION TO

 9   ENSURE REASONABLE RATES; THAT FERC HAS WIDE LATITUDE TO

10   DETERMINE WHAT'S THE MOST EFFECTIVE WAY TO CARRY OUT ITS

11   MANDATE.

12          THE COURT ACTUALLY SAID THAT UNFILED MARKET-BASED

13   RATES ARE FERC-AUTHORIZED.  IN OTHER WORDS, JUST AS AUTHORIZED

14   AS IF THE RATES HAD BEEN FILED.  AND SAID THAT THE AGENCY WAS

15   CARRYING ON ONGOING OVERSIGHT, EVEN IF IT WAS WHAT THE COURT

16   CALLED "LIGHT-HANDED."

17          AND THE NINTH CIRCUIT SAID THAT FERC HAD NOT

18   ABDICATED ITS RESPONSIBILITIES, ALTHOUGH IT WAS REGULATING WITH

19   A LIGHT HAND.  AND THAT WAS DEEMED SUFFICIENT.

20          AND A FEW MONTHS LATER IN THE WAH CHANG CASE, WHICH

21   IS, AGAIN, IN THE ELECTRIC AREA, THE NINTH CIRCUIT DESCRIBED THE

22   FILED RATE DOCTRINE AS IMPENETRABLE AND A FORTRESS.  AND IN

23   REGARD TO THE DEGREE OF SCRUTINY OF THESE MARKET-BASED RATES

24   SAID THAT "REGULATORY LAXNESS" -- THAT'S THE COURT'S WORD IN

25   WAH CHANG -- "LAXNESS DOES NOT INDICATE, MUCH LESS ESTABLISH

1   THAT WAH CHANG, THE PLAINTIFF, CAN TURN DIRECTLY TO THE COURTS

2   FOR RELIEF."

3          SO WE WOULD SUBMIT THAT THE GALLO CASE REALLY IS ON

4   ALL FOURS WITH THIS CASE.

5          NOW, IN THAT CASE, IT WAS A SUMMARY JUDGMENT CASE,

6   AND SUMMARY JUDGMENT WAS DENIED.  BUT THE REASON WAS BECAUSE

7   SOME OF THE RATES IN THE INDICES WERE BEYOND FERC'S

8   JURISDICTION.  THAT'S NOT WHAT WE HAVE HERE.

9          IN SUMMARY, YOUR HONOR, I GUESS THERE'S ONE OTHER

10  THING I'D LIKE TO SAY. AND THAT IS THERE'S AN AWFUL LOT OF

11  BRIEFING BY THE PLAINTIFFS IN WHICH THEY CHARACTERIZE THE

12  CONDUCT HERE AS UNLAWFUL AND CHARACTERIZE THE REGULATION OF THE

13  INDUSTRY AS BECOMING LESS -- LESS STRICT, AND HOW COMPETITION IS

14  ON THE MARCH AND SO FORTH.

15         ALL OF THAT MAY BE TRUE, BUT IN CASE AFTER CASE GOING

16  ALL THE WAY BACK TO SQUARE D, AND THE NINTH CIRCUIT CASES LIKE

17  WAH CHANG AND SNOHOMISH, IN ALL OF THOSE CASES THE COURT

18  ASSUMED -- IT WAS ON A MOTION TO DISMISS -- AND THE COURT

19  ASSUMED THAT THE WRONGFUL CONDUCT, UNLAWFUL CONDUCT ACTUALLY

20  OCCURRED. BUT SAID THAT'S GOT NOTHING TO DO WITH THIS DOCTRINE,

21  WHICH IS A LIMITATION ON REMEDY.

22         THE GOVERNMENT CAN PURSUE ACTION. THERE MAY BE

23  ANTITRUST CONDUCT THAT'S NOT RATE-RELATED THAT'S SUBJECT TO

24  CIVIL TREBLE DAMAGES.  BUT IF IT'S LOOKING FOR COMPENSATION FOR

25  SOME ALLEGED OVERCHARGE BECAUSE RATES PURPORTEDLY WERE TOO HIGH,

1    EVEN THOUGH IT WAS A FILED RATE AND AN APPROVED RATE, THAT YOU

2    CAN'T DO.

3              AND WITH RESPECT TO THE RATES THAT WERE ACTUALLY

4    FILED, WE THINK IT'S CLEAR AS DAY. AND EVEN UNDER THE GALLO CASE

5    WITH RESPECT TO THOSE MARKET-BASED RATES, WE SUBMIT IN THIS

6    CIRCUIT THE FILED-RATE DOCTRINE APPLIES.

7              AND I'D LIKE TO JUST RESERVE A FEW MINUTES FOR

8    FOLLOW-UP.

9              THANK YOU, YOUR HONOR.

10             **MR. WILLIAMS:**  GOOD AFTERNOON, AGAIN, YOUR HONOR.

11   STEVE WILLIAMS FOR THE PLAINTIFFS TO DISCUSS THE FILED RATE.

12             I WAS INTERESTED IN THE COURT'S QUESTION ABOUT

13   WHETHER DOT SHOULD BE ASKED FOR THEIR VIEWS ON THIS SUBJECT.

14             I DON'T THINK DOT CAN ANSWER THE ULTIMATE QUESTION,

15   WHICH IS WHETHER RATES HAVE BEEN VALIDLY FILED OR WHETHER, IN

16   INSTANCES WHERE RATES AREN'T FILED, THE CLAIMS ASSERTED BY THE

17   PLAINTIFFS ARE SUBJECT TO THE FILED RATE DOCTRINE REGARDLESS.

18             BUT ON SOME OF THE ISSUES DOT HAS SPOKEN. SO, FOR

19   EXAMPLE, IN OUR REQUEST FOR JUDICIAL NOTICE, IN RELATION TO FUEL

20   SURCHARGE FILINGS BY THE DEFENDANTS, DOT HAS SAID:

21                  "WE CAN'T EFFECTIVELY MONITOR THESE."

22             THAT'S WHAT DOT HAS SAID.

23             SO WHEN WE TURN TO AN ISSUE OF, FOR EXAMPLE:  HAVE

24   THEY ABDICATED THEIR POWERS?  OR ARE THEY NOT ABLE TO

25   EFFECTIVELY REGULATE, AS CONGRESS HAS ASKED THEM?  THEY HAVE

1  ALREADY TOLD US IN 2004 AT THE TIME THAT THIS CONSPIRACY WE

2  ALLEGE WAS IN PLACE THAT THEY CAN EFFECTIVELY MONITOR THAT.

3          AND THAT'S IN OUR PAPERS. IT'S EXHIBIT DD.

4          IN TERMS OF THE APPLICATION OF THE FILED RATE, FIRST

5  WHERE RATES ARE VALIDLY FILED, THE FILED RATE DOCTRINE APPLIES.

6  THAT'S WHAT THE NINTH CIRCUIT SAID SPECIFICALLY IN THE CONTEXT

7  OF AIR TRANSPORTATION IN THE HARBY (PHONETIC) BY CASE IN 1987.

8          BUT THE KEY IS VALID FILINGS. NOW, WE UNDERSTAND, AND

9  THE DEFENDANTS DON'T ARGUE, THAT THEY FILE EVERY RATE THEY

10  CHARGE. WE KNOW THEY DON'T. WE KNOW SINCE THE LATE '90'S MOST OF

11  THE RATES THEY CHARGE AND MOST OF THE TRAVEL AT ISSUE IN THIS

12  CASE HASN'T BEEN FILED.  AND I'M GOING TO COME BACK TO THAT

13  ISSUE IN A SECOND.

14          BUT IN TERMS OF THE FILINGS WE DO CONTEND THEY HAVE

15  FAILED TO VALIDLY FILE RATES.

16          NOW, TAKE, FOR EXAMPLE, THE CASE OF ALL NIPPON

17  AIRWAYS, WHICH ANNOUNCED FRIDAY IT WAS PLEADING GUILTY TO FIXING

18  THE PRICE OF AIR TRANSPORTATION.  THEY, IN THEIR PAPERS, HAVE

19  ASKED YOUR HONOR TO DISMISS THEM BASED ON THE FILED RATE.

20          IT'S A LITTLE UNCLEAR PARTIALLY WHAT THEY FILED HERE

21  AND MAYBE WHAT THEY FILED IN JAPAN.  BUT ALL THEY HAVE GIVEN YOU

22  IS ONE TARIFF THEY SAY THEY FILED BEFORE THE DOJ RATES IN 2006.

23          AND AMONG THE THINGS WE CONTEND IS THAT FOR

24  PARTICULARLY FOR THE JAPAN ROUTES, BEFORE THOSE RATES THE

25  FILINGS OF TARIFFS WAS NOT BEING DONE AS IT SHOULD BE.

1      WE CONTEND AS TO SOME OF THE RATES THAT WERE FIXED,

2  AND THIS IS IN OUR COMPLAINT, THE SATOGARI RATES, YOBIYOSI

3  RATES, AS TO THOSE RATES WE CONTEND -- AND THESE ARE RATES IN

4  OUR COMPLAINT.  WE SET FORTH WHO MET WITH WHO, WHEN THEY MET,

5  HOW THEY DISCUSSED THIS, THERE'S NO FILINGS FOR THOSE, PERIOD,

6  AT ALL.

7      AS TO DEFICIENCIES, WE'VE GIVEN --

8      **THE COURT:**  LET ME MAKE SURE I FOLLOW YOUR ARGUMENT.

9  I UNDERSTAND THAT YOU ARE GOING TO HAVE -- THAT YOU HAVE A

10  ARGUMENT AS TO THE SO CALLED "MARKET-BASED OR UNFILED, THE

11  UNFILED RATES.  BUT WHAT IS -- AS TO THE FILED RATES, YOU

12  EMPHASIZE THE FACT THEY HAVE TO BE VALIDLY FILED. AND I'M NOT

13  QUITE SURE WHAT YOU MEAN BY "VALIDLY FILED."

14      ARE YOU DISPUTING WHETHER OR NOT THEY WERE FILED?

15  ARE YOU DISPUTING GIVEN -- LET'S ASSUME FROM YOUR ARGUMENT,

16  WHICH I CERTAINLY WOULD ASSUME FOR THESE PURPOSES, THAT THE

17  COMPETITORS MET.

18      THEY SAID:

19          "THIS IS A GREAT RATE.  WE'RE GOING TO MAKE A

20          LOT OF MONEY IF WE ALL AGREE TO CHARGE THIS RATE,

21          $10, WHATEVER IT IS.  OKAY. LET'S GO FILE NOW."

22      SO THEY GO FILE. IS THAT A VALIDLY FILED TARIFF OR

23  NOT?  IS IT YOUR VIEW IT IS?  YOUR VIEW IT ISN'T IT'S CERTAINLY

24  A -- I'LL SAY FOR THESE PURPOSES IT'S CORRUPT. THAT IS TO SAY IT

25  MAY BE VERY MUCH THE PRODUCT OF AN ANTITRUST CONSPIRACY, BUT IS

1    IT A VALIDLY FILED RATE?

2              **MR. WILLIAMS:**  AND MY ANSWER IS:  THE VALID FILING

3    DEPENDS ON COMPLYING WITH DOT -- OR, I'M SORRY -- THE FEDERAL

4    LAW WHICH SAYS IT'S GOT TO BE PUBLICLY AVAILABLE.

5              WHAT THESE DEFENDANTS --

6              **THE COURT:**  GOT TO BE WHAT?

7              **MR. WILLIAMS:**  PUBLICLY AVAILABLE, THE PASSENGER.  49

8    U.S.C. 41504A.

9              **THE COURT:**  PUBLICLY AVAILABLE.

10             **MR. WILLIAMS:**  I, AS A PASSENGER, IF I'M BUY A TICKET

11   ON JAL, IT HAS TO BE MADE AVAILABLE TO ME TO SEE.

12             **THE COURT:**  YOU'RE SAYING THESE RATES, THESE TARIFFS

13   THAT WERE FILED WERE NOT PUBLICLY AVAILABLE.

14             **MR. WILLIAMS:**  CORRECT.

15             **THE COURT:**  AND, THEREFORE, THEY WERE INVALID ON THAT

16   BASIS.

17             **MR. WILLIAMS:**  CORRECT.  OR AT THE LEAST AT THIS

18   POINT WE BELIEVE THAT TO BE TRUE.  WE CONTEND IT TO BE TRUE,

19   BECAUSE THEY ARE NOT FILED WITH THE DEPARTMENT OF

20   TRANSPORTATION.

21             **THE COURT:**  THEY ARE NOT AVAILABLE TO THE PUBLIC.

22             **MR. WILLIAMS:**  THEY ARE FILED WITH A COMPANY THAT THE

23   DEFENDANTS OWN.

24             **THE COURT:**  WELL, THAT'S NOT SO UNUSUAL IN REGULATORY

25   PRACTICE, IS IT?

1          I'M NOT A -- NOT ONLY AM I NOT AN EXPERT, I'M NOT

2     TERRIBLY KNOWLEDGEABLE AT ALL ABOUT REGULATORY PRACTICE. BUT MY

3     SENSE IS THAT THERE IS A CERTAIN AMOUNT OF COMMERCE THAT OCCURS

4     IN THE UNITED STATES IN, QUOTE, "REGULATED BUSINESS," IN WHICH

5     THE REQUIREMENT IS THAT THE BUSINESS PERSON OR THE COMPANY HAS

6     TO KEEP WITHIN ITS FILES, OR WHATEVER IT IS, A LIST OF RATES, A

7     LIST OF -- AND THAT CONSTITUTES -- AS LONG AS NOTICE IS GIVEN,

8     THAT CONSTITUTES THE FILING, THE PUBLIC FILING.

9          AND YOU'RE SAYING THAT DIDN'T HAPPEN HERE.

10          **MR. WILLIAMS:**  I'M SAYING IN THIS CASE NOT ALL OF THE

11     RATES FILED WITH THIS PRIVATE COMPANY ATPCO ARE AVAILABLE TO THE

12     PASSENGERS FOR THEIR REVIEW AND, THEREFORE --

13          **THE COURT:**  AFTER THOSE WHICH ARE AVAILABLE, WOULD IT

14     BE STILL YOUR CONTENTION THAT THOSE ARE NOT VALID?

15          **MR. WILLIAMS:**  AS TO THOSE THAT ARE VALIDLY FILED,

16     THAT ARE AVAILABLE TO THE PUBLIC, THAT COMPLY WITH THE STATUTE

17     AND AS TO THOSE ALONE.

18          **THE COURT:**  WELL, NO.  AS TO THOSE WHICH ARE FILED

19     WHICH ARE PUBLICLY AVAILABLE, ARE THEY VALIDLY FILED?

20          **MR. WILLIAMS:**  THOSE WHICH ARE FILED WITH DOT AND

21     ATPCO AND ARE PUBLICLY AVAILABLE ARE VALID.

22          **THE COURT:**  AND THOSE THAT ARE NOT PUBLICLY AVAILABLE

23     ARE NOT VALID.

24          **MR. WILLIAMS:**  CORRECT.

25          **THE COURT:**  OKAY.

1          **MR. WILLIAMS:**  AND, IN ADDITION -- I APOLOGIZE,

2     BECAUSE I GOT OFF ON A SLIGHTLY DIFFERENT TOPIC --

3          **THE COURT:**  GO AHEAD.

4          **MR. WILLIAMS:**  -- TO ANSWER THE COURT'S QUESTION.

5          AS TO THE SATOGARI, I MENTIONED, THE YOBIYOSI, EVEN

6     THOUGH THESE ARE THE CLASS C COUNTRIES WHO ARE SUPPOSED TO FILE

7     ALL RATES, WE CONTEND AS TO THOSE NO TARIFFS WERE FILED.  SO

8     THAT, THEREFORE, EVEN THOSE DEFENDANTS THAT MIGHT SAY:

9               "WE ARE CATEGORY C.  WE'RE SUPPOSED TO FILE

10              EVERYTHING."

11         WE BELIEVE THE FACTS ARE, IN FACT, THAT THEY DO NOT

12    FILE PARTICULARLY AS TO THOSE RATES, WHICH, AS WE'VE SET FORTH

13    IN THE COMPLAINT SPECIFICALLY, WERE FIXED BY THE DEFENDANTS.

14         SO, THEREFORE, WHILE THEY CONTEND -- AND BEAR IN MIND

15    WE TALKED ABOUT GALLO, AND GALLO IS IMPORTANT IN A LOT OF

16    RESPECTS, INCLUDING THAT THE FILED RATE DOCTRINE IS AN

17    AFFIRMATIVE DEFENSE.  AND WHEN THE DEFENDANTS COME IN AND SAY:

18              "THROW THIS ENTIRE CASE OUT. FILED RATE

19              DOCTRINE," THEY NEED TO MAKE A SHOWING TO THE COURT

20    THAT IT'S APPLICABLE.

21         WE ALLEGE AND WE SAY:

22              "THOSE RATES WEREN'T FILED.  FIRST OF ALL,

23              YOU'VE NOT SHOWN US YOU FILED THE TARIFFS."

24         AND I SHOULD MENTION TO THE COURT YOU'VE SEEN SOME

25    THINGS COME ACROSS THE DOCKET ON A MOTION TO COMPEL, AND IT WAS

1    WITHDRAWN.

2             WE'RE IN THE MIDST OF DISCOVERY WITH ATPCO TO FIND

3    THE TARIFFS THAT WERE ACTUALLY FILED DURING THIS PERIOD SO WE

4    CAN EVALUATE THIS.

5             BUT THE DEFENDANTS, THEY HAVEN'T TRIED TO

6    SUBSTANTIATE THIS, BECAUSE THEIR ARGUMENT WAS:

7                  "THE FILED RATE, YOU JUST STOP THERE. THERE IS A

8                  REGULATOR.  SOMETIMES RATES ARE FILED.  PLAINTIFFS

9                  HAVE NO CASE."

10            BUT WHAT THE NINTH CIRCUIT SAYS, AND WHAT IT SAID IN

11   GALLO AND WHAT IT SAID IN PHONETELE IS NOT THAT SIMPLE.

12   DIFFERENT REGULATIONS ARE DIFFERENT.  DIFFERENT BUSINESSES ARE

13   DIFFERENT.  THE ICC IN KEOGH AND SQUARE D IS DIFFERENT BECAUSE

14   EVERYTHING IS TARIFFED.  THERE IS NO IN-BETWEENS.  THERE'S NO

15   EXEMPTIONS.  YOU DON'T HAVE TO THINK OR LOOK AT PARTICULAR

16   FACTS.

17            THAT'S NOT THE CASE HERE.  HERE YOU'VE GOT THE

18   DIFFERENT CATEGORIES OF COUNTRIES. HERE YOU'VE GOT THE DIFFERENT

19   TYPES OF TRAVEL. HERE YOU'VE GOT CERTAIN TRAVEL THAT WE'VE

20   ALLEGED BASED ON THE INFORMATION WE'VE BEEN PROVIDED IN THIS

21   CASE IT'S NOT EVEN FILED AT ALL.

22            IN TERMS OF THE NONFILED, BECAUSE I THINK THAT'S

23   REALLY THE HEART OF THIS. MOST OF THE TRAVEL IS NONFILED.  AND

24   WHAT THE DEFENDANTS ARE ARGUING TO YOU IS:

25                  "LOOK.  LOOK AT THE CASES THE NINTH CIRCUIT HAS

1          HAD REALLY, WAH CHANG, THESE ELECTRICITY CASES, THERE

2          THEY SAID MARKET RATES ARE FINE."

3          BUT IN THOSE CASES, WHETHER IT'S GAS, WHETHER IT'S

4     ELECTRICITY, THE FERC HAD LOOKED AT THE COMPANIES INVOLVED,

5     PARTICULARLY IN ELECTRICITY.

6          EVERY ONE OF THOSE ELECTRICITY CASES WAS BASED FIRST

7     ON CONGRESS TELLING THE COURTS:

8               "FERC HAS EXCLUSIVE JURISDICTION OVER

9          ELECTRICITY, PERIOD."

10         THERE'S NOTHING LIKE THAT HERE.

11         SECOND, FERC LOOKING AT THE COMPANIES, THE POWER

12    COMPANIES, AND MAKING A DETERMINATION AS TO THAT PARTICULAR

13    COMPANY, YOU DO NOT HAVE MARKET POWER.  YOU DO NOT HAVE THE

14    ABILITY TO CHARGE SUPERCOMPETITIVE RATES.

15         THERE'S NOTHING LIKE THAT HERE. THE D REGULATION THAT

16    HAPPENED HERE, HAPPENED BECAUSE PRESIDENT CLINTON SIGNED THE

17    REGULATORY REFORM ACT WHICH TOLD ALL THE FEDERAL AGENCIES:

18              "LOOK THROUGH YOUR REGULATIONS.  DEREGULATE.

19         GET RID OF THEM."

20         AND IT WAS IN LINE WITH THE TWO STATUTES THAT

21    DEREGULATED THIS MARKET.  SO WHAT WE'RE TALKING ABOUT IS A

22    MARKET THAT HAS BEEN DEREGULATED THROUGH ACT OF CONGRESS,

23    THROUGH PRESIDENTIAL EXECUTIVE ORDERS, AND THEN THROUGH THE

24    REGULATORS SAYING:

25              "WE'RE NOT GOING TO REQUIRE ANY FILINGS ANYMORE

```
1                  FOR THESE COUNTRIES. WE'RE GOING TO REQUIRE VERY

2                  LIMITED FILINGS FOR THESE COUNTRIES BECAUSE WE ARE

3                  GOING TO RELY ON COMPETITION AND ON COMPANIES

4                  INDIVIDUALLY SETTING PRICES IN ORDER TO ENSURE PRICES

5                  ARE FAIR."

6                  THAT'S VERY DIFFERENT FROM WHAT HAPPENED IN

7      ELECTRICITY AND NATURAL GAS.  THAT IS THE REGULATOR SAYING:

8                  "WE'RE STEPPING BACK."

9                  AND THIS IS NOT AN INSTANCE WHERE CONGRESS HAS SAID

10     TO THIS COURT:

11                 "HANDS OFF DOT.  THEY ARE THE ONLY ONES, UNLIKE

12                 ELECTRICITY, WHO CAN LOOK AT THIS SUBJECT."

13                 IN TERMS OF THE DISCUSSION OF THE FOREIGN

14     GOVERNMENTS -- AND THERE WASN'T A LOT OF DISCUSSION IN THAT

15     ARGUMENT -- BUT THERE'S NO COURT THAT HAS EVER APPLIED THE FILED

16     RATE DOCTRINE TO THE ACTIONS TAKEN BY A FOREIGN GOVERNMENT OR

17     FOREIGN GOVERNMENT REGULATORS.

18                 AND THE FILED RATE DOCTRINE IS BASED UPON, AS I WAS

19     SAYING, CONGRESS TELLING THIS COURT IN THE CASE OF ELECTRICITY:

20                 "FERC HAS POWER OVER THIS. DEFER TO, AS THE

21                 SUPREME COURT SAID, A CONGRESSIONAL DECISION THAT A

22                 REGULATORY ARM SHOULD BE MAKING DECISIONS ABOUT THAT

23                 GIVEN SUBJECT MATTER."

24                 THERE'S NO BASIS BY WHICH THIS COURT COULD SAY AND,

25     THEREFORE, CONGRESS WOULD WANT ME TO DEFER TO THE GOVERNMENT OF
```

1    JAPAN, THAILAND AND VIETNAM AND THEIR REGULATORY DECISIONS.

2           **THE COURT:**  THAT'S PROBABLY TRUE.

3           **MR. WILLIAMS:**  AND, AS SUCH, THERE'S NO WAY FOR THE

4    COURT TO GET THERE.

5           IN TERMS OF THE ENTIRE MOTION HERE, FOR FILED RATES

6    THAT ARE VALID, AVAILABLE TO THE PUBLIC, THE FILED RATE

7    DOCTRINE, YOUR HONOR, MOST LIKELY APPLIES.

8           MOST OF THE RATES THAT WE'RE TALKING ABOUT FOR MOST

9    OF THE DEFENDANTS HERE WERE NEVER FILED. THIS IS NOT A

10   REGULATORY REGIME LIKE THE FERC.

11          **THE COURT:**  WELL, IN ANY EVENT, YOU WOULD SAY THAT IF

12   THEIR MOTION WERE TO BE CONSIDERED IT WOULD REALLY HAVE TO BE

13   CONSIDERED IN THE CONTEXT OF A SUMMARY JUDGMENT MOTION.

14          **MR. WILLIAMS:**  THAT'S --

15          **THE COURT:**  IT CAN'T BE -- CAN'T BE -- CAN'T BE

16   ADJUDICATED AT THIS POINT, BECAUSE THERE ARE THESE DISPUTES AS

17   TO WHAT WAS FILED, WHAT WASN'T FILED, WHAT CONSTITUTED A FILING?

18          THERE'S SO MANY FACTUAL ISSUES THAT AT LEAST HAVE TO

19   BE PUT INTO A RECORD THAT IT'S NOT APPROPRIATE TO DEAL WITH IT

20   ON A MOTION TO DISMISS.  THAT'S, IN PART, YOUR ARGUMENT, ISN'T

21   IT?

22          **MR. WILLIAMS:**  THAT'S CORRECT. AND THE DEFENDANTS

23   ARGUED IN THEIR BRIEFS THAT WE'RE SAYING YOU CAN NEVER DECIDE

24   THIS IN A MOTION TO DISMISS.  AND THAT'S NOT WHAT WE'RE SAYING.

25   BUT WHAT WE'RE SAYING IS --

1        **THE COURT:**  NO, I THINK YOU MIGHT BE ABLE TO DEAL

2    WITH IT IN A MOTION TO DISMISS IF IT WERE, YOU KNOW, VERY WELL

3    ESTABLISHED, RATHER SIMPLE, STRAIGHTFORWARD.  YOU HAD TO RULE,

4    AND THERE WERE THESE FILINGS OR THERE WEREN'T.

5        I MEAN, I COULD SEE A SET OF CIRCUMSTANCES WHERE YOU

6    COULD DEAL WITH IT ON A MOTION TO DISMISS.  I'M JUST NOT

7    COMFORTABLE AT THIS POINT SAYING THAT THIS IS THE SET OF

8    CIRCUMSTANCES THAT YOU CAN DEAL WITH IT ON A MOTION TO DISMISS.

9    BUT I'LL LISTEN TO THE OTHER SIDE ABOUT THAT.

10       I MEAN, I WAS TROUBLED BY THAT, AS WELL. I MEAN,

11   THERE ARE ALL SORTS OF QUESTIONS THAT IT SORT OF -- YOU SLIP

12   OVER. YOU JUST IGNORE:  WAS THE DEPARTMENT -- YOU KNOW, WHAT IS

13   THE DEPARTMENT OF TRANSPORTATION DOING?  HOW WERE THESE FILINGS

14   MADE?  YOU KNOW, WHAT ABOUT FILINGS IN FOREIGN COUNTRIES, AND SO

15   FORTH?

16       AND IT'S A RATHER COMPLICATED FACTUAL RECORD AS TO

17   WHAT REALLY GOES ON. AND I FELT THAT IT WOULD BE ODD TO TRY TO

18   DEAL WITH THIS ON A MOTION TO DISMISS. THAT DOESN'T MEAN THAT

19   WHEN THE DAY IS OVER, THE RECORD'S DEVELOPED, YOU CAN'T DECIDE

20   IT ONE WAY OR THE OTHER WAY.

21       IT JUST MEANS THAT, GEE, THERE'S NO RECORD HERE.

22   THERE ARE A SET OF ALLEGATIONS.  OKAY.

23       **MR. WILLIAMS:**  I THINK THAT'S VERY TRUE. AND I KNOW

24   THE GALLO CASE WELL. MOTIONS TO DISMISS ON FILED RATE WERE

25   DENIED IN THE GALLO CASE.

1      THE NINTH CIRCUIT DENIED REVIEW ONCE.  WE WENT

2   THROUGH DISCOVERY.

3      FILED RATE DOCTRINE MOTIONS TO DISMISS DENIED AT

4   SUMMARY JUDGMENT, AND AGAIN BY THE NINTH CIRCUIT ON SUMMARY

5   JUDGMENT.  AND THOSE FACTS, YOUR HONOR, WERE A LOT SIMPLER THAN

6   THOSE HERE.

7      SO WE THINK BECAUSE OF THE COMPLEXITY, BECAUSE OF THE

8   DIFFERENT FACTS, BECAUSE OF THE DIFFERENT INDUSTRY, THIS IS NOT

9   A CASE YOU CAN DECIDE ON A MOTION TO DISMISS.  IT SHOULD BE

10  THROWN OUT PURSUANT TO THE FILED RATE DOCTRINE.

11      **THE COURT:**  ON THIS ISSUE.

12      **MR. WILLIAMS:**  ON THIS ISSUE.

13      **THE COURT:**  OKAY. THANK YOU.

14      **MR. BAMBERGER:**  THANK YOU, YOUR HONOR.

15      WITH RESPECT TO THE LAST POINT ABOUT MOTION TO

16  DISMISS, WE'VE CITED A NUMBER OF CASES IN A VARIETY OF

17  INDUSTRIES WHERE MOTIONS TO DISMISS HAVE BEEN GRANTED ON THE

18  FILED RATE BASIS:  SQUARE D, IN TRANSPORTATION; WAH CHANG IN

19  ELECTRIC; THE WEB CASTER CASE, IN COPYRIGHT.

20      AND SO IT IS NOT UNUSUAL OR DIFFICULT FOR COURTS TO

21  RESOLVE THESE.

22      **THE COURT:**  WELL, IT SEEMS TO ME THAT THERE'S A LOT

23  OF DIFFERENT FACTUAL SCENARIOS HERE WHERE -- I DON'T KNOW

24  WHETHER THEY EXISTED IN THOSE OTHER CASES, BUT HERE THEY ARE

25  TELLING ME:

```
 1                    "LOOK, SOME PEOPLE FILE WITH THE DEPARTMENT.

 2               SOME PEOPLE PUT IT IN THEIR FILE CABINET.  SOME MAY

 3               HAVE BEEN PUBLIC.  SOME WEREN'T PUBLIC.  AND BY THE

 4               WAY, THAT'S WHAT HAPPENS IN PARIS, AND THEN THERE'S

 5               URUGUAY AND SO FORTH, SO ON."

 6               WHO KNOWS?  WHO KNOWS?  I MEAN, IT'S A LOT OF

 7   DIFFERENT THINGS.  AND, YOU KNOW, IT'S NOT JUST THE OLD DAYS OF

 8   THE ALCOHOLIC BEVERAGE CONTROL.  IN CALIFORNIA, IF YOU WANTED TO

 9   SELL YOUR BOOZE, YOU KNOW, YOU HAD TO POST YOUR PRICES WITH

10   ARTIE SAMISH OR SOMEBODY UP THERE IN SACRAMENTO.

11               SO I DON'T KNOW. IT DOESN'T SEEM TO BE THE SAME OLD

12   THING, YOU KNOW.  IT SEEMS TO BE A LITTLE DIFFERENT.

13               MR. BAMBERGER:  WELL --

14               THE COURT:  AND THE WORSE THING THAT COULD HAPPEN IS

15   I GRANT YOUR MOTION, IT GOES UP TO THE NINTH CIRCUIT, IN TWO

16   YEARS IT COMES BACK. YOU DON'T WANT THAT TO HAPPEN, DO YOU?

17               NO.

18               MR. BAMBERGER:  YOU DIDN'T GIVE ME A CHANCE TO

19   ANSWER, YOUR HONOR.

20               THE COURT:  GO AHEAD.

21               MR. BAMBERGER:  NO, SERIOUSLY. IF I MAY JUST ADDRESS

22   A COUPLE OF QUICK POINTS THAT MR. WILLIAMS MADE.  HE REFERRED TO

23   VARIOUS RATES THAT WERE NOT FILED, SPECIFICALLY THE ANA RATES.

24               THE COURT:  RIGHT.

25               MR. BAMBERGER:  THESE YOBIYOSI, I THINK IT'S CALLED.
```

```
 1   I MEAN, THESE ARE DISCOUNTED RATES WHERE PEOPLE PAID LESS THAN

 2   THE FILED RATES.  IT WASN'T THAT THE RATES WEREN'T FILED.  THEY

 3   WERE. BUT THEY WERE DISCOUNTED THEN WHEN THEY WERE ACTUALLY SOLD

 4   TO PEOPLE.

 5           AND WE WOULD JUST MAKE THE POINT THAT IF THE FILED

 6   RATE IS DEEMED REASONABLE, ANYTHING UNDER THE FILED RATE IS

 7   THEREBY REASONABLE UNDER SQUARE D AND KEOGH.

 8           IF THERE'S ANY CLAIM FOR UNDERCHARGING, IT'S NOT IN

 9   THIS COMPLAINT OR PROPERLY BROUGHT BY THESE PLAINTIFFS.

10           NOW, SECOND POINT ABOUT HOW WELL THE DEPARTMENT OF

11   TRANSPORTATION MONITORS THE MARKET AND HOW WELL THEY CAN DEAL

12   WITH ALL THIS, THE SQUARE D CASE ADDRESSED THAT DIRECTLY.  AND

13   THEY WERE REFERRING, IN PARTICULAR, IN FOOTNOTE 19 TO THE COURT

14   OF APPEALS READING OF KEOGH.

15           AND THEY SAID WITH APPROVAL:

16               "RATHER THAN LIMITING ITS HOLDING TO CASES

17               WHERE, AS IN KEOGH, RATES HAD BEEN INVESTIGATED AND

18               APPROVED BY THE ICC, THE COURT OF APPEALS SAID

19               BROADLY THAT SHIPPERS COULD NOT RECOVER TREBLE

20               DAMAGES FOR OVERCHARGES WHENEVER TARIFFS HAVE BEEN

21               FILED."

22           IN OTHER WORDS, THEY WEREN'T GOING TO LOOK INTO THAT.

23           AND THE CARLIN CASE, A DECISION OF JUST THIS YEAR

24   FROM THE EASTERN DISTRICT OF CALIFORNIA SAID THE SAME THING,

25   QUOTE:
```

1              "THE FILED RATE DOCTRINE APPLIES REGARDLESS OF

2          THE ACTUAL DEGREE OF AGENCY REVIEW OF THOSE RATES."

3              SO HOW WELL OR HOW EXTENSIVELY OR HOW THE DEPARTMENT

4     OF TRANSPORTATION WENT ABOUT ITS BUSINESS WE WOULD SUBMIT IS

5     PERHAPS INTERESTING, PERHAPS COMPLICATED, BUT WE WOULD SUBMIT

6     NOT MATERIAL TO THE DECISION WITH RESPECT TO THE FILED RATE

7     DOCTRINE.

8              LAST POINT ON THE ISSUE OF PUBLIC AVAILABILITY, WITH

9     RESPECT TO RATES THAT ARE FILED, WE'VE CITED A WHOLE HOST OF

10    REGULATIONS AS TO HOW THOSE ARE MADE PUBLIC.  SO THAT IS

11    CERTAINLY THE CASE WITH RESPECT TO THE ACTUAL FILED RATES.

12             BUT I WOULD POINT OUT, YOUR HONOR, AS WELL, THAT IN

13    SQUARE D THE FILED RATE DOCTRINE WAS APPLIED AND FOUND TO BAR

14    THE CLAIMS ON A MOTION TO DISMISS, EVEN THOUGH THE COMPLAINT

15    ALLEGED THAT THE DEFENDANT SET THE RATES WITHOUT FOLLOWING

16    NOTICE AND PUBLICATION REQUIREMENTS.

17             THE COURT ASSUMED THAT TO BE TRUE. SO THE PUBLICATION

18    IS NOT A REQUIREMENT FOR APPLICATION OF THE FILED RATE DOCTRINE.

19    AND THAT'S AT PAGE 412.

20             UNLESS YOUR HONOR HAS ANY FURTHER QUESTIONS, THANK

21    YOU, YOUR HONOR.

22             **THE COURT:**  ANYTHING ELSE ON THIS ISSUE?

23             **MR. BAMBERGER:**  NO.

24             **THE COURT:**  OKAY. THIRD ISSUE:  FAILURE TO STATE A

25    CLAIM.  I THINK I PROBABLY WANT TO HEAR FROM THE DEFENSE BECAUSE

1    I THOUGHT THEY HAVE STATED A CLAIM.

2              SO YOU HAVE THE LABORING OAR.

3         **MR. MILLER:**   YOUR HONOR, TODD MILLER FOR QANTAS

4    AIRWAYS.

5              I WAS GOING TO ADDRESS WHY THE CONSOLIDATED COMPLAINT

6    FAILS TO STATE A CLAIM BECAUSE IT FAILS TO RAISE A PLAUSIBLE

7    INFERENCE OF THE CONSPIRACY THAT THE PLAINTIFFS PURPORT TO

8    ALLEGE.  AND THAT'S SORT OF THE CRITICAL POINT HERE, YOUR HONOR.

9              THE PLAINTIFFS COMPLAIN IT'S NOT JUST OF ANY

10   CONSPIRACY OR OF ANY COLLUSION.  RATHER, IT'S THIS MASSIVE

11   ALLEGED CONSPIRACY INVOLVING 26 AIRLINES FLYING TREMENDOUSLY

12   DIFFERENT ROUTES THAT PURPORTEDLY AFFECTED ALL FLIGHTS ACROSS

13   THE PACIFIC FOR ALMOST A DECADE.

14             ONE WOULD THINK THAT WITH SUCH A BROAD, LONG-STANDING

15   CONSPIRACY AND ALL THE SUPPORT THAT PLAINTIFFS HAVE HAD FROM

16   JAPAN AIRLINES, PLAINTIFFS WOULD HAVE SUBSTANTIAL EVIDENCE TO

17   SUPPORT THIS CONSPIRACY CLAIM.

18             BUT THEY DO NOT. SO PLAINTIFFS HAVE COBBLED TOGETHER

19   A LENGTHY COMPLAINT THAT IS FULL OF INNUENDO AND THEIR OWN

20   SUPPOSITIONS.  THUS EXAMINED UNDER TWOMBLY AND IQBAL,

21   PLAINTIFFS' COMPLAINT MUST BE DISMISSED.

22             WE DO REALIZE, YOUR HONOR, THAT THE COURT IS FAMILIAR

23   WITH BOTH TWOMBLY AND IQBAL, SO I WILL BE BRIEF.

24             NOTWITHSTANDING PLAINTIFFS' ARGUMENT TO THE CONTRARY,

25   TWOMBLY AND IQBAL DO SET A NEW STANDARD THAT REQUIRES THIS COURT

1   TO EXAMINE CAREFULLY ANY COMPLAINT BEFORE IT.

2            TWOMBLY REQUIRES THE COURT TO ENGAGE IN A

3   CONTEXT-SPECIFIC REVIEW OF THE PROPERLY PLED FACTS.

4            YOU'RE THEN TO APPLY YOUR JUDICIAL EXPERIENCE AND

5   COMMON SENSE AND DETERMINE WHETHER THE PLAINTIFFS' CLAIM OF

6   CONSPIRACY IS PLAUSIBLE.

7            IQBAL TEACHES THAT THE COURT CAN BEGIN BY IGNORING

8   CONCLUSORY ALLEGATIONS. THIS WOULD INCLUDE PLAINTIFFS' OWN

9   INFERENCES.

10            FOR EXAMPLE, THIS COMPLAINT IS FULL OF THEIR OWN

11   INFERENCES AND SUPPOSITION. PARAGRAPHS 109 AND 110 PLAINTIFFS

12   REFLECT THEIR OWN POSITION ON WHAT THE ECONOMICS WOULD TEACH US

13   ABOUT HOW THE AIRLINE INDUSTRY WOULD WORK, THE DIFFERENT COST

14   STRUCTURES THAT LEAD TO DIFFERENT PRICING, SO ON AND SO FORTH.

15            BUT THESE ARE SIMPLY PLAINTIFFS' OWN SUPPOSITION. ONE

16   OF THE CASES THEY CITE, PETROLEUM PRODUCTS, 906 F.2D 482, TALKS

17   ABOUT PRICING IN MARKETS WHERE THERE IS INTERDEPENDENCY.

18   PLAINTIFFS DON'T TALK ABOUT THAT IN THEIR PAPERS OR IN THEIR

19   COMPLAINT.

20            SIMILARLY, PARAGRAPH 192, PLAINTIFFS CONCLUDE THAT

21   AIR NEW ZEALAND MUST HAVE HAD NOT INFORMATION THAT WASN'T

22   PUBLICLY AVAILABLE WHEN IT STATED THAT OTHER AIRLINES WERE

23   CONSIDERING FUEL SURCHARGE INCREASES.

24            AGAIN, THAT'S NOT A FACT, YOUR HONOR. THAT'S THEIR

25   OWN CONCLUSION. YOU CAN IGNORE THAT.

1    THEN, THE SECOND STEP IS, AS I MENTIONED, YOU THEN

2    PROCEED WITH THE PROPERLY PLED FACTS TO DO A CONTEXT-SPECIFIC

3    REVIEW.

4    AND IN THIS REGARD, IT'S WORTH NOTING THE LAFLAMME

5    CASE, 702 F. SUPP. 2D, 136, WHICH IS ESSENTIALLY ON ALL FOURS

6    WITH THIS CASE. IT'S GOT THE SAME BASIC CONTEXT OF THE AIR

7    PASSENGER INDUSTRY; THE SAME ALLEGATIONS RELATING TO IATA.

8    IT'S GOT MANY OF THE SAME ALLIANCES INVOLVED, SAME

9    FUEL SURCHARGES AND SAME ALLEGATIONS ABOUT PLEAS OF GUILTY IN

10   THE CARGO AREA.

11   THERE, OF COURSE, THE COURT CONSIDERED CAREFULLY ALL

12   OF THESE ALLEGATIONS AND FOUND THAT THEY DID NOT RAISE A

13   PLAUSIBLE INFERENCE OF A CONSPIRACY FOR FLIGHTS BETWEEN UNITED

14   STATES AND THE EUROPEAN UNION.

15   NOW, LET ME TURN BACK TO THE CONSOLIDATED COMPLAINT.

16   PLAINTIFFS' CONTEND THAT THERE ARE TEN DIFFERENT TYPES OF

17   CONDUCT ALLEGED THAT SUPPORT THEIR CLAIM.

18   I COULD WALK THROUGH EACH ONE OF THESE, THE

19   ALLIANCES, THE IATA, LOCKSTEP PRICING, PARALLEL PRICING, BUT THE

20   REALITY IS IS THAT NOTWITHSTANDING ALL OF THESE THINGS, IT

21   DOESN'T PROVIDE -- THEIR COMPLAINT DOESN'T PROVIDE A FACTUAL

22   BASIS TO CONCLUDE THAT THE MASSIVE TRANSPACIFIC CONSPIRACY WAS

23   PLAUSIBLE.

24   AT BEST, PLAINTIFFS' ALLEGATIONS SHOW THAT MAYBE

25   THERE WAS SOME COORDINATION INVOLVING A SUBSET OF DEFENDANTS ON

1    A SUBSET OF ROUTES TO OR FROM THE UNITED STATES.

2              BUT THERE'S NOTHING THAT ALLOWS THIS COURT TO MAKE

3    THAT BROAD LEAP FROM PLAINTIFFS' COMPLAINT TO A PLAUSIBLE

4    CONSPIRACY THAT COVERS FLIGHTS BETWEEN NOT JUST THE U.S. AND

5    ASIA, BUT U.S. AND OCEANIA.

6              AND WHEN YOU SORT OF APPRECIATE THE GEOGRAPHY, YOUR

7    HONOR, YOU'VE GOT AUCKLAND AND NEW ZEALAND 5500 MILES AWAY FROM

8    TOKYO.  WHERE, AGAIN, AS YOU KNOW FROM YOUR REVIEW OF THE

9    COMPLAINT, A LARGE PERCENTAGE OF THE COMPLAINT IS CONSUMED WITH

10   DISCUSSIONS ABOUT U.S. AND JAPAN TRANSPORTATION.

11             SO THIS BRINGS US BACK TO THE LAFLAMME CASE. THAT

12   CASE IS IMPORTANT HERE BECAUSE TWOMBLY REQUIRES A

13   CONTEXT-SPECIFIC REVIEW. AND THAT IS EXACTLY WHAT THE LAFLAMME

14   COURT DID ON FACTS THAT ARE ALSO ALLEGED HERE.

15             THERE IS A GUILTY PLEA BY ONE AIRLINE, B.A., THAT

16   AFFECTED CERTAIN FLIGHTS BETWEEN UNITED STATES AND THE UK.

17             HERE, AS YOU'VE HEARD, WE HAVE ANA PLEADING GUILTY ON

18   CERTAIN FLIGHTS BETWEEN THE UNITED STATES AND JAPAN.

19             AND THE INFORMATION THAT'S AVAILABLE TODAY AND POSTED

20   BY THE DEPARTMENT OF JUSTICE TALKS ABOUT THERE BEING ONE

21   CO-CONSPIRATOR.  HAPPENS TO BE JAPAN AIRLINES.  BUT THAT DOESN'T

22   ALLOW THIS COURT TO JUMP FROM THAT LIMITED PLEA TO THE IDEA THAT

23   THERE'S THIS BROADER CONSPIRACY AFFECTING ALL FLIGHTS ACROSS THE

24   PACIFIC.

25             THE LAFLAMME CASE ALSO TALKS ABOUT THE LACK OF

 1  ANOMALOUS BEHAVIOR BY DEFENDANTS.  IT ADDRESSED THE RISE IN FUEL

 2  PRICES.  IT TALKED ABOUT THAT YOU CAN'T USE IMMUNIZED CONDUCT IN

 3  THE IATA SETTING TO INFER SOME BROADER CONSPIRACY.

 4        THERE'S ALSO AN IMPORTANT DISTINCTION BETWEEN THIS

 5  CASE AND LAFLAMME, YOUR HONOR. IN LAFLAMME THERE WAS A FOCUS

 6  BETWEEN UNITED STATES AND FLIGHTS TO THE EUROPEAN UNION.

 7        HERE, THERE'S NOT JUST FLIGHTS BETWEEN, AS I SAID,

 8  THE U.S. AND A PARTICULAR REGION OR SUBREGION, BUT WE HAVE GOT

 9  FLIGHTS FROM THE U.S. ACROSS THE ENTIRE PACIFIC, BOTH OCEANIA

10  AND ASIA.

11        WELL, THAT MAKES THIS CASE EVEN LESS PLAUSIBLE.  SO,

12  IN ESSENCE, YOUR HONOR, WHAT WE'VE GOT HERE IS A SERIES OF

13  ALLEGATIONS, A LOT OF INNUENDO ABOUT WHAT THESE ALLEGATIONS SHOW

14  IN TERMS OF COORDINATION OR COLLUSION, AND THEN SOME PARALLEL

15  PRICING, MUCH OF WHICH ISN'T EVEN PARALLEL, BY DIFFERENT

16  COMPETITORS THAT DON'T EVEN FLY THE SAME ROUTES.  AND THEN, THE

17  IDEA THAT WE'RE SUPPOSED TO INFER THAT THERE'S THIS

18  BROAD-RANGING, DECADE-LONG CONSPIRACY.

19        AND THAT IS EXACTLY WHAT TWOMBLY DOES NOT ALLOW.

20        THANK YOU, YOUR HONOR.

21     **MR. LEHMANN:**  YOUR HONOR, MICHAEL LEHMANN APPEARING

22  ON BEHALF OF THE CLASS PLAINTIFFS.

23        I THINK THE DEFENDANTS NEED A REALITY CHECK HERE WITH

24  RESPECT TO THE ALLEGATIONS OF THIS COMPLAINT. THIS 114-PAGE

25  CONSOLIDATED AMENDED COMPLAINT IS ONE OF THE MOST DETAILED

1   FILINGS IN THE ANNALS OF ANTITRUST JURISPRUDENCE.

2           WE HAVE 19 PARAGRAPHS UPFRONT DETAILING EACH

3   DEFENDANT'S ROLE IN THE ALLEGED CONSPIRACY.  AT LEAST 236

4   INDIVIDUALS FROM THE DEFENDANTS OR THEIR CO-CONSPIRATORS ARE

5   IDENTIFIED AS HAVING PARTICIPATED IN THE ALLEGED CONSPIRACY TO

6   ONE DEGREE OR OTHER.

7           IT IDENTIFIES NUMEROUS MEETINGS OF ASIAN BOARDS OF

8   AIRLINE REPRESENTATIVES, IATA-COMPOSITE CONFERENCES, MEETINGS

9   AMONG COMPETITORS WHERE DIFFERENT FARES OR SURCHARGES WERE

10  WORKED OUT, NONE OF WHICH ARE FOUND IN TWOMBLY OR LAFLAMME OR

11  ANYTHING LIKE IT.

12          IT IDENTIFIES AND DESCRIBES IN DETAIL, QUOTING:

13              "56 CONSPIRATORIAL E-MAILS, IMPLICATE A WHOLE --

14          AS A WHOLE EVERY NAMED DEFENDANT AND NUMEROUS

15          CO-CONSPIRATORS."

16          AND I THINK, YOU KNOW, WHEN THE DEFENDANTS TALK ABOUT

17  TWOMBLY AND ITS REQUIREMENTS, THE NINTH CIRCUIT IN THE CASES

18  WE'VE CITED IN OUR BRIEF SAYS:

19              "YES, YOU HAVE TO ALLEGE ENOUGH FACTS TO MAKE

20          THE CLAIM PLAUSIBLE, BUT YOU DON'T HAVE TO SATISFY A

21          PROBABILITY STANDARD NOR DO YOU HAVE TO ENGAGE IN

22          DETAILED PLEADING."

23          THEY BASICALLY CITE TWO SETS OF CASES HERE ABOUT HOW

24  IMPLAUSIBLE THIS CASE IS. AND AS EXAMPLES THEY CITE -- THEY SAY:

25              "WELL, HOW CAN YOU HAVE A CONSPIRACY THAT GOES

1       BACK TO 2000 THAT INVOLVES THIS MANY AIRLINES?"

2       WELL, I WOULD ASK YOUR HONOR TO CONSIDER SOME OF THE

3  COMPLAINTS THAT HAVE BEEN UPHELD IN THIS DISTRICT AND OTHERS.

4       CRTS, JUDGE CONTI SUSTAINS THE COMPLAINT INVOLVING 45

5  DEFENDANTS WITH AN INTERNATIONAL CARTEL GOING BACK TO 1995.

6       IN FLASH MEMORY, THE COURTS UPHELD A COMPLAINT

7  INVOLVING 13 DEFENDANTS BASED IN NUMEROUS ASIAN COUNTRIES GOING

8  BACK TO 1999 AND CONTINUING TILL FEBRUARY OF 2008.

9       TFT-LCD, JUDGE ILLSTON FIND A COMPLAINT SUSTAINABLE

10  WITH RESPECT TO 26 DEFENDANTS FOR A CONSPIRACY FROM 1996 TO LATE

11  2006.

12       SRAM, 24 DEFENDANTS, 1996 THROUGH 2005.

13       THE ANSWER IS:  THERE ARE A LOT OF INTERNATIONAL,

14  GLOBAL, MULTIPARTICIPANT CONSPIRACIES WHERE THE COMPLAINTS HAVE

15  BEEN UPHELD.

16       THE LAFLAMME CASE, WHICH IS, I THINK, THEIR KEY

17  EXHIBIT HERE, IS ALSO, I THINK, DISTINGUISHABLE. AND IT'S

18  DISTINGUISHABLE ON THE SAME GROUNDS THAT JUDGE POHORELSKY

19  IDENTIFIED IN HIS SEPTEMBER 22ND DECISION IN THE AIR CARGO CASE.

20       AND, BY THE WAY, THAT DECISION OF HIS, WHICH WAS A

21  REPORT AND RECOMMENDATION WAS ACCEPTED AND ADOPTED TODAY BY

22  JUDGE GLEASON.

23       SO IT REPRESENTS THE OPINION OF THE DISTRICT COURT.

24  HE SAID, POHORELSKY, THAT LAFLAMME IS DISTINGUISHABLE ON AT

25  LEAST THREE GROUNDS.

 1          FIRST, HE SAID THAT, QUOTE:

 2               "PLAINTIFFS' PURPORTED DIRECT EVIDENCE OF

 3          AGREEMENT IN THAT CASE WAS BASED ON A BALD,

 4          CONCLUSORY ALLEGATION THAT IT APPEARS DEFENDANTS AND

 5          OTHERS DECIDED TO ADOPT THE TERMS OF A PARTICULAR

 6          IATA RESOLUTION DURING MAY AND AUGUST OF 2004 ABSENT

 7          U.S. DOT APPROVAL."

 8          WE DON'T HAVE APPEARANCES HERE.  WE'VE GOT DIRECT

 9  EVIDENCE OF AGREEMENTS TO ADOPT SPECIFIC RESOLUTIONS THAT HAD

10  DEFINITE EFFECT ON PRICES.

11          THE OTHER POINT THAT WAS MADE IS THAT THE COURT

12  FOUND -- COURT IN LAFLAMME FOUND THAT THE COMPLAINT WAS BASED

13  NAMELY ON ALLEGATIONS OF PARALLEL CONDUCT.

14          WE DON'T HAVE JUST ALLEGATIONS OF PARALLEL CONDUCT

15  HERE. WE'VE GOT EVIDENCE OF SPECIFIC AGREEMENTS.  INDEED, THE

16  DEFENDANTS HAVE PUT ONE IN THE RECORD. IT'S ATTACHED AS THE

17  BOARD OF AIRLINE REPRESENTATIVES THAILAND MEETING 18 OF MAY,

18  2004, TALKING ABOUT THE AIR PASSENGER SURCHARGES WHERE THERE'S

19  AN EXPRESS AGREEMENT THAT WAS SAID TO  --  THE ACBA CHAIRMAN

20  THERE EXPRESSED THE IMPORTANCE OF EVERYTHING UNITY AMONG

21  AIRLINES WHEN IMPOSING SURCHARGES FOR BOTH CARGO AND PASSENGERS.

22          WELL, THEY HAVE BEEN HIT WITH OVER A BILLION DOLLARS

23  IN FINES ACROSS THE WORLD IN CARGO.

24          THEIR CONDUCT HERE IS NO LESS REPREHENSIBLE.

25          FINALLY, THE COURT IN LAFLAMME NOTED THAT THE

1   CONSPIRACY WAS IMPLEMENTED SOLELY THROUGH IMMUNIZED ACTIVITIES

2   OF IATA.

3           WELL, HERE WE ALLEGED ACTIVITY WITH RESPECT TO

4   NONIMMUNIZED IATA FARES.  AND WE ALLEGED ACTIVITIES IN ASIA THAT

5   WERE NO PART OF THE LAFLAMME CASE.

6           WE THINK ON THE BASIS OF ALL OF THIS, THIS IS A

7   SUSTAINABLE COMPLAINT UNDER TWOMBLY.

8               MR. MILLER:  I JUST HAVE ABOUT FOUR OR FIVE POINTS.

9           NOTWITHSTANDING PLAINTIFFS' ARGUMENT, NOT ONCE DID

10  THEY EXPLAIN TO YOU HOW THEY GET FROM THEIR THAI BAR MEETING,

11  THEIR E-MAIL, WHICH I THINK THEY ARE READING QUITE AGGRESSIVELY,

12  BY THE WAY.  BUT GIVING THEM THE BENEFIT OF THE DOUBT, HOW THEY

13  READ THAT AND TURN THAT INTO THIS BROADER CONSPIRACY OF 26

14  AIRLINES COVERING ALL FLIGHTS ACROSS THE PACIFIC FOR BOTH ASIA

15  AND OCEANIA.

16          SO THAT'S THE MISSING LINK. AND THEY OFFERED YOU

17  NOTHING JUST NOW TO PROVIDE THAT LINK.

18          THEY DO --

19              THE COURT:  WELL, YOU SAY THAT MISSING LINK MAKES

20  THEIR THEORY IMPLAUSIBLE?

21              MR. MILLER:  YES.  THEY NEED TO PROVIDE SOME CREDIBLE

22  THING, SOME BELIEVABLE STORY -- THAT'S WHAT "PLAUSIBILITY" IS --

23  THAT MAKES AN E-MAIL --

24              THE COURT:  THEY POINTED TO QUITE A FEW THINGS.

25              MR. MILLER:  WELL, BUT IT DOESN'T MAKE THE BREADTH OF

1    THIS THE CONSPIRACY.

2            **THE COURT:**  THEY DON'T HAVE IT ALL TIED UP IN A NICE

3    LITTLE RIBBON BECAUSE THIS IS A COMPLAINT.

4            YOU KNOW, I HAVE TO TELL YOU I'M NOT SO -- I MEAN,

5    GIVEN TWOMBLY AND IQBAL I DON'T KNOW THAT THERE'S SUCH AN

6    ENORMOUS SEA CHANGE IN THE LAW.

7            I MEAN, I HEAR ALL THE DEFENDANTS COME IN ALL THE

8    TIME AND THEY TWOMBLY YOU TO DEATH, AND THEY IQBAL YOU TO DEATH

9    SAYING:

10               "IT'S NOT THERE.  IT'S NOT THERE.  IT'S NOT

11               THERE."

12            BUT THE QUESTION IS:  WHAT ISN'T THERE?  AND WHAT

13    ISN'T THERE AND WHAT I THINK TWOMBLY AND IQBAL ADDRESS IS

14    WHETHER OR NOT WHAT IS SAID IS PLAUSIBLE.

15            IT'S A PLAUSIBILITY TEST. SO WHAT YOU HAVE TO DO IS

16    YOU GO BACK AND YOU LOOK AT THE COMPLAINT. YOU TAKE A LOOK AT

17    ALL THE DETAILS OF THE COMPLAINT, AND YOU SAY:

18               "NOW, HAVE THEY?  HAVE THEY STATED A PLAUSIBLE

19               CAUSE OF ACTION?"

20            BECAUSE IF THEY HAVEN'T, SURE.  CAN YOU KICK IT OUT.

21    THAT'S FINE. BUT, REMEMBER, THIS IS ALL PREDISCOVERY. I MEAN,

22    THIS ISN'T -- THEY DON'T HAVE THE OPPORTUNITY OF GOING IN AND

23    GETTING ALL THOSE DETAILS, THOSE THOUSANDS OF DETAILS.

24    ESPECIALLY WHEN THEY ALLEGE A CONSPIRACY, THE EVIDENCE MAY VERY

25    WELL BE HIDDEN.

1        COULD BE. CONSPIRACIES GENERALLY AREN'T DONE IN THE

2   BROAD DAYLIGHT. SO THAT'S BASICALLY THE ARGUMENT. AND THAT IT

3   MAY BE, QUOTE, "MISSING LINK."

4        AND I UNDERSTAND WHAT YOU'RE SAYING.  BUT MISSING

5   LINKS MAY BE VERY, VERY SIGNIFICANT IN TERMS OF EITHER SUMMARY

6   JUDGMENT OR TRIAL.

7        **MR. MILLER:**  WELL, SIR --

8        **THE COURT:**  BUT A MOTION TO DISMISS?  I JUST HAVE TO

9   WONDER ABOUT IT. I MEAN, THAT'S THE QUESTION.

10       I ALSO WANTED TO ASK YOU THIS:  THE PLAINTIFFS HAVE

11  FILED A SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE WITH RESPECT TO

12  ANA'S ANNOUNCEMENT OF ITS PLEA; IS THAT RIGHT?  ANNOUNCEMENT TO

13  ITS PLEA, ITS PLEA AGREEMENT.

14       **MR. MILLER:**  YES.

15       **THE COURT:**  THAT'S ALTHOUGH NOTICEABLE, ISN'T IT?

16       **MR. MILLER:**  WELL, IT IS, YOUR HONOR.  WHAT

17  DEFENDANTS OBJECTED TO THERE IS THEIR FILING OF THE PRESS

18  RELEASE WHEN THAT ISN'T REALLY THE UNDERLYING FACTS. THERE WAS

19  AN INFORMATION THAT'S FILED TODAY --

20       **THE COURT:**  YES.

21       **MR. MILLER:**  -- THAT HAS MORE SPECIFIC FACTS THAT'S

22  MORE ENLIGHTENING.  THERE WILL BE A PLEA AGREEMENT THAT WILL BE

23  MADE PUBLIC IN DUE COURSE BY THE DEPARTMENT OF JUSTICE THAT WILL

24  EXPLAIN SPECIFICALLY WHAT THE CHARGES ARE.

25       AND THE IMPORTANT THING OUT OF THE ANA PLEA, YOUR

1   HONOR, IS THAT THERE'S NO BROAD CONSPIRACY, AS ALLEGED BY THE

2   PLAINTIFFS, THAT ANA IS AGREEING TO PLEAD TO.

3          **THE COURT:**  WELL, YOU'RE SAYING IT CAN BE NOTICED,

4   BUT IT'S NOT GOING TO HAVE MUCH OF AN IMPACT.

5          **MR. MILLER:**  IT SHOULD HAVE NO IMPACT, YOUR HONOR, ON

6   THE TWOMBLY THING.

7          **THE COURT:**  ALL RIGHT.

8          **MR. MILLER:**  AND IF I MAY TURN BACK TO YOUR

9   COMMENTS --

10          **THE COURT:**  SURE.

11          **MR. MILLER:**  -- ABOUT THIS MISSING LINK.  THE IDEA OF

12   TWOMBLY IS THAT THEY NEED TO PROVIDE A PLAUSIBLE STORY AS TO HOW

13   ALL OF THIS WORKS.  IT DOESN'T HAVE TO BE A COMPLETELY NEAT,

14   DONE BOW.

15          I WOULD NOTE, THOUGH, YOUR HONOR, YOU DO SAY IT'S

16   PREDISCOVERY, BUT AT THIS POINT THEY HAVE HAD SUBSTANTIAL

17   ASSISTANCE FROM JAPAN AIRLINES.

18          SO IT'S NOT AS IF THEY HAVE HAD ACCESS TO NO

19   INFORMATION THAT MIGHT BE OF ASSISTANCE.  AND NOT WITHSTANDING

20   THAT SUBSTANTIAL ASSISTANCE AND ALL THEIR DETAILED ALLEGATIONS,

21   THOSE ARE ALL ABOUT JAPAN.

22          AND SO THE QUESTION FOR YOU, YOUR HONOR, AND WHAT IT

23   DOES CHANGE IS YOU DO NEED TO TAKE -- IT'S NOT JUST NOTICED

24   PLEADING.  YOU HAVE TO LOOK FOR THAT PLAUSIBLE CONNECTION:  HOW

25   ARE ALL OF THESE DEFENDANTS NOW CONNECTED TOGETHER IN A

1    CONSPIRACY THAT'S DOESN'T JUST AFFECT THE UNITED STATES TO

2    JAPAN; THAT DOESN'T JUST AFFECT UNITED STATES TO THAILAND, BUT

3    HOW DOES IT -- HOW DOES IT CONNECT ALL OF THIS TOGETHER?

4              AND THAT'S WHAT THEY DON'T DO.  AND, THEREFORE, THEY

5    DON'T HAVE A PLAUSIBLE CONSPIRACY STORY HERE, YOUR HONOR, ON ALL

6    FLIGHTS TRANSPACIFIC.

7              WELL, LET ME QUICKLY MENTION, THEN, A COUPLE OTHER

8    THINGS.  PLAINTIFFS LIKE TO CITE A LOT OF CASES THAT -- WHERE

9    COURTS HAVE UPHELD MULTIDEFENDANT COMPLAINTS, AND WE DON'T DENY

10   THAT.

11             **THE COURT:**  I HAVE TO TELL YOU DON'T HAVE TO GO

12   THROUGH THEM.  I MEAN, IF YOU GIVE ME TEN CASES AND SAY THAT

13   THEY WERE:

14                  "YES, WE FOUND IT HERE.  THEY FOUND IT THERE.

15             THEY FOUND IT THERE.  THEY FOUND IT THERE."

16             FINE.  I DON'T KNOW.  THOSE ARE CASES. I MEAN, THERE

17   ARE 12 BILLION CASES, AND I KNOW THAT THERE ARE THREE BILLION IN

18   WHICH WERE FOUND ONE WAY AND NINE BILLION WHICH AREN'T.

19             I MEAN, THAT IS NOT GOING TO DO IT. I MEAN, I HAVE

20   TO -- I LOOK AT -- IF SOMEBODY SAYS:

21                  "LOOK AT THIS CASE.  THIS CASE IS LIKE THIS

22             CASE.  THAT CASE IS LIKE THIS CASE," WELL, FINE.

23             BUT, I MEAN, THE OVERALL PRINCIPLE OF:

24                  "WELL, YOU CAN FIND FOREIGN CONSPIRACIES, OR

25             CONSPIRACIES TO SET PRICES ABROAD," AND SO FORTH AND

1    SO ON.

2              YES, INDEED.  YOU SURE CAN. I UNDERSTAND THAT. I

3    DON'T KNOW WHETHER THAT'S THIS CASE OR NOT.  AND THAT'S WHAT WE

4    HAVE TO --

5              **MR. MILLER:**  AND IT'S NOT, YOUR HONOR.

6              **THE COURT:**  OKAY.  WELL --

7              **MR. MILLER:**  THE CASES THEY ARE CITING, IF I MAY JUST

8    MAKE ONE BRIEF COMMENT, IS THOSE INVOLVE HOMOGENEOUS PRODUCTS.

9              **THE COURT:**  YOU HAVE ACTUALLY UNTIL 4:57 TODAY, WHEN

10   THE FIRST PITCH --

11             **MR. MILLER:**  WELL, YOUR HONOR, I WASN'T --

12             **THE COURT:**  TIM LINCECUM.  SO YOU HAVE ACTUALLY

13   UNTIL --

14             **MR. MILLER:**  YOUR HONOR, I PROMISE I WON'T TAKE THAT

15   MUCH TIME.

16             **THE COURT:**  I JUST WANT YOU TO KNOW THAT YOU'RE NOT

17   UNDER ANY PRESSURE.

18             **MR. MILLER:**  WELL, THAT'S -- THAT'S VERY GENEROUS.

19             **THE COURT:**  BUT I'M OUT OF HERE TO WATCH THE FIRST

20   PITCH. THAT IS A NUMBER OF PEOPLE, I WOULD HOPE -- OKAY.  GO

21   AHEAD.

22             **MR. MILLER:**  JUST A COUPLE OF VERY BRIEF POINTS ON

23   THE CASES, YOUR HONOR.

24             **THE COURT:**  YES.

25             **MR. MILLER:**  THE POINT OF LAFLAMME IS THAT IT IS THIS

1   CONTEXT.  IT'S THE CONTEXT OF THE AIRLINE INDUSTRY.  ALL THE

2   OTHER CASES CITED BY THEM ARE HOMOGENEOUS PRODUCTS.  AND SO IT

3   DOES DISCUSS -- IT DOES DISCUSS THE SAME THINGS THAT ARE GOING

4   ON HERE.

5          IT DOES DISCUSS HOW THERE'S OTHER EXPLANATIONS FOR

6   THIS BEHAVIOR IN THE INTERDEPENDENT AIRLINE INDUSTRY WHERE YOU

7   HAVE RAPIDLY ESCALATING FUEL INCREASES.  AND THAT'S THE

8   IMPORTANCE HERE, YOUR HONOR, IS THAT AS ONE DOES TWOMBLY

9   EXAMINATION -- AND I'M SURE I AGREE WITH MY COLLEAGUES THAT WE

10  CERTAINLY DO NOT WANT TO TWOMBLY YOU TO DEATH.  BUT WE WOULD

11  LIKE YOU TO APPLY TWOMBLY HERE AND LOOK AT --

12          **THE COURT:**  WELL, I'LL APPLY IT.  I HAVE TO APPLY IT.

13  IT'S NOT LIKE:

14              "OH, I DON'T LIKE THAT SUPREME COURT DECISION."

15          I MEAN, YEAH, FOUR DIDN'T; IS THAT RIGHT?  WERE THERE

16  FOUR?  USUALLY ARE.

17          BUT AT ANY RATE, THEY DON'T WRITE THE LAW. THE FIVE

18  WRITE THE LAW.  SO, ANYWAY, THAT'S THE WAY IT IS.  I'M CERTAINLY

19  GOING TO APPLY IT.

20          **MR. MILLER:**  OF COURSE YOU WILL.  BUT YOU SAID

21  DEFENDANTS COME IN AND TWOMBLY YOU TO DEATH, AND WE DON'T WANT

22  TO DO THAT.

23          **THE COURT:**  OKAY.  YOU'RE NOT TWOMBLYING ME TO DEATH.

24  BUT I READ TWOMBLY IN A PARTICULAR WAY. I'M NOT SURE THAT YOU

25  READ IT ANY DIFFERENT FROM THE WAY I READ IT.

1     BUT YOU SAY IT'S MISSING. IT HAS TO HAVE -- THIS

2  COMPLAINT HAS TO HAVE THAT ELEMENT TO.

3        **MR. MILLER:**  EXACTLY, YOUR HONOR.

4        **THE COURT:**  IT HAS TO HAVE THAT ALLEGATION, AND IT

5  DOESN'T.  AND I UNDERSTAND THAT ARGUMENT.  AND I LOOK AT THE

6  CONTEXT OF A COMPLAINT, AND I TRY TO DETERMINE WHETHER FROM THE

7  ENTIRE CONTEXT OF THE COMPLAINT THEIR THEORY OF THE CASE IS

8  PLAUSIBLE.

9        THAT'S WHAT I HAVE TO LOOK AT. BECAUSE I'M NOT GOING

10  TO GO INTO YEARS OF LITIGATION.

11        CAN YOU SAY A LITTLE BIT MORE?  CAN YOU JUST GIVE US

12  A LITTLE BIT OF THIS OR A LITTLE BIT OF THAT TO CROSS THE

13  THRESHOLD INTO PLAUSIBILITY?  BECAUSE I DON'T THINK

14  THAT'S -- NUMBER ONE, I DON'T KNOW WHERE I WOULD DRAW THE LINE,

15  PARTICULARLY.

16        NUMBER TWO, I DON'T KNOW HOW PRODUCTIVE THAT IS TO

17  THE LITIGATION PROCESS.

18        NOW, IT'S EITHER GOING TO BE THERE OR IT'S NOT. AND

19  WE'RE GOING TO FIND OUT SOON ENOUGH IF THE CASE GOES FORWARD.

20  AND TO GET PEOPLE WRAPPED UP INTO YEARS OF LITIGATION ON:  IS

21  THIS PLAUSIBLE ENOUGH?  I JUST DON'T THINK RENDERS A GREAT

22  SERVICE.

23        ANYWAY, I UNDERSTAND YOUR ARGUMENTS.  I SORT OF TRIED

24  TO INDICATE HOW I WAS COMING OUT, AND THERE WE ARE.

25        **MR. MILLER:**  I HOPE I'VE ANSWERED YOUR QUESTIONS,

1   YOUR HONOR.

2           **THE COURT:**  YOU HAVE.  THANK YOU.

3           **MR. MILLER:**  BECAUSE WE HOPED YOU'D COME OUT A

4   DIFFERENT WAY.

5           **THE COURT:**  OKAY.  SO?

6           **MR. SHERMAN:**  WELL, YOUR HONOR, IT'S THOSE THREE, AND

7   WE HAD ESTIMATED THAT OUR ARGUMENT ON THE THREE MOTIONS, THE

8   OMNIBUS MOTION, WOULD TAKE UNTIL THREE.

9           WE ARE PREPARED TO MOVE ON TO THE FIRST ONE THAT WE

10  HAD SCHEDULED FOR TOMORROW, IF YOUR HONOR PREFERS TO DO THAT.

11          **THE COURT:**  SURE.  THAT IS ALL RIGHT WITH EVERYONE?

12          OKAY. SURE. OF COURSE.

13          **MR. WARNOT:**  GOOD AFTERNOON, YOUR HONOR.  JAMES

14  WARNOT OF LINKLATERS.

15          I'M REPRESENTING AIR FRANCE, AND I'LL BE SPEAKING

16  TODAY ON BEHALF OF AIR FRANCE, ALONG WITH SAS, KLM, LUFTHANSA

17  AND SWISS AIR, WHO WE HAVE DESIGNATED AS THE "EUROPEAN

18  CARRIERS."

19          AND WE SAY THAT BECAUSE WE DO FLY TO THE U.S., BUT WE

20  FLY ACROSS THE ATLANTIC, NOT THE PACIFIC.  AND THAT IS THE

21  FUNDAMENTAL REASON WHY WE DON'T BELONG IN THIS CASE BECAUSE THE

22  CLASS THAT'S DEFINED IN THIS CASE IN PARAGRAPH 306 OF THE

23  COMPLAINT IS PASSENGERS WHO FLY ON CARRIERS WITH A FLIGHT

24  SEGMENT BETWEEN U.S. AND ASIA AND OCEANIA, AND THAT'S NOT US.

25          YOUR HONOR, THIS IS ACTUALLY THE THIRD CASE IN WHICH

1    THE EUROPEAN CARRIERS HAVE BEEN SUED ON BEHALF OF A CLASS OF

2    PROSPECTIVE PASSENGERS, IN OUR VIEW, BOOTSTRAPPING THE PROBLEMS

3    THAT WE HAD IN THE CARGO BUSINESS.

4            YOU'VE HEARD ABOUT A COUPLE OF THOSE CASES A LITTLE

5    BIT.

6            THE FIRST ONE WAS THE MCLAFFERTY CASE.  THAT'S THE

7    CASE BY JUDGE POLLAK IN PHILADELPHIA IN WHICH THE CLASS THAT WAS

8    ALLEGED WAS PASSENGERS ON FLIGHTS BETWEEN THE EUROPEAN UNION AND

9    JAPAN, WHICH, OF COURSE, WE DO PARTICIPATE IN THAT MARKET.

10           AND THAT COMPLAINT, LIKE THIS ONE, WAS BASED UPON

11   ALLEGATIONS OF THE GUILTY PLEAS IN THE CARGO CASES AND SOME

12   OTHER INVESTIGATIONS, THE SAME IATA MEETING THAT'S ALLEGED IN

13   THIS CASE AND VARIOUS OTHER THINGS THAT WE CALL "OPPORTUNITIES

14   TO CONSPIRE."  VERY, VERY SIMILAR TO THIS COMPLAINT.

15           JUDGE POLLAK THREW THAT CASE OUT ON FTAIA GROUNDS

16   BECAUSE IT WAS ALL PURELY FOREIGN COMMERCE, SO WE NEVER EVEN GOT

17   TO THE TWOMBLY ARGUMENT.

18           BUT THAT, AT LEAST, WAS A MARKET IN WHICH WE DID

19   PARTICIPATE IN.

20           THE SECOND CASE YOU'VE JUST HEARD ABOUT IS THE

21   LAFLAMME CASE.  LAFLAMME, AGAIN, WAS A MARKET THAT WE DID

22   PARTICIPATE IN.  AND, AGAIN, AS MR. MILLER'S JUST EXPLAINED, THE

23   ALLEGATIONS IN LAFLAMME WERE VERY SIMILAR TO THE ALLEGATIONS

24   HERE. NOTWITHSTANDING THAT WE DID PARTICIPATE IN THAT MARKET,

25   FOR THE REASONS THAT MR. MILLER HAS EXPLAINED, AND I'M NOT GOING

1    TO BELABOR, JUDGE MATSUMOTO FOUND THAT COMPLAINT LACKING, AS

2    WELL.

3            SO HERE WE GET TO THIS CASE.  AND WHAT'S THE BASIS

4    FOR OUR MOTION?  FIRST OF ALL, THEY DON'T ALLEGE THAT WE FLY IN

5    THIS MARKET.  THEY ALLEGE THAT WE FLY INTERNATIONAL FLIGHTS,

6    INCLUDING TO THE U.S.  WELL, THAT'S VERY TRUE, BUT IT'S BESIDES

7    THE POINT.

8            THEY ALLEGE THAT THE CARRIERS BASED IN OCEANIA AND

9    ASIA FLY ACROSS THE TRANSPACIFIC, BUT NOT US.

10           THEY HAVE SOME CONCLUSORY ALLEGATION IN THEIR SECTION

11   ABOUT THE FTAIA THAT, QUOTE/UNQUOTE:

12               "THE DEFENDANTS SERVICE THE TRANSPACIFIC

13           MARKET." BUT THEY CAN'T BRING THEMSELVES TO SAY THAT

14   WE DO.

15           SO THAT WAS THE BASIS FOR OUR MOVING PAPERS.  AND IN

16   OUR REPLY PAPERS WE PUT BEFORE THE COURT SOME MATERIAL FROM THE

17   DOT OF WHICH THE COURT CAN TAKE JUDICIAL NOTICE THAT, IN FACT,

18   DEMONSTRATES THAT WE -- ALL OF OUR FLIGHTS, AND THAT WE DON'T

19   SERVICE THIS MARKET, WITH ONE EXCEPTION, WHICH I'LL GET TO IN A

20   MINUTE, FOR ONE OF THE CARRIERS, MY CLIENT.

21           SO THEY CAN'T REFUTE THAT BASIC PROPOSITION, AND THEY

22   HAVEN'T MADE ONLY A MINIMAL ATTEMPT TO DO SO.  AND IT'S A LITTLE

23   BIT DIFFERENT WITH RESPECT TO EACH ONE OF THE DEFENDANTS, SO I'M

24   GOING TO HAVE TO GO THROUGH THEM ONE BY ONE.

25           FIRST OF ALL WITH RESPECT TO --

1          **THE COURT:**  I'M A LITTLE CONCERNED.  WE HAVE CERTAIN

2     THINGS THAT ARE HAPPENING AT THREE, AND I DON'T KNOW THAT YOU'RE

3     GOING TO BE ABLE TO FINISH AND I CAN HEAR OPPOSITION BY THREE.

4     I DON'T THINK YOU CAN.

5          SO I THINK I'M GOING TO ADJOURN AT THIS POINT, AND

6     YOU CAN START IN FIRST THING TOMORROW MORNING, WHEREVER YOU WANT

7     TO START.

8          **MR. WARNOT:**  THAT'S FINE, YOUR HONOR.

9          **THE COURT:**  BUT I DON'T WANT TO LISTEN TO YOUR

10    ARGUMENTS, AND THEN CUT OFF THE PLAINTIFFS.  AND I WANT TO HEAR

11    THEIR ARGUMENT AT THE SAME TIME, AND SO FORTH.  SO IF YOU'LL

12    FORGIVE ME, I THINK I WILL ADJOURN, THEN, SEVEN MINUTES EARLY,

13    AND THEN WE CAN REFORMAT 9:30; IS THAT RIGHT?

14         **MR. WARNOT:**  THAT'S FINE, YOUR HONOR.  THANK YOU.

15         **MR. SHERMAN:**  THANK YOU, YOUR HONOR.

16         **THE COURT:**  THANK YOU.

17         (THEREUPON, THIS HEARING WAS CONCLUDED.)

18

19

20

21

22

23

24

25

KATHERINE WYATT, OFFICIAL REPORTER, RPR, RMR  925-212-5224

```
 1                    CERTIFICATE OF REPORTER

 2          I, KATHERINE WYATT, THE UNDERSIGNED, HEREBY CERTIFY

 3   THAT THE FOREGOING PROCEEDINGS WERE REPORTED BY ME, A CERTIFIED

 4   SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED BY ME INTO

 5   TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE

 6   RECORD OF SAID PROCEEDINGS.

 7          I FURTHER CERTIFY THAT I AM NOT OF COUNSEL OR

 8   ATTORNEY FOR EITHER OR ANY OF THE PARTIES IN THE FOREGOING

 9   PROCEEDINGS AND CAPTION NAMED, OR IN ANY WAY INTERESTED IN THE

10   OUTCOME OF THE CAUSE NAMED IN SAID CAPTION.

11          THE FEE CHARGED AND THE PAGE FORMAT FOR THE

12   TRANSCRIPT CONFORM TO THE REGULATIONS OF THE JUDICIAL

13   CONFERENCE.

14          IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND THIS

15   12TH DAY OF NOVEMBER, 2010.

16

17

18

19   _____

20          /S/ KATHERINE WYATT

21

22

23

24

25
```