1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE TRANSPACIFIC PASSENGER AIR
TRANSPORTATION ANTITRUST
LITIGATION

This Document Relates to:
ALL ACTIONS
_____/

No. C 07-05634 CRB

**MEMORANDUM AND ORDER
GRANTING IN PART AND DENYING
IN PART MOTIONS TO DISMISS**

This case involves allegations that 26 airlines engaged in a ten year international conspiracy to fix the prices of transpacific air passenger travel, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  In November 2009, the Court denied a Motion to Dismiss filed by Continental Airlines.  See dkt. 278.  The remaining Defendants subsequently filed thirteen additional Motions to Dismiss, see dkt. 287, 288, 290, 293, 294, 295, 299, 300, 303, 304, 310, 311, 312, which the Court herein grants in part and denies in part.[1]

---

[1] Also pending is a Motion to Stay the case.  See dkt. no. 344.  On January 19, 2010, Japan Airlines Corp. filed a Chapter 15 bankruptcy petition in the Southern District of New York.  Four weeks later, the Bankruptcy Court issued an injunction prohibiting "all persons and entities from commencing or continuing . . . any judicial, administrative or other action or proceeding involving or against" Japan Airlines.  Because this case "involv[es]" Japan Airlines, Defendants moved to stay the proceedings in accordance with the injunction.  See id.  The Court did not stay the case, but continued the March 12, 2010 hearing that was then scheduled on the various motions to dismiss, and instructed the parties to advise the Court of the Bankruptcy Court's decision as to the scope of its injunction when that decision was issued.  See dkt. 376.  The parties subsequently informed the Court that the Bankruptcy Court's stay does not apply to the non-debtor Defendants.  See dkt. 379, 381, 382.  Japan Airlines has subsequently settled with Plaintiffs.  See dkt. 436 at 4.  Accordingly, there is no reason to stay the case, and, as indicated at the motion hearing, this Motion is denied.

United States District Court
For the Northern District of California

# I.    BACKGROUND

According to the Consolidated Amended Complaint ("CAC"), Defendants are various airlines that agreed to fix, raise, maintain, and/or stabilize air passenger travel, including associated surcharges, for international flights between the United States and Asia/Oceania.[2] CAC ¶¶ 1-2.  Plaintiffs are a class of individuals who purchased air transportation services from one or more of the Defendants that included at least one flight segment between the United States and Asia/Oceania.  CAC ¶¶ 8-21.  The CAC alleges that, beginning no later than January 1, 2000, Defendants and their co-conspirators[3] agreed, and began, to impose air passengers air fare increases, including fuel surcharge increases, that were in substantial lockstep both in their timing and amount.  CAC ¶ 2.

Now pending are thirteen motions to dismiss.  They are:

A.    A Consolidated Motion by all Defendants to dismiss based on: (1) the Foreign Trade Antitrust Improvements Act ("FTAIA"); (2) the filed rate doctrine; and (3) the sufficiency of the pleadings under Twombly.  See dkt. 290.

B.    A joint Motion by the European Carriers to dismiss based on the sufficiency of the pleadings.  See dkt. 293.

C.    A joint Motion of ANA, China Airlines, and Thai Airways ("the Japan Regulatory Brief") to dismiss based on the state action doctrine and the implied preclusion doctrine.  See dkt. 304.

---

[2] Plaintiffs bring claims against the following Defendants: Continental; Air France; Air New Zealand Limited (hereinafter "Air New Zealand"); All Nippon Airways Company, Limited (hereinafter "ANA"); British Airways; Cathay Pacific Airways Limited (hereinafter "Cathay Pacific"); China Airlines Limited (hereinafter "China Airlines"); Deutsche Lufthansa AG (hereinafter "Lufthansa"); EVA Airways Corporation (hereinafter "EVA"); Japan Airlines International Company, Limited (hereinafter "JAL"); KLM Royal Dutch Airline (hereinafter "KLM"); Malaysian Airline System Berhad (hereinafter "Malaysian Airlines"); Philippine Airlines, Inc. (hereinafter "Philippine Airlines"); Qantas Airways Limited (hereinafter "Qantas"); SAS AB (hereinafter "SAS"); Singapore Airlines Limited (hereinafter "Singapore Airlines"); Swiss International AG (hereinafter "Swiss International"); Thai Airways International Public Co., Ltd. (hereinafter "Thai Airways"); and Vietnam Airlines ( hereinafter "VNA").  CAC at ¶¶ 22-40.  JAL has apparently settled and is out of the case.  See dkt. 436 at 4.

[3] Non-defendant named co-conspirators include Northwest Airlines Corporation (hereinafter "Northwest"); United Airlines, Inc. (hereinafter "UAL"); American Airlines, Inc. (hereinafter "American Airlines"); Delta Airlines, Inc. (hereinafter "Delta"); KAL; Asiana; Virginia Atlantic Airways Ltd. (hereinafter "Virgin Atlantic"); and International Air Transport Association (hereinafter "IATA").  CAC ¶ 42.

D.     A joint Motion of VNA and Thai Airways to dismiss based on the act of state
       doctrine.  <u>See</u> dkt. 299.

E.     A joint Motion of Air New Zealand and Malaysian Airlines to dismiss the
       allegations of fraudulent concealment on the grounds that they have not been
       pleaded with sufficient particularity under Rule 9(b).  <u>See</u> dkt. 311.

F.     A joint Motion of Philippine Airlines and VNA to dismiss on relation back
       grounds.  <u>See</u> dkt. 287.

G.     A Motion by VNA to dismiss based on (1) the sufficiency of the pleadings; (2)
       the FTAIA; (3) an agreement between the United States and Vietnam; and (4)
       the filed rate, state action, and implied preclusion doctrines.  <u>See</u> dkt. 294.

H.     A Motion by ANA to dismiss based on (1) the filed rate doctrine; (2) the
       FTAIA; (3) the sufficiency of the pleadings; and (4) the argument that Japan's
       policy to displace competition precludes antitrust enforcement in U.S. courts.
       <u>See</u> dkt. 295.

I.     A Motion by Cathay Pacific to dismiss based on (1) the filed rate doctrine; and
       (2) the sufficiency of the pleadings.  <u>See</u> dkt. 303.

J.     A Motion by EVA Airways to dismiss based on the sufficiency of the
       pleadings.  <u>See</u> dkt. 300.

K.     A Motion by Malaysian Airlines to dismiss based on an agreement between the
       United States and Malaysia.  <u>See</u> dkt. 310.

L.     A Motion by Philippine Airlines to dismiss based on (1) an agreement between
       the United States and the Philippines, and (2) the Noerr-Pennington, filed rate,
       implied preclusion, and the state action doctrines.  <u>See</u> dkt. 288.

M.     A Motion by Thai Airways to dismiss based on (1) an agreement between the
       United States and Thailand, (2) the filed rate, state action, and implied
       preclusion doctrines.  <u>See</u> dkt. 312.

//

3

**United States District Court**
For the Northern District of California

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a cause of action which fails to state a claim upon which relief can be granted.  On a motion to dismiss, all well-pleaded allegations of material fact are taken as true and construed in the light most favorable to the non-moving party.  <u>Wyler-Summit Partnership v. Turner Broadcasting System, Inc.</u>, 135 F.3d 658, 661 (9th Cir. 1998).  To survive a Rule 12(b)(6) motion to dismiss, the complaint must state a claim to relief that is "plausible on its face."  <u>Ashcroft v. Iqbal</u>, --- U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).  A claim has "facial plausibility" when the pleaded factual allegations "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Id.</u>

Under Federal Rule of Civil Procedure 12(b)(1), a complaint may be dismissed for lack of subject matter jurisdiction.  Though the defendant makes the motion, the plaintiff bears the burden of establishing subject matter jurisdiction. <u>See</u> <u>Kokkonen v. Guardian Life Ins. Co. of America</u>, 511 U.S. 375, 377 (1994); <u>Stock West, Inc. v. Confederated Tribes of the Colville Reservation</u>, 873 F.2d 1221, 1225 (9th Cir. 1989).  A Rule 12(b)(1) jurisdictional attack may be facial or factual.  <u>See Safe Air v. Meyer</u>, 373 F.3d 1035, 1039 (9th Cir. 2004).  "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction."  <u>Id.</u>  In resolving a facial attack, a motion will be granted if the complaint, when considered in its entirety, on its face fails to allege facts sufficient to establish subject matter jurisdiction.  <u>See, e.g.</u>, <u>Savage v. Glendale Union High School</u>, 343 F.3d 1036, 1040 n.2 (9th Cir. 2003).

## III.    DISCUSSION

### A.    Consolidated Motion by all Defendants

All Defendants bring a Consolidated Motion to Dismiss, which makes three primary arguments: (A) the foreign injury claims are barred by the FTAIA; (B) the damages claims are barred by the filed rate doctrine; and © the CAC has not been adequately pleaded.  <u>See generally</u> Mot. (dkt. 290).  As explained below, the Court finds one of the three persuasive.

//

United States District Court
For the Northern District of California

### 1.     The FTAIA

Defendants argue that the FTAIA, 15 U.S.C. § 6a, bars the Court from exercising subject matter jurisdiction over Plaintiffs' claims of foreign injury – that is, the overcharges associated with flights originating in Asia. Id. at 8.  The FTAIA limits the courts' subject matter jurisdiction over Sherman Act claims involving foreign commerce.  It provides in part:

> Sections 1 to 7 of [the Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless:
> (1) such conduct has a direct, substantial, and reasonably foreseeable effect–
> (A) on trade or commerce which is not trade or commerce with foreign nations [i.e., domestic commerce], or on import trade or import commerce with foreign nations; or
> (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States [i.e., U.S.-based exporter]; and
> (2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

15 U.S.C. § 6a (emphasis added).  Defendants argue that the FTAIA bars Plaintiffs' foreign injury claims, because such claims (a) do not involve import commerce; and (b) do not have domestic effects that give rise to Plaintiffs' foreign claims.  See Mot. at 9-16.  The Court agrees.

### a.     The "Import Commerce" Exception

The CAC alleges that "Defendants are engaged in the business of delivering air passengers from place to place," and that "[p]ursuant to the FTAIA, the delivery of air passengers from airports in Asia/Oceania to airports in the United States and vice versa constitutes or involves import trade or import commerce."  CAC ¶ 48.  In support of this assertion, Plaintiffs rely on a dictionary definition of import that defines the verb "import" but not the noun.  See Opp'n (dkt. 339) at 5 (defining import as "to bring in; to introduce from a foreign or external source").  They contend that "[i]dentical allegations to those set forth in the CAC have been thoroughly examined in the Air Cargo action[4] and have been found to pass muster," id. at 5-6, without acknowledging that there are significant differences

---

[4] In re: Air Cargo Shipping Serv. Antitrust Litig., Case No. MD 06-1775 (JG) (VVP), 2008 U.S. Dist. LEXIS 107882 (E.D. N.Y. Sept. 26, 2008).

1  between cargo and (most) people.[5]  Plaintiffs also cite to a variety of cases from vastly

2  different legal contexts in which courts have used the word "import" as something that can

3  be done to a person.  See id. at 7 (citing, for example, United States v. Lopez, 484 F.3d 1186,

4  1193 (9th Cir. 2007), a case about smuggling aliens into the United States).  And Plaintiffs

5  rely on outdated, pre-FTAIA authority.  Id. at 8.  These arguments are unavailing.

6          Faced with a similar argument, that "passengers traveling from Korea to the U.S. are

7  'a type of import,'" the court in In re Korean Air Lines Co., Ltd. Antitrust Litigation, Case

8  No. MDL 07-01891, 2008 U.S. Dist. LEXIS 111722, at *18 (C.D. Cal. 2008) (internal

9  quotation marks omitted), held that "the sole authority offered in support of [Plaintiffs']

10 position is strained and without context."  The court concluded that "[a]ir passengers are not

11 products like the oriental rugs that were found to be the object of import commerce in Carpet

12 Group, 227 F.3d at 72,[6] and Plaintiffs have failed to make a strong case for why they should

13 be treated as such."  Id.

14         Courts addressing this issue focus on "whether the conduct of defendants, not

15 plaintiffs, involves 'import trade or commerce.'"  See, e.g., Turicentro, S.A. v. Am. Airlines

16 Inc., 303 F.3d 293, 303 (3d Cir. 2002).  The Third Circuit has noted that the FTAIA "does

17 not define the term 'import,' but the term generally denotes a product (or perhaps a service)

18 [that] has been brought into the United States from abroad."  Id.  Thus, in Turicentro, the

19 court held that a conspiracy to set commissions paid to travel agents for bookings services on

20 passenger flights outside the United States did not involve "import commerce" even though

21 some of the flights were for travel to the United States.  Id. at 303-04.

22

23

24         [5] For the same reasons, the Report and Recommendation in Precision Assoc., Inc., et al. v.
   Panalpina World Transp. (Holding) LTD., et al., EDNY Case No. 08-CV-42 (E.D.N.Y. Jan. 4, 2011)
25 submitted by Plaintiffs in their Statement of Recent Decisions Concerning Defendants' Pending Motions
   to Dismiss (dkt. 460) is distinguishable.  That case, about the freight forwarding industry, "involve[d]
26 conduct that directly implicates import commerce in goods transported by air into the United States.
   The freight forwarding service at issue . . . is the business of obtaining money for placing goods into the
27 flow of commerce into and out of the United States."  Id. at 69.  Here, there are no "goods" being
   placed into the flow of commerce.
28

           [6] Carpet Group Int'l v. Oriental Rug Imps. Ass'n, 227 F.3d 62, 72 (3d Cir. 2000).

United States District Court
For the Northern District of California

1    Here, the relevant conduct of the Defendants is air passenger transportation.  See CAC

2  ¶ 1 ("air passenger travel").   It is too great a leap to equate air passenger travel with the

3  importing of people, or to characterize air passengers as "a product (or perhaps a service)."

4  See Turicentro, 303 F.3d at 303.  Moreover, Plaintiffs point to no authority compelling such

5  a conclusion, and the Court disregards as conclusory the CAC's allegation that the case

6  involves import commerce.  See Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th

7  Cir. 2001).  This exception to the FTAIA does not apply.

8              **b.    The "Domestic Effects" Exception**

9    Plaintiffs also argue that they can satisfy the FTAIA's "domestic effects" exception.

10  That exception has two prongs, requiring both that "the effect on U.S. commerce or

11  American interests engaged in foreign commerce must be direct, substantial and reasonably

12  foreseeable – not minor impacts – and it must give rise to the antitrust claim."  In re Dynamic

13  Random Access Memory (DRAM) Antitrust Litig., 546 F.3d 981, 986 (9th Cir. 2008)

14  ("Centerprise") (internal quotations omitted).  The CAC's allegations as to the domestic

15  effects exception consist of the following:

16      The direct, substantial, reasonably foreseeable, and proximate effect of the
        anticompetitive conduct set forth below is the type of harm prohibited by the Sherman
17      Act.
        For example, U.S. residents and citizens paid more for air passenger transportation
18      services, whether those services were purchased in the United States or elsewhere in
        the world.  As another example of the direct, substantial, reasonably foreseeable, and
19      proximate effect that Defendants' alleged conduct has on United States trade and
        commerce is the fact that travelers using price-fixed air transportation services are
20      able to allocate a smaller fraction of their total travel budget to the purchase of
        commercial goods and services during their stay in the United States.  The alleged
21      conduct also injures any foreign national that purchased air transportation services in
        the United States.  In addition, the inflated fares charged by Defendants for air
22      passenger transportation from Asia/Oceania to the United States is inextricably bound
        up with and dependent upon the fares charged by Defendants for air transportation
23      from the United States to Asia/Oceania.

24  CAC ¶¶ 50-51.

25              **I.     Whether there is a Direct Effect on U.S. Commerce**

26    As an initial matter, the Court finds unpersuasive Plaintiff's allegation that travelers

27  who spent too much money on their air transportation will be forced to "allocate a smaller

28  fraction of their total travel budget to the purchase of commercial goods and services" within

7

**United States District Court**
For the Northern District of California

1   the United States.  Such an effect is entirely indirect.  <u>See, e.g.</u>, <u>United States v. LSL</u>

2   <u>Biotechnologies</u>, 379 F.3d 672, 680 (9th Cir. 2004) (noting Supreme Court definition of

3   "direct" in this context as an effect following "as an immediate consequence of the

4   defendant's activity").  It also makes numerous assumptions about travelers' spending habits

5   that are by no means certain; who is to say that all air passengers have fixed "travel budgets"

6   or that they strictly abide by those budgets?  <u>See id.</u> (rejecting speculative effect and noting

7   that an effect cannot be "'direct' where it depends on such uncertain intervening

8   developments"); <u>El Cid, Ltd. v. New Jersey Zinc. Co.</u>, 551 F. Supp. 626, 633 (S.D.N.Y.

9   1982) (finding that it was "sheer speculation" to allege that plaintiff would have spent more

10  money on mining equipment from the United States absent a conspiracy preventing it from

11  obtaining mining rights in Bolivia).  Accordingly, this is not a type of domestic effect that is

12  recognizable by the law.

13          However, Plaintiff's other allegation of a direct effect – that "U.S. residents and

14  citizens paid more for air passenger transportation" is fairly indisputable.  <u>See, e.g.</u>, <u>F.</u>

15  <u>Hoffmann-La Roche Ltd. v. Empagran S.A.</u>, 542 U.S. 155, 175 (2004) ("Empagran I")

16  (characterizing the adverse domestic effect of a global price-fixing conspiracy as "higher

17  prices in the United States"); <u>In re Korean</u>, 2008 U.S. Dist. LEXIS 111722, at *20 ("A

18  conspiracy to fix the prices charged for the service of flying passengers between Korea and

19  the U.S. has a direct, substantial, and reasonably foreseeable effect on domestic commerce:

20  higher prices in the U.S.").  This first prong of the domestic effects exception has thus been

21  met.

22                  **ii.      Whether That Direct Effect Caused the Foreign Injury**

23          More problematic for Plaintiffs is the second prong of the domestic effects exception

24  – whether the domestic effect actually caused the foreign injury.

25          In <u>Empagran I</u>, 542 U.S. at 159, plaintiffs alleged that defendants, foreign and

26  domestic vitamin manufacturers and distributors, engaged in a price-fixing conspiracy as to

27  vitamins both in the United States and abroad.  The Court explained that "the higher foreign

28  prices of which the foreign plaintiffs here complain are not the consequence of any domestic

8

United States District Court
For the Northern District of California

anticompetitive conduct <u>that Congress sought to forbid</u>, for Congress did not seek to forbid any such conduct insofar as it is here relevant, <u>i.e.</u>, insofar as it is intertwined with foreign conduct that causes independent foreign harm." <u>Id.</u> at 165-66 (emphasis in original).  The Court made clear that it "assumed that the anticompetitive conduct here independently caused foreign injury; that is, the conduct's domestic effects did not help to bring about that foreign injury." <u>Id.</u> at 175.  The Court remanded to the D.C. Circuit to consider plaintiffs' new, alternative argument that the anticompetitive conduct's domestic effects <u>were</u> linked to the foreign harm (i.e., that absent the adverse domestic effect of higher U.S. prices, "the sellers could not have maintained their international price-fixing arrangement and respondents would not have suffered a foreign injury").

Upon remand, the D.C. Circuit held that "but for" causation was not sufficient; the domestic effect had to proximately cause the foreign injury.  <u>Empagran S.A. v. F. Hoffmann-LaRoche, LTD.</u>, 417 F.3d 1267, 1271 (D.C. Cir. 2005) ("Empagran II").  Applying the proximate cause standard, the court held that the domestic effects in that case did not give rise to the foreign injury in order to bring the claims within the domestic effects exception. <u>Id.</u>  The court explained: "While maintaining super-competitive prices in the United States may have facilitated the appellees' scheme to charge comparable prices abroad, this fact demonstrates at most but-for causation." <u>Id.</u>  It continued, "It does not establish . . . that the U.S. effects of the appellees' conduct – i.e., increased prices in the United States – proximately caused the foreign appellants' injuries." <u>Id.</u>

The Ninth Circuit subsequently joined the D.C. Circuit in holding that the domestic effects exception requires proximate causation.  <u>Centerprise</u>, 546 F.3d at 987.  The <u>Centerprise</u> case involved allegations of a global price-fixing conspiracy as to DRAM, a type of memory chip.  <u>Id.</u> at 984.  Plaintiff had alleged that "the domestic effect of the defendants' anticompetitive conduct – higher DRAM prices in the United States – gave rise to its foreign injury of having to pay higher DRAM prices abroad because the defendants could not have raised prices worldwide and maintained their global price-fixing arrangement without fixing the DRAM prices in the United States." <u>Id.</u>  The Ninth Circuit held:

The defendants' conspiracy may have fixed prices in the United States and abroad, and maintaining higher U.S. prices might have been necessary to sustain the higher prices globally, but Centerprise has not shown that the higher U.S. prices proximately caused its foreign injury of having to pay higher prices abroad.  Other actors or forces may have affected the foreign prices.  In particular, that the conspiracy had effects in the United States and abroad does not show that the effect in the United States, <u>rather than the overall price-fixing conspiracy itself</u>, proximately caused the effect abroad.

Id. at 988 (emphasis added).

Here, the CAC uses the term "proximate effect," but its supporting allegations do not illustrate one.  The CAC alleges that "the inflated fares charged . . . for air passenger transportation from Asia/Oceania to the United States is inextricably bound up with and dependent upon the fares [from the United States to Asia/Oceania]."  See CAC ¶ 51.  The global conspiracy alleged here is therefore no different from the global conspiracies alleged in <u>Empagran</u> and in <u>Centerprise</u>.  In all three, the foreign injury was the result not of the domestic effect, but of the same overall price-fixing conspiracy that caused the domestic effect.[7]  <u>See also</u> <u>In re Rubber Chemicals Antitrust Litig.</u>, 504 F. Supp. 2d 777, 783 (N.D. Cal. 2007) ("Interpreting the FTAIA to permit Plaintiffs to bring claims for independent foreign injury, merely because they also suffered domestic injury arising from the same conduct, would significantly encroach upon the traditional jurisdictional prerogatives, and run afoul of principles of prescriptive comity.")

Plaintiffs attempt to distinguish the cases relied on by Defendants by contending that flights are somehow different– "the transportation routes at issue are firmly rooted on one end in the United States, and the seats on Defendants' planes simultaneously carry passengers whose travel originated in foreign markets as well as those whose travel originated in the United States" and so "the prices for travel originating in foreign countries and travel originating in the U.S. are inextricably bound up with and dependent on each other."  Opp'n at 14.  But "bound up," even very bound up, is not proximate causation.

_____

[7] The Court makes this observation notwithstanding the order in <u>In re Static Random Access Memory (SRAM) Antitrust Litig.</u>, Case No. 07-md-01819 CW, 2010 WL 5477313, at *6-7 (N.D. Cal. Dec. 31, 2010), finding that direct purchasers of a product subject to a global price-fixing conspiracy had successfully met the second prong of the domestic effects exception.  The court there held without much discussion that "as a result of the alleged conspiracy [p]laintiffs were overcharged for their purchases in the United States, and the overcharges give rise to their antitrust claims."  <u>Id.</u>  The Court is not persuaded that this finding is correct.

**United States District Court**
For the Northern District of California

Additionally, as Defendants note, "if anything the prices at issue in this case have less of a correlation and are less 'dependent upon' each other than the prices at issue in <u>Empagran II</u>, <u>Centerprise</u>, and <u>MSG</u>"[8] because those cases involved fungible products, while "the services at issue here are not fungible (e.g., a passenger wanting to fly from Seattle to Tokyo would not substitute a flight from Tokyo to Seattle)."  Reply (dkt. 358) at 8-9.

Plaintiffs also rely on the finding in <u>In re Korean</u> that the plaintiffs there had met the domestic effects exception by alleging a theory in which there is only one market – the Korea-U.S. flight route – rather than two separate markets in U.S. and Korea, and thus "the foreign effect of Defendants' conduct (higher prices in Korea) may well be proximately related to the domestic effect of Defendants' conduct (higher prices in the U.S.), jointly giving rise to the claims of foreign and domestic purchasers alike."  2008 U.S. Dist. LEXIS 111722, at *24.  This holding was at odds with the prevailing case law ("proximately related to" is not the standard), and, in fact, that court subsequently changed course, explaining:

> [I]n light of <u>Centerprise</u>, Plaintiffs have failed to sufficiently allege that the domestic effect gave rise to the foreign injury. . . . At best, Plaintiffs' briefing . . . suggests a correlation between higher U.S.-purchase prices and higher Korea-purchase prices. Such a correlation or interdependence of markets does not suffice to show that the effect in the United States actually gives rise to Plaintiffs' Korea-purchase claims.

<u>In re Korean Air Lines Co., Ltd. Antitrust Litig.</u>, Case No. 07-01891, 2010 U.S. Dist. LEXIS 93110, at *39 (C.D. Cal. Aug. 2, 2010).

Plaintiffs also rely on <u>Caribbean Broad. Sys. v. Cable & Wireless PLC</u>, 148 F.3d 1080 (D.C. Cir. 1998).  In that case, about radio stations in the Caribbean, the D.C. Circuit exercised Sherman Act jurisdiction over the claims of a foreign plaintiff, CBS, where a foreign competitor, CCC, and its joint venture partner had conspired to maintain CCC's monopoly, misrepresenting to its U.S. advertisers the reach of CCC's broadcasting signal, which in turn caused the foreign plaintiff to lose out on sales to those U.S. advertisers.  <u>Id.</u> at 1082.  Plaintiffs argue that "[w]hile the <u>Caribbean Broadcasting</u> plaintiff's claim arose under the Sherman Act because it was not able to make U.S. sales that it otherwise could have

---

[8] <u>In re Monosodium Glutamate Antitrust Litig.</u>, 477 F.3d 535, 538-39 (8th Cir. 2007) (also adopting proximate cause standard and finding that plaintiffs' theory did not satisfy that standard).

**United States District Court**
For the Northern District of California

1    made, there is no material difference between that injury and the Plaintiffs' <u>domestic injury</u>

2    here– that the Plaintiffs who purchased air transportation services to the U.S. were not able to

3    make U.S. purchases of goods and services that they otherwise could have made in the

4    absence of the higher prices for Transportation services created by the cartel." Opp'n at 15-

5    16.  As already discussed, this is an indirect and speculative effect.  Even assuming such an

6    effect, Plaintiffs fail to explain how a domestic effect of diminished spending activity, rather

7    than the conspiracy itself, caused Plaintiffs' foreign injuries.  <u>See also</u> <u>Centerprise</u>, 546 F.3d

8    at 989 n.9 ("it is questionable whether <u>Caribbean Broadcasting</u> has any relevance, because it

9    pre-dates <u>Empagran</u>").

10          The CAC's allegations of a domestic effect, and indeed, its overall theory of harm, are

11   insufficient.  Moreover, Plaintiffs failed to articulate at the motion hearing a viable means of

12   amending the Complaint to plead around the FTAIA.  Accordingly the Court GRANTS the

13   Motion to Dismiss as to the foreign injury claims on FTAIA grounds, with prejudice.

                              **c.      Standing**

15          An antitrust plaintiff must also allege facts demonstrating antitrust standing, which

16   requires not only harm, as would be sufficient to establish constitutional standing, but also

17   that "the plaintiff is a proper party to bring a private antitrust action."  <u>Assoc. Gen. Cont. of</u>

18   <u>Cal., Inc. v. Cal. State Council of Carpenters</u>, 459 U.S. 519, 535 n.31 (1983).  Plaintiffs must

19   demonstrate that they suffered an injury that is "of the type that the antitrust statute was

20   intended to forestall."  <u>Id.</u> at 540.  Naturally, this analysis "implicates many of the same

21   issues as the jurisdictional analysis under the [FTAIA]."  <u>Turicentro</u>, 303 F.3d at 307 (noting

22   also that standing inquiry in antitrust cases is dependent on the finding of subject matter

23   jurisdiction).  Defendants here argue that Plaintiffs do not have standing to bring an antitrust

24   claim for their foreign injuries.  <u>See</u> Mot. at 16-18 ("While paying inflated prices for air

25   transportation may be the type of injury Section 1 of the Sherman Act was intended to

26   forestall, paying such prices in foreign markets is not." ).

27          In <u>Galavan Supplements, Ltd. v. Archer Daniels Midland Co.</u>, Case No. C 97-3259

28   FMS, 1997 WL 732498, at *3-4 (N.D. Cal. Nov. 19, 1997), the court listed five factors to

consider in determining whether a plaintiff has standing to assert an antitrust claim: (1) the specific intent of the alleged conspirators (here, price-fixing of foreign and domestic flights); (2) the directness of the injury (here, the injury was caused by the alleged price-fixing conspiracy and not by the domestic effect); (3) the character of the damages (here, payment of higher rates for flights originating outside of the U.S.); (4) the existence of other, more appropriate plaintiffs (here, there are also plaintiffs who paid higher rates for flights originating within the U.S.); and (5) the nature of plaintiff's claimed injury (here, that injury is foreign). The last factor is one of "tremendous significance." Id. at *3 (internal quotations omitted).

The nature of Plaintiffs' claimed injury here is fatal to their antitrust standing. Plaintiffs' injuries were not caused by the domestic effect of the conspiracy. Similarly, in In re Intel Corp. Microprocessor Antitrust Litig., 452 F. Supp. 2d 555, 562-63 (D. Del. 2006), the court held that injuries suffered by plaintiffs "as a result of foreign conduct are foreign injuries that occurred in foreign markets" and are therefore "not the type of injury Congress intended to prevent through the [FTAIA] or the Sherman Act." Id. The court concluded that the plaintiff lacked standing to pursue its claims based on foreign injury, and dismissed the foreign injury claims. Id. See also Turicentro, 303 F.3d at 307 (finding that conduct not directly related to the U.S. market that occurred exclusively in foreign markets is "not of the type Congress intended to prevent through the [FTAIA] or the Sherman Act.").

Accordingly, Plaintiffs do not have standing to bring antitrust claims based on their foreign injury.

### 2.      The filed rate doctrine

Defendants next argue that the filed rate doctrine bars Plaintiffs' damages claims under the Sherman Act. See Mot. at 18-19. The filed rate doctrine is a judicial creation derived from principles of federal preemption and deference to administrative decision-making. E. & J. Gallo Winery v. EnCana Corp., 503 F.3d 1027, 1033 (9th Cir. 2007). "At its most basic, the filed rate doctrine provides that state law, and some federal law (e.g. antitrust law), may not be used to invalidate a filed rate nor to assume a rate would be

13

United States District Court
For the Northern District of California

1    charged other than the rate adopted by the federal agency in question." Transmission

2    Agency of N. Cal. v. Sierra Pac. Power Co., 295 F.3d 918, 929-30 (9th Cir. 2002).  The

3    doctrine was first recognized in the context of rates set pursuant to the Interstate Commerce

4    Act, see Keogh v. Chicago & N. W. Ry. Co., 260 U.S. 156 (1922), but has since been applied

5    in various other contexts, including challenges to rates set pursuant to the Natural Gas Act,

6    the Federal Power Act, and the Communications Act.  Gallo, 503 F.3d at 1033.  Where it

7    applies, the filed rate doctrine bars claims for damages on the basis of antitrust injury.  The

8    doctrine does not apply where an agency has "effectively abdicated its rate-making authority

9    . . . ." Id. at 1040 (citing Pub. Utility Dist. No. 1 of Grays Harbor Cty. Wash. v. IDACORP

10   Inc., 379 F.3d 641 (9th Cir. 2004); Pub. Utility Dist. No. 1 of Snohomish Cty. v. Dynegy

11   Power Mktg., Inc., 384 F.3d 756, 760 (9th Cir. 2004)).

12          Defendants argue that the filed rate doctrine bars Plaintiffs' damages claims because

13   Defendants must file certain rates with the Department of Transportation ("DOT").  See Mot.

14   at 18-19.  Moreover, according to Defendants, the doctrine bars damages claims even as to

15   rates it does not file with the DOT but that fall under the DOT's regulatory purview.  Id.

16   Defendants also assert that the filed rate doctrine should apply to bar damages claims where

17   Defendants filed rates with foreign regulators because the principles underlying the doctrine

18   apply equally to rates filed with foreign regulators.  Id.

19          Several factual matters that would guide the Court in assessing Defendants' arguments

20   are currently undeveloped.  For example, it is not clear which rates at issue in this case were

21   actually filed and which were not.  Nor is it clear whether the DOT believes that its market-

22   based rates are covered by the filed rate doctrine, or what role the foreign regulators at issue

23   play and whether such role warrants this Court's deference.  See Gallo, 503 F.3d at 1033.

24   Accordingly, the Court finds that is not appropriate to grant Defendants' Motion on the basis

25   of the filed rate doctrine at this time, and so DENIES the Motion as to the filed rate doctrine.[9]

26   //

27

28          [9] Defendants are free to raise this argument again at the summary judgment phase of the case,
     if appropriate.

14

United States District Court
For the Northern District of California

### 3.    Plausibility

Finally, Defendants argue that "for all its unstructured bulk, [the CAC] does not allege facts that would render Plaintiffs' massive conspiracy theory plausible" under Bell Atlantic v. Twombly, 550 U.S. 544, 556 (2007).  Mot. at 32-33.  They ask the Court to dismiss for failure to state a claim.  Id.

### a.    Pleading Standard

Section 1 of the Sherman Act provides in pertinent part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  A Section 1 claim "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made."  Twombly, 550 U.S. at 556.  "Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."  Id.  Conduct that is merely consistent with conspiracy is not enough to "plausibly suggest an illicit accord" in the face of a compatible and, indeed, more likely, lawful explanation.  Iqbal, 129 S. Ct. at 1951.

In Twombly, 550 U.S. at 553, the Supreme Court discussed pleading standards for antitrust conspiracy claims under Section 1.  There, the plaintiff alleged that the defendant telephone companies had "entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets and have agreed not to compete with one another and otherwise allocated customers and markets to one another."  Id. at 571.  The plaintiffs had not made any specific allegations providing direct evidence of an illicit agreement.  Id. at 561-62.  Rather, the plaintiffs relied on circumstantial evidence of parallel action.  Id. at 553.  The Supreme Court held that a Section 1 complaint that alleges "certain parallel conduct unfavorable to competition, absent some factual context suggesting agreement, as distinct from identical, independent action" should be dismissed.  Id. at 548-49.  In reaching that decision, the Court held, "[w]ithout more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement

**United States District Court**
For the Northern District of California

1    at some unidentified point does not supply facts adequate to show illegality." Id. at 556-57.

2    Plaintiffs there failed to "nudge[] their claims across the line from conceivable to plausible."

3    Id. at 570.

4                    **b.    Plaintiffs' Allegations Here**[10]

5           Defendants complain that Plaintiffs here have merely alleged a "parallel pricing case,"

6    and remind the Court that "[c]onsciously parallel pricing is not illegal." Mot. at 35 (citing

7    Twombly, 550 U.S. at 553-54). They assert that each of the factual allegations in the CAC

8    falls into one of more of four categories – (1) parallel pricing; (2) opportunities to collude;

9    (3) communications involving information-sharing or unilateral requests for cooperation

10   where no responsive action is alleged; and (4) irrelevant government investigations. Id. at

11   36. And they conclude that this evidence is insufficient to plausibly state a claim of antitrust

12   conspiracy. Id. Plaintiffs counter that the Court must view their allegations as a whole, and

13   not on a piecemeal basis. See Opp'n at 38 (citing Cont'l Ore Co. v. Union Carbide & Carbon

14   Corp., 370 U.S. 690, 699 (1962) ("plaintiffs should be given the full benefit of their proof

15   without tightly compartmentalizing the various factual components and wiping the slate

16   clean after scrutiny of each")). Plaintiffs further assert that the CAC contrasts sharply with

17   the complaint found wanting in Twombly, and which relied exclusively on allegations of

18   parallel conduct. Plaintiffs have the better argument.[11]

19          In fact, Plaintiffs' 114-page CAC provides fairly detailed allegations of price-fixing

20   between the Defendants.

21   //
     //

22

23

24

25

26

_____

27          [10] Plaintiffs' allegations are accepted as true for the purposes of this Motion.

28          [11] Moreover, this is the same CAC the Court found plausibly stated a claim of conspiracy as to
     Continental Airlines in November 2009. See dkt. 278.

United States District Court
For the Northern District of California

# I.     The Role of Code-Sharing Alliances and Trade Associations

The CAC alleges that the Defendants' participation in various code-sharing agreements[12] and professional alliances "reinforce and facilitate the conspiracy."  CAC ¶ 78.

Plaintiffs allege that each Defendant is a member of the International Airline Transport Association ("IATA").  Id. ¶ 67.  "During the Class period, one of IATA's express goals was "[t]o assist the industry to achieve adequate" – the implication being, not maximum – "levels of profitability."  Id. ¶ 69 (emphasis in original).  The CEO of IATA allegedly instructed the membership to limit seating capacity during the Class period in order to manage market share and effectively "match capacity to demand."  Id. ¶¶ 69-70.  According to Plaintiffs, "[his] comments are patently anticompetitive – he is repeatedly exhorting individual market participants to refrain from vigorous competition with each other in order to facilitate enhanced profitability for all."  Id. ¶ 71.  Plaintiffs further contend that, "it is basic microeconomic theory that 'managing' supply provides opportunities to increase and/ or stabilize prices."  Id.

The CAC further alleges that the "Sky Team" code-sharing alliance, for example, provides alliance members (KAL, Air France, KLM, and others) with access to commercially sensitive information of its competitors via code-sharing agreements.  Id. ¶¶ 56, 59.  "[The Sky Team Defendants] and non-defendant co-conspirators have established agreements in which they code share seats on each other's flights and share in the revenue generated."  Id. ¶ 59.  Additionally, "many of the Defendants and non-defendant co-conspirators are participants in a multitude of independent code-sharing arrangements outside of their primary alliances. . . ."  Id. ¶ 60.  "These code-sharing agreements blur the line between partner and competitor."  Id. ¶ 56.  According to the European Competition Authorities:

---

[12] "'A code sharing agreement is an agreement between two or more air carriers whereby the carrier operating a given flight allows one or more other carriers to market this flight and issue tickets for it as if they were operating the flight themselves.  In practice, these other carriers add their own carrier designator code and flight number onto that of the operating carrier.  Code share partners also agree on how to compensate each other for the seats they sell on one another's flights.'"  CAC ¶ 55 (quoting European Competition Authorities).  Defendants implement these code sharing agreements through various alliance partnerships.  Id. ¶¶ 57-60.

United States District Court
For the Northern District of California

[A] code-sharing agreement between two previously competing airlines may significantly dampen competition on the routes covered by the agreement which may lead to price increases.  <u>Given the multi-market nature of the airline industry, where airlines compete on various routes, the exchange of commercially sensitive information that might take place in a code-sharing agreement could favour tacit collusion between the code-share partners with respect to routes not covered by the agreement.</u>

<u>Id.</u> ¶ 56 (emphasis in original).  The DOJ's Antitrust Division has expressed similar concern regarding airline marketing alliances and code sharing agreements.  <u>Id.</u> ¶ 61.  "In addition, on June 26, 2009, the DOJ announced that it was opposed to a proposal by the Star Alliance to add Continental as a member," characterizing that request as anticompetitive.  <u>Id.</u> ¶ 64.

And the CAC makes like allegations as to the Defendants' memberships in various Board of Airline Representatives groups ("BARs").  <u>Id.</u> ¶ 76.  As to the Hong Kong BAR, for example, the CAC alleges that "[u]ntil very recently, Hong Kong did not have a competition law that prevented Defendants from tacitly or expressly reaching agreements on passenger fares, including surcharges.  Moreover, antitrust regulators in these and other Asian countries have not, until very recently, aggressively enforced their countries' respective competition rules."  <u>Id.</u> ¶ 76.  Plaintiffs claim that "these BAR organizations have served as forums for Defendants to discuss and agree on passenger fares and fuel surcharges."  <u>Id.</u>  The CAC also asserts that in November 2007, shortly after the first of these lawsuits was filed, the Hong Kong BAR displayed on its website a new policy prohibiting anticompetitive conduct.  <u>Id.</u> ¶ 77.

Summing up this evidence, the CAC alleges that the Defendants participated "in industry meetings that have been deemed by antitrust officials in the U.S.,[13] Europe and Australia to be inherently anticompetitive and not in the best interests of competitive airline markets (<u>see</u> ¶¶ 66-71, 85, 89-99)," and participated "in meetings hosted by regional trade

---

[13] For example, in a July 5, 2006 "Order to Show Cause" as to why IATA's antitrust immunity should not be revoked, the DOT stated, "A participating airline will at times urge competing airlines to raise fares in their markets in order to avoid undercutting the fares charged in the airline's own principal markets" and "IATA members do not believe that their discussions are subject to the antitrust law prohibitions normally imposed on pricing discussions between competitors."  <u>Id.</u> ¶ 89-91.  <u>See also id.</u> ¶¶ 98-99 (final order by DOT concluding that "Pricing discussions among competitors of the kind that take place at the IATA tariff conferences are inherently anticompetitive.").

United States District Court
For the Northern District of California

associations in which anticompetitive conduct is encouraged[14] and/or tolerated (see ¶¶ 72-76)." See, e.g., Id. ¶ 26 (allegations against Cathay Pacific, repeated as to other Defendants).

### ii. Base Fare Coordination

Plaintiffs allege that there is a "pattern of identical or virtually identical pricing by [D]efendants' closest competitors on routes between the United States and Asia and Oceania," which is not to be expected in a competitive market. Id. ¶ 106. In light of the Defendants' varying cost structures (age of fleet, labor costs, etc.), Plaintiffs posit that competition should result in varying fare prices, and yet "that has not occurred." Id. ¶ 109. The CAC also provides some specific, and suspicious, examples of fare collusion between Defendants. These include:

- Allegations that, in January 2003, JAL requested that ANA "raise the fare out of New York (and use as the pretext for doing so a claim that ANA had increased the level of accommodations on its flights)." Id. ¶ 138.

- An August 20, 2000 email from Thai Airways to JAL and ANA stating that Thai Airways would send to ANA and JAL its fares for the period between October 1, 2000 and March 31, 2001 on certain flights from Tokyo and Osaka to the United States and seeking "concurrence from [JAL.ANA] on fares." Id. ¶ 144.

- A very similar email sent on February 13, 2001, concluding with "we would appreciate your usual kind cooperation and support." Id. ¶ 145.

- An October 24, 2002 email from JAL to Thai Airways: "Regarding your ZPEX fares from JPN to USA, we have no problem." The email also notes JAL's intention to seek agreement with Philippine Airlines. Id. ¶ 151.

- A July 13, 2004 email from KAL to JAL stating: "Now, due to fare increases, we are about to file Zone Pex fares from Japan to US and need your concurrence on TYO-LAX portion. All the fares are matching JL fares." Id. ¶ 154.

//

---

[14] For example, at the November 12, 2002 annual Association of Asia-Pacific Airlines meeting, the CEO of Philippine Airlines allegedly stated that "in order to survive, competition must be replaced by cooperation." See id. ¶ 74.

19

### iii.     Fuel Surcharge Coordination

Plaintiffs allege that Defendants succeeded in imposing fuel surcharges on top of the price of airline tickets as of 2004 through meetings of the IATA and the various Asian BARs. Id. ¶¶ 191, 204.  Defendants allegedly charged "identical fuel surcharges for passenger traffic from Hong Kong, including to the United States."  Id. ¶ 203.  These surcharges fluctuated, and did so in lockstep from August 1, 2006 to April 1, 2008.  Id.  The CAC alleges that Defendants explicitly agreed to coordinate pricing of fuel surcharges "during and after BAR meetings," as well as through "express and tacit agreements."  See, e.g., Id. at ¶¶ 204, 207-209, 215, 234-35.  It further alleges that the coordination of fuel surcharges is not an expected by-product of competition, as rising fuel costs have varying impacts on individual airlines based on factors like fleet utilization and efficiency.  Id. ¶ 236.

An example of the correspondence described in the CAC as to surcharge coordination is a November 1, 2004 email, which allegedly confirms the exchange of information regarding surcharges between JAL and Continental, American Airlines, UAL, Delta, and Northwest.  Id. ¶ 218.  These surcharges were also confirmed through the ATPCO, a tariff publication company owned by Continental, Air France, American Airlines, British Airways, JAL, Delta, KLM, Lufthansa, Northwest, Swiss International, UAL, and other Defendants. Id.

### iv.     Government Investigations

Lastly, the DOJ, the European Commission, the ACCC, and other "competition authorities" have been conducting investigations into price-fixing of passenger and cargo fares.  Id. ¶¶ 249-94.  A substantial number of guilty pleas have been obtained by the DOJ and other competition authorities, including guilty pleas from KAL, British Airways, Qantas, Cathay Pacific, Air France, KLM, SAS, and other Defendants.  Id. at ¶¶ 255-94.  Other Defendants still face charges.  Id. ¶¶ 255-294.  Cathay Pacific has apologized for anticompetitive conduct on routes between the United States and Hong Kong in the related market for air cargo.  Id. ¶¶ 275-76.

//

United States District Court
For the Northern District of California

### c.     Adequacy of Plaintiffs' Allegations

These extensive allegations are adequate.  Plaintiffs specifically allege that the Defendants reached various agreements to coordinate pricing.  And Plaintiffs detail certain communications between the Defendants which, construed in the light most favorable to Plaintiffs, support an inference of conspiracy.

Defendants' protestations as to these allegations' sufficiency are unavailing.

Joint participation in various trade organizations "cannot alone support Plaintiffs' claims, but such participation demonstrates how and when Defendants had opportunities to exchange information or make agreements."  In re SRAM Antitrust Litigation, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008); see also In re Graphics Processing Units Antitrust Litig., 527 F. Supp. 2d 1011, 1023 (N.D. Cal.2007) (emphasis added) ("Attendance at industry trade shows and events is presumed legitimate and is not a basis from which to infer a conspiracy, without more).

While parallel conduct alone does not demonstrate antitrust conspiracy, it can be suggestive of a conspiracy, when coupled with additional factual allegations.  Twombly, 550 U.S. at 556-57.  Also, "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason would support a plausible inference of conspiracy."  Id. at 557 n.4 (internal quotation marks omitted).  Here, unlike in Twombly, Plaintiffs have pleaded not only parallel conduct, but also additional facts that are enough to "nudge[] their claims across the line from conceivable to plausible."  Id. at 570.  In addition to general allegations of a conspiracy, price fixing, parallel conduct, and the susceptibility of the airline industry to such violations, Plaintiffs include in the CAC numerous specific allegations of communications involving Defendants.

Defendants' contention that "each proffered example of specific communications alleged in the CAC is equally if not more consistent with lawful independent conduct" is simply inaccurate.  See Mot. at 41.  The communications discussed herein, as well as numerous others, might well have legitimate explanations.  But, at this stage in the litigation,

United States District Court
For the Northern District of California

1    they seem to show would-be competitors discussing the raising or matching of prices.

2    Defendants offer no lawful independent explanations for this.  Defendants argue next that

3    such allegations fail because they are not accompanied by "allegations as to whether the

4    other airline reciprocated or whether the event happened before or after the fares were

5    available to the public."  Id.  But this is also untrue – both because the communications were

6    often forward-looking, see, e.g., CAC ¶ 119 (describing December 27, 2005 email

7    mentioning that JAL prepared pricing that matched ANA's pricing for the first half of the

8    2006 fiscal year), and because they reflect an ongoing dialogue, not unilateral

9    communication, see, e.g., id. ¶ 162 (July 27, 2001 email from China Airlines to JAL: "We

10   have received the fares for Hong Kong and Honolulu.  Are they final fares? If they are final,

11   we will match and send them to the head office.  Thank you").  Construed in the light most

12   favorable to Plaintiffs, these communications support an inference that Defendants joined

13   and participated in the conspiracy.  See SRAM, 580 F. Supp. 2d at 901-02.

14          Finally, while courts have held that the existence of ongoing investigations is a "non-

15   factor," evidence of guilty pleas entered by various co-defendants can be evidence of

16   antitrust conspiracy.  See SRAM, 580 F. Supp. 2d at 903 ("Although the allegations

17   regarding . . . guilty pleas are not sufficient to support Plaintiffs' claims standing on their

18   own, they do support an inference of a conspiracy"); see also In re TFT-LCD (Flat Panel)

19   Antitrust Litigation, 599 F. Supp. 2d 1179, 1184 (N.D. Cal. 2009) (considering "facts of the

20   guilty pleas entered by four defendants for fixing prices" in determining sufficiency of

21   allegations specific to each defendant); In re Flash Memory Antitrust Litigation, Case No. C

22   07-0086 SBA, 2009 WL 1096602, at *4 (N.D. Cal. Mar. 31, 2009) (noting "Complaint

23   alleges that many of the same employees in various companies (some of whom have pleaded

24   guilty to price fixing in the DOJ's . . .  investigation) were responsible for setting prices.").

25          The CAC has sufficiently stated a claim of an antitrust conspiracy.

26   //

27   //

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 4.      Conclusion as to Consolidated Motion to Dismiss

For the foregoing reasons, the Court GRANTS Defendants' Motion as to the FTAIA, with prejudice, and DENIES the Motion as to the filed rate doctrine and plausibility.

### B.      Motion by the European Carriers

The European Carriers – Luftansa, KLM, SAS, Air France, and Swiss International – jointly move to dismiss the CAC on two grounds: first, that the CAC fails to state a claim as to them, and second, that the Court lacks jurisdiction under the FTAIA. <u>See generally</u> Mot. (dkt. 293). The Court has already found the Defendants' arguments persuasive as to the FTAIA. As to the European Carriers' <u>Twombly</u> argument, the Court is not persuaded.

The European Carriers assert that the CAC "relies exclusively on generalities," and fails to allege that each individual defendant joined the conspiracy. <u>Id.</u> at 9. But the Court has already found that the CAC plausibly pleaded a conspiracy. A complaint "need not contain detailed 'defendant by defendant' allegations." <u>See</u> <u>In re TFT-LCR (Flat Panel)</u> <u>Antitrust Litig.</u>, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008). It need only "make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy." <u>In re SRAM</u>, 580 F. Supp. 2d at 904. Plaintiffs' allegations meet this standard.

The CAC alleges that the European Carriers participated in various trade and code-sharing agreements that facilitated the conspiracy. <u>See, e.g.</u>, CAC ¶¶ 57, 59, 60, 66-67, 76. It alleges that Air France, KLM and Lufthansa participated in a July 2003 meeting in Geneva at which they indicated their support in principle of a collective fuel surcharge. <u>Id.</u> ¶ 185. Moreover, far from generalities, the CAC describes specific, suspicious emails involving the European Carriers. One email alleged to have been sent May 24, 2004 to Air France, KLM and Luftansa, memorializes that the Thai BAR representatives at the May 18, 2004 meeting "agreed that unless otherwise instructed by their Head Offices . . . they would apply the following fuel surcharges . . ." <u>Id.</u> ¶ 209. The CAC further states that Air France representative Smartchai Tuchinda, KLM representative Ihab Sourial, and Luftansa representative Wolfgang Schmidt attended the May 18, 2004 meeting. <u>Id.</u> ¶ 208. An additional email, alleged to have been sent by a representative of Philippine Airlines in

United States District Court
For the Northern District of California

1   response to a May 24, 2007 from an individual at the Manilla BAR stated that "Swiss

2   International had agreed to imposition of the surcharge." Id. ¶ 213.  An email alleged to have

3   been sent on October 29, 2004 from an individual from JAL "confirmed that Air France

4   would begin collection of a 10 Euro fuel surcharge on international flights." Id. ¶ 216.  A

5   further email alleged to have been sent to all of the European Carriers from an employee of

6   Thai Airways on August 18, 2005 was titled, "Message from THAI re Fuel Surcharge" and

7   stated: "We also know that we have to be aware of market acceptability of these increases.

8   But most of all, we at THAI are looking for all of your efforts to toe the line with us.  All the

9   time we compete absolutely, but this time we ask for unity and to be onboard the fuel

10  surcharge wagon for our future and survival." Id. ¶ 234.  Together these allegations create a

11  plausible inference of conspiracy.

12          The European Carriers also argue, however, that "[g]iven the absence of allegations

13  connecting the European Carriers to the trans-Pacific market, Plaintiffs have not offered even

14  a theory as to how claims against those defendants are possible." Mot. at 9.  They suggest

15  that because they "are not trans-Pacific carriers," they cannot be a part of the conspiracy.  Id.

16  at iv.  But they cite to no authority in support of this argument.  Moreover, the CAC suggests

17  a motive for anticompetitive coordination even by airlines that are not primarily trans-Pacific

18  carriers: "A participating airline will at times urge competing airlines to raise fares in their

19  markets in order to avoid undercutting the fares charged in the airline's own principal

20  markets." CAC ¶ 90 (citing DOT Order to Show Cause).  The Court finds this allegation

21  plausible, and finds that the CAC states a claim against the European Carriers.

22          Accordingly, their Motion to Dismiss is DENIED as to plausibility and as to the filed

23  rate doctrine, although, for the reasons already discussed, it is GRANTED as to the FTAIA.

24          C.      **Joint Motion of All Nippon Airways, China Airlines and Thai Airways**

25          ANA, China Airlines and Thai Airways jointly filed a "Japan Regulatory Brief,"

26  moving to dismiss on two grounds.  See generally Mot. (dkt. 304).  First, they argue that the

27  case must be dismissed under the state action doctrine because "Japan, pursuant to its Air

28  Services Agreement with the United States, its Air Services Agreements with other

United States District Court
For the Northern District of California

1    governments and aeronautical authorities, and its own law and regulatory regime, [] actively

2    supervises" these airlines' fares and charges. Id. at v. Second, they argue that the case must

3    be dismissed under the implied preemption doctrine because "Japan, pursuant to its Air

4    Services Agreement with the United States, its Air Services Agreements with other

5    governments and aeronautical authorities, and its own law and regulatory regime, exercises

6    such close and extensive regulatory supervision of international air services into and out of

7    Japan, and the fares and charges therefore, that the conduct of private sector actors cannot . . .

8    be judged reliably by[] U.S. antitrust courts." Id. These arguments, although novel and

9    skillfully made, are nonetheless unpersuasive.

10        The state action doctrine (also known as the Parker doctrine) applies to actions

11   authorized and supervised by U.S. states; it is based on federalism. See Parker v. Brown, 317

12   U.S. 341, 350-52 (1943) ("In a dual system of government in which, under the Constitution,

13   the states are sovereign, save only as Congress may constitutionally subtract from their

14   authority, an unexpressed purpose to nullify a state's control over its officers and agents is

15   not lightly to be attributed to Congress"); Southern Motor Carriers Rate Conference, Inc. v.

16   United States, 471 U.S. 48, 105 S. Ct. 1721, 1729 (1985) ("The Parker doctrine represents an

17   attempt to resolve conflicts that may arise between principles of federalism and the goal of

18   the antitrust laws, unfettered competition in the marketplace"); F.T.C. v. Ticor Title Ins. Co.,

19   504 U.S. 621, 633 (1992) ("[I]n Parker . . . [o]ur decision was grounded in principles of

20   federalism"). As Defendants conceded at the motion hearing, the doctrine has never before

21   been applied to actions authorized and supervised by foreign governments. See Tr. (dkt.

22   446) at 8-11 (in which Defendants' counsel argued to the Court that this was a case of first

23   impression). The Court does not agree with Defendants that foreign states should benefit

24   from this doctrine, born of federalism, because they "have the core elements of sovereignty."

25   See Mot. at 14. This Court will not be the first to extend the state action doctrine so far

26   beyond its original purpose. Cf. Outboard Marine Corp. v. Pezetel, 461 F. Supp. 384, 397

27   (D. Del. 1979) ("Defendant's motion to dismiss on grounds of state action finds no support in

28

United States District Court
For the Northern District of California

1    an antitrust law that expressly covers corporations organized under the laws of foreign

2    states.").

3         Similarly, the implied preclusion doctrine arose in the context of securities law.  In

4    Credit Suisse Securities (USA) LLC v. Billing, 551 U.S. 264, 267 (2007), a group of

5    investors brought an antitrust suit against several investment banks that "had acted as

6    underwriters, forming syndicates that helped execute the IPOs of several hundred

7    technology-related companies."  The Court found that there was a "'plain repugnancy'

8    between these antitrust claims and the federal securities law."  Id.  Accordingly, the Court

9    held that the securities law implicitly precluded the application of the antitrust laws to that

10   case.  Id.  Although Defendants cite to one case applying the doctrine outside of the securities

11   context, see Mot. at 16 (citing McCarthy v. Middle Tenn. Elec. Membership Corp., 466 F.3d

12   399, 414 (6th Cir. 2006) (affirming dismissal of electrical cooperative services case based on

13   the same authority relied on in Credit Suisse)), application outside of that context is

14   indisputably rare, see, e.g., Energy Mktg. Servs, Inc. v. Columbia Gas Transmission Grp.,

15   LLC, 639 F. Supp. 2d 643, 650-51 (D. W. Va. 2009) (non-securities case, finding that the

16   defendant had "not made a strong case for the potential applicability of Credit Suisse . . . .

17   [which] dealt with the intersection of securities law and antitrust law," and noting that the

18   defendant "failed to cite any case applying the Credit Suisse framework outside of the

19   securities context").  Moreover, Defendants point to no authority applying the implied

20   preclusion doctrine to actions authorized and supervised by foreign governments.  Indeed,

21   Defense counsel conceded at the motion hearing that Credit Suisse had never been applied in

22   this context.  See Tr. (dkt. 446) at 36:18-23.  "[I]mplied preclusion is disfavored."  In re

23   Delta/AirTran Baggage Fee Antitrust Litig., 733 F. Supp. 2d. 1348, 1364 (N.D. Ga. 2010)

24   (citing Gordon v. N.Y. Stock Exch., 422 U.S. 659, 682 (1975)).  The Court is again unwilling

25   to extend a doctrine so far beyond its original purpose.[15]

26

27        [15] Even if the implied preclusion doctrine could be properly applied to actions of foreign states,
     the Court finds that Defendants have not satisfied Credit Suisse's four-part test, which requires (1) that
28   the possible conflict affected practices squarely within an area of activity that the laws seek to regulate;
     (2) regulatory authority to supervise the activities in question; (3) evidence that the responsible

26

Accordingly, the Court DENIES this Motion.

D.   **Joint Motion of Vietnam Airlines and Thai Airways**

VNA and Thai Airways move to dismiss, arguing that the act of state doctrine compels dismissal. See generally Mot. (dkt. 299). The act of state doctrine applies where "(1) there is an official act of a foreign sovereign performed within its own territory; and (2) the relief sought or the defense interposed [in the action would require] a court in the United States to declare invalid the [foreign sovereign's] official act." See Cruz v. United States, 387 F. Supp. 2d 1057, 1068 (N.D. Cal. 2005). Courts also look to additional factors, such as whether the foreign state was acting in the public interest; the degree of international consensus as to the activity; whether adjudication would hinder the Executive Branch's formulation of foreign policy; and whether the case could lead to different pronouncements on the same subject. Id. (citing Liu v. Republic of China, 892 F.2d 1419, 1433-34 (9th Cir. 1989)). It is Defendants' burden to prove that the act in question was an act of state. Republic of Philippines v. Marcos, 862 F.2d 1355, 1369-70 (9th Cir. 1988).

Defendants argue that VNA is State-owned, is under the administrative direction of the Civil Aviation Authority of Vietnam, and that its board members and General Director are appointed by Vietnam's Prime Minister. Mot. at 2. The Prime Minister of Vietnam is to "decide the policies and undertakings and principles for setting the air fare rates on international and domestic flights." Id. Defendants also assert that the Thai government owns 51.03% of the shares in Thai Airways. Id. at 3; see also Gupta v. Thai Airways Intern., Ltd., 487 F.3d 759, 762 n.2 (9th Cir. 2007 ("Under federal law, an entity whose controlling shares or majority interest is owned by a foreign state or political subdivision is itself a

---

regulatory entities exercise that authority and (4) a resulting risk that the securities and antitrust laws would produce conflicting guidance. See Credit Suisse, 551 U.S. at 264. Among other things, Defendants have not demonstrated that there is a real risk of conflicting guidance between Japan's system and the U.S. antitrust laws, particularly as the March 14, 1998 Memorandum of Understanding Between the United States and Japan provides that "Nothing in this 1998 MOU shall be construed to limit the rights of either Party to enforce its domestic competition laws," see RFJN (dkt. 307) Ex. 5 at 26 ¶ X.C.2, and as foreign carriers may seek and receive antitrust exceptions from the U.S. Department of Transportation pursuant to 49 U.S.C. § 41308. Mere incompatibility, as opposed to clear repugnancy, is insufficient to trigger implied preclusion. See Churchill Downs, Inc. v. Thoroughbred Horsemen's Group, 605 F. Supp. 2d 870, 886 (W.D. Ky. 2009).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   'foreign state'" under the FSIA, a related but separate law).  Thai Airways's Board of

2   Directors must appoint a Nomination Committee that includes the Permanent Secretary of the

3   Ministry of Finance and the Permanent Secretary of the Ministry of Transport.  Mot. at 3.

4   And the Thai government retains power to proscribe rules and procedures for calculating air

5   fares and the power to approve fares.  Id.

6          Plaintiffs ask the Court to deny the Motion, urging the Court to apply a commercial

7   exception to the act of state doctrine.  Opp'n (dkt. 337) at 5-9.  Though the Supreme Court

8   has spoken of a "commercial activity" exception to the act of state doctrine, see Alfred

9   Dunhill of London, Inc. v. Republic of China, 425 U.S. 682, 704 (1976) ("subjecting foreign

10  governments to the rule of law in their commercial dealings presents a much smaller risk of

11  affronting their sovereignty than would an attempt to pass on the legality of their

12  governmental acts"), only a plurality of the Court has endorsed that principle, see Cruz, 387

13  F. Supp. 2d at 1068.  Moreover, the Ninth Circuit has not explicitly recognized such an

14  exception.  See Int'l Assoc. of Machinists v. OPEC, 649 F.2d 1354, 1360 (9th Cir. 1981)

15  ("the Act of State doctrine is not diluted by the commercial activity exception which limits

16  the doctrine of sovereign immunity").[16]  Although Plaintiffs suggest that "[n]othing bars this

17  Court from adopting Dunhill's commercial activity exception," Opp'n at 6, this Court will

18  not apply an exception that might or might not exist.

19         However, Plaintiffs also assert that VNA and Thai Airways have failed to show that

20  the complained-of actions were taken in the public interest,[17] that foreign policy will be

21  affected by rejection of the defense, or that the case could lead to different pronouncements

22

23         [16] But see Northrop Corp. v. McDonnell Douglas Corp., 705 F.2d 1030, 1048 n.25 (9th Cir.
    1983) ("Although 'seemingly commercial activity' can trigger act of state concerns . . . purely
    commercial activity ordinarily does not require judicial forbearance under the Act of State doctrine").

24  However, Clayco Petroleum Corp. v. OPEC, 712 F.2d 404, 408 (9th Cir. 1983), which held that "[t]he
    Ninth Circuit has not definitively ruled on the commercial exception," was decided on August 2, 1983,

25  several months after Northrop, which was decided on February 28, 1983.  Accordingly, it remains
    unclear whether the Ninth Circuit recognizes a commercial activity exception. It is also unclear whether

26  the activity at issue here is "purely commercial," per Northrop.

27         [17] Although the Opposition asserts that Thai Airways and VNA have not shown that they were
    sovereigns, Opp'n at 10, at the motion hearing counsel for Plaintiff conceded for the purposes of the

28  motion that the two airlines are sovereigns.  See dkt. 446 (Tr.) at 42:14-17.  Plaintiff also conceded that
    most of the actions complained of occurred in those sovereigns' own territories.  Id. at 42:18-23.

United States District Court
For the Northern District of California

on the same subject. Opp'n at 10-12. In light of these assertions, the Court solicited the opinion of the Department of State, asserting that the Court "would appreciate knowing the Department of State's view regarding whether, in these circumstances, this Clayton Act § 4 lawsuit for damages, alleging that fares set by these state-owned airlines violate Sherman Act § 1, should be barred by the Act of State doctrine." See dkt. 455. Solicitation of the Department of State's opinion is common in such cases, and reflects the courts' deference to the Executive Branch's primary role in foreign relations matters. See, e.g., Sarei v. Rio Tinto PLC, 221 F. Supp. 2d 1116, 1179-80 (C.D. Cal. 2002) (collecting cases in which district court "requested and received a letter expressing the views of the . . . Department of State as to the applicability of the Act of State doctrine").

The Department of State responded to the Court, stating "[a]t present, the United States is not in a position to express its views on whether a ruling in this matter would implicate the Act of State doctrine." See dkt. 461. It continued: "Fact-finding by a court may cast light on whether the prerequisites of the Act of State doctrine are present (e.g., whether the court must decide the validity of an official act, whether the relevant acts taken are 'sovereign' acts, and whether the territorial requirements are met) and whether any exceptions to the Act of State doctrine apply." Id.

In light of this statement from the Department of State, and the Court's conclusion that VNA and Thai Airways have not yet met their burden of demonstrating that the act of state doctrine applies, see Republic of Philippines, 862 F.2d at 1369-70, the Court DENIES the Motion at this time.[18]

E.      **Joint Motion of Air New Zealand and Malaysian Airlines**

Air New Zealand and Malaysian Airlines move to dismiss the CAC's claims of fraudulent concealment. See generally Mot. (dkt. 311). According to these Defendants, the CAC relates back to the original complaint, filed on November 6, 2007. Id. at 3. Because the statute of limitations for a private cause of action arising under the Sherman Act is four

---

[18] Defendants are free to raise this argument again at the summary judgment phase of the case, if appropriate.

United States District Court
For the Northern District of California

years,[19] it would bar recovery for any illegal conduct that occurred before November 6, 2003. Id. at 3-4. This would present a problem for Plaintiffs, who identify the class period as beginning no later than January 1, 2000. CAC ¶ 1. The CAC asserts, however, that the statute of limitations was tolled; it alleges "equitable tolling, equitable estoppel, and fraudulent concealment" (although it only includes allegations of fraudulent concealment).[20] Id. ¶¶ 295-305. In the present Motion, Defendants argue that the CAC does not plead fraudulent concealment with sufficient particularity under Rule 9(b). See generally Mot. The Court agrees.

To state a claim for fraudulent concealment, plaintiffs must allege that (1) they were affirmatively misled, (2) they had neither actual nor constructive knowledge of the facts giving rise to their claim, and (3) they exercised due diligence in attempting to discover the facts. See Conmar Corp. v. Mitsui & Co., Inc., 858 F.2d 499, 502 (9th Cir. 1988). At the pleadings stage, a party alleging fraud "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "To survive a motion to dismiss . . . where a complaint includes allegations of fraud, [Rule 9(b)] requires . . . specificity including an account of the 'time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." Schwartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007). This heightened pleading requirement also applies to allegations of fraudulent concealment. See Guerrero v. Gates, 442 F.3d 697, 707 (9th Cir. 2006).

In the Court's view, the CAC alleges the necessary elements of fraudulent concealment, but does so too vaguely to meet the heightened pleading standard. The CAC alleges that Defendants affirmatively concealed the price-fixing conspiracy:

---

[19] See 15 U.S.C. § 15b.

[20] Accordingly, the Court rejects Plaintiffs' argument that "Even if [they] were to prevail on their motion, Plaintiffs' alternative grounds – equitable tolling – remain unchallenged and sufficient to toll any applicable statute of limitations. Opp'n (dkt. 334) at 13 n.2. Despite the wording of the applicable heading ("Accrual of Claim, Equitable Tolling, Equitable Estoppel, and Fraudulent Concealment"), CAC ¶ 295, the Court reads the CAC as seeking equitable tolling only on the basis of fraudulent concealment. Fraudulent concealment is an equitable tolling doctrine. See Grimmett v. Brown, 75 F.3d 506, 514 (9th Cir. 1996).

(a) By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of the illegal scheme;
(b) By engaging in secret meetings, telephone calls, and other communications in order to further their illicit cartel;
© By staggering the dates on which changes to fares, including surcharges, became effective and/or were announced to the public;
(d) By generating e-mails which recipients were told to destroy after reading;
(e) By destroying documentary evidence of the alleged conspiracy after the regulatory raids . . . ;
(f) By giving false and pretextual reasons for their pricing of passenger fares and for the increases in those prices during the relevant period, and by describing such pricing and increases falsely as being a result of external costs, including the cost of fuel, rather than collusion.

CAC ¶ 304.  Although Plaintiffs claim, in their briefing, to have provided "specific detailed examples regarding these affirmative acts," Opp'n (dkt. 334) at 6, those examples are not detailed in the fraudulent concealment section of the CAC.  See, e.g., CAC ¶ 299 ("following the February 2006 raids by competition regulators, directions were given by senior management of one of the Defendants to destroy all documents concerning communications with competitors regarding fare and rate-setting activities"); ¶ 300 ("one of the Defendants suggested that another Defendant conceal a collusive fare increase by falsely stating that it was due to the enhanced in-flight services provided to passengers.").  Only one of the fraudulent concealment allegations names an actual person, and that allegation is far from damning.  See id. ¶ 301 ("Mr. Suebsantiongse referred to fuel surcharges as a 'sensitive' issue when the Thailand BAR met and agreed to joint imposition of such charges").  Another allegation that might well be suspicious nonetheless lacks specificity.  See id. ¶ 298 ("Plaintiffs have alleged herein an instance in which the author of an e-mail about fuel surcharge communications asked the recipients to destroy it.").[21]

The Court is aware that "many courts have noted in the antitrust conspiracy context [that] it is generally inappropriate to resolve the fact-intensive allegations of fraudulent concealment at the motion to dismiss stage, particularly where the proof relating to the extent

---

[21]  This allegation does not incorporate by reference the CAC's earlier description of this email; fortunately, Defendants, in their Motion, identify it as CAC ¶ 233. Mot. at 5. That paragraph identifies a date (May 31, 2005), an author (Hirai Noboru of JAL) and, although it does not state who the recipients were, it references Northwest and Continental Airlines. CAC ¶ 233. These kinds of details are utterly lacking in the fraudulent concealment section.

United States District Court
For the Northern District of California

1    of the fraudulent concealment is alleged to be largely in the hands of the alleged

2    conspirators."  See Rubber Chems., 504 F. Supp. 2d at 789.  Indeed, Plaintiffs here claim that

3    in Rubber Chemicals, the court "upheld the following allegations as sufficiently particular to

4    plead 'affirmative acts': 'secret meetings to set prices, [an] agreement not to publicly discuss

5    the nature of the scheme, destruction of documents that might evidence their actions, and

6    pretextual justifications for the inflated prices.'" Opp'n at 6 (citing Rubber Chems., 504 F.

7    Supp. 2d at 788).  But what Plaintiffs characterize as allegations in the Rubber Chemicals

8    case were in fact the court's summary of the allegations.  The allegations themselves were

9    much more detailed.  See, e.g., Case No. 3:06-cv-5700, Compl. (dkt. 8) ¶¶ 76-81 ("an email

10   dated January 11, 2002 to plan a price-fixing meeting between Crompton/Uniroyal's James

11   O'Hearn and Flexsys' Reinhart stated: 'given the nature of our intended discussion, I wonder

12   whether we shouldn't have a more 'secluded' location,'"; "An internal Flexsys email dated

13   August 16, 2000 refers to Crompton/Uniroyal pricing but cautions: 'this is not something we

14   can discuss via email'"; "an email dated November 11, 1996, written by Joachim Volker

15   Hollitsch concerning pricing and other competitive matters, was flagged with the language: 'f

16   y I and 'destroy' after reading.' . . . Byer's Michael Shade, in responding to that email on the

17   same day, stated, 'Thanks for the note which I read and deleted.'").  Similarly, in Flat Panel,

18   586 F. Supp. 2d 1109, another case reiterating that it is generally inappropriate to resolve

19   fraudulent concealment allegations at the motion to dismiss stage, and which Plaintiffs rely

20   on, see Opp'n at 6, the allegations were more detailed than those in the CAC.  See Case No.

21   3:07-md-1827-SI, Compl. (dkt. 366) ¶¶ 178-188 (listing specific examples of pretextual

22   explanations for price increases, such as "On February 4, 2001, Bruce Berkoff, Executive

23   Vice-President at L.G. Philips was quoted by News.com as saying that price increases were

24   due to shortages.  He claimed, 'demand grew so fast that supply can't keep up.'").

25        The fraudulent concealment allegations of the CAC – compared to the fraudulent

26   concealment allegations in other cases that have survived motions to dismiss, and even

27   compared to the CAC's own extensive allegations of price-fixing – are lacking. "Conclusory

28   statements are not enough."  See Conmar, 858 F.2d at 502.  Though the Court is not swayed

32

United States District Court
For the Northern District of California

1   by Defendants' additional argument, that the fraudulent concealment claims fail because they

2   make no specific allegations of fraudulent concealment by Air New Zealand and Malaysian

3   Airlines, see Mot. at 4, 7,[22] the allegations' lack of particularity warrants dismissal.

4   Accordingly, this Motion is GRANTED, without prejudice.  Plaintiffs may amend the CAC

5   only to add additional allegations to substantiate their claim of fraudulent concealment, if

6   they can do so in good faith.  Having found the allegations of fraudulent concealment to be

7   lacking, the Court finds no other basis for equitable tolling in the CAC.

8       F.      **Joint Motion of Philippine Airlines and Vietnam Airways**

9       Philippine Airlines and VNA move to dismiss the CAC with respect to all claims

10  occurring or damages incurred prior to August 5, 2005.  See generally Mot. (dkt. 287).  Their

11  Motion makes two arguments: (1) the CAC does not relate back to the original complaint,

12  which failed to name them as defendants; and (2) the CAC's allegations of fraudulent

13  concealment fail.  Id.  The Court agrees.

14      As an initial matter, Plaintiffs do not dispute, or even address, the argument that the

15  CAC, filed in August 2009, does not relate back to the original complaint, filed in November

16  2007, as to these Defendants.[23]  Plaintiffs argue instead that the relation back doctrine is

17  beside the point: "the only relevant statute of limitations question that exists with respect to

18  PAL and Vietnam Airlines . . . is when plaintiffs were on notice of their antitrust claims

19  against the defendants, and whether, prior to being on notice, the defendants, including PAL

20  and Vietnam Airlines, successfully concealed the existence of the alleged conspiracy."

21  Opp'n (dkt. 335) at 1.  Plaintiffs go on to assert that they were not on notice of their claims

22  until August 1, 2007, when KAL pled guilty to antitrust violations in connection with

23

24      [22] See In re Scrap Metal Antitrust Litig., 527 F.3d 517, 537 (6th Cir. 2008) ([f]raudulent
    concealment . . . may be established through the acts of co-conspirators"); Beltz Travel Serv., Inc. v.

25  Int'l Air Transport Ass'n, 620 F.2d 1360, 1367 (9th Cir. 1980) ("[p]articipation by each conspirator in
    every detail of the conspiracy is unnecessary").

26

27      [23] Defendants rely on Federal Rule of Civil Procedure 15(c)(1)(C)(ii), which requires that when
    the original pleading was filed, the newly named defendant "knew or should have known that the action

28  would have been brought against it, but for a mistake concerning the proper party's identity."  See id.
    at 3.  Plaintiff make no effort to explain why these Defendants were not named in the original pleading
    and certainly do not claim to have made a mistake about their identities.

1    passenger air transportation, had no reason to know of the conspiracy before that, and so

2    "pursuant to the applicable statute of limitations, plaintiffs actually have until August 1, 2011

3    to sue PAL, [and] Vietnam Airlines . . . for their participation in the alleged conspiracy at

4    issue." Id.

5           Had Plaintiffs adequately pleaded fraudulent concealment, they would be correct: the

6    statute of limitations would begin to run when they were on notice of their claims, August

7    2007, and would run for four years. See 15 U.S.C. § 15b. That is how statutes of limitations

8    work. However, having already found that the CAC fails to allege fraudulent concealment

9    with sufficient particularity,[24] the Court finds that the statute of limitations was not tolled.

10          Accordingly, this Motion is GRANTED, without prejudice. Again, Plaintiffs may

11   amend the CAC to add additional allegations of fraudulent concealment, if they can do so in

12   good faith.

13          G.      **Motion by Vietnam Airlines**

14          VNA brings an individual Motion to Dismiss, arguing that (1) Plaintiff's allegations

15   fail to meet the minimum pleading standards; (2) the FTAIA bars Plaintiffs' claims; (3) the

16   Air Transportation Agreement ("ATA") between the United States and Vietnam governs the

17   resolution of pricing disputes; and (4) the filed rate, state action, and implied preclusion

18   doctrines also warrant dismissal. See generally Mot. (dkt. 294).

19          For the reasons already explained, the Court finds persuasive Defendants' arguments

20   as to the FTAIA, but not their arguments as to the filed rate, state action, and implied

21   preclusion doctrines.

22   //

23   //

24   _____

25          [24] The Court does not subscribe to these Defendants' additional argument that Plaintiffs failed
     to adequately allege due diligence. See Mot. at 10. "The requirement of due diligence is only
26   meaningful . . . when facts exist that would excite the inquiry of a reasonable person." See Conmar, 858
     F.2d at 504. Defendants argue that "[m]uch of the evidence Plaintiffs cite for the alleged conspiracy
27   was a matter of public record and easily discoverable." Mot. at 10. But the evidence Defendants point
     to – their role in various organizations – is not "much of the evidence" Plaintiffs rely on in describing
28   the conspiracy, or, standing on its own, very powerful evidence. The Court finds that the CAC
     adequately alleges due diligence.

34

United States District Court
For the Northern District of California

### 1.    Plausibility

The Court also finds that the CAC sufficiently states a claim against VNA.  The Court has already concluded that the CAC sufficiently states a claim of an antitrust conspiracy. Having successfully alleged an overarching conspiracy, Plaintiffs must simply allege "'that each individual defendant joined the conspiracy and played some role in it.'"  See Flat Panel, 586 F. Supp. 2d at 1117.  Plaintiffs' allegations meet this standard.  The CAC alleges that VNA:

> participated in the conspiracy alleged herein by, among other things, sharing commercially sensitive information through its code-sharing agreements with competitors (see ¶¶ 54-65), participating directly or indirectly in industry meetings that have been deemed by antitrust officials in the U.S., Europe, and Australia to be inherently anticompetitive and not in the interests of competitive airline markets (see ¶¶ 66-71, 85, 89-99), participating in meetings hosted by regional trade associations in which anticompetitive conduct is encouraged and/or tolerated (see ¶¶ 72-76), participating directly or indirectly in meetings with its competitors at which coordinating increased base passenger fares were agreed upon (see ¶¶ 111-180), participating directly or indirectly in meetings with competitors at which a passenger fare pricing was discussed and then benchmarking fares off of the prices agreed upon at those meetings (see ¶¶ 83-105), participating directly or indirectly in meetings with competitors at which collectively increasing fuel surcharges was agreed upon as a means of dealing with rising fuel costs (see ¶¶ 185, 188, 204-235), raising fares and surcharges more than necessary to offset increased fuel costs even though such actions are not consistent with economic theory (see ¶¶ 237-244), instituting surcharges in close proximity to those of its competitors in sharp contrast to conduct that occurred prior to the Class Period (see ¶¶ 191-203), and participating directly or indirectly in anticompetitive meetings with other Defendants concerning the fixing of prices in the closely related air-cargo market (see ¶¶ 245-293).  Industry analysts based in Asia/Oceania acknowledge that anticompetitive conduct "overhangs" the airline passenger transportation industry, particularly in light of lax enforcement in Asia.

CAC ¶ 40.

The CAC alleges, among other things, that VNA had code-sharing agreements that facilitated the conspiracy, see id. ¶¶ 60, 61, that it participated in BAR meetings at which it "exchanged information about the imposition of fuel surcharges," id. ¶ 204, and that it implemented and adjusted fuel surcharges in lockstep with Japan Airlines, Thai Airways, Singapore Airlines, and others during much of the class period, id. ¶ 203.  The CAC also describes several specific and suspicious emails involving VNA.  For example, in an email allegedly sent on June 15, 2004, an individual at VNA (Tran Thu Hien) emailed with an individual at JAL (Akira Mori) about ANA's fuel surcharge intentions.  Id. ¶ 219.  On August 18, 2005, VNA received from an individual at Thai Airways an email titled,

35

United States District Court
For the Northern District of California

1  "Message from THAI re Fuel Surcharge," which stated: "We also know that we have to be

2  aware of market acceptability of these increases.  But most of all, we at THAI are looking for

3  all of your efforts to toe the line with us.  All the time we compete absolutely, but this time

4  we ask for unity and to be onboard the fuel surcharge wagon for our future and survival."  Id.

5  ¶ 234.  The Court finds that these allegations sufficiently state a claim against VNA.[25]

6              **2.      The ATA**

7          VNA also argues that the ATA "signed by [the U.S. and Vietnam] on December 4,

8  2003, specifies procedures for raising issues and resolving disputes over the pricing of air

9  transport."  Mot. at 10.  VNA argues that because this suit is based on the setting of airline

10  fares and seeks injunctive relief and damages against VNA, it contravenes the ATA.  Id.  The

11  ATA states in pertinent part:

12          Neither Party shall take unilateral action to prevent the inauguration or continuation of
          a price proposed to be charged or charged by (I) an airline of either Party for
13          international air transportation between the territories of the Parties, or (ii) an airline
          of one Party for international air transportation between the territory of the other Party
14          and any other country, including in both cases transportation on an interline or
          intraline basis.  If either Party believes that any such price is inconsistent with the
15          considerations set forth in paragraph 1 of this Article, it shall request consultations and
          notify the other Party of the reasons for its dissatisfaction as soon as possible.  These
16          consultations shall be held not later than 30 days after receipt of the request, and the
          Parties shall cooperate in securing information necessary for reasoned resolution of
17          the issue.  If the Parties reach agreement with respect to a price for which a notice of
          dissatisfaction has been given, each Party shall use its best efforts to put that
18          agreement into effect.  Without such mutual agreement, the price shall go into effect
          or continue in effect.

19  Diggs Decl. (dkt. 305) Ex. 13 (ATA) at Art. 12(3).  VNA asserts further that "treaties are the

20  'supreme law of the land,'" and that this Court's unilateral adjudication[26] of the

21  reasonableness of fares charged by VNA under the Sherman Act is superseded by the ATA.

22  Mot. at 11.  This argument misses the mark; the Court need not weigh the ATA against the

23

24          [25] VNA also argues that many of the CAC's allegations against it are time-barred.  VNA asserts
   that the statute of limitations for Sherman Act claims is four years, that the CAC allegations do not

25  relate back, and that therefore the "claims based on conduct prior to August 6, 2005 must be dismissed."
   Mot. at 3, n.1.  As already discussed as to the joint motion by Philippine Airlines and VNA (dkt. 287),

26  the Court agrees, although Plaintiffs will be permitted to amend their allegations of fraudulent
   concealment, which could lead to the tolling of the statute of limitations.

27

28          [26] This Court does not subscribe to VNA's puzzling theory of "unilateral adjudication" or its
   implicit argument that a court hearing a dispute brought by private parties is the equivalent of a party
   to the ATA unilaterally challenging a price.

1    Sherman Act, as the two are not in conflict in this case.  The ATA sets out a process for

2    resolving price disputes between the United States government and the Vietnamese

3    government; by its terms, it does not prevent private parties from bringing suit about those

4    prices, nor prevent this nation's courts from hearing such suits.  Cf. Airline Pilots' Ass'n,

5    Intl. v. TACA Int'l Airlines, 748 F.2d 965, 969 (5th Cir. 1984) ("Nor are we persuaded that

6    the parties to the Air Transportation Agreement intended that a dispute between private

7    parties . . . was to be arbitrable under the agreement's provisions").

8            VNA's assertion that "[c]ourts have held that the consultation process outlined in

9    bilateral air transport agreements, like the one here, must govern the resolution of disputes to

10   the exclusion of the courts," Mot. at 12, misstates the case law.  In Air Transport Assoc. of

11   Am. v. City of Los Angeles, 844 F. Supp. 550, 557 (C.D. Cal. 1994), airlines brought suit

12   challenging the City of Los Angeles's landing fees, arguing that the fees violated the bilateral

13   agreements.  The court explained that "[n]othing in these Bilateral Agreements indicates that

14   the contracting parties may resort to their respective judicial systems for relief or that

15   individual airlines are granted a private right of action to enforce supposed treaty rights."  Id.

16   Far from holding that private parties were barred from suit, the court simply held that there

17   was no private right of action under the agreements – something not at issue here, where

18   Plaintiffs bring suit under the Sherman Act, not the ATA.  In British Caledonian Airways

19   Ltd. v. Bond, 665 F.2d 1153, 1164 (D.C. Cir. 1981), the other case relied upon by

20   Defendants, the FAA sought to rely on a provision in a similar bilateral agreement that

21   allowed the FAA to take emergency action to ban landings and takeoffs in the United States

22   if several criteria were met.  The court held that because the FAA had not actually relied on

23   any of the criteria, the provision in the agreement "cannot help [the FAA]."  Id.  British

24   Caledonian is not applicable here, where the bilateral agreement is being invoked not by a

25   party seeking to justify its actions, but by one seeking to avoid adjudication of its actions.

26   VNA does not argue that the ATA permits it to engage in anticompetitive conduct, and in

27   fact the agreement states that "Each Party shall allow prices for air transportation to be

28

                                        37

United States District Court
For the Northern District of California

1   established by each designated airline based upon commercial considerations in the

2   marketplace."  Diggs Decl. Ex. 13 (ATA) at Art. 12(1).[27]

3       Somewhat more relevant is <u>Laker Airways Ltd. v. Sabena, Belgian World Airlines,</u>

4   731 F.2d 909, 924-25 (D.C. Cir. 1984), in which the court explained in the context of a

5   jurisdictional analysis that "[f]oreign airlines fly in the United States on the prerequisite of

6   obeying United States law," and that "United States creditors are entitled to, and do, rely on

7   their ability to enforce their claims against foreign corporations."  In that case, the court

8   explained that foreign airlines had "no claim to antitrust immunity under their air service

9   treaties," (adding that language in Article 12(1) of agreement, parallel to language in ATA at

10  issue here, "express[ly] subject[ed] them to the jurisdiction of the United states over

11  predatory pricing").  <u>Id.</u> at 932.  In addition, as Plaintiff points out, there is both legislation

12  on the books concerning the antitrust obligations of foreign air carriers, <u>see</u> 49 U.S.C. §

13  41301 et seq.,[28] and the Department of Justice does not recognize the existence of ATAs as a

14  limitation on its prosecution of foreign airlines for violating antitrust laws,

15  <u>see</u> http://www.justice.gov/opa/pr/2009/April/09-at-324.html (describing pleas of

16  Luxembourg-based, Japan-based, and Korea-based airlines in suit alleging price fixing of air

17  cargo flights).

18      The Court does not read the ATA between Vietnam and the United States as barring

19  suits by private parties alleging anticompetitive pricing, and no authority cited by Plaintiff

20  supports such a reading.

21      Accordingly, the Court GRANTS the Motion on the basis of the FTAIA but DENIES

22  the Motion to Dismiss on all other grounds.

23

24      [27] The cases cited by VNA in its Reply are similarly unpersuasive.  Both <u>Virgin Atl. Airways
    Ltd. v. British Airways PLC</u>, 872 F. Supp. 52, 62 (S.D.N.Y. 1994) and <u>Lemnitzer v. Philippine Airlines</u>,
25      783 F. Supp. 1238, 1245 (N.D. Cal. 1991) involve airlines being challenged for taking actions (code-
    sharing and preferring its own citizens) that were permitted under the ATAs.  That is not the case here.
26

27      [28] The Court recognizes that this legislation pre-dates the 2003 ATA but notes that Vietnam does
    not assert that it was granted immunity under section 41308 of the statute, and, as <u>Laker Airways</u> held,
28      "[the ATAs] were all negotiated recently, at a time when the countries could be expected to have been
    familiar with the United States's position regarding enforcement of its antitrust laws over foreign
    corporations operating in the United States."  731 F.2d at 932.

H.      **Motion by All Nippon Airways**

ANA moves to dismiss the CAC on four primary bases: (1) the filed rate doctrine; (2) the Court lacks subject matter jurisdiction over flights originating outside of the United States; (3) the CAC fails to plead plausible injury; and (4) Japan's policy to displace competition precludes antitrust enforcement in U.S. courts. The Court has already concluded that it will not dismiss the CAC based on the filed rate doctrine at this time, and that it does indeed lack subject matter jurisdiction over the foreign injury claims. It has also declined to dismiss based on the state action or implied preclusion doctrines. The Court now turns to ANA's plausibility argument.

ANA's plausibility argument varies from that of some of the other defendants. Rather than attack the sufficiency of the CAC generally, ANA argues more narrowly that (1) the CAC fails to clearly allege facts supporting jurisdiction by not asserting that any claims result from travel originating within the United States, and (2) the CAC fails to raise a plausible inference of conspiracy because it fails "to specify whether any plaintiff purchased air transportation or initiated travel in any jurisdiction or on any city pair route served by ANA." Mot. (dkt. 295) at 3. These arguments are without merit.

As to ANA's first argument, to the extent that the flights at issue in the CAC do not originate within the United States, the Court has dismissed them. As to ANA's second argument, Plaintiffs need not allege that plaintiffs purchased tickets, or flew, in ANA's jurisdiction. Just as the CAC states a claim against the European Carriers despite their protestations that they did not fly trans-Pacific routes, the CAC states a claim against ANA because it plausibly alleges that ANA was part of a conspiracy to fix prices. In fact, the allegations against ANA are extensive. The CAC includes numerous allegations of specific communications ANA had with its competitors over the coordinating of air fares. See, e.g., CAC ¶¶ 111-181. For example, a December 27, 2005 email by JAL mentions that JAL prepared pricing matching ANA's pricing for the first half of the 2006 fiscal year. Id. ¶ 119. An August 15, 2002 meeting allegedly took place between JAL and ANA over the

United States District Court
For the Northern District of California

1    coordinating of Yobiyose fares.[29]  Id. ¶ 129.  A September 1, 2004 email from ANA to JAL

2    allegedly included a fare chart for ANA's discount class fares for the forthcoming six-month

3    period.  Id. ¶ 140.  The CAC also includes numerous allegations of specific communications

4    ANA had with its competitors over coordinating of fuel surcharges.  See, e.g., ¶¶ 225-35.

5    For example, in November 30, 2004, a representative of Cathay Pacific emailed ANA and

6    JAL with the subject "Fuel Surcharge," explaining "that ANA wanted to implement a fuel

7    surcharge" and adding "I was wondering if I could obtain an agreement from your company."

8    Id. ¶ 225.  An August 18, 2005 email from Thai Airway, with a subject "Message from THAI

9    re Fuel Surcharge," was sent to ANA and others, stating in part, "this time we ask for unity

10   and to be onboard the fuel surcharge wagon for our future and survival."  Id. ¶ 234.  In light

11   of these and the other allegations against ANA, the Court finds that the CAC plausibly states

12   a claim against ANA.

13        Accordingly, the Court GRANTS the Motion as to flights originating outside of the

14   United States, and DENIES the Motion on all other grounds.

15        I.        **Motion by Cathay Pacific Airways**

16        Cathay Pacific moves to dismiss the CAC, arguing that (1) it should be dismissed on

17   the basis of the filed rate doctrine, and (2) it fails to allege a plausible conspiracy against

18   Cathay Pacific.  See generally Mot. (dkt. 303).  The Court has already explained that it will

19   not grant Defendants' motions on the basis of the filed rate doctrine at this time.  The Court

20   will also deny Cathay Pacific's Motion based on its plausibility argument.

21        The Court has already concluded that the CAC sufficiently states a claim of an

22   antitrust conspiracy.  Having successfully alleged an overarching conspiracy, Plaintiffs must

23   simply allege "'that each individual defendant joined the conspiracy and played some role in

24   it.'"  See Flat Panel, 586 F. Supp. 2d at 1117.  A complaint "need not contain detailed

25   'defendant by defendant' allegations."  Id.; see also In re SRAM, 580 F. Supp. 2d at 904

26

27   _____

28        [29] According to the CAC, Yobiyose Fares are discount fares for sale in the United States for roundtrip travel between the United States and Japan; they were designed to allow Japanese nationals living in the United States to bring family members in Japan to visit them.  Id. ¶ 124.

**United States District Court**
For the Northern District of California

1   ("they now only need to make allegations that plausibly suggest that each Defendant

2   participated in the alleged conspiracy").  Plaintiffs' allegations do so.

3          The CAC includes the following paragraph about Cathay Pacific:

4          Defendant [Cathay Pacific] is a Hong Kong-based company. . . . Defendant Cathay
           Pacific participated in the conspiracy alleged herein by, among other things, sharing
5          commercially sensitive information through its code-sharing agreements with
           competitors (see ¶¶ 54-65), participating directly or indirectly in industry meetings
6          that have been deemed by antitrust officials in the U.S., Europe, and Australia to be
           inherently anticompetitive and not in the best interests of competitive airline markets
7          (see ¶¶ 66-71, 85, 89-99), participating in meetings hosted by regional trade
           associations in which anticompetitive conduct is encouraged and/or tolerated (see ¶¶
8          72-76), participating directly or indirectly in meetings with its competitors at which
           coordinated increased base passenger fares were agreed upon (see ¶¶ 111-180),
9          participating directly or indirectly in meetings with competitors at which passenger
           fare pricing was discussed and then benchmarking fares off of the prices agreed upon
10         at those meetings (see ¶¶ 83-105), participating directly or indirectly in meetings with
           competitors at which collectively increasing fuel surcharges was agreed upon as a
11         means of dealing with rising fuel costs (see ¶¶ 185, 188, 204-235), raising fares and
           surcharges more than necessary to offset increased fuel costs even though such actions
12         are not consistent with economic theory (see ¶¶ 237-244), instituting surcharged in
           close proximity to those of its competitors in sharp contrast to conduct that occurred
13         prior to the Class Period (see ¶¶ 191-203), and participating directly or indirectly in
           anticompetitive meetings with other Defendants concerning the fixing of prices in the
14         closely related air-cargo market (see ¶¶ 245-293). . . ."

15  CAC ¶ 26.  The CAC further includes allegations of additional, specific conspiratorial

16  actions.  See, e.g., id. ¶¶ 188, 189, 199, 201, 205, 207, 208.  The CAC describes one email

17  sent on November 30, 2004 from a representative of Cathay Pacific to representatives of

18  ANA and Japan Airlines.  Id. ¶ 225.  The email, entitled "Fuel Surcharges," thanked Japan

19  Airlines for its "continued support," explained that ANA wanted to implement a fuel

20  surcharge and sought agreement from your company."  Id.  Another email alleged to have

21  been sent to Cathay Pacific from an employee of Thai Airways on August 18, 2005 was

22  titled, "Message from THAI re Fuel Surcharge" and stated: "We also know that we have to

23  be aware of market acceptability of these increases.  But most of all, we at THAI are looking

24  for all of your efforts to toe the line with us.  All the time we compete absolutely, but this

25  time we ask for unity and to be onboard the fuel surcharge wagon for our future and

26  survival."  Id. ¶ 234.  And, in June 26, 2008, the DOJ announced that it had filed an

27  information against Cathay Pacific regarding price-fixing of air cargo rates on international

28

41

**United States District Court**
For the Northern District of California

1   flights to and from the United States.  Id. ¶ 275.  Cathay Pacific agreed to admit guilt, pay a

2   fine of $60 million, and its CEO has expressed regret about its actions.  Id. ¶ 276.

3            Although Cathay Pacific argues that "the specific allegations regarding Cathay Pacific

4   are particularly insufficient to satisfy the requirements of Twombly and Iqbal," Opp'n (dkt.

5   303) at 8 n.6, the Court disagrees.  The CAC plausibly alleges that Cathay Pacific

6   participated in the conspiracy.  Accordingly, the Court DENIES this Motion.

7            **J.      Motion by EVA Airways**

8            EVA moves to dismiss the CAC, arguing that it fails to adequately allege that EVA

9   joined or participated in the alleged conspiracy.  See generally Mot. (dkt. 300).  The Court

10  has already concluded that the CAC sufficiently states a claim of an antitrust conspiracy.

11  Having successfully alleged an overarching conspiracy, Plaintiffs must simply allege "'that

12  each individual defendant joined the conspiracy and played some role in it.'"  See Flat Panel,

13  586 F. Supp. 2d at 1117.  A complaint "need not contain detailed 'defendant by defendant'

14  allegations."  Id.; see also In re SRAM, 580 F. Supp. 2d at 904 ("they now only need to make

15  allegations that plausibly suggest that each Defendant participated in the alleged

16  conspiracy").  Kendall does not hold to the contrary; there the Ninth Circuit explained that

17  "the complaint must allege facts such as 'a specific time, place, or person involved in the

18  alleged conspiracies' to give a defendant seeking to respond to allegations of a conspiracy an

19  idea where to begin."  518 F.3d at 1047 n.5 (citing Twombly, 550 U.S. at 565 n.10)

20  (emphasis added).  Plaintiffs' allegations meet this standard.

21           The CAC includes the following paragraph about EVA:

22       Defendant EVA Airways Corporation ("EVA") is a Taiwanese company. . . .
         Defendant EVA participated in the conspiracy alleged herein by, among other things,
23       sharing commercially sensitive information through its code-sharing agreements with
         competitors (see ¶¶ 54-65), participating directly or indirectly in industry meetings
24       that have been deemed by antitrust officials in the U.S., Europe, and Australia to be
         inherently anticompetitive and not in the best interests of competitive airline markets (
25       see ¶¶ 66-71, 85, 89-99), participating in meetings hosted by regional trade
         associations in which anticompetitive is encouraged and/or tolerated (see ¶¶ 72-76),
26       participating directly or indirectly in meetings with its competitors at which
         coordinating increased base passenger fares were agreed upon (see ¶¶ 111-180),
27       participating directly or indirectly in meetings with competitors at which passenger
         fare pricing was discussed and then benchmarking fares off of the prices agreed upon
28       at those meetings (see ¶¶ 83-105), participating directly or indirectly in meetings with
         competitors at which collectively increasing fuel surcharges was agreed upon as a

means of dealing with rising fuel costs (see ¶¶ 185, 188, 204-235), raising fares and surcharges more than necessary to offset increased fuel costs even though such actions are not consistent with economic theory (see ¶¶ 237-244), instituting surcharges in close proximity to those of its competitors in sharp contrast to conduct that occurred prior to the Class Period (see ¶¶ 191-203), and participating directly or indirectly in anticompetitive meetings with other Defendants concerning the fixing of prices in the closely related air-cargo market (see ¶¶ 245-293). Industry analysts based in Asia/Oceania acknowledge that anticompetitive conduct "overhangs" the airline passenger transportation industry, particularly in light of law antitrust enforcement in Asia (see ¶ 105).

CAC ¶ 30. The CAC further identifies specific conspiratorial meetings attended by EVA, and specific conspiratorial communications to which it was a party. See, e.g., id. ¶¶ 67, 72, 85, 185, 205, 208, 209, 211, 234, Appxs. E, F. One such email alleged to have been sent to EVA from an employee of Thai Airways on August 18, 2005 was titled, "Message from THAI re Fuel Surcharge" and stated: "We also know that we have to be aware of market acceptability of these increases. But most of all, we at THAI are looking for all of your efforts to toe the line with us. All the time we compete absolutely, but this time we ask for unity and to be onboard the fuel surcharge wagon for our future and survival." Id. ¶ 234. An additional email, alleged to have been sent May 24, 2004 to EVA, memorializes that the Thai BAR representatives at the May 18, 2004 meeting "agreed that unless otherwise instructed by their Head Offices . . . they would apply the following fuel surcharges . . ." Id. ¶ 209. The CAC further states that EVA representative Thira K. attended the May 18, 2004 meeting. Id. ¶ 208. Though EVA now seeks to explain away these suspicious emails, and other discrete allegations, allegations "cannot be compartmentalized and considered in isolation 'as if they were separate lawsuits, thereby overlooking the conspiracy claim itself.'" Jung v. Ass'n of Am. Med. Colleges, 300 F. Supp. 2d 119, 155 (D.C. Cir. 2004) (quoting In re Fine Paper Antitrust Litig., 685 F.2d 810, 822 (3d Cir. 1982)).

The CAC plausibly alleges that EVA participated in the conspiracy. Accordingly, the Court DENIES this Motion.

K.     **Motion by Malaysian Airlines**

Malaysian Airlines moves to dismiss the CAC, arguing that the ATA between the United States and Malaysia establishes bilateral consultations as the exclusive remedy for disputes over its fares. See Mot. (dkt. 310) at 5. The language Malaysian Airlines relies on

**United States District Court**
For the Northern District of California

1    in the ATA parallels the language in the United States-Vietnam ATA relied on by VNA.

2    Compare dkt. 294 at 10-11 with dkt. 310 at 4-5.  For the same reasons the Court finds that the

3    United States-Vietnam ATA does not bar this suit, it also finds that the United States-

4    Malaysia ATA does not bar this suit.  The Court notes additionally that Malaysian Airlines's

5    reference to antitrust immunity, dkt. 310 at 9 n.3, is misplaced; that it is possible for foreign

6    carriers to seek and receive an antitrust exception from the Department of Transportation

7    pursuant to 49 U.S.C. § 41308 and that Malaysian Airlines has apparently previously sought

8    such an exception, see 2000 DOT Av. LEXIS 451 at *25, actually supports the contention

9    that foreign carriers face exposure under the Sherman Act unless immunity is conferred (and

10   the further contention that Malaysian Airlines knows this).  As no immunity was conferred

11   for the conduct alleged in the CAC, the Court finds that Malaysian Airlines can be sued for

12   antitrust violations, and DENIES this Motion.

13           L.      **Motion by Philippine Airlines**

14           Philippine Airlines moves to dismiss the CAC, arguing (1) that the ATA between the

15   governments of the United States and the Philippines supersedes Plaintiff's claims; and (2)

16   that the comprehensive nature of the Philippines regulatory scheme requires dismissal based

17   on the Noerr-Pennington, filed rate, implied preclusion, and state action doctrines.  See

18   generally Mot. (dkt. 288).  None of these arguments is persuasive.

19                   **1.     The ATA**

20           Philippine Airlines argues that the CAC antitrust claims directly conflict with the

21   ATA between the United States and the Philippines, because the ATA requires bilateral

22   resolution of pricing disputes in most scenarios, and "bars either Party from acting

23   unilaterally to 'prevent the inauguration or continuation of any price proposed or charged by

24   the airlines of either Party.'"  See Mot. (dkt. 288) at 3-4.  Philippine Airlines's argument fails

25   for many of the same reasons that apply to the United States-Vietnam and the United States-

26   Malaysia ATAs.  The ATA at issue here includes a section on the importance of "Fair

27   Competition."  See Finley Decl. (dkt. 298-15) (Article 11) at 15 (stating in part: "Each party

28   shall take all appropriate action within its jurisdiction to eliminate all forms of . . . unfair

United States District Court
For the Northern District of California

1  competitive practices adversely affecting the competitive position of the airlines of the other

2  Party"). And it anticipates that fares will be set through free competition. See id. (Article

3  12) at 15 (stating in part: "each Party shall allow prices for air transportation to be established

4  by each designated airline based upon commercial considerations in the marketplace").

5  Philippine Airlines can point to no provision in the ATA barring private antitrust suits or

6  even showing them to be inconsistent with the ATA's purposes.

7       Moreover, while the ATA might bar "either Party from acting unilaterally" to

8  challenge prices, it does not prevent private parties from bringing suit about those prices, nor

9  prevent this nation's courts from hearing such suits. Cf. Airline Pilots' Ass'n, 748 F.2d at

10  969 ("Nor are we persuaded that the parties to the Air Transportation Agreement intended

11  that a dispute between private parties . . . was to be arbitrable under the agreement's

12  provisions"). Philippine Airlines's additional argument, that "[a]llowing this suit to proceed

13  could have negative effects on the commercial relationship between the United States and the

14  Philippines" because that government "has demonstrated a willingness to retaliate against

15  agreement partners that take unilateral actions harmful to [Philippine Airlines]," Mot. at 4, is

16  not a legal argument. This Court's duty is to resolve legal disputes, not to decide policy. As

17  the law compels a finding that the ATA does not bar suits by private parties alleging

18  anticompetitive pricing, the Court DENIES the Motion on that basis.

19          **2.    The Philippines Regulatory Scheme**

20       For the reasons already discussed as to Consolidated Motion to Dismiss and the Japan

21  Regulatory Brief, the Court rejects this Motion's arguments about the filed rate, implied

22  preclusion, and state action doctrines. The Court also rejects the argument that the Noerr-

23  Pennington doctrine bars suit against Philippine Airlines for the actions complained of in the

24  CAC. First, the Motion's characterization of the conspiracy alleged in the CAC is too

25  narrow: it is not merely a conspiracy about petitioning the government to approve a

26  surcharge and about discussing surcharges at meetings. Compare Mot. at 7 with CAC ¶¶ 79-

27  244. Second, petitioning the government to adopt a price reached through a price-fixing

28  conspiracy is not a protected activity. See Allied Tube & Conduit Corp. v. Indian Head, Inc.,

United States District Court
For the Northern District of California

1   486 U.S. 492, 503 (1988) ("If all such conduct were immunized then, for example,

2   competitors would be free to enter into horizontal price agreements as long as they wished to

3   propose that price as an appropriate level for government ratemaking of price supports.");

4   Columbia Steel Casting Co. v. Portland Gen. Elec. Co., 111 F.3d 1427, 1446 (9th Cir. 1996)

5   ("[a]pplying to an administrative agency for approval of an anticompetitive contract is not

6   lobbying activity within the meaning of the Noerr-Pennington doctrine"); see also Eastern

7   R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 140 (1961) ("Insofar

8   as [the Sherman] Act sets up a code of ethics at all, it is a code that condemns trade restraints,

9   not political activity").  And third, jointly filing rates, see Mot. at 8 ("Philippine law

10  expressly allows for the filing of joint fares and surcharges"), likely does not qualify as

11  petitioning at all.  See Ticor Title Ins. v. F.T.C., 998 F.2d 1129, 1138 (3d Cir. 1993) ("The

12  conduct which [Ticor] refers to as 'joint petitioning' of the government is in fact nothing

13  more than action in a private marketplace.  We agree with the FTC that Ticor's 'collective

14  rate setting efforts can more aptly be characterized as commercial activity with a political

15  impact . . . than as political activity with a commercial impact.'") (internal quotation marks

16  omitted).

17          Accordingly, this Motion is DENIED.

18      M.      **Motion by Thai Airways**

19          Finally, Thai Airways moves to dismiss the CAC, alleging that (1) the ATA between

20  the United States and Thailand, and (2) the filed rate, state action, and implied preclusion

21  doctrines, bar this suit.  See generally Mot. (dkt. 312).  These arguments are unavailing.

22          The 1996 and 2005 ATAs between the United States and Thailand provide that a Party

23  concerned about "a price proposed by a designated airline" must "notify the other Party of

24  the reasons for its dissatisfaction as soon as possible," and then engage in a "consultation" to

25  try to resolve the issue.  Id. at 2.  Thai Airways argues that this agreement is therefore in

26  conflict with the Sherman Act, and that "[a]llowing a U.S. court to punish Thai Airways

27  based on the fares that it charged . . . would vitiate the purpose of the ATAs and undermine

28  U.S. relations."  Id. at 6.  The language Thai Airways relies on in the ATA is substantially

United States District Court
For the Northern District of California

1  similar to the language in the United States-Vietnam ATA and the United States-Malaysia

2  ATA.  Compare dkt. 312 at 5-6, with dkt. 294 at 10-11 and dkt. 310 at 4-5.  For the same

3  reasons the Court finds that the United States-Vietnam ATA and the United States-Malaysia

4  ATA do not bar suit, it also finds that the United States-Thailand ATA does not bar suit.

5       In addition, for the reasons already explained with regard to the other Defendants, the

6  Court does not adopt Thai Airways's additional bases for dismissal at this time.

7       Accordingly, this Motion is DENIED.

8  **IV.   CONCLUSION**

9       For the foregoing reasons, the Court:

10  A.   GRANTS in part (with prejudice) and DENIES in part the Consolidated

11       Motion to Dismiss.  See dkt. 290.

12  B.   GRANTS in part and DENIES in part the motion by the European Carriers.

13       See dkt. 293.

14  C.   DENIES the motion of ANA, China Airlines, and Thai Airways.  See dkt. 304.

15  D.   DENIES the motion of VNA and Thai Airways.  See dkt. 299.

16  E.   GRANTS the Motion to Dismiss by Malaysian Airlines and Air New Zealand,

17       without prejudice.  See dkt. 311.

18  F.   GRANTS the motion of Philippine and VNA.  See dkt. 287.

19  G.   GRANTS in part and DENIES in part the motion by VNA.  See dkt. 294.

20  H.   GRANTS in part and DENIES in part the motion by ANA.  See dkt. 295.

21  I.   DENIES the motion by Cathay Pacific.  See dkt. 303.

22  J.   DENIES the motion by EVA Airways.  See dkt. 300.

23  K.   DENIES the motion by Malaysian Airlines.  See dkt. 310.

24  L.   DENIES the motion by Philippine Airlines.  See dkt. 288.

25  M.   DENIES the motion by Thai Airways.  See dkt. 312.

26  **IT IS SO ORDERED.**

27

28  Dated: May 9, 2011

                                    _____
                                    CHARLES  R.  BREYER
                                    UNITED STATES DISTRICT JUDGE