Joseph W. Cotchett (36324)
Neil P. McCarthy (160175)
Paul N. "Pete" McCloskey (024541)
Steven N. Williams (175489)
Nanci E. Nishimura (152621)
Niki B. Okcu (229345)
Eric J. Buescher (271323)
Aron K. Liang (228936)
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone:  650-697-6000
Facsimile:   650-697-0577
jcotchett@cpmlegal.com
nmccarthy@cpmlegal.com
swilliams@cpmlegal.com
nnishimura@cpmlegal.com
nokcu@cpmlegal.com
ebuescher@cpmlegal.com
aliang@cpmlegal.com

Michael D. Hausfeld
**HAUSFELD LLP**
1700 K Street, NW, Suite 650
Washington, DC 20006
Telephone:  202-540-7200
Facsimile:   202-540-7201
mhausfeld@hausfeldllp.com

Michael P. Lehmann (77152)
Christopher L. Lebsock (184546)
Jon T. King (205073)
**HAUSFELD LLP**
44 Montgomery Street, Suite 3400
San Francisco, CA  94104
Telephone:  415-633-1908
Facsimile:   415-358-4980
mlehmann@hausfeldllp.com
clebsock@hausfeldllp.com
jking@hausfeldllp.com

*Interim Class Counsel for the Putative Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **IN RE TRANSPACIFIC PASSENGER AIR TRANSPORTATION ANTITRUST LITIGATION**  )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 07-CV-5634-CRB<br><br>MDL 1913<br><br><u>CLASS ACTION</u><br><br>**PLAINTIFFS' FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |
| **This Document Relates to:** | |
| **ALL ACTIONS** | |

1

## TABLE OF CONTENTS

2   NATURE OF THE ACTION ...................................................................................... 1

3   JURISDICTION AND VENUE ................................................................................. 2

4   PLAINTIFFS .............................................................................................................. 3

5   DEFENDANTS .......................................................................................................... 5

6   AGENTS .................................................................................................................. 19

7   NON-DEFENDANT, NAMED CO-CONSPIRATORS ........................................ 19

8   UNNAMED CO-CONSPIRATORS ....................................................................... 20

9   INTERSTATE TRADE AND COMMERCE ......................................................... 20

10  THE FOREIGN TRADE AND ANTITRUST IMPROVEMENT ACT IS INAPPLICABLE .....20

11  FACTUAL ALLEGATIONS .................................................................................. 21

12      A.   Aspects Of The Airline Industry That Facilitate The Alleged Conspiracy ............... 21

13          1.   The Airline Industry's Use Of Airline Alliances ............................................. 21

14          2.   The Industry's Use Of Trade Associations .................................................... 24

15      B.   The Conspiracy ..................................................................................................... 27

16          1.   Base Passenger Fares Are Set In An Anticompetitive Environment ............. 28

17              a.   Immunized IATA Fares ............................................................................. 28

18              b.   The Use Of Immunized IATA Fares As A Benchmark For
19                   Non- Immunized Fares ............................................................................. 32

20              c.   Lockstep Pricing Is Not To Be Expected In A
                     Competitive Market ................................................................................. 33

21              d.   Specific Examples Of Base Fare Coordination ..................................... 36

22          2.   Fuel Surcharges .................................................................................... 50

23              a.   Defendants' Unsuccessful Effort To Obtain Immunity For Fuel
24                   Surcharge Agreements ............................................................................ 50

25              b.   Defendants' Fuel Surcharges Which Commenced In 2004
                     Contrast With Their Conduct In The Preceding Years ....................... 52

26              c.   Fuel Surcharges Were Implemented And Raised Through
27                   Collective Action .................................................................................... 63

28

d.   Coordination Of Fuel Surcharge Increases Are Not An Expected By-Product Of Competition ........................................ 72

e.   Substantial Increases In Profitability Are Not An Expected By-Product Of Competition ........................................ 73

3.   Additional Evidence Establishes That There Was A Wide-Ranging Conspiracy To Impose Fuel Surcharges In The Closely Related Cargo Market During the Class Period ........................................ 75

GOVERNMENT INVESTIGATIONS INTO THE AIR PASSENGER INDUSTRY AND THE CLOSELY RELATED AIR CARGO INDUSTRY ........................................ 75

ACCRUAL OF CLAIM, EQUITABLE TOLLING, EQUITABLE ESTOPPEL, AND FRAUDULENT CONCEALMENT ........................................ 84

CLASS ACTION ALLEGATIONS ........................................ 125

COUNT I: VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1 ........................................ 128

PRAYER FOR RELIEF ........................................ 130

JURY DEMAND ........................................ 131

Appendix A ........................................ 136

Appendix B ........................................ 138

Appendix C ........................................ 139

Appendix D ........................................ 141

Appendix E ........................................ 143

Appendix F ........................................ 145

Appendix G ........................................ 146

## <u>NATURE OF THE ACTION</u>

1.      This action arises out of a long-running, international conspiracy by the defendants named herein (collectively, "Defendants") and their co-conspirators which began no later than January 1, 2000, and continues to the present (the "Class Period"), to fix, raise, maintain, and/or stabilize air passenger travel, including associated surcharges, for international flights involving at least one flight segment between the United States and Asia/Oceania[1] in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

2.      As set forth in greater detail below, beginning no later than January 1, 2000, the Defendants and their unnamed co-conspirators began imposing air fare increases, including fuel surcharge increases, on international air passengers.  The timing and amount of Defendants' increases were the product of a collusive agreement to fix, raise, maintain, and stabilize the prices of base passenger fares and fuel surcharges on international flights.

3.      This complaint is based upon the investigation of counsel, information provided by a participant in the conspiracy, and information obtained through criminal and regulatory investigations in the United States and abroad, including guilty pleas.  Even though no discovery has taken place in this case, set forth below are the dates on which meetings took place to initiate and coordinate the conspiracy and the identities of those who participated in these meetings and communications.  These descriptions are substantiated by pertinent documents.

4.      This action has been proceeding during the pendency of various on-going enforcement actions taken by competition authorities around the world concerning anticompetitive conduct in the air passenger transportation industry.  The actions taken so far include, but are not limited to:

- ●      Korean Air Lines, Ltd.'s ("KAL") guilty plea in the United States for participating in a conspiracy with others to fix the prices of passenger travel, including certain fares and surcharges. "Plea Agreement," (Aug. 1, 2007) in *United States v. Korean Air Lines, Ltd.*, No.Cr. 07-184 JDB (D.D.C.).

---

[1]      Oceania is defined as Australia, New Zealand, and the Pacific Islands.  *See* http://www.airnewzealand.com/gateway.jsp.

● Asiana Airlines, Inc.'s ("Asiana") guilty plea in the United States for participating in a conspiracy with others to fix the prices of certain air passenger fares. "Plea Agreement" (April 9, 2009) in *United States v. Asiana Airlines, Inc*., Cr. No. 09-Cr-00009 JDB (D.D.C.)

● All Nippon Airways Company, Limited's ("ANA") guilty plea in the United States for participating in a conspiracy with others to fix the prices of certain air passenger fares and a conspiracy to fix the prices of air cargo shipments. "Plea Agreement," (November 2, 2010) in *United States v. Japan Airlines*, Cr. No. 10-CR-00295-JDB (D.D.C.).

● The grant of conditional immunity from the United States Department of Justice ("DOJ") to at least one of the Defendants in exchange for its agreement to cooperate with an investigation concerning price-fixing of passenger travel, including surcharges.

● Virgin Atlantic's receipt of leniency from the DOJ and British competition authorities after disclosing its participation in a conspiracy to fix the prices of long-haul international passenger travel, including surcharges.

● British Airways PLC's ("British Airways") guilty plea in the United States and admission to British competition authorities concerning its involvement in a conspiracy to fix the price of long-haul international air transportation, including surcharges. "Plea Agreement" (July 31, 2007) in *United States v. British Airways PLC*, No. Cr 07183 (D.D.C.)

## **JURISDICTION AND VENUE**

5.      This complaint is filed under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to obtain injunctive relief for violation of Section 1 of the Sherman Act (15 U.S.C. § 1). The Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

6.      Venue is proper in this District pursuant to Sections 4(a) and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22), and 28 U.S.C. § 1391(b), (c), and (d) because Defendants reside, transact business, are found within, and/or have agents within this District and a substantial part of the events giving rise to Plaintiffs' claims occurred and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

1    7.    This Court has personal jurisdiction over Defendants because, *inter alia,* each: (a)

2    transacted business in this District; (b) directly or indirectly sold and/or delivered passenger air

3    transportation in this District; (c) has substantial aggregate contacts with this District; and/or (d)

4    engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of

5    causing injury to, persons and entities residing in, located in, or doing business in this District.

6                              **PLAINTIFFS**

7    8.    Plaintiff Meor Adlin is a California resident.  During the Class Period, Plaintiff

8    purchased air transportation services in the United States from one of more of the Defendants

9    that included at least one flight segment between the United States and Asia/Oceania and has

10   suffered pecuniary injury as a result of the antitrust violation alleged herein.

11   9.    Plaintiff Franklin Ajaye is a California resident.  During the Class Period, Plaintiff

12   purchased air transportation services in the United States from one of more of the Defendants

13   that included at least one flight segment between the U.S. and Asia/Oceania and has suffered

14   pecuniary injury as a result of the antitrust violation alleged herein.

15   10.    Plaintiff Andrew Barton is a California resident.  During the Class Period,

16   Plaintiff purchased air transportation services in the United States from one of more of the

17   Defendants that included at least one flight segment between the U.S. and Asia/Oceania and has

18   suffered pecuniary injury as a result of the antitrust violation alleged herein.

19   11.    Plaintiff Larry Chen is a California resident.  During the Class Period, Plaintiff

20   purchased air transportation services in the United States from one of more of the Defendants

21   that included at least one flight segment between the U.S. and Asia/Oceania and has suffered

22   pecuniary injury as a result of the antitrust violation alleged herein.

23   12.    Plaintiff Rachel Diller is a California resident.  During the Class Period, Plaintiff

24   purchased air transportation services in the United States from one of more of the Defendants

25   that included at least one flight segment between the U.S. and Asia/Oceania and has suffered

26   pecuniary injury as a result of the antitrust violation alleged herein.

27

28

13.     Plaintiff Scott Frederick is a Washington resident.  During the Class Period, Plaintiff purchased air transportation services in the United States from one of more of the Defendants that included at least one flight segment between the U.S. and Asia/Oceania and has suffered pecuniary injury as a result of the antitrust violation alleged herein.

14.     Plaintiff David Kuo is a California resident.  During the Class Period, Plaintiff purchased air transportation services in the United States from one of more of the Defendants that included at least one flight segment between the U.S. and Asia/Oceania and has suffered pecuniary injury as a result of the antitrust violation alleged herein.

15.     Plaintiff Dickson Leung is a California resident.  During the Class Period, Plaintiff purchased air transportation services in the United States from one of more of the Defendants that included at least one flight segment between the U.S. and Asia/Oceania and has suffered pecuniary injury as a result of the antitrust violation alleged herein.

16.     Plaintiff Brendan Maloof is a New York resident.  During the Class Period, Plaintiff purchased air transportation services in the United States from one of more of the Defendants that included at least one flight segment between the U.S. and Asia/Oceania and has suffered pecuniary injury as a result of the antitrust violation alleged herein.

17.     Plaintiff David Murphy is a resident of Tokyo, Japan.  During the Class Period, Plaintiff purchased air transportation services in the United States from one of more of the Defendants that included at least one flight segment between the U.S. and Asia/Oceania and has suffered pecuniary injury as a result of the antitrust violation alleged herein.

18.     Plaintiff Titi Tran is a California resident.  During the Class Period, Plaintiff purchased air transportation services in the United States from one of more of the Defendants that included at least one flight segment between the U.S. and Asia/Oceania and has suffered pecuniary injury as a result of the antitrust violation alleged herein.

19.     Plaintiff Donald Wortman is a California resident.  During the Class Period, Plaintiff purchased air transportation services in the United States from one of more of the

1    Defendants that included at least one flight segment between the U.S. and Asia/Oceania and has

2    suffered pecuniary injury as a result of the antitrust violation alleged herein.

3    ## DEFENDANTS

4        20.     Defendant Air France is a French company with its principal place of business

5    located at 45, rue de Paris, Roissy CDG cedex , France F-95747.  Air France conducts passenger

6    air transportation throughout the world, including flights to and from the United States and this

7    District.  Defendant Air France participated in the conspiracy alleged herein by, among other

8    things, sharing commercially sensitive information through its code-sharing agreements with

9    competitors (*see* ¶¶45-56), participating directly or indirectly in industry meetings that have been

10   deemed by antitrust officials in the U.S., Europe, and Australia to be inherently anticompetitive

11   and not in the best interests of competitive airline markets (*see* ¶¶57-62, 76, 80-90), participating

12   in meetings hosted by regional trade associations in which anticompetitive conduct is encouraged

13   and/or tolerated (*see* ¶¶63-67), participating directly or indirectly in meetings with its

14   competitors at which coordinating increased base passenger fares were agreed upon (*see* ¶¶102-

15   170), participating directly or indirectly in meetings with competitors at which passenger fare

16   pricing was discussed and then benchmarking fares off of the prices agreed upon at those

17   meetings (*see* ¶¶74-96), participating directly or indirectly in meetings with competitors at which

18   collectively increasing fuel surcharges was agreed upon as a means of dealing with rising fuel

19   costs (*see* ¶¶175, 178, 194-224), raising fares and surcharges more than necessary to offset

20   increased fuel costs even though such actions are not consistent with economic theory (*see*

21   ¶¶226-233), instituting surcharges in close proximity to those of its competitors in sharp contrast

22   to conduct that occurred prior to the Class Period (*see* ¶¶181-193), and participating directly or

23   indirectly in anticompetitive meetings with other Defendants concerning the fixing of prices in

24   the closely related air-cargo market (*see* ¶¶234-282).  Industry analysts based in Asia/Oceania

25   acknowledge that anticompetitive conduct "overhangs" the airline passenger transportation

26   industry, particularly in light of lax antitrust enforcement in Asia (*see* ¶97).

27

28

21.     Defendant Air New Zealand Limited ("Air New Zealand") is a New Zealand company with its principal place of business located at Quay Tower, 29 Customs Street West, Auckland, 1020, New Zealand.  Air New Zealand conducts passenger air transportation throughout the world, including flights to and from the United States and this District. Defendant Air New Zealand participated in the conspiracy alleged herein by, among other things, sharing commercially sensitive information through its code-sharing agreements with competitors (*see* ¶¶45-56), participating directly or indirectly in industry meetings that have been deemed by antitrust officials in the U.S., Europe, and Australia to be inherently anticompetitive and not in the best interests of competitive airline markets (*see* ¶¶57-62, 76, 80-90), participating in meetings hosted by regional trade associations in which anticompetitive conduct is encouraged and/or tolerated (*see* ¶¶63-67), participating directly or indirectly in meetings with its competitors at which coordinating increased base passenger fares were agreed upon (*see* ¶¶102-170), participating directly or indirectly in meetings with competitors at which passenger fare pricing was discussed and then benchmarking fares off of the prices agreed upon at those meetings (*see* ¶¶74-96), participating directly or indirectly in meetings with competitors at which collectively increasing fuel surcharges was agreed upon as a means of dealing with rising fuel costs (*see* ¶¶175, 178, 194-224), raising fares and surcharges more than necessary to offset increased fuel costs even though such actions are not consistent with economic theory (*see* ¶¶226-233), instituting surcharges in close proximity to those of its competitors in sharp contrast to conduct that occurred prior to the Class Period (*see* ¶¶181-193), and participating directly or indirectly in anticompetitive meetings with other Defendants concerning the fixing of prices in the closely related air-cargo market (*see* ¶¶234-282).  Industry analysts based in Asia/Oceania acknowledge that anticompetitive conduct "overhangs" the airline passenger transportation industry, particularly in light of lax antitrust enforcement in Asia (*see* ¶97).

22.     Defendant All Nippon Airways Company, Limited ("ANA") is a Japanese company with its principal place of business located at Shidome-City Center, 1-5-2, Higashi-Shimbashi Minato-ku, Tokyo 105-7133, Japan.  ANA conducts passenger air transportation

1   throughout the world, including flights to and from the United States and this District.

2   Defendant ANA participated in the conspiracy alleged herein by, among other things, sharing

3   commercially sensitive information through its code-sharing agreements with competitors (*see*

4   ¶¶45-56), participating directly or indirectly in industry meetings that have been deemed by

5   antitrust officials in the U.S., Europe, and Australia to be inherently anticompetitive and not in

6   the best interests of competitive airline markets (*see* ¶¶57-62, 76, 80-90), participating in

7   meetings hosted by regional trade associations in which anticompetitive conduct is encouraged

8   and/or tolerated (*see* ¶¶63-67), participating directly or indirectly in meetings with its

9   competitors at which coordinating increased base passenger fares were agreed upon (*see* ¶¶102-

10  170), participating directly or indirectly in meetings with competitors at which passenger fare

11  pricing was discussed and then benchmarking fares off of the prices agreed upon at those

12  meetings (*see* ¶¶74-96), participating directly or indirectly in meetings with competitors at which

13  collectively increasing fuel surcharges was agreed upon as a means of dealing with rising fuel

14  costs (*see* ¶¶175, 178, 194-224), raising fares and surcharges more than necessary to offset

15  increased fuel costs even though such actions are not consistent with economic theory (*see*

16  ¶¶226-233), instituting surcharges in close proximity to those of its competitors in sharp contrast

17  to conduct that occurred prior to the Class Period (*see* ¶¶181-193), and participating directly or

18  indirectly in anticompetitive meetings with other Defendants concerning the fixing of prices in

19  the closely related air-cargo market (*see* ¶¶234-282).  Industry analysts based in Asia/Oceania

20  acknowledge that anticompetitive conduct "overhangs" the airline passenger transportation

21  industry, particularly in light of lax antitrust enforcement in Asia (*see* ¶97).

22      23.    Defendant Cathay Pacific Airways Limited ("Cathay Pacific") is a Hong Kong-

23  based company with its principal place of business located at 5/F, South Tower, Cathay Pacific

24  City, 8 Scenic Rd., Hong Kong International Airport, Lantau, Hong Kong.  Cathay Pacific

25  conducts passenger air transportation throughout the world, including flights to and from the

26  United States and this District.  Defendant Cathay Pacific participated in the conspiracy alleged

27  herein by, among other things, sharing commercially sensitive information through its code-

28

1   sharing agreements with competitors (*see* ¶¶45-56), participating directly or indirectly in

2   industry meetings that have been deemed by antitrust officials in the U.S., Europe, and Australia

3   to be inherently anticompetitive and not in the best interests of competitive airline markets (*see*

4   ¶¶57-62, 76, 80-90), participating in meetings hosted by regional trade associations in which

5   anticompetitive conduct is encouraged and/or tolerated (*see* ¶¶63-67), participating directly or

6   indirectly in meetings with its competitors at which coordinating increased base passenger fares

7   were agreed upon (*see* ¶¶102-170), participating directly or indirectly in meetings with

8   competitors at which passenger fare pricing was discussed and then benchmarking fares off of

9   the prices agreed upon at those meetings (*see* ¶¶74-96), participating directly or indirectly in

10  meetings with competitors at which collectively increasing fuel surcharges was agreed upon as a

11  means of dealing with rising fuel costs (*see* ¶¶175, 178, 194-224), raising fares and surcharges

12  more than necessary to offset increased fuel costs even though such actions are not consistent

13  with economic theory (*see* ¶¶226-233), instituting surcharges in close proximity to those of its

14  competitors in sharp contrast to conduct that occurred prior to the Class Period (*see* ¶¶181-193),

15  and participating directly or indirectly in anticompetitive meetings with other Defendants

16  concerning the fixing of prices in the closely related air-cargo market (*see* ¶¶234-282).  Industry

17  analysts based in Asia/Oceania acknowledge that anticompetitive conduct "overhangs" the

18  airline passenger transportation industry, particularly in light of lax antitrust enforcement in Asia

19  (*see* ¶97).

20          24.     Defendant China Airlines Limited ("China Airlines") is a Taiwanese company

21  with its principal place of business located at 131 Nanking East Rd., Section 3, Taipei, Taiwan.

22  China Airlines conducts passenger air transportation throughout the world, including flights to

23  and from the United States and this District.  Defendant China Airlines participated in the

24  conspiracy alleged herein by, among other things, sharing commercially sensitive information

25  through its code-sharing agreements with competitors (*see* ¶¶45-56), participating directly or

26  indirectly in industry meetings that have been deemed by antitrust officials in the U.S., Europe,

27  and Australia to be inherently anticompetitive and not in the best interests of competitive airline

28

markets (*see* ¶¶57-62, 76, 80-90), participating in meetings hosted by regional trade associations in which anticompetitive conduct is encouraged and/or tolerated (*see* ¶¶63-67), participating directly or indirectly in meetings with its competitors at which coordinating increased base passenger fares were agreed upon (*see* ¶¶102-170), participating directly or indirectly in meetings with competitors at which passenger fare pricing was discussed and then benchmarking fares off of the prices agreed upon at those meetings (*see* ¶¶74-96), participating directly or indirectly in meetings with competitors at which collectively increasing fuel surcharges was agreed upon as a means of dealing with rising fuel costs (*see* ¶¶175, 178, 194-224), raising fares and surcharges more than necessary to offset increased fuel costs even though such actions are not consistent with economic theory (*see* ¶¶226-233), instituting surcharges in close proximity to those of its competitors in sharp contrast to conduct that occurred prior to the Class Period (*see* ¶¶181-193), and participating directly or indirectly in anticompetitive meetings with other Defendants concerning the fixing of prices in the closely related air-cargo market (*see* ¶¶234-282). Industry analysts based in Asia/Oceania acknowledge that anticompetitive conduct "overhangs" the airline passenger transportation industry, particularly in light of lax antitrust enforcement in Asia (*see* ¶96).

25. Defendant Continental Airlines, Inc. ("Continental Airlines") is a United States corporation with its principal place of business located at 1600 Smith Street, Houston, Texas 77002. Continental Airlines conducts passenger air transportation throughout the world, including flights to and from the United States and this District. Defendant Continental Airlines participated in the conspiracy alleged herein by, among other things, sharing commercially sensitive information through its code-sharing agreements with competitors (*see* ¶¶45-56), participating directly or indirectly in industry meetings that have been deemed by antitrust officials in the U.S., Europe, and Australia to be inherently anticompetitive and not in the best interests of competitive airline markets (*see* ¶¶57-62, 76, 80-90), participating in meetings hosted by regional trade associations in which anticompetitive conduct is encouraged and/or tolerated (*see* ¶¶63-67), participating directly or indirectly in meetings with its competitors at which

1    coordinating increased base passenger fares were agreed upon (*see* ¶¶102-170), participating

2    directly or indirectly in meetings with competitors at which passenger fare pricing was discussed

3    and then benchmarking fares off of the prices agreed upon at those meetings (*see* ¶¶74-96),

4    participating directly or indirectly in meetings with competitors at which collectively increasing

5    fuel surcharges was agreed upon as a means of dealing with rising fuel costs (*see* ¶¶175, 178,

6    194-224), raising fares and surcharges more than necessary to offset increased fuel costs even

7    though such actions are not consistent with economic theory (*see* ¶¶226-233), instituting

8    surcharges in close proximity to those of its competitors in sharp contrast to conduct that

9    occurred prior to the Class Period (*see* ¶¶181-193), and participating directly or indirectly in

10   anticompetitive meetings with other Defendants concerning the fixing of prices in the closely

11   related air-cargo market (*see* ¶¶234-282).  Industry analysts based in Asia/Oceania acknowledge

12   that anticompetitive conduct "overhangs" the airline passenger transportation industry,

13   particularly in light of lax antitrust enforcement in Asia (*see* ¶96).

14          26.     Defendant EVA Airways Corporation ("EVA") is a Taiwanese company with its

15   principal place of business located at 117, Sec. 2, Chang-An E. Rd., Taipei, 104, Taiwan.  EVA

16   conducts passenger air transportation throughout the world, including flights to and from the

17   United States and this District.  Defendant EVA participated in the conspiracy alleged herein by,

18   among other things, sharing commercially sensitive information through its code-sharing

19   agreements with competitors (*see* ¶¶45-56), participating directly or indirectly in industry

20   meetings that have been deemed by antitrust officials in the U.S., Europe, and Australia to be

21   inherently anticompetitive and not in the best interests of competitive airline markets (*see* ¶¶57-

22   62, 76, 80-90), participating in meetings hosted by regional trade associations in which

23   anticompetitive conduct is encouraged and/or tolerated (*see* ¶¶63-67), participating directly or

24   indirectly in meetings with its competitors at which coordinating increased base passenger fares

25   were agreed upon (*see* ¶¶102-170), participating directly or indirectly in meetings with

26   competitors at which passenger fare pricing was discussed and then benchmarking fares off of

27   the prices agreed upon at those meetings (*see* ¶¶74-96), participating directly or indirectly in

28

1    meetings with competitors at which collectively increasing fuel surcharges was agreed upon as a

2    means of dealing with rising fuel costs (*see* ¶¶175, 178, 194-224), raising fares and surcharges

3    more than necessary to offset increased fuel costs even though such actions are not consistent

4    with economic theory (*see* ¶¶226-233), instituting surcharges in close proximity to those of its

5    competitors in sharp contrast to conduct that occurred prior to the Class Period (*see* ¶¶181-193),

6    and participating directly or indirectly in anticompetitive meetings with other Defendants

7    concerning the fixing of prices in the closely related air-cargo market (*see* ¶¶234-282).  Industry

8    analysts based in Asia/Oceania acknowledge that anticompetitive conduct "overhangs" the

9    airline passenger transportation industry, particularly in light of lax antitrust enforcement in Asia

10   (*see* ¶96).

11            27.      Defendant Japan Airlines International Company, Limited ("JAL") is a Japanese

12   company with its principal place of business located at 4-11 Higashi-shinagawa 2-chome,

13   Shinagawa-ku, Tokyo, 140-8605, Japan.  JAL conducts passenger air transportation throughout

14   the world, including flights to *and* from the United States and this District.  Defendant JAL

15   participated in the conspiracy alleged herein by, among other things, sharing commercially

16   sensitive information through its code-sharing agreements with competitors (*see* ¶¶45-56),

17   participating directly or indirectly in industry meetings that have been deemed by antitrust

18   officials in the U.S., Europe, and Australia to be inherently anticompetitive and not in the best

19   interests of competitive airline markets (*see* ¶¶57-62, 76, 80-90), participating in meetings hosted

20   by regional trade associations in which anticompetitive conduct is encouraged and/or tolerated

21   (*see* ¶¶63-67), participating directly or indirectly in meetings with its competitors at which

22   coordinating increased base passenger fares were agreed upon (*see* ¶¶102-170), participating

23   directly or indirectly in meetings with competitors at which passenger fare pricing was discussed

24   and then benchmarking fares off of the prices agreed upon at those meetings (*see* ¶¶74-96),

25   participating directly or indirectly in meetings with competitors at which collectively increasing

26   fuel surcharges was agreed upon as a means of dealing with rising fuel costs (*see* ¶¶175, 178,

27   194-224), raising fares and surcharges more than necessary to offset increased fuel costs even

28

1   though such actions are not consistent with economic theory (*see* ¶¶226-233), instituting

2   surcharges in close proximity to those of its competitors in sharp contrast to conduct that

3   occurred prior to the Class Period (*see* ¶¶181-193), and participating directly or indirectly in

4   anticompetitive meetings with other Defendants concerning the fixing of prices in the closely

5   related air-cargo market (*see* ¶¶234-282).  Industry analysts based in Asia/Oceania acknowledge

6   that anticompetitive conduct "overhangs" the airline passenger transportation industry,

7   particularly in light of lax antitrust enforcement in Asia (*see* ¶96).

8          28.     Defendant KLM Royal Dutch Airline ("KLM") is a Dutch company with its

9   principal place of business located at Amsterdamseweg 55, 11282 GP Amstelveen, The

10  Netherlands.  KLM conducts passenger air transportation throughout the world, including flights

11  to and from the United States and this District.  Defendant KLM participated in the conspiracy

12  alleged herein by, among other things, sharing commercially sensitive information through its

13  code-sharing agreements with competitors (*see* ¶¶45-56), participating directly or indirectly in

14  industry meetings that have been deemed by antitrust officials in the U.S., Europe, and Australia

15  to be inherently anticompetitive and not in the best interests of competitive airline markets (*see*

16  ¶¶57-62, 76, 80-90), participating in meetings hosted by regional trade associations in which

17  anticompetitive conduct is encouraged and/or tolerated (*see* ¶¶63-67), participating directly or

18  indirectly in meetings with its competitors at which coordinating increased base passenger fares

19  were agreed upon (*see* ¶¶102-170), participating directly or indirectly in meetings with

20  competitors at which passenger fare pricing was discussed and then benchmarking fares off of

21  the prices agreed upon at those meetings (*see* ¶¶74-96), participating directly or indirectly in

22  meetings with competitors at which collectively increasing fuel surcharges was agreed upon as a

23  means of dealing with rising fuel costs (*see* ¶¶175, 178, 194-224), raising fares and surcharges

24  more than necessary to offset increased fuel costs even though such actions are not consistent

25  with economic theory (*see* ¶¶226-233), instituting surcharges in close proximity to those of its

26  competitors in sharp contrast to conduct that occurred prior to the Class Period (*see* ¶¶181-193),

27  and participating directly or indirectly in anticompetitive meetings with other Defendants

28

1   concerning the fixing of prices in the closely related air-cargo market (*see* ¶¶234-282).  Industry

2   analysts based in Asia/Oceania acknowledge that anticompetitive conduct "overhangs" the

3   airline passenger transportation industry, particularly in light of lax antitrust enforcement in Asia

4   (*see* ¶96).

5          29.     Defendant Malaysian Airline System Berhad ("Malaysian Airlines") is a

6   Malaysian company with its principal place of business located at Bangunan MAS, 33rd Fl.,

7   Jalan Sultan Ismail, 50250 Kuala Lumpur, Malaysia.  Malaysian Airlines conducts passenger air

8   transportation throughout the world, including flights to and from the United States and this

9   District.  Defendant Malaysian Airlines participated in the conspiracy alleged herein by, among

10  other things, sharing commercially sensitive information through its code-sharing agreements

11  with competitors (*see* ¶¶45-56), participating directly or indirectly in industry meetings that have

12  been deemed by antitrust officials in the U.S., Europe, and Australia to be inherently

13  anticompetitive and not in the best interests of competitive airline markets (*see* ¶¶57-62, 76, 80-

14  90), participating in meetings hosted by regional trade associations in which anticompetitive

15  conduct is encouraged and/or tolerated (*see* ¶¶63-67), participating directly or indirectly in

16  meetings with its competitors at which coordinating increased base passenger fares were agreed

17  upon (*see* ¶¶102-170), participating directly or indirectly in meetings with competitors at which

18  passenger fare pricing was discussed and then benchmarking fares off of the prices agreed upon

19  at those meetings (*see* ¶¶74-96), participating directly or indirectly in meetings with competitors

20  at which collectively increasing fuel surcharges was agreed upon as a means of dealing with

21  rising fuel costs (*see* ¶¶175, 178, 194-224), raising fares and surcharges more than necessary to

22  offset increased fuel costs even though such actions are not consistent with economic theory (*see*

23  ¶¶226-233), instituting surcharges in close proximity to those of its competitors in sharp contrast

24  to conduct that occurred prior to the Class Period (*see* ¶¶181-193), and participating directly or

25  indirectly in anticompetitive meetings with other Defendants concerning the fixing of prices in

26  the closely related air-cargo market (*see* ¶¶234-282).  Industry analysts based in Asia/Oceania

27

28

1   acknowledge that anticompetitive conduct "overhangs" the airline passenger transportation

2   industry, particularly in light of lax antitrust enforcement in Asia (*see* ¶96).

3          30.      Defendant Philippine Airlines, Inc. ("Philippine Airlines") is a Philippine

4   corporation with its principal place of business located at PNB Financial Center, Pres. Diosdado

5   Macapagal Avenue, CCP Complex, Passay City, Philippines.  Philippine Airlines conducts

6   passenger air transportation throughout the world, including flights to and from the United States

7   and this District.  Defendant Philippine Airlines participated in the conspiracy alleged herein by,

8   among other things, sharing commercially sensitive information through its code-sharing

9   agreements with competitors (*see* ¶¶45-56), participating directly or indirectly in industry

10  meetings that have been deemed by antitrust officials in the U.S., Europe, and Australia to be

11  inherently anticompetitive and not in the best interests of competitive airline markets (*see* ¶¶57-

12  62, 76, 80-90), participating in meetings hosted by regional trade associations in which

13  anticompetitive conduct is encouraged and/or tolerated (*see* ¶¶63-67), participating directly or

14  indirectly in meetings with its competitors at which coordinating increased base passenger fares

15  were agreed upon (*see* ¶¶102-170), participating directly or indirectly in meetings with

16  competitors at which passenger fare pricing was discussed and then benchmarking fares off of

17  the prices agreed upon at those meetings (*see* ¶¶74-96), participating directly or indirectly in

18  meetings with competitors at which collectively increasing fuel surcharges was agreed upon as a

19  means of dealing with rising fuel costs (*see* ¶¶175, 178, 194-224), raising fares and surcharges

20  more than necessary to offset increased fuel costs even though such actions are not consistent

21  with economic theory (*see* ¶¶226-233), instituting surcharges in close proximity to those of its

22  competitors in sharp contrast to conduct that occurred prior to the Class Period (*see* ¶¶181-193),

23  and participating directly or indirectly in anticompetitive meetings with other Defendants

24  concerning the fixing of prices in the closely related air-cargo market (*see* ¶¶234-282).  Industry

25  analysts based in Asia/Oceania acknowledge that anticompetitive conduct "overhangs" the

26  airline passenger transportation industry, particularly in light of lax antitrust enforcement in Asia

27  (*see* ¶96).

28

1      31.    Defendant Qantas Airways Limited ("Qantas") is an Australian corporation with

2 its principal place of business located at Qantas Centre, 203 Coward Street, Mascot New South

3 Wales 2020.  Qantas conducts passenger air transportation throughout the world, including

4 flights to and from the United States and this District.  Defendant Qantas participated in the

5 conspiracy alleged herein by, among other things, sharing commercially sensitive information

6 through its code-sharing agreements with competitors (*see* ¶¶45-56), participating directly or

7 indirectly in industry meetings that have been deemed by antitrust officials in the U.S., Europe,

8 and Australia to be inherently anticompetitive and not in the best interests of competitive airline

9 markets (*see* ¶¶57-62, 76, 80-90), participating in meetings hosted by regional trade associations

10 in which anticompetitive conduct is encouraged and/or tolerated (*see* ¶¶63-67), participating

11 directly or indirectly in meetings with its competitors at which coordinating increased base

12 passenger fares were agreed upon (*see* ¶¶102-170), participating directly or indirectly in

13 meetings with competitors at which passenger fare pricing was discussed and then benchmarking

14 fares off of the prices agreed upon at those meetings (*see* ¶¶74-96), participating directly or

15 indirectly in meetings with competitors at which collectively increasing fuel surcharges was

16 agreed upon as a means of dealing with rising fuel costs (*see* ¶¶175, 178, 194-224), raising fares

17 and surcharges more than necessary to offset increased fuel costs even though such actions are

18 not consistent with economic theory (*see* ¶¶226-233), instituting surcharges in close proximity to

19 those of its competitors in sharp contrast to conduct that occurred prior to the Class Period (*see*

20 ¶¶181-193), and participating directly or indirectly in anticompetitive meetings with other

21 Defendants concerning the fixing of prices in the closely related air-cargo market (*see* ¶¶234-

22 282).  Industry analysts based in Asia/Oceania acknowledge that anticompetitive conduct

23 "overhangs" the airline passenger transportation industry, particularly in light of lax antitrust

24 enforcement in Asia (*see* ¶96).

25      32.    Defendant SAS AB ("SAS") is a company based in Scandinavia with its principal

26 place of business located at Frösundaviks Allé 1, Solna, SE-195 87, Stockholm, Sweden.  SAS

27 conducts passenger air transportation throughout the world, including flights to and from the

28

1   United States and this District.  Defendant SAS Airlines participated in the conspiracy alleged

2   herein by, among other things, sharing commercially sensitive information through its code-

3   sharing agreements with competitors (*see* ¶¶45-56), participating directly or indirectly in

4   industry meetings that have been deemed by antitrust officials in the U.S., Europe, and Australia

5   to be inherently anticompetitive and not in the best interests of competitive airline markets (*see*

6   ¶¶57-62, 76, 80-90), participating in meetings hosted by regional trade associations in which

7   anticompetitive conduct is encouraged and/or tolerated (*see* ¶¶63-67), participating directly or

8   indirectly in meetings with its competitors at which coordinating increased base passenger fares

9   were agreed upon (*see* ¶¶102-170), participating directly or indirectly in meetings with

10  competitors at which passenger fare pricing was discussed and then benchmarking fares off of

11  the prices agreed upon at those meetings (*see* ¶¶74-96), participating directly or indirectly in

12  meetings with competitors at which collectively increasing fuel surcharges was agreed upon as a

13  means of dealing with rising fuel costs (*see* ¶¶175, 178, 194-224), raising fares and surcharges

14  more than necessary to offset increased fuel costs even though such actions are not consistent

15  with economic theory (*see* ¶¶226-233), instituting surcharges in close proximity to those of its

16  competitors in sharp contrast to conduct that occurred prior to the Class Period (*see* ¶¶181-193),

17  and participating directly or indirectly in anticompetitive meetings with other Defendants

18  concerning the fixing of prices in the closely related air-cargo market (*see* ¶¶234-282).  Industry

19  analysts based in Asia/Oceania acknowledge that anticompetitive conduct "overhangs" the

20  airline passenger transportation industry, particularly in light of lax antitrust enforcement in Asia

21  (*see* ¶96).

22          33.     Defendant Singapore Airlines Limited ("Singapore Airlines") is a Singaporean

23  company with its principal place of business located at Airline House, 25 Airline Rd., 819829

24  Singapore.  Singapore Airlines conducts passenger air transportation throughout the world,

25  including flights to and from the United States and this District.  Defendant Singapore Airlines

26  participated in the conspiracy alleged herein by, among other things, sharing commercially

27  sensitive information through its code-sharing agreements with competitors (*see* ¶¶45-56),

28

1  participating directly or indirectly in industry meetings that have been deemed by antitrust

2  officials in the U.S., Europe, and Australia to be inherently anticompetitive and not in the best

3  interests of competitive airline markets (*see* ¶¶57-62, 76, 80-90), participating in meetings hosted

4  by regional trade associations in which anticompetitive conduct is encouraged and/or tolerated

5  (*see* ¶¶63-67), participating directly or indirectly in meetings with its competitors at which

6  coordinating increased base passenger fares were agreed upon (*see* ¶¶102-170), participating

7  directly or indirectly in meetings with competitors at which passenger fare pricing was discussed

8  and then benchmarking fares off of the prices agreed upon at those meetings (*see* ¶¶74-96),

9  participating directly or indirectly in meetings with competitors at which collectively increasing

10 fuel surcharges was agreed upon as a means of dealing with rising fuel costs (*see* ¶¶175, 178,

11 194-224), raising fares and surcharges more than necessary to offset increased fuel costs even

12 though such actions are not consistent with economic theory (*see* ¶¶226-233), instituting

13 surcharges in close proximity to those of its competitors in sharp contrast to conduct that

14 occurred prior to the Class Period (*see* ¶¶181-193), and participating directly or indirectly in

15 anticompetitive meetings with other Defendants concerning the fixing of prices in the closely

16 related air-cargo market (*see* ¶¶234-282).  Industry analysts based in Asia/Oceania acknowledge

17 that anticompetitive conduct "overhangs" the airline passenger transportation industry,

18 particularly in light of lax antitrust enforcement in Asia (*see* ¶96).

19         34.     Defendant Thai Airways International Public Co., Ltd. ("Thai Airways") is a Thai

20 company with its principal place of business located at 89 Vibhavadi-Rangsit Rd., Bangkok,

21 10900, Thailand.  Thai Airways conducts passenger air transportation throughout the world,

22 including flights to and from the United States and this District.  Defendant Thai Airways

23 participated in the conspiracy alleged herein by, among other things, sharing commercially

24 sensitive information through its code-sharing agreements with competitors (*see* ¶¶45-56),

25 participating directly or indirectly in industry meetings that have been deemed by antitrust

26 officials in the U.S., Europe, and Australia to be inherently anticompetitive and not in the best

27 interests of competitive airline markets (*see* ¶¶57-62, 76, 80-90), participating in meetings hosted

28

1  by regional trade associations in which anticompetitive conduct is encouraged and/or tolerated

2  (*see* ¶¶63-67), participating directly or indirectly in meetings with its competitors at which

3  coordinating increased base passenger fares were agreed upon (*see* ¶¶102-170), participating

4  directly or indirectly in meetings with competitors at which passenger fare pricing was discussed

5  and then benchmarking fares off of the prices agreed upon at those meetings (*see* ¶¶74-96),

6  participating directly or indirectly in meetings with competitors at which collectively increasing

7  fuel surcharges was agreed upon as a means of dealing with rising fuel costs (*see* ¶¶175, 178,

8  194-224), raising fares and surcharges more than necessary to offset increased fuel costs even

9  though such actions are not consistent with economic theory (*see* ¶¶226-233), instituting

10  surcharges in close proximity to those of its competitors in sharp contrast to conduct that

11  occurred prior to the Class Period (*see* ¶¶181-193), and participating directly or indirectly in

12  anticompetitive meetings with other Defendants concerning the fixing of prices in the closely

13  related air-cargo market (*see* ¶¶234-282).  Industry analysts based in Asia/Oceania acknowledge

14  that anticompetitive conduct "overhangs" the airline passenger transportation industry,

15  particularly in light of lax antitrust enforcement in Asia (*see* ¶96).

16       35.     Defendant Vietnam Airlines ("Vietnam Airlines") is a Vietnamese corporation

17  with its principal place of business located at 200 Nguyen Son Str., Long Bien District, Hanoi

18  City, Vietnam.  Vietnam Airlines conducts passenger air transportation throughout the world,

19  including flights to and from the United States and this District.  Defendant Vietnam Airlines

20  participated in the conspiracy alleged herein by, among other things, sharing commercially

21  sensitive information through its code-sharing agreements with competitors (*see* ¶¶45-56),

22  participating directly or indirectly in industry meetings that have been deemed by antitrust

23  officials in the U.S., Europe, and Australia to be inherently anticompetitive and not in the best

24  interests of competitive airline markets (*see* ¶¶57-62, 76, 80-90), participating in meetings hosted

25  by regional trade associations in which anticompetitive conduct is encouraged and/or tolerated

26  (*see* ¶¶63-67), participating directly or indirectly in meetings with its competitors at which

27  coordinating increased base passenger fares were agreed upon (*see* ¶¶102-170), participating

28

directly or indirectly in meetings with competitors at which passenger fare pricing was discussed

and then benchmarking fares off of the prices agreed upon at those meetings (*see* ¶¶74-96),

participating directly or indirectly in meetings with competitors at which collectively increasing

fuel surcharges was agreed upon as a means of dealing with rising fuel costs (*see* ¶¶175, 178,

194-224), raising fares and surcharges more than necessary to offset increased fuel costs even

though such actions are not consistent with economic theory (*see* ¶¶226-233), instituting

surcharges in close proximity to those of its competitors in sharp contrast to conduct that

occurred prior to the Class Period (*see* ¶¶181-193), and participating directly or indirectly in

anticompetitive meetings with other Defendants concerning the fixing of prices in the closely

related air-cargo market (*see* ¶¶234-282).  Industry analysts based in Asia/Oceania acknowledge

that anticompetitive conduct "overhangs" the airline passenger transportation industry,

particularly in light of lax antitrust enforcement in Asia (*see* ¶96).

# AGENTS

36.     The acts alleged to have been done by Defendants were authorized, ordered, or

performed by their directors, officers, managers, agents, employees, or representatives while

actively engaged in the management of Defendants' affairs.

# NON-DEFENDANT, NAMED CO-CONSPIRATORS

37.     On information and belief, at all relevant times, other airlines, entities, and/or

persons, including, but not limited to, Northwest Airlines Corporation ("Northwest"), United

Airlines, Inc. ("UAL"), British Airways, American Airlines, Inc. ("American Airlines"), Delta

Airlines, Inc. ("Delta"), Deutsche Lufthansa Airlines AG, KAL, Asiana, Virgin Atlantic Airways

Ltd. ("Virgin Atlantic"),  Swiss International Airlines AG and International Air Transport

Association ("IATA") willingly conspired with Defendants in their unlawful restraint of trade.

All averments of wrongdoing alleged herein against Defendants are also alleged against these

non-defendant co-conspirators.

## UNNAMED CO-CONSPIRATORS

38. On information and belief, at all relevant times, other airlines, entities, and/or persons willingly conspired with Defendants and the non-defendant, named co-conspirators in their unlawful restraint of trade. All averments of wrongdoing alleged herein against Defendants and the non-defendant co-conspirators are also alleged against these unnamed co-conspirators as though set forth at length.

## INTERSTATE TRADE AND COMMERCE

39. Throughout the Class Period, there was a continuous and uninterrupted flow of invoices for payment, payments, and other documents essential to the provision of passenger air transportation transmitted in interstate and foreign trade and commerce between and among offices of Defendants and their customers located throughout the world, including throughout the United States.

40. Throughout the Class Period, Defendants transported substantial numbers of passengers, in a continuous and uninterrupted flow of interstate and foreign trade and commerce, between various airports in the United States and foreign airports.

41. Throughout the Class Period, Defendants' unlawful activities, as described herein, took place within and substantially affected the flow of interstate and foreign trade and commerce and had a direct, substantial and reasonably foreseeable effect upon commerce in the United States and elsewhere.

## THE FOREIGN TRADE AND ANTITRUST IMPROVEMENT ACT IS INAPPLICABLE

42. The Foreign Trade and Antitrust Improvement Act ("FTAIA") (15 U.S.C. §6(a)) does not shield defendants' conduct here from liability under the Sherman and Clayton Acts.

43. Defendants are engaged in the business of delivering air passengers from place to place, including delivery of air passengers from points in the United States to points in Asia/Oceania and vice versa. Plaintiffs' claims are for the increased cost of air transportation which they suffered as a result of Defendants' actions for transportation purchased in the United

States.  Air transportation from airports in Asia/Oceania to the United States which is paid for in the United States is not subject to the FTAIA.

# FACTUAL ALLEGATIONS

**A.      Aspects Of The Airline Industry That Facilitate The Alleged Conspiracy**

44.      Most of the Defendants are the dominant international airlines based in Asia and Oceania, and provide passenger air transportation services on international routes between the United States and Asia/Oceania.

**1.      The Airline Industry's Use Of Airline Alliances**

45.      In recent years, the Defendants have established highly integrated alliances that substantially deviate from the norm in most competitive industries.

46.      The European Competition Authorities ("ECA") recently prepared a working paper entitled "Code-sharing agreements in scheduled passenger air transport—The European Competition Authorities' perspective."  The ECA explained the nature and purpose of code-sharing agreements between airlines:

> A code-sharing agreement is an agreement between two or more air carriers whereby the carrier operating a given flight allows one or more other carriers to market this flight and issue tickets for it as if they were operating the flight themselves.  In practice, these other carriers add their own carrier designator code and flight number onto that of the operating carrier.  Code share partners also agree on how they compensate each other for the seats they sell on one another's flights.

> Code-sharing agreements between airlines may go beyond a mere sharing of the designator codes and may be supplemented by other elements of cooperation: *e.g.* coordination of the frequent flyer programmes, route and schedule planning, coordination of marketing, sales and distribution networks, joint pricing, sharing of facilities and services at airports, integration and development of information systems etc.

47.      These code-sharing agreements blur the line between partner and competitor. Indeed, the ECA continued:

> [A] code-sharing agreement between two previously competing airlines may significantly dampen competition on the routes covered by the agreement which may lead to price increases.

1
2
3

**Given the multi-market nature of the airline industry, where airlines compete on various routes, the exchange of commercially sensitive information that might take place in a code-sharing agreement could favour tacit collusion between the code-share partners also with respect to routes not covered by the agreement.** (Emphases added).

4   48.   Defendants Air New Zealand, ANA, SAS, Singapore Airlines, and Thai Airways,

5   among others, including non-defendant co-conspirators Asiana, UAL, and Lufthansa , operate

6   jointly through the Star Alliance, and have established agreements in which they code share seats

7   on each other's flights and share in the revenue generated.

8   49.   Another major industry alliance, Oneworld, includes Defendants JAL, Cathay

9   Pacific, Qantas, and others, as well as non-defendant co-conspirator British Airways.  These

10   Defendants have established agreements in which they code share seats on each other's flights

11   and share in the revenue generated.  Moreover, during the Class Period, members of Oneworld

12   pressured at least one of the Defendants to combine separate APEX fares into a single APEX

13   (Advanced Purchase Excursion) fare.  (APEX fares are discussed below in greater detail.)

14   50.   The third major alliance is SkyTeam.  Its members include KAL, Air France,

15   KLM, Continental, and others.  These Defendants and non-defendant co-conspirators have

16   established agreements in which they code share seats on each other's flights and share in the

17   revenue generated.

18   51.   In addition, many of the Defendants and non-defendant co-conspirators are

19   participants in a multitude of independent code-sharing arrangements outside of their primary

20   alliances, including, but not limited to, the following agreements:  Air New Zealand and JAL;

21   Air New Zealand and Qantas (never implemented because the Australian Competition &

22   Consumer Commission ("ACCC") determined that the agreement was anticompetitive); Cathay

23   Pacific and Malaysian Airlines; EVA and ANA; EVA and Qantas; Malaysian Airlines and ANA;

24   Malaysian Airlines and Singapore Airlines; Malaysian Airlines and Thai Airways; Asiana and

25   Qantas; Thai Airways and China Airlines; Vietnam Airlines and JAL; Vietnam Airlines and

26   China Airlines; Vietnam Airlines and Cathay Pacific; Vietnam Airlines and Qantas; Vietnam

27   Airlines and Philippine Airlines; Philippine Airlines and Cathay Pacific; Philippine Airlines and

28

1  Malaysian Airlines; Lufthansa and Swiss International; Swiss International and Singapore

2  Airlines; Swiss International and Thai Airways; Swiss International and UAL; Air France and

3  Qantas; Air France and JAL; KLM and JAL; KLM and Malaysian Airlines; KLM and

4  Northwest; KLM and Qantas; Continental Airlines and EVA; Northwest and Air France;

5  Northwest and Continental; Northwest and KLM; and Northwest and Delta.

6      52.    According to testimony by the DOJ's Antitrust Division before the Senate

7  Committee on Commerce, Science and Transportation:

> [A]irline marketing alliances . . . are essentially joint ventures between airlines.  These alliances fall somewhere between an outright merger and a traditional arm's-length interline agreement.  Marketing alliances come in all shapes and sizes . . . Alliances involving code-sharing are in many respects the most controversial . . . .  Code sharing agreements also have the potential to be anticompetitive.  They can result in market allocation, capacity limitations, higher fares, or foreclosure of rivals from markets, all to the injury of consumers . . . the greatest threat to competition comes when two of very few airlines that compete in a market enter into a code-sharing agreement in that market.

15     53.    Antitrust regulators have just begun to step up their oversight of these far reaching

16  alliances.  For example, the Directorate General (Competition) for the European Commission has

17  opened a "priority" investigation into the competitive effects of certain agreements between

18  airlines on trans-Atlantic routes.  On or about April 20, 2009, *Bloomberg News* reported that

19  "Jonathan Todd, a commission spokesman, told reporters that the commission doesn't open

20  probes on a 'routine basis.'"  "Based on what commission has seen so far, 'we think that there

21  may be breaches of the antitrust rules because of the very extensive levels of cooperation on

22  trans-Atlantic routes between these airlines,' Todd said."

23     54.    On July 1, 2009, Neelie Kroes, the European Commission's Competition

24  Commissioner, raised "serious concerns" about the proposed merger of Lufthansa and Austrian

25  Airlines.

26     55.    In addition, on June 26, 2009, the DOJ announced that it was opposed to a

27  proposal by the Star Alliance to add Continental as a member.  The DOJ determined that the

28

1   sweeping request was anticompetitive and asked the United States Department of Transportation

2   ("DOT") to reconsider its tentative approval of the agreement.

3       56.     The Defendants' extensive use of code-sharing agreements exposes them to each

4   others' commercially sensitive information and therefore reduces strategic uncertainty for each

5   of them within the marketplace.

6       **2.    The Industry's Use Of Trade Associations**

7       57.     The Defendants' alliance and code-sharing arrangements are not the only

8   opportunities for close interaction between the Defendants.  Defendants' personnel also

9   participate in various trade associations with each other, including the following trade

10  associations relevant to this litigation: the IATA, the Association of Asia-Pacific Airlines

11  ("AAPA"), and the Bureau of Airline Representatives ("BARs") for Hong Kong, Thailand,

12  Philippines, and Malaysia, among other countries.

13      58.     Each Defendant is a member of IATA.  IATA is an international trade body

14  representing over 230 airlines.

15      59.     IATA has served as a forum for its members to discuss rising fuel costs and the

16  need for measures to mitigate such costs, such as increasing fares or levying fuel surcharges.  In

17  fact, as detailed below, IATA has specific committees, such as the IATA Tariff Coordination

18  Conferences, whose express purpose is to collectively set air passenger fares throughout the

19  world, including between the United States and Asia/Oceania.  These Tariff Coordination

20  Conferences have been condemned as anticompetitive.  For example, on November 9, 2006, the

21  ACCC noted that **"IATA Passenger Tariff Coordinating Conferences provide an**

22  **opportunity for the sharing of knowledge which given the roles of the airline**

23  **representatives attending, the clearly stated objectives of the conferences and the matters**

24  **being discussed would not be in the interests of competitive air passenger markets."**

25  (Emphases added).

26      60.     During the Class Period, one of IATA's express goals was **"[t]o assist the**

27  **industry to achieve adequate levels of profitability."**  (Emphases added).  That goal is

28

1   repeatedly driven home to IATA's members, including Defendants.  Giovanni Bisignani,

2   Director General and CEO of IATA, gave a speech in Paris on June 5, 2006 in which he urged

3   the industry to "manage capacity" in order to increase profitability:

> Let's start at home. Sometimes we have been our own worst
> enemy—chasing growth instead of profitability.  As discussed, we
> changed after 2001.  But let's be frank.  We are now benefiting
> from a strong global economy.  And record aircraft orders could be
> our Achilles heel if we stop managing capacity carefully.

7   61.   Bisignani made similar comments a year earlier, on May 30, 2005, in Tokyo,

8   when he urged IATA's members to limit seating capacity:  "We focused too much on market

9   share.  We did not effectively match capacity to demand."

10   62.   IATA's goal of assisting the industry achieve "adequate" levels of profitability is

11   not the type of mission statement one would normally expect an industry trade association to

12   adopt in order to enhance competition.  Indeed, Bisignani's comments are patently

13   anticompetitive—he is repeatedly exhorting individual market participants to refrain from

14   vigorous competition with each other in order to facilitate enhanced profitability for all.  And, it

15   is basic microeconomic theory that "managing" supply provides opportunities to increase and/or

16   stabilize prices.

17   63.   In addition to their general memberships in IATA, Singapore Airline's CEO,

18   Chew Choon Seng, and JAL's former President, Toshiyuki Shinmachi, served on IATA's Board

19   during the Class Period.  They are also actively involved in AAPA, as are other Defendants (Air

20   New Zealand, ANA, Cathay Pacific, China Airlines, EVA, KAL, Malaysian Airlines, Philippine

21   Airlines, Qantas, Thai Airways, and Vietnam Airlines).

22   64.   Like IATA, the AAPA has served as a forum for its members to discuss rising

23   fuel costs and the need for measures to mitigate such costs, such as increasing fares or levying

24   fuel surcharges.

25   65.   Like IATA, the AAPA has a long history of emphasizing collusion over

26   competition.  For example, at the AAPA's November 15, 2002, annual meeting, the chief

27   executive officer of Philippine Airlines, Lucio Tan, declared:  "The issues confronting our

28

industry today are critical and pressing." Tan cited security threats, declining traffic, high insurance premiums and rising fuel costs as among the major challenges facing the industry. "To effectively address these issues, we need our combined strategies," Tan explained. "We need to direct our efforts towards one goal—survival. **And in order to survive, competition must be replaced by cooperation.**" (Emphases added).

66.     In anticipation of AAPA's annual meeting, China Airlines similarly stated in November 2004 that:

> The 48th Assembly of Presidents will take place at the Grand Hyatt Taipei November 25 and 26.  Important airline industry issues, such as US regulatory policies, rising fuel costs, hedging strategies, insurance, war risks and low-cost carriers, will be reviewed and discussed.  **In the past, the Assembly has helped maintain a mutual understanding and a common purpose among airlines in the Asia Pacific region.** (Emphases added).

67.     In addition, the Defendants are participants in BAR organizations in Hong Kong, Thailand, the Philippines, and Malaysia.  Until very recently, Hong Kong did not have a competition law that prevented Defendants from tacitly or expressly reaching agreements on passenger fares, including surcharges.  Moreover, antitrust regulators in these and other Asian countries have not, until very recently, aggressively enforced their countries' respective competition rules.  These BAR organizations have served as forums for Defendants to discuss and agree on passenger fares and fuel surcharges.  Indeed, the Thailand BAR describes itself as a "forum for member airlines to deal with common interests and issues and represents the interests of member airlines to government, official organizations and other parties interested in the aviation industry in Thailand.  This includes maintaining close liaison on a regular basis with the International Air Transport Association (IATA), the IATA Billing and Settlement Plan (BSP), the Air Cargo Business Association (ACBA) and other industry bodies."  As of 2006, the Thailand BAR had 56 members and 4 associate members.  The Thailand BAR's executive committee included Thai Airways, Cathay Pacific, Singapore Airlines, Swiss International, SAS, Qantas, British Airways, Northwest, and Emirates.  An executive from Swiss International was appointed president of the Thailand BAR as of 2006.

68.     In November 2007, shortly after the first of these lawsuits was filed, BAR HK uploaded onto its website a new policy prohibiting anticompetitive conduct, which provides in relevant part as follows:

> Participants shall comply with the following general principles in respect of all their activities within BAR HK:
>
> Participants' competitive behaviour should remain independent. Participants' commercial decisions must be made unilaterally and independently from that of their competitors.  Participants will not engage in express or tacit agreements or understandings to reduce competition or any form of collusion.

69.     In summary, the highly integrated economic agreements between the Defendants and their various code-share and alliance partners, and the relationships fostered by Defendants' key employees at industry meetings concerning fares and surcharges reinforce and facilitate the conspiracy alleged below.

**B.      The Conspiracy**

70.     Beginning no later than January 1, 2000, the Defendants and their co-conspirators began increasing the price of passenger air transportation on international air passengers.  These price increases were done through previously agreed means, at previously agreed amounts, and through previously agreed timing.  The price increases were the product of a collusive agreement to fix, raise, maintain, and stabilize the prices of base passenger fares and fuel surcharges on international flights.

71.     Base fares for multi-segment travel—*e.g.* a flight from the United States to New Zealand to Western Samoa—are constructed using a methodology established by the Defendants that allows for ready determination of the portion of the total fare allocated to each segment of travel.

72.     The fuel surcharges referenced herein are applied "per segment" or "per coupon" —*i.e.*, they apply to a discreet and identifiable segment of travel.  Therefore, these fuel surcharges apply equally, for example, to any passenger traveling from San Francisco to Japan regardless of whether San Francisco was the point of origin for the trip, whether Japan was the

1   final destination, or whether the flight from San Francisco to Japan was only one segment of a

2   multi-segment trip.

3         73.    Neither the DOT nor United States law allows Defendants to participate in

4   coordinated efforts to set the price fares and surcharges for air transportation to and from the

5   United States, except with respect to the limited grants of immunity discussed herein.

6         **1.    Base Passenger Fares Are Set In An Anticompetitive Environment**

7              **a.    Immunized IATA Fares**

8         74.    IATA and its airline members have historically been the beneficiaries of limited

9   antitrust immunity from a number of worldwide competition authorities, including the DOT, the

10  ACCC, and the European Union.  These grants of immunity allowed IATA and its member

11  airlines to meet and agree on fares for interline (a.k.a. multi-airline) travel throughout the world.

12        75.    Immunized fares (hereinafter referred to as "IATA fares") are set during meetings

13  between member airlines at regularly scheduled IATA Tariff Coordination Conferences and are

14  issued in fare classes P and F (First Class), J and C (Business Class), and Y (Economy Class),

15  although not all fares in each of those service classes are immunized.  Moreover, the agreements

16  reached at IATA Tariff Conferences cannot be implemented until all governmental approvals,

17  including approval from the DOT, have been obtained.

18        76.    Most of the Defendants participate in these Tariff Coordination Conferences.  *See*

19  http://www.iata.org/whatwedo/passenger/tariffs/tcparticipants.htm.

20        77.    In a November 9, 2006, Determination by the ACCC concerning IATA's

21  Application for Revocation and Substitution of Authorization A90435 (the "ACCC

22  Determination"), the ACCC summarized the way in which IATA fares are established:

23                 The interaction of elements which constitute the IATA interline
                   system for the transport of passenger and cargo occurs as follows:

24

25                 A.    Airlines agree between each other that they will accept
                   each others' passenger tickets and cargo air waybills where

26                 those tickets and waybills incorporate an IATA
                   interlineable fare or rate (IATA Multilateral Interline
                   Agreements).

27

28

B.     IATA interline fares for passengers and rates for cargo are determined jointly by airlines at IATA Tariff Coordinating Conferences (Passenger Tariff Coordination and Cargo Tariff Coordination).

C.     Airlines agree how revenue from the sale of a passenger ticket with an IATA interlineable fare or a cargo air waybill with an IATA interlineable rate is to be apportioned between the carriers who accept the waybill as part of an interline journey (IATA Prorate System).

D.     Revenue from a waybill with an interline rate is nominally attributed to the primary carrier, the carrier undertaking the first leg of the journey, and then distributed amongst other participating carriers using proportions agreed with the Prorate System (IATA Clearing House).

78.     Not surprisingly, IATA fares are generally the most expensive fare available in each service class.

79.     In recent years, competition authorities in the United States, Europe, and Australia have moved to scale back the limited grant of antitrust immunity provided to IATA due to concerns about the inherently anticompetitive nature of the Tariff Coordination Conferences.

80.     In a July 5, 2006 "Order to Show Cause" concerning why IATA's antitrust immunity should not be revoked, the DOT examined a handful of minutes from the Tariff Coordination Conferences and noted that the conference structure has led to substantial anticompetitive abuse by member airlines, including abuse by several Defendants and their co-conspirators.

81.     For example, the DOT noted:

**A participating airline will at times urge competing airlines to raise fares in their markets in order to avoid undercutting the fares charged in the airline's own principal markets.** *See, . . .* IATA Application, Docket 2004-20051, Minutes of October 25-November 4, 2004, Conference at para. 147 (Japan Air Lines asked for higher fares in U.S.-Korean markets because the existing fares were undercutting U.S.-Japan fares).  (Emphases added).

82.     The DOT, in its "Order to Show Cause" concluded:

The chairman [at IATA Tariff Conferences] does not otherwise state that the discussions are subject to any antitrust or competition law restraints, except insofar as our alliance condition bars alliance members from participating in the discussions of fares and rates for alliance markets . . . . **The minutes thus show**

1
2

> **that the IATA members do not believe that their discussions are subject to the antitrust law prohibitions normally imposed on pricing discussions between competitors.**
>
> \* \* \*
>
> In these circumstances, we think the IATA by-laws reduce competition. This tentative finding is consistent with the established antitrust law principle that, with rare exceptions, discussions and agreements on pricing between competitors reduce competition. (Emphases added).

3
4
5

6     83.     Moreover, following each Tariff Coordination Conference, IATA publishes and

7   distributes the names, e-mail addresses, and telephone numbers of each of the participants.  This

8   practice facilitates communication between employees of the Defendants outside of the Tariff

9   Coordination Conferences.  It is neither necessary nor appropriate for the various attendees at the

10  Tariff Coordination Conferences—whose express duties are to collectively set fares—to be

11  communicating with each other outside of formal IATA channels.

12     84.     On June 3, 2005, the ACCC preliminarily concluded that "while there may not be

13  any explicit agreement on market fares between airline representatives at IATA Tariff

14  Coordination Conferences, it is likely given the roles of the representatives, the clearly stated

15  objectives of the conferences and the matters being discussed that the sharing of knowledge that

16  occurs could be conducive to coordinated conduct in relation to market fares and would not be in

17  the interests of competitive airline markets."

18     85.     On November 9, 2006, the ACCC announced that all immunity for IATA

19  activities will be phased out by June 30, 2008, noting again that **"[t]he ACCC believes that**

20  **IATA Passenger Tariff Coordinating Conferences provide an opportunity for the sharing**

21  **of knowledge which given the roles of the airline representatives attending, the clearly**

22  **stated objectives of the conferences and the matters being discussed would not be in the**

23  **interests of competitive air passenger markets."** (Emphases added).

24     86.     Similarly, on or about March 14, 2005, the Directorate General (Competition) of

25  the European Commission found that the IATA Tariff Conferences present a "major risk" for

26  anticompetitive conduct by the member airlines.  The Directorate General stated:

27
28

---

To conclude, the organisation of **IATA Tariff Conferences . . . provides an opportunity for competing undertakings to regularly communicate on commercially sensitive information, in particular pricing and sale conditions. Such regular communication helps to eliminate strategic uncertainty and thereby raises significantly the risk of collusion between airlines.** Airlines can agree on future conduct and generally coordinate tacitly or explicitly their behaviour. IATA Passenger Tariff Conferences therefore appear to present a major risk to restrict competition. (Emphases added).

87.     The Commission further noted:

By adopting similar terms and conditions [for non-immunized fares], IATA members develop similar tariff structures. This makes it easier for competing carriers to monitor each other's fares. Detection on deviation from agreed upon conduct is quicker. This reinforces the stability of possible collusive agreements between competing airlines, whether tacit or explicit. The standardisation of pricing rules is suspicious because it remains unclear how this benefits consumers.

88.     On October 3, 2006, the European Commission published (EC) Commission Regulation 1459/2006, which phased out antitrust immunity to IATA and its member airlines, including the elimination of immunity for Tariff Coordination Conferences concerning the routes between Europe and the United States and Australia on June 30, 2007 and between Europe and the rest of the world on October 31, 2007.

89.     On March 30, 2007, the DOT entered a final order disapproving IATA's Provisions for the Conduct of the IATA Traffic Coordination Conferences insofar as the agreement authorized United States and foreign carriers to discuss and agree upon fares, rates, conditions of service, and price and rate applicability conditions, either directly or indirectly or through tariff conferences or other related means of information sharing for passenger and cargo air services: (i) between the United States and the European Union (together with Iceland, Norway, Switzerland, and Liechtenstein); (ii) between the United States and the overseas territories of the member states of the European Union subject to an air services agreement between the United States and a member state; and (iii) between the United States and Australia

1   (the "Final Order").  *See* IATA Tariff Conference Case, Order 2007-3-23 (Docket OST-2006-

2   25307).

3       90.    The DOT explained that "[t]he tariff conferences are anticompetitive and do not

4   provide important public benefits or meet a serious transportation need.  **Pricing discussions**

5   **among competitors of the kind that take place at the IATA tariff conferences are inherently**

6   **anticompetitive and likely to increase the fares paid by consumers."** (Emphases added).

7           **b.      The Use Of Immunized IATA Fares As A Benchmark For Non-**
                       **Immunized Fares**
8

9       91.    The number of IATA fares sold by airlines is a small fraction of the number of

10  tickets issued to air passengers annually.  However, the effect of the anticompetitive conduct

11  observed in the immunized Tariff Coordination Conferences is not limited to the relatively small

12  market for immunized IATA fares—it also affects the vastly larger market for non-immunized

13  fares as well.

14      92.    For example, the ACCC recently conducted a fare analysis which suggests that

15  immunized IATA fares are used by the airline industry as benchmarks for the fare prices charged

16  for non-immunized air passenger service.

17      93.    The ACCC also noted "that the IATA Tariff Services Handbook, Issue 1 of 1 July

18  1999, specifically identifies as a benefit to airlines from attending IATA Tariff Coordinating

19  Conferences the gaining of 'access to market knowledge': 'Participation in Tariff Coordination

20  opens the door to sharing in the exchange of market and other types of information required to

21  intelligently price passenger and cargo tariffs.'"

22      94.    The DOT similarly noted in its March 30, 2007 Final Order that "an agreement by

23  airlines participating in a tariff conference that IATA fares should be increased by a certain

24  percentage amount can easily represent an industry agreement that equivalent fares for on-line

25  service [i.e., non-immunized fares] should be increased by a similar amount.  DG-Competition

26  and the ACCC showed that in fact this has happened."

27

28

95.     In connection with its analysis, the ACCC interviewed Qantas personnel, who confirmed the existence of a pricing relationship between IATA fares and Qantas' non-immunized fares.  Indeed, "Qantas indicated in its discussions with the ACCC that it would normally try to apply fare increases agreed at IATA Tariff Coordinating Conferences to Qantas' own published fares for premium classes on all routes on which it operates as the market allows."

96.     The ACCC has reported that many other airlines have acknowledged in submissions that IATA fares are used for benchmarking prices for non-immunized fares.  In a recent article, Peter Harbison from the Sydney-based Centre for Asia Pacific Aviation, a consulting organization, noted that fixing prices of passenger fares occurred "fairly openly" at one point in time, and that the culture still "overhangs" today.  Harbison went on to note that [t]here's a lot of interaction at management level between airlines."  Shukor Yusof, an aviation analyst with Standard and Poor's Equity Research, further commented that Asia, in particular, lacks an over-arching anti-trust legal framework.  Yusof was quoted as saying, "There's no one main body to oversee that kind of thing."  Jim Eckes of Indoswiss Aviation Consultancy in Hong Kong noted that talking about prices between competitors has more of a stigma in the United States, where the law is firm.

### c.     Lockstep Pricing Is Not To Be Expected In A Competitive Market

97.     The following chart shows the pricing for a small selection of non-immunized passenger air fares (and surcharges) as of November of 2007, as reported by www.flightstats.com.  There is an obvious pattern of identical or virtually identical pricing by the defendants' closest competitors on routes between the United States and Asia and Oceania:

**San Francisco to Auckland**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---|---|---|---|---|
| Air New Zealand | Coach | $918 | $255 | $1173 |
| Qantas | Coach | $918 | $255 | $1173 |

**San Francisco to Sydney**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---------|-------|-----------|------------|-------|
| Air New Zealand | Coach | $818 | $312 | $1130 |

**San Francisco to Bangkok**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---------|-------|-----------|------------|-------|
| ANA | Coach | $650 | $281 | $931 |
| JAL | Coach | $620 | $281 | $901 |

**San Francisco to Hong Kong**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---------|-------|-----------|------------|-------|
| ANA | Coach | $580 | $269 | $849 |
| JAL | Coach | $579 | $269 | $848 |

**San Francisco to Tokyo**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---------|-------|-----------|------------|-------|
| ANA | Coach | $529 | $270 | $799 |
| JAL | Coach | $529 | $270 | $799 |

98.    There are other instances of coordinated base fare pricing.  For example, the following charts demonstrate that Defendant ANA and Defendant Thai Airways closely coordinated base fares during portions of the Class Period.

/ / /

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20





21    99.    With respect to ANA's business fare pricing from Bangkok to Los Angeles, the

22  preceding chart identifies a substantial and historically unprecedented change in pricing behavior

23  that commenced in or about September 2004 and continued through the DOJ raids in February

24  2006.  This sharp change in pricing occurred during summer 2004, which is the same time period

25  during which the Defendants and their co-conspirators instituted and quickly raised fuel

26  surcharges.

27
28

100.    Defendants' cost structures are markedly different and vary based in part on the age of their aircraft fleet, their labor costs, and whether and to what extent they hedged input costs, including fuel costs.  Under these circumstances, economic theory suggests that competition would result in varying fare prices.  This is particularly true where, as here, fixed costs, including the acquisition, operation, and maintenance of aircraft, are high and the marginal cost of adding additional passengers to each flight is small.  Under such circumstances, one would expect to see airlines with cost advantages routinely undercutting their competitors' pricing in order to maximize seat occupancy on their planes.  During the Class Period, that has not occurred.

101.    The United States domestic market provides an illustrative example of how economic theory plays out in the real world.  Southwest Airlines—which is not a member of IATA, AAPA, and the various Asian BAR associations and is therefore not exposed to the collective rate-setting culture promoted by these organizations—is well-known to be a vigorous competitor in the domestic markets in which it operates.  Southwest Airlines is able to routinely beat—not simply match—the fares offered by its competition by, among other things, hedging fuel costs, minimizing the diversity of aircraft it operates, and paying close attention to its labor costs.  The difference in cost structure between Southwest and its competitors naturally leads to a variation in fare prices, something that is not seen on routes between the United States and Asia/Oceania—routes that are dominated by the majority of the Defendants.

### d.    Specific Examples Of Base Fare Coordination

102.    Plaintiffs have learned to date of a number of specific examples of collusion among Defendants on base air passenger fares. These are only illustrative; discovery in this case is likely to yield more evidence.

103.    ANA and JAL conspired with one another and with other Defendants to coordinate various non-IATA carrier fares between different city pairs.  ANA and JAL functioned as the primary airlines operating in Japan, and were consistently contacted by non-Japanese Defendant carriers regarding the coordination of carrier fares for all fare categories for

1   flights from Japan to the United States.  In hubs in which ANA and JAL were less prominent

2   players, ANA and JAL remained actively involved in the coordination of carrier fares, often

3   involving the primary Defendant or Defendants operating from any given hub.

4         104.    Airline carriers generally set passenger fares for different fare categories twice a

5   year.  The fare decisions were effective throughout the first and second half of each fiscal year.

6   Carrier fare communications that took place from December through February of a given year set

7   the fare price for the first half of that fiscal year.  Carrier fare communications that took place

8   from June through August of a given year set the fare price for the second half of that fiscal year.

9   Defendants coordinated at least the following fare categories for transpacific flights from Asia to

10  the United States: (a) an APEX (Advanced Purchase Excursion) fare, which is a discounted

11  economy class fare that requires an advanced purchase, and is set based on specific city-pair

12  destinations; (b) a ZONE PEX  (or Z-PEX) fare, which is a discounted economy class fare that

13  does not require an advanced purchase and does not involve specific city-pair destinations

14  (ZONE PEX fares are set based on zone, or regional, destinations as opposed to individual cities

15  (*i.e.,* Narita to a group of United States West Coast cities)); and (c) C-APEX fares, which is  a

16  special form of an APEX fare.

17        105.    From at least 2004 into the summer of 2006, ANA and JAL coordinated APEX,

18  ZONE PEX and C-APEX carrier fares on flights from Japan to the United States.  ANA and JAL

19  communicated approximately five or six fiscal half-years within the relevant time period.  ANA

20  and JAL communications regarding the coordination of carrier fares occurred in January and

21  February for carrier fares effective during the first half of the fiscal year, and June and July for

22  carrier fares effective during the second half of the fiscal year.  During that time, ANA and JAL

23  illegally set carrier fares for the six month period that followed.  ANA and JAL discussed and

24  agreed upon the level of the fares, fare rules, seasonal discounting, fare finalization and final fare

25  structures.

26        106.    The primary ANA employees who participated in these discussions were Akiko

27  Oyama, Atsushi Yabuki, and Keiji Omae (among others).  The primary JAL employees who

28

1   participated in these discussions regarding carrier fares were Misato Tanaka, Noboru Hirai,

2   Tomomi Kubota, Takeshi Aoki, Kenichiro Ochi, and Takashi Inagaki.  Although all individuals

3   listed above were not involved in the conspiracy at the same time, during their tenure as

4   employees of ANA and JAL's fare-setting groups, these ANA and JAL employees participated

5   in discussions regarding coordinated rates.

6        107.   Direct communications between ANA and JAL employees regarding seasonality

7   and the coordination of fare levels occurred by e-mail and telephone.

8        108.   In addition, ANA employees and JAL employees also exchanged fare charts and

9   then discussed those charts.

10       109.   Various ANA employees discussed carrier fare levels at least eight times with

11   Takashi Inagaki of JAL.  Similarly, various ANA employees, including Keiji Omae, also

12   discussed carrier fare coordination with Kenichiro Ochi of JAL.  Akiko Oyama and Atsushi

13   Yabuki, both from ANA, also discussed C-APEX carrier fare coordination with Tomomi Kubota

14   and Takashi Inagaki of JAL.

15       110.   Between December of 2005 and January of 2006, ANA employees, including

16   Akiko Oyama, participated in discussions with JAL employees Misato Tanaka, Takeshi Aoki

17   and Takashi Inagaki regarding the coordination of APEX, ZONE PEX and C-APEX fares for

18   flights from Japan, including Japan-U.S. flights for the first half of the 2006 fiscal year.  For

19   example, one e-mail dated December 27, 2005 mentions that JAL prepared APEX pricing that

20   matched ANA's pricing for the first half of the 2006 fiscal year and that the two companies

21   would get together to "talk this over."

22       111.   In July of 2006, ANA employees, including Atsushi Yabuki, participated in

23   communications with JAL employees, including Takeshi Aoki, regarding the coordination of

24   changes to each airline's APEX fare structure.  Prior to the proposed coordination, ANA and

25   JAL offered separate 14 day and 28 day APEX fares.  (The term "14 day and 28 day APEX fare"

26   is defined by the number of days a ticket is bought prior to a given flight).  JAL employees

27

28

1    contacted ANA employees, including Atsushi Yabuki, with a proposal for both ANA and JAL to

2    coordinate and combine their APEX fares into a single 21 day APEX fare.

3           112.    Indeed, a number of e-mails that were generated in late 2005 and early 2006

4    reflect ANA's agreements with JAL to coordinate certain fares.  One set of examples involved

5    ZONE PEX pricing.  These e-mails showed that ANA proposed that JAL raise such passenger

6    fares during 2006.  Subsequent e-mails reveal that an agreement "probably" could be reached.

7    This agreement was, in fact, reached.  ANA and JAL also exchanged proposals and counter

8    proposals via e-mail throughout the month of January regarding ZONE PEX pricing.

9           113.    Other passenger fares between the United States and Japan were also set through

10   coordinated agreements between ANA and JAL.  Non-immunized fares are benchmarked off of

11   the IATA "normal" rate.  Thus, for example, one of the fare classes discussed below (the non-

12   immunized "Business Saver" fare) was discounted by 25% off of the IATA fare for routes

13   between Tokyo and New York during 2005 (for weekday service).

14          114.    Beginning no later than January 1, 2000, ANA and JAL began to coordinate the

15   price of non-immunized passenger fares they offered for travel between the United States and

16   Japan, including, so-called "Yobiyose" economy-class fares, "Satogaeri" economy-class fares,

17   and "Business Saver" business class fares.  All three fare categories are discounted relative to the

18   IATA "normal" rate for seating in the respective class on transpacific flights.

19          115.    **Yobiyose Fares.**  From at least 2000 or early 2001 until their elimination in

20   October of 2005, ANA and JAL coordinated the setting and eventual elimination of Yobiyose

21   fares.  Yobiyose fares were discount fares for sale in the United States for roundtrip travel from

22   Japan to the United States.  They were established to allow Japanese nationals living in the

23   United States to bring their family members in Japan to visit them in the United States.

24   Yobiyose fares were set semi-annually for the periods between April 1 to September 30 and

25   October 1 through March 31.  When advance purchase published fares were introduced in Japan,

26   however, these Yobiyose fares became a problem for the companies because they were

27   undercutting the companies' published fares.  ANA and JAL began coordinating Yobiyose fares

28

1   to increase the Yobiyose fares to be more in line with the published fares and then eventually

2   agreed to eliminate Yobiyose fares altogether.

3         116.    The employees that either participated in or had knowledge of the Yobiyose fare

4   agreements between ANA and JAL include:  Yosaku Osumi, ANA's Deputy Director of

5   Marketing and Sales Planning; Aknobu Shibata and Yasushi Omori of JAL's Tokyo office;

6   Shinzo Amagai and his superior at JAL Americas Region El Segundo Headquarters, Fusako

7   Cahill, among others.

8         117.    Every half-year, beginning no later than later 2000 or early 2001, representatives

9   from the United States  head offices of ANA and JAL coordinated on Yobiyose fares for the next

10   six-month rate period.  In-person meetings were usually held at ANA's office in New York.

11   Often, during or before these meetings, ANA and JAL exchanged proposed fare sheets.

12         118.    For example, during a meeting at ANA's New York office on February 16, 2001,

13   ANA and JAL considered proposed coordinated Yobiyose fares for the upcoming six-month

14   period.

15         119.    On March 1, 2002, representatives of ANA and JAL met again at ANA's New

16   York office to discuss revising the Yobiyose rate structure and level.  They discussed whether to

17   introduce a lower price for 14-day advance purchase tickets or to adopt a three-tiered advance

18   purchase structure, in which the ticket price would depend on whether the ticket was purchased

19   more than 28 days in advance, more than 14 days in advance or less than 14 days in advance.

20         120.    Another meeting was held on August 15, 2002.  At that meeting, representatives

21   of ANA and JAL agreed to discontinue the 28-day and 14-day "advance purchase" Yobiyose

22   fares and to offer only the highest-priced fare that did not require any advance purchase.  ANA

23   and JAL also agreed to a formula for setting the non-advance purchase Yobiyose fares.

24         121.    At a lunch meeting in late 2002 or early 2003, representatives of ANA and JAL

25   agreed that the system previously established for Yobiyose fares should be maintained for the

26   upcoming six month period.

27

28

122.    The two carriers subsequently agreed on the price and terms of Yobiyose fares for each six-month period until October 1, 2005.

123.    At some point in 2005, a discussion was held between ANA and JAL at which both airlines confirmed that they would discontinue Yobiyose fares beginning with the fare season starting October 1, 2005.

124.    **Satogaeri fares.**  Satogaeri, or "homecoming" fares, are discount fares established to allow Japanese people living in the United States to travel to Japan to visit family and friends.  Satogaeri fares are discount fares for sale in the United States for roundtrip travel from the United States to Japan. Unlike Yobiyose fares, Satogaeri fares (which are sometimes called "M" class fares) fluctuated in response to changing market conditions.

125.    Beginning no later than late 2000 and continuing through early 2006, ANA and JAL frequently exchanged advance notice of proposed changes in Satogaeri fares.  Such communications took place between employees in regional sales offices within the United States, as well as between employees in the two carriers' U.S. headquarters offices.

126.    ANA and JAL employees with knowledge of the conspiracy include Sugi, Yokoyama and Isao Ono of ANA; and Amagai, Sun, Cahill and Michiko Kumataka of JAL.

127.    **Discount Business Class fares.**  Discount or "Business Saver" fares are business (or "C") class fares for sale in the United States that are set substantially below immunized IATA tariff rates for business class travel.  For example, in 2005, the benchmark for discount business class travel between Tokyo and New York (for weekday travel) was 75% of the IATA immunized business class fare.  ANA introduced discount business class fares from the United States to Japan in early 2002, followed soon thereafter by JAL.

128.    In March of 2002, ANA and JAL agreed not to compete with respect to the level of discount business class fares from the United States.

129.    On March 11, 2002, Shuta Saito, JAL's Vice-President of Industry Affairs, reconfirmed JAL's intent not to "compete" with ANA on non-immunized C-class fares.  In January 2003, ANA representatives reconfirmed at a lunch meeting with Amagai that they would

1   continue to coordinate those fares with JAL.  JAL then requested that ANA raise the fare out of

2   New York (and use as the pretext for doing so a claim that ANA had increased the level of

3   accommodations on its flights).

4         130.   The parties effectuated and monitored their conspiracy by exchanging proposals

5   concerning the fare levels for non-immunized "C" class fares before these fares were announced

6   to the public.  On March 17, 2004, a JAL employee requested that the ANA-JAL agreements be

7   circulated to all JAL offices in the Americas Region so that all JAL personnel were aware of

8   pricing changes agreed to by JAL and ANA.

9         131.   On September 1, 2004, an ANA representative e-mailed JAL representatives a

10  fare chart for ANA's discount class fares for the forthcoming six-month period.  That same ANA

11  representative sent JAL another fare chart in February 2006, before the fares in the chart were

12  made public.

13        132.   Employees of ANA and JAL with knowledge of the conspiracy concerning non-

14  immunized business class fares include:  Mr. Fukuda of ANA, Cahill, Sun, Amagai, Saito,

15  Kaneko, Fujiki, Ono, and Joan Kumai of JAL, among others.

16        133.   Thai Airways joined ANA and JAL to coordinate APEX, ZONE PEX and C-

17  APEX fares from Japan to the United States.  Beginning in 2001, Thai Airways representatives

18  sought prior approval or "concurrence" of their carrier fares with the carrier fares of ANA and

19  JAL on flights from Japan to the United States.  Concurrence involving routes to and from the

20  United States implicates the antitrust laws of this country and constitutes illegal communication

21  and coordination of prices.

22        134.   Every fiscal half-year from at least August 2000 through at least August of 2002,

23  Thai Airways e-mailed representatives of ANA and JAL requesting prior approval (concurrence)

24  for the forthcoming six-month period on ZONE PEX, and occasionally also APEX, fares from

25  Japan to various cities in the western United States, including Las Vegas, Los Angeles, Oakland,

26  Portland, San Diego, San Francisco, and Seattle.  In almost all instances, these e-mails attached

27  fare sheets and fare rules for the relevant period.

28

135.    In an e-mail dated August 20, 2000, Tsuneo Kojima (Thai Airways) wrote to Keeratiroj Sirisap (Thai Airways), Shinji Ono (JAL) and Fukushima (ANA), stating that Thai Airways would send to ANA and JAL its fares and rules of application for the period between October 1, 2000 and March 31, 2001 on certain flights from Tokyo and Osaka to the United States.  In the e-mail, Tsuneo Kojima wrote, "[w]e will send fares/rules for USA from TYO/OSA effective 01OCT00 through 31MAR01 as per attached . . . .  We would appreciate if you can obtain concurrence from JL/NH [JAL/ANA] on fares/rules soonest."  The attachment to the e-mail included ZPEX fares that Plaintiffs allege were subject to the conspiratorial agreement, for LAX [Los Angeles], SFO [San Francisco], LAS [Las Vegas], SEA [Seattle], PDX [Portland], SAN [San Diego] and OAK [Oakland].

136.    On February 13, 2001, Tsuneo Kojima (Thai Airways) sent an e-mail to Keeratiroj Sirisap (Thai Airways), copying Shinji Ono (JAL) and Akiko Oyama (ANA) regarding concurrence on ZONE PEX fares to the U.S. for the first half of FY 2001.  In that e-mail Tsuneo Kojima wrote: "Now we have completed TG Zpex fares/rules from Japan to USA for S2001 . . . .  We would like to ask you to obtain concurrence from JL/NH [JAL/ANA] as soon as possible . . . and would appreciate your usual kind cooperation and support."  Attached to the e-mail was the proposed ZONE PEX fares for Japan to the U.S. and the rules of application about the ZONE PEX fare.

137.    On July 25, 2001, Tsuneo Kojima (Thai Airways) sent an e-mail to Keeratiroj Sirisap (Thai Airways), copying Shinji Ono (JAL) and A. Kawaguchi (ANA) regarding ZONE PEX fares for the second half of FY 2001.  Similar to the February 13, 2001 e-mail, Tsuneo Kojima wrote on July 25, 2001 that: "[w]e have now completed the fares for TG [Thai Airways] Zone Pex from Japan to USA for 01Oct01 through 31Mar02.  Applicable rules remain unchanged.  We would like to request you to receive concurrence from JL/NH on our proposal as soon as possible."  Kojima again attached a fare sheet to the e-mail.

138.    On July 26, 2001, Keeratiroj Sirisap (Thai Airways) sent an e-mail to Shinji Ono (JAL) and Yasuhiro Nishiyama (ANA), copying Tsuneo Kojima (Thai Airways) and Seree

1    Pipatchaipoom (Thai Airways) asking for concurrence as to the flights on various city pairs,

2    including flights between Japan and the United States.  In his July 26, 2001 e-mail, Keeratiroj

3    Sirisap proposed coordinated fares for the approval of ANA and JAL, writing:  "TG [Thai

4    Airways] proposed Z-PEX/APEX/Special Apex fares from Japan to Thailand/MNL/USA for the

5    period of 01Oct01 – 31Mar02."

6        139.    On January 29, 2002, Tsuneo Kojima (Thai Airways) sent Thai Airways'

7    proposed ZONE PEX fares between Narita/Kansai to Los Angeles for the period between April

8    1, 2002, and September 30, 2002, to Keeratiroj Sirisap (Thai Airways), Shinji Ono (JAL), Akiko

9    Kawaguchi (ANA) and Hajime Kuroiwa (Thai Airways).  The e-mail requested that Thai

10   Airways' proposed ZONE PEX fares be proposed to ANA and JAL and indicated that Thai

11   Airways would like to have concurrence from JL/NH [JAL/ANA] as early as possible.

12       140.    On August 5, 2002, Tsuneo Kojima (Thai Airways) sent an e-mail to Akiko

13   Oyama (ANA) and Shinji Ono (JAL), copying Shingo Komatsu (Thai Airways) and Hajime

14   Kuriowa (Thai Airways) requesting concurrence on ZONE PEX fares on flights to the U.S. for

15   the second half of FY 2002.  In his e-mail, Kojima wrote, "[w]e would like to apply solely for

16   TG [Thai Airways] FLEX fares to the USA for the second half in the same way as for the present

17   term.  We have matched NH's [ANA's] GET price; therefore, please confirm this, and if you are

18   fine with that, we would like to contact TG headquarters."

19       141.    On August 9, 2002, an e-mail from Tsuneo Kojima (Thai Airways) to Keeratiroj

20   Sirisap (Thai Airways), Shingo Komatsu (Thai Air) and Hajime Kuroiwa (Thai Airways),

21   copying Shinji Ono (JAL) and Akiko Oyama (ANA) confirmed that an agreement had been

22   reached between the three airlines regarding carrier fares from Japan to the U.S.: "[p]lease be

23   informed that TG [Thai Airways] Zone Pex fares/rules to USA for W02/03 have been concluded

24   now which fares/rules agreed with JL/NH [JAL/ANA] at our end."

25       142.    On October 24, 2002, Shinji Ono (JAL) sent an e-mail to Keeratiroj Sirisap (Thai

26   Airways) and Tsuneo Kojima (Thai Airways) responding to Thai Airways' ZONE-PEX fares

27   from Japan to the U.S. proposed on July 26, 2001: "Regarding your ZPEX fares from JPN to

28

1   USA, we have no objection."  In that e-mail, Shinji Ono also discussed with Keeratiroj Sirisap

2   and Tsuneo Kojima the fact that JAL intended to seek agreement with Philippine Airlines

3   regarding coordinated fares to Manila and also indicated a willingness to coordinate with Thai

4   Airways on carrier fares to Thailand.  This is evidence that all coordination efforts from any

5   major airline hub in Asia involved the prior approval of the dominant airline at that hub.

6          143.    Singapore Airlines also coordinated carrier fares on flights to the U.S.  On August

7   9, 2002, Takashi Oshima (Singapore Airlines) e-mailed Shinji Ono (JAL), writing that "[f]or Los

8   Angeles and Las Vegas fares, we have matched your fares . . . ."

9          144.    On February 19, 2003, Takashi Oshima (Singapore Airlines) sent an e-mail to

10   Shinji Ono (JAL) asking for concurrence on APEX fares from Tokyo to Los Angeles, writing,

11   "APEX fares in Los Angeles match those of ANA; Taiwan fares match those of Japan Asia

12   Airways; zone fares to Los Angeles and Las Vegas match your company's fares."  Following

13   this exchange, Singapore Airlines matched exactly JAL's APEX fares from Tokyo to Los

14   Angeles.  After communications with ANA and JAL, Singapore Airlines also matched the

15   ZONE PEX fares charged by ANA and JAL for routes from Tokyo to Los Angeles and Las

16   Vegas for the first half of the 2003 fiscal year.

17         145.    KAL also coordinated carrier fares on Japan-U.S. routes.  On July 13, 2004, Si

18   Yeon Lee (KAL) sent an e-mail to Takashi Inagaki (JAL) providing him with proposed APEX

19   fares from Tokyo to Los Angeles for the first half of FY2004.  "Now, due to fare increases, we

20   are about to file Zone Pex fares from Japan to US and need your concurrence on TYO-LAX

21   portion.  All the fares are matching JL fares."  That e-mail included an attachment with

22   agreement upon ZONE PEX prices between Tokyo and Los Angeles.  Eight days later, on July

23   21, 2004, Tomomi Kubota (JAL) responded to Si Yeon Lee, stating, "[a]fter reviewing, we

24   would like to offer our official concurrence to your proposal," indicating JAL's agreement with

25   KAL's proposed coordinated price.

26         146.    On October 31, 2005, KAL provided JAL with the fare levels from Japan to U.S.

27   In the e-mail to JAL, KAL wrote, "[w]e are matching NW's [Northwest] level."

28

147.    In an e-mail dated October 31, 2005, Takashi Inagaki (JAL) discussed KAL's proposed coordinated fares for flights from Japan to the United States and described JAL's relationship with KAL as one premised on a "gentlemen's agreement." The e-mail also noted that Northwest was matching the fares.

148.    In a November 1, 2005 e-mail Takashi Inagaki stated again that KAL always agreed to match JAL's fares pursuant to a "gentlemen's agreement." The e-mail specifically referenced fares from Tokyo to Los Angeles.

149.    China Airlines also sought prior approval from ANA and JAL regarding flights from Tokyo to Honolulu and explicitly sought the coordination of such carrier fares.

150.    A January 25, 2000 e-mail from Hidetomi Kadoya (JAL) evidenced discussions with China Airlines regarding the agreement on ZONE PEX prices to Honolulu and that the two companies were finalizing the specifics on ZONE PEX prices to Honolulu after agreeing in principle to coordinate ZONE PEX pricing.

151.    On August 19, 2000, Eugene Yi-Ching Lee (China Airlines) sent an e-mail to Shinji Ono (JAL), with a carbon copy to multiple China Airlines employees, stating that he had recently faxed 20 pages with China Airlines' ZONE PEX, APEX and other carrier fares from Japan to Taiwan, S.E. Asia and Honolulu for the period from October 1, 2000 to March 31, 2001. In his e-mail, Eugene Lee asks JAL to review and concur with China Airlines' prices.

152.    On October 24, 2000, Shinji Ono (JAL) responded to Eugene Lee: "I reviewed all of your documents and concur your Zpex/Apex/carrier IIT fares" except for APEX fares from Tokoname in Japan to Kaohsiung in Taiwan. Shinji Ono goes on to ask, for the Tokoname-Kaohsiung route, that China Airlines agree to the fare set by EG (Japan Asia Airways) on that route. After making that request, Shinji Ono went on to state that "if you will agree with the above matching, EG will concur . . . ."

153.    In a July 27, 2001 e-mail, Katsutaka Fujii (China Airlines) wrote to Shinji Ono (JAL) stating that, "We have received the fares for Hong Kong and Honolulu. Are they final fares? If they are final, we will match and send them to the head office. Thank you."

1    154.    On July 30, 2001, Katsutaka Fujii (China Airlines) sent an e-mail to Shinji Ono

2    (JAL), and various China Airlines employees, including Mei-Wen Lin, Yoshihisa Yamamoto

3    and Masaru Kunihiro, notifying JAL employees of China Airlines' intention to match JAL's

4    ZONE PEX and APEX fares from Hong Kong to Honolulu for the second half of FY 2001 and

5    attached fare sheets with pricing for the referenced fares.  Fujii wrote, "[a]s per attached, TYOCI

6    [China Airlines] will match JL's HKG/HNL PEX/APEX Fare."  Amongst the attachments to the

7    e-mail were coordinated carrier fares between Japan and Honolulu.

8    155.    On August 2, 2001, Katsutaka Fujii (China Airlines) e-mailed Shinji Ono (JAL),

9    Choji Nakamura (JAL), Mei-Wen Lin (China Airlines), Tsugio Arasaki (China Airlines), Kengo

10   Tanaka (China Airlines), Yoshihisa Yamamoto (China Airlines) and Masaru Kunihiro (China

11   Airlines), informing JAL that China Airlines was going to match JAL's ZONE PEX and APEX

12   fares between Tokyo and various destinations including Honolulu.  The e-mail identified

13   matching fares between various city pairs, including flights between Asia and Honolulu.

14   156.    On August 7, 2001, Mei-Wen Lin (China Airlines) wrote to Shinji Ono (JAL) and

15   copying various China Airlines employees, requesting coordination with JAL on various city

16   pair routes, including the coordination of ZONE PEX and APEX fares between Tokyo and

17   Honolulu.

18   157.    In an October 31, 2001 e-mail, Katsutaka Fujii (China Airlines) wrote to Choji

19   Nakamura (JAL) and Shinji Ono (JAL) and other China Air employees, stating their proposal for

20   Special APEX fares to Honolulu.  In the e-mail, Katsutaka Fujii wrote, "We will inform you if

21   there is [sic] any changes, but we match fare and rule with JL."

22   158.    In a January 24, 2002 e-mail, Katsutaka Fujii (China Airlines) wrote an internal e-

23   mail, on which both Shinji Ono and Choji Nakamura of JAL were copied, stating that, "[p]lease

24   be advised of the ZPEX/APEX fare for S02, which is matched with JL's fare."

25   159.    On February 18, 2002, Mei-Wen Lin (China Airlines) sent an e-mail to Shinji

26   Ono (JAL), Katsutaka Fujii (China Airlines), Masaru Kunihiro (China Airlines), Kengo Tanaka

27   (China Airlines), Yoshihisa Yamamoto (China Airlines), Tsugio Arasaki (China Airlines) and

28

1   Kenji Doi (China Airlines) requesting concurrence for ZONE PEX and APEX fares from Tokyo

2   to Honolulu for the first half of FY2002.  The last line of the e-mail stated, "HNL ROUTE

3   (MATCHING WITH JL) TYO-HNL ZPEX/APEX."

4       160.    On July 29, 2002, Kenji Doi (China Airlines) wrote an e-mail to Shinji Ono (JAL)

5   stating that, "As to the HNL route and the South East Asia route, . . . we will match JAL

6   naturally but we have no information [about it]."

7       161.    On August 16, 2002, Mei-Wen Lin (China Airlines) sent an e-mail to Shinji Ono

8   (JAL), copying other China Air employees, requesting concurrence of ZONE PEX, 14 day

9   APEX and 35 day APEX fares from Tokyo to Honolulu for the second half of FY2002.  In the e-

10   mail this is expressed by writing, "TYO [Tokyo] to HNL [Honolulu] –

11   ZPEX/APEX14/APEX35."

12       162.    On October 24, 2002, Shinji Ono (JAL) responded to Mei-Wen Lin (China

13   Airlines), Masaru Kunihiro (China Airlines) and Kenji Doi (China Airlines) on behalf of JAL

14   explaining JAL had "no objection for the captioned fares" between Tokyo and Honolulu

15   proposed by China Airlines.

16       163.    On July 7, 2006, Ai Watanabe (China Airlines) e-mailed Owano Hideo (JAL),

17   copying Kenji Doi (China Airlines), explaining that China Airlines hoped to establish an APEX

18   fare between Tokyo and Honolulu soon.  China Airlines requested concurrence from JAL as

19   soon as JAL's routes became available.  Watanabe's e-mail indicated he wanted to know when

20   JAL's second half FY2006 fare proposal to Honolulu would be provided, writing, "however,

21   because we soon would like to establish APEX fares for HNL routes . . . could you please let me

22   know when your final fare proposal for the second half is finalized?"

23       164.    Northwest and Continental also illegally coordinated carrier fares with other

24   carriers.  During a meeting on October 23, 2002, JAL representatives discussed the coordination

25   of carrier fares with Northwest employees regarding coordination between ANA and JAL on C-

26   APEX fares to North America with advance purchase provisions.

27

28

1    165.    On May 31, 2005, Noboru Hirai (Northwest) sent an e-mail to JAL referencing a

2    May 30, 2005 meeting between Northwest and JAL.  The e-mail discussed pricing for fares to

3    Honolulu and Micronesia for the second half of FY2005.  For flights from Osaka to Honolulu,

4    Noboru Hirai wrote that he would "seek to coordinate and consider with branch offices for plus

5    5000 yen."  For flights from Tokyo to Honolulu, Mr. Hirai wrote that he would "seek

6    coordination within a range from about the same as last year to about plus 2000 yen."  For fares

7    from Tokyo to Micronesia, Mr. Hirai wrote, "[d]ecision will be made after CO

8    [Continental]/JAL price coordination.  Desire price increase of about 5% . . . AP [APEX] would

9    continue."

10    166.    The coordination of fares between Japan and the United States alleged herein is

11    just one example of a wide-ranging conspiracy to coordinate passenger fares on flights between

12    Asia/Oceania and the United States.

13    167.    The airline industry, particularly in Asia, operates through the use of a hub

14    system.  Each airline maintains one or more hubs in which it is the primary airline serving that

15    destination.  For example, Singapore Airlines' hub is at Singapore Changi International Airport

16    and Cathay Pacific's hub is at Hong Kong International Airport.  For each of these hubs,

17    concurrence communications relating to the coordination of carrier fares takes place with the

18    primary airline at each hub for flights between that hub and the United States.  In other words,

19    the coordination of carrier fares from Thailand's Bangkok-Suvarnabhumi Airport to the United

20    States involves communications amongst the Defendant carriers and Thai Airways, the primary

21    airline at that hub.  These coordination efforts are similar to those that occurred for flights from

22    Japan to the United States and involved communications and exchanges of information that

23    allowed the members of the conspiracy to coordinate the carrier fares charged from these

24    international hubs to the United States.

25    168.    For example, at a September 1, 2005 meeting of the Thailand BAR, the attendees

26    complained that fares to and from Thailand were substantially below fares charged to other

27

28

1    regional destinations.  The attendees were urged to support the creation of a subgroup to examine

2    base fare prices and to otherwise discuss each other's fares.

3    169.       Other airlines have also suggested that the coordination involved in this case extends

4    far beyond routes between the Japan and the United States.  An e-mail from an employee of

5    Singapore Airlines circulated to a number of "Airline Partners"—some of whom have been

6    identified as JAL, Malaysian Airlines, Thai Airways, and Vietnam Airlines—stated that "[e]ven

7    if a carrier would not be able to increase the fares from their country, it would benefit from fare

8    increases adopted ex other countries."  Additionally, a JAL e-mail dated November 8, 2004,

9    described the assistance that JAL will provide to other airlines concerning pricing for "arrivals

10   from Europe, the Americas and Asia."  At "overseas" hubs of other carriers, JAL said it would

11   "follow" the lead of other carriers.

12   170.    Other examples of coordinated pricing activity throughout Asia are set forth in the

13   following section.

14        **2.    Fuel Surcharges**

15   171.    Defendants' discussions concerning the implementation of and/or amount of fuel

16   surcharges (as opposed to certain base fares) have never been immunized by IATA Tariff

17   Coordination Conferences, though as described below, there was an attempt to obtain immunity

18   for such discussions by the Defendants.  The fuel surcharge conspiracy was facilitated by

19   discussions and agreements reached by the Defendants and others at various IATA, AAPA, and

20   BAR meetings in Hong Kong, Manila, Malaysia, Thailand, and elsewhere.

21        **a.    Defendants' Unsuccessful Effort To Obtain Immunity For Fuel
22             Surcharge Agreements**

23   172.    As early as December 31, 2000, Defendants, through the Malaysian BAR

24   undertook collective efforts to impose fuel surcharges, though these efforts were short lived and

25   largely unsuccessful.

26   173.    However, during the first half of 2003, Defendants, through the Philippine BAR,

27   again undertook collective efforts to obtain governmental approval of a surcharge from the

28

---

1   Philippines Department of Justice.  On May 16, 2003, Defendants' request for approval of fuel

2   surcharges was "declined."

3        174.    Thereafter, during an IATA Special Composite Meeting of Passenger Tariff

4   Coordinating Conferences held in Geneva, Switzerland from July 14 through 18, 2003,

5   participating members adopted Resolution 001w titled "Special Enabling Resolution

6   (Surcharges)."  Resolution 001w would have established a procedure by which IATA members

7   could quickly agree to and then implement fuel, security, and other surcharges on IATA fares.

8   Resolution 001w had an intended effective date of April 1, 2004 so that IATA and its members

9   could obtain approval from various government agencies, including the DOT, which has the

10  authority to immunize agreements reached at Tariff Conferences from scrutiny under the

11  Sherman Act.

12       175.    Thirty-six air carriers voiced support "in principle" for a collective fuel surcharge,

13  including Air France, British Airways, China Airlines, JAL, KAL, KLM, Lufthansa, ANA,

14  Northwest, Air New Zealand, Qantas, and Thai Airways.  There was no opposition.  The

15  participants then commenced discussions concerning the specific wording of the proposal.

16  Several air carriers objected to minor details concerning the implementation and operation of the

17  fuel surcharge.  Defendants and non-defendant co-conspirators ultimately voting in favor of

18  Resolution 001w included: Air New Zealand, ANA, China Airlines, EVA, JAL, Qantas, and

19  Thai Airways.  Several members abstained from voting and no member opposed the resolution.

20       176.    On August 25, 2003, IATA filed Resolution 001w with the DOT and sought

21  immunity for the agreements set forth in it.  The DOT did not act on the proposal.

22       177.    On May 27, 2004 Giovanni Bisignani of IATA, stated:

23
        On average, fuel accounts for 16% of airline operating costs.  Fuel
24         prices are 55% higher than one year ago.  This could add between
        US$8 and US$12 billion to our annual fuel bill and threatens to
25         strangle our modest projected return to profitability.  Instead of
        flying high, we could be left swimming in red ink . . . The current
26         crisis resulting from sky high fuel prices once again highlights the
        industry's vulnerability to external shocks. . . . We need to build a
27         new industry structure capable of withstanding external shocks
        and delivering sustained profitability.

28

178.     On May 28, 2004, IATA held a Special Composite Meeting of Passenger Tariff Coordinating Conferences in Geneva, Switzerland.  Minutes of the meeting reflect that at least seven airlines, including Cathay Pacific and KAL, sought to achieve an agreement with respect to fuel surcharges ranging from US$4 per sector to US$18 for one way travel.  Other airlines proposed raising passenger fares instead.  IATA's Secretary reminded its airline members that Resolution 001w had not been approved by all necessary governmental entities, so collective agreements concerning fuel surcharges were not immunized.  Mr. McEwen, Manager of IATA Ticketing Services, then explained to the meeting's participants that IATA was nonetheless developing a methodology for collection of fuel surcharges.  Thereafter, the airlines agreed to increase immunized IATA base fares on interline tickets to offset increased fuel costs.  Implicit in this change in tactics was an understanding by Defendants that non-immunized base fares would also be raised.

179.     On April 29, 2005, another Special Composite Meeting of Passenger Tariff Coordinating Conferences was held in Geneva, Switzerland.  At the meeting, Cathay Pacific, Air France and others again sought agreement on fuel surcharges.  Again, the airlines were advised that Resolution 001w had not been approved by all necessary governmental entities and again the airlines raised base fares for immunized IATA interline tickets to offset increased fuel costs.  Again, there was an implicit understanding that non-immunized base fares would also be raised.

180.     Despite IATA's efforts to obtain immunity for the collective rate-setting of fuel surcharges, the DOT never acted on IATA's request, and several years later, on March 9, 2007, IATA quietly moved to withdraw the resolution from further consideration by the DOT.

        **b.**       **Defendants' Fuel Surcharges Which Commenced In 2004 Contrast With Their Conduct In The Preceding Years**

181.     Prior to 2004, the Defendants had not successfully imposed fuel surcharges on top of the price of an air passenger ticket.  However, as noted above, collusive efforts to attempt to do so commenced in or about 2000 through the Asian BAR organizations and IATA.  These efforts began to have an effect in May of 2004.

1    182.    On May 11, 2004, Qantas publicly announced that it was introducing a fuel

2    surcharge, effective on May 17, 2004.  The very next day, Qantas' partner in the Oneworld

3    Alliance, British Airways, also announced that it was implementing a fuel surcharge.  On May

4    12, 2004, Air New Zealand announced that it, too, was implementing a fuel surcharge, effective

5    May 17, 2004.

6    183.    The decision to introduce fuel surcharges required prior consideration by senior

7    executives and planning committees.  Computers must be programmed to accept fuel surcharges,

8    and marketing and customer service departments must prepare for the change.  The rapid fire

9    introduction of these fuel surcharges over a period of, at most, 24 hours is not consistent with

10   independent, uncoordinated actions by Air New Zealand, Qantas, and British Airways.

11   184.    Thus, in the late-spring/early summer, Air New Zealand imposed a fuel surcharge

12   of approximately US $13.00, Qantas imposed a fuel surcharge of US $15.00, Cathay Pacific

13   imposed a fuel surcharge of approximately US $14.00, Thai Airways imposed a fuel surcharge of

14   approximately US $15.00, and non-Defendant co-conspirator UAL imposed a fuel surcharge of

15   US $15.00.  The surcharge amounts cited herein can and do vary based on differences in the

16   relative valuation of foreign currencies over time and the assumptions underlying currency to

17   currency comparisons.  They also vary based on geography and flight routing as well as on

18   airline perceptions about the tolerance level of regulators and passengers for these surcharges.

19   185.    Discreet examples of contemporaneous fuel surcharge increases exist for other

20   Defendants as well.  In October-November of 2004, Qantas imposed a fuel surcharge of

21   approximately US $21.22, Singapore Airlines imposed a fuel surcharge of approximately US

22   $22.00, and Thai Airways imposed a fuel surcharge of approximately US $20.00.

23   186.    On February 1, 2005, ANA and JAL added a US $24.37 fuel surcharge on

24   passenger flights between North America and Japan.  On the same day, Singapore Airlines added

25   a fuel surcharge of approximately US $22.00 on international air passenger tickets.

26   187.    In March of 2005, co-conspirator Northwest and Qantas introduced fuel

27   surcharges of US $35.00.

28

188.     In July of 2005, ANA and JAL imposed a fuel surcharge of US $48.00 and Singapore Airlines imposed a fuel surcharge of approximately US $45.00, as did non-defendant co-conspirator Northwest.

189.     In September-October of 2005, Cathay Pacific imposed a fuel surcharge of approximately US $45.30 and co-conspirator Northwest imposed a fuel surcharge of US $45.00.

190.     In the spring of 2006, ANA and JAL increased their respective fuel surcharges to US $66.00. Qantas raised its surcharge to approximately US $65.00, as did Air New Zealand, Thai Airways, and EVA.

191.     During the summer 2006 travel season, Singapore Airlines raised its fuel surcharge to approximately US $60.00 (on long-haul routes between Japan and Los Angeles), Malaysian Airlines raised its fuel surcharge to approximately US $60.00 (on long-haul routes between Taipei and Los Angeles), and Cathay Pacific raised its fuel surcharge to approximately US $61.70.

192.     Later that summer, Thai Airways raised its fuel surcharge to approximately US $90.00 and Malaysian Airlines raised its fuel surcharge to approximately US $92.00 (on routes between Malaysia and the U.S.), non-defendant co-conspirator Northwest raised its fuel surcharge to US $90.00, non-defendant co-conspirator UAL raised its fuel surcharge to US $90.00, China Airlines raised its fuel surcharge to approximately US $95.00, and Singapore Airlines raised its fuel surcharge to approximately US $90.00 (on routes between Singapore and the U.S.).

193.     Moreover, during much of the Class Period, the Defendants repeatedly charged identical fuel surcharges for passenger traffic from Hong Kong, including to the United States:

| Air Carrier | Fuel Surcharge Amount | Effective Date |
| --- | --- | --- |
| Air New Zealand | HKD481 per coupon (long haul) **(approximately US $62.00)** | August 1, 2006 |
| Air France | HKD468 per coupon | August 1, 2006 |
| Qantas | HKD481 per coupon (long haul) | August 1, 2006 |
| British Airways | HKD481 per coupon | August 1, 2006 |

| Air Carrier | Fuel Surcharge Amount | Effective Date |
|---|---|---|
| Cathay Pacific | Short haul:  HKD117 per coupon<br>Long haul:  HKD481 per coupon | August 1, 2006 |
| Singapore Airlines | HK/SIN  HKD117 per coupon (short haul)<br>HK/SFO  HKD481 per coupon (long haul) | August 1, 2006 |
| ANA | HKD117 per coupon (short haul) | August 1, 2006 |
| China Airlines | HKD117 per coupon (short haul) | August 1, 2006 |
| Continental Airlines | HKD481 per coupon | August 1, 2006 |
| EVA | HKD117 per coupon (short haul) | August 1, 2006 |
| JAL | HKD117 per coupon (short haul) | August 1, 2006 |
| KLM | HKD481 per coupon | August 1, 2006 |
| Lufthansa | HKD481 per coupon | August 1, 2006 |
| Malyasian Airlines | HKD117 per coupon (short haul) | August 1, 2006 |
| Philippine Airlines | HKD481 per coupon | August 1, 2006 |
| Swiss International | HKD481 per coupon | August 1, 2006 |
| Thai Airways | HKD117 per coupon (short haul) | August 1, 2006 |
| Vietnam Airlines | HKD117 per coupon | August 1, 2006 |
| Air France | HKD481 per coupon | October 1, 2006 |
| Qantas | HKD481 per coupon (long haul) | October 1, 2006 |
| Singapore Airlines | HK/SIN  HKD117 per coupon (short haul)<br>HK/SFO  HKD481 per coupon (long haul) | October 1, 2006 |
| ANA | HKD117 per coupon (short haul) | October 1, 2006 |
| British Airways | HKD481 per coupon | October 1, 2006 |
| China Airlines | HKD117 per coupon (short haul) | October 1, 2006 |
| Continental Airlines | HKD481 per coupon | October 1, 2006 |
| EVA | HKD117 per coupon (short haul) | October 1, 2006 |
| JAL | HKD117 per coupon (short haul) | October 1, 2006 |
| KLM | HKD481 per coupon | October 1, 2006 |
| Lufthansa | HKD481 per coupon | October 1, 2006 |

| Air Carrier | Fuel Surcharge Amount | Effective Date |
|---|---|---|
| Malaysian Airlines | HKD117 per coupon (short haul) | October 1, 2006 |
| Philippine Airlines | HKD117 per coupon | October 1, 2006 |
| Swiss International | HKD481 per coupon | October 1, 2006 |
| Thai Airways | HKD117 per coupon (short haul) | October 1, 2006 |
| Vietnam Airlines | HKD481 per coupon | October 1, 2006 |
| Air New Zealand | HKD466 per coupon (long haul) | December 1, 2006 |
| Air France | HKD466 per coupon (long haul) | December 1, 2006 |
| British Airways | HKD466 per coupon (long haul) | December 1, 2006 |
| China Airlines | HKD113 per coupon (short haul) | December 1, 2006 |
| Continental Airlines | HKD466 per coupon (long haul) | December 1, 2006 |
| KLM | HKD455 per coupon (long haul) | December 1, 2006 |
| Lufthansa | HKD466 per coupon (long haul) | December 1, 2006 |
| Philippine Airlines | HKD113 per coupon (short haul) | December 1, 2006 |
| Qantas | HKD466 per coupon (long haul) | December 1, 2006 |
| Singapore Airlines | HK/SIN  HKD113 per coupon (short haul)<br>HK/SFO  HKD466 per coupon (long haul) | December 1, 2006 |
| Swiss International | HKD466 per coupon (long haul) | December 1, 2006 |
| ANA | HKD113 per coupon (short haul) | December 1, 2006 |
| China Airlines | HKD113 per coupon (short haul) | December 1, 2006 |
| EVA | HKD113 per coupon (short haul) | December 1, 2006 |
| JAL | HKD113 per coupon (short haul) | December 1, 2006 |
| Malaysian Airlines | HKD113 per coupon (short haul) | December 1, 2006 |
| Thai Airways | HKD113 per coupon (short haul) | December 1, 2006 |
| Vietnam Airlines | HKD113 per coupon (short haul) | December 1, 2006 |

| Air Carrier | Fuel Surcharge Amount | Effective Date |
|---|---|---|
| Air New Zealand | HKD438 per coupon (long haul) | February 1, 2007 |
| Air France | HKD438 per coupon (long haul) | February 1, 2007 |
| British Airways | HKD438 per coupon (long haul) | February 1, 2007 |
| Continental Airlines | HKD438 per coupon (long haul) | February 1, 2007 |
| KLM | HKD438 per coupon (long haul) | February 1, 2007 |
| Lufthansa | HKD438 per coupon (long haul) | February 1, 2007 |
| Philippine Airlines | HKD106 per coupon (short haul) | February 1, 2007 |
| Qantas | HKD438 per coupon (long haul) | February 1, 2007 |
| Cathay Pacific | Short haul:  HKD106 per coupon (short haul) Long haul:  HKD438 per coupon | February 1, 2007 |
| Singapore Airlines | HK/SIN  HKD106 per coupon (short haul) HK/SFO  HKD438 per coupon | February 1, 2007 |
| Swiss International | HKD438 per coupon (short haul) | February 1, 2007 |
| ANA | HKD106 per coupon | February 1, 2007 |
| China Airlines | HKD106 per coupon (short haul) | February 1, 2007 |
| EVA | HKD106 per coupon (short haul) | February 1, 2007 |
| JAL | HKD106 per coupon (short haul) | February 1, 2007 |
| Malaysian Airlines | HKD106 per coupon (short haul) | February 1, 2007 |
| Thai Airways | HKD106 per coupon (short haul) | February 1, 2007 |
| Vietnam Airlines | HKD438 per coupon (short haul) | February 1, 2007 |
| Air New Zealand | HKD420 per coupon (long haul) | April 1, 2007 |
| Air France | HKD420 per coupon (long haul) | April 1, 2007 |
| British Airways | HKD420 per coupon (long haul) | April 1, 2007 |
| Continental Airlines | HKD420 per coupon (long haul) | April 1, 2007 |

| Air Carrier | Fuel Surcharge Amount | Effective Date |
|---|---|---|
| Lufthansa | HKD420 per coupon (long haul) | April 1, 2007 |
| KLM | HKD420 per coupon (long haul) | April 1, 2007 |
| Philippine Airlines | HKD102 per coupon (short haul) | April 1, 2007 |
| Qantas | HKD420 per coupon (long haul) | April 1, 2007 |
| Cathay Pacific | Short haul:  HKD102 per coupon<br>Long haul:  HKD420 per coupon | April 1, 2007 |
| Singapore Airlines | HK/SIN  HKD102 per coupon (short haul)<br>HK/SFO  HKD420 per coupon (long haul) | April 1, 2007 |
| Swiss International | HKD420 per coupon (long haul) | April 1, 2007 |
| ANA | HKD102 per coupon (short haul) | April 1, 2007 |
| China Airlines | HKD102 per coupon (short haul) | April 1, 2007 |
| EVA | HKD102 per coupon (short haul) | April 1, 2007 |
| Malaysian Airlines | HKD102 per coupon (short haul) | April 1, 2007 |
| Thai Airways | HKD102 per coupon (short haul) | April 1, 2007 |
| Vietnam Airlines | HKD102 per coupon (short haul) | April 1, 2007 |
| Air New Zealand | HKD412 per coupon (long haul) | June 1, 2007 |
| Air France | HKD412 per coupon (long haul) | June 1, 2007 |
| British Airways | HKD412 per coupon (long haul) | June 1, 2007 |
| Continental Airlines | HKD412 per coupon (long haul) | June 1, 2007 |
| Philippine Airlines | HKD100 per coupon (short haul) | June 1, 2007 |
| Qantas | HKD412 per coupon (long haul) | June 1, 2007 |

| Air Carrier | Fuel Surcharge Amount | Effective Date |
|---|---|---|
| Cathay Pacific | Short haul:  HKD100 per coupon<br>Long haul:  HKD412 per coupon | June 1, 2007 |
| Singapore Airlines | HK/SIN  HKD100 per coupon (short haul)<br>HK/SFO  HKD412 per coupon (long haul) | June 1, 2007 |
| Swiss International | HKD100 per coupon (short haul) | June 1, 2007 |
| ANA | HKD100 per coupon (short haul) | June 1, 2007 |
| China Airlines | HKD100 per coupon (short haul) | June 1, 2007 |
| EVA | HKD100 per coupon (short haul) | June 1, 2007 |
| Malaysian Airlines | HKD100 per coupon (short haul) | June 1, 2007 |
| Thai Airways | HKD100 per coupon (short haul) | June 1, 2007 |
| Vietnam Airlines | HKD100 per coupon (short haul) | June 1, 2007 |
| Air New Zealand | HKD424 per coupon (long haul) | August 1, 2007 |
| Air France | HKD424 per coupon (long haul) | August 1, 2007 |
| British Airways | HKD424 per coupon (long haul) | August 1, 2007 |
| Continental Airlines | HKD424 per coupon (long haul) | August 1, 2007 |
| KLM | HKD424 per coupon (long haul) | August 1, 2007 |
| Lufthansa | HKD424 per coupon (long haul) | August 1, 2007 |
| Philippine Airlines | HKD103 per coupon (short haul) | August 1, 2007 |
| Qantas | HKD424 per coupon (long haul) | August 1, 2007 |
| Cathay Pacific | Short haul:  HKD103 per coupon<br>Long haul:  HKD424 per coupon | August 1, 2007 |
| Singapore Airlines | HK/SIN  HKD103 per coupon (short haul)<br>HK/SFO  HKD424 per coupon (long haul) | August 1, 2007 |

| Air Carrier | Fuel Surcharge Amount | Effective Date |
|---|---|---|
| Swiss International | HKD424 per coupon (long haul) | August 1, 2007 |
| ANA | HKD103 per coupon (short haul) | August 1, 2007 |
| China Airlines | HKD103 per coupon (short haul) | August 1, 2007 |
| EVA | HKD103 per coupon (short haul) | August 1, 2007 |
| JAL | HKD103 per coupon (short haul) | August 1, 2007 |
| Malaysian Airlines | HKD103 per coupon (short haul) | August 1, 2007 |
| Thai Airways | HKD103 per coupon (short haul) | August 1, 2007 |
| Air New Zealand | HKD428 per coupon (long haul) | October 1, 2007 |
| Air France | HKD428 per coupon (long haul) | October 1, 2007 |
| British Airways | HKD428 per coupon (long haul) | October 1, 2007 |
| Continental Airlines | HKD428 per coupon (long haul) | October 1, 2007 |
| KLM | HKD428 per coupon (long haul) | October 1, 2007 |
| Lufthansa | HKD428 per coupon (long haul) | October 1, 2007 |
| Philippine Airlines | HKD104 per coupon | October 1, 2007 |
| Qantas | HKD428 per coupon (long haul) | October 1, 2007 |
| Cathay Pacific | Short haul:  HKD104 per coupon<br>Long haul:  HKD428 per coupon | October 1, 2007 |
| Singapore Airlines | HK/SIN  HKD104 per coupon (short haul)<br>HK/SFO  HKD428 per coupon (long haul) | October 1, 2007 |
| Swiss International | HKD428 per coupon (long haul) | October 1, 2007 |
| ANA | HKD104 per coupon (short haul) | October 1, 2007 |
| China Airlines | HKD104 per coupon (short haul) | October 1, 2007 |
| EVA | HKD104 per coupon (short haul) | October 1, 2007 |

| Air Carrier | Fuel Surcharge Amount | Effective Date |
|---|---|---|
| JAL | HKD104 per coupon (short haul) | October 1, 2007 |
| Malaysian Airlines | HKD104 per coupon (short haul) | October 1, 2007 |
| Thai Airways | HKD104 per coupon | October 1, 2007 |
| Vietnam Airlines | HKD104 per coupon | October 1, 2007 |
| Air New Zealand | HKD466 per coupon (long haul) | December 1, 2007 |
| Air France | HKD466 per coupon (long haul) | December 1, 2007 |
| British Airways | HKD466 per coupon (long haul) | December 1, 2007 |
| Continental Airlines | HKD466 per coupon (long haul) | December 1, 2007 |
| KLM | HKD466 per coupon (long haul) | December 1, 2007 |
| Lufthansa | HKD466 per coupon (long haul) | December 1, 2007 |
| Philippine Airlines | HKD113 per coupon (short haul | December 1, 2007 |
| Qantas | HKD466 per coupon (long haul) | December 1, 2007 |
| Cathay Pacific | Short haul:  HKD113 per coupon<br>Long haul:  HKD466 per coupon | December 1, 2007 |
| Singapore Airlines | HK/SIN  HKD113 per coupon (short haul)<br>HK/SFO  HKD466 per coupon (long haul) | December 1, 2007 |
| Swiss International | HKD466 per coupon (long haul) | December 1, 2007 |
| ANA | HKD113 per coupon (short haul) | December 1, 2007 |
| China Airlines | HKD113 per coupon (short haul) | December 1, 2007 |
| EVA | HKD113 per coupon (short haul) | December 1, 2007 |
| JAL | HKD113 per coupon (short haul) | December 1, 2007 |
| Malaysian Airlines | HKD113 per coupon (short haul) | December 1, 2007 |
| Thai Airways | HKD113 per coupon (short haul) | December 1, 2007 |
| Vietnam Airlines | HKD113 per coupon (short haul | December 1, 2007 |

| Air Carrier | Fuel Surcharge Amount | Effective Date |
|---|---|---|
| Air New Zealand | HKD508 per coupon (long haul) | February 1, 2008 |
| Air France | HKD508 per coupon (long haul) | February 1, 2008 |
| British Airways | HKD508 per coupon (long haul) | February 1, 2008 |
| Continental Airlines | HKD508 per coupon (long haul) | February 1, 2008 |
| KLM | HKD508 per coupon (long haul) | February 1, 2008 |
| Lufthansa | HKD508 per coupon (long haul) | February 1, 2008 |
| Philippine Airlines | HKD123 per coupon (short haul) | February 1, 2008 |
| Qantas | HKD508 per coupon (long haul) | February 1, 2008 |
| Cathay Pacific | Short haul:  HKD123 per coupon (short haul) Long haul:  HKD508 per coupon | February 1, 2008 |
| Singapore Airlines | HK/SIN  HKD123 per coupon (short haul) HK/SFO  HKD508 per coupon (long haul) | February 1, 2008 |
| Swiss International | HKD508 per coupon (long haul) | February 1, 2008 |
| ANA | HKD113 per coupon (short haul) | February 1, 2008 |
| China Airlines | HKD123 per coupon | February 1, 2008 |
| EVA | HKD123 per coupon | February 1, 2008 |
| JAL | HKD113 (2/1/08 – 2/9/08) per coupon (short haul) HKD123 (2/10/08 – 3/31/08) per coupon | February 1, 2008 |
| Malaysian Airlines | HKD123 per coupon (short haul) | February 1, 2008 |
| Thai Airways | HKD123 per coupon (short haul) | February 1, 2008 |
| Vietnam Airlines | HKD123 per coupon (short haul) | February 1, 2008 |
| Air New Zealand | HKD518 per coupon (long haul) | April 1, 2008 |
| Air France | HKD518 per coupon (long haul) | April 1, 2008 |
| British Airways | HKD518 per coupon (long haul) | April 1, 2008 |

| Air Carrier | Fuel Surcharge Amount | Effective Date |
|---|---|---|
| Continental | HKD518 per coupon (long haul) | April 1, 2008 |
| KLM | HKD518 per coupon (long haul) | April 1, 2008 |
| Lufthansa | HKD518 per coupon (long haul) | April 1, 2008 |
| Philippine Airlines | HKD125 per coupon (short haul) | April 1, 2008 |
| Qantas | HKD518 per coupon (long haul) | April 1, 2008 |
| Cathay Pacific | Short haul:  HKD125 per coupon<br>Long haul:  HKD518 per coupon | April 1, 2008 |
| Singapore Airlines | HK/SIN  HKD125 per coupon (short haul)<br>HK/SFO  HKD518 per coupon (long haul) | April 1, 2008 |
| Swiss International | HKD518 per coupon (long haul) | April 1, 2008 |
| ANA | HKD125 per coupon (short haul) | April 1, 2008 |
| China Airlines | HKD125 per coupon (short haul) | April 1, 2008 |
| EVA | HKD125 per coupon (short haul) | April 1, 2008 |
| JAL | HKD125 per coupon (short haul) | April 1, 2008 |
| Malaysian Airlines | HKD125 per coupon (short haul) | April 1, 2008 |
| Thai Airways | HKD125 per coupon (short haul) | April 1, 2008 |
| Vietnam Airlines | HKD125 per coupon (short haul) | April 1, 2008 |

### c.    Fuel Surcharges Were Implemented And Raised Through Collective Action

194.    During and after various BAR meetings in Thailand, the Philippines, Malaysia, and Hong Kong, the Defendants exchanged information about the imposition of fuel surcharges and reached express and tacit agreements about whether to impose fuel surcharges, the amounts of the surcharges, and the timing of their imposition.  These fuel surcharges included surcharges imposed on flights to and from the United States.

195.    Defendants Air New Zealand, Air France, ANA, Cathay Pacific, China Airlines, Continental Airlines, EVA, JAL, Malaysian Airlines, Philippine Airlines, Qantas, Singapore Airlines, Thai Airways, and Vietnam Airlines and non-defendant co-conspirators British Airways, Lufthansa, and Swiss International are all members of BAR HK which facilitated agreements to coordinate fuel surcharge pricing by the Defendants through its "Airline Charges Sub-Committee" on a bi-monthly basis during at least a portion of the Class Period alleged herein. Additional meetings were facilitated by the BAR organizations in Thailand, Philippines, and Malaysia. The agreements reached at these formal meetings (which included agreements with respect to flights to and from the United States) were reinforced through additional agreements between the conspirators.

196.    For example, on or before May 17, 2004, the exact date of which is unknown to Plaintiffs, a representative of Philippine Airlines (Ida Vinas) circulated a request to its "Airline Partners" in which Philippine Airlines asked: "Are you considering a fuel-related fare increase or a fixed amount?" On May 17, 2004, Hary Suhardi of Garuda Airlines responded to this request and copied a number of the "Airline Partners," some of whom have been identified as Kim Lye of Singapore Airlines, "Laurence" of Malaysian Airlines, "Sahhiran" of Malaysian Airlines, "Seree" of Thai Airways, "trangtt.pmd" of Vietnam Airlines and Anzai Yoshharu of JAL. In his response, the Garuda Airlines employee expressed concern that his government would not like to "see this," referring to implementation of a fuel surcharge. Singapore Airlines then responded that while it had not taken any action yet, the company "may match national carriers practice" and that "IATA has called for a Special Meeting. Believe it is beneficial for all carriers to support the IATA Meeting. Even if a carrier would not be able to increase the fares from their country, it would benefit from fare increases adopted ex other countries." Vietnam Airlines (Tran Thu Hein) then noted that it had not taken any action yet. "However, I am not sure that we can maintain the current situation if fuel prices continue to escalate."

197.    The next day, Tuesday, May 18, 2004, at the Thai BAR meeting in the Thai Airways office in Bangkok, the Thai BAR chairman, Suthep Suebsantiwongse, advised that

1    implementation of fuel surcharges would not be opposed by Thai regulators so long as the total

2    ticket price remained below IATA immunized fare levels.  Mr. Suebsantiwongse proposed

3    benchmarks and a formula for fuel surcharges.  The participants agreed to "come up with a

4    proposal . . . with a target implementation date of 1st June 2004."  Each of the BAR members

5    was asked to check with their superiors about the palatability of fuel surcharges, with "[r]esults

6    to be collated next Monday, 24 May."  During the meeting, the attendees discussed surcharges

7    for domestic, regional and international (including United States) flights.  The latter was

8    proposed to start at US$15.  The formula proposed was that if fuel costs were up or down by

9    20% over two consecutive weeks, the surcharge would change correspondingly by US$2.50.

10   Mr. Suebsantiwongse stated that success depended on "airline unity in practice."   It was

11   specifically noted that the United States carriers in attendance could participate in discussions

12   about implementing a fuel surcharge, but could not discuss rates.

13       198.    According to the minutes for the May 18 meeting, participants included

14   representatives of Thai Airways (Suthep Suebsantiwongse, Pandit Chanapai), Qantas (Julianne

15   Rogers, J. Louisi Moser), EVA (Thira K.) British Airways (Julianne Rogers, J. Louisi Moser),

16   UAL (Warren Gerig, left meeting before specific fuel surcharges discussed), Air France

17   (Smartchai Tuchinda), China Airlines (Nelson Fang), Cathay Pacific (Yongyut Lujintanon), JAL

18   (Kamol V.), KAL (James K.C. Yeung), KLM (Ihab Sourial), Lufthansa (Wolfgang Schmidt),

19   ANA (Somnuek Asavaveeradej), Northwest (Sarathool M., left meeting before specific fuel

20   surcharges discussed), Asiana (Vorakit Nivatwong), and Philippine Airlines (Dell Merano,

21   Vatchara Silpohevagitja), among others.  A complete list is set forth in Appendix B.

22       199.    On May 24, 2004, Carol Phatoomros (Thai Airways) followed up the May 18

23   Thai BAR meeting with an e-mail to the meeting participants and others, including American

24   Airlines (Prajak Burarak, Chaichan Khongsrithong) and EVA Airways.  The e-mail attached a

25   letter that Thai Airways was sending to the Thai Department of Transport.  The letter stated in

26   part that "[t]he members of the Board of Airlines Representatives at a meeting on 18th May

27   agreed that unless otherwise instructed by their Head Offices . . . they would apply the following

28

1    fuel surcharges adapting the fuel price index methodology of calculating the surcharge . . . .

2    US15.00 for intercontinental flights.  The fuel surcharge will be on a per sector basis . . . ."

3    These surcharges included surcharges on flights to and from the United States.  The complete list

4    of recipients of this e-mail is set forth in Appendix C.

5         200.    A number of Defendants acquiesced to this letter, which was sent out on May 26,

6    2004.

7         201.    On June 7, 2004, Thai Airways sent an e-mail confirming the imposition of fuel

8    surcharges as previously discussed by Thailand BAR members.  The e-mail further noted that

9    "[t]he surcharge amounts are as agreed by BAR members at the BAR meeting on 18May04 . . ."

10        202.    Thailand was not the only country in which collusive action was being taken on

11   fuel surcharges in 2004. On May 21, 2004, at a meeting of the Philippine BAR, the issue of fuel

12   surcharges on passenger fares was again discussed by the meeting's participants.  Philippine

13   Airlines advocated for a US$6.00 per segment, which would include flights to and from the

14   United States.  Other carriers were concerned that this would disadvantage carriers with multiple

15   stops on transpacific routes.  Philippine Airlines was seeking to introduce the fuel surcharge on

16   June 1, 2004.

17        203.    On May 25, 2004, Estrellita O. Inoturan from the Manilla BAR and a manager in

18   Philippine Airlines' Tariffs, Revenue Management Department sent an e-mail to a JAL

19   employee further discussing the intended surcharge, the effective date, and method of

20   implementation (as a separate YQ element on the passenger's bill).  The e-mail asked for

21   confirmation that the recipients would agree to it.   A follow-up e-mail by Joanne Sotocinal of

22   Philippine Airlines noted that Swiss International had agreed to imposition of the surcharge. A

23   complete list of the recipients of this e-mail is set forth in Appendix F.

24        204.    On May 26, 2004, Terada Haruhiku (JAL) indicated in an e-mail that "[w]e do not

25   oppose PR's [Philippine Airlines'] adoption of the fuel Surcharge."

26        205.    Also in May of 2004, the members of the Malaysia BAR exchanged information

27   regarding a fuel surcharge.  Malaysian Airlines wanted a $50 Malay (roughly US $14.00)

28

1  surcharge per sector (including North America), effective June 1.  EVA proposed a surcharge as

2  well.  These surcharges included surcharges on flights to and from the United States.

3        206.    Various communications reflect collusion among numerous air carriers with

4  respect to fuel surcharges. On October 29, 2004, Hirashi Rie (JAL) sent an e-mail confirming

5  that Air France would begin collection of a 10 Euro fuel surcharge on international flights.  An e-

6  mail earlier in the day confirmed that Lufthansa had increased its fuel surcharge for international

7  carriage from 7 Euros to 17 Euros and that British Airways had increased its fuel surcharge from

8  £6 to £10.

9        207.    Another e-mail of that same date from Liu Zheng  (JAL) to Mr. Yamasaki

10  confirms that China Airlines will start collection of fuel surcharge for the "China-America" route

11  of US$14.00 and that KAL had started imposing a fuel surcharge of US$25.00 for departures

12  from the United States on October 25, 2004.  The same e-mail noted that Qantas had increased

13  its fuel surcharge for the "America routes" to US$21.30, effective October 20, 2004.

14        208.    On November 1, 2004, Naoma Kaori (JAL) sent an e-mail confirming that she

15  had communicated with American Airlines, UAL, Delta, Continental, and Northwest and that

16  these airlines had imposed fuel surcharges of US$25.00 on transpacific routes, except to/from

17  Japan, where the fuel surcharge was US$5.00.  With the exception of Northwest, these

18  surcharges were not expressly described as "fuel surcharges."  The same e-mail noted that

19  Philippine Airlines was also imposing a US$25.00 fuel surcharge, effective for tickets issued on

20  and after October 22, 2004, and that Thai Airways was introducing a fuel surcharge of

21  US$19.00, effective November 1, 2004, for routes to and from the United States.  Ms. Kaori was

22  also able to confirm through ATPCO, a tariff publication company owned by Air France,

23  American Airlines, British Airways, Continental, JAL, Delta, KLM, Lufthansa, Northwest,

24  Swiss International, UAL, and others, that Thai Airways was implementing a fuel surcharge of

25  US$15.00 one way to and from the United States, and that Singapore Airlines was collecting a

26  US$17.00 fuel surcharge to and from the United States.

27

28

209.    On June 15, 2004, Akira Mori (JAL) responded to an inquiry from Vietnam Airlines (Tran Thu Hien) regarding ANA's fuel surcharge intentions.  Mr. Mori stated that JAL was planning on implementing Vietnam Airlines' "captioned surcharge from July 1, 2004" and that ANA "will most likely match us."  A subsequent JAL e-mail from Nakano Hoshiko dated June 22, 2004 noted that "[w]e have a sensitive relationship with the authority and we do not want to have any arguments about the set-up of carrier fares etc."  On September 21, 2004, Mr. Yamasaki of JAL wrote to Mohamed Habib of Northwest asking why the DOT was reluctant to authorize fuel surcharges for passenger tickets.  Mr. Habib quickly responded that same day and inquired: "Is there interest in your company to implement fuel surcharge?"

210.    On October 15, 2004, Inagaki Takashi of JAL wrote to Mohamed Habib of Northwest:  "Have you heard that DOT at last decided to permit the filing of FUEL surcharges by carriers!!?"  Mr. Habib responded, in part, by noting that American Airlines has already undertaken efforts to implement a fuel surcharge.   Mr. Habib stated that Northwest would "most likely match" it.

211.    From November 8, 2004 through November 10, 2004, Mr. Yamasaki engaged in an effort on behalf of JAL to coordinate fuel surcharges with other airlines.  Mr. Yamasaki noted that Air France, KLM, Lufthansa, British Airways, Singapore Airlines, Thai Airways, KAL, China Airlines, Qantas, Air New Zealand, American Airlines, UAL, and Northwest, among others, had instituted fuel surcharges.  Mamaoru Tsutsumi of JAL concluded in a November 8, 2004 e-mail that JAL would help its competitors implement fuel surcharges in Japan and would then follow the lead of these competitors in their home markets.

212.    Mr. Tsutsumi then referenced the second round of fuel surcharges imposed by the industry that occurred in the fall of 2004 and stated that JAL would implement a fuel surcharge of its own "for Japan departures, after secondary fare increase approval, with an eye on levels in Europe and the Americas, we will file C/S at around JPY 1,000 for short distance and JPY 2,000-2,500 for long distance, and other foreign airlines to follow."

1    213.    On November 10, 2004, Mr. Yamasaki  confirmed the following current and

2    future fuel surcharges in the Japanese market (including flights to and from the United States):

3           Carriers that have implemented fuel surcharges:

4           British Airways (USD17)

5           American Airlines (USD25)

6           Carriers that have not yet implemented fuel surcharges:

7           SU (Aeroflot) (USD10)

8           LH (Lufthansa) (USD17)

9           CX (Cathay Pacific) (USD7)

10          NW (USD25)

11          CO (USD25)

12          214.    On November 30, 2004, Hiroko Ueba (Cathay Pacific) e-mailed Yasuhiro

13   Nishiyama (ANA) and Ms. Noma (JAL).  The subject matter of the e-mail was "Fuel

14   Surcharge."  Mr. Ueba opened his e-mail by stating that he thanked JAL for their "continued

15   support."  He continued by explaining that ANA wanted to implement a fuel surcharge:  "I was

16   wondering if I could obtain an agreement from your company."  The requested agreement

17   concerned flight coupons between Hong Kong and North America, among other places around

18   the world effective December 1, 2004.  Ms. Noma obtained the approval of Gen Yamasaki (JAL)

19   through an e-mail dated November 30, 2004.  Mr. Yamasaki wrote, "It is okay to agree."  On

20   December 2, 2004, Ms. Noma confirmed to Mr. Yamasaki that "[y]esterday I told CX [Cathay

21   Pacific] that we would agree to it."

22          215.    On December 26, 2004, Mr. Yamasaki reported in an e-mail to Irie Kesuke of

23   JAL and others that an "airline concordance" was submitted to KE [KAL] today."

24          216.    On January 5, 2005, Kubota Tomomi of JAL wrote to Mr. Yamasaki of JAL and

25   reported that "TG [Thai Airways] has inquired about a fuel surcharge with a view to obtaining an

26   agreement from us.  According to them, it will be USD 20 per leg for international flights.  Is it

27   okay to agree?"  Mr. Yamasaki replied: "Yes, go ahead and agree."  Mr. Tomomi then stated that

28

1     he has "confirmed with them as follows . . . . Manila International sector: USD 20.00 or

2     equivalent for LAX-bound Kansai departures."

3          217.     On January 7, 2005, Kubota Tomomi of JAL sent an e-mail to Toshiaki Oshima

4     of Singapore Airlines thanking him for his "continuous help" and asking for information about

5     the status of Singapore Airlines' fuel surcharges.  Mr. Tomomi followed up with Mr. Oshima

6     again on January 13, 2005.  Kazuhisa Okamoto of Singapore Airlines' "Alliance dept." then

7     responded to Mr. Tomomi on January 17, 2005 by explaining the details of Singapore Airlines'

8     fuel surcharges.  Mr.Tomomi thanked Mr. Okamoto for the information, promised to be "very

9     carefull [sic] with handling", and requested that Singapore Airlines "keep cooperating with us in

10     the future."

11          218.     Also, for a period of time commencing in 2004 and for the next several years

12     thereafter, ANA and JAL held regular meetings (which usually took place at ANA's

13     headquarters in Tokyo) in order to agree on the timing and amount of fuel surcharge increases

14     for flights into and out of Japan, including flights to and from the United States.  ANA and JAL

15     also agreed on the exchange rates that would be used to effectuate their agreements and the

16     trigger points for changes in the surcharges.  For example, ANA and JAL agreed that a February

17     1, 2005 surcharge described below would terminate when the price of crude oil dropped below

18     $40/barrel on the Singapore index and that the surcharge into and out of Japan would be $2,500

19     yen.

20          219.     As of December 24, 2005 JAL proposed implementing the surcharge only on

21     outbound flights.  On January 5, 2005, ANA proposed a surcharge for both inbound and

22     outbound flights.  On January 18, 2005, JAL agreed with ANA's proposal.

23          220.     Participants in the earliest meetings between ANA and JAL included Mr. Shinobe

24     (ANA revenue management); Mr. Kato (ANA revenue management); Mr. Ineda (ANA revenue

25     management); Yugi Saito (JAL international marketing); and Mr. Ishida (JAL revenue

26     management).  Beginning in late-November or early December 2004 and continuing thereafter,

27     additional meetings were held between Mr. Yabuki, Mr. Sato, and Mr. Yakoyama from the ANA

28

1    tariff group and Ms. Hoshiko, Ms. Nakano, and Mr. Yamasaki from the JAL tariff group to

2    facilitate and implement agreements concerning the timing and amount of fuel surcharges on

3    routes into and out of Japan.

4         221.    On May 31, 2005, Hirai Noboru of JAL circulated an e-mail with a subject line

5    titled: "[r]egarding meeting with NW (**forwarding prohibited read only**)."  Mr. Noboru stated

6    that he was providing a summary of his meeting with NW "yesterday" and that the recipients

7    should "**delete this after you have finished reading**."  The e-mail noted that Northwest was

8    considering matching JAL's application on fuel surcharge increases on routes to Honolulu, but

9    that Northwest had not yet made a determination about North America "because of reasons such

10   as the need to watch the trend in other American companies."  This e-mail also referenced fare

11   coordination between JAL and Northwest, with a final decision to be "made after CO

12       [Continental]/JL [JAL] price coordination."  The e-mail concluded:  "The environment is

13   such that continued price increases will be desired."

14        222.    Collusion on air passenger surcharges continued in Thailand and other countries

15   as well.  For example, on August 18, 2005, Carol Phatoomros of Thai Airways circulated an e-

16   mail on behalf of "Wallop/VP Sales and Distribution."  The e-mail was titled:  "Message from

17   THAI re Fuel Surcharge."  In the e-mail, Thai Airways stated in part: "[w]e also know that we

18   have to be aware of market acceptability of these increases.  But most of all, we at THAI are

19   looking for all of your efforts to toe the line with us.  All the time we compete absolutely, but

20   this time we ask for unity and to be onboard the fuel surcharge wagon for our future and

21   survival."  The e-mail was sent to Singapore Airlines (David Lau), UAL (Eric Wilson), SAS

22   (Axel Blom), Cathay Pacific (Patrick Yeung), British Airways (Julianne Rogers), Lufthansa

23   (Wofgang Schmidt), Air India, Air Canada, Eva Airways, KLM (Jhab Sorial), Northwest

24   ("Sarathool"), Air New Zealand (Panya Silpargam), Asiana, Cathay Pacific (Alan Tang), IATA,

25   KAL, China Airlines (Charlie Fu), American Airlines (Pajack Burarak, Chaichan

26   Khorgsrithong), JAL (Chanchai Wangyuenyong), Qantas (L. Moser), Vietnam Airlines, Air

27

28

1    France, Swiss International (Brian Sinclair-Thompson), Alitalia, Vietnam Airlines, Philippine

2    Airlines, and ANA, among others.

3         223.    On September 1, 2005, a meeting of the Thai BAR was held.  It was noted at the

4    meeting that Thai Airways was asking for support for higher fuel surcharges, which would

5    encompass surcharges on flights to and from the United States.  The meeting minutes indicated

6    that "[i]t was proposed that BAR should write to TG [Thai Airways] noting that all airlines suffer

7    and in principle accept the higher fuel surcharge, but at the same time have to look at market

8    fares in Thailand which are 20-30% below published [IATA] fares."  The airlines in attendance

9    at the meeting were upset that the "BKK [Suvarnabhumi Bangkok International Airport] fare

10   was below other regional destinations."  Airlines present at this meeting included Thai Airlines

11   (Rangsiman Mokhansasamit), British Airways (Julianne Rogers), Qantas (Julianne Rogers),

12   Cathay Pacific (Patrick Yeung), Northwest (Sarathool), Air France (Christine Seuge), China

13   Airlines (Charlie Fu, Andy Yao), JAL (S. Iwasaki, Chanchai Wangyuengyong), Lufthansa

14   (Wolfgang Schmidt), Korean Air (Suchon Paleewong), ANA (Kimiya Arima, Somnuk Asava),

15   Philippine Airlines (Monet Trespeses), UAL (Eric Wilson), and Vietnam Airlines (Ngayen Nhu

16   Thang), among others.  The attendees were urged to support the creation of a subgroup to

17   examine base fare prices and to otherwise discuss each other's fares.

           **d.    Coordination Of Fuel Surcharge Increases Are Not An Expected By-
                   Product Of Competition**

20        224.    The coordination of the Defendants' fuel surcharge increases cannot be explained

21   merely as a function of the industry's exposure to fuel cost increases.  The impact of rising fuel

22   costs on individual airline profits varies widely depending on factors such as fleet utilization and

23   efficiency.  Singapore Airlines, for example has newer, more fuel-efficient planes than a number

24   of the Defendants.  The impact of rising fuel also varies depending how much of projected fuel

25   consumption was committed to at a fixed price at the beginning of the year, a practice known as

26   hedging.  In short, the Defendants' cost structures differ widely.  Their desire to coordinate the

27

28

1   timing and amount of fuel surcharges is not consistent with a competitive air transportation

2   market.

               **e.**     **Substantial Increases In Profitability Are Not An Expected By-Product Of Competition**

5        225.   The Defendants and their trade associations encourage a false public perception

6   that the airline industry has been unprofitable in recent years due to increased fuel prices, which

7   have increased substantially during the latter part of the Class Period.

8        226.   While it is true that some airlines have been recently unprofitable—mainly U.S.

9   airlines whose profitability problems are only tangentially related to fuel prices—the majority of

10   airlines headquartered in the Asia and Oceania have achieved substantial profits throughout the

11   Class Period, as the following AAPA chart indicates:



20        The 2007 financial report produced by the AAPA notes that carriers in Asia Pacific were

21   collectively recording substantially increased profits even as they were experiencing increased

22   fuel costs:

> **FY2006/2007 saw a significant improvement in profitability
> for Asia Pacific airlines.  Net income tripled, while operating
> profit increased by 69% to USD 3.7 billion.  The healthy
> performance was achieved with strong revenue growth, up
> 15.4%, outpacing the overall cost increase of 14.1%.**
> (Emphases added).

1    227.    AAPA's 2008 financial report demonstrated that the Asia Pacific carriers

2    recorded historically high profits again for the year ending 2007.

3         Asia Pacific airlines' net income grew by 38% to USD 5.1 billion
          while operating profit was USD 7.3 billion, up by 87%. AAPA
4         member airline consolidated net income totaled USD 3.9 billion,
          up by 12.5% or USD 433 million. **Operating profit surged 68%**
5         **to a record high of USD 6.2 billion.**

6    228.    Moreover, Defendants' own data demonstrates that the imposition of fuel

7    surcharges was a profit generator for the airlines, not just a cost recovery mechanism.

8    229.    For example, ANA reported a net profit of 7.68 billion Japanese yen for the first

9    quarter of fiscal year 2006.  Thai Airways collected nearly US$80 million in fuel surcharges and

10   reported substantial profits in the third quarter of 2006.  An August 10, 2006 article in the *China*

11   *Post* quoted a securities analyst as saying that "'[t]he higher fuel surcharge in place was also

12   quite effective'" in raising Thai Airway's revenues.  Similarly, on August 28, 2007, Air New

13   Zealand announced a net profit of NZ$214 million, up 123% from the previous year.  For the

14   same period, Air New Zealand's operating costs increased by 13% while the number of

15   passengers increased only by 4.9%.

16   230.    On August 7, 2007, the *Japan Times* reported that JAL's operating loss shrank

17   from 31.9 billion yen the prior year to 8.5 billion yen.  The article further stated, "JAL's

18   executive officer, attributed the improved earnings performance to the carrier's efforts to cut

19   costs, brisk business demand for international flights, higher revenue per passenger achieved

20   through fare hikes on domestic routes and increased fuel surcharges on international flights."

21   231.    On August 8, 2007, Cathay Pacific announced that its passenger revenue had

22   increased 14.6% for the first half of 2007, compared with the previous year.  The total number of

23   passengers increased by only 4.1%, but passenger yield was up 10.9%.  The Defendants operate

24   within the confines of a highly-competitive, mature industry.  Their ability to substantially affect

25   profitability unilaterally, particularly during a period of turbulent changes in input costs, is not

26   consistent with free and unfettered marketplace competition.

27

28

3.   **Additional Evidence Establishes That There Was A Wide-Ranging Conspiracy To Impose Fuel Surcharges In The Closely Related Cargo Market During the Class Period**

232.   Defendants engaged in conspiratorial meetings in Asia, Europe, and the Middle East during and prior to the Class Period in which they reached generalized global agreements to fix prices that were then implemented regionally and on a route-by-route basis.

233.   Indeed, in an April 30, 2009 press release from the ACCC, Australian Competition Authorities alleged that "arrangements or understandings were reached in countries including Singapore, Indonesia, Hong Kong, United Arab Emirates, India, Japan and Italy." The same press release also asserts that Cathay Pacific entered into at least 70 agreements with other air cargo carriers to fix the price of fuel and other surcharges.

234.   During the meetings described above, the participants, including the Defendants, agreed to conceal their price-fixing cartel by staggering the dates on which airlines would publicly announce that they would match a fare and/or surcharge increase.

235.   Airline cargo and passenger services are inextricably intertwined markets. The efficient operation of an airline requires close coordination between its cargo and air passenger operations. Indeed, much of the cargo that is shipped around the world is carried in the belly of aircraft that is also used to simultaneously transport people. Accordingly, there is close interaction between cargo and passenger operations to reserve space, coordinate schedules, and maximize revenue of each flight.

## GOVERNMENT INVESTIGATIONS INTO THE AIR PASSENGER INDUSTRY AND THE CLOSELY RELATED AIR CARGO INDUSTRY

236.   The DOJ and competition authorities around the world are investigating anticompetitive conduct by the airline industry. A criminal grand jury has been empanelled in the District Court for the District of Columbia to investigate price-fixing of passenger and cargo air transportation, including related fuel surcharges.

237.   The investigation into passenger fares and cargo began on or before December 31, 2005, when Lufthansa, on behalf of itself and its subsidiaries, approached the DOJ, the European

1

2    Commission, the ACCC, and other competition authorities with evidence of illegal price-fixing

3    of air cargo rates.

4         238.    The DOJ has "a policy of according leniency to corporations reporting their

5    illegal antitrust activity at an early stage, if they meet certain conditions."

6         239.    Based on its report to the DOJ and consistent with and pursuant to the DOJ

7    leniency policy, Lufthansa was accepted into the leniency program.

8         240.    Thereafter, Virgin Atlantic sought (and was granted) amnesty from the DOJ and

9    British competition authorities after disclosing its participation in a conspiracy to fix the prices of

10   international passenger fares, including surcharges.

11        241.    On August 1, 2007, the DOJ filed a criminal information against KAL in the

12   United States District Court for the District of Columbia, charging it with violating Section 1 of

13   the Sherman Act for engaging in the price fixing of *inter alia*, air passenger fuel surcharges.

14        242.    That same day, the DOJ announced that KAL had agreed to plead guilty and pay a

15   $300 million fine for its participation in the passenger and cargo conspiracy.  In confirming that

16   it had agreed to plead guilty, KAL attorney Ahn Yong-Seok announced that the company

17   "apologises to shareholders and customers for causing trouble."  He further stated that KAL's

18   compliance officer would attempt to ensure future compliance with U.S. and global fair trade

19   rules.  Subsequent news reports indicated that Asiana may also be subject to potential fines.

20        243.    On August 23, 2007, British Airways pled guilty and was sentenced to pay a $300

21   million criminal fine for conspiring to fix cargo rates for international air shipments, including to

22   and from the United States, and to fix passenger fuel surcharges for long-haul international air

23   transportation, including between the United States and United Kingdom.

24        244.    On November 27, 2007, it was announced that Qantas had agreed to plead guilty

25   to fixing prices for cargo shipments to and from the U.S. and elsewhere, in violation of Section 1

26   of the Sherman Act.

27

28

245.    On November 28, 2007, Qantas' CEO, Geoff Dixon, apologized for his

company's behavior and confirmed:

> Similar investigations to those being carried out by the US
> Department of Justice (DOJ) are being undertaken by antitrust
> regulators in other countries, including Australia.  We understand
> more than 30 other airlines are included in these investigations.

246.    In an April 29, 2009 press release by the DOJ announcing the guilty plea of Frank

De Jong of Martinair in connection with the price-fixing of air cargo rates, the DOJ summed up

its efforts in this area as follows:

> The 15 airlines that have pleaded guilty or agreed to plead guilty
> to date as a result of the Department's ongoing investigation into
> the air transportation industry are: British Airways Plc, Korean
> Air Lines Co. Ltd., Qantas Airways Limited, Japan Airlines
> International Co. Ltd., Martinair, Cathay Pacific Airways Limited,
> SAS Cargo Group A/S, Société Air France, Koninklijke
> Luchtvaart Maatschappij N.V. (KLM Royal Dutch Airlines), EL
> AL Israel Airlines Ltd., LAN Cargo S.A., Aerolinhas Brasileiras
> S.A., Cargolux Airlines International S.A., Nippon Cargo Airlines
> Co. Ltd., and Asiana Airlines Inc. Airline executives who have
> already pleaded guilty for their involvement in the illegal activity
> are Bruce McCaffrey of Qantas, Timothy Pfeil of SAS and Keith
> Packer of British Airways.

247.    On December 22, 2007, ANA announced that it had received a statement of

objections from the European Commission regarding ANA's participation in the fixing of prices

of air freight.  As set forth above, on November 2, 2010, ANA pled guilty to fixing the prices of

air freight and of air passenger transportation.

248.    Other air carriers, including a number of Defendants and their co-conspirators,

have also announced that in late-December 2007 they, too, received formal charges from the

European Commission for conspiring to fix cargo rates, including Air New Zealand, Air France,

Lufthansa, Qantas, co-conspirator KAL, Malaysian Airlines, British Airways, Cathay Pacific,

JAL, Thai Airways, and Singapore Airlines, among others.  According to Thai Airways, a total

of 26 airlines have received "Statements of Objection" from the European Commission.

249.    Thai Airways has further disclosed that it is being investigated by competition authorities in Europe, the United States, New Zealand, South Korea, and Australia concerning its participation in anticompetitive conduct involving the global airline industry.

250.    In their 2007 Annual Reports, China Airlines and EVA acknowledged that the DOJ is investigating price-fixing of cargo rates.  Both China Airlines and EVA stated that they were cooperating with the investigation, but were unable to assess their financial exposure at the time the reports were published.  On September 10, 2010, China Airlines pled guilty to criminal price-fixing for its role in a conspiracy to fix the rates of shipments of cargo to and from the United States and elsewhere.   On  May 27, 2011, EVA agreed to plead guilty to criminal price-fixing for its role in a conspiracy to fix the rates of shipments of cargo to and from the United States and elsewhere

251.    On January 14, 2008, Qantas pled guilty and was sentenced to pay a $61 million criminal fine for its role in a conspiracy to fix the rates of shipments of cargo to and from the United States and elsewhere.

252.    News reports indicated that during the week of March 10, 2008, the DOJ ordered a number of Qantas employees to appear in San Francisco for further questioning in the ongoing price-fixing investigations.

253.    On March 11, 2008, the European Commission raided the offices of Lufthansa (the DOJ's air cargo amnesty candidate), Air France, KLM, and Alitalia for evidence of price-fixing on air passenger tickets for international flights.

254.    The European Commission confirmed the raids by its personnel:

> The European Commission can confirm that on 11th March 2008 Commission officials carried out unannounced inspections at the premises of a number of international airline passenger carriers. These airline carriers provide scheduled passenger air transport services on long-haul routes between Europe and a third country. The Commission has reason to believe that the companies concerned may have violated EC Treaty rules on restrictive business practices (Article 81).

255.    Following the raids, Lufthansa stated that "[a]ccording to information from the investigation decision, the commission has information that passenger aviation companies including Lufthansa in Europe and in Japan may have taken part in anticompetitive price-fixing and collusive behavior in traffic between the EU and Japan."

256.    On March 12, 2008, the European Commission announced that the Japanese competition authorities also have an investigation underway concerning price-fixing of passenger fares on routes between Japan and Europe.

257.    On April 16, 2008, the DOJ announced that JAL agreed to plead guilty to fixing the rates for international cargo shipments and to pay a $110 million fine.

258.    On April 30, 2008, ANA announced that it had recorded an "extraordinary loss" of $156 million, which it noted is a preliminary estimate of the fines it is facing from the European Commission for anti-competitive conduct related to the fixing of prices for air freight. ANA noted that "[t]he allegations are based on evidence held by the European Commission and provided to them by other companies."

259.    On May 8, 2008, the DOJ announced that Bruce McCaffrey, a Qantas executive, agreed to plead guilty to price-fixing cargo fares.  He will serve 8 months in federal prison.  The announcement explained:

> McCaffrey is the first individual to be charged, and this is the fifth case to arise, in the wide-ranging investigation into the air transportation industry.

260.    Also on May 8, 2008, Air Canada disclosed that it, too, had received a statement of objections from the European Commission concerning its participation in a conspiracy to fix air cargo rates.  Air Canada also disclosed that it was reserving Cdn. $125 million to resolve its antitrust problems.

261.    On June 17, 2008, the *Business Spectator* reported as follows:

> Qantas Airways has reached a confidential settlement agreement with the Australian Competition and Consumer Commission, in a deal expected to see the airline pay a multi-million dollar penalty for its alleged role in illegally fixing fuel surcharges as part of a global cartel, reports The Australian Financial Review.

> According to the paper, the European Commission is also in the final stages of its price-fixing investigations and is ready to take action against 26 airlines.

> Qantas has signaled to the European regulators that it will admit liability and is expected to pay a hefty fine, the paper said.

262.     On June 26, 2008, the DOJ announced that it had filed informations against KLM, Air France, Cathay Pacific, and others for fixing cargo rates on international flights to and from the United States.  Air France and KLM, which have now merged their operations, have agreed to admit guilt and will pay a $350 million fine.  Cathay Pacific has also agreed to admit guilt and will pay a fine of $60 million.

263.     Cathay Pacific's CEO has admitted that Cathay Pacific's actions "were in conflict with US antitrust laws, and we very much regret this."

264.     On July 18, 2008, the New Zealand Commerce Commission announced that it had filed criminal charges against Singapore Airlines' Cargo Division, Cathay Pacific, and another airline for failing to provide relevant documents and information in response to the Commission's investigation into an international cartel to fix cargo rates, including surcharges. Paula Rebstock, the chairwoman of the New Zealand Commerce Commission stated: "Any failure to comply with . . . statutory notices that form part of a commission investigation is a serious enforcement issue."

265.     In July of 2008, Air France agreed to plead guilty to fixing cargo fares in the United States.  As part of its guilty plea, Air France agreed to a criminal fine of US $210 million.

266.     In August of 2008, Timothy Pfeil, the former highest-ranking cargo executive in the United States for SAS, pleaded guilty to conspiring to fix the rates charged to U.S. and international customers on air cargo shipments.

267.     On September 30, 2008, the DOJ announced that Keith Packer, former Commercial General Manager for British Airways World Cargo, had agreed to plead guilty to fixing air cargo rates charged to customers for international air shipments, including to and from the U.S., in violation of the Sherman Act. Under the plea agreement, which is subject to court

1   approval, Packer has agreed to serve eight months in jail, pay a $20,000 criminal fine and

2   cooperate with the DOJ's ongoing investigation.

3         268.   On October 28, 2008, the ACCC announced that British Airways had agreed to a

4   fine of AU$5,000,000.00 to resolve price-fixing claims lodged against its cargo division.  The

5   ACCC also announced that Qantas had similarly agreed to a fine of AU$20,000,000.00 for its

6   participation in the cargo conspiracy.  The ACCC Chairman, Graeme Samuel stated, "There are

7   some other airlines who are not cooperating with us and we will pursue our investigations there,

8   with a view to bringing them to account as soon as we possibly can.  We regard any cartel

9   activity—particularly those that are engaged in by large businesses and are of a price fixing

10  nature—as very serious in terms of consumers, they are nothing more than theft.  They steal from

11  consumers potentially millions if not tens of millions of dollars; there's no way that consumers

12  can recover what it has cost them."

13        269.   On December 15, 2008, the New Zealand Commerce Commission announced that

14  it had filed an action in the High Court in Auckland against 13 airlines and 10 senior executives,

15  including Air New Zealand, Air France, Cathay Pacific, British Airways, JAL, KAL, Malaysian

16  Airlines, Singapore Airlines, Qantas, Thai Airways, and UAL, for violations of New Zealand's

17  Commerce Act.  The New Zealand Commerce Commission also noted that other airlines were

18  cooperating with the investigation.  The Commission alleged "that airlines throughout the world

19  colluded to raise the price of freighting cargo by imposing fuel surcharges for more than seven

20  years."  The Commerce Commission further noted that the conspiracy "affected the price of

21  cargo both into and out of New Zealand.  It is alleged that airlines first entered into an illegal

22  global agreement in 1999/2000 under the auspices of the trade organization International Air

23  Transport Association (IATA).  The airlines imposed the fuel surcharges between 2000 and

24  2006.  The allegations also involve a series of regional price fixing agreements."

25        270.   On December 22, 2008, the ACCC announced that it had instituted proceedings

26  against Singapore Airline's cargo division in Federal Court in Sydney.  "The ACCC alleges that

27  Singapore Airlines Cargo Pte Ltd, between 2001 and 2005, entered into arrangements or

28

understandings with other international air cargo carriers that had the purpose or effect of fixing the price of a fuel surcharge and a security surcharge that was applied to air cargo carried by Singapore Airlines Cargo Pte Ltd and other airlines including to and from Australia." The ACCC further noted that a number of additional airlines were not cooperating with its investigation. In a related proceeding, on or about April 3, 2009, Australia's Federal Court in Melbourne ordered Singapore Airlines and its subsidiary, Singapore Cargo, and Emirates to turn over documents to the ACCC.

271. On January 22, 2009, El Al, Aerolinhas Brasileiras, and Lan Cargo agreed to plead guilty to price-fixing air cargo charges.

272. On February 16, 2009, a federal court in Australia ordered Air France to pay a AU $6 million penalty for participating in a conspiracy to fix cargo fuel surcharges.

273. On March 31, 2009, Air France agreed to pay a penalty to antitrust authorities in Canada of Cdn. $4 million.

274. On April 9, 2009, Asiana, Nippon Cargo (an affiliate of ANA), and Cargolux agreed to plead guilty to price-fixing air cargo charges in the United States. Asiana also admitted to fixing the price of wholesale and passenger fares and has agreed to pay a $50 million fine.

275. On or about April 20, 2009, the European Commission announced that it has opened a "priority" investigation into certain airline alliance agreements on trans-Atlantic routes. According to Jonathan Todd, a Commission spokesperson, "we think that there may be breaches of the antitrust rules because of the very extensive levels of cooperation on trans-Atlantic routes between these airlines."

276. On April 30, 2009, the ACCC announced that it had filed suit against Cathay Pacific for fixing the prices of fuel and other surcharges. The ACCC noted that it had evidence of at least 70 agreements between Cathay Pacific and its conspirators to fix cargo fares during the period from 2000 to 2006. The ACCC also stated that it is continuing to investigate the airline industry and "further actions are expected over the next few months."

277.     Also on April 30, 2009, the DOJ announced that a Martinair Holland executive had agreed to plead guilty to fixing air cargo fares, pay a $20,000 criminal fine and spend 8 months in jail.

278.     On June 26, 2009, the Canadian Competition Bureau announced that Air France, KLM, and Martin Air pled guilty to fixing the price of air cargo shipments during the period from April 2002 to February 2006 and were fined Cdn. $10 million.

279.     On July 7, 2009, the Canadian Competition Bureau announced that Qantas had agreed to plead guilty to fixing the price of air cargo shipments during the period from May 2002 to February 2006.

280.     Total fines levied by the DOJ to date in this wide-ranging investigation exceed $1.6 billion and collectively constitute the largest fines ever imposed by the DOJ as a result of a criminal antitrust investigation.  As of April of 2009, fifteen airlines and four executives have admitted (or have agreed to admit) guilt in US courts for their involvement in the worldwide cargo conspiracy.  Five airlines have either admitted guilt in fixing the prices of passenger fares or have sought leniency from the DOJ for doing so.  The DOJ has stated that its investigation of the industry is continuing.  Appendix G summarizes the status of the DOJ investigation with respect to the Defendants named in this complaint.

281.     It is significant that Defendants' anticompetitive behavior is the subject of a criminal grand jury investigation by the DOJ.  In order for the DOJ to institute a grand jury investigation, a DOJ Antitrust Division attorney must believe that a crime has been committed and prepare a detailed memo to that effect.  *See Antitrust Grand Jury Practice Manual*, Vol. 1, Ch. I.B.1 ("[i]f a Division attorney believes that a criminal violation of the antitrust laws has occurred, he should prepare a memorandum requesting authority to conduct a grand jury investigation.").  Furthermore, following a review of the memorandum, the request for a grand jury must be approved by the Assistant Attorney General for the Antitrust Division, based on the standard that a criminal violation may have occurred.  *See id*.  In addition, the fact that the DOJ Antitrust Division investigation is criminal, as opposed to civil, is significant as well.  The

1   Antitrust Division's "Standards for Determining Whether to Proceed by Civil or Criminal

2   Investigation" state: "[i]n general, current Division policy is to proceed by criminal investigation

3   and prosecution in cases involving horizontal, per se unlawful agreements such as price fixing,

4   bid rigging and horizontal customer and territorial allocations." *See Antitrust Division Manual*,

5   Chapter III.C.5.

## ACCRUAL OF CLAIM, EQUITABLE TOLLING, EQUITABLE ESTOPPEL, AND FRAUDULENT CONCEALMENT

8        282.    Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or

9   of facts sufficient to place them on inquiry notice of the antitrust claims set forth in this

10  Complaint, until shortly before the initial class action complaint was filed in this multi-district

11  litigation.

12       283.    Nor could Plaintiffs and the members of the Class have discovered the violations

13  through the exercise of reasonable diligence earlier than that time because Defendants conducted

14  their conspiracy in non-public meetings and through confidential emails and telephonic

15  communications which are detailed extensively above, concealed the nature of their unlawful

16  conduct and acts in furtherance thereof, and fraudulently concealed their activities through

17  various other means and methods designed to avoid detection.  The conspiracy was by its nature

18  self-concealing.

19       284.    Only on or about August 1, 2007, when the DOJ announced the charges against

20  KAL for fixing passenger fares and wholesale fares was the existence of the conspiracy disclosed

21  to the public.  That investigation resulted in a criminal guilty plea by ANA in November 2010

22  for anticompetitive conduct in the passenger transportation services market that commenced "at

23  least as early as April 2000."  As part of the plea deal, the criminal court sitting in Washington

24  D.C. elected to forego a sentence that included restitution for the victims because of the

25  pendency of *this litigation*.  The Court, in addressing the sentence for ANA, stated:

> I agree with the government and the defendant in this case and the
> circumstances of this case that in light of pending civil action,
> restitution should not be ordered here today against ANA after
> considering factors that are relevant under Section 3663 of Title

1   18 and *particularly noting that there is a possible recovery of*
2   *treble damages through that civil action.* I'm going to accept the
    agreed-upon sentence in this case as it is set out in the plea
3   agreement and therefore accept the plea with this sentence as
    agreed by the government and ANA.

4   285.   It is grossly inequitable and unfair to allow an admittedly guilty defendant to

5   avoid fully compensating its victims under the circumstances.

6   286.   In fact, there is specific evidence demonstrating that Defendants agreed to conceal

7   their conduct from U.S. regulators and others.  For example, illegal price-fixing meetings were

8   held at locations outside of the United States, where they would be difficult to detect by United

9   States antitrust regulators.  The meeting minutes of the May 18, 2004 Thai Board of Airline

10  Representatives which reference substantial price-fixing conduct by the Defendants are marked

11  "Confidential" in order to prevent them from being distributed to anyone but the members of the

12  price-fixing conspiracy alleged herein.  Further, at the meeting, Thai Board of Airline

13  Representatives, Mr. Suebsantiongse of Thai Airlines, the Board's chairman, specifically

14  reminded the attendees that fuel surcharge discussions were a "sensitive" issue.  A reasonable

15  interpretation of Mr. Suebsantiongse's comment was an express or implied warning not to

16  publicly acknowledge the collective efforts of the airlines to impose fuel surcharges, particularly

17  in light of the fact that, as just described, the notes of the meeting were stamped confidential and

18  not to be disseminated to the public.  A list of the attendees at the meeting is set forth in

19  Appendix B.  The Defendants all understood that coordinated pricing discussions must not be

20  disclosed to the public in order to prevent a backlash from their customers, and this

21  understanding cut across all of the various BAR meetings discussed herein, including September

22  1, 2005 meeting of the Thailand BAR meeting,[2] the May 21, 2004 meeting of the Philippine

23  BAR, and the May 2004 meeting of the Malaysia BAR.

24  287.   Specific price-fixing discussions (referencing names, dates, and subject matter)

25  set forth in the dozens of emails and face-to-face meetings described in Paragraphs 111-79 and

26  206-35 above were conducted in secret and were intended by the participants to never be

27

28  [2] A list of attendees of this meeting is set forth in Appendix D.

1    disclosed to the public.  Indeed, the illegal discussions remained secret until one of the

2    conspirators decided to become a whistle-blower and provided this secret material to the

3    Plaintiffs shortly before they filed their amended complaint in August 2009.

4          288.    Some of these intentionally secretive communications included the following

5    non-public emails:

| Date | From | To | cc: | Description |
|------|------|-----|-----|-------------|
| 1/25/2000 | Hidetomi Kadoya (JAL) | Choji Nakamura (JAL) | Shinji Ono (JAL) | Referenced discussions with China Airlines regarding the agreement on ZONE PEX prices to Honolulu and that the two companies were finalizing the specifics on ZONE PEX prices to Honolulu after agreeing in principle to coordinate ZONE PEX pricing. |
| 8/19/2000 | Eugene Yi-Ching Lee (China Airlines) | Shinji Ono (JAL) | China Airlines Employees | Recent 20 page facsimile with China Airlines' ZONE PEX, APEX and other carrier fares from Japan to Taiwan, S.E. Asia and Honolulu for the period from 10/1/00 to 3/31/01.  Asks JAL to review and concur with China Airlines' prices. |
| 8/20/2000 | Tsuneo Kojima (Thai Airways) | Keeratiroj Sirisap (Thai Airways); Shinji Ono (JAL); Fukushima (ANA) | | Thai Airways to send to ANA and JAL its fares and rules of application for the period between 10/1/00 and 3/31/01 on certain flights from Tokyo and Osaka to the US.  Request concurrence. **Attachment**: ZPEX fares for LAX, SFO, LAS, SEA, PDX, SAN, and OAK. |
| 10/24/2000 | Shinji Ono (JAL) | Eugene Yi-Ching Lee (China Airlines) | | Indicated review of documents and concur with ZPEX/APEX/Carrier IIT fares, except for APEX fares from Tokoname in Japan to Kaohsiung in Taiwan.  Ono also asked for the Tokoname - Kaohsiung route, that China Airlines agree to the fare set by EG (Japan Asia Airways) on that route.  "[i]f you will agree with the above |

| Date | From | To | cc: | Description |
|------|------|-----|-----|-------------|
| | | | | matching, EG will concur..." |
| 2/13/2001 | Tsuneo Kojima (Thai Airways) | Keeratiroj Sirisap (Thai Airways) | Shinji Ono (JAL); Akiko Oyama (ANA) | Regarding concurrence on ZONE PEX fares to the US for the first half of FY2001. **Attachment**: Proposed ZONE PEX fares for Japan to US and the rules of application about the ZONE PEX fare. |
| 7/25/2001 | Tsuneo Kojima (Thai Airways) | Keeratiroj Sirisap (Thai Airways) | Shinji Ono (JAL); A. Kawaguchi (ANA) | Regarding ZONE PEX fares for second half of FY2001. **Attachment**: Fare Sheet. |
| 7/25/2001 | Tsuneo Kojima (Thai Airways) | Keeratiroj Sirisap (Thai Airways) | Shinji Ono (JAL); Akiko Kawaguchi (ANA) | "[w]e have now completed the fares for TG [Thai Airways] Zone Pex from Japan to US for 10/1/01 through 3/2/11.  Applicable rules remain unchanged.  We would like to request you to receive concurrence from JL/NH on our proposal as soon as possible." **Attachment**: Fare sheet |
| 7/26/2001 | Keeratiroj Sirisap (Thai Airways) | Shinji Ono (JAL); Yasuhiro Nishiyama (ANA) | Tsuneo Kojima (Thai Airways); Seree Pipatchaipoom (Thai Airways) | Asking for concurrence as to the flights on various city pairs, including flights between Japan and the US. |
| 7/27/2001 (In email string 10/24/02) | Katsutaka Fujii (China Airlines) | Shinji Ono (JAL) | | Indicated, "[w]e have received the fares for Hong Kong and Honolulu.  Are they final fares?  If they are final, we will match and send them to the head office." |
| 7/30/2001 | Katsutaka Fujii (China Airlines) | Mei-Wen Lin (China Airlines) | Shinji Ono (JAL); Yoshihisa Yamamoto (China Airlines); Masaru Kunihiro (China | Notifying JAL employees of China Airlines' intention to match JAL's ZONE PEX and APEX fares from Hong Kong to Honolulu for the second half of FY2001. **Attachment:** Fare sheet with pricing for the referenced fares. |

| Date | From | To | cc: | Description |
|------|------|-----|-----|-------------|
| | | | Airlines) | |
| 8/2/2001 | Katsutaka Fujii (China Airlines) | Shinji Ono (JAL); Choji Nakamura (JAL); Mei-Wen Lin (China Airlines); Tsugio Arasaki (China Airlines); Kengo Tanaka (China Airlines); Yoshihisa Yamamoto (China Airlines); Masaru Kunihiro (China Airlines) | | Informing JAL that China Airlines was going to match JAL's ZONE PEX and APEX fares between Tokyo and various destinations including Honolulu. Identified matching fares between various city pairs, including flights between Asia and Honolulu. |
| 8/7/2001 | Mei-Wen Lin (China Airlines) | Shinji Ono (JAL) | Katsutaka Fuji (China Airlines); Choji Nakamura (JAL); Masaru Kunihiro (China Airlines); Yoshihisa Yamamoto (China Airlines); Tsogio Arasaki (China Airlines); | Requesting coordination with JAL on various city pair routes, including the coordination of ZONE PEX and APEX fares between Tokyo and Honolulu. |

| Date | From | To | cc: | Description |
|------|------|-----|-----|-------------|
| | | | Kengo Tanaka (China Airlines) | |
| 10/31/2001 | Katsutaka Fujii (China Airlines) | Choji Nakamura (JAL); Shinji Ono (JAL) | Mei Wen Lin (China Airlines); Masaru Kunihiro (China Airlines); Junichi Kimura (China Airlines) | Stated proposed Special APEX fares to Honolulu, adding "[W]e will inform you if there is any changes, but we match fare rule with JL." |
| 1/24/2002 | Katsutaka Fujii (China Airlines) | Mei Wen Lin (China Airlines) | Ta Kung Lee (China Airlines); Yeh Cheng Fan (China Airlines); Yoshihisa Yamamoto (China Airlines); Kengo Tanaka (China Airlines); Masaru Kunihiro (China Airlines); Tsugio Arasaki (China Airlines); Shinji Ono (JAL); Choji Nakamura (JAL) | |

| Date | From | To | cc: | Description |
|------|------|-----|-----|-------------|
| 1/29/2002 | Tsuneo Kojima (Thai Airways) | Keeratiroj Sirisap (Thai Airways); Shinji Ono (JAL); Akiko Kawaguchi (ANA); Hajime Kuroiwa (Thai Airways) | | Proposed ZONE PEX fares between Narita/Kansai to Los Angeles for the period between 4/1/02 and 9/30/02.  Indicated that Thai Airways would like to have concurrence from [JAL/ANA] as early as possible. |
| 2/18/2002 | Mei-Wen Lin (China Airlines) | Shinji Ono (JAL); Katsutaka Fujii (China Airlines); Masaru Kunihiro (China Airlines); Kengo Tanaka (China Airlines); Yoshihisa Yamamoto (China Airlines); Tsugio (China Airlines); Kenji Doi (China Airlines) | | Requesting concurrence on ZONE PEX and APEX fares from Tokyo to Honolulu for the first half of FY2002.  Last line of email states "HNL ROUTE (MATCHING WITH JL) TYO-HNL ZPEX/APEX" |
| 7/29/2002 | Kenji Doi (China Airlines) | Shinji Ono (JAL) | | Stating, "As to the HNL route and the South East Asia route,… we will match JAL naturally but we have no information [about it]." |
| 8/5/2002 | Tsuneo Kojima (Thai Airways) | Akiko Oyama (ANA); Shinji Ono (JAL) | Shingo Komatsu (Thai Airways); Hajime Kuriowa (Thai | Requesting concurrence on ZONE PEX fares on flights to the US for the second half of FY2002. |

| Date | From | To | cc: | Description |
|------|------|-----|-----|-------------|
| | | | Airways) | |
| 8/9/2002 | Tsuneo Kojima (Thai Airways) | Keeratiroj Sirisap (Thai Airways); Shingo Komatsu (Thai Airways); Hajime Kuroiwa (Thai Airways) | Shinji Ono (JAL); Akiko Oyama (ANA) | Confirmed that an agreement had been reached between the 3 airlines regarding carrier fares from Japan to the US |
| 8/9/2002 | Takashi Oshima (Singapore Airlines) | Shinji Ono (JAL) | | Singapore Airlines coordinated carrier fares on flights to the US – "[f]or Los Angeles and Las Vegas fares, we have matched your fares…" |
| 8/16/2002 | Mei-Wen Lin (China Airlines) | Shinji Ono (JAL) | Masaru Kunihiro (China Airlines); Kenji Doi (China Airlines) | Requesting concurrence of ZONE PEX, 14 day APEX and 35 day APEX fares from Tokyo to Honolulu for the second half of FY2002.  Stated, "TYO to HNL - ZPEX/APEX14/APEX35." |
| 10/24/2002 | Shinji Ono (JAL) | Keeratiroj Sirisap (Thai Airways); Tsuneo Kojima (Thai Airways) | | Response to Thai Airways' ZONE PEX fares from Japan to the US proposed on 7/26/01, indicating "we have no objection."  Also discussed the fact that JAL intended to seek agreement with Philippine Airlines regarding coordinated fares to Manila and also indicated a willingness to coordinate with Thai Airways on carrier fares to Thailand. |
| 10/24/2002 | Shinji Ono (JAL) | Mei-Wen Lin (China Airlines); Masaru Kunihiro (China Airlines); Kenji Doi | | JAL explaining it had "no obligation for the captioned fares" between Tokyo and Honolulu proposed by China Airlines. |

| Date | From | To | cc: | Description |
|------|------|-----|-----|-------------|
| | | (China Airlines) | | |
| 2/19/2003 | Takashi Oshima (Singapore Airlines) | Shinji Ono (JAL) | | Asking for concurrence on APEX fares from Tokyo to Los Angeles |
| 5/24/2004 | Carol Phatoomros (Thai Airways) | Thai BAR meeting participants and others, including Prajak Burarak and Chaichan Khongsrithong (American Airlines), and EVA Airways | | Follow-up after Thai BAR meeting.  **Attachment**: Letter that Thai Airlines was sending to the Thai Department of Transport. Letter stated in part that "the members of the Board of Airlines Representatives at a meeting on May 18th agreed that unless otherwise instructed by their Head Offices...  they would apply fuel surcharges adapting the fuel price index methodology of calculating the surcharge... US15.00 for intercontinental flights. The fuel surcharge will be on a per sector basis..."  These Surcharges included surcharges on flights to and from the US. |
| 5/25/2004 | Estrellita O. Inoturan (PAL) | JAL employee | | Discussing the intended surcharge, the effective date, and the method of implementation. Request confirmation that the recipients would agree to it. |
| 5/26/2004 | Terada Haruhiko (JAL) | Ito Satoshi (JSA Tyopiz); Uyama Hiroshi (JSA Tyopiz); Nakano Hoshiko (JSA Tyopiz) | | Indicated that "[w]e do not oppose PR's [Philippine Airlines'] adoption of the fuel surcharge." |
| 6/7/2004 | Suthep Suebsantiwongse (Thai Airways) | Annie Tsima (Austrian Airlines); Buranut Limjitti | | Confirming the impositions of fuel surcharges as previously discussed by Thailand BAR members. |

| Date | From | To | cc: | Description |
|------|------|-----|-----|-------------|
| | | (AUA); Merita (Kenya Air); Raymond Honings (Asia); Royal Runei; ANA; Markus Moschner (Asia) | | |
| 6/15/2004 | Akira Mori (JAL) | Tran Thu Hien (Vietnam Airlines) | | Response to inquiry regarding ANA's fuel surcharge intentions. JAL was planning on implementing Vietnam Airlines' "captioned surcharge from July 1, 2004" and that ANA "will most likely match us." |
| 6/22/2004 | Nakano Hoshiko (JAL) | Onuki Tetsuya (JSA TYPOCGZ) | | Noted that "[w]e have a sensitive relationship with the authority and we do not want to have any arguments about the set-up of carrier fares, etc." |
| 7/13/2004 | Si Yeon Lee (KAL) | Takashi Inagaki (JAL) | | Providing proposed APEX fares from Tokyo to Los Angeles for the first half of FY2004 and requesting concurrence. **Attachment**: Agreement upon ZONE PEX prices between Tokyo and Los Angeles |
| 7/21/2004 | Tomomi Kubota (JAL) | Si Yeon Lee (KAL) | | Indicating JAL's agreement with KAL's proposed coordinated price. |
| 9/1/2004 | ANA Rep | JAL Reps | | Fare chart for ANA's discount class fares for the forthcoming 6-month period. |
| 9/21/2004 | Gen Yamasaki (JAL) | Mohamed Habib (Northwest) | | Asking why the DOT was reluctant to authorize fuel surcharges for passenger tickets. Habib response inquired as to possible interest within JAL to implement fuel surcharges. |

| Date | From | To | cc: | Description |
|------|------|-----|-----|-------------|
| 10/15/2004 | Inagaki Takashi (JAL) | Mohamed Habib (Northwest) | | Asking, "Have you heard that DOT at last decided to permit the filing of FUEL surcharges by carriers!!?"  Habib responded by noting that American Airlines has already undertaken efforts to implement a fuel surcharge and that Northwest would "most likely match" it. |
| 10/29/2004 | Hirashi Rie (JAL) | Gen Yamasaki (JAL) | | Confirming that Air France would begin collection of a 10 Euro fuel surcharge on international flights. |
| 10/29/2004 | Hirashi Rie (JAL) | Gen Yamasaki (JAL) | | Confirmed that Lufthansa had increased its fuel surcharge for international carriage from 7 Euros to 17 Euros and that British Airways had increased its fuel surcharge from 6 Pounds to 10 Pounds. |
| 10/29/2004 | Liu Zheng (JAL) | Gen Yamasaki (JAL) | | Confirming that China Airlines will start collection of fuel surcharge for the "China-America" route of US$14.00 and that KAL had started imposing a fuel surcharge of US$25.00 for departures from the US on October 25, 2004.  Also, noted that Qantas had increased its fuel surcharge for the "America routes" to US$21.30, effective October 20, 2004. |
| 11/1/2004 | Noma Kaori (JAL) | Gen Yamasaki (JAL) | | Confirming communication with American Airlines, UAL, Delta, Continental, and Northwest and that these airlines had imposed fuel surcharges of US$25.00 on transpacific routes, except to/from Japan, where the fuel surcharge was US$5.00.  With the exception of Northwest, these surcharges were not expressly described as "fuel surcharges."  Also, noted that Philippine Airlines was also imposing a US$25.00 fuel surcharge, effective for tickets issued on and after October 22, |

| Date | From | To | cc: | Description |
|------|------|------|------|-------------|
| | | | | 2004, and that Thai Airways was introducing a fuel surcharge of US$19.00, effective November 1, 2004, for routes to and from the US. Also confirmed through ATPCO, a tariff publication company owned by Air France, American Airlines, British Airways, Continental, JAL, Delta, KLM, Lufthansa, Northwest, Swiss International, UAL, and others, that Thai Airways was implementing a fuel surcharge of US$15.00 one way to and from the US, and that Singapore Airlines was collecting a US$17.00 fuel surcharge to/from the US. |
| 11/4/2004 | JAL | | | Described the assistance that JAL would provide other airlines concerning pricing for "arrivals from Europe, the Americas and Asia." For overseas hubs of other carriers, JAL said it would "follow" the lead of other carriers. |
| 11/8/2004 | Gen Yamasaki (JAL) | Mamaoru Tsutsumi (JAL) | Yamada Tomoaki (JAL); Hakoda Hideki (JAL); Fukada Yasuhiro (JAL); Fujioka Hidekazu (JAL); Fukada Makoto (JAL); Tanabe Harukata (JAL); Yamaguchi EichI (JAL); Onuki | Indicated that JAL would help its competitors implement fuel surcharges in Japan and would then follow the lead of these competitors in their home markets. |

| Date | From | To | cc: | Description |
|------|------|-----|-----|-------------|
| | | | Tetsuya (JAL); Hayakawa Shinji (JAL); Takahashi Tetsuo (JSA); Saito Yuji (JSA); Mizuno Toru (JAL); Fujita Tadashi (JSA); Amakawaya Shigeru (JSA); Ando Tsutomu (JAL) | |
| 11/10/2004 | Gen Yamasaki (JAL) | Mamaoru Tsutsumi (JAL) | Yamada Tomoaki (JAL); Hakoda Hideki (JAL); Fukada Yasuhiro (JAL); Fujioka Hidekazu (JAL); Fukada Makoto (JAL); Tanabe Harukata (JAL); Yamaguchi EichI (JAL); Onuki Tetsuya (JAL); Hayakawa Shinji (JAL); Takahashi Tetsuo (JSA); Saito Yuji (JSA); Mizuno Toru | Confirmed current and future fuel surcharges in the Japanese market (including flights to and from the US) |

| Date | From | To | cc: | Description |
|------|------|------|------|------|
| | | | (JAL); Fujita Tadashi (JSA); Amakawaya Shigeru (JSA); Ando Tsutomu (JAL) | |
| 11/30/2004 | Hiroko Ueba (Cathay Pacific) | Yasuhiro Nishiyama (ANA); and Ms. Noma (JAL) | | Thanking JAL for their "continued support."  Also explained that ANA wanted to implement a fuel surcharge and sought agreement.  The requested agreement concerned flight coupons between Hong Kong and North America, among other places around the world effective December 1, 2004. |
| 11/30/2004 | Noma Kaori (JAL) | Gen Yamasaki (JAL) | | Obtained the approval of Gen Yamasaki (JAL) |
| 12/2/2004 | Noma Kaori (JAL) | Gen Yamasaki (JAL) | | "yesterday I told CX [Cathay Pacific] that we would agree to it." |
| 12/26/2004 | Gen Yamasaki (JAL) | Irie Kesuke (JAL) | | Reported that an "airline concordance was submitted to KE [KAL] today." |
| 1/5/2005 | Kubota Tomomi (JAL) | Gen Yamasaki (JAL) | | Reported that Thai Airways sought agreement on a fuel surcharge to be USD 20 per leg for international flights.  "Is it okay to agree" - Mr. Yamasaki replied "Yes, go ahead and agree," and stated that he has "confirmed with them as follows…  Manila International sector USD 20.00 or equivalent |

| Date | From | To | cc: | Description |
|------|------|-----|-----|-------------|
| | | | | for LAX-bound Kansai departures." |
| 1/7/2005 | Kubota Tomomi (JAL) | Toshiaki Oshima (Singapore Airlines) | | Thanking him for "continuous help" and asking for information about the status of Singapore Airlines' fuel surcharges. |
| 1/17/2005 | Kazuhisa Okamoto (Singapore Airlines) | Kubota Tomomi (JAL) | | Explaining the details of Singapore Airlines' fuel surcharges. |
| 5/31/2005 | Hirai Noboru (JAL) | Mitaki Kenya (JSA); Mizuguchi (JSA); Terao Yasushi (JSA) | Kuryu Ichiro (JSA); Amakawaya Shigeru (JAL); Ninomiya Hideo (JAL); Koyama Yuji (JAL); Hayakawa Shinji (JAL); Saito Yuji (JAL); Nakada Atsushi (JSA) | Referenced 5/30/05 meeting between Northwest and JAL. Email discussed pricing for fares to Honolulu and Micronesia for the second half of FY2005. For flights from Osaka to Honolulu, Hirai wrote that he would "seek to coordinate and consider with branch offices for plus 5000 yen." For flights from Tokyo to Honolulu, Hirai wrote that he would "seek coordination within range from about the same as last year to about plus 2000 yen." For fares from Tokyo to Micronesia, Hirai wrote, "decision will be made after CO/JAL price coordination. Desire price increase of about 5%... APEX would continue." |
| 5/31/2005 | Hirai Noboru (JAL) | Mitaki Kenya (JSA); Mizuguchi (JSA); Terao Yasushi (JSA) | Kuryu Ichiro (JSA); Amakawaya Shigeru (JAL); Ninomiya Hideo (JAL); Koyama Yuji (JAL); Hayakawa Shinji (JAL); Saito Yuji (JAL); Nakada | Subject line: "Regarding meeting with NW (forwarding prohibited read only)" - Providing a summary of his meeting with NW and informing recipients to "delete this after you have finished reading." Noted that Northwest was considering matching JAL's application on fuel surcharge increases on routes to Honolulu, but that Northwest had not yet made a determination about North America "because of reasons such as the need to watch |

| Date | From | To | cc: | Description |
|------|------|-----|-----|-------------|
|  |  |  | Atsushi (JSA) | the trend in other American companies."  Also referenced fare coordination between JAL and Northwest, with a final decision to be "made after CO [Continental]/JL [JAL] price coordination."  Ending with, "The environment is such that continued price increases will be desired." |
| 8/18/2005 | Carol Phatoomros (Thai Airways) | David Lau (Singapore Airlines); Eric Wilson (UAL); Axel Blom (SAS); Patrick Yeung (Cathay Pacific); Julianne Rogers (British Airways); Wofgang Schmidt (Lufthansa); Air India; Air Canada; Eva Airways; Jhab Sorial (KLM); Sarathool (Northwest); Panya Silpargam (Air New Zealand); Asiana; Alan Tang (Cathay Pacific); IATA; KAL; |  | Subject line: "Message from THAI re Fuel Surcharge" - stated "[w]e also know that we have to be aware of market acceptability of these increases… we at THAI are looking for all of your efforts to toe the line with us.  All the time we compete absolutely, but this time we ask for unity and to be onboard the fuel surcharge wagon for our future and survival." |

| Date | From | To | cc: | Description |
|------|------|-----|-----|-------------|
| | | Charlie Fu (China Airlines); Pajack Burarak (American Airlines); Chaichan Khorgsrithong (American Airlines); Chanchai Wangyueny ong (JAL); L. Moser (Qantas); Vietnam Airlines; Air France; Brian Sinclair-Thompson (Swiss International); Alitalia; Philippine Airlines; ANA | | |
| 10/31/2005 | Siyeon Lee (KAL) | Takashi Inagaki (JAL) | | "[w]e are matching NW's [Northwest] level." |
| 10/31/2005 | Takashi Inagaki (JAL) | Tanaka Misato (JAL) | | Discussed KAL's proposed coordinated fares for flights from Japan to the US and described JAL's relationship with KAL as one premised on a "gentlemen's agreement."  Also noted that Northwest was matching fares. |
| 11/1/2005 | Takashi Inagaki (JAL) | Inagaki Takashi (JAL) | | Indicated KAL always agreed to match JAL's fares pursuant to a "gentlemen's agreement" - reference to fares from Tokyo to Los Angeles. |

| Date | From | To | cc: | Description |
|------|------|-----|-----|-------------|
| 7/7/2006 | Ai Watanabe (China Airlines) | Owano Hideo (JAL) | Kenji Doi (China Airlines) | Explaining that China Airlines hoped to establish an APEX fare between Tokyo and Honolulu soon.  Requested concurrence from JAL as soon as JAL's routes became available.  Want to know when JAL's second half FY2006 fare proposal to Honolulu. |

289.    Other examples of concealment include, for example, the following:  On June 15, 2004, Akira Mori (JAL) responded to an inquiry from Vietnam Airlines (Tran Thu Hien) regarding ANA's fuel surcharge intentions.  Mr. Mori stated that JAL was planning on implementing Vietnam Airlines' "captioned surcharge from July 1, 2004" and that ANA "will most likely match us."  A subsequent JAL e-mail from Nakano Hoshiko dated June 22, 2004 noted that "[w]e have a sensitive relationship with the authority and we do not want to have any arguments about the set-up of carrier fares etc."  A reasonable interpretation of Mr. Hoshiko's comment is that the participants in these price-fixing discussions needed to conceal their collective rate-setting efforts in order to avoid scrutiny by the regulatory authorities.

290.    In fact, JAL and ANA specifically agreed during the conspiracy period to submit separate fare and fuel surcharge applications to the Japanese regulatory authority and to avoid referencing the existence of agreements by one or the other to "match" each other's pricing policies.  Indeed, when a pricing change was desired by JAL and ANA, one or the other of the carriers would generally submit an application with the Japanese regulator first and the other carrier would follow with a matching application a few days later.  The staggered nature of these submissions served to conceal pre-existing price-fixing agreements.  The first fuel surcharge increase between Japan and the U.S. provides an example of how this process occurred.

291.    In October 2004, JAL marketing department employee Yuji Saito initiated contact with his counterpart at ANA to discuss the implementation of fuel surcharges into and out of Japan.  ANA Revenue Management Employee Mr. Ishida said ANA would not be applying a surcharge.  Nevertheless, JAL continued to seek ANA's support for a fuel surcharge and a

further meeting was held in November of 2004 to discuss its implementation. This meeting was attended by: Saito, Shinobe (ANA Revenue Management), Kato (ANA Revenue Management, and Inida (Management Planning).  Following this, a series of meetings were held in November and December 2004, usually at JAL' s Tokyo headquarters where discussions were held concerning the amount and structure of the fuel surcharges. The two companies coordinated: (1) amounts and (2) when the surcharge would sunset.  It was agreed that the surcharges would terminate if the price of crude oil dropped below $40/barrel on the Singapore index.  JAL employees involved in these meetings included:  (1) Ms. Hoshiko and International Marketing Department employee and head of JAL tariff group; (2) Ms. Nakano; and (3) Gen Yamasaki (Nakano's No. 2). The ANA tariff group representatives were: Messrs Yabuki, Sato, and Yakoyama.  The participants in this scheme agreed that fuel surcharge requests should not be filed simultaneously.

292.    On December 24, 2004, JAL submitted its surcharge request to the Japanese regulator.  The initial surcharge of 2,500 yen would take effect on January 20, 2005 but would only apply to outbound flights.

293.    On January 5, 2005, ANA submitted its surcharge request to the Japanese regulator for 2,500 yen set to take effect on February 1, 2005 for both outbound and inbound flights.

294.    On January 7, 2005, Kubota Tomomi of JAL sent an e-mail to Toshiaki Oshima of Singapore Airlines thanking him for his "continuous help" and asking for information about the status of Singapore Airlines' fuel surcharges.  Mr. Tomomi followed up with Mr. Oshima again on January 13, 2005.

295.    On January 16, 2005, Gen Yamasaki of JAL warned members of his staff to please "be careful" with the fuel surcharge information of JAL and other carriers.

296.    Kazuhisa Okamoto of Singapore Airlines' "Alliance dept." then responded to Mr. Tomomi on January 17, 2005 by explaining the details of Singapore Airlines' fuel surcharges. Mr. Tomomi thanked Mr. Okamoto for the information, promised to be "very carefull [sic] with

1  handling"—meaning that he would not disclose this non-public information to individuals

2  outside the conspiracy—and requested that Singapore Airlines "keep cooperating with us in the

3  future."

4      297.    On February 18, 2005 JAL amended its surcharge so that it would apply to both

5  inbound and outbound flights.

6      298.    On May 31, 2005, Hirai Noboru of JAL circulated an e-mail with a subject line

7  titled: "[r]egarding meeting with NW (**forwarding prohibited read only**)" to the following JAL

8  employees: Mitaki Kenya (JSA TYOSMA); Mizuguchi Yusuke (JSA TYOSMA); Terao Yasushi

9  (JSA OSASIG); Kuryu Ichiro (JSA TYOSMA); Amakawaya Shigeru (JALI TYOCIZ);

10  Ninomiya Hideo (JALI TYOCIZ); Koyama Yuji (JALI TYOCIZ); Hayakawa Shinji (JALI

11  TYOCGZ); Saito Yuji (JALI TYOCIZ); Nakada Atsuhi (JSA OSASIG).

12      299.    Mr. Noboru stated that he was providing a summary of his meeting with NW

13  "yesterday" and that the recipients should "**delete this after you have finished reading**."

14  (emphasis in original).  The e-mail noted that Northwest was considering matching JAL's

15  application on fuel surcharge increases on routes to Honolulu, but that Northwest had not yet

16  made a determination about North America "because of reasons such as the need to watch the

17  trend in other American companies."  This e-mail also referenced fare coordination between JAL

18  and Northwest, with a final decision to be "made after CO [Continental]/JL [JAL] price

19  coordination."  The e-mail concluded:  "The environment is such that continued price increases

20  will be desired."

21      300.    On December 28, 2005, Irie Keisuke (JAL) sent an email to numerous JAL

22  employees, including Morioka Kiyoto, Cahill Fusako, Fujioka Hidekazu, Anan Masaaki, Lucas

23  Mark, Nishijima Mahahiro, Tsuda Naoto, Ito Satoshi, Nishiwaki Jun, Shibata Akinobu, Furuta

24  Shur, Kuwahara Yukiko, Inagaki Takashi, Yamasaki Gen, Nakano Hoshiko, Tanaka Misa,

25  Hayashirie, Saito Yuji, Yasumitsu Shinsaku;, Iwahi Koso, Koyama Yuji, Asahi Atsuko,

26  Hatakeyama Takahisa, Fukuda Yutaka, Hayakawa Shinji, Omori Yasushi.  The email's subject

27  was: "[**HIGHLY CONFIDENTIAL- DO NOT FORWARD ] Increase in fuel surcharge** for

28

flights departing from and **arriving in Japan.**"  The email continued:  "With regard to the captioned matter, as fuel costs are trending at a higher level than expected with the present fuel surcharge, we will file an application to increase the fuel surcharge for [flights] departing from and arriving in Japan. . . .  This is in the middle of the period, and we have not obtained the agreement of the other airlines, so for the present time I am asking each of the branches to wait for instructions until after the New Year with regard to information disclosure."  As set forth in the following chart, agreement was reached between ANA and JAL and announcements of fuel surcharges were made by JAL (Jan. 16, 2006) and ANA (Jan. 23, 2006).

301.    ANA and JAL's public announcements concerning changes to fuel surcharge pricing further served to conceal the existence of price-fixing agreements between the competitors from the public.  For example, the companies would stagger the timing of their announcements and the effective dates of the price changes in order to make it appear that one competitor was following the lead of the other, rather than entering into pre-existing, coordinated agreements to fix-prices:

| | |
|---|---|
| January 5, 2005.  ANA announced it would add fuel surcharges on international fares on **February 1**.  The surcharges for transpacific flights were 2,500 yen (approximately US $24.37) | January 20, 2005.  JAL announced it would add fuel surcharges on international passenger fares on **February 1**.  The surcharges for transpacific flights were 2,500 yen (approximately US $24.37). |
| June 3, 2005.  JAL announced its intention to raise its international fuel surcharge effective **July 1**. | June 7, 2005.  ANA announced its intention to raise its international fuel surcharge effective **July 7.** |
| January 16, 2006.  JAL announced its intention to raise its international fuel charge effective **March 1**. | January 23, 2006.  ANA announced its intention to raise its international fuel surcharge, effective **March 1**. |
| August 17, 2006.  JAL announced its intention to raise its international fuel surcharge, effective **October 1**, from 8,000 yen to 13,600 yen ($66 to $113). | August 31, 2006.  ANA announced its intention to raise its international fuel surcharge, effective **October 15**, from 8,000 yen to 13,600 yen ($66 to $113). |
| November 16, 2006.  JAL announced its intention to reduce the fuel surcharge on international passenger fares effective **January 1**, lowering the surcharge from 13,600 yen to 13,000 yen ($113 to $108). | November 16, 2006.  ANA announced its intention to reduce the fuel surcharge in international passenger fares effective **January 1**, lowering the surcharge from 13,600 yen to 13,000 yen ($113 to $108). |

| | |
|---|---|
| <u>March 19, 2007</u>. JAL announced its intention to reduce the fuel surcharge on international passenger fares effective **May 1**, to 11,000 yen ($91). | <u>March 20, 2007</u>. ANA announced its intention to reduce the fuel surcharge on international passenger fares effective **May 1**, to 11,000 yen ($91). |
| <u>May 15, 2007</u>. JAL announced its intention to raise the fuel surcharge on international passenger fares effective **July 1**, from 11,000 yen or $91 to 12,000 yen ($100). | <u>May 25, 2007</u>. ANA announced its intention to raise the fuel surcharge on international passenger fares effective **July 10**, from 11,000 yen or $91 to 12,000 yen ($100). |
| <u>August 15, 2007</u>. JAL announced its intention to raise the fuel surcharge on international passenger fares effective **October 1**, from 12,000 yen or $100 to 13,000 yen ($108). | <u>August 20, 2007</u>. ANA announced its intention to raise the fuel surcharge on international passenger fares effective **October 1**, from 12,000 yen or $100 to 13,000 yen ($108). |

302.     Moreover, the Defendants made false statements to the public and to others, including the issuance of false and misleading press releases claiming that fuel surcharges were required to offset the rising cost of fuel to further conceal the true reason for the imposition of fuel surcharges, when in reality, the fuel surcharges were the product of coordinated actions by the Defendants and became a profit center for them.   In making these announcements, Defendants never mentioned that the true reason for the fuel surcharges was the secret agreement that their competitors would also increase fuel surcharges.  If there had been no secret agreement, competition would have precluded imposition of the surcharges.  There is an obligation in the law that requires one who speaks on a subject to speak truthfully and completely.  It is misleading to suppress a fact when giving information of other facts which are likely to mislead for want of communication of that fact.  One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.  In addition, a party is responsible for a representation that was not made directly to a plaintiff if the representation is made to someone else intending or reasonably expecting that it would be repeated to the plaintiff. Defendants may have been entitled to justify the fuel surcharges by reference to increased fuel costs had they also explained that they and their competitors had agreed to increase prices collusively.  By divulging part of the story, the Defendants were obligated to explain the whole

1   story.  The failure to do so was false and misleading.  Specific examples of fuel surcharge

2   announcements include:

3          303.    On May 12, 2004, the *PNG Post-Courier* published an article entitled "Qantas,

4   BA slugs surcharge on ticket to meet fuel costs."  The article stated that the fuel surcharges were

5   being imposed "because of soaring oil prices" caused, according to Qantas chief executive Geoff

6   Dixon, by "continuing tensions in the Middle East and strong global demand, particularly from

7   the US and China."  Articles containing the same information about Qantas' fuel surcharge were

8   published that same day in *The Age*, *Dow Jones Factiva*, and *Travelpress*.  Defendant did not

9   disclose that collusion was the true reason for fuel surcharge increases.

10         304.    On May 14, 2004, an article was published in *Dow Jones Factiva* and *Reuters*

11  entitled "SAS hikes fares to compensate for high fuel costs."  The article stated "Scandinavian

12  airline SAS joined European rivals on Friday in raising air fares to compensate for sky-high fuel

13  prices.  'As a result of the recent extremely high prices for aviation fuel, the SAS group is

14  adjusting its fares in line with other European and American airlines,' SAS said in a statement."

15  Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

16         305.    On May 17, 2004, an article was published in *IAC (SM) Newsletter Database*,

17  *Kyodo News International, Inc.*, and *Japan Transportation Scan* entitled "Air New Zealand

18  follows other airlines with fuel surcharge."  The article stated "Air New Zealand announced

19  Wednesday it will introduce a surcharge on tickets, joining airlines around the world that are

20  passing the rising cost of jet fuel on to passengers."  The article went on to state "Air New

21  Zealand could no longer absorb escalating fuel costs combined with a rapidly depreciating New

22  Zealand dollar and was forced to implement the surcharge, [Air New Zealand group general

23  manager of marketing, network and sales Norm Thompson] said in a statement."  Defendant did

24  not disclose that collusion was the true reason for fuel surcharge increases.

25         306.    Another article published on May 17, 2004 in *Dow Jones Factiva* and *Reuters*

26  entitled "Air France latest airline to adopt fuel surcharge."  The article said "French carrier Air

27  France (AIRF.PA) will introduce a fuel surcharge of three euros per flight from May 19 due to

28

1   the steep rise in fuel prices, the airline said in a statement on Monday."   Defendant did not

2   disclose that collusion was the true reason for fuel surcharge increases.

3        307.    An article published in *Dow Jones Factiva* and *Reuters* on May 18, 2004 entitled

4   "Airline Swiss raises fares citing high fuel costs" stated  that Swiss International Air Lines was

5   increasing  air fares as a result of higher oil prices.  Defendant did not disclose that collusion was

6   the true reason for fuel surcharge increases.

7        308.    On May 20, 2004, *Global News Wire, Asia Africa Intelligence Wire, The Indian*

8   *Express Online Media Ltd.,* and *Financial Express* published an article entitled "Fuel Prices May

9   Mar Tourism Feel-Good."  The article cited a Cathay Pacific official as stating that the reason for

10  fuel surcharges recently imposed by airlines was "the recent exceptionally high level of fuel

11  prices."  Defendant did not disclose that collusion was the true reason for fuel surcharge

12  increases.

13       309.    On May 23, 2004, the *Los Angeles Times* published an article entitled "Airfares

14  rise on fuel costs" which said "citing the soaring price of jet fuel, foreign airlines began raising

15  passenger fares or adding fuel surcharges."  The article referenced surcharges imposed by Swiss

16  International Air Lines, Air France, British Airways, Qantas, and Singapore Airlines.  The article

17  did not disclose collusion in fixing the prices of air transportation.  A similar article was

18  published on May 25, 2004 in *Flight International*.   This article referenced surcharges by British

19  Airways, Continental Airlines, KLM, Qantas, and Singapore Airlines.  The article stated that

20  "many carriers, including United blame fuel costs for their continuing losses."  Defendants did

21  not disclose that collusion was the true reason for fuel surcharge increases.

22       310.    A May 26, 2004 article published in *Associated Press Worldstream* entitled

23  "Malaysia Airlines to impose surcharge to offset rising fuel costs" referred to Malaysian as "the

24  latest airline to slap extra charges on passengers because of rising fuel prices."  A similar article

25  was published that same day in *Dow Jones Factiva* and *Dow Jones* Newswires, and quoted

26  Malaysian Airline Managing Director Ahmad Fuaad Dahlan as saying that the airline was

27  "requesting the surcharge due to high fuel prices."  A similar article was published on May 27,

28

2004 in *Airline Industry Information*.  Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

311.    An article published on May 26, 2004 in *Airline Industry Information* stated "Thai Airways International is seeking to impose a fuel surcharge on international flights to offset higher fuel prices."  Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

312.    On May 27, 2004, *Dow Jones Factica* and *Reuters* published an article entitled "Thai Hot Stocks – Thai Air at month high."  The article stated that Thai Airways International PCL "would impose a fuel surcharge of up to $15 on international flights to offset surging oil prices."  Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

313.    On May 29, 2004, *Dow Jones Factiva* and *Reuters* published an article entitled "Malaysian Airline says to impose fuel surcharge."  The article stated that Malaysian Airline System would "impose a fuel surcharge on all international routes from June 1, due to surging prices of jet fuel, the carrier said on Saturday."  Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

314.    On June 1, 2004, *Agence France Press* published an article entitled "Singapore Airlines imposes fuel surcharge for all flight legs."  This article stated "Singapore Airlines will next week extend a fuel surcharge of five US dollars for each leg of all its flights in an effort to offset the impact of rising oil prices, the carrier said Tuesday. . . . 'This move is necessary in light of rising fuel prices and in line with action being taken by other major carriers to help defray part of the higher fuel cost,' it said in a statement."  The article went on to say "[a]irlines say they are unable to absorb the impact of rising oil prices, which have this year soared more than 30 percent higher than last year's average."  Similar articles were published that same day in *Airline Industry Information, Dow Jones Factiva*, and *Reuters.*  Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

1      315.    An article published in *Financial Times Information, Global News Wire – Asia*

2    *Africa Intelligence Wire*, and *Thai Press Reports* on June 2, 2004 entitled "Thai Gets

3    Government Approval for Surcharge" stated that Thai Airways would be levying a fuel

4    surcharge "to cover rising fuel costs."  Defendant did not disclose that collusion was the true

5    reason for fuel surcharge increases.

6      316.    On June 4, 2004, an article was published in *Dow Jones Factiva* and *Reuters*

7    entitled "ANA to raise int'l fares by 5 pct."  The article stated that All Nippon Airways Co.

8    "plans to raise international passenger fares by five percent to counter a spike in oil prices, its

9    chief executive said on Friday."   Defendant did not disclose that collusion was the true reason

10    for fuel surcharge increases.

11      317.    On June 9, 2004, *Financial Times Information, Global News Wire – Asia Africa*

12    *Intelligence Wire*, and *The Saigon Times Daily* published an article entitled "More Airlines

13    Impose Fuel Surcharge."  The article described fuel surcharges supposedly imposed "to cope

14    with rising oil prices on the world market."  Among the airlines imposing surcharges mentioned

15    in the article were Vietnam Airlines, Singapore Airlines, Qantas Airways, and Cathay Pacific.

16    The article did not say anything about collusion in setting prices for air transportation.

17      318.    On June 16, 2004, an article was published in *Asia Pulse* entitled "Briefing – Asia

18    Aviation – June 16, 2004," which stated that "Vietnam Airlines has announced that starting June

19    21 it will apply a US$5 surcharge to the price of international tickets to compensate for the rising

20    cost of fuel."  Defendant did not disclose that collusion was the true reason for fuel surcharge

21    increases.

22      319.    On August 18, 2004 *Air Transport Intelligence* published an article entitled "Air

23    France, KLM latest to add fuel surcharge."  The article stated "[n]ewly-merged carriers Air

24    France and KLM have today outlined plans to implement a further fuel surcharge in response to

25    spiraling fuel prices."  Similar articles about Air France's and KLM's fuel surcharge were

26    published on the same date by *Dow Jones Factiva, Dow Jones Newswires, Financial Times,* and

27

28

1   *Global News Wire – Europe Intelligence Wire.*  Defendants did not disclose that collusion was

2   the true reason for fuel surcharge increases.

3       320.    An article published in *The Business Times Singapore* on August 21, 2004 stated

4   "Singapore Airlines has said it will raise its fuel surcharge from Sept 1 to offset continuing high

5   fuel prices."  Defendant did not disclose that collusion was the true reason for fuel surcharge

6   increases.

7       321.    On August 21, 2004, *The Cairns Post* reported that "Qantas [ ] will increase fuel

8   surcharges on its ticket prices by up to 50 per cent after oil prices surged to all-time highs,

9   threatening the sectors profitability. . . . Chief executive Geoff Dixon flagged a likely increase

10  when Qantas announced a record annual profit on Thursday."  These articles were republished

11  on August 24, 2004, in *Dow Jones Factiva* and *The Wall Street Journal*.  Defendant did not

12  disclose that collusion was the true reason for fuel surcharge increases.

13      322.    On  August 26, 2004, it was reported that Air New Zealand would "increase its

14  passenger fuel surcharge as a result of  continuing high oil prices."  This article was published in

15  *Dow Jones Factiva* and *Dow Jones Newswire*.  Defendant did not disclose that collusion was the

16  true reason for fuel surcharge increases.

17      323.    In an article published on August 28, 2004 in *Financial Times Global News Wire*

18  and *The Christchurch Press,* the following was stated in reference to Qantas: "The airline

19  justifies the surcharge by pointing to a 77 per cent increase in the price of Singapore jet fuel

20  since July last year."   The same article was republished on September 1, 2004, in *The*

21  *Independent*. Defendant did not disclose that collusion was the true reason for fuel surcharge

22  increases.

23      324.    On September 9, 2004, an article entitled "SAS ups fuel price surcharge by 2

24  euros per ticket" was published in *Dow Jones Factiva* and *Reuters*.  The article said

25  "Scandinavian airline SAS announced it was raising its fuel surcharge on ticket prices by 2 euros

26  on Thursday, citing increasing costs of jet fuel, sending its shares lower. . . . There have

27  subsequently been further increases in the cost of aviation fuel and these are now approximately

28

1    15 to 20 percent higher than at the end of May," SAS said in a statement.  Defendant did not

2    disclose that collusion was the true reason for fuel surcharge increases.

3           325.    On October 9, 2004, an article appeared in *Financial Times Information – Global*

4    *News Wire – Asia Africa Intelligence Wire* entitled "Air France, Lufthansa Impose Fuel

5    Surcharge."  The article stated that "The soaring price of fuel has compelled Air France to

6    increase its fuel surcharge by 11 euros . . ."  Defendant did not disclose that collusion was the

7    true reason for fuel surcharge increases.

8           326.    On October 11, 2004, an article was published in *Dow Jones Factiva, Dow Jones*

9    *Newswires* entitled "BA Exec Says High Oil Prices Cost Co GBP 225M-Handelsblatt."  The

10   article stated "last Friday, BA followed the lead of other European airlines like Air France and

11   Lufthansa and increased its fuel surcharge on short-haul and long-haul flights due to rising oil

12   prices."  Defendant did not disclose that collusion was the true reason for fuel surcharge

13   increases.

14          327.    On October 12, 2004, article was published in *AFX New Limited*, *AFX European*

15   *Focus*, *Dow Jones Factiva*, *Dow Jones Newswires*, and *Reuters* entitled "Swiss' hike fuel

16   surcharge."  The article stated "Swiss International Air Lines AG said it is raising its fuel

17   surcharge due to record high prices of crude oil and kerosene.  Defendant did not disclose that

18   collusion was the true reason for fuel surcharge increases.

19          328.    The same day, an article entitled "Qantas to raise fuel surcharges" was published

20   in *M2 Communications LTD, M2 Airline Industry Information, Australian Broadcasting*

21   *Corporation,* and *Agence France Presse.* Defendant did not disclose that collusion was the true

22   reason for fuel surcharge increases.

23          329.    Also on October 12, 2004, an article was published in *The Business Times*

24   *Singapore* which stated "Asia Pacific carriers poised to raise fares; Move aimed at preventing

25   profits from being ravaged by rising oil prices"  Defendant did not disclose that collusion was the

26   true reason for fuel surcharge increases.

27

28

330.     On October 15, 2004, an article was published in *Business World* entitled "Carriers seek fare hike for international flights."   The article stated "Philippine Airlines President Jaime Bautista earlier said the airline wants to hike the fuel surcharge since $6 was not enough to offset the cost of fuel."   Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

331.     On October 16, 2004, the *Sydney Morning Herald* published an article entitled "Qantas Raises Fuel Surcharge."  The article said  "Qantas has defended its plans to slug passengers with an additional fuel surcharge from next Wednesday, despite the airline being 100 per cent hedged against the surge in oil prices until December 31. . . . 'With jet fuel now at more than $US60 a barrel and showing no sign of falling, an increase in the airline's fuel surcharge was unavoidable,' Qantas chief financial officer Peter Gregg said in a statement."  Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

332.     On October 18, 2004, *AFX New Limited*, *AFX European Focus*, and *Agence France Presse* published an article entitled "Air NZealand likely to increase fuel surcharges." The article said "Air New Zealand will likely announce an increase in its jet fuel surcharges within days because of the relentless climb in oil prices, the carrier's chief executive, Ralph Norris, said here.  'Where the price of fuel is at the moment, it's very probable that we will increase our fuel surcharges.'" The same statements were made in an article published on October 21, 2004 in  *Dow Jones Factiva.* Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

333.     On October 26, 2004, *Dow Jones Factiva* and *Reuters* published an article entitled "Thai Airways to raise surcharge on int'l flights."  The article said "Thai Airways International PCL is planning to raise the fuel surcharge on its overseas flights by the end of next month due to soaring fuel prices, an official at the carrier said on Tuesday."  Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

334.     On November 8, 2004, an article entitled "Singapore Airlines raises fuel surcharge for third time since June to offset rising fuel prices" was published in *Associated Press*

1  *Worldstream.*  The article said "Singapore Airlines and its subsidiary on Monday said they

2  would again increase their fuel surcharges to offset rising jet fuel costs."  Defendant did not

3  disclose that collusion was the true reason for fuel surcharge increases.

4        335.    On January 11, 2005 *Aviation Daily* published an article entitled "ANA to add

5  fuel surcharge to international tickets."  The article stated "All Nippon Airways plans to add a

6  surcharge to all international fares starting Feb. 1 to help offset the higher fuel prices, even

7  though crude oil costs have dropped in recent weeks."  Defendant did not disclose that collusion

8  was the true reason for fuel surcharge increases.

9        336.    On January 18, 2005, Japan Airlines issued a press release entitled "Introduction

10  of Fuel Surcharge."  The press release stated "[a]s a result of the effects of the unprecedented rise

11  in fuel costs, the JAL Group plans to introduce a fuel surcharge on all international passengers

12  flights, subject to government approval."  The press release did not mention collusion in setting

13  prices of air transportation.

14        337.    On March 24, 2005, *Agence France Presse* published an article entitled "Airline

15  Swiss announces major increase in fuel surcharge on fares."  The article stated that "Swiss

16  International Air Lines announced Thursday that it was raising the fuel surcharge on its fares by

17  up to 60 percent because the price of jet fuel had reached 'record' levels in recent weeks."  The

18  same announcement by Swiss International was republished in *M2 Airline Industry Information*

19  on March 25, 2005 and in *The Toronto Star* on April 2, 2005.  Defendant did not disclose that

20  collusion was the true reason for fuel surcharge increases.

21        338.    On April 6, 2005, *Financial Times, Global News Wire – Asia Africa Intelligence*

22  *Wire* and *New Zealand Press Association* published an article entitled "Air NZ to Increase Fuel

23  Surcharge."  This article said "Air New Zealand will increase its fuel surcharge from next

24  Tuesday, citing the rising cost of aviation fuel."  The same information was published the same

25  day in *Dow Jones Factiva, Dow Jones Newswires, AAP Newsfeed,* and *Associated Press*

26  *Worldstream.* The articles did not mention collusion in the pricing of air transportation.

27

28

339.    On April 7, 2005, *the Sydney Morning Herald* published an article entitled "Flyers may revolt as fuel soars."  In the article, Qantas' chief financial officer Peter Gregg was quoted saying "It is inevitable that the surcharge will go up.  [ ] Jet fuel prices remain volatile and at record highs."  Neither Mr. Gregg nor the article mentioned collusion in setting the pricing of air transportation.  News of the Qantas surcharge was covered in other media including *AAP Newsfeed, The Daily Telegraph, Australian Broadcasting Corporation, Dow Jones Factiva,* and *The Age.*  The article did not mention collusion in setting the pricing of air transportation.

340.    On April 12, 2005, *AFX International Focus* published an article entitled "KLM to raise fuel surcharge from Friday."  The article stated "KLM Royal Dutch Airlines said it will increase its jet fuel surcharge in response to 'soaring' oil prices.'"  *Dow Jones Factiva* and *Reuters* both covered the same story on the same day.  Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

341.    On April 14, 2005, *Agence France Presse* published an article entitled "Lufthansa ups fuel surcharge on long-haul flights" which stated "German flag carrier Lufthansa said Thursday it planned to increase its current fuel surcharge on long-haul flights by 10 euros (12.90 dollars) to 27 euros with effect from April 25 to take into account the sharp increase in kerosene costs."  Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

342.    On April 22, 2005, *Associated Press Worldstream* published an article entitled "Singapore Airlines to raise fares again due to fuel price spike."  The article stated that Singapore Airlines would raise fares by as much as US$8 ([euro]6.10) – its second price hike in six months – but that it still expects to lose money because of a recent surge in jet fuel costs. 'The revised (fuel) surcharge will still not offset the increase in costs arising from recent record jet fuel prices,' the airline – the world's second largest carrier by market capitalization – said in a statement."  Similar articles were published in *Channel NewsAsia, M2 Airline Industry Information, Asia Pulse, Dow Jones Factiva, The Wall Street Journal Asia, Japan Economic*

*Newswire,* and *Global News Wire – Asia Africa Intelligence Wire.* Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

343.    On June 3, 2005, Japan Airlines issued a press release to the American Region entitled "Japan Airlines Increases International Passenger Fare Fuel Surcharges – effective July 1st." The press release stated that "JAL introduced the fuel surcharge in February this year in response to rises in the cost of fuel.  Since then continued fuel cost increases have led JAL to review the amount of fuel surcharge levied."  The press release did not mention anything about collusion in setting the price of air transportation.

344.    On July 1, 2005, *Associated Press Financial Wire* published an article entitled "Lufthansa to Raise Fuel Surcharge" which stated that "Lufthansa AG said Friday that because of rising fuel costs, it will increase the fuel surcharge on its European and long-haul flights." Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

345.    On July 1, 2005, *Business World* published an article entitled "PAL mulls fuel surcharge hike."  The article said "[a]fter oil prices shot up to record-breaking $61 per barrel early this week, flag carrier Philippine Airlines, Inc. (PAL) said it is mulling on applying for a second round of increase in fuel surcharge this year."   Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

346.    On July 4, 2005, *Agence France Press* published an article entitled "Air France hikes fuel surcharge on tickets" which stated "Air France, following the lead of other airlines around the world, said Monday it was hiking its fuel surcharge on passenger tickets to offset increased costs due to the high price of oil."   An article published the same day in *Global News Wire – Asia Africa Intelligence Wire* entitled "Foreign Airlines Hike Fuel Surcharge" discussed similar surcharges imposed by British Airways and Lufthansa.  Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

347.    On July 8, 2005 *M2 Airline Industry Information* published an article entitled "Singapore Airlines raises fuel surcharge."  The article said that Singapore Airlines would increase its fuel surcharge and that its decision "was motivated by an increase of jet fuel prices."

1    Other articles conveying the same information appeared in *Dow Jones Factiva, The Wall Street*

2    *Journal Asia, The Business Times Singapore*, *Global News Wire – Asia Africa Intelligence Wire*,

3    *The Edge Singapore,* and *Aviation Daily*.  Defendant did not disclose that collusion was the true

4    reason for fuel surcharge increases.

5         348.    On July 14, 2005, *AFX.Com* published an article entitled "Japan Airlines to hike

6    international freight fuel surcharge again."  The article stated that Japan Airlines would "raise its

7    surcharges on international freight for the second time in as many months as fuel costs remain

8    high."  A similar article covering the same story was published that day in *Agence France*

9    *Presse*.  Defendant did not disclose that collusion was the true reason for fuel surcharge

10   increases.

11        349.    On July 18, 2005, *Dow Jones Factiva* and *Thai News Service* published an article

12   entitled "Thai Airways to implement additional fuel surcharge."  The article republished a press

13   release issued by Thai that said "[d]ue to the increase in the cost of fuel, Thai Airways

14   International Public Company Limited announced that the airline will implement an additional

15   fuel surcharge on international flights as of 1 August 2005 onwards.  Mr. Kanok Abhiradee,

16   THAI's President, said the gradual increase in world fuel costs has affected airlines around the

17   world by incurring increased expense in jet fuel.  As the cost of jet fuel has increased and

18   continues to rise, the company will implement an additional fuel surcharge on international

19   flights, which is applicable to all passengers traveling on THAI's international flights with

20   tickets issued as of 1 August 2005 onwards."  The press release was covered in other media

21   outlets, including *Financial Times Information, Global News Wire – Asia Africa Intelligence*

22   *Wire,* and *Thai Press Reports*. Defendant did not disclose that collusion was the true reason for

23   fuel surcharge increases.

24        350.    On July 20, 2005, an article entitled "PAL SEEKS ANOTHER FARE HIKE" was

25   published in multiple outlets including *Financial Times Information, Global News Wire – Asia*

26   *Africa Intelligence Wire,* and *Philippine Daily Inquirer*.  In the article, the claim that the fuel

27   surcharge was a temporary relief for airlines that suffered rising costs due to increases in jet fuel

28

1  prices is attributed to Philippine Airlines president Jaime Bautista.  Defendant did not disclose

2  that collusion was the true reason for fuel surcharge increases.

3       351.    On July 21, 2005, *Business World* published an article entitled "Northwest

4  seeking fuel surcharge hike" which described Northwest Airline's plans to impose additional fuel

5  surcharges on flights between the United States and the Philippines.  The article said that "[t]he

6  airline said the fuel surcharge would cushion the impact of rising world oil prices."  Defendant

7  did not disclose that collusion was the true reason for fuel surcharge increases.

8       352.    On August 10, 2005, an article was published in *AFX  International Focus*

9  entitled "Japan Airlines extends fuel surcharge due to high oil costs."  The article stated that

10  "Japan Airlines (JAL) said it will extend its fuel surcharge on international routes through the

11  end of march because of the high cost of oil."  Defendant did not disclose that collusion was the

12  true reason for fuel surcharge increases.

13       353.    On August 23, 2005 *AFX International Focus* published an article entitled "Swiss

14  raises fuel surcharge to 68 sfr per long haul, 24 sfr per European flights."  The article stated

15  "Swiss International Air Lines AG ('Swiss') said it is raising fuel surcharges to 68 sfr per leg

16  (from 53 sfr) for long haul flights . . . citing a steep rise in crude oil and jet fuel prices in recent

17  weeks."  Defendant did not disclose that collusion was the true reason for fuel surcharge

18  increases.

19       354.    On August 23, 2005, *Northern Territory News* published an article entitled "Air

20  NZ leads way on fuel surcharge rise."   The article said "Air NZ chief financial officer Rob

21  McDonald said jet fuel is now 42 per cent higher than in August last year and about 25 per cent

22  higher than three months ago.  'Given that jet fuel is currently around 30 per cent of our total

23  operating costs, we can't absorb these prices and need to reflect such increases in the cost of

24  travel,' Mr. McDonald said."  Defendant did not disclose that collusion was the true reason for

25  fuel surcharge increases.

26       355.    On September 8, 2005 *AFX International Focus* published an article entitled

27  "Singapore Airlines to raise fuel surcharge" which stated "Singapore Airlines (SIA) said it will

28

1    raise its fuel surcharge to partially offset higher operating costs arising from higher jet fuel

2    prices." *Agence France Press* and *Malaysia General News* published articles the same day to the

3    same effect.   Defendant did not disclose that collusion was the true reason for fuel surcharge

4    increases.

5        356.    On January 16, 2006, Japan Airlines issued a press release entitled "Japan

6    Airlines Extends & Increases International Passenger Fare Fuel Surcharges."  The press release

7    referred to "rises in the cost of fuel" as the reason for fuel surcharges.  The press release did not

8    mention collusion in setting the prices for air transportation.On January 17, 2006, *The*

9    *International Herald Tribune* published an article which said "Japan Airlines said Monday that it

10   planned to raise fuel surcharges on international flights to help offset higher jet fuel prices."

11   Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

12       357.    On April 12, 2006, *MarketWatch* published an article entitled "KLM raises fuel

13   surcharge on long-haul flights."  The article said "KLM Royal Dutch Airlines (nl:09645) on

14   Wednesday said that in response to soaring fuel prices it will raise its fuel surcharge on long-haul

15   flights by 5 euros for each leg of the journey."  Defendant did not disclose that collusion was the

16   true reason for fuel surcharge increases.

17       358.    On April 20, 2006, *AFX International Focus* published an article entitled

18   "Lufthansa unit 'Swiss' raises fuel surcharge after spike in kerosene prices."  The article said

19   "Deutsche Lufthansa unit Swiss International Air Lines AG said it will raise fuel surcharges

20   following a sharp increase in crude oil and aviation kerosene prices over the past few weeks and

21   days."  Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

22       359.    On April 26, 2006, an article entitled "Singapore Airlines to raise jet fuel

23   surcharges on or after May 15" was published in *AFX News Limited* and *AFX Asia*.  The article

24   stated "Singapore Airlines Ltd said it will increase its fuel surcharge for tickets issued on or after

25   May 15 as a result of the sustained increase in jet fuel prices."  The article did not say anything

26   about collusion in fixing the prices of air transportation.

27

28

360.     On April 26, 2006, *AFX News Limited* and *AFX International Focus* published a story entitled "Australia's Qantas raises fuel surcharges again."   The story was published again on April 27, 2006 in *Dow Jones Factiva* and on April 28, 2006, in *The USA Today*.   The article said "Australia's national airline Qantas has again increased its domestic and international fuel surcharges because of soaring crude oil and jet fuel prices. . . .Qantas' executive general manager John Borghetti said the cost of fuel was a critical issue for the airline industry."   Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

361.     On April 27, 2006, an article was published in *Dow Jones Factiva* and *Shipping Times* referring to Singapore Air entitled "SIA, some other airlines hike fuel surcharge again" The article said  "the adjustments will offer only partial relief of higher operating costs arising from persistently high price of jet fuel . . ."  Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

362.     On May 8, 2006, an article entitled "Thailand:  National Carrier THAI announces new air travel fuel surcharge rates" was published in *Dow Jones Factiva* and *Thai News Service*. The article said "Thai Airways International (THAI), Thailand's national airline, announced new fuel surcharge rates affecting both domestic and international routes effective from June 1. According to THAI Vice President for Commercial Affairs Vasingh Kittikul the new rates are in response to rising global energy prices.  The tariffs reflect the rising cost of aviation fuel, and are in line with airline practice around the world."  Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

363.     On May 24, 2006, *Asia Pulse* published an article entitled "Hong Kong Newspaper Highlights which said "Cathay Pacific Airways and Singapore Airlines will raise fuel surcharges by more than 20 percent next month to help offset rising costs."  Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

364.     On June 13, 2006, *Dow Jones Factiva* and *Dow Jones Newswires* published an article entitled "Malaysia Airlines to Raise Fuel Surcharge – Report" which said "Malaysia Airlines will raise fuel surcharge for flights to the Americas, Europe and South Africa by 20%

1  from Friday, a report said Tuesday.   The flag carrier issued an advisory last week informing

2  travel agents of the hike in surcharge by $10 to $60 one-way to mitigate rising fuel cost, The Star

3  newspaper said.  Defendant did not disclose that collusion was the true reason for fuel surcharge

4  increases.

5      365.     On August 3, 2006, an article entitled "SIA to raise fuel surcharge on ultra long

6  routes" was published in *Dow Jones Factiva* and *Dow Jones Newswire*.  The article stated "[t]he

7  revised surcharge on these 'ultra long' routes only partially covers the increased cost of jet fuel,

8  the world's second-biggest carrier by market capitalization said in a statement."   An article on

9  the same subject published on August 4, 2006 in *Financial Times* stated "the airline attributed

10  the revised fuel surcharge to the persistently high jet fuel prices.   'The adjustments offer only

11  partial relief on higher operating costs arising from the price of jet fuel, which now hovers

12  around $90 per barrel,' the statement added."  Defendant did not disclose that collusion was the

13  true reason for fuel surcharge increases.

14      366.     On August 8, 2006, an article entitled "Air France to Raise Fuel Surcharge from

15  Aug 10" was published in *Dow Jones Factiva* and *Dow Jones Newswires;* the same article was

16  published on August 9, 2006 in  *The Calgary Herald* and *The Globe and Mail.*  The article stated

17  "Air France, part of the Air France-KLM (AKH) group, Tuesday said it will increase its fuel

18  surcharges as of August 10 due to high oil prices."  Defendant did not disclose that collusion was

19  the true reason for fuel surcharge increases.

20      367.     On August 8, 2006, an article entitled "KLM raises fuel surcharges" was

21  published in *Dow Jones Factiva* and *Reuters*.  The article stated "KLM Royal Dutch Airlines, the

22  Dutch arm of Air France KLM, will raise its fuel surcharge by 5 euros ($6.42) on

23  intercontinental flights and 1 euro on European flights, it said on Tuesday. . . . increase . . will

24  be dropped as soon as the price of oil has fallen below $70 per barrel for more than 30

25  consecutive days, KLM said in a statement."  The article did not say anything about collusion in

26  fixing the prices of air transportation.  These articles were reprinted in the August 10, 2006 issue

27

28

1  of *The International Herald Tribune.*  Defendant did not disclose that collusion was the true

2  reason for fuel surcharge increases.

3       368.   On August 26, 2006, *The Daily Telegraph* published an article entitled "Qantas

4  fares soar as fuel surcharge doubles."  The article stated "The company had warned it would

5  raise surcharges to offset the rise in fuel prices – for the sixth time in just over two years . . ."

6  Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

7       369.   On September 1, 2006, an article entitled "All Nippon Airways raises fuel

8  surcharge" was published in *AFX News Limited* and *AFX International Focus.*  The article stated

9  "All Nippon Airways Co Ltd (ANA), Japan's second largest carrier, said it will raise a fuel

10  surcharge on tickets for the second time this year due to high oil costs. . . . 'ANA regrets that

11  despite constant efforts to reduce costs and secure greater operating efficiencies, long-term rises

12  in the price of crude oil mean that it must ask its valued customers to share the increased cost

13  burden,' the company said in a statement.'"  Defendant did not disclose that collusion was the

14  true reason for fuel surcharge increases.

15       370.   On September 3, 2006, an article entitled "Malaysian Airline raises fuel

16  surcharges on international routes" was published in *AFX News Limited, AFX – Asia.*  The article

17  stated "'Fuel cost continues to remain the single largest expense item for all carriers,' it said.

18  Malaysia Airlines will continue monitoring and taking measures to mitigate this cost increase by

19  streamlining and matching fuel surcharge rates with other airlines,' the statement added."

20  Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

21       371.   On October 20, 2006, *Dow Jones Factiva* and *Thai News Service* reported that

22  Japan Airlines and All Nippon Airways were raising their fuel service charges.  According to the

23  article, "[r]ising oil prices were cited as the main reason for the increase."  Defendant did not

24  disclose that collusion was the true reason for fuel surcharge increases.

25       372.   On January 15, 2007, *Airguide Online* published an article entitled "Airline

26  Finance News – Asia/Pacific."  The article described plans by Japan Airlines and All Nippon

27

28

Airways to raise airfares "to cover high fuel costs."  Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

373.    On March 22, 2007, *Dow Jones Factiva* and *Reuters* published an article entitled "Lufthansa says no plans to change fuel surcharges."  The article states that Lufthansa had said that "it was not planning any changes to the fuel surcharges it imposes on passengers to compensate for the price of fuel," and that Air France-KLM "said earlier it would raise its fuel surcharge on long-haul flights operated on the Air France network due to rising oil prices."  Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

374.    On March 25, 2007 *Manila Bulletin* published an article entitled "News In Brief" which said "Singapore Airlines (SIA) said it will raise fuel surcharges from April 1 following a sharp increase in jet fuel prices."  Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

375.    On April 4, 2007, *Asia Pulse* published an article entitled "Taiwanese Newspaper Highlights" which stated that "China Airlines and EVA Airways Corp., Taiwan's two largest carriers, will increase fuel surcharges on overseas flights by 20 percent starting on April 16 after jet fuel prices soared, the island's transport ministry said."  The transport ministry's source of information was China Airlines and EVA Airways Corp.  Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

376.    On April 30, 2007, *Dow Jones Factiva* and *Reuters News* published an article entitled "Air France raises fuel surcharges" which said "Air France is increasing its fuel surcharge by 5 euros per segment on long haul flights, the airline said on Saturday.  The increase is due to higher oil prices."  Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

377.    On May 4, 2007, *Dow Jones Factiva* and *Reuters News* published an article entitled "Singapore Hot Stocks-SembCorp Industries, Rickmers in focus" which said "Singapore Airlines, the world's biggest airline by market value, said it will raise the fuel surcharge on most

1   of its flights by $4 to $58 to offset higher jet fuel prices."  Defendant did not disclose that

2   collusion was the true reason for fuel surcharge increases.

3        378.    On May 16, 2007, *The Honolulu Advertiser* published an article which stated

4   "Japan Airlines said it will increase its fuel surcharge to $64 each way on flights between Japan

5   and Hawai'i."   The article cited the price of jet fuel as the reason for the increase.  Defendant did

6   not disclose that collusion was the true reason for fuel surcharge increases.

7        379.    On June 21, 2007, *Pacific Business News* published an article entitled "JAL, ANA

8   to hike fuel surcharges July 1" which stated "[c]iting increases in the price of jet fuel, Japan

9   Airlines and All Nippon Airways are increasing their fuel surcharges on July 1. . . . Gilbert

10  Kimura, director of public relations for JAL-Hawaii, said the rate hike is attributed to the price of

11  jet fuel, which is close to $80 per barrel, an all-time high, according to Kimura."  Defendant did

12  not disclose that collusion was the true reason for fuel surcharge increases.

13       380.    On July 12, 2007, *Dow Jones Fac*tiva and *Reuters News* published an article

14  entitled "Air France, KLM raises fuel surcharge" which said "Airline Air France KLM said on

15  Thursday it would increase its fuel surcharges following a rise in the price of oil."  Defendant did

16  not disclose that collusion was the true reason for fuel surcharge increases.

17       381.    On July 14, 2007, *Associated Press Worldstream* published an article entitled

18  "Thai Airways set to increase fuel surcharges on some international flights."  The article said

19  "Thai Airways International announced Saturday it will increase its fuel surcharge on some

20  international flights by $10US (euro7.25), due in part on the rising cost of jet fuel worldwide."

21  The article did not say anything about collusion in setting the prices of air transportation.

22  Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

23       382.    On July 18, 2007, *The USA Today* published an article entitled "Business Travel"

24  which stated "Thai Airways and Air France are the latest airlines to increase fuel surcharges on

25  selected flights, blaming the rising cost of jet fuel."  Defendant did not disclose that collusion

26  was the true reason for fuel surcharge increases.

27

28

383.     On July 26, 2007, *The Manila Bulletin* published an article entitled "Tourism" which stated "Thai Airways International announced it will increase its fuel surcharge on some international flights by $ 10, due in part to the rising cost of jet fuel worldwide."  Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

384.     On July 27, 2007, *Associated Press Financial Wire* published an article entitled "Singapore Airlines to further increase fuel surcharge on tickets."  The article stated "Singapore Airlines will increase its fuel surcharge for tickets to alleviate rising jet fuel costs, the carrier said."  Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

385.     On August 8, 2007, *Financial Times* published an article entitled "Air France Raises Fuel Surcharge" which stated "Air France . . . has increased its fuel surcharge . . . [t]he rise is being attributed to increasing fuel costs."  Defendant did not disclose that collusion was the true reason for fuel surcharge increases.

386.     The foregoing are specific, illustrative examples of Defendants' efforts to conceal their price-fixing activities from the public and competition regulators.  Plaintiffs believe that additional examples of concealment will be discovered during discovery, which has yet to occur.

387.     Further, the very existence of fuel surcharges was often difficult to detect by a lay person.  Fuel surcharges were often identified on an airline ticket only as the "YQ" portion of an airline fare, a designation that is totally unintelligible to those outside of the airline industry.

388.     Very shortly after the February 14, 2006, raids by competition regulators, Ms. Hoshiko Nakano, a senior official in JAL's passenger Tariff Division of the International Sales & Marketing Department, orally instructed subordinates to destroy any documents concerning communications with other airlines about fare and rate-setting activities.  JAL employees carried out that instruction by erasing, shredding or otherwise destroying at least some documentary evidence of JAL's prior communications with competitors, including ANA.  JAL employees also contemporaneously informed a senior manager from ANA of their intent to destroy evidence of prior communications between JAL and ANA.

389.     Accordingly, Defendants engaged in a successful, illegal price-fixing conspiracy with respect to passenger air transportation, which they affirmatively concealed in at least the following respects:

(a)     By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of the illegal scheme;

(b)     By engaging in secret meetings, telephone calls, and other communications in order to further their illicit cartel;

(c)     By staggering the dates on which changes to fares, including surcharges, became effective and/or were announced to the public;

(d)     By generating e-mails which recipients were told to destroy after reading;

(e)     By destroying documentary evidence of the alleged conspiracy  after the regulatory raids described above; and/or

(f)     By giving false and pretextual reasons for their pricing of passenger fares and for the increases in those prices during the relevant period, and by describing such pricing and increases falsely as being a result of external costs, including the cost of fuel, rather than collusion.

390.     As a result, Plaintiffs and the members of the Class assert the tolling of any applicable statute of limitations affecting the rights of action of Plaintiffs and the members of the Class during the Class Period.

## CLASS ACTION ALLEGATIONS

391.     The Plaintiffs bring this action on their own behalf and as a class action pursuant to Rule 23(a) and (b) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons and entities that purchased passenger air transportation in the United States at rates that were not immunized by the United States Department of Transportation for single or multi-segment travel between the United States and Asia or Oceania from Defendants or their co-conspirators, or any predecessor, subsidiary or affiliate thereof, at any time between January 1, 2000 and the present.  Excluded from the class are purchases of passenger air transportation directly between the United States and the Republic

of South Korea purchased from Korean Air Lines, Ltd. and/or Asiana Airlines, Inc.. Also excluded from the class are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, and Defendants' officers, directors, employees and immediate families.

392.    Plaintiffs do not know the exact number of members of the Class because such information is in the exclusive control of Defendants.  Due to the nature of the trade and commerce involved, however, Plaintiffs believe that members of the Class number at least in the hundreds of thousands and are sufficiently numerous and geographically dispersed throughout the United States and the world so that joinder of all Class members is impracticable.

393.    There are questions of law and fact which are common to the claims of Plaintiffs and the Class they seek to represent, including, but are not limited to:

(a)    Whether Defendants engaged in a combination or conspiracy with their co-conspirators to fix, raise, maintain, and/or stabilize the prices for passenger air transportation, including surcharges;

(b)    Whether the purpose and/or effect of the acts and omissions alleged herein was to restrain trade, or to affect, fix, control, and/or maintain the prices for passenger air transportation, including surcharges;

(c)    The existence and duration of the horizontal agreements alleged herein to fix, raise, maintain, and/or stabilize the prices for passenger air transportation, including surcharges;

(d)    Whether Defendants violated Section 1 of the Sherman Act (15 U.S.C. § 1);

(e)    Whether Defendants fraudulently concealed the alleged conspiracy so as to equitably toll any applicable statute of limitations;

(f)    Whether Defendants' agents, officers, employees, or representatives participated in correspondence and meetings in furtherance of the illegal conspiracy alleged herein, and, if so, whether such agents, officers,

1  employees, or representatives were acting within the scope of their
2  authority and in furtherance of Defendants' business interests;

3  (g)  Whether, and to what extent, the conduct of Defendants caused injury to
4  Plaintiffs and members of the Class, and, if so, the appropriate measure of
5  damages; and

6  (h)  Whether Plaintiffs and members of the Class are entitled to injunctive
7  relief to prevent the continuation or furtherance of the violation of Section
8  1 of the Sherman Act and/or the foreign laws alleged.

9  394.  Plaintiffs' claims are typical of the claims of the members of the Class they seek
10  to represent.

11  395.  Plaintiffs will fairly and adequately assert and protect the interests of the Class
12  members.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other
13  members of Class they seek to represent.

14  396.  Plaintiffs are represented by counsel competent and experienced in the
15  prosecution of antitrust and class action litigation.

16  397.  The questions of law and fact common to the members of the Class predominate
17  over any questions affecting only individual members.

18  398.  A class action is superior to other available methods for the fair and efficient
19  adjudication of this controversy because:

20  (a)  The prosecution of separate actions by individual members of the Class
21  would create a risk of inconsistent or varying adjudications, establishing
22  incompatible standards of conduct for Defendants.

23  (b)  The Class is readily definable and one for which records should exist in
24  the files of Defendants.

25  (c)  Prosecution as a class action will eliminate the possibility of repetitious
26  litigation.

27

28

1  (d)  Treatment as a class action will permit a large number of similarly situated

2  persons to adjudicate their common claims in a single forum

3  simultaneously, efficiently, and without the duplication of effort and

4  expense that numerous individual actions would require.

5  (e)  Class treatment will permit the adjudication of relatively small claims by

6  many Class members who otherwise could not afford to litigate an

7  antitrust claim such as is asserted in this complaint on an individual basis.

8  399.  This class action presents no difficulties of management that would preclude its

9  maintenance as a class action.

## COUNT I

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

12  400.  Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth

13  herein.

14  401.  Defendants and their co-conspirators engaged in a continuing contract,

15  combination, and conspiracy to artificially fix, raise, maintain, and/or stabilize the prices of

16  passenger air transportation, including surcharges for flights between the United States and Asia

17  and between the United States and Oceania, in violation of Section 1 of the Sherman Act, 15

18  U.S.C. § 1.

19  402.  Defendants and their co-conspirators agreed to, and did in fact, restrain trade or

20  commerce by fixing, raising, maintaining, and/or stabilizing at artificial and non-competitive

21  levels, the prices of passenger air transportation, including surcharges.  Their illegal activities

22  involved import trade or import commerce with foreign nations.

23  403.  In formulating and effectuating their contract, combination or conspiracy,

24  Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and

25  effect of which were to artificially fix, raise, maintain and/or stabilize passenger air

26  transportation, including surcharges.  These activities included the following:

27

28

(a)     Agreeing to charge prices for passenger air transportation, including surcharges, at certain levels and otherwise fix, raise, maintain and/or stabilize prices for passenger air transportation, including surcharges; and

(b)     Charging for passenger air transportation, including surcharges at agreed upon levels.

404.    The illegal combination and conspiracy alleged herein had the following effects, among others:

(a)     The prices charged by Defendants to, and paid by Plaintiffs and members of the Class for passenger air transportation, including surcharges were fixed, raised, maintained and/or stabilized at artificially high and non-competitive levels;

(b)     Plaintiffs and members of the Class have been deprived of free and open competition in the purchase of passenger air transportation;

(c)     Plaintiffs and members of the Class have been required to pay more for passenger air transportation, including surcharges, than they would have paid in a competitive marketplace absent Defendants' price-fixing conspiracy;

(d)     Competition in the sale of passenger air transportation has been restrained, suppressed or eliminated.

405.    As noted above, Defendants' conduct as alleged herein constitutes or involves import trade or import commerce.  Additionally, this conduct both had a direct, substantial, and reasonably foreseeable effect on American domestic, import and export commerce, and had an effect of a kind that antitrust law considers harmful.  Higher U.S. prices brought about by Defendants' conspiracy proximately caused injury to those who purchased tickets for air passenger travel in the United States.

406.    As a direct and proximate result of Defendants' conduct, the Plaintiffs and members of the Class have been injured and damaged in their business and property in an amount to be determined according to proof.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray:

A.    That the Court determine that this action may be maintained as a class action under  Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

B.    That the Court adjudge and decree that the contract, combination and conspiracy alleged herein is a *per se* unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

C.    That the Court enter judgment against Defendants, jointly and severally, in favor of Plaintiffs and the Class;

D.    That the Court award Plaintiffs and the Class treble damages;

E.    That the Court award Plaintiffs and the Class attorneys' fees and costs as well as pre-judgment and post-judgment interest as permitted by law;

F.    That Defendants and their co-conspirators, their respective successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of Defendants or their co-conspirators, or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combination, conspiracy, agreement, understanding or concert of action, or adopting any practice, plan, program or design having a similar purpose or affect in restraining competition; and

G.    That the Court award Plaintiffs and the Class such other and further relief as may be deemed necessary and appropriate.

1

## JURY DEMAND

2  Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of the

3 Sherman Act claims and any other claims so triable asserted in this Complaint.

4 Dated:  July 14, 2011      Respectfully submitted,

5           By:   */s/ Michael P. Lehmann*
6             Michael P. Lehmann
             Christopher L. Lebsock
7             Jon T. King
             **HAUSFELD LLP**
8             44 Montgomery Street, Suite 3400
             San Francisco, CA  94104
9             Telephone:  415-633-1908
             Facsimile:  415-358-4980
10            mlehmann@hausfeldllp.com
             clebsock@hausfeldllp.com
11            jking@hausfeldllp.com

12            Michael D. Hausfeld
             **HAUSFELD LLP**
13            1700 K Street, NW, Suite 650
             Washington, DC 20006
14            Telephone:   202-540-7200
             Facsimile:   202-540-7201
15            mhausfeld@hausfeldllp.com

16 Dated:  July 14, 2011      Respectfully submitted,

17           By:   */s/ Joseph W. Cotchett*
18             Joseph W. Cotchett
             Neil P. McCarthy
             Paul N. "Pete" McCloskey
19            Steven N. Williams
             Nanci E. Nishimura
20            Niki B. Okcu
             Eric J. Buescher
21            Aron K. Liang
             **COTCHETT, PITRE & MCCARTHY, LLP**
22            San Francisco Airport Office Center
             840 Malcolm Road, Suite 200
23            Burlingame, CA 94010
             Telephone:   650-697-6000
24            Facsimile:   650-697-0577
             jcotchett@cpmlegal.com
25            nmccarthy@cpmlegal.com
             swilliams@cpmlegal.com
26            nnishimura@cpmlegal.com
             nokcu@cpmlegal.com
27            ebuescher@cpmlegal.com
             aliang@cpmlegal.com

28

1

## ADDITIONAL COUNSEL

2
Daniel C. Girard
Elizabeth C. Pritzker
**GIRARD GIBBS LLP**
3
601 California Street, Suite 1400
San Francisco, CA 94108
4
Tel: 415-981-4800
Fax: 415-981-4846
5
dcg@girardgibbs.com
ecp@girardgibbs.com
6

7

8
Steven A. Kanner
**FREED, KANNER, LONDON
& MILLEN, LLC**
9
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
10
Tel: 224-632-4500
Fax: 224-632-4519
11
skanner@fklmlaw.com

12
Jennie Lee Anderson
**ANDRUS ANDERSON LLP**
13
155 Montgomery Street, Suite 900
San Francisco, CA 94104
14
Tel: 415-986-1400
Fax: 415-986-1474
15
jennie@andrusanderson.com

16

17

18
Joseph M. Patane
**LAW OFFICE OF JOSEPH M. PATANE**
19
2280 Union Street
San Francisco, CA 94123
20
Tel: 415-563-7200
Fax: 415-346-0679
21
jpatane@tatp.com

22
Peter G.A. Safirstein
**MILBERG LLP**
23
One Pennsylvania Plaza, 49th Floor
New York, NY 10119-0165
24
Tel: 212-594-5300
Fax: 212-868-1229
25
psafirstein@milberg.com

Walter J. Lack
Elizabeth L. Crooke
Richard P. Kinnan
**ENGSTROM, LIPSCOMB & LACK**
10100 Santa Monica Boulevard, 12th Floor
Los Angeles, CA 90067
Tel: 310-552-3800
Fax: 310-552-9434
wlack@elllaw.com
bcrooke@elllaw.com
rkinnan@elllaw.com

Craig C. Corbitt
**ZELLE HOFMANN VOELBEL
& MASON LLP**
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Tel: 415-693-0700
Fax: 415-693-0770
ccorbitt@zelle.com

Mario N. Alioto
Lauren C. Russell
**TRUMP ALIOTO TRUMP
& PRESCOTT LLP**
2280 Union Street
San Francisco, CA 94123
Tel: 415-563-7200
Fax: 415-346-0679
malioto@tatp.com
laurenrussell@tatp.com

Jeff S. Westerman
**MILBERG LLP**
One California Plaza
300 S. Grand Avenue, Suite 3900
Los Angeles, CA 90071
Tel: 213-617-1200
Fax: 213-617-1975
jwesterman@milberg.com

Phillip Alden Baker
**BAKER, KEENER & NAHRA**
633 W 5th Street, Suite 5400
Los Angeles, CA 90071
Tel: 213-241-0900
Fax: 213-241-0990
pbaker@bknlawyers.com

26

27

28

Guido Saveri
Richard Alexander Saveri
Cadio R. Zirpoli
**SAVERI & SAVERI, INC.**
706 Sansome Street
San Francisco, CA 94111
Tel: 415-217-6810
Fax: 415-217-6813
guido@saveri.com
rick@saveri.com
cadio@saveri.com

Robert Kaplan
Laurence D. King
**KAPLAN FOX & KILSHEIMER LLP**
350 Sansome Street. Suite 400
San Francisco, CA 94104
Tel: 415-772-4700
Fax: 415-772-4707
rkaplan@kaplanfox.com
lking@kaplanfox.com

Daniel J. Walker
**SUSMAN GODFREY LLP**
1201 Third Avenue, Suite 3800
Seattle, WA 98101
206-516-3880
Fax: 206-516-3883
E-mail: dwalker@susmangodfrey.com

Marc M. Seltzer
**SUSMAN GODFREY LLP**
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
310-789-3100
Fax: 310-789-3150
E-mail: mseltzer@susmangodfrey.com

Jack Wing Lee
Brad Yamauchi
Sean Tamuro-Sato
Derek Howard
**MINAMI TAMAKI LLP**
360 Post Street, 8th Floor
San Francisco, CA 94108
Tel: 415-788-9000
Fax: 415-398-3887
jlee@minamitamaki.com
byamauchi@minamitamaki.com
seant@minamitamaki.com
dhoward@minamitamaki.com

Terry Gross
**GROSS, BELSKY & ALONSO LLP**
180 Montgomery Street, Suite 2200
San Francisco, CA 94104
Tel: 415-544-0200
Fax: 415-544-0201
terry@gba-law.com

Susan Gilah Kupfer
**GLANCY BINKOW & GOLDBERG LLP**
One Embarcadero Center, Suite 760
San Francisco, CA 94111
Tel: 415-972-8160
Fax: 415-972-8166
skupfer@glancylaw.com

B. J. Wade
**GLASSMAN EDWARDS WADE & WYATT PC**
26 N. Second Street
Memphis, TN 38103
Tel: 901-527-4873
Fax: 901-521-0940
bwade@gewwlaw.com

John G. Emerson
**EMERSON POYNTER LLP**
830 Apollo Lane
Houston, TX 77058
Tel: 281-488-8854
Fax: 281-488-8867
jemerson@emersonpoynter.com

Scott E. Poynter
**EMERSON POYNTER LLP**
The Museum Center
500 President Clinton Avenue, Suite 305
Little Rock, AR 72201
Tel: 501-907-2555
Fax: 501-907-2556
scott@emersonpoynter.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Brian P. Murray
Albert Lee
**MURRAY FRANK & SAILER LLP**
275 Madison Avenue, Suite 801
New York, NY 10016
Tel:  212 682-1818
Fax: 212-682-1892
bmrray@murrayfrank.com
lalbert@murrayfrank.com

Brian Joseph Barry
**LAW OFFICES OF BRIAN BARRY**
1801 Avenue of The Stars, Suite 307
Los Angeles, CA 90067
Tel:  310-788-0831
Fax: 310-788-0841
bribarry1@yahoo.com

Eugene A. Spector
**SPECTOR ROSEMAN KODROFF &**
**WILLIS PC**
1818 Market Street, 25th Floor
Philadelphia, PA 19103
Tel:  215-496-0300
Fax: 215-496-6611
espector@srkw-law.com

Daniel E. Gustafson
**GUSTAFSON GLUEK PLLC**
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
Tel:  612-333-8844
Fax: 612-339-6622
dgustafson@gustafsongluek.com

Joseph Goldberg
**FREEDMAN BOYD HOLLANDER**
**GOLDBERG & IVES PA**
20 First Plaza, Suite 700
Albuquerque, NM 87102
Tel:  505-842-9960
Fax: 505-842-0761
jg@fbdlaw.com

W. Joseph Bruckner
**LOCKRIDGE GRINDAL NAUEN PLLP**
100 Washington Avenue S, Suite 2200
Minneapolis, MN 55401
Tel:  612-339-6900
Fax: 612-339-0981
wjbruckner@locklaw.com

Thomas Girardi
Graham B.LippSmith
**GIRARDI & KEESE**
1126 Wilshire Blvd.
Los Angeles, CA 90017
Tel: (213) 977-0211
Fax: (213) 481-1554
tgirardi@girardikeese.com
glippsmith@girardikeese.com

Brian S. Kabateck
Richard Kellner
**KABATECK BROWN KELLNER LLP**
644 South Figueroa Street
Los Angeles, CA 90017
Tel:  213-217-5000
Fax:  213-217-5010
bsk@kbklawyers.com
rlk@kbklawyers.com

Christopher T. Heffelfinger
**BERMAN DE VALERIO**
425 California Street, Suite 2100
San Francisco, CA 94104
Tel:  415-433-3200
Fax: 415-433-6382
cheffelfinger@bermandevalerio.com

Dianne M. Nast
**RODA & NAST PC**
801 Estelle Drive
Lancaster, PA 17601
Tel:  717-892-3000
Fax: 717-892-1200
dnast@rodanast.com

Richard J. Arsenault
**NEBLETT, BEARD & ARSENAULT**
P.O. Box 1190
2220 Bonaventure Court
Alexandria, LA 71309
Tel:  318-487-9874
Fax: 318-561-2591
rarsenault@nbalawfirm.com

Daniel Cohen
**CUNEO GILBERT & LADUCA, LLP**
507 C Street NE
Washington DC  20002
Tel:  202-789-3960
Fax: 202-789-1813
danielc@cuneolaw.com

1

Steven J. Greenfogel
**MEREDITH COHEN GREENFOGEL &
SKIRNICK, P.C.**
1521 Locust Street
8th Floor, Philadelphia, PA  19102
Tel:  215-564-5182
Fax: 215-569-0958
sgreenfogel@mcgslaw.com

Vincent J. Esades
**HEINS MILLS & OLSON, P.L.C.**
310 Clifton Avenue
Minneapolis, MN 55403
Tel:  612-338-4605
Fax:  612-338-4692
vesades@heinsmills.com

2

3

4

5

Hollis L. Salzman
Bernard Persky
Gregory S. Asciolla
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Tel: 212-907-0700
Fax: 212-818-0477
hsalzman@labaton.com
bpersky@labaton.com
gasciolla@labaton.com

Allan Steyer
D. Scott Macrae
**STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH LLP**
One California Street, 3d Floor
San Francisco, CA 94111
Tel: 415-421-3400
Fax: 415-421-2234
asteyer@steyerlaw.com
smacrae@steyerlaw.com

6

7

8

9

10

11

Kimberly A. Kralowec
**THE KRALOWEC LAW GROUP**
188 The Embarcadero, Suite 800
San Francisco, CA 94105
Tel:  415-546-6800
Fax:  415-546-6801
kkralowec@kraloweclaw.com

Rober Eisler
**GRANT & EISENHOFER P.A.**
1201 N. Market Street
Suite 2100
Wilmington, DE 19801
Tel:  302-622-7030
Fax:  302-622-7100
reisler@gelaw.com

12

13

14

15

16

Bruce L. Simon
Will Newsom
**PEARSON SIMON WARSHAW & PENNY**
44 Montgomery St, Suite 2450
San Francisco, CA 94104
Tel:  415-433-9000
Fax: 415-433-9008
bsimon@pswplaw.com
wnewsom@pswplaw.com

Garrett D. Blanchfield, Jr.
Mark Reinhardt
**REINHARDT WENDORF &
BLANCHFIELD**
East 1250 First National Bank Building
322 Minnesota Street
St. Paul, MN 55101
Tel: 651-287-2100
Fax: 651-287-2103
g.blanchfield@rwblawfirm.com
m.reinhardt@rwblawfirm.com

17

18

19

20

21

22

Michael Buchman
J. Douglas Richards
**POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS**
100 Park Avenue
New York, NY 10019
Tel: 212-661-1100
Fax: 212-661-8665
mbuchman@pomlaw.com
drichards@pomlaw.com

Pierce O'Donnell
Gregory Jonathon Mann
Robert M. Partain
**O'DONNELL AND ASSOCIATES, PC**
550 South Hope Street Suite 1000
Los Angeles, CA 90071
Tel: 213-347-0290
Fax: 213-347-0299
pod@oslaw.com
gmann@oslaw.com
rpartain@oslaw.com

23

24

25

26

27

28

# Appendix A

## Members of the Hong Kong Board of Airline Representatives

Aer Lingus
Aeroflot
Aerolineas Argentinas
Aeromexico Airlines
Aeromexpress Cargo Airlines
Air Astana
AirBridge Cargo Airlines Limited
Air Canada
Air France
Air Hong Kong
Air India
Air Mauritius
Air New Zealand
Air Niugini
Alitalia
All Nippon Airways
Aloha Airlines
American Airlines
Asiana Airlines
Austrian Airlines
Bangkok Airways
Biman Bangladesh Airlines
BMI British Midland
British Airways
Cargolux Airlines
Cathay Pacific Airways
Cebu Pacific
China Airlines
China National Aviation Corporation
Continental Airlines
CSA Czech Airlines
Delta Airlines
Egypt Air
Emirates
El Al Israel Airlines
Ethiopian Airlines
Etihad Airways
Eva Airways
Evergreen Int'l Airlines
Federal Express Corporation
Finnair
Garuda Indonesia
Gulf Air

Hahn Air
Hong Kong Airlines Limited
Hong Kong Dragon Airlines
Hong Kong Express Airways Ltd
Japan Airlines
Japan Asia Airways
Jet Airways (India) Ltd
Kalitta Air
Kenya Airways
KLM Royal Dutch Airlines
Korean Air
Lanchile Airlines
Lufthansa Cargo AG
Lufthansa German Airlines
Malaysian Airlines
Martinair Cargo
Myanmar Airways
Nippon Cargo Airlines
Northwest Airlines
Oasis Hong Kong Airlines Ltd
Ocean Airlines Hong Kong Limited
Orient Thai Airlines
Pakistan Int'l Airlines
Philippine Airlines
Polar Air Cargo
Qantas Airways
Qatar Airways
Royal Brunei Airlines
Royal Jordanian
Royal Nepal Airlines
Saudi Arabian Airlines
Scandinavian Airlines System
Singapore Airlines
Sky Express S.A.
South African Airways
SriLankan Airlines
Swiss International
Thai Airways
Transmile Air Services Sdn. Bhd.
Turkish Airlines Inc.
United Airlines
United Parcel Service
US Airways
Varig Brazilian Airlines
Vietnam Airlines
Virgin Atlantic

1

## <u>Appendix B</u>

2

## <u>List of Attendees at May 18, 2004 Meeting of the Thailand</u>

3

## <u>Board of Airline Representatives</u>

4

Mr. Suthep Suebsantiwongse (TG-Chairman)

5

Mr. Axel Blom (SK-Chairman EXCOM)

Ms. J. Rogers (QF/BA(EXCOM Australia))

6

Mr. Pandit Chanapai (TG(EXCOM/Thailand))

Mr. Warren Gerig (UA(EXCOM/N.America))

7

Mr. Kachornsak V. (JL-Chairman AC BA)

Mr. Louis Moser (QF/BA-Chairman AOC)

8

Mr. Smartchai Tuchinda (AF)

9

Ms. Ujala tham (AI)

Mr. Shafiwar Rahman (BG)

10

Mr. Thira K. (BR)

Mr. Nelson Fang (CI)

11

Mr. Yongyut Lujintanon (CX)

12

Mr. Soonthorn Suree (EK)

Ms. Aree H. (GA)

13

Mr. Rakesh Bhatia (IC)

Mr. Kamol V. (JL)

14

Mr. James K. C. Yeung (KA)

Mr. Suchon Paleewong (KE)

15

Ms. Merita Ombuor (KQ)

16

Mr. Ihab Sourial (KL)

Mr. Hamed Almatoq (KU)

17

Mr. Wolfgang Schmidt (LH)

Mr. Ashrat Osmen (MS)

18

Mr. Somnuek Asavaveeradej (NH)

Mr. Sarathool M. (NW)

19

Mr. Buranut Limjitti (OS)

20

Mr. Vorakit Nivatwong (OZ)

Mr. Suchard Buranakarn (PG)

21

Ms. Dell Merano (PR)

Ms. Vatchara Silpohevagitja (PR)

22

Mr. Taleb Hadidi (RJ)

23

Ms. Wantip Piyamalmas (RJ)

Mr. Chokchai Ittipanuvat (TK)

24

Mr. Esra Pehlivangogli (TK)

Mr. Rohan Seneviratne (UL)

25

Ms. Vannasiri (8M)

Guest Mr. Prakobkiat Ninnad (TG (VP, Petroleum Management))

26

27

28

1

## Appendix C

2

## List of Recipients of Carol Phatoomros May 24, 2004 E-mail

3

## Re: Fuel Surcharges

4

Singapore Air (Tuckwah Tang)

5

Thai (BAR Chairman Suthep Suebsantiwongse, pandit.c@thaiairways.com)
US (Warren Gerig)

6

SAS (Alex Blom)
CX (Ivan Chu)

7

BA (Julianne M. Rogers)
LH (Wolfgang Schmidt)

8

Emirates (Soonthorn Suree)

9

Dragon Air (Sutthisak Pungtamawatthanakun, James Yeung)
KLM (Ihab Sorial)

10

Air New Zealand (Panya Silparjarn)
South Aftican Airways (Annie Tsima)

11

American Airlines (Prajak Burarak, Chaichan Khongsrithong)
Airline Cargo Busines Association (kachornsak@jalcargobkk.com)

12

Druk Air (drukair@loxinfo.co.th)

13

Aloha Airlines (malai@plt.co.th)
Air India (airindia@loxinfo.co.th)

14

Angel Airlines (info@angelairlines.com)
Air Canada (airagcy@asiaaccess.net.th)

15

Air France (joroutier@airfrance.fr, potulyaanukij@airfrance.fr)
Finnair (Finnair.Thailand@finnair.com)

16

Eva Airways (gsiamair@loxinfo.co.th)

17

Air China (cabkk@asianet.co.th)
China Southern Airlines (bkkcsn@ksc.th.com)

18

Ethiopian Airlines (bkkam@ethiopianairlines.com)
Indian Airlines (smicbkk@ksc.th.com)

19

ANA (bkksg@ana.co.th, asava@ana.co.jp)

20

NWA (sarathool@nwa.com)
Air Macau (deksth@asiaaccess.net.th)

21

Czech Airlines (prae@guetravel.com)
Asiana (aabkksmz@flyasiana.com)

22

Bangkok Air (pwiesner@bangkokair.co.th)
Qatar Air (qatarair@loxinfo.co.th)

23

Varig (varigbkk@federal.co.th)

24

China Southwest Airlines (szbkk@bkk3.loxinfo.co.th)
Turkish Airlines (tkacct@thy.co.th)

25

Myanmar Airways (maibkk@asiaaccess.net.th)
Sri Lankan (bkkadmin@srilankan.lk, bkksales@srilankan.lk)

26

Egypt Air (bkkdm@egyptair-bangkok.th.com)
Korean Air (bkksm@koreanair.co.kr)

27

Air-MPA (hhansen@mpa-security.com)

28

Royal Brunei Airlines (bkkprapat@rba.com.bn, bkkwatans@rba.com.bn)
JAL (bkkssm.jal@jal.com)
Gulf Air (bkkszgf@gulfair.co.th)
China Airlines (lin-sen_fang@e-mail.china-airlines.com)
Bangladesh Biman (bimanbkk@loxinfo.co.th)
El Al (elalbkk@hotmail.com)
Qantas (Lmoser@qantas.com.au)
Federal Express (cliftonchua@fedex.com, phaswan@fedex.com)
Lauda Air (sirichanyaW@laudaair.com)
Kuwait Airways (bkk@kuwait-airways.net, airkuwait@yahoo.com)
British Midland (dtwm@lox info.co.th)
Vietnam Air (admin.bkk@vietnam-air.com, Sale.bkk@vietnam-air.com)
Lao Aviation (bkkrrqv@ksc.th.com)
Swiss International Airlien (bsinclai@mail.swiss.com)
Bangkok Airways (suchard@bangkokair.co.th)
Alitalia (korn@bravox.net)
Phillipine Airliens (palphstar@hotmail.com)
Austrian Airilines (Buranut.Limjitti@aua.com)
Kenya Air (kenyaair@loxinfo.co.th)
Air Berlin (Raymond Honings, Markus Moschner)
Silkair (silkair@upc1.loxinfo.co.th)
China Eastern Airlines (musales@ksc.th.com)
Pakistan International Airlines (piabkk@ji-net.com)
Royal Jordanian (bkktbrj@rja.com.jo)
Malaysia Airlines (bkkzqmh@samart.co.th)
LOT (preecha@wondervacation.com)
Garuda Indonesia (secrdmga@box1.a-net.net.th)
Tarom (tarombkk@yahoo.com)
Royal Nepal Airlines (rabkk@cscoms.com)

1

## Appendix D

2

## List of Attendees at September 1, 2005 Meeting of the Thailand

3

## Board of Airline Representatives

4

Mr. Brian Sinclair-Thompson (LX – President)

5

Ms. Julianne Rogers (BA/QF – Board)
Mr. Patrick Yeung (CX – Board)

6

Mr. Soonthorn Suree (EK – Board)
Mr. Sarathool M. (NW – Board)

7

Mr. Rangsiman Mokkhanasamit (TG – Board)
Ms. Christine Seuge (AF)

8

Mrs. Ujala Tham (Al)

9

Mr. A. V. Trindade (Al)
Ms. Neeramun Namalee (Al)

10

Mr. Malai Sakolviphak (AQ)

11

Mr. Markku Dravainen (AY)
Mr. Vorakit Nivatvongs (BI)

12

Mr. Charlie Fu (CI)
Mr. Andy Yao (CI)

13

Mr. Billy Chomsakorn (EY)
Mr. Teguh Subandrio (GA)

14

Mr. Comson Leelalumlert (GA)
Mr. John Evans (GF)

15

Mr. Somporn K. Utasiri (GF)
Mr. S. Iwasaki (JL)

16

Mr. Chanchai Wangyuenyong (JL)

17

Mr. Sutthisak P. (KA)
Mr. Suchon Paleewong (KE)

18

Mr. Nieon Suddhidhanaroq (KQ)
Mr. Wolfgang Schmidt (LH)

19

Mr. Raymond Honings (LT)

20

Mr. Howard Noble (MD)
Mr. Kimiya Artma (NH)

21

Mr. Somnuck Asava (NH)
Mr. Suchard Buranakorn (PG)

22

Ms. Monet Trespeses (PR)
Mr. Taleb Hadidi (RJ)

23

Ms. Wantip Piyamalamas (RJ)

24

Mr. Chokchai Ittipanuvat (SA)
Ms. Punthip Issarungura (SK)

25

Mr. Eric Wilson (VA)
Mr. Ngayen Nhu Than (VN)

26

Mr. Gilmore Soe Min (8M)

27

28

Mr. Prakit Trongkarmonmas (EY/ACBA Chairman)
Ms. Sopin Daengteth (LX/AOC Chairperson)
Mr. Chitvee Leelasiri (IATA)

# Appendix E

## List of Recipients of Carol Phatoomros August 18, 2005

## E-mail Re: Fuel Surcharges

Singapore Air (David Lau)
Thai Airways (vasing.k@thaiairways.com, nn.office@thaiairways.com,
wallop.b@thaiairways.com)
United Airlines (Eric Wilson)
SAS (Axel Blom)
CX (Patrick Yeung,
BA (Julianne M. Rogers)
LH (Wolfgang Schmidt)
Tarom (tarombkk@yahoo.com)
JAL (kachornsak@jalcargobkk.com)
Druk Air (drukair@loxinfo.co.th)
Aloha Airlines (malai@plt.co.th)
Air India (airindia@loxinfo.co.th)
Angel Airlines (info@angelairlines.com)
Air Canada (airagcy@asiaaccess.net.th)
Air France (joroutier@airfrance.fr)
Finnair (Finnair.Thailand@finnair.com)
Eva Airways (gsiamair@loxinfo.co.th)
Air China (cabkk@asianet.co.th)
China Southern Airlines (bkkcsn@ksc.th.com)
Emirates (Soonthorn Suree)
Ethiopian Airlines (bkkam@ethiopianairlines.com)
Garuda (secrdmga@box1.a- net.net.th)
Indian Airlines (smicbkk@ksc.th.com)
Dragon Air (Sutthisak Pungtamawatthanakun)
KLM (Ihab Sorial)
LOT (preecha@wondervacation.com)
Malaysia Airlines (bkkzqmh@samart.co.th, mohdali@samart.co.th)
Silkair (silkair@upc1.loxinfo.co.th)
China Eastern Airlines (musales@ksc.th.com)
NW (sarathool@nwa.com)
Air Macau (deksth@asiaaccess.net.th)
Air New Zealand (Panya Silparjarn)
Asiana (aabkksmz@flyasiana.com)
Bangkok Airways (pwiesner@bangkokair.co.th)
Pia (piabkk@ji- net.com)
Qatar Airways (jer@th.qatarairways.com)
China Southwest Airlines (szbkk@bkk3.loxinfo.co.th)
SAA (Nely Kusmin)
Royal Jordanian (thadidi@rja.com.jo)
Cathay Pacific (Alan Tang)
LH (Vanida Charoensombud, lhbkk@samart.co.th)

Dragon Air (Stephen TK Chang)
Turkish Airlines (tkacct@thy.co.th)
Myanmar Airways (bkk.cm@maiair.com)
Sri Lankan Airlines (bkkadmin@srilankan.lk, hussainj@srilankan.aero)
KAL (bkksm@koreanair.co.kr)
Royal Nepal Airlines (rabkk@cscoms.com)
Air- MPA (hhansen@mpa- security.com)
American Airlines (Prajak Burarak, Chaichan Khongsrithong)
Japan Airlines (chanchai.wangyuenyong@jal.com)
Gulf Air (bkkszgf@gulfair.co.th)
China Airlines (Charlie Fu)
Bangladesh Biman (bimanbkk@loxinfo.co.th)
El Al (elalbkk@hotmail.com)
Qantas (Lmoser@qantas.com.au)
Fedex (cliftonchua@fedex.com)
Kuwait Airways (bkk@kuwait- airways.net, airkuwait@yahoo.com)
Srilankan (bkksales@srilankan.aero)
British Midland (dtwm@loxinfo.co.th)
Vietnam Airlines (admin.bkk@vietnam- air.com)
Lao Aviation (bkkrrqv@ksc.th.com)
Lauda Air (TantiprasutP@laudaair.com)
Swiss International (Brian Sinclair-Thompson)
Air France (potulyaanukij@airfrance.fr)
Bangkok Airways (suchard@bangkokair.co.th)
Federal Express (phaswan@fedex.com, ichand@fedex.com)
Alitalia (korn@bravox.net)
Vietnam Airlines (Sale.bkk@vietnam- air.com)
Philippine Airlines (palphstar@hotmail.com)
Austrian Airlines (Buranut Limjitti)
Royal Brunei (vorakitn@rba.com.bn)
ANA (asava@ana.co.jp, k.arima@ana.co.jp, Kuniko Ito)
Air Berlin (Raymond Honings, Markus Moschner)
Myanmar Airways (bkk.cm@maiair.com)
Malaysia Airlines (mohdali@samart.co.th)
Etihad Airways (kalbrow@etihadairways.co.th, asomjaiwongse@etihadairways.co.th)
Kenya Air (Merita Ombour, kenyaair@loxinfo.co.th)
Qatar Airways (mkoleilat@qatarairways.com.qa)
Phuket Airlines (kavida@phuketairlines.com)
Kuwait Airways (bkk@kuwaitairways.com, airkuwait@yahoo.com)
Phuket Airlines (dwpatana@phuketairlines.com)
AOC (sborisut@mail.swiss.com)
JAL (bkkss.jal@jal.com)
Air Madagascar (Howard Noble)
IATA (LEELASIRIC@iata.org)

1

## Appendix F

2

## Recipients of Joanne Sotocinal E-mail of May 25, 2004

3

## Re The Philippines BAR Fuel Surcharge Proposal

4

China airlines (Yuchih@china-airlines.com)
Royal Brunei Airlines (Mnlagnes@rba.com.bn)
5
Federal Express (Alex Brandes, Ssdavid@fedex.com)
Korean (koreanmnl@hotmail.com)
6
Asiana (Hyunil Kim, aamnlsmz@flyasiana.com, Rene01@flyasiana.com)
Air France (mlreyes@airfrance.fr, Lovergeon@airfrance.fr)
7
Gulf Airways (Bobby Hukom)
DLH (Darryl Modelo, Dietmar Kramer, Jo Portugal)
8
Singapore Air (David Lau, Nenita Dy, Eugene Chew)
Felix Cruz (PAL)
9
Kuwait Airways (Manager@kuwaitairways.com.ph, Sales@kuwaitairways.com.ph)
Emirates (Gigie Baroa)
10
Malaysia Airlines (Malaysia@skyinet.net)
Pakistan International Airlines (Mnluupk@piac.com.pk)
11
EVA (Jackyu@asia-pacific.evaair.com, Nenitachan@asia-pacific.evaair.com)
PAL (Jing Javier, Tillit Inoturan, Rol_legal)
12
KLM  (Jose Laurente)
Cebu Pacific Air (Jose Inez, Roland Nunez)
13
Qatar Airways (manolo@qatarairways.com.ph)
Cathay Pacific (Mark Sutch, Vickie Yue)
14
American Airways (Mary Ann Marcias)
JAL (Kubo Masanobu)
15
Alitalia (Benini Mauro)
SAS (Nila Layug)
16
Swiss (Paul Schenk)
NCA (Tetsuo Sugiyama)
17
mnlaa@thaimnl.com.ph
Sales@thaimnl.com.ph
18
czenarosa@globenet.com.ph
svcm@twasp.com
19
kalkts@hanmail.net
HKVNPH@qinet.net
20
msadmin@info.com.ph
Mcabanto@mozcom.com
21
Jcting@info.com.ph
Safaisal@skyinet.net

22

23

24

25

26

27

28

# Appendix G

## Summary of Investigations With Respect to Defendants Named in the Transpacific Litigation

| DEFENDANT | AIR CARGO[1] DEFENDANT | PLED GUILTY TO US DOJ CRIMINAL CHARGES | US DOJ FINE | EC[2] | NZCC[3] | ACCC[4] | CCB[5] | KFTC[6] |
|---|---|---|---|---|---|---|---|---|
| AIR NEW ZEALAND | X | | | X | X | X | | |
| AIR FRANCE/KLM | X | X | $350 million | X | X | X | X | X |
| ALL NIPPON AIRWAYS CO. LTD | X | X | $73 million | X | | | | X |
| BRITISH AIRWAYS | X | X | $300 million | X | X | X | X | X |
| CATHAY PACIFIC AIRWAYS LTD | X | X | $60 million | X | X | X | | X |
| CHINA AIRLINES | | X | $40 million | X | | | | |
| CONTINENTAL AIRLINES | | | | | | | | |
| EVA (TAIWAN) | | X | $13.2 million | X | | | | |
| JAL (JAPAN AIRLINES INT'L) | X | X | $110 million | X | X | X | | X |
| LUFTHANSA/ SWISS INTERNATIONAL | X | Amnesty Applicant[7] | | X | | X | | X |
| MALAYSIAN AIRLINES | | | | X | X | X | | X |
| PHILIPPINE AIRLINES | | | | | | | | |
| QANTAS (AUSTRALIA) | X | X | $61 million | X | X | X | X | X |
| SAS (SCANDINAVIAN) | X | X | $52 million | X | | | | X |
| SINGAPORE AIRLINES | X | | | X | | X | | X |
| THAI AIRWAYS | X | | | X | X | X | | X |
| | | TOTAL | $933 million | | | | | |

[1] Air Cargo -
   In re Air Cargo Shipping Services Antitrust Litigation;
   US District Court, ED New York, Case no. 06-MD-1775
[2] EC -       European Commission
[3] NZCC -   New Zealand Commerce Commission
[4] ACCC-   Australian Competition and Consumer commission
[5] CCB -     Canadian Competition Bureau
[6] KFTC -   Korea Fair Trade Commission