1    JOSEPH W. COTCHETT (36324)
     STEVEN N. WILLIAMS (175489)
2    NANCY L. FINEMAN (124870)
     ADAM J. ZAPALA (245748)
3    ELIZABETH TRAN (280502)
     **COTCHETT, PITRE & McCARTHY, LLP**
4    San Francisco Airport Office Center
     840 Malcolm Road, Suite 200
5    Burlingame, CA 94010
     Telephone:  650-697-6000
6    Facsimile:    650-697-0577
     swilliams@cpmlegal.com
7    nfineman@cpmlegal.com
     azapala@cpmlegal.com
8    etran@cpmlegal.com

9    MICHAEL D. HAUSFELD            MICHAEL P. LEHMANN (77152)
     SETH R. GASSMAN               CHRISTOPHER L. LEBSOCK (184546)
10   **HAUSFELD LLP**              **HAUSFELD LLP**
     1700 K. Street, N.W., Suite 650   44 Montgomery Street, Suite 3400
11   Washington, D.C. 20006        San Francisco CA  94104
     Tel: (202) 540-7200           Tel: (415) 633-1908
12   Fax: (202) 540-7201           Fax: (415) 358-4980
     mhausfeld@hausfeldllp.com     mlehmann@hausfeldllp.com
13   sgassman@hausfeldllp.com      clebsock@hausfeldllp.com

14   *Interim Co-Lead Counsel for Plaintiffs*

15              **UNITED STATES DISTRICT COURT**

16          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

17                  **SAN FRANCISCO DIVISION**

18   **IN RE TRANSPACIFIC PASSENGER**      Civil Case No. 3:07-cv-05634-CRB
     **AIR TRANSPORTATION ANTITRUST**
19   **LITIGATION**                         **MDL No. 1913**

20   _____      **PLAINTIFFS' OMNIBUS OPPOSITION**
                                           **TO DEFENDANTS' MOTIONS FOR**
21   **This Document Relates to:**          **SUMMARY JUDGMENT**

22          **All Actions**                 **Date:    TBD**
                                           **Time:    TBD**
23                                          **Courtroom: 6, 17th Floor**

24

25                    *HIGHLY CONFIDENTIAL*

26          *DOCUMENT SUBMITTED UNDER SEAL*

27

28

# TABLE OF CONTENTS

**Page**

I.    STATEMENT OF ISSUES TO BE DECIDED ....................................................1

II.   INTRODUCTION ............................................................................................1

III.  PROCEDURAL BACKGROUND.....................................................................4

IV.  FACTUAL BACKGROUND ...........................................................................5

     A.     Defendants Engaged in a Conspiracy to Fix Prices for International Airfares and Surcharges ...............................................................5

          1.    Defendants Engaged in a Conspiracy to Fix Base Fares ...........................5

          2.    Defendants Engaged in a Conspiracy to Fix the Prices of Fuel Surcharges ...............................................................................6

          3.    JAL and ANA Engaged in a Conspiracy to Fix Unpublished Discount Fares that are Not Filed with DOT ...............................6

     B.     Congress and DOT Deregulated the International Air Transportation Industry and Directed that Market Competition – Not Regulation – Should Determine Prices ...............................................7

          1.    Congress deregulated the domestic aviation industry and made clear that the antitrust laws apply ................................................8

          2.    Congress deregulated the international aviation industry and provided that antitrust immunity would only come through explicit grants of immunity by DOT ...........................................8

          3.    Pursuant to the congressional mandate, DOT issued rules and regulations designed to deregulate the international airline industry and divest itself of powers related to pricing ...........................11

              a.     Air New Zealand....................................................13

              b.     All Nippon Airways.................................................14

               c.     Cathay Pacific Airways.............................................14

               d.     China Airlines ......................................................14

              e.     EVA Airways .......................................................15

               f.     Philippine Airlines .................................................15

               g.     Qantas Airways.....................................................15

               h.     Singapore Airlines .................................................15

     C.     History of Fuel Surcharges ...............................................................15

| | | | |
|---|---|---|---|
| | D. | ATPCO's Role as Clearinghouse.................................................................. | 17 |
| V. | | STANDARD OF REVIEW ................................................................................ | 20 |
| VI. | | ARGUMENT ...................................................................................................... | 21 |
| | A. | Congress Intended for the Antitrust Laws to Fully Apply in the Deregulated International Airline Industry ............................................... | 21 |
| | B. | Provisions For Obtaining Antitrust Immunity in the Transportation Code Demonstrate that Congress Did Not Intend for the Filed Rate Doctrine to Apply ........................................................................................ | 26 |
| | C. | DOT Has Deregulated Pricing in the International Airline Industry to Comply with its Congressional Mandate and Believes the Antitrust Laws Fully Apply ............................................................................................ | 28 |
| | D. | Though the Filed Rate Doctrine Does Not Apply At All in this Case, It Clearly Does Not Apply Where There is No Filing Requirement ....................... | 31 |
| | | 1.  No Court Has Applied the Filed Rate Doctrine to a Regulatory Regime Like DOT's in the Absence of Actual Filing ............................. | 31 |
| | | a.  Air New Zealand ................................................................. | 32 |
| | | b.  China Airlines and EVA Airways ...................................... | 32 |
| | | c.  Philippine Airlines and Qantas Airways ........................... | 32 |
| | | d.  Singapore Airlines ............................................................. | 32 |
| | | 2.  No Defendant Was Required to File Fuel Surcharges ............................. | 33 |
| | | 3.  Several Defendants Claiming Filed Rate Protection Did Not File Fuel Surcharges with DOT ....................................................................... | 34 |
| | | 4.  Filed Rate Protection for Unfiled, "Market-Based" Rates Is Inappropriate in the International Airline Industry .................................. | 37 |
| | E. | Even if This Court Finds that DOT is Required to Engage in Regulatory Review of Pricing, it Has Effectively Abdicated that Authority .......................... | 43 |
| | | 1.  DOT Has Effectively Abdicated Its Authority Over All International Fares ................................................................................... | 43 |
| | | 2.  Even if DOT Has the Authority to Regulate the Level of Fuel Surcharges, Which it Does Not, It Effectively Abdicated its Authority .................................................................................................. | 45 |
| | F. | Adjudication in a Court of Law Is Appropriate Where the Federal Agency Lacks Authority to Craft a Remedy to an Antitrust Violation .............................. | 46 |
| | G. | Defendants Have Failed to Meet Their Summary Judgment Burden ................... | 49 |

H.  Defendants' Fare Filings With Foreign Regulators Does Not Give Rise To A Filed Rate Defense ..................................................50

I.  Joint and Several Antitrust Liability Precludes Granting Summary Judgment ..................................................................................52

J.  The Filed Rate Doctrine Does Not Apply to Plaintiffs' Claim for Injunctive Relief...............................................................................53

K.  Unpublished Discount Fares Are Not Subject to Filed Rate Protection...........53

    1.  Discount Fares, including *Satogaeri, Yobiyose* and Business Discount Are not "Fares" Actually Filed by ANA ...............................54

L.  For Additional Reasons, ANA May Not Invoke The Filed Rate Defense In This Case ..................................................................................56

    1.  ANA Is Judicially Estopped From Invoking the Filed Rate Defense........58

    2.  ANA Has Waived The Right to Involke the Filed Rate Defense .............56

    3.  DOJ Has Sufficiently Expressed Its "Disapproval" Of ANA's Anticompetitive Conduct to Preclude the Filed Rate Defense .................58

VII.  CONCLUSION...........................................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aloha Airlines, Inc. v. Hawaiian Airlines, Inc.,*
   489 F.2d 203 (9th Cir. 1973) ...............................................................................24, 25, 47

*American National Red Cross v. S.G.,*
    505 U.S. 247 (1992)..........................................................................................................26

*Arsberry v. Illinois,*
   244 F.3d 558 (7th Cir. 2001) ...........................................................................................53

*AT&T Corp. v. Central Office Tel., Inc.,*
   524 U.S. 214 (1998)...........................................................................................................55

*Blue Growth Holdings, Ltd. v. Mainstreet Ltd. Ventures, LLC,*
   2013 U.S. Dist. LEXIS 126352 (N.D. Cal. Sept. 4, 2013) ................................20, 49

*Cain v. Air Cargo, Inc.,*
   599 F.2d 316 (9th Cir. 1979) ......................................................................................21, 34

*Carlin v. Dairy America, Inc.,*
   2013 U.S. Dist. LEXIS 149086 (E.D. Cal. Oct. 11, 2013) ..........................................42

*Carlin v. Dairy America, Inc.,*
   705 F.3d 856 (9th Cir. 2013) .........................................................................41, 42, 58, 59

*Carnation v. Pacific Westbound Conference,*
   383 U.S. 213 (1965)...........................................................................................................27

*Choiceparts, LLC v. GMC,*
   2005 U.S. Dist. LEXIS 6272 (N.D. Ill. Mar. 30, 2005)...............................................52

*Cost Management Services. Inc. v. Washington Natural Gas Company,*
   99 F.3d 937 (9th Cir. 1996) ........................................................................................21, 51

*County of Stanislaus v. Pacific Gas & Elec. Co.,*
   114 F.3d 858 (9th Cir. 1998) ............................................................................................51

*Daleure v. Commonwealth of Kentucky,*
   119 F. Supp. 2d 683 (W.D. Ky. 2000)...........................................................................53

*E. & J. Gallo Winery v. EnCana Corp.,*
   503 F.3d 1027 (9th Cir. 2007) .............................................................................. passim

*First Pennsylvania Bank, N.A. v. Eastern Airlines, Inc.,*
   731 F.2d 1113 (3rd Cir. 1984) ..........................................................................................31

*Florida Municipal Power Agency v. Florida Power & Light Co.,*
   64 F.3d 614 (11th Cir. 1995) ............................................................................................31

*Georgia v. Pennsylvania R.R.,*
    324 U.S. 439 (1945)..................................................................................53

*Great Destinations, Inc. v. Transportes Aeros Portugeses S.A.R.L.,*
    460 F. Supp. 1160 (S.D.N.Y. 1978) ........................................................24

*Hamilton v. State Farm Fire & Cas. Co.,*
    270 F.3d 778 (9th Cir. 2001) ...................................................................57

*In re NOS Communications,*
    495 F.3d 1052 (9th Cir. 2007) .................................................................53

*In re Ocean Shipping Antitrust Litig.,*
    500 F.Supp. 1235 (S.D. N.Y. 1980) ................................................. passim

*In re TFT-LCD (Flat Panel) Antitrust Litigation,*
    820 F.Supp.2d 1055 (N.D. Cal. 2011) ......................................................52

*In re Transpacific Passenger Air Antitrust Litig.,*
    No. C-07-05634, 2011 U.S. Dist. LEXIS 49853 (N.D. Cal. May 11, 2011).................... passim

*International Travel Arrangers, Inc. v. Western Air Lines, Inc.,*
    408 F. Supp. 431 (D. Minn. 1975).............................................................47

*Keogh v. Chicago & Northwestern Railway Co.,*
    260 U.S. 156 (1922)............................................................................21, 51

*Maislin Indus., U.S., Inc. v. Primary Steel, Inc.,*
    497 U.S. 116 (1990)..................................................................................55

*Marcus v. AT&T Corp.,*
    138 F.3d 46 (2d Cir. 1998) .......................................................................53

*Marnell v. United Parcel Service of Am., Inc.,*
    260 F. Supp. 391, 397 (N.D. Cal. 1966) ...................................................48

*Medco Energi US L.L.C. v. Sea Robin Pipeline Co., L.L.C.,*
    895 F.Supp.2d 794 (W.D. La. 2012) .........................................................50

*Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC,*
    692 F.3d 983 (9th Cir. 2012) ...................................................................57

*Nantahala Power & Light Co. v. Thornburg,*
    476 U.S. 953 (1986).................................................................................51

*New Hampshire v. Maine,*
    532 U.S. 742 (2001).................................................................................57

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos. Inc.,*
    210 F.3d 1099 (9th Cir. 2000) .................................................................21

*Pan American World Airways, Inc. v. United States,*
    371 U.S. 296 (1963)............................................................................25, 48

*Paper Systems, Inc. v. Nippon Paper Industries Co., Ltd.*,
   281 F.3d 629 (7th Cir. 2002) ........................................................................................52

*Pub. Utility Dist. No. 1 of Grays Harbor Cty. Wash. v. IDACORP Inc.*,
   379 F.3d 641 (9th Cir. 2004) ........................................................................5, 37, 38, 39

*Pub. Utility Dist. No. 1 of Snohomish Cty. v. Dynegy Power Mktg., Inc.*,
   384 F.3d 756 (9th Cir. 2004) ........................................................................5, 37, 38, 39

*Republic Airlines v. C.A.B.*,
   756 F.2d 1304 (8th Cir. 1985) .....................................................................................26

*Roberts Distrib. v. Federal Express Corp.*,
   917 F. Supp. 630 (S.D. Ind. 1996) ...............................................................................31

*Square D Co. v. Niagara Frontier Tariff Bureau*,
   476 U.S. 409 (1986).......................................................................................21, 51, 53

*Tempel Steel Corp. v. Landstar Inway, Inc.*,
   211 F.3d 1029 (7th Cir. 2000) ...............................................................................24, 41

*Thomas Jefferson Univ. v. Shalala*,
   512 U.S. 504 (1994) .....................................................................................................34

*Ting v. AT&T*,
   319 F.3d 1126 (9th Cir. 2003) ............................................................................. passim

*Transkentucky Transp. R. v. Louisville & Nashville R. Co.*,
   581 F. Supp. 759 (E.D. Ky. 1983) ...............................................................................47

*United  States ex rel. Touhy v. Ragen*,
   340 U.S. 462 (1951).....................................................................................................50

*United States v. American Tel. & Tel. Co.*,
   461 F. Supp. 1314 (D.D.C. 1978)................................................................................47

*United States v. Amwest Surety Insurance Co.*,
   54 F.3d 601 (9th Cir. 1995) .......................................................................................58

*United States v. Hunter*,
   101 F.3d 82 (9th Cir. 1996) .........................................................................................26

*United States v. Philadelphia Nat. Bank*,
   374 U.S. 321 (1963)......................................................................................................21

*Williams v. Duke Energy International, Inc.*,
   681 F.3d 788 (6th Cir. 2012) .......................................................................................56

**Statutes, Codes, Regulations and Notices**

14 C.F.R. § 293.10 .................................................................................13, 15, 18, 31

29 C.F.R. § 293.10 .................................................................................................41

49 C.F.R. § 9.15 .....................................................................................................50

5 U.S.C. §301 .........................................................................................................50

47 U.S.C. § 202(a) ..................................................................................................24

49 U.S.C. § 13710(a)(2) .........................................................................................41

49 U.S.C. § 40101(e) ................................................................................................9

49 U.S.C. § 40109(c) .........................................................................................11, 41

49 U.S.C. § 41308 .............................................................................................16, 26

49 U.S.C. § 41308(b) ....................................................................................10, 11, 26

49 U.S.C. § 41501 ...................................................................................................23

49 U.S.C. § 41510 ...................................................................................................43

49 U.S.C. § 43109 ...........................................................................................11, 12, 26

53 Fed. Reg. 41353 (Oct. 21, 1988).................................................................11, 43, 56

60 Fed. Reg. 21841 (May 3, 1995) ..................................................................11, 44

60 Fed. Reg. 61478 (Nov. 30, 1995).......................................................................12

62 Fed. Reg. 10758 (Mar. 10, 1997)...................................................................12, 44

64 Fed. Reg. 40654 (July 27, 1999)....................................................................12, 34

69 Fed. Reg. 65676 (Nov. 15, 2004)............................................................17, 34, 45, 46

Airline Deregulation Act of 1978,
    (Pub. L. No. 95-504, 92 Stat. 1705 (1978)) ("ADA") ....................................7

Fed. R. Civ. Proc. 56(a) ...................................................................................20. 53

Fed. R. Civ. Proc. 56(g) ..........................................................................................20

International Air Transportation Competition Act of 1979
    (Pub. L. No. 96-192, 94 Stat. 35 (1979)) ("IATCA")...................................7, 8

**Other Authorities**

Airline Fuel Corporation, Agreement,
  CAB Order 79-9-120, 83 C.A.B. 1358 ...................................................................30

*Braniff South American Route-Transfer Case,*
  1983 CAB LEXIS 288 (April 20, 1983)................................................................29

Competitive Marketing of Air Transportation, Order 82-12-85,
  1982 CAB Lexis 23, *313 (Dec. 16, 1982) ...............................................28, 29, 30

DOT Order 2008-7-4 (July 7, 2008) ..............................................................1, 29

DOT Order 2012-11-4, 2012 DOT Av. LEXIS 462 (Nov. 6, 2012) ......................28, 44

DOT Order 80-6-66, 85 C.A.B. 2481, 1980 CAB Lexis 323, at *70 (DOT, June 12, 1980)........30

DOT Order 82-12-85, 99 C.A.B. 1, 1982 CAB LEXIS 23 (Dec. 16, 1982) ...............................2, 8

DOT Order 87-12-48, 1987 DOT Av. LEXIS 38 (Dec. 17, 1987)................................29

DOT Order 88-3-67, 1988 DOT Av. LEXIS 250 (March 31, 1988)..........................29

IATA Tariff Conference Proceeding, Order 2006-7-3,
  2006 DOT Av. LEXIS 460 (July 5, 2006)...........................................................9, 26

Tang, Rachel, Congressional Research Service ("CRS"),
  *Airline Passenger Rights: The Federal Role in Aviation Consumer Protection* (2013) ...........12

1    **I.    STATEMENT OF ISSUES TO BE DECIDED**

2        1.    Whether Congress intended to exempt the international airline industry from civil

3    claims for violations of the antitrust laws through application of the filed rate doctrine, despite

4    systematically deregulating the industry and determining that market competition, not

5    government regulation, should govern pricing.

6        2.    Whether the filed rate doctrine should apply in an industry where DOT does not

7    regulate the pricing level of fares or fuel surcharges based on their "reasonableness."

8        3.    Whether the filed rate doctrine applies to unfiled fares or surcharges over which

9    DOT does not exercise regulatory supervision.

10   **II.    INTRODUCTION**

11       Defendants[1] move for the complete dismissal of this action on the theory that the filed rate

12   doctrine bars Plaintiffs' claims for damages.  Defendants' motions effectively seek to immunize

13   the international airline industry from antitrust liability.  To carry their burden, Defendants must

14   prove to the Court that – despite the systematic deregulation of the foreign air transportation

15   industry over the last 40 years – the United States Department of Transportation ("DOT")

16   maintains sufficient regulatory authority over airline pricing such that preemption of the federal

17   antitrust laws is required.  But the facts submitted by Plaintiffs demonstrate that Congress has

18   determined that pricing for international air transportation should be set by competition, not

19   regulation.  Following its Congressional directive, DOT has undertaken a concerted effort to

20   foster competition among international air carriers and does not regulate pricing in any

21   meaningful way – evincing a clear intent that the nation's antitrust laws apply full-force and in

22   many instances expressly saying so.  *See* Plaintiffs' Request for Judicial Notice ("RJN"), Ex. 16,

23   Action on IATA Agreement Issued by the Department of Transportation on the 1st day of July,

24   2008, DOT Order 2008-7-4 (July 7, 2008) (expressing DOT's view that foreign airlines are "fully

25

26   [1] Air New Zealand, All Nippon Airways Co., Ltd., Cathay Pacific Airways, Ltd., China Airlines,
     Ltd., EVA Airways Corporation, Philippine Airlines, Inc., Qantas Airways Limited, and
27   Singapore Airlines Ltd. have all filed summary judgment motions based on the filed rate doctrine
     or joined the collective brief.  ECF Nos. 724, 725, 728, 731, 753, 761, 763, 786, and 792.  Thai
28   Airways International Public Co., Ltd. withdrew its motion.  ECF No. 839.

subject to the U.S. antitrust laws."); RJN, Ex., 13, Competitive Marketing of Air Transportation, DOT Order 82-12-85, 99 C.A.B. 1, 1982 CAB Lexis 23, *313 (Dec. 16, 1982) ("We have consistently held that a part of the return to market control is exposure of participants to the antitrust laws, as that exposure exists in unregulated industries.").

This Court previously denied Defendants' motions to dismiss based upon the filed rate doctrine, holding:

> Several factual matters that would guide the Court in assessing Defendants' arguments are currently undeveloped. For example, it is not clear which rates at issue in this case were actually filed and which were not. Nor is it clear whether the DOT believes that its market-based rates are covered by the filed rate doctrine . . . .

*In re Transpacific Passenger Air Antitrust Litig.*, No. C-07-05634, 2011 U.S. Dist. LEXIS 49853, at * 38 (N.D. Cal. May 11, 2011) ("*Transpacific*").  Defendants failed to follow the roadmap set forth in this Court's order on the motions to dismiss.  Since then, the evidence, legal authorities and expert testimony demonstrate:

- The United States' policy is that market competition, rather than regulatory supervision should set airline prices;

- DOT does not determine whether the prices charged to customers are "just and reasonable";

- Neither Congress nor the DOT intended for consumers of international air transportation to be precluded from seeking damages in court for antitrust violations;

- There is no DOT process by which customers may seek a refund for any airfare that is not just and reasonable; and

- For the few carriers still required to file fares, the requirement exists in order to permit DOT to pressure foreign governments to adopt more pro-competitive aviation agreements and to protect U.S. carriers from discriminatory treatment from foreign governments – not to regulate the level of rates, as required for invocation of the filed rate doctrine.

1   In light of the foregoing statutory and factual realities, Defendants' arguments seeking an

2   unwarranted expansion of the filed rate doctrine should be rejected by this Court for at least ten

3   reasons:

4   *First*, Congress and DOT deregulated prices charged to consumers in the international

5   aviation industry and intended for the antitrust laws to apply with full-force.

6   *Second*, Congress provided a detailed statutory scheme for obtaining antitrust immunity

7   that would be rendered superfluous by application of the filed rate doctrine in this case.

8   *Third*, DOT does not regulate just and reasonable fares and/or surcharges.

9   *Fourth*, many of the fares and/or surcharges for which Defendants seek dismissal were not

10  permitted to be filed or were not, in fact, filed with DOT.  Indeed, Defendants admit, as they

11  must, that most international fares at issue in this case do not even require an airline to file *any*

12  tariff with DOT.  For those unfiled fares, the filed rate doctrine does not apply.  Several

13  Defendants have conveniently glossed over their various failures to file fuel surcharges with

14  DOT.  Contrary to their artfully worded declarations, Defendants Air New Zealand, China

15  Airlines, EVA Airways, Qantas, Philippine Airlines and Singapore Airlines did not file all of their

16  fuel surcharges.  This is also fatal to ANA's separate arguments that certain discount fares, which

17  ANA refers to as "net fares", warrant filed rate protection.  ANA concedes that these fares are

18  "unpublished" and not filed with DOT.  In any event, ANA has waived this argument and is

19  estopped from claiming filed rate protection for such fares.  When the Hon. John D. Bates of the

20  United States District Court for the District of Columbia accepted ANA's guilty plea for violating

21  the Sherman Act by price-fixing these fares, he did not order ANA to pay restitution to the

22  victims because DOJ and ANA had agreed that civil recovery would come in this case.

23  *Fifth*, DOT does not exercise sufficient regulatory authority for invocation of the filed rate

24  doctrine.

25  *Sixth*, even if DOT has some theoretical power over pricing, it has effectively abdicated

26  that purported rate-making authority, including over fuel surcharges.  Moreover, as explained

27  more fully herein, DOT has stated that fuel surcharges are not "government approved" and it

28  would be false and misleading to suggest otherwise in carrier advertising.

*Seventh*, DOT's hearing procedures do not accommodate adjudication of price-fixing claims nor do they provide a remedy, evincing a clear intent that price-fixing be subject to federal court jurisdiction.

*Eighth*, Defendants have failed to carry their factual burden in supporting their affirmative defenses, as required on a motion for summary judgment.

*Ninth*, no court has ever accepted the radical argument that the filing of a rate with a foreign regulator invokes the filed rate doctrine and immunizes conspiratorial conduct.

*Tenth*, joint and several antitrust liability prevents complete resolution of this issue on a motion for summary judgment.

For the foregoing reasons and for others more fully explained herein, this Court should deny each of Defendants' motions in full.

## III.     PROCEDURAL BACKGROUND

On August 6, 2009, Plaintiffs filed a Consolidated Class Action Complaint.  ECF No. 200. Thereafter, several Defendants moved to dismiss arguing, in part, that the filed rate doctrine bars damages.  ECF Nos. 290 (Defendants' Joint Motion), 294 (Vietnam Airlines), 288 (Philippine Airlines), 295 (ANA), 303 (Cathay), and 312 (Thai Airways).

On November 1 and 2, 2010, the Court held oral argument on the motions to dismiss. ECF No. 440.  In addressing Defendants' filed rate argument, this Court made clear that the proper way to evaluate its merits was to seek the view of DOT.  *See, e.g.,* Declaration of Steven N. Williams in Support of Plaintiffs' Omnibus Opposition to Defendants' Motions for Summary Judgment ("Williams Decl.") ¶ 1, Ex. 1, Transcript, Nov. 1, 2010 at 45: 6-8 ("Well, why don't we ask the Department of Transportation what their view is?"); 48: 13-23 ("If the Department of Transportation said that they don't believe that market-based rates . . . are covered by the filed-rate doctrine, wouldn't that be some evidence of abrogation of their authority in this field . . . wouldn't that be some indication of whether or not they have actually abrogated their responsibility?"); 63:12-13 ("[W]hat is the Department of Transportation doing?").

On May 9, 2011, the Court granted in part and denied in part Defendants' motions to dismiss.  ECF No. 467.  With respect to Defendants' filed rate argument, the Court denied the

1   motion, finding, *inter alia*, that the "doctrine does not apply where an agency has 'effectively

2   abdicated its rate-making authority.'"  *Transpacific*, U.S. Dist. LEXIS 49853, at *37 (*citing E. &*

3   *J. Gallo Winery v. EnCana Corp.*, 503 F.3d 1027, 1040 (9th Cir. 2007) ("*Gallo*"), *Pub. Utility*

4   *Dist. No. 1 of Grays Harbor Cty. Wash. v. IDACORP Inc.*, 379 F.3d 641 (9th Cir. 2004) ("*Grays*

5   *Harbor*"); *Pub. Utility Dist. No. 1 of Snohomish Cty. v. Dynegy Power Mktg., Inc.*, 384 F.3d 756,

6   760 (9th Cir. 2004) ("*Snohomish*")).  In denying the motion, this Court held that several factual

7   issues remained undeveloped, including DOT's own views about the extent of its purported

8   pricing regulation in the international aviation market.  *Id.*  The Court invited Defendants to

9   renew the motion at summary judgment with a more fulsome factual record.  *Id.*

10          The Second Amended Consolidated Class Action Complaint ("Complaint" or "Compl.")

11   filed on November 22, 2013, is the operative complaint in this matter.  Between September 10,

12   2013, and December 17, 2013, several Defendants filed summary judgment motions seeking

13   dismissal based on the filed rate doctrine, repeating the same arguments they previously made in

14   their motions to dismiss.

15   **IV.    FACTUAL BACKGROUND**

16          **A.    Defendants Engaged in a Conspiracy to Fix Prices for International Airfares
              and Surcharges**

17

18          This case involves a long-running international conspiracy by Defendants and their co-

19   conspirators to fix, raise, maintain and/or stabilize the prices of both base passenger fares and fuel

20   surcharges on international flights between the United States and Asia/Oceania.  Compl. ¶ 1.[2]

21              **1.    Defendants Engaged in a Conspiracy to Fix Base Fares**

22          As alleged in Plaintiffs' Complaint, Defendants engaged in a multi-year conspiracy to fix,

23   raise, maintain and/or stabilize the prices of the base fare component of travel on international

24   routes from the United States to Asia/Oceania.  *Id.* ¶¶ 78-105.  Plaintiffs alleged that Defendants

---

[2] All citations and references to the complaint are to Plaintiffs' Second Amended Consolidated
Class Action Complaint.  For purposes of this summary judgment motion, the facts regarding
Defendants' involvement in the conspiracy are not in dispute.  Defendants' motion asks this Court
to accept those facts as true, but to nonetheless dismiss the case based on the filed rate doctrine.
Plaintiffs, therefore, cite to the Second Amended Consolidated Class Action Complaint to
summarize the conspiracy.

1    utilized their antitrust-immunized International Air Transport Association ("IATA") fares[3] to set

2    and fix benchmark rates for their non-IATA, non-immunized fares.  *Id.* ¶¶ 95-100.  Plaintiffs also

3    provided an analysis of Defendants' prices, showing lockstep pricing – a fact that is not to be

4    expected in a competitive market.  *Id.* ¶¶ 101-105.  Finally, Plaintiffs outlined several instances of

5    direct competitor communications regarding price-fixing on non-IATA fares.  *Id.* ¶¶ 106-174.  In

6    its order on Defendants' motions to dismiss, this Court found that Plaintiffs alleged a plausible

7    base fare conspiracy.  *Transpacific*, 2011 U.S. Dist. LEXIS 49853, *39-43.

8              **2.    Defendants Engaged in a Conspiracy to Fix the Prices of Fuel
                       Surcharges**
9

10            Defendants also agreed to fix the prices of fuel surcharges on transpacific flights.  Compl.

11   ¶¶ 175-228.  Initially, Defendants requested that DOT immunize their collusive fuel surcharge

12   discussions with competitors through the exclusive process by which DOT grants antitrust

13   immunity.  *Id.* ¶¶ 176-184; *see also* RJN, Ex. 9, Application for Approval of Agreements by the

14   International Air Transport Association, DOT Docket OST-2003 (2003).  Although DOT never

15   granted the request, Defendants nevertheless continued meeting and agreeing on common fuel

16   surcharges.  *Id.* ¶¶ 184-228.  *See also*, RJN, Ex. 10, Application for Approval of Agreements by

17   the International Air Transport Association, DOT Docket OST-2004 (2004).

18            **3.    JAL and ANA Engaged in a Conspiracy to Fix Unpublished Discount
                      Fares that are Not Filed with DOT**
19

20            The complaint further alleges that JAL and ANA engaged in a conspiracy to fix

21   unpublished discount fares.  Compl. ¶¶ 118-136.  Fares subject to the ANA-JAL discount fare

---

[3] IATA fares are typically the highest fares offered by an airline.  IATA fares were previously set in a collusive environment at IATA tariff coordinating conferences, where participating airlines agreed on uniform rates.  On July 5, 2006, DOT refused to continue providing blanket antitrust immunity to these IATA tariff coordinating conferences, finding that they were inherently anticompetitive.  *See* RJN, Ex. 14, IATA Tariff Conference Proceeding, DOT Order 2006-7-3, 2006 DOT Av. LEXIS 460 (Jul. 5, 2006); *see also* Declaration of Michael Levine ¶¶ 29-32 ("Levine Decl.").  IATA fares are not the subject of this motion; nor do Plaintiffs seek damages for purchases of these fares.  Nevertheless, as discussed *infra* at 26-28, DOT's actions in granting antitrust immunity (or rejecting it, as the case may be) demonstrate that the filed rate doctrine does not apply to international fares.  No Defendant obtained antitrust immunity through DOT's exclusive statutory means for the fares and/or surcharges at issue in Defendants' motion.

conspiracy include *Yobiyose*, *Satogaeri* and business class discount fares. *Id.* It is undisputed that ANA did not file these unpublished discount fares with DOT through the Airline Tariff Publishing Company ("ATPCO"), the clearinghouse that is the only means through which fares can be presented to DOT. *See* ANA Mem. Law at 18-23. Deposition testimony from ANA and other evidence confirm that "unpublished fares", including *Yobiyose*, *Satogaeri*, and business discount fares are *not* filed with DOT. *See* Williams Decl. ¶¶ 3-4, Exs. 2-3; Deposition Transcript of Isao Ono ("Ono Dep.") at 37:6-18, 56:3-16, 116:4-12; Deposition Transcript of Tetsuo Fukuda ("Fukuda Dep.") at 37:19-42:15; *see also* Declaration of Jonathan Schwartz ¶ 12, ("Schwartz Decl.") (describing private database containing certain discount fares); *id.* ¶ 14 ("Nothing in the private GFS database is submitted to DOT . . . .").

On December 6, 2010, ANA pleaded guilty to engaging in a conspiracy from at least as early as April 1, 2000 until at least April 1, 2004 to fix the prices of these unpublished fares. *See* RJN, Ex. 2; *see also* ECF No. 449.

As a result of the aforementioned conspiracies, Plaintiffs and the members of the class they seek to represent paid an inflated amount for their air travel between the United States and Asia/Oceania.

**B.      Congress and DOT Deregulated the International Air Transportation Industry and Directed that Market Competition – Not Regulation – Should Determine Prices**

Contrary to Defendants' erroneous statement that DOT's regulatory regime "has changed little in more than 50 years . . . . [and] has not changed fundamentally since the enactment of the [FAA,]", ECF No. 728 at 8, the United States' aviation policy, including its policy on international routes, has undergone a massive change since the passage of the Airline Deregulation Act of 1978, (Pub. L. No. 95-504, 92 Stat. 1705 (1978)) ("ADA") and the International Air Transportation Competition Act of 1979 (Pub. L. No. 96-192, 94 Stat. 35 (1979)) ("IATCA"). *See also* Declaration of Michael Levine ¶¶ 2-48 ("Levine Decl.").

/ / /
/ / /

1

### 1. Congress deregulated the domestic aviation industry and made clear that the antitrust laws apply

2

3    The ADA applies to domestic aviation and ended the authority of DOT's predecessor

4  agency, the Civil Aeronautics Board's ("CAB"), to limit the entry of new competitors in that

5  market.  By its terms, the ADA phased out domestic rate regulation.  In doing so, Congress

6  eliminated CAB's ability to exempt airlines in the domestic market from antitrust liability, as set

7  forth in the accompanying declaration of Michael L. Levine – a former CAB official and

8  longtime airline executive.  *See* Levine Decl. ¶ 13.  Congress and the CAB believed that the

9  application of the antitrust laws were a critical component to deregulation and necessary for

10 purposes of protecting consumers.  *See, e.g., id.* ¶ 13 ("All of those involved in formulating the

11 new regime [ADA] regarded the application of antitrust laws as critical to protecting consumers

12 . . . ."); RJN, Ex. 13, Competitive Marketing of Air Transportation, DOT Order 82-12-85, 99

13 C.A.B. 1, 1982 CAB LEXIS 23 (Dec. 16, 1982) ("More important, eliminating antitrust immunity

14 will subject the air transportation marketing industry to the full force of competitive market

15 pressures.  Exposure to antitrust liability has long been recognized as a means of ensuring

16 competitive behavior in other sectors of our economy.").  Enactment of the ADA served as a

17 precursor to Congress's and DOT's deregulation of the international airline industry.  *See* Levine

18 Decl. ¶¶ 12-14 ("It was almost simultaneously recognized by the U.S. government that the same

19 deregulatory principles would benefit consumers in international markets.").

20
21

### 2. Congress deregulated the international aviation industry and provided that antitrust immunity would only come through explicit grants of immunity by DOT

22    Congress's purpose in enacting IATCA was to "promote competition in international air

23 transportation."  *See* IATCA, Pub. L. No. 96-192, 94 Stat. 35 (1980).  Under IATCA, Congress

24 expressed its belief that the public interest was best served by competition, not government

25 regulation.  *Id.*  Congress instructed the CAB to achieve this public interest through "maximum

26 reliance on competitive market forces and . . . competition . . . . [and] encouragement,

27 development, and maintenance of an air transportation system relying on actual and potential

28 competition."  IATCA, Pub. L. No. 96-192, § 102(a)(4), (9), 94 Stat. 35 (1980); *see also* 49

1    U.S.C. § 40101(e) ("In formulating United States international air transportation policy, the

2    Secretaries of State and Transportation shall develop a negotiating policy emphasizing the

3    greatest degree of competition compatible with a well-functioning international air transportation

4    system, including [:] . . . (2) freedom of air carriers and foreign air carriers to offer prices that

5    correspond to consumer demand.").

6         Prior to deregulation, international carriers were permitted to enter into collusive

7    agreements reached at IATA tariff coordinating conferences regarding a certain subset of

8    international fares.  That ability changed with Congressional deregulation.  Levine Decl. ¶¶ 7, 13.

9    According to DOT, "[t]he Deregulation Act and the International Air Transportation Competition

10   Act radically changed our authority (then the Civil Aeronautics Board's authority) to approve and

11   grant antitrust immunity to airline agreements."  RJN, Ex. 14, IATA Tariff Conference

12   Proceeding, Order 2006-7-3, 2006 DOT Av. LEXIS 460 (July 5, 2006).  DOT explained that the

13   intent of deregulation was to ensure that market forces, in tandem with enforcement of the

14   antitrust laws, should govern pricing:

15              Congress explained that it made these changes (and changes to related
16              statutory provisions that required Board review of corporate transactions) as
                part of its determination that airline service levels and fares should be
17              controlled by competition, not by government regulation . . . .

18              We stated that an important goal of airline deregulation was to ***"make the
                airline industry subject to the same competitive and antitrust standards***
19              ***applicable to other industries, as far as practicable."***

20   *Id.* at *25-26 (July 5, 2006) (emphasis added) (citations omitted).  In deregulating the

21   international airline industry, "both Congress and the public have come to recognize . . . that the

22   public can often best be protected when the forces of the marketplace ***under the general***

23   ***discipline of the antitrust laws are left free to govern industries*** that do not exhibit the economic

24   characteristics of monopoly."  *Id.* (*citing* S. Rep. No. 95-631, at 75) (1978) (emphasis added);  *see*

25   *also* Levine Decl. ¶ 5 (deregulation "meant that, as in most other businesses, the application of

26   the antitrust laws would be the most important tool to make sure that competition would be

27   unimpeded by structural changes and collusive behavior that would suppress competition.").

28

After enactment of IATCA in 1979, the United States policy on international aviation centered on: (1) obtaining open entry to foreign countries for U.S. carriers, (2) permitting pricing freedom, and (3) preservation of competition.  Levine Decl. ¶ 20.  In keeping with these policy goals, the U.S. entered into several bilateral "Air Services Agreements" ("ASAs") with foreign countries under which market forces were to prevail.  *Id.* ¶¶ 16-19.[4]  In addition to several other provisions bearing on achieving free enterprise in the international aviation industry, the ASAs explicitly removed DOT's discretion to unilaterally disapprove of a carrier's pricing or fare level.  The provisions in the ASAs are referred to as "double-disapproval pricing" and do not permit the signatory governments to unilaterally disapprove of a carrier's fares.  *Id* ¶¶ 21-22.  Under double-disapproval pricing regimes, regulatory intervention is permitted only when both countries agree.  *See*, RJN, Exs. 6-7; *see also* Levine Decl. ¶ 21 (double-disapproval "effectiveness was premised on the presumption that the U.S. would never intervene on substantive grounds to prevent the offering of a fare, which would succeed or fail in the marketplace based on normal market forces.").

The State Department's "Model Open Skies Agreement", reflecting United States policy regarding foreign air transportation during the class period, states that the respective governments "shall allow prices for air transportation to be established by airlines of both Parties based upon commercial considerations in the marketplace."  RJN, Ex. 7; *see also* Model Open Skies Agreement, Article 12, Pricing, http://www.state.gov/e/eb/rls/othr/ata/114866.htm.  The Model Agreement also states that "***[p]rices for international air transportation between the territories of the Parties shall not be required to be filed***."  *Id.* (emphasis added).  Even in markets without double-disapproval regimes – so called Category C or B countries – the "U.S. government adopted the same policy of non-intervention with fare filings . . . . Consumers . . . received the protection of unfettered fare competition . . . ."  Levine Decl. ¶ 23.

Congress has also provided DOT with a regulatory mechanism for granting antitrust immunity to certain airlines where it is "required by the public interest."  49 U.S.C. § 41308(b).

---

[4] Some multilateral agreements involving the United States and a group of foreign countries were also reached.  *See, e.g.,* RJN, Ex. 6 (Multilateral Agreement with New Zealand).

1    The statutory scheme provides detailed guidelines to DOT for reviewing and responding to airline

2    requests for antitrust immunity.  49 U.S.C. § 43109.  While DOT can choose to exempt certain

3    conduct of foreign air carriers from liability under the Sherman Act, it has been instructed by

4    Congress to grant such immunity only in limited circumstances and upon a special showing of

5    need.  *See* 49 U.S.C. § 41308(b).

6         Finally, notwithstanding the statutory scheme, Congress empowered the Secretary of

7    Transportation to exempt air carriers engaged in international transportation from all statutes

8    pertaining to economic regulation or any requirement to file fares.  49 U.S.C. § 40109(c)

9    ("Secretary may exempt [airline] . . . from a provision of chapter 411 [economic regulation].").

10        **3.    Pursuant to the congressional mandate, DOT issued rules and
          regulations designed to deregulate the international airline industry
11        and divest itself of powers related to pricing**

12        DOT followed Congress's directive from the ADA and IATCA to favor competition and

13   to disfavor active pricing regulation.  In 1995, for example, DOT released a "Statement of United

14   States International Air Transportation Policy", and said: "[w]e continue to believe that the best

15   way to achieve this goal [to foster safe, affordable, convenient and efficient air service for

16   consumers] is to rely on the marketplace and unrestricted, fare competition to determine the

17   variety, quality, and price of air service."  RJN, Ex. 22, 60 Fed. Reg. 21841 (May 3, 1995).  "To

18   the greatest extent possible, airlines should be free to set prices and offer various service products

19   in response to passenger preferences."  *Id.* at 21842.

20        Importantly, with respect to pricing supervision, DOT further stated:  "Carriers' ability to

21   set prices ***should also be unrestricted to create maximum incentives for cost efficiencies and to***

22   ***provide consumers with the benefits of price competition and lower fares*** . . . ."  *Id.* at 21844

23   (emphasis added).

24        To achieve these ends, DOT systematically and substantially reduced its role in pricing

25   decisions in the foreign air transportation market.  In 1988, DOT announced – as a matter of

26   prosecutorial discretion – that it would not prosecute airlines for charging rates that were different

27   from their filed rates.  *See, e.g.,* RJN, Ex. 21, DOT Statement of Enforcement Policy on Rebating,

28   53 Fed. Reg. 41353 (Oct. 21, 1988); Levine Decl. ¶ 24 ("In other words, the DOT announced that

1    it did not intend to enforce its tariffs.  The post-deregulatory posture of CAB/DOT is clear: the

2    declared policy of those agencies was and is that international airline deregulation meant not

3    regulating rates and not evaluating filed tariffs to achieve regulatory objectives.").  Furthermore,

4    the previous regulatory regime required air carriers to file all foreign transportation tariffs.  RJN,

5    Ex. 25, Exemptions From Passenger Tariff-Filing Requirements in Certain Instances, 64 Fed.

6    Reg. 40654 (Jul. 27, 1999) (DOT describing prior regulatory regime).  In 1995, DOT exempted

7    carriers from having to file air cargo tariffs.  RJN, Ex. 23, 60 Fed. Reg. 61472 (Nov. 30, 1995).

8    Continuing the trend, in 1997, DOT exercised its authority under 49 U.S.C. § 40109 to exempt

9    foreign carriers from economic regulation and concluded that fare filing would not be required for

10   most markets between the United States and foreign countries.  RJN, Ex. 24, 62 Fed. Reg. 10758

11   (Mar. 10, 1997); *see also* Levine Decl. ¶ 5.

12          On March 10, 1997, DOT issued a formal notice of proposed ruling making where it

13   determined that the filing of certain tariffs was no longer necessary due to the success of

14   deregulation and market forces.  RJN, Ex. 24, 62 Fed. Reg. 10758 ("***Market forces are usually***

15   ***sufficient to ensure that these fares are reasonably priced without government intervention***.")

16   (emphasis added).  DOT stated that "[t]he U.S. Government has actively pursued the

17   liberalization of international aviation markets, including the right of carriers to set their prices

18   based on management discretion, *free of regulatory intervention* . . . . [W]e now question whether

19   *any purpose* is served in burdening U.S. and foreign carriers with continuing to file passenger

20   fares for approval in markets where pricing has been effectively deregulated by government

21   agreement and the evolution of competitive market forces."  *Id.* at 10760 (emphasis added); *see*

22   *also*, Tang, Rachel, Congressional Research Service ("CRS"), *Airline Passenger Rights: The*

23   *Federal Role in Aviation Consumer Protection* at pg. 5 (2013) ("Since deregulation, and

24   especially with the advent of low-cost carriers, the primary means of competition has become

25   price, not service.")

26          Then, in 1999, DOT de-tariffed most international aviation touching the United States,

27   finding that such filings were "no longer necessary or appropriate."  RJN, Ex. 25, 64 Fed. Reg.

28   40654 (July 27, 1999); *see also* 49 U.S.C. § 40109 (granting DOT the authority to exempt airlines

1   from statutory framework and economic regulation).  Pursuant to that change, DOT canceled all

2   then-existing tariffs, decreeing that, except for certain categories and certain countries, new tariffs

3   would not be accepted for filing.  *Id.* at 40654.  And even for the limited circumstances under

4   which fare filings were still required, the filings were not used to evaluate the "reasonableness" of

5   the fare.  Levine Decl. ¶¶ 2(d), 6, 25, 37, 40, 43, 45.[5]  Rather, the fare filing requirement existed

6   in those markets in order to give the U.S. a tool to persuade foreign governments to liberalize and

7   enter double-disapproval agreements with the United States.  *Id.*

8          With the changes in 1999, DOT eliminated the previous tariff filing requirements and

9   implemented filing categories A, B, and C for travel between the United States and designated

10  countries, or travel provided by a designated country's carriers.  *See* 14 C.F.R. § 293.10.

11  Exemptions for each of the categories were expanded in 2005, 2008, and 2012.  *Id.*  Carriers from

12  countries listed in Category A "are exempted from the duty to file all passenger fares . . . ."  *Id.*

13  Carriers from countries listed in Category B are "exempted from the duty to file all passenger

14  tariffs except those setting forth one-way economy-class fares [also known as "Y-normal fares"]

15  . . . ." with DOT for itineraries between the United States and Category B countries, as well as

16  tariffs affecting "beyond" home-country travel in some instances.  *Id.*  Finally, foreign carriers

17  whose "home" countries have been designated as Category C must file all tariffs for travel to and

18  from the United States with DOT.[6]  *See* Schwartz Decl. ¶ 25 (chart of Defendant airlines'

19  categorization during class period).

20                       **a.      Air New Zealand**

21          For the entire class period, DOT classified New Zealand as a Category "A" country.  *See*

22  Declaration of Joanna Bryant in Support of Defendants' Motions for Summary Judgment

23  ("Bryant Decl."), Exs. 1-4.  Consequently, Air New Zealand was not required to file any of its

24

25  [5] For example, ANZ's brief concedes that the filing requirement in Category C countries exists
    where "effective price leadership opportunities for U.S. carriers are not available between the
26  foreign carrier's home country and third countries."  ANZ Mem. of Law at 3.

27  [6] Carriers from Category A and Category B countries only have to file fares with the DOT to the
    extent that a fare originates in the United States and travels to a point in a Category C country.  14
28  C.F.R. 293.10.

1   fares and/or surcharges with the DOT for travel to New Zealand.  *See id.*; *see also* ANZ Mem. of

2   Law at 1.  While ANZ argues to the Court that it also filed fares when flights continued from

3   New Zealand to third countries, such as Hong Kong, this is beside the point because ANZ

4   concedes that its only non-stop direct flight from the United States was to New Zealand – a

5   Category A country.  *See* ANZ Mem. of Law at 1, Declaration of Robyn Brown in Support of

6   ANZ's Summary Judgment Motion ¶¶ 3-8.

7                    **b.      All Nippon Airways**

8              DOT classified Japan as a Category "C" country from before 2000 to April 8, 2008.

9   During that period, ANA was required to file its fares with DOT.  Bryant Decl., Exs. 1-4.  This

10  requirement existed in Category C countries not for the purpose of price regulation but to provide

11  the United States with leverage to pressure foreign governments to liberalize their markets and

12  enter into double-disapproval agreements.  Levine Decl. ¶¶ 2(d), 6, 25, 37, 40, 43, 45.

13             On April 8, 2008, DOT reclassified Japan as a Category "B" country.  Bryant Decl., Exs.

14  1-4.  Thereafter, ANA was only required to file one-way economy class fares (also known as "Y-

15  normal" fares) with DOT.  *Id.*  In October of 2012, DOT again reclassified Japan and made it a

16  Category A country, removing all fare filing requirements.  During the class period, ANA's only

17  non-stop direct flight to Asia from the United States was to Japan.  ANA Mem. of Law at 2-11.

18                   **c.      Cathay Pacific Airways**

19             DOT classified Hong Kong as a Category C country, pursuant to which Cathay Pacific

20  was required to file its fares with DOT.  Bryant Decl., Exs. 1-4.  This requirement existed in

21  Category C countries not for the purpose of price regulation but to provide the United States with

22  leverage to pressure foreign governments to liberalize their markets and enter into double-

23  disapproval agreements.  Levine Decl. ¶¶ 2(d), 6, 25, 37, 40, 43, 45.

24                   **d.      China Airlines**

25             DOT classified Taiwan as a Category A country.  Consequently, China Airlines was not

26  required to file fares for the vast majority of its itineraries.  Bryant Decl., Exs. 1-4; *see also*

27  Schwartz Decl. ¶ 45.  Moreover, almost all of China Airlines' itineraries during the class period

28

1   were from the United States to Taiwan.  *Id.*  For these itineraries, China Airlines did not have to

2   file fares and/or surcharges.  *Id.*

### e.   EVA Airways

4        Like China Airlines, EVA Airways is based in Taiwan and therefore was not required to

5   file its fares with DOT.  Bryant Decl., Exs. 1-4.  From 2008 onward, EVA Airways offered a

6   flight from Los Angeles to Osaka, Japan.  EVA was required to file fares for this limited flight.

7   *See* EVA Memo of Law at 2.

### f.   Philippine Airlines

9        DOT classified the Philippines as a Category "B" country.  Bryant Decl., Exs. 1-4.  As a

10  result, Philippine Airlines ("PAL") was only required to file its one-way, normal Y-economy

11  class passenger fares between the United States and the Philippines.  14 C.F.R. § 293.10; *see also*

12  Bryant Decl., Exs. 1-4.

### g.   Qantas Airways

14       For the vast majority of the class period (1999-2008), DOT classified Australia as a

15  Category "B" country.  Bryant Decl., Exs. 1-4.  Consequently, Qantas Airways was only required

16  to file its one-way, normal Y-economy class fares.  14 C.F.R. § 293.10.  Qantas only operated

17  flights from the United States to Australia (1999-present) and to New Zealand (1999-2012).

18  Consequently, it was only required to file with DOT its one-way, normal Y-economy class fares

19  between Australia and the United States.  *See* Qantas Mem. of Law at 1-2.

### h.   Singapore Airlines

21       DOT classified Singapore as a Category "A" country.  Bryant Decl., Exs. 1-4.  As such,

22  Singapore Airlines ("SIA") was not required to file any of its fares and/or surcharges with the

23  DOT for travel to Singapore.  SIA's summary judgment motion summarizes its additional routes.

24  *See* SIA Mem. of Law at 3-4.

### C.   History of Fuel Surcharges

26       In July 2003, at an IATA tariff coordinating conference, the participating airlines adopted

27  Resolution 001w, which provided a mechanism by which Defendants could quickly agree, and

28  implement, collusively fixed fuel surcharges.  Compl. ¶ 178; *see also* RJN, Ex. 9, Application for

1   Approval of Agreements by the International Air Transport Association, DOT Docket OST-2003.

2   Thirty-six air carriers voiced their support for the resolution "in principle", including, ANA, Air

3   New Zealand, China Airlines, EVA, JAL, Qantas and Thai Airways.  Compl. ¶ 179; RJN, Ex. 9 at

4   pg. 46-51.  On August 25, 2003, IATA filed Resolution 001w with DOT and sought to immunize

5   collusive fuel surcharge rate setting through 49 U.S.C. § 41308, *et seq.* – the exclusive regulatory

6   mechanism by which DOT grants antitrust immunity.  *Id.*  DOT never acted on this request for

7   immunity and IATA quietly withdrew it on March 9, 2007.  Thus, Defendants' conversations

8   regarding collective fuel surcharge rates were never immunized from the antitrust laws by DOT.

9   Compl. ¶ 180.

10       In May 2004, IATA held another conference at which fuel surcharges were discussed.

11  IATA's Secretary reminded the airline participants that discussions regarding fuel surcharges had

12  not been immunized by the DOT.  RJN, Ex. 10 at pg. 59 of 74, Application for Approval of

13  Agreements by the International Air Transport Association, DOT Docket OST-2004.

14       Prior to October of 2004, DOT's position regarding fuel surcharges was that any increase

15  in the cost of fuel should be reflected in the ticket's "base" fare.  DOT was concerned that

16  inclusion of fuel surcharges in the price charged to consumers would lead to false and deceptive

17  advertising without adequate disclosure.  *See, e.g.,* RJN, Ex. 5, Letter from Paul L. Gretch to

18  Parties filing tariffs with the Department of Transportation, Oct. 14, 2004 ("Gretch Letter"), *see*

19  *also* Williams Decl. ¶ 8, Ex. 7 ("ANA-00541515").  Starting in October 2004, however, DOT

20  permitted airlines to include separate fuel surcharges as part of their general rule.  *Id.*; *see also*

21  Schwartz Decl. ¶ 17 (general rule is the only means through which a fuel surcharge can be

22  submitted to DOT).   Critically, DOT **did not require** carriers to file fuel surcharges at any time

23  during the class period.  *See id.*

24       In reversing its position, DOT explained that the previous policy prohibiting separate fuel

25  surcharges "was established at a time when the Department was regulating fares much more

26  actively than is the case today, and we were concerned that tariff surcharges could undermine our

27  regulatory supervision of fare levels."  *Id.*; *see also* Levine Decl. ¶ 6 ("In the new [deregulated]

28

1  regime, any remaining tariff provisions were not intended to, and never did, function in their

2  historic role as potential vehicles for substantive evaluation of fares and fare levels.").

3       On November 14, 2004, shortly after the Gretch Letter, DOT issued another notice related

4  to fuel surcharges.  *See* RJN, Ex. 26, 69 Fed. Reg. 65676 (Nov. 15, 2004).  In the notice, DOT

5  stated:

6            [T]he desire of carriers to pass on the higher cost of certain expenses discretely, such as insurance and fuel, has led to such expenses being

7            filed separately from the "base" fare in tariffs, ***a situation that the Department cannot effectively monitor*** . . . . [T]he Enforcement

8            Office will no longer allow the separate listing of "government-approved" surcharges in fare advertising.  We will consider the

9            separate listing of such charges in fare advertisements an unfair and deceptive trade practice . . . .

10

11  *Id.* at 65677 (emphasis added).

12       **D.**    **ATPCO's Role as Clearinghouse**

13       ATPCO is a privately-held company owned by 16 U.S. and foreign airlines, including

14  several Defendants, that serves as a clearinghouse for fares in the air transportation industry.  *See*

15  Bryant Decl. ¶ 4.  ATPCO describes itself as "the world's leader in the collection and distribution

16  of airline fare and fare-related data.  We collect this information from more than 450 airlines

17  worldwide and distribute it to global distribution systems (GDS) such as Amadeus, Travelport,

18  and Sabre; online travel agents (Expedia and ITA); and other computer reservation systems."  *See*

19  http://www.atpco.net/atpco/aboutatp.shtml.

20       Through ATPCO databases, airlines distribute fare information to various entities,

21  including global distribution systems ("GDRs") and computer reservation systems ("CRSs"), both

22  of which distribute fare information to subscribing travel agents.  The submission of fare

23  information to travel agents is distinct from the submission of fare information to government

24  regulators.  Schwartz Decl. ¶¶ 8, 14.

25       There are several databases contained within ATPCO, including the Government Filing

26  System ("GFS") of the Fare Manager and Service Fees Analysis tool containing Carrier Imposed

27  (YQ/YR) Fees ("YQ/YR database").  *Id.* ¶ 3.  It is important to understand how these databases

28  operate in order to understand what is and is not "filed" with the DOT.  *Id.* ¶¶ 8-15.  The term

1   "Government Filing System" is a misnomer.  Filing through the GFS does not indicate that a fare

2   has been filed with a government in general, or with the DOT in particular.  *See* Williams Decl. ¶

3   9, Ex. 8, Transcript of Deposition of Joanna Bryant at 236:14-237:21 ("Bryant Dep."); Schwartz

4   Decl. ¶ 14.  Instead, GFS has a complex algorithm that determines which filings get presented to

5   which entities and governments.  *See* Schwartz Decl. ¶ 16 (explaining how airlines designate a

6   country regulatory body to receive a submission through what is called the "justification" box).

7   Within the GFS itself, there is both a "public" and "private" fares database.  *Id.* ¶ 10.  ATPCO

8   does not present fares in the private database to DOT.  Bryant Dep. 205-206.  The fares filed in

9   the "private" GFS database are viewable only by parties that have been approved by an airline to

10  view those fares, such as the carriers' network of travel agents.  *Id.*  Fares in the private database,

11  therefore, are **not** filed with DOT.  *Id.*  A review of the ATPCO private database reveals that

12  every Defendant had private fares during the class period.  Schwartz Decl. ¶ 13 (stating that every

13  Defendant has fares in the private fare database, and providing examples of private fares from

14  each Defendant in effect during the class period).

15          Moreover, even for those fares filed in GFS's *public* database, which is used to distribute

16  fare information to GDSs and CRSs, DOT is only presented with the fares that are required to be

17  filed pursuant to DOT regulations (*i.e.*, pursuant to the country designations, A, B and C,

18  discussed above).  *See* Bryant Decl., Ex. 6 (ATPCO Plan for Implementing DOT's Exemptions:

19  "ATPCO will present only fares that have not been exempted to the DOT.") (1999); *see also*

20  Bryant Dep. at 236:14-237:21.

21          Only fares between the United States and Category C countries, as well as Y economy

22  class normal, one-way fares for travel between the United States and Category B countries are

23  required to be submitted to DOT through ATPCO's GFS system.  14 C.F.R. § 293.10.  Thus,

24  while fares to Category A countries and fares to Category B countries (other than Y-economy

25  class normal, one-way fares) often appear on GFS's "public" database, they are not presented[7] to

---

[7] Joanna Bryant used the word "presented" to indicate that the fare has been entered into
ATPCO's computer system such that DOT could, technically, access the fare information.  DOT
is only "presented" with fares that are required to be filed under DOT's regulatory scheme.  All
other fares are not presented and, therefore, not filed with DOT.  Bryant Decl., Ex. 6.

1   DOT.  *See* Bryant Decl., Ex. 6 (ATPCO Plan for Implementing DOT's Exemptions: "ATPCO

2   will present only fares that have not been exempted to the DOT."); Bryant Dep. at 236:14-237:21.

3           In addition to the aforementioned databases, ATPCO maintains the YQ/YR database.

4   Schwartz Decl. ¶ 15. This tool allows airlines to implement fuel and insurance surcharges as YQ

5   or YR surcharges on the ticket.  The system allows for more complex rules surrounding the

6   amount of the surcharges than was possible with the automated rule system. **DOT does not have**

7   **access to any information in the YQ/YR database**.  Bryant Dep. at 264:23-265:10 (YQ/YR

8   database not part of GFS and is not presented to DOT for filing); *see also* Schwartz Decl., ¶ 15.

9           When DOT changed its policy to permit airlines to implement fuel surcharges, airlines

10  that filed them with DOT did so through a "general rules tariff" filing.  *See, e.g.,* Declaration of

11  Suzuka Shibata in Support of ANA's Summary Judgment Motion ("Shibata Decl.") ¶ 4, Exs. A-

12  B.  Submitting fuel surcharges through the general rule is the only way to submit fuel surcharges

13  to DOT.  Schwartz Decl. ¶ 16-17.  Additionally, when submitting fuel surcharges to DOT,

14  airlines were required to indicate to which governments the general rule filing should be sent.

15  These are then listed as a "justification" for that particular filing.  "Justification" is a field in the

16  GFS filing system that permits the user to indicate the relevant countries for filing.  If the airline

17  does not indicate "US" in the justification box, the filing is not presented to DOT.  *Id.*; *see also*

18  Bryant Dep. at 236:7-237:3.

19          Finally, included in the GFS's private database are so-called "ethnic fares."[8]  These

20  "ethnic fares" include *Satogaeri,*[9] *Yobiyose*[10] and business discount fares.[11]  *See* Ono Dep. at

21  37:6-18, 56:3-16, 116:4-12; Fukuda Dep. at 37:19-42:15; *see also* Schwartz Decl. ¶¶ 28-39

22  (explaining the differences in fare and fare rules between these discount fares and fares presented

23  ---

[8] ANA refers to these fares as "net fares."  ANA Mem. of Law at 18-23.

24
[9] *Satogaeri* fares are discount fares offered through certain travel agencies in the United States for
25  travel from the United States to Japan and back.  *See* Declaration of Yusako Osumi in Support of
    ANA's Summary Judgment Motion ¶ 13 ("Osumi Decl.").

26  [10] *Yobiyose* fares were also made available to travel agents in the United States, but for discounted
    travel that originated in Japan.  *Id.* ¶ 29

27
[11] Business discount fares are simply, unpublished, unfiled (with the DOT) discount business
28  class fares.

1    to DOT).  These private fares are considered "unpublished" because they were not filed with the

2    DOT, and are in the private database.  *Id.*  These fares were typically only available for sale

3    through ANA's travel agents.  Ono Dep. at 37:6-18, 56:3-16, 116:4-12; Fukuda Dep. at 37:19-

4    42:15.  ANA has pleaded guilty to fixing the prices of unpublished fares from 2000 to 2004.  *See*

5    RJN, Exs. 1-4 ("During the relevant period, through its officers and employees, including high-

6    level personnel of defendant, participated in a conspiracy with another Japanese airline, the

7    primary purpose of which was to suppress and eliminate competition by fixing ***unpublished***

8    ***passenger fares*** on passenger tickets . . . in the Japanese ethnic travel market in the United

9    States.") (emphasis added).  Defendant ANA concedes that these ethnic fares, as unpublished,

10   private fares, were not filed with DOT.  *See* Williams Decl., Exs. 2, 3, 4; Ono Dep. 37:6-18, 56:3-

11   16, 116:4-12; Fukuda Dep. 37:19-42:15; Deposition Transcript of Yusako Osumi ("Osumi Dep.")

12   292:11-15; ANA Mem. of Law at 18-23.

13   **V.     STANDARD OF REVIEW**

14            The legal standards for a summary judgment motion are well known to this Court:

15            The court shall grant summary judgment *if the movant shows* that there is no
              genuine dispute as to any material fact and the movant is entitled to judgment
16            as a matter of law. Fed. R. Civ. P. 56(a) . . . . *The burden is on the moving*
              *party to demonstrate that there is no genuine dispute with respect to any*
17            *material fact and that it is entitled to judgment as a matter of law. Celotex*
              *Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).
18            A court must view the evidence in the light most favorable to the non-moving
              party and draw all justifiable inferences in its favor. *Anderson [v. Liberty*
19            *Lobby, Inc.*, 477 U.S. 422, 255 (1986)] 477 U.S. at 255.

20   *Blue Growth Holdings, Ltd. v. Mainstreet Ltd. Ventures, LLC*, No. CV 13-1452 CRB, 2013 U.S.

21   Dist. LEXIS 126352, *2-3 (N.D. Cal. Sept. 4, 2013) (emphasis added).[12]  The filed rate doctrine

22   is an affirmative defense on which Defendants bear the burden of proof.  *Gallo*, 503 F.3d at

23   1050, n.11.  Accordingly, Defendants bear the burden of proof on the application of this doctrine

24   and must do so with an affirmative and undisputed proffer of admissible evidence.  Defendants

25   may not obtain summary judgment by arguing that Plaintiffs have no evidence to support their

26

27   _____

28   [12] Although there is a procedure for partial summary judgment, F.R.Civ.P. 56(a), (g), Defendants
     have not sought partial summary judgment.  Instead, they only seek judgment on ***all*** claims.

1   opposing contentions.  *See Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos. Inc.*, 210 F.3d 1099,

2   1102-03 (9th Cir. 2000).

3       Moreover, because Defendants seek an exemption from the generally applicable antitrust

4   laws, this Court should construe the filed rate doctrine narrowly to permit the widest application

5   of the antitrust laws.  Indeed, "[r]epeals of the antitrust laws by implication from a regulatory

6   statute are strongly disfavored" and should only be found where the antitrust laws and regulatory

7   provisions plainly conflict.  *United States v. Philadelphia Nat. Bank*, 374 U.S. 321, 350 (1963);

8   *see also Cain v. Air Cargo, Inc.*, 599 F.2d 316, 320 (9th Cir. 1979) ("immunity from the antitrust

9   laws is not lightly inferred.") ("*Cain*"); *Cost Management Services. Inc. v. Washington Natural

10  Gas Company,* 99 F.3d 937,945 (9th Cir. 1996) (rejecting an expansion of the filed rate doctrine

11  because "[t]he fact that *Square D's* [476 U.S. 409 (1986)] endorsement of *Keogh* [*v. Chicago &

12  Northwestern Railway Co. et al.*, 260 U.S. 156 (1922)] was only lukewarm is of particular

13  importance here, because WNG is essentially asking us to extend *Keogh* . . . .").

14      As the Supreme Court has made clear, "collective ratemaking activities are not immunized

15  from antitrust scrutiny simply because they occur in a regulated industry."  *Square D Co. v.

16  Niagara Frontier Tariff Bureau,* 476 U.S. 409, 421 (1986) ("exemptions from the antitrust laws

17  are strictly construed and strongly disfavored"); *In re Ocean Shipping Antitrust Litig.*, 500

18  F.Supp. 1235, 1240 (S.D. N.Y. 1980) ("*Ocean Shipping*") (applying the presumption against

19  repeals of the antitrust laws in the context of rejecting a filed rate argument).

20  **VI.   ARGUMENT**

21      **A.   Congress Intended for the Antitrust Laws to Fully Apply in the Deregulated
22           International Airline Industry**

23      Because the filed rate doctrine is based on federal preemption, courts must examine

24  congressional intent in enacting the regulatory regime of the specific industry to determine the

25  applicability of the doctrine.  *See Cain*, 599 F.2d at 320 ("Immunity of regulated activities from

26  the antitrust laws depends on congressional intent . . . . For the courts to infer an antitrust

27  exemption, it is not enough that the conduct at issue be merely within a regulatory agency's

28  jurisdiction.").  Preemption is not favored in an industry that has been deregulated, as the airline

1   industry has for the past 40 years.  *See Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003) ("*Ting*")

2   (finding the filed rate doctrine did not apply based, in part, on the systematic deregulation of the

3   telecommunications industry).

4          In order for this Court to infer an antitrust exemption in the airline industry, Defendants

5   must make more than blanket assertions that the conduct is within a regulatory agency's general

6   jurisdiction.  *See, e.g., Ocean Shipping*, 500 F.Supp. at 1241 (rejecting a filed rate argument,

7   reasoning that "[b]y focusing solely on the tariff filing provision in isolation from the entire

8   statutory scheme, defendants lose sight of the principles guiding courts in determining immunity

9   from the antitrust laws.  If the existence of a filing system were the touchstone of determining

10  immunity from the antitrust laws, it would be difficult to abide by the well established principle

11  that repeal of the antitrust laws is not favored and not casually allowed.").

12         Where Congress took the intentional step of ending any purported rate regulation in the

13  airline industry and engaged in systematic deregulation in favor of competitive market pricing, as

14  it did here, the preemptive force of the regulatory regime required for the filed rate doctrine is

15  simply not present.  The modern air transportation regulatory scheme established by Congress in

16  the late 1970s expressly included a role for the Sherman Act in regulating foreign air carrier

17  conduct.  For example, the legislative history of IATCA declares Congress's intent that "the

18  antitrust laws remain ***fully*** applicable . . . .  We believe the protection of the antitrust laws is

19  sufficient . . . in the same way that Congress concluded it would be for agreements affecting

20  interstate and overseas air transportation in the airline deregulation act of 1978."  *See* S. Rep. No.

21  96-329, at 61 (IATCA Legislative History), RJN, Ex. 28.  In IATCA, Congress directed the DOT

22  to develop a regulatory regime to foster the "encouragement, development, and maintenance of an

23  air transportation system relying on actual and potential competition to provide . . . low prices,

24  and to determine the . . . price of air transportation services."  IATCA, Pub. L. No. 96–192, 94

25  Stat. 35 (1980).

26         These statements by Congress demonstrate that it did not intend for Defendants to receive

27  an antitrust exemption based merely on filing fares with DOT.  *See* Levine Decl. ¶ 33 ("There

28  was no presumption of immunity created by the fact that the fares had been filed in tariffs."); *id.* ¶

46 ("Congress never intended that fares or surcharges that were the product of price-fixing would be immune from antitrust prosecution, public or private, because they were filed in tariffs with the DOT.  To do so, would create an aviation policy that is the antithesis of one intended to promote competition.").  As these authorities make clear, Congress intended that vigorous enforcement of the antitrust laws would serve to police the deregulated market and would foster competition.

Moreover, the continued existence of filing requirements for a small subset of foreign carriers does not militate in favor of applying the filed rate doctrine.  Michael Levine, an expert in the United States' policies related to the airline industry, explained that the continued fare filing requirement in limited markets was not for the purpose of regulating "just and reasonable" rates, but existed to permit DOT to protect domestic air carriers from discriminatory treatment by foreign governments.  Levine Decl. ¶¶ 2(d), 6, 23, 25, 33, 37, 40, 43; *see also* Declaration of Frank Avent in Opposition to Defendants' Motions for Summary Judgment Decl. ¶¶ 2-4 ("Avent Decl.") (aware of no DOT action to enforce just and reasonable rates).  Under circumstances very similar to this case, the court in *Ocean Shipping* rejected defendants' arguments that their collusive conduct was protected by the filed rate doctrine, despite an industry requirement to file tariffs.  500 F.Supp. at 1240 (rejecting the contention that mere filings with a regulatory agency require the application of the filed rate doctrine and holding that "to determine the applicability of the Sherman Act to a regulated industry, courts must consider whether and to what extent Congress intended to exempt activities of that industry from the antitrust laws.  This can be determined through an examination of the legislative history and the administrative scheme itself.").

Nor is the fact that Congress left intact section 41501 a reason to apply the filed rate doctrine.  Defendants may argue in reply that active Congressional deregulation of the international aviation industry is irrelevant because the statute requiring carriers to impose "reasonable prices  . . ." still exists.  *See* 49 U.S.C. § 41501; *see also* ECF No. 728 at 8 (Certain Defendants' Joint Motion) (relying on section 41501 for application of the filed rate doctrine).  Yet several cases have held that the retention of such a broad statute does not *a fortiori* mean that the filed rate doctrine applies, especially in the face of massive deregulation.  For example, in

*Ting*, the Ninth Circuit considered whether the filed rate doctrine applied in the telecommunications industry in light of substantial deregulation.  319 F.3d at 1138.  It found that it did not, despite express "congressional intent that customers receive fair and reasonable rates from telecommunications carriers."  *Id.* (*citing* 47 U.S.C. § 202(a)); *see also Tempel Steel Corp. v. Landstar Inway, Inc.*, 211 F.3d 1029, 1030 (7th Cir. 2000) (Interstate Commerce Commission still had authority over just and reasonable rates but the filed rate doctrine did not apply post-deregulation).

Importantly, no court in the United States has *ever* held that the filed rate doctrine applies to preclude private antitrust actions in the international airline industry.  Courts have looked at Congress's intent with respect to regulation of the airline industry and concluded that the antitrust laws apply with full-force.  Even before the dramatic deregulation of the international airline industry, courts recognized that the Federal Aviation Act ("FAA") and its regulatory regime did not preempt private antitrust damage claims.  *See Aloha Airlines, Inc. v. Hawaiian Airlines, Inc.*, 489 F.2d 203 (9th Cir. 1973) ("*Aloha Airlines*"); *Great Destinations, Inc. v. Transportes Aeros Portugeses S.A.R.L.*, 460 F. Supp. 1160, 1165 (S.D.N.Y. 1978) (FAA did not shield foreign airline from antitrust claim).

In *Aloha Airlines*, for example, the plaintiff alleged the defendant's practices violated the Sherman Act and defendant argued that the lawsuit was preempted by CAB's exclusive and primary jurisdiction.  489 F.2d at 205.  As Defendants do here, the defendant argued that the case should be dismissed because CAB had authority over "unfair methods of competition" and had a hearing procedure.  *Id.*  In rejecting those arguments, the court applied the correct standard of review to proposed exemptions from the antitrust laws and found that "there is no order of the CAB authorizing the conduct which has been made the basis of the antitrust complaint . . . ."  *Id.* at 208.  The Ninth Circuit also reasoned that the CAB's hearing procedure provided no mechanism for obtaining damages – the primary aim of the lawsuit – and therefore could not be dismissed.  *Id.* at 211 ("It is significant that there is not now, nor has there ever been, any authority in the Board under section 411 or elsewhere to make a factual determination as to the existence *vel non* of all the ingredients of an antitrust suit under the Sherman Act.").  The Ninth

1   Circuit therefore concluded that the regulatory regime did not preempt private antitrust claims,

2   and permitted the suit to proceed.

3     *Aloha Airlines* was decided *even before* deregulation of the airline industry, at a time

4   when both international and domestic carriers were required to file *all* of their fares and tariffs.

5   Yet, like the defendant in *Aloha Airlines*, Defendants here make similar arguments that the broad,

6   but vague, statutory language preempts (through the filed rate doctrine) private antitrust damages.

7   The reasoning of the case applies with even more force now than it did prior to deregulation, and

8   demonstrates why Defendants' simple reliance on such sweeping statements is insufficient to

9   confer filed rate protection, especially in the airline industry.  As a matter of doctrinal

10  consistency, the airlines should not be afforded *more* protection from the antitrust laws than they

11  were prior to deregulation.  Moreover, as discussed *infra* at 46, DOT does not presently have a

12  complaint procedure that would permit adjudication of an antitrust, price-fixing claim, nor does it

13  provide consumers with damages or a rebate for the supra-competitive prices paid for the airfare.

14  *See* Avent Decl. ¶ 3.  As it did in *Aloha Airlines*, this fact cuts against Defendants' arguments that

15  the filed rate doctrine applies at all.

16    Nor is Aloha Airlines the sole example of a court determining prior to deregulation that

17  private enforcement of the Sherman Act was critical in the international airline industry.  In *Pan*

18  *American World Airways, Inc. v. United States*, 371 U.S. 296 (1963), for example, the Supreme

19  Court held that, under the then-existing and far more arduous regulatory regime, certain types of

20  antitrust violations between competitors could be subject to the CAB's jurisdiction.  *Id.*  It held,

21  however, that other antitrust violations, <u>*such as price-fixing*</u>, were not subject to CAB's authority.

22  *Id.*; *see also id.* at 325 (Brennan J., dissenting) ("I see no basis upon which to withdraw questions

23  of route allocation, territorial division, and combinations between common carriers and air

24  carriers from judicial cognizance, yet leave unaffected (as the Court appears to intend to do)

25  **questions of rate fixing.**") (emphasis added).  This case is fatal to Defendants' arguments that the

26  filed rate doctrine applies because, even under the previous, stricter regulatory regime, courts had

27  continued jurisdiction over price-fixing claims.

28

1

2

**B.**     **Provisions For Obtaining Antitrust Immunity in the Transportation Code Demonstrate that Congress Did Not Intend for the Filed Rate Doctrine to Apply**

3      While Defendants argue that this Court should apply a wholesale exemption from the

4   antitrust laws in the international aviation industry based on general statutory language, they

5   ignore the fact that Congress imposed an exclusive and detailed statutory means for obtaining

6   antitrust immunity.  No Defendant used that process, and Defendants do not even contend that

7   their collusive agreements were blessed by that process.

8      Under the Transportation Code, Congress granted DOT the power to exempt airlines from

9   the generally applicable antitrust laws where it is "required by the public interest."  49 U.S.C. §

10   41308.  The statutory scheme provides detailed guidance to DOT in reviewing and responding to

11   such requests for antitrust immunity.  *Id.* § 43109.  While DOT can choose to exempt certain

12   conduct of foreign air carriers from liability under the Sherman Act, it has been instructed by

13   Congress to grant immunity only in limited circumstances and upon a special showing of need.

14   *See* 49 U.S.C. § 41308(b); *see also Republic Airlines v. C.A.B.*, 756 F.2d 1304, 1317 (8th Cir.

15   1985) ("Examination of sections [41308 and 41309] and their legislative history clearly reveals

16   that antitrust immunity for airline agreements is intended to be the exception and not the rule.");

17   RJN, Ex. 14, IATA Tariff Conference Proceeding, Order 2006-7-3, 2006 DOT Av. LEXIS 460, at

18   *77 (July 5, 2006) ("Congress did not intend us to routinely grant antitrust immunity to inter-

19   airline agreements related to international air transportation.").

20      If the mere submission of certain tariffs with DOT effectively exculpates an airline from

21   antitrust liability, as Defendants contend here, there is simply no need in the Code for the

22   provisions regarding obtaining antitrust immunity.  Indeed, application of the filed rate doctrine

23   would make these aforementioned provisions entirely superfluous, counter to a fundamental

24   canon of statutory interpretation.  *Learjet, Inc. v. Oneok, Inc. (In re Western States Wholesale*

25   *Natural Gas Antitrust Litig.*), 715 F.3d 716, 735 (9th Cir. 2012) (canon of statutory interpretation

26   "counsels against reading acts of Congress to be superfluous.") (*citing American National Red*

27   *Cross v. S.G.,* 505 U.S. 247, 263 (1992)); *see also United States v. Hunter*, 101 F.3d 82, 85 (9th

28   Cir. 1996) ("[A]s a matter of statutory construction, we presume that Congress is knowledgeable

1   about existing law pertinent to the legislation it enacts.").  Congress was, of course, aware of the

2   law on the filed rate doctrine yet decided to include provisions for obtaining antitrust immunity.

3   The logical and proper conclusion to be drawn is that the immunity provisions were included

4   precisely because Congress did not intend for the filed rate doctrine to apply across the airline

5   industry.

6          The *Ocean Shipping* case presents a statutory scheme that is not unlike DOT's in that the

7   Shipping Act also included provisions related to both tariff filing *and* obtaining antitrust

8   immunity.  500 F.Supp. at 1240-41.  There, a class of shippers sued common carriers of freight

9   for price-fixing on transatlantic routes.  *Id.* at 1237.  Defendants argued that the Federal Maritime

10  Commission ("FMC") had exclusive jurisdiction over the claims and that the filed rate doctrine

11  barred damages because of the Shipping Act's tariff filing requirements.  *Id.* at 1239-1241.  In

12  rejecting that argument, the court first noted that the Shipping Act contained express provisions

13  for obtaining antitrust immunity.  It found that "the language of that provision must have been

14  selected as a matter of deliberate choice in order to indicate the extent to which the industry's rate

15  making activities remain subject to the antitrust laws as well as the extent to which these activities

16  are exempted from antitrust regulation."  *Id.* at 1241 (*citing Carnation v. Pacific Westbound

17  Conference*, 383 U.S. 213, 220 (1965)).  Moreover, the court was not persuaded that the Act's

18  tariff filing system "fundamental[ly] change[d] . . . Congress's accommodation of the Shipping

19  Act and the antitrust laws . . . ."  *Id.* at 240.  The court concluded that "the existence of the tariff

20  filing system ***is not repugnant to the antitrust laws***."  *Id.* at 1241.

21         *Ocean Shipping* stands on all fours with this case.  A detailed review of DOT's statutory

22  scheme and the subsequent deregulation of pricing in the air transportation industry lead to the

23  conclusion that application of the filed rate doctrine is inappropriate.  As in *Ocean Shipping*, the

24  existence of specific, detailed statutory provisions related to obtaining antitrust immunity

25  militates against a finding that the filed rate doctrine applies.  Congress knew what it was doing

26  when it explicitly enacted the limited antitrust immunity provisions in the Transportation Code.

27  This Court should not extend those immunities any further than Congress intended.  *Id.* at 1240

28

1    ("If Congress had desired to grant any further immunity, Congress doubtless would have said

2    so.") (citations omitted).

3          All of these factors demonstrate that Congress did not preempt private suits and entrust

4    complete antitrust enforcement authority to DOT.

5    **C.    DOT Has Deregulated Pricing in the International Airline Industry to
         Comply with its Congressional Mandate and Believes the Antitrust Laws
6        Fully Apply**

7          DOT and its predecessor, CAB, have consistently and publicly expressed their view that

8    the antitrust laws fully apply to the air transportation industry, except in the rare situations where

9    DOT has expressly granted immunity based on a showing of compelling need:

10              The power to confer antitrust immunity is given to regulatory agencies in
                order that they may protect conduct which would be considered an abuse of
11              competitive processes in an unregulated industry from antitrust challenge.
                ***We have recognized, therefore, that full antitrust exposure is consistent
12              with deregulation and have set a high standard for granting antitrust
                immunity.*** Antitrust immunity will not be granted unless an applicant shows
13              that immunity is required in the public interest and the transaction will not
                go forward without that immunity.
14
                ***More important, eliminating antitrust immunity will subject the air
15              transportation marketing industry to the full force of competitive market
                pressures.  Exposure to antitrust liability has long been recognized as a
16              means of ensuring competitive behavior in other sectors of our economy.***

17   RJN, Ex. 13, Competitive Marketing of Air Transportation, Order 82-12-85, 99 C.A.B. 1, 1982

18   CAB Lexis 23, *29-31 (Dec. 16, 1982) (emphasis added).

19         Several orders from DOT demonstrate that it believes it no longer regulates pricing on

20   international routes and that the antitrust laws provide an important enforcement mechanism for

21   permitting the exercise of market competition.  For example, in DOT Order 2012-11-4, the DOT

22   stated that "in the 34 years since the passage of the Airline Deregulation Act, the Department has

23   declined to use this authority to strike down fare rules in foreign air transportation, but instead has

24   applied the pro-competitive policies cited above for domestic air fares to fares and rules in foreign

25   air transportation."  RJN, Ex. 15, Petition for Rulemaking and Third-Party Complaint of Donald

26   L. Pevsner, Esq., DOT Order 2012-11-4, 2012 DOT Av. LEXIS 462 (Nov. 6, 2012).

27         Similarly, in a 2008 Order, DOT considered whether to grant antitrust immunity to a

28   "flex-fares system."  *See* RJN, Ex. 16, Action on IATA Agreement Issued by the Department of

1    Transportation on the 1st day of July, 2008,  DOT Order 2008-7-4 (July 7, 2008).  An airline

2    trade association argued that the system was competitively benign, but that DOT's antitrust

3    immunity was needed to "remove the specter of *private* antitrust suits that would allegedly

4    frighten carriers away from participating in Flex Fares." *Id.*  (emphasis added).  In rejecting that

5    argument, the DOT held that "if the new system is indeed competitively benign there is no reason

6    it should not be able to operate ***fully subject to the U.S. antitrust laws***." *Id.* (emphasis added).

7    This statement is fatal to Defendants' filed rate arguments.  DOT construed its Congressional

8    mandate to mean that the antitrust laws fully apply, despite the existence of limited filing

9    requirements on international fares.

10           Other DOT authorities follow a similar pattern, demonstrating that the DOT does not

11   believe the filed rate doctrine applies in the airline industry.  *See, e.g.,* RJN, Ex., 13, Competitive

12   Marketing of Air Transportation, Order 82-12-85, 99 C.A.B. 1, 1982 CAB Lexis 23, *313 (Dec.

13   16, 1982) ("In enacting the ADA, Congress directed that control of the air transportation system

14   be returned to the marketplace.  We have consistently held that a part of the return to market

15   control is exposure of participants to the antitrust laws, as that exposure exists in unregulated

16   industries."); RJN, Ex. 17, Agreements adopted by the Tariff Coordinating Conferences of the

17   International Air Transport Association relating to baggage matters and fare construction rules,

18   DOT Order 88-3-67, 1988 DOT Av. LEXIS 250, at *1-2 (March 31, 1988) ("conference activities

19   involving carriers without immunity do not have immunity and so may be subject to the *full*

20   *application of the antitrust laws*.") (emphasis added); RJN, Ex. 18, Agreements adopted by the

21   Tariff Coordinating Conferences of the International Air Transport Association relating to

22   baggage matters and fare construction rules, DOT Order 87-12-48, 1987 DOT Av. LEXIS 38, at

23   *7 (Dec. 17, 1987) ("any conference activities which include carriers that have lost their

24   immunity may be subject to the full application of the antitrust laws until immunity is restored by

25   the Department."); RJN, Ex., 12, *Braniff South American Route-Transfer Case*, 1983 CAB

26   LEXIS 288, at *28-29 (April 20, 1983) ("Antitrust exposure is a normal risk of doing business in

27   an unregulated competitive environment and is consistent with our policy of reliance on

28   competition to the maximum extent possible"); RJN, Ex. 19, Airline Fuel Corporation,

1   Agreement, CAB Order 79-9-120, 83 C.A.B. 1358 ("The contention that immunity is needed to

2   protect AFCO's activities from being disrupted by threats of unwarranted antitrust litigation is

3   unpersuasive.  Such threats are simply one of the risks of doing business which all trade

4   associations must assume . . . ."); RJN, Ex. 20, DOT Order 80-6-66, 85 C.A.B. 2481, 1980 CAB

5   Lexis 323, at *70 (DOT, June 12, 1980) ("Full exposure" to antitrust liability is consistent with

6   the marketplace orientation of IATCA).[13]

7        There simply is no justification for this Court to exculpate Defendants' anticompetitive

8   conduct by judicial fiat when Congress, DOT, and DOJ have clearly and consistently expressed a

9   contrary intent.  Given the history regarding deregulation of the airline industry and Defendants'

10  failure to provide evidence that Congress, the DOT, and the DOJ intended to exempt the airline

11  industry from antitrust laws, Defendants have failed to meet their burden of showing that the

12  regulatory regime in the airline industry qualifies for the preemptive force of the filed rate

13  doctrine.  Far from supporting Defendants' view that the FAA preempts the antitrust laws in the

14  airline industry, in the almost 40 years since pricing in the airline industry was deregulated, the

15  clear, consistent, and public view of DOT, DOJ and Congress is that the "full application" of the

16  antitrust laws governs air carriers' conduct.  RJN, Ex. 13, Competitive Marketing of Air

17  Transportation, Order 82-12-85, 1982 CAB Lexis 23, *313 (Dec. 16, 1982); *see also* Levine

18  Decl. ¶ 45 ("exposure to private actions and liability for damages under the antitrust laws is part

19  and parcel of the deregulatory scheme substituting the antitrust laws for rate regulation, as has

20  been set out by Congress and CAB/DOT for domestic and international aviation.").  Defendants'

21  motions for summary judgment based on the filed rate doctrine should be rejected.

22

23

24

25

---

26  [13]  The United States Department of Justice ("DOJ") has also expressed its view that "[a]ntitrust
    enforcement has played a vital role in bringing increased competition and consumer benefits to
27  the deregulated airline industry."  *See e.g.* Comments of the Department of Justice On The Show
    Cause Order, Docket OST-2008-0234,
28  http://www.justice.gov/atr/public/comments/247556.htm#fn_30.

1

**D.      Though the Filed Rate Doctrine Does Not Apply At All in this Case, It Clearly Does Not Apply Where There is No Filing Requirement**

2

3      Several Defendants concede, as they must, that they are not permitted to file fares with

4   DOT.  Under the circumstances of this case, these concessions are fatal to their arguments

5   because such rates do not qualify for filed rate protection.

6

**1.      No Court Has Applied the Filed Rate Doctrine to a Regulatory Regime Like DOT's in the Absence of Actual Filing**

7

8      The vast majority of international fares, like all domestic fares, are not permitted to be

9   filed with DOT.  With congressional authorization, DOT specifically exempted fare/tariff filing

10   for Category A markets and many Category B markets, and therefore, no tariffs are permitted to

11   be filed. 14 C.F.R. § 293.10; *see also* Bryant Decl., Exs. 1-4.

12      DOT lacks regulatory oversight over unfiled fares or fares merely gratuitously filed with

13   an agency.  *See, e.g., First Pennsylvania Bank, N.A. v. Eastern Airlines, Inc.*, 731 F.2d 1113,

14   1120 (3rd Cir. 1984) ("With respect to [domestic] rates, a succinct statement of the effect of

15   deregulation would be that the CAB was shorn of its powers to pass upon the reasonableness of

16   rates for interstate air transportation of property, and to prescribe future rates to replace those

17   found to be unreasonable."); *Roberts Distrib. v. Federal Express Corp.*, 917 F. Supp. 630, 637

18   (S.D. Ind. 1996) ("Beginning in 1977, Congress and the responsible federal agencies

19   progressively deregulated domestic air carriers until, by the time of the recodification of Title 49

20   in 1994, Pub. L. 103-272, 108 Stat. 745, there was no remaining authority to regulate prices or

21   practices of air carriers providing domestic interstate services.").  DOT, therefore, has no

22   jurisdiction over unfiled fares under its own regulations.

23      Courts have found that the lack of a filing requirement militates in favor of finding that

24   the filed rate doctrine does not apply.  *See, e.g., Ting*, 319 F.3d at 1139 (finding that the filed rate

25   doctrine did not apply in deregulated market with no fare filing requirements); *Florida Municipal*

26   *Power Agency v. Florida Power & Light Co.*, 64 F.3d 614 (11th Cir. 1995) (reversing grant of

27   summary judgment because record showed there was genuine issue of material fact as to whether

28

1  rate was actually filed).  For the international fares that are no longer permitted to be filed, the

2  filed rate doctrine clearly does not apply.

3       The following subsections summarize the lack of fare filing requirements for particular

4  Defendants.  For these Defendants, this Court should reject Defendants' motions:

5       **a.**      **Air New Zealand**

6       As a carrier from a Category A (New Zealand) country, Air New Zealand was not

7  required to file fares and its only direct, U.S. originating travel during the class period was to

8  New Zealand.  Air New Zealand cannot claim filed rate protection for its fares.  *See* Schwartz

9  Decl. ¶ 64-66.

10       **b.**      **China Airlines and EVA Airways**

11       As carriers from a Category A country (Taiwan), China Airlines and EVA were not

12  required to file their fares to Taiwan.  China Airlines and EVA, therefore, cannot claim filed rate

13  protection.  Indeed, both Defendants exaggerate the extent to which they are required to file fares,

14  *see* Schwartz Decl. ¶¶ 6-47, with EVA Airways claiming that a fare from Los Angeles to Taipei

15  was approved by the DOT when, in fact, it was not.  *Id.* at 52.

16       **c.**      **Philippine Airlines and Qantas Airways**

17       As carriers from Category B countries, PAL and Qantas were only required to file one-

18  way, Y-normal, economy passenger fares.  Both airlines exaggerate their filing requirements.

19  Schwartz Decl. ¶¶ 55-60.  Even if the filed rate doctrine applies (which it does not), PAL and

20  Qantas cannot conceivably claim protection for *roundtrip fares* that originated in the United

21  States.

22       **d.**      **Singapore Airlines**

23       As a carrier from a Category A country, SIA was not required to file fares for flights

24  between the United States and Singapore.  It cannot, therefore, claim filed rate protection for

25  these fares or other fares between the U.S. and Category A countries.  Schwartz Decl. ¶ 63

26  (noting that SIA relies on a fare submitted to DOT prior to the implementation of the

27  categorization regime to claim that it filed fares).

28  / / /

1

### 2.    No Defendant Was Required to File Fuel Surcharges

2      Plaintiffs allege a conspiracy to fix the prices of air travel, with a significant portion of

3  that conspiracy including the fixing of fuel surcharges implemented in or around the fall of 2004.

4  Compl. ¶¶ 175-228.  Defendants argue that fuel surcharges filed with the DOT are also subject to

5  the filed rate doctrine.  This argument is premised solely on Defendants *voluntarily* filing fuel

6  surcharges with the DOT starting in 2004 – despite no obligation to do so.  Furthermore, even if

7  some subset of Defendants were required to file fuel surcharges with DOT (which they were not),

8  as subsequent sections make clear, DOT effectively abdicated whatever rate-making authority it

9  had with respect to fuel surcharges.

10      Prior to 2004, DOT disapproved of any discrete fuel surcharge filings based on the policy

11  that any such costs should be recouped through an increase in base fares.  DOT was concerned

12  that fuel surcharges would be confusing to consumers and might lead to false and deceptive

13  advertising.  *See*, RJN, Ex. 5, Gretch Letter; *see also* Williams Decl. ¶ 8, Ex. 7 (ANA-

14  00541515”); Schwartz Decl. ¶ 18 (noting that the only “Disapprovals” located in the ATPCO

15  system for fuel surcharges involved the disapproval of standalone fuel surcharges submitted prior

16  to October 2004).  The initial policy prohibiting separate surcharges was established at a time

17  when DOT “was regulating fares much more actively” than after the 1999 changes

18  circumscribing fare filing to a few markets.  *Id.* (Gretch Letter).  Previously, DOT “was

19  concerned that tariff surcharges could undermine [DOT’s] regulatory supervision of fare levels.”

20  *Id.*  In 2004, however, DOT changed its policy and noted that “the existence of more competitive

21  conditions” led it to conclude that “the general prohibition of separate fare surcharges in

22  individual carrier tariffs is no longer necessary . . . . ”  *Id.*  Because DOT no longer actively

23  regulated fare prices due to the competitive nature of the airline market, there was no longer a

24  reason to prohibit fuel surcharges.  The Gretch Letter does not require any carrier to file fuel

25  surcharges with DOT, but notes that “carriers are free to file surcharges in general rules tariffs

26  . . . . We would caution carriers, however . . . all fare advertising must be in accordance with the

27  Department’s advertising rules, which prohibit the separate listing of carrier surcharges in fare

28  advertisements.”  *Id.*  In a separate notice issued shortly after the Gretch letter, DOT again did not

1  state that carriers were required to file fuel surcharges.  *See* RJN, Ex. 26, 69 Fed. Reg. 65676

2  (2004).

3  Even upon changing its policy, the DOT failed to require the filing of fuel surcharges, as it

4  did for fares themselves.  *Compare* 69 Fed. Reg. 65676 (November 15, 2004) (carriers "free" to

5  file separate fuel surcharges) *with* 64 Fed. Reg. 40654-01 at § 221.1 (July 27, 1999) (carriers

6  "[m]ust" file tariffs for certain fares).  Had the DOT intended to require the filing of fuel

7  surcharges, it was well-equipped to do so.  It had written such requirements into regulations in the

8  past.  Instead, the 2004 policy change allowed, but did not require, the filing of fuel surcharges.

9  Antitrust immunity under the filed rate doctrine is dependent on analysis of the regulatory

10  framework, *Cain*, 599 F.2d at 320, and given the lack of evidence that the DOT intended to

11  regulate fuel surcharges – and indeed the affirmative evidence that it had no intention of ever

12  regulating them – fuel surcharges for all markets are not protected by the filed rate doctrine.

13  Defendants argue that DOT's 1999 regulatory notice required the filing of all fuel

14  surcharges.  For example, Qantas points to language from DOT's 1999 exemption, 64 Fed. Reg.

15  40654, for the proposition that "[a]ll surcharges must be filed…."  *See* Memorandum

16  Supplementing Qantas Airways Ltd.'s Motion for Summary Judgment at 2.  Yet, this argument

17  ignores the history of fuel surcharges at DOT.  It cannot reasonably be disputed, and Defendants

18  do not dispute that fuel surcharges were *specifically prohibited* prior to 2004.  *See*, RJN, Ex. 5,

19  Gretch Letter.  Indeed, they were specifically prohibited at the very time when DOT issued its

20  exemption notice in 1999, the authority Defendants cite.  *Id.*; *see also* Schwartz Decl. ¶ 18.  It

21  simply cannot be the case that DOT required the filing of fuel surcharges in 1999 when such an

22  act would have been considered unlawful under DOT's regulatory regime.  Because DOT is

23  entitled to deference in interpreting its own regulations, the 1999 regulation cannot possibly be

24  read to require the filing of fuel surcharges at a time when they were expressly prohibited by the

25  DOT.  *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).  Defendants cannot receive

26  filed rate protection for their gratuitous filing of collusively fixed fuel surcharges.

27

28

### 3.     Several Defendants Claiming Filed Rate Protection Did Not File Fuel Surcharges with DOT

Defendants Air New Zealand, China Airlines, EVA Airways, Qantas, Philippine Airlines and Singapore Airlines claim that *all* of their fuel surcharges were filed with DOT, and therefore they are entitled to filed rate protection.  ECF Nos. 724, 725, 728, 731, 753, 761, 763, 786, and 792.  ***Tellingly, none of these parties submitted all of their fuel surcharges to DOT***.  *See* Schwartz Decl. ¶¶ 41-65.

Air New Zealand claims, for example, that it filed its fuel surcharges with ATPCO, who then distributed the information to DOT through its Global Distribution System.  *See* ANZ Mem. Law at 2; *see also* Brown Decl., submitted therewith.  This contention is simply wrong.  As Defendants' own declarant, Joanna Bryant testified, and as Plaintiffs have been able to confirm through an investigation of ATPCO's database, the mere submission of ANZ's fuel surcharges in ATPCO's general system does not constitute "filing" with DOT.  Instead, only those fuel surcharges that were filed through ATPCO's GFS system in the general rules section were actually filed with DOT.  *See* Schwartz Decl. ¶ 16-17.  Fuel surcharges submitted in ATPCO's YQ/YR database were not filed with DOT, which could not even access that database.  *Id.* ¶ 15; Bryant Dep. at 264:24-265:10.   Plaintiffs' expert reviewed ANZ's general rule and could locate no filed fuel surcharges with DOT.  Schwartz Decl. ¶ 65.

China Airlines did not begin to file its fuel surcharges with DOT until December 6, 2006, despite the fact that it implemented fuel surcharges on its flights well before this date.  *See* Schwartz Decl. ¶ 44.  Thus, prior to December 6, 2006, China Airlines did not file its fuel surcharges with DOT for travel to Japan, the Philippines or any other transpacific destination, including Taiwan.  This directly contradicts its contention that it filed "all" such fuel surcharges. *Id.* ¶ 42.  This dispute in the evidence creates a genuine issue of material fact that cannot be resolved on this summary judgment motion.  Moreover, attached as Exhibits 25, 26, and 27 to the Schwartz declaration is the text of China Airlines General Rule 38 from December 21, 2006, July 1, 2007 and May 1, 2013, respectively.  A comparison of these exhibits indicates that the same rule has been in effect since at least December 21, 2006.  This demonstrates that, since at

1    least 2006, China Airlines has not updated its general rule for fuel surcharges despite changing

2    the amount of the fuel surcharge several times.  Schwartz Decl. ¶¶ 43-44.  This again contradicts

3    China Airlines vague contention that it filed "all" of its fares and surcharges.  *Id*.

4    EVA Airways failed to submit *any* fuel surcharges to DOT.  Schwartz Decl. ¶ 49.  EVA's

5    artfully worded declaration confirms as much, with their declarant claiming to have filed the fuel

6    surcharges through ATPCO's YQ application.  *See* Declaration of Tina Kuo in Support of

7    EVA's Motion for Summary Judgment ("Kuo Decl.") ¶¶ 7-10.  Yet, as Defendants' own

8    declarant testified at deposition: ATPCO's YQ application is not part of GFS and surcharges

9    filed in that system are not filed with DOT.  Bryant Dep. 264:24-265:10; *see also* Schwartz

10   Decl., ¶¶ 15, 49.  There is no record of EVA's purported filing of fuel surcharges with DOT.

11   For Qantas, a review of ATPCO's GFS public system reveals that it did not file ***any*** fuel

12   surcharges with DOT.  Schwartz Decl. ¶ 56.  Indeed, the materials submitted by Qantas's own

13   filed rate declarant show that the fuel surcharges were filed with the Canadian government, but

14   not with the U.S.  *Id.*; *see also* Declaration of Carol Day in Support of Qantas's Motion for

15   Summary Judgment; Bryant Dep. at 236:7-237:21.

16   Regarding PAL, it did not begin presenting fuel surcharges to DOT until October 28,

17   2005 at the very earliest.  Schwartz Decl. ¶ 59.

18   With respect to SIA, prior to April 2005, its fuel surcharges were not presented to DOT.

19   Only governments that are included in the justification are presented with general rule filings.  In

20   examining the ATPCO database for Singapore Airlines fuel surcharge general rule filings, prior

21   to April 2005, "US" does not appear in the justification box.  Schwartz Decl. ¶ 62.  SIA,

22   therefore, did not file any of its fuel surcharges with DOT prior to April 2005.

23   As the foregoing demonstrates, Defendants have conveniently glossed over their various

24   failures to actually file the fuel surcharges with DOT.  At the very least, the Schwartz declaration

25   creates disputed questions of fact that cannot be resolved on this motion.

26

27

28

4.   **Filed Rate Protection for Unfiled, "Market-Based' Rates Is Inappropriate in the International Airline Industry**

Recognizing that many of them are not required to file any rates at all or did not in fact file them, Defendants mistakenly rely on cases that interpret the filed rate doctrine in highly-regulated industries to argue that they nonetheless should receive protection.  Indeed, Defendants rely exclusively on authorities applying the filed rate doctrine to market based rates in the natural gas and electricity markets.  These cases only interpret the regulatory framework of a single federal agency, Federal Energy Regulatory Commission ("FERC").

Defendants contend, for example, that the teachings of *Grays Harbor*, 379 F.3d at 651, *Snohomish,* 384 F.3d at 761, and *Gallo*, 503 F.3d. at 1033, all require the application of the filed rate doctrine here – even for fares that are not required or allowed to be filed by DOT.  These cases are inapposite, and do not call for such a radical imposition of federal preemption to pricing for international air travel.

First, one of the primary distinguishing factors in the electricity and natural gas cases is that FERC expressly stated that it was engaged in active supervision of pricing in the energy markets, despite the move to market-based rates.  *See, e.g., Grays Harbor*, 379 F.3d at 651 (FERC informed the court that it continued to regulate rates through established procedures).  DOT has made no such statement in this case.  In fact, the only record evidence that exists is from Plaintiffs' experts and demonstrates that DOT does not, in fact, regulate pricing.  Levine Decl. ¶¶ 6, 8, 22, 23, 25; Avent Decl. ¶¶ 2-4.  This may explain why Defendants have ignored the Court's suggestion that they ask DOT's opinion regarding whether it regulates just and reasonable fares.  *See* Declaration of Elizabeth Tran ¶¶ 3-6, Exs. 1-2 ("Tran Decl.") (describing FOIA request showing Defendants did not even attempt to solicit DOT's views about its regulatory supervision of pricing, the application of the antitrust laws and the filed rate doctrine); *see also, infra* at 49-50.

In *Grays Harbor*, a public utility district brought suit against an energy wholesaler seeking to rescind or reform an electricity contract alleging that it was forced to pay exorbitant prices for electricity.  The Ninth Circuit affirmed dismissal of the complaint on preemption and

1   filed rate grounds, rejecting the district court's holding that the filed rate doctrine did not apply

2   because the market set the prices and rates were not filed.  379 F.3d at 651.  The court held that

3   "the market-based regime established by FERC continues FERC's oversight of the rates

4   charged."  *Id*.  In reaching this decision, the court relied on the following facts related to FERC's

5   regulatory authority: (1) FERC only allowed the sales after scrutinizing whether "the seller and its

6   affiliates do not have, or have adequately mitigated, market power in generation and transmission

7   and cannot erect other barriers to entry;" (2) FERC stated that these conditions assured that rates

8   were just and reasonable; and (3) FERC argued that its procedures effectively constituted review

9   of rates prior to their implementation and satisfied "the filed rate doctrine for market-based rates."

10  *Id.* (citations omitted).

11      Here, in stark contrast to *Grays Harbor*, DOT does not have any procedures in place to

12  evaluate rates or market power, it has not provided any information to the Court nor have

13  Defendants (despite being their burden on this motion to do so, *see infra*, Section at pg. 49-50),

14  and DOT, unlike FERC, never argued that its procedures effectively constitute review of rates

15  prior to implementation.  Indeed, despite Defendants' multiple briefs there is not a single

16  reference to the DOT actually regulating the pricing levels of airline travel.  Nor could there be.

17  *See* Levine Decl.  40 ("DOT was not engaged in regulation of fare levels and concluded that free-

18  market competition had advanced to the point that only special situations required it to have some

19  ability to potentially use fare retaliation as a bargaining chip in the event of a dispute with a

20  recalcitrant foreign regulator.  During this time, DOT did not, in practice, monitor or otherwise

21  regulate fare levels, leaving this to the forces of the market even in Category B (for one-way

22  normal fares) and C countries."); *see also* Bryant Dep. at 213:22-215:16; 228:24-229:3

23  (ATPCO's summary judgment declarant explaining that fewer than 10 log-ins existed for DOT

24  employees to review filings, despite airlines presenting thousands of filings per day).

25      Following *Grays Harbor*, the Ninth Circuit in *Snohomish* again analyzed FERC's

26  regulatory authority, and concluded that preemption and the filed rate doctrine barred a utility

27  from suing generators and traders of wholesale electricity for violations of California state

28  antitrust and consumer protection laws.  384 F.3d at 756.  The court's holding was once again

1   based on the regulatory regime Congress enacted through which FERC maintained continued

2   oversight of the wholesale electricity rates.  Unlike DOT and the airline industry in this case,

3   FERC (1) "review[ed] and approve[d] a variety of documents filed by the defendants"; (2)

4   "approved these market-based tariffs only upon a showing that the seller lacked or had mitigated

5   its market power"; (3) "required each seller to file quarterly reports, which contained certain

6   required information including the minimum and maximum rate charged and the total amount of

7   power delivered during the quarter;" and (4) "reviewed and approved detailed tariffs filed by the

8   PX and the ISO, which described in detail how the markets operated by each entity would

9   function."  *Id.* at 760-761 (bracketed material added).[14]  In this case, Defendants have not

10  demonstrated, or even attempted to demonstrate, that any of this oversight exists in the

11  international air travel market for unfiled fares.

12         *Gallo* is also instructive.  There, a winery sued a natural gas supplier for manipulation of

13  natural gas prices.  The Ninth Circuit ***affirmed the denial*** of the gas supplier's motion for

14  summary judgment.  The winery claimed that the rates it paid its supplier "were unfairly high

15  because they were pegged to indices that were artificially inflated due to illegal practices", while

16  the supplier claimed that the winery was "challenging market-based rates that were authorized by

17  FERC" and thus protected by the filed rate doctrine.  503 F.3d at 1033.  The Ninth Circuit

18  required the party invoking the doctrine to convince the district court that the regulatory regime at

19  issue satisfied certain criteria:

20         First, under *Grays Harbor*, a Court must investigate: (a) whether the agency has the

21  authority to regulate price levels *and* (b) whether it actually exercises that authority.  *Id.*  In *Gallo*,

22  the Ninth Circuit concluded that the analysis of *Grays Harbor* applied to certain rates because the

23  Federal Power Act, upon which *Grays Harbor* was based, and the Natural Gas Act, which

24  governed *Gallo*, were substantially similar to satisfy this first prong of the inquiry.  It concluded

25  that the filed rate doctrine barred claims based upon the market rates and the index based on those

26

27  ――――――――――――――――
    [14]   Legislation created PX and ISO, two non-governmental entities, to operate markets and
    otherwise manage the sale of electricity.  These entities were subject to FERC's jurisdiction.
28  *Snohomish*, 384 F.3d at 759.

1    authorized rates because FERC had both the power to regulate *and* exercised its statutory

2    authority to approve natural gas rates.  *Id*. at 1041-45.

3           Second, under *Gallo*, in order to prevail, Defendants in this case must convince this Court

4    that even rates which were not required to be filed fall under DOT's pricing jurisdiction.  There,

5    the Ninth Circuit found that some of the rates were not under FERC jurisdiction and therefore the

6    filed rate doctrine did <u>not</u> bar those claims.  503 F.3d at 1045-47.  The court rejected the

7    supplier's broad argument that because FERC had jurisdiction over the transportation of natural

8    gas in interstate commerce, FERC had jurisdiction over all sales of natural gas transported in

9    interstate pipelines.  *Id.* at 1047.  The court also rejected the supplier's argument that the filed rate

10   doctrine barred claims where the indices were comprised of both jurisdictional and non-

11   jurisdictional rates.  *Id.* at 1048.  The Ninth Circuit further held that the supplier failed to meet its

12   burden of establishing that all transactions in the indices were transactions under FERC

13   jurisdiction.  *Id.* at 1049.  The same analysis that the Ninth Circuit used to find that a portion of

14   the rates were not under FERC's jurisdiction applies to this case.

15          Here, Defendants cannot bootstrap the fact that some limited number of international

16   tariffs must be filed with DOT – even assuming *arguendo* that DOT in fact regulated the pricing

17   levels of those rates, which it does not – to gain immunity over all international fares and fuel

18   surcharges.  Such a conclusion is inconsistent with the policies of Congress and DOT to allow

19   market competition rather than regulation to set rates.  Moreover, the fact that a leg of a route

20   may be non-exempt from tariff filing requirements cannot be used to bootstrap the application of

21   the filed rate doctrine to any exempt leg of a trip.[15]  Thus, as in *Gallo*, the Court should deny the

22   motion for summary judgment.

23          In *Ting*, the court held that the filed rate doctrine did not apply to rates in the

24   telecommunications industry.  319 F.3d 1126.  The *Gallo* court distinguished *Ting* because

25   Congress had "fundamentally altered" the filed rate tariff procedure by eliminating the rate filing

26

27   ───────────────────
     [15] Defendants attempt to do this by implying all fares from the United States to Country B nations
     are immune, despite the requirement that these Defendants only file *one-way*, *normal* Y-economy
28   class fares.

1   requirement and relying solely on market rates, but "Congress has not made a similar statutory

2   change to the NGA or FPA such that FERC is permitted to abdicate its authority and, without any

3   oversight, leave rate setting entirely to the markets remaining within FERC's jurisdiction." *Gallo*,

4   503 F.3d at 1042 (*citing Ting*, 319 F.3d at 1132).  The *Gallo* court also found it significant in

5   *Ting* that Congress imposed sweeping changes to the regulatory regime that expressly

6   incorporated state law, the basis of the underlying suit.  Consequently, the *Ting* court refused to

7   apply the filed rate doctrine.

8        Here, as in *Ting*, Congress deregulated air travel and permitted DOT to abdicate its

9   authority over rate-making.  *See, e.g.,* 49 U.S.C. § 40109(c) (permitting DOT to abdicate its

10   authority over economic regulation of the international airline industry).  Once Congress did so,

11   as in *Ting*, DOT exempted many international carriers from the requirements of filing tariffs.  29

12   C.F.R. § 293.10.  Nor does the continued requirement that air carriers have "reasonable" fares

13   require a finding that market-based rates are protected by the filed rate doctrine.  The Federal

14   Communications Commission, like DOT, still retained authority to regulate fair and reasonable

15   rates for telecommunications and yet the Ninth Circuit found the doctrine did not apply.  *Ting*,

16   319 F.3d at 1138-39.  Moreover, Congress clearly intended for the antitrust laws to apply to the

17   airline industry.  Accordingly, as in *Ting*, the filed rate doctrine cannot preempt the Sherman Act

18   and does not apply where DOT does not require the filing of tariffs.[16]

19        Defendants also rely on *Carlin v. Dairy America, Inc.*, 705 F.3d 856, 871-872 (9th Cir.

20   2013) ("*Carlin*"), involving raw milk sales, but that case is also inapposite.  There, the Ninth

21   Circuit recognized that the statutory scheme under the United States Department of Agriculture

22   ("USDA") expressly regulated milk pricing, among other things, and included an exercise of that

23   pricing regulatory authority to minimum prices.  *Id.* at 869-70.  The Ninth Circuit also recognized

24

25   ────────────────────
    [16] Airlines and telecommunications are not the only industries Congress has deregulated.
    Congress has also, for example, deregulated the motor carrier industry so the filed rate doctrine

26   no longer applies, but the Interstate Commerce Commission still has the authority to determine
    whether rates are reasonable.  *Tempel Steel Corp. v. Landstar Inway, Inc.*, 211 F.3d 1029, 1030

27   (7th Cir. Ill. 2000); *see also* 49 U.S.C. § 13710(a)(2); *Ocean Shipping*, 500 F.Supp. at 1240
    (rejecting the contention that some regulation in the industry required application of the filed rate

28   doctrine).

---

1    that the statutory scheme "does not present the typical filed rate scenario" but found that "there

2    are sufficient attributes which justify the application of the doctrine to the AMAA milk pricing

3    situation generally" including: "milk *pricing* is the subject of extensive federal statutory and

4    regulatory control" (emphasis added); the USDA sets minimum prices for raw milk through

5    Federal Milk Marketing Order ("FMMOs"); and the USDA exercised that authority to create the

6    FMMOs, which are used to establish minimum prices.  *Carlin*, 705 F.3d at 869-870.

7         Here, in contrast, Congress and DOT set a consistent policy of deregulation in favor of

8    competition.  Nor is there a federal scheme for uniform minimum prices for air travel, as there

9    was for milk in *Carlin*.

10        And as the district court in *Carlin* explained (after remand), while the Ninth Circuit found

11   that the filed rate doctrine applies generally to minimum prices for milk and milk products set by

12   the USDA, it also held: "that where, as in this action, the USDA later repudiates the minimum

13   price determination because excludable pricing inputs were wrongly submitted by dairy product

14   producers, the filed rate doctrine does not bar state law claims as are alleged in this action."

15   *Carlin v. Dairy America, Inc.*, No. 1:09-CV-00430-AWI-DLB, 2013 U.S. Dist. LEXIS 149086,

16   *6 (E.D. Cal. Oct. 11, 2013)

17        Finally, DOT orders and adjudications demonstrate that it does not regulate pricing in a

18   manner consistent with a finding that market-based rates are subject to the filed rate doctrine.

19   Indeed, its public statements demonstrate the opposite: it believes *private* enforcement of the

20   antitrust laws is a necessary ingredient to its regulatory scheme.  For example, in DOT Order

21   2008-7-4 regarding Flex-Fares and Inclusive Tours, IATA asked DOT to extend antitrust

22   immunity to a "Flex-Fares system."  RJN, Ex. 16.  As discussed, in 2007, DOT refused to

23   continue providing participants in IATA tariff coordinating conferences with antitrust immunity.

24   *Id.* ("Our final order disapproving IATA's Provisions addressed IATA's longstanding tariff

25   conference procedure, which provide for airline discussions and agreements on interlineable fares

26   . . . .").  The proposed Flex-Fare systems, in contrast to IATA tariff conferences, was a computer-

27   driven process that involved no direct competitor contact.  *Id.*  While arguing that the system was

28   "competitively benign", IATA nevertheless sought statutory antitrust immunity under DOT's

1    procedures.  In rejecting the request, DOT stated that immunity was not "warranted **in order to**

2    **remove the specter of private antitrust suits**."  *Id.* (emphasis added).  DOT reasoned that "if the

3    new system is indeed competitively benign there is no reason it should not be able to operate **fully**

4    **subject to U.S. antitrust laws**."  *Id.* (emphasis added).

5         Here, these statements are fatal to Defendants' entire filed rate argument.  At the very

6    least, the statements are fatal to Defendants' argument regarding unfiled, market-based rates

7    because it is clear DOT believes those rates should be subject to the antitrust laws – *i.e.,* that they

8    are not exempt merely because they are made in an industry that is minimally regulated by a

9    federal agency.  Defendants' unfiled, market based rates should not receive protection from the

10   antitrust laws by this Court.[17]

11   **E.    Even if This Court Finds that DOT is Required to Engage in Regulatory**
12   **Review of Pricing, it Has Effectively Abdicated that Authority**

13        As this Court noted in its dismissal order, "[t]he [filed rate] doctrine does not apply where

14   an agency has 'effectively abdicated its rate-making authority . . . .'" *Transpacific*, 2011 U.S.

15   Dist. LEXIS 49853 at *37.  Defendants concede as much in their briefs.  For the filed rate

16   doctrine to apply, Congress must have given the federal agency authority to set rates *and* the

17   agency must exercise that authority.  *Gallo*, 503 F.3d at 1035.

18   **1.    DOT Has Effectively Abdicated Its Authority Over All International**
19   **Fares**

20        DOT has effectively abdicated any purported duty to regulate pricing for international air

21   travel and does not exercise its purported authority, even for Category C markets.  Since

22   deregulation, it is indisputable that DOT has not used tariff filings for rate regulation.  Instead,

23   DOT's fare-filing requirement exists as negotiating leverage to force more competitive

24   agreements in markets "where pricing initiatives have been frustrated in recent years and/or

---

25   [17] As discussed elsewhere, in 1988 DOT announced that it would no longer prosecute airlines that
26   charged rates different than their filed rate.  53 Fed. Reg. 41353.  Previously, deviation from the
     filed rate was considered illegal and subject to enforcement action.  *See* 49 U.S.C. § 41510.  In
27   making this announcement, DOT "announced that it did not intend to enforce its tariffs."  Levine
     Decl. ¶ 24.  If this is the case for tariffs that are filed with DOT, market based rates cannot qualify
28   for filed rate protection.

1  where the U.S. has other serious bilateral problems and/or very restrictive agreements."  RJN, Ex.

2  24, 62 Fed. Reg. 10758, 10760 (Mar. 10, 1997); *see also* Levine Decl. ¶ 2(d) 6, 23, 25, 33, 37, 40,

3  43 (limited, remaining fare filing rules do not exist for purpose of pricing regulation).

4          On several occasions, DOT has made clear that it has effectively abdicated its rate-making

5  authority even in those limited circumstances when air transportation companies must file their

6  rates.  For example, in November of 2012, DOT explained:

7  > [I]n the 34 years since the passage of the Airline Deregulation Act, the
> Department has declined to use this authority [49 U.S.C. § 41509 authority to
8  > cancel a rule that is unreasonable after notice and a hearing] to strike down fare
> rules in foreign air transportation, but instead has applied the pro-competitive
9  > policies cited above for domestic air fares to fares *and rules in foreign air
> transportation.*
10

11  RJN, Ex. 15, Petition for Rulemaking and Third-Party Complaint of Donald L. Pevsner, Esq.,

12  DOT Order 2012-11-4, 2012 DOT Av. LEXIS 462, *12 (Nov. 6, 2012) (emphasis added;

13  bracketed material added).[18]  DOT has also stated that "[c]arriers' ability to set prices *should also*

14  *be unrestricted to create maximum incentives for cost efficiencies and to provide consumers with*

15  *the benefits of price competition and lower fares*."  RJN, Ex. 22, 60 Fed. Reg. 21841, 21844

16  (emphasis added).

17          Moreover, Plaintiffs have offered expert testimony from Michael Levine, a former CAB

18  official and longtime airline executive, who discusses in detail DOT's abdication of any

19  purported rate-making authority.  *See generally*, Levine Decl. ¶¶ 2-48.  He states that post-

20  deregulation "DOT was not engaged in regulation of fare levels." *Id.* ¶ 40.  Frank Avent, another

21  expert on actions taken by DOT, testified that he reviews and monitors a comprehensive database

22  

23    [18]  DOT can and does vigorously regulate false and misleading advertising in *both* the domestic
and international aviation markets.  Defendants concede that domestic air travel has been

24  completely deregulated despite DOT's continued enforcement against false advertising and that
the filed rate doctrine would be inappropriate in that industry.  *See* Def. Mem. of Law at 3, fn 5;

25  *see also* ANZ Mem. of Law at 6 (suggesting that the filed rate doctrine should apply because
DOT regulates false advertising but failing to recognize that it also does so in the domestic

26  industry).  In any event, the regulation of truthful advertising is distinct from regulating the actual
level of fares.  DOT does not take a position on the level of the fare, only whether that level has

27  been fairly communicated to consumers.  It would be illogical to apply the filed rate doctrine to
preclude an antitrust action, which is not predicated on false advertising, but on collusive activity

28  that artificially raises the prices of fares.  DOT's regulation of false and misleading advertising is
therefore irrelevant.

1    on DOT actions and has not found (a) any DOT action to suspend, reject, or modify, international

2    airfares or surcharges filed by carriers on the basis of their reasonableness; (b) any DOT

3    examination of international airfares or surcharges filed by an individual carrier to determine their

4    reasonableness; (c) any complaint or similar action where a consumer has been able to challenge

5    the reasonableness of international airfares or surcharges filed by a carrier or carriers on the basis

6    of price-fixing; (d) any case in which DOT has awarded, or even contemplated, compensation to

7    consumers for price-fixing; and (e) any action by DOT to determine whether international fares

8    are just and reasonable.  Avent Decl. ¶¶ 2-4.

9         This expert testimony is supported by Defendants' own answers to discovery.  *Not a*

10   *single Defendant* could identify any fare that was disapproved by DOT based on its pricing level

11   or its justness or reasonableness.  *See* Williams Decl. ¶¶ 10-17, Exs. 9-16; Schwartz Decl. ¶¶ 18,

12   24 ("I have not seen any fares of Defendants that were disapproved by DOT.").[19]  All of this

13   evidence points in one direction: DOT has abdicated whatever purported authority it had with

14   respect to pricing international fares and/or surcharges.

15            **2.     Even if DOT Has the Authority to Regulate the Level of Fuel**
                       **Surcharges, Which it Does Not, It Effectively Abdicated its Authority**
16

17        Defendants were not required to file fuel surcharges as general rules tariffs and this is

18   sufficient standing alone to deny Defendants' motions.  Nonetheless, even if Defendants were

19   required to file fuel surcharges (which they were not) and even if DOT had a mechanism by

20   which it could regulate the pricing level of the fuel surcharge (which it does not), DOT effectively

21   abdicated its authority over fuel surcharges.

22        In November of 2004, DOT announced that it abdicated whatever purported authority it

23   had over fuel surcharges.  *See* RJN, Ex. 22, 69 Fed. Reg. 65676, 65677 (Nov. 15, 2004).  DOT

24

25   [19] Some Defendants identified surcharges that were disapproved but not because of their justness
     or reasonableness.  For example, a proposed security surcharge was disapproved by DOT because
26   the statutory scheme expressly did not permit the imposition of a security surcharge.  Williams
     Decl. ¶ 10-17, Exs. 9-16 (Defendants' discovery responses regarding awareness of DOT
27   disapprovals).  Moreover, certain Defendants had fuel surcharges rejected because they were
     submitted before October 2004, prior to the time that DOT permitted fuel surcharges at all.  *Id.*;
28   Schwartz Decl. ¶ 18.

1   explained that its decision to de-couple fare and fuel surcharge filings effectively meant that there

2   would be no DOT oversight of fuel surcharges in any market – even for Category C and B

3   markets.  *Id.* at *65677.  Indeed, the notice states that the "the desire of carriers to pass on the

4   higher costs of certain expenses discretely, such as insurance and fuel, has led to such expenses

5   being filed separately from the 'base' fare in tariffs, ***a situation that the Department cannot***

6   ***effectively monitor.***" *Id.* *65677 (emphasis added).

7          But DOT's nonexistent regulatory authority in this area or effective abdication goes even

8   further: the notice informs carriers that it would be false and misleading to imply that such fuel

9   surcharges were "government approved."  *Id.*  ("In view of these developments, the Enforcement

10  Office will no longer allow the separate listing of 'government-approved' surcharges in fare

11  advertising.  We will consider the separate listing of such charges in fare advertisements an unfair

12  and deceptive trade practice . . . .").  It would be false and misleading precisely because DOT

13  does not actually regulate the level of carriers' fuel surcharges and does not substantively

14  "approve" such surcharges.  There can be no clearer evidence of DOT's effective abdication on

15  fuel surcharges.

16         Moreover, when the DOT issued the Gretch Letter in October 2004, permitting but not

17  requiring fuel surcharges to be filed, it premised the change in policy on the fact that the base

18  fares were no longer regulated as actively as they had been in the past, thereby eviscerating the

19  original rationale for requiring comprehensive filings.  RJN, Ex. 5.  Finally, Defendants

20  themselves have been utterly unable to identify any fuel surcharge that was rejected based on its

21  pricing level.  Williams Decl. ¶¶ 10-17, Exs. 9-16.  Defendants' collusive fuel surcharges are not

22  entitled to filed rate protection.

23         **F.      Adjudication in a Court of Law Is Appropriate Where the Federal Agency
                     Lacks Authority to Craft a Remedy to an Antitrust Violation**
24

25         Courts have often held that preemption does not apply where the federal agency lacks the

26  authority to adjudicate the antitrust violation – in this case, a price-fixing claim.  In these

27  instances, the case is properly heard before the courts.

28

1     *Aloha Airlines* is again instructive.  There, the court considered whether the FAA

2     preempted private antitrust lawsuits.  489 F.2d at 204-5.  Defendant argued that it did, based on

3     the CAB's authority to investigate "unfair or deceptive practices or unfair methods of competition

4     in air transportation or the sale thereof. . . ."  *Id.*  In rejecting this argument, the Ninth Circuit

5     reasoned the CAB could not award damages; it could only issue a cease and desist order.  *Id.* at

6     208.  The court explained that only those matters "normally thought of as antitrust problems" that

7     are "*expressly entrusted to the CAB are withdrawn from consideration by the Courts.*" *Id.* at 206

8     (emphasis added).  Congress has not expressly entrusted DOT with the authority to adjudicate

9     price-fixing claims post-*Aloha Airlines*.  They are, therefore, appropriately before this Court.

10    In another case involving the CAB, the court also held that its maintenance of an antitrust

11    suit did not conflict with the CAB's remedial authority because the CAB had power to immunize

12    the conduct from operation of the antitrust laws.  *International Travel Arrangers, Inc. v. Western*

13    *Air Lines, Inc.*, 408 F. Supp. 431, 434 (D. Minn. 1975), *aff'd*, 623 F.2d 1255 (8th Cir. 1980).  The

14    court explained that the "effect of concluding that the CAB has exclusive jurisdiction over the

15    case at bar would be to deny the plaintiff a right to compensation for these alleged acts of unfair

16    competition.  The issuance of a cease and desist order will not compensate plaintiff for any injury

17    which it might have suffered by reasons of Western's alleged conduct . . . ."  *Id.* at 1259.

18    District courts in other circuits have likewise found judicial consideration to be

19    appropriate in cases involving other federal agencies.  *See, e.g., Transkentucky Transp. R. v.*

20    *Louisville & Nashville R. Co.*, 581 F. Supp. 759, 767 (E.D. Ky. 1983) (the Interstate Commerce

21    Commission considers antitrust principles in determining the reasonableness of rates but lacks

22    authority to enforce the antitrust laws or even to determine if they have been violated); *Ocean*

23    *Shipping,* 500 F. Supp. at 1239–41 (rate-making agreements not approved by the Federal

24    Maritime Commission are subject to antitrust laws); *United States v. American Tel. & Tel. Co.*,

25    461 F. Supp. 1314, 1321 (D.D.C. 1978) (if the court lacks jurisdiction, it could only be because

26    defendants enjoy an immunity by implication, resulting from an incompatibility between the

27    antitrust laws and the statutes which regulate the industry). Courts may therefore adjudicate

28    antitrust issues where federal agencies lack the express authority to do so.

1    Courts also recognize that cases are appropriately decided in courts of law and not federal

2  agencies where the regulatory structure fails to provide complete or adequate remedies.  In

3  *Marnell v. United Parcel Service of Am., Inc.*, the plaintiff alleged that defendants destroyed

4  competition by monopolizing the retail parcel delivery market.  260 F. Supp. 391, 397 (N.D. Cal.

5  1966).  Defendants argued that they were exempt from antitrust laws because the ICC governed

6  their rates. *Id.* at 398.  The court found that even a decision that such rates were just, reasonable

7  and not unduly discriminatory by the ICC would be neither useful nor determinative of the

8  monopoly claim (*i.e.*, whether those rates have been used to monopolize a market).  *Id.* at 414.

9  The court denied defendants' motion for a stay, stating the ICC was not empowered to deal with

10  the "essential ingredients" of the antitrust monopolization conduct alleged against competitors. *Id.*

11  at 404 (finding that the FAA did not remove the right of litigants to obtain damages for antitrust

12  violations).

13    Here too, DOT does not adjudicate private price-fixing conspiracy claims – one of the

14  reasons this area of antitrust law continues to be entrusted to the courts in the international airline

15  industry.  *See Pan American World Airways, Inc.,* 371 U.S. 296 (finding price-fixing claims

16  subject to litigation in federal courts, not the CAB).  While Defendants have argued that DOT has

17  the power to suspend or revoke a filed fare, that remedial authority is of little help to consumers

18  years after paying the supra-competitive fare.  Significantly, DOT is not empowered to award a

19  rebate or damages to consumers, which is the very point of the antitrust laws.  Indeed, it is poorly

20  situated for doing so: it would have to determine the "but for" price of a collusively fixed fare

21  through an econometric analysis.

22    Given its lack of regulatory authority and capacity, it is no surprise that a review of the

23  Airline Information Research ("AIR")'s comprehensive database on regulatory activity by the

24  DOT reveals an absence of (1) any complaint or similar action where a consumer has been able to

25  challenge the justness or reasonableness of international airfares or surcharges filed by a carrier or

26  carriers on the basis of price-fixing, and (2) any case in which the DOT has awarded, or even

27  contemplated, compensation to consumers for price-fixing.  *See* Avent Dec., ¶ 2-4.  Additionally,

28  DOT has issued orders that expressly state international air carriers are subject to private antitrust

1    suits and are subject to U.S. antitrust laws.  There is no evidence before the Court that DOT

2    would engage in such a review.  To the contrary, the record evidence before this Court is that (1)

3    DOT has never examined rates for their reasonableness, (2) there is no evidence that a consumer

4    has ever challenged the reasonableness of a rate or surcharge based on price-fixing, (3) DOT has

5    never taken action to award compensation to victims of price-fixing, and (4) there is no DOT

6    procedure in place to permit consumers to receive a refund or rebate for supra-competitive prices

7    paid for air travel.  All of these factors militate against Defendants' arguments.[20]

8         **G.    Defendants Have Failed to Meet Their Summary Judgment Burden**

9         As the moving parties to these motions for summary judgment, Defendants bear the

10   burden of proof.  *Blue Growth Holdings, Ltd. v. Mainstreet Ltd. Ventures, LLC*, No. CV 13-1452

11   CRB, 2013 U.S. Dist. LEXIS 126352, *2-3 (N.D. Cal. Sept. 4, 2013).  This Court previously

12   denied Defendants' motions to dismiss based on the filed rate doctrine and provided a roadmap to

13   Defendants for any renewed motion at summary judgment.  *See Transpacific*, 2011 U.S. Dist.

14   LEXIS 49853 at *13.  The Court held that "[s]everal factual matters that would guide the Court in

15   assessing Defendants' arguments are currently undeveloped.  For example, it is not clear which

16   rates at issue in this case were actually filed and which were not.  Nor is it clear whether the DOT

17   believes that its market-based rates are covered by the filed rate doctrine."  *Id.*

18        Defendants have indeed renewed the motion, but have failed to provide the more fulsome

19   record requested by this Court.  *See, e.g.,* Williams Decl. ¶ 2, Ex. 1, Hearing Tr. Dated Nov. 1,

20   2010, 45: 6-8 ("Well, why don't we ask the Department of Transportation what their view is?");

21   48: 13-23 ("If the Department of Transportation said that they don't believe that market-based

22   rates . . . are covered by the filed-rate doctrine, wouldn't that be some evidence of abrogation of

23   their authority in this field . . . . . wouldn't that be some indication of whether or not they have

24   actually abrogated their responsibility?"); 63:12-13 ("[W]hat is the Department of Transportation

25   ───────────────

26   [20] Defendants' argue that DOT's authority to prohibit unfair competition in the airline industry requires a
     finding that the filed rate doctrine applies.  *See* Def. Mem. at 3; *see also* 49 U.S.C. § 41310.  A close
     reading of that section, however, reveals that it does not provide relief to *consumers* or other purchasers of

27   airline services.  Rather, this provision merely permits the Secretary of Transportation to take action if
     there "is an unjustifiable or unreasonable discriminatory, predatory, or anticompetitive practice *against an*

28   *air carrier* . . . ."  49 U.S.C. § 41310(c)(1)(A) (emphasis added).

1  doing?").  *None of the Defendants* provided any evidence from DOT or testimony from its

2  officials regarding the reach of its regulatory oversight in the international airline industry.  This

3  is enough to deny Defendants' motions alone.

4  In fact, *Defendants did not even attempt to obtain such evidence or testimony*.  Under the

5  DOT's framework, private parties must go through a regulatory process to obtain a declaration or

6  testimony from a federal official.  *See* 5 U.S.C. §301; 49 CFR § 9.15.  The process is known as a

7  "*Touhy* request", as per the Supreme Court's holding in *United States ex rel. Touhy v. Ragen,*

8  340 U.S. 462 (1951).  Plaintiffs submitted a Freedom of Information Act ("FOIA") Request to

9  DOT to determine whether DOT received any request from Defendants or their attorneys to give

10  such testimony.  DOT informed Plaintiffs that neither Defendants nor their attorneys solicited its

11  view on the regulatory reach over international fare pricing and whether DOT actually exercises

12  such authority.  Tran Decl. ¶¶ 3-6, Exs. 1-2.  Based on this evidence, the Court can infer that

13  Defendants would not have liked DOT's answer.  Defendants' evidentiary showing (or lack

14  thereof) contrasts sharply with the expert testimony submitted by Plaintiffs.  *See generally* Levine

15  Decl.; Avent Decl.  Defendants have failed to meet their evidentiary burden, as articulated by this

16  Court in its order on the motions to dismiss.

17  **H.  Defendants' Fare Filings With Foreign Regulators Does Not Give Rise To A**
18  **Filed Rate Defense**

19  Defendants seek to extend the filed rate doctrine far beyond the case law by arguing that

20  United States courts are without power to adjudicate antitrust claims if businesses submit rates to

21  a foreign regulator.  Defendants fail to cite any authority supporting this unwarranted and

22  dangerous expansion of the filed rate doctrine.

23  No court in the United States has ever accepted Defendants' argument, and for good

24  reason.  The filed rate doctrine is related to federal preemption, which is based on the

25  Constitution's supremacy clause.  *See Medco Energi US L.L.C. v. Sea Robin Pipeline Co., L.L.C.*,

26  895 F.Supp.2d 794, 795 (W.D. La. 2012).  The doctrine is also based on separation of powers

27  principles, with courts applying it out of deference to a congressional scheme of uniform

28  regulation to avoid usurping a function entrusted to a regulatory body.  *Nantahala Power & Light*

1    *Co. v. Thornburg,* 476 U.S. 953, 964 (1986) ("the doctrine is ... designed to ensure that federal

2    courts respect the decisions of federal administrative agencies'"); *County of Stanislaus v. Pacific*

3    *Gas & Elec. Co.*, 114 F.3d 858, 862-63 (9th Cir. 1998).

4    The policy reasons that animate the filed rate doctrine, therefore, do not exist for filings

5    made before a foreign country, and no authority exists to support the application of such broad

6    antitrust immunity.  None of the authorities Defendants cite involve application of the filed rate

7    doctrine to a foreign law.  There is simply no legal basis for the vast expansion of the filed rate

8    doctrine proposed by Defendants.

9    To the limited extent that the doctrine has been applied to the actions of state regulators,

10   this extension is based upon constitutional principles of federalism.  There is no justification to

11   extend this doctrine to actions of foreign governments when the filed rate doctrine is applied to

12   bar damage claims in deference to co-equal branches of government.

13   Agreements between the United States and Japan also support the view that new

14   expansions of antitrust immunities are not appropriate.  The Memorandum of Understanding

15   Between the United States and Japan (March 14, 1998) provides:

16   > *Nothing in this 1998 MOU shall be construed to limit the rights of either Party to*
     > *enforce its domestic competition laws* and other laws and regulations on such

17   > issues as safety, security and environment against any airline operating services
     > under this 1998 MOU or any of the prior agreements following an appropriate

18   > proceeding, so long as such laws and regulations do not discriminate on the basis
     > of nationality or any other improper or inappropriate basis.

19

20   RJN, Ex. 11; *see also*, http://www.state.gov/e/eb/rls/othr/ata/j/ja/114175.htm (emphasis added).

21   The Supreme Court and the Ninth Circuit have cautioned against new extensions of the

22   filed rate doctrine.  *See Square D,* 476 U.S. at 421 ("exemptions from the antitrust laws are

23   strictly construed and strongly disfavored."); *Cost Management Services. Inc.,* 99 F.3d at 945 (9th

24   Cir. 1996) (declining to extend application of filed rate doctrine and noting "[t]he fact that *Square*

25   *D's* endorsement of *Keogh* was only lukewarm is of particular importance here, because WJG is

26   essentially asking us to extend *Keogh*").

27

28

1   Accordingly, Defendants' invitation to extend this doctrine to the actions of foreign

2 regulators should be declined and this Court should not become the first court in the United States

3 to accept this theory.

4  **I.**  **Joint and Several Antitrust Liability Precludes Granting Summary Judgment**

5   As the Ninth Circuit has instructed, in order to obtain summary judgment based upon the

6 filed rate doctrine, Defendants must demonstrate that <u>all</u> damage claims are barred.  *Gallo*, 503

7 F.3d at 1049 ("As we have explained, to prevail on its summary judgment motion that Gallo's

8 [plaintiff] damage claims were barred by the Filed Rate Doctrine as a matter of law, EnCana

9 [defendant] would have had to establish that all transactions in the indices were transactions

10 under FERC jurisdiction.").  Here, Defendants have not met their burden because there are

11 damage claims based upon fares that are simply not subject to DOT jurisdiction.  This precludes

12 summary judgment as a matter of law.

13   Moreover, as a foundational matter, the Court does not need to make determinations about

14 each Defendants' motion for summary judgment because each motion fails to demonstrate that

15 the filed rate doctrine precludes liability for all of its co-conspirators' fares.  The gravamen of

16 Plaintiffs' case is that Defendants and others entered into a conspiracy to fix-prices.  "It is well-

17 established that once a defendant joins a conspiracy, it is jointly and severally liable for any

18 actions taken in furtherance of the conspiracy", including damages for its co-conspirators'

19 conduct.  *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 820 F.Supp.2d 1055, 1059 (N.D. Cal.

20 2011) (citations omitted).  As long as a Defendant participated in the conspiracy, then it is jointly

21 and severally liable for the entire overcharge.  *See Paper Systems, Inc. v. Nippon Paper Industries*

22 *Co., Ltd.*, 281 F.3d 629, 634 (7th Cir. 2002) (finding that if defendant participated in a cartel to

23 reduce output and raise prices, then defendant is jointly and severally liable for the cartel's entire

24 overcharge, even if plaintiffs did not buy from the defendant, directly or at all); *Choiceparts, LLC*

25 *v. GMC*, 2005 U.S. Dist. LEXIS 6272 (N.D. Ill. Mar. 30, 2005) (court stated that a reason it

26 denied summary judgment to defendant was because defendant could be jointly and severally

27 liable for being part of a conspiracy to withhold automotive parts data).

28

1   Even if Defendants' arguments about their own fares are true, which Plaintiffs dispute,

2   Defendants are not relieved of liability since they have not demonstrated that there are no facts in

3   dispute about each of their co-conspirators' fares.  Thus, the failure of the motions to address

4   Defendants' liability for their co-conspirators acts is fatal to their motions for summary judgment.

5   Fed. R. Civ. Proc. 56(a) (moving party must show that "there is no genuine issue as to any

6   material fact and the movant is entitled to judgment as a matter of law.").

7   **J.      The Filed Rate Doctrine Does Not Apply to Plaintiffs' Claim for Injunctive**

8            **Relief**

9   Even when it applies, the filed rate doctrine does not inoculate a defendant from all

10  liability.  *Square D,* 476 U.S. at 419, n. 28.  Rather, while the doctrine limits the availability of

11  damages, it does not limit the availability of declaratory and injunctive relief.  *Georgia v.*

12  *Pennsylvania R.R.*, 324 U.S. 439, 462 (1945) (plaintiff could bring antitrust action to enjoin

13  alleged "coercive and collusive influences" in federal rate-making); *In re NOS Communications,*

14  495 F.3d 1052, 1060 (9th Cir. 2007) ("injunctive relief or consequential damages flowing from

15  lost profits might be assessed without" implicating the filed rate doctrine); *Arsberry v. Illinois,*

16  244 F.3d 558, 562-63 (7th Cir. 2001) (claim for injunctive relief "does not seek to invalidate any

17  tariff, but merely to create an environment in which the regulated firm is more likely to file a

18  tariff that contains terms more favorable to customers"); *Marcus v. AT&T Corp.,* 138 F.3d 46, 62

19  (2d Cir. 1998) (holding that "a suit for injunctive relief appears not to interfere with the

20  nondiscrimination policy underlying the filed-rate doctrine"); *Daleure v. Commonwealth of*

21  *Kentucky,* 119 F. Supp. 2d 683, 690 (W.D. Ky. 2000) (recognizing that filed rate doctrine "does

22  not bar injunctive relief from the underlying conspiracy" in antitrust case).  At a minimum,

23  therefore, the Court must reject Defendants' request for summary judgment based on the filed rate

24  doctrine to the extent Plaintiffs seek declaratory and injunctive relief.

25  **K.      Unpublished Discount Fares Are Not Subject to Filed Rate Protection**

26  ANA makes a separate argument that certain discount fares are entitled to filed rate

27  protection.  *See* ANA Mem. 18-21.  As alleged in the Complaint and not disputed on this motion,

28  ANA conspired with JAL on "unpublished fares" – or what ANA refers to as "net fares."  *See*

1   ANA Mem. of Law.  "Unpublished fares" included *Satogaeri*, *Yobiyose* and business class

2   discount fares.  *See* Ono Dep. 37:6-18, 56:3-16, 116:4-12; Fukuda Dep. 37:19-42:15; *see also*

3   Schwartz Decl. ¶ 28.  ANA deponents have confirmed that "unpublished fares" are not filed with

4   DOT.  *Id.*   Instead, they are distributed through a separate ATPCO system to participating travel

5   agents and other entities.  *Id.*  These fares are discount fares with separate rules and restrictions

6   from ANA's normal, Y-economy class fares.  Fukuda Dep. 71:24-77:4, 83:18-84-12; Schwartz

7   Decl. ¶¶ 28-39 (describing fare and fare rule differences between ANA discounted fares and its

8   filed fares).   As noted above, ANA pleaded guilty to engaging in at least a 4-year conspiracy

9   with JAL to fix the prices on these "unpublished fares."  RJN, Ex. 2.

10       **It is thus undisputed, both by ANA's oral testimony at depositions, and in its brief to this**

11   **Court that it did not file these fares.**  Ono Dep. 37:6-18, 56:3-16, 116:4-12; Fukuda Dep. 37:19-

12   42:15; *see also,* Schwartz Decl. ¶ 14.  Thus, as explained above, the filed rate doctrine cannot

13   apply.  ANA seeks to invoke the filed rate doctrine for these unfiled, discounted fares because *it*

14   *did* file its normal, Y-economy class fares.  Putting aside the fact that the fare levels were entirely

15   different, ANA is not entitled to filed rate protection for these unfiled fares.

16       1.      **Discount Fares, including *Satogaeri*, *Yobiyose* and Business Discount**
              **Are not "Fares" Actually Filed by ANA**

17

18       As noted above, ANA's discount fares are not actually filed with DOT.  Ono Dep. 37:6-

19   18, 56:3-16, 116:4-12; Fukuda Dep. 37:19-42:15.  Instead, ANA argues that those fares should be

20   protected by the filed rate doctrine based on its filing of normal economy class fares, which are

21   much higher than the discounted fares for which it also claims field rate protection.  ANA Mem.

22   of Law at 18-23.  ANA cites several cases purporting to hold that filed rate protection applies

23   even where a defendant charges a rate less than the actual, filed rate.  *See id*.  ANA's reliance on

24   these cases is misplaced and its argument should be rejected.

25       First, ANA concedes that the rates it *did* file with DOT are not at the same fare levels as

26   its, net, discount fares.  *See id*.  This should be enough to defeat application of the filed rate

27   doctrine by itself.  In addition, it is undisputed that these discounted fares are not the same

28   product as an unrestricted economy class fare.  In addition to the facial difference in price, it is

1   undisputed that these unpublished, unfiled fares have highly restrictive fare rules associated with

2   them that do not exist for ANA's normal, Y-economy class fares (*i.e.,* its filed fares).  For

3   example, with respect to the normal Y-economy class fares that ANA says it files, they are

4   unrestricted in that they are: (a) fully refundable, (b) re-routable, and (c) do not have time limits

5   for the return flight or provide wide latitude to the customer to decide when to return, among

6   other rules.[21]  Fukuda Dep. 71:24-77:4, 83:18-84:12.  ANA's discount fares, on the other hand,

7   are highly restrictive.  These fares are generally: (a) not refundable, or only refundable after

8   incurring a large fee, (b) non re-routable, and (c) have strict time limits as to when the return leg

9   of the flight must occur, among other restrictions like advance purchase requirements.  *Id.*  Expert

10  testimony and a review of all of ANA's fare basis codes reveals that the discount fares are very

11  different from their regular economy class fares.  *See, e.g.,* Schwartz Decl. ¶¶ 29-30, 36-37

12  (describing difference in fare and fare rules between public M-Class fares and private Satogaeri

13  discount fares); *id.* ¶¶ 31-32 (describing difference in fare and fare rules between public B Class

14  fares and private Satogaeri discount fares); *id* ¶¶ 33-34 (describing difference in fare and fare

15  rules between public business class fares and private "Business Discount" fares); *id* ¶¶ 38-39

16  (describing difference in fare and fare rules between public business class and private "Business

17  Value" discount fare).  Moreover, ANA deponents have testified that the fare rules are highly

18  relevant to pricing – the less restricted, the higher the fare.  Fukuda Dep. 73:6-15; Deposition of

19  Yohei Ishida ("Ishida Dep.") 121: 1-21.  It is clear, therefore, that the price difference in these

20  discount fares is not due to a simple discount from the filed rate, but rather is due to the fact that

21  several restrictions are associated with the discounted fares such that they are an entirely different

22  product.

23      This is why ANA's reliance on *AT&T Corp. v. Central Office Tel., Inc.*, 524 U.S. 214

24  (1998) and *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 126 (1990) is

25  misplaced.  In those cases, the business seeking filed rate protection merely discounted the actual

26  filed rate.  They did not, however, seek filed rate protection for an entirely separate product that

27

28  [21] Tetsuo Fukuda testified that for the unrestricted Y-class economy fare – the fare that ANA filed – customers had a year to return home from the first leg of the flight.  Fukuda Dep. at 76:11-15.

1   had not been filed.  *See, e.g., Williams v. Duke Energy International, Inc.*, 681 F.3d 788, 797-798

2   (6th Cir. 2012) (rejecting filed rate defense for rates that were never filed and were discounted

3   from the filed rates).  ANA's argument would permit an air carrier to merely file its highest first

4   class fare and claim that it protects any fare below that, even fares in business or economy class.

5   This situation would exist despite the fact that first class fares are very different from economy

6   class fares in terms of quality, service and other variables.  A first class fare is clearly a different

7   product from ANA's economy class fares, just as its discounted fares – with their associated

8   restrictions – are very different products than ANA's unrestricted, economy class fares.  ANA

9   cannot claim filed rate protection for these unfiled, discount fares based merely on the filing of an

10   entirely different product.  Despite ANA's contention, there is no "filed rate doctrine by

11   association."

12        Finally, DOT has made clear that it does not regulate "unpublished fares."  DOT has a

13   stated policy of "non-intervention" with respect to the sales of these "unpublished" fares.  *See*

14   RJN, Ex. 21, DOT Statement Of Enforcement Policy On Rebating, Statement of Enforcement

15   Policy on Rebating, 53 Fed. Reg. at 41354 ("Since 1978, both the Department and its

16   predecessor, the Civil Aeronautics Board, have declined to prosecute alleged instances of

17   rebating"); Levine Decl. ¶ 24.  ANA's arguments should be rejected.

18       **L.**   **For Additional Reasons, ANA May Not Invoke The Filed Rate Defense In**
            **This Case**

19

20        **1.**   **ANA Is Judicially Estopped From Invoking The Filed Rate Defense**

21        ANA's Plea Agreement in *United States v. All Nippon Airways Co*., Ltd., D.D.C. Case

22   No. 10-cr-00295-JDB (D.D.C.) ("Plea") states that it "knowingly and voluntarily" waived

23   numerous rights.  RJN, Ex. 2.  The Plea further acknowledges that pursuant to "§§8B1.1 of the

24   United States Sentencing Guidelines . . . or 18 U.S.C. §3563(b)(2) or 3663(a)(3), the Court may

25   order it to pay restitution to the victims of the offense . . . ."  *Id.* at ¶6(b).  Further, the Plea states:

26   "In light of pending civil class action lawsuits filed against the defendant, which potentially

27   provide for a recovery of a multiple of actual damages, the United States agrees that it will not

28   seek a restitution order for the offenses charged in the Information."  *Id.* at ¶11.

1    As the Ninth Circuit explained, "judicial estoppel, 'generally prevents a party from

2    prevailing in one phase of a case on an argument and then relying on a contradictory argument to

3    prevail in another phase.'"  *Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d

4    983, 993 (9th Cir. 2012) (*"Greene"*) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749

5    (2001).  It is an equitable doctrine invoked "not only to prevent a party from gaining an advantage

6    by taking inconsistent positions, but also because of general considerations of the orderly

7    administration of justice and regard for the dignity of judicial proceedings, and to protect against

8    a litigant playing fast and loose with the courts."  *Hamilton v. State Farm Fire & Cas. Co.*, 270

9    F.3d 778, 782 (9th Cir. 2001) (quotations omitted).

10    Three factors determine whether the doctrine is applicable: (1) a party's later position must

11    be clearly inconsistent with its earlier position; (2) the party succeeded in persuading a court to

12    accept that party's earlier position, such that judicial acceptance of an inconsistent position in a

13    later proceeding would create the perception that either the first or the second court was misled;

14    and (3) the party seeking to assert an inconsistent position would derive an unfair advantage over

15    the opposing party if not estopped.  *Greene*, 692 F.3d at 995 (quoting *New Hampshire*, 532 U.S.

16    742, 750–51).  Additionally, "chicanery or knowing misrepresentation" by the party to be

17    estopped is a factor to be considered in the judicial estoppel analysis but is not an "inflexible

18    prerequisite" to its application.  *Id.*

19    Here, ANA pleaded guilty to price-fixing "unpublished" passenger fares.  As part of its

20    Plea, DOJ and ANA agreed that DOJ would not seek restitution through the criminal proceeding

21    "[i]n light of" this litigation.  Moreover, the agreement not to seek restitution persuaded The Hon.

22    John D. Bates of the United States District Court for the District of Columbia to state at the

23    sentencing hearing:

> Now, I have reviewed all the materials received and reviewed them closely.
> The first issue that I will address is restitution.
>
> I agree with the government and the defendant in this case and the
> circumstances of this case that in light of pending civil action, restitution
> should not be ordered here today against ANA after considering factors that
> are relevant under Section 3663 of Title 18 and particularly noting that there
> is a possible recovery of treble damages through that civil action.  I'm going to
> accept the agreed-upon sentence in this case as it is set out in the plea

1    agreement and therefore accept the plea with this sentence as agreed by the government and ANA.

2    *See* RJN, Ex. 4, (ANA Guilty Plea Hearing Tr.).

3        Accordingly, all three criteria for judicial estoppel are satisfied here.  ANA clearly sought

4    to defer the resolution of damages stemming from its misconduct to this litigation and

5    successfully persuaded Judge Bates to sentence ANA without an order of restitution.  As to the

6    third criteria, ANA would derive an unfair advantage in avoiding its obligations to its victims if it

7    is not estopped from invoking the filed rate defense.  For these further reasons, ANA's motion for

8    summary judgment should be denied.

9              **2.    ANA Has Waived The Right To Invoke The Filed Rate Defense**

10        ANA has waived the filed rate defense by pleading guilty to criminal charges of price-

11    fixing during the class period and not being ordered to provide restitution because of this case.[22]

12    "A waiver is an intentional relinquishment or abandonment of a known right or privilege."

13    *United States v. Amwest Surety Insurance Co.,* 54 F.3d 601, 602-603 (9th Cir. 1995) (citations

14    omitted).

15        ANA knowingly and voluntarily acknowledged that this litigation was the appropriate

16    vehicle for resolving the amount of ANA's financial exposure to the class as a result of its

17    wrongdoing.  In doing so, ANA relinquished its right to invoke a doctrine explicitly designed as a

18    limitation on the ability of Plaintiffs to recover damages.  ANA has waived the filed rate defense.

19              **3.    DOJ Has Sufficiently Expressed Its "Disapproval" Of ANA's**
             **Anticompetitive Conduct to Preclude the Filed Rate Defense**

20

21        In *Carlin*, the Ninth Circuit determined that the filed rate doctrine could not be invoked

22    where defendant manipulated pricing data, causing the Department of Agriculture to approve

23    milk prices at an improper level.  705 F.3d at 879.  After determining that the applicable

24    agricultural regulatory regime would ordinarily preempt an antitrust challenge (which, as

25    _____

26    [22]    ANA agreed to plead guilty to a violation of the Sherman Act for the period "from at least as early as April 1, 2000 until at least April 1, 2004."  According to ANA's Plea, "[d]uring the relevant period, the defendant, through its officers and employees, including high-level personnel of the defendant, participated in a conspiracy with another Japanese passenger airline [JAL, the amnesty applicant], the primary purpose of which was to suppress and eliminate competition by fixing unpublished passenger fares on tickets . . . ."  *Id.* at ¶ 4(b).

27

28

1   explained above, is not the case with respect to aviation), the court established a two-part test to

2   determine whether overarching policy considerations nevertheless precluded application of the

3   doctrine.  First, the court held that the regulator must adequately express "disapproval" of the

4   pricing structure at issue once it learned of the misconduct.  *Id.*  Second, the district court must

5   find that the purposes of the regulatory regime and the filed rate doctrine would not be furthered

6   by giving effect to the filed rate defense.  *Id.* at 880-83.

7           Here, it is undisputed that DOJ disapproved of ANA's agreements with JAL to fix the

8   prices of "unpublished passenger fares" by criminally charging ANA with participation in a price-

9   fixing conspiracy and imposing a $73 million criminal fine.  *See* RJN, Ex. 1 (Information filed in

10  *United States of America v. All Nippon Airways Co., Ltd.*, CR 10-0295-JDB (D. D.C.).  The

11  DOJ's criminal charge is a clear and explicit disapproval of ANA's conduct.  ANA is now an

12  antitrust felon.  Moreover, the purpose of the antitrust laws is to ensure free and unfettered

13  competition, a goal that Congress, DOT, and DOJ have clearly set for the air transportation

14  industry.  That purpose is furthered by enforcement of the antitrust laws.

15          Further, according to the Ninth Circuit, the underlying rationale of the filed rate doctrine

16  is "deference to agencies' greater expertise in rate-setting, preventing discrimination by ensuring

17  all ratepayers face the same price, and avoiding disruption of a Congressional scheme for uniform

18  price regulation."  *Carlin*, 705 F.3d  at 880.  None of these goals are furthered by application of

19  the filed rate doctrine in this case.

20          As set forth, the regulatory regime for international air transportation expressly anticipates

21  application of the antitrust laws.  The traditional principles underpinning the filed rate doctrine

22  arise out of regulatory regimes where prices are strictly controlled by a uniform tariffed rate.

23  That goal cannot be achieved in the context of ANA's "ethnic" discount fares because they are

24  "unpublished" fares that are not supervised or filed with DOT.

25          Indeed, DOT has a stated policy of "non-intervention" with respect to the sales of these

26  "unpublished" fares.  *See* RJN, Ex. 21, DOT Statement of Enforcement Policy On Rebating, 53

27  Fed. Reg. at 41354 ("Since 1978, both the Department and its predecessor, the Civil Aeronautics

28  Board, have declined to prosecute alleged instances of rebating").

1    In this case, the criminal court imposing the sentence on ANA was persuaded not to

2  impose a restitution order on ANA in favor of a damages recovery in this litigation.  For all of

3  these reasons, *Carlin*'s exception to the filed rate doctrine applies here and precludes ANA from

4  asserting it as an affirmative defense in this case.

5  **VII.    CONCLUSION**

6    For the reasons set forth above, Plaintiffs respectfully request that the Court deny

7  Defendants' motions for summary judgment in their entirety.

8

9  Dated:  March 10, 2014                        Respectfully submitted,

10                                           */s/ Steven N. Williams*
                                           Joseph W. Cotchett
11                                           Steven N. Williams
                                           Nancy L. Fineman
12                                           Adam J. Zapala
                                           Elizabeth Tran
13                                           COTCHETT, PITRE, McCARTHY, LLP
                                           Burlingame, CA 94010
14                                           Tel: (650) 697-6000
                                           Fax: (650) 697-0577
15

16  Dated:  March 10, 2014                        Respectfully submitted,

17                                           */s/ Christopher L. Lebsock*
                                           Michael P. Lehmann
18                                           Christopher L. Lebsock
                                           **HAUSFELD LLP**
19                                           44 Montgomery Street, Suite 3400
                                           San Francisco CA  94104
20                                           Tel: (415) 633-1903
                                           Fax: (415) 358-4980
21
                                           Michael D. Hausfeld
22                                           Seth R. Gassman
                                           **HAUSFELD LLP**
23                                           1700 K Street, N.W., Suite 650
                                           Washington, D.C. 20006
24                                           Tel: (202) 540-7200
                                           Fax: (202) 540-7201
25
                                           *Interim Co-Lead Counsel for Plaintiffs*
26

27

28