**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE TRANSPACIFIC PASSENGER AIR TRANSPORTATION ANTITRUST LITIGATION

This Document Relates to:
ALL ACTIONS

_____/

No. C 07-05634 CRB

**MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT**

The five remaining Defendants in this antitrust suit–Air New Zealand, All Nippon Airways ("ANA"), China Airlines, EVA Air, and Philippine Airlines–move for summary judgment on the basis of the filed rate doctrine, a defense to private antitrust suits, which provides that "to the extent Congress has given [an agency] authority to set rates . . . and [the agency] has exercised that authority, such rates are just and reasonable as a matter of law and cannot be collaterally challenged under federal antitrust law. . . ." See E. & J. Gallo Winery v. EnCana Corp., 503 F.3d 1027, 1035 (2007).  As explained below, the Court finds that Congress gave the Department of Transportation ("DOT") authority over all of the rates and charges at issue in this case, and that (1) the DOT exercised that authority over the rates that Defendants actually filed with the DOT (Class B and C air fares), but (2) the DOT did not exercise that authority over the rates that Defendants did not file with the DOT (Class A air

1    fares, fuel surcharges, and ANA special discount rates).  The filed rate doctrine therefore

2    applies, and bars treble damages, only as to the filed rates in this case.[1]

3    **I.    BACKGROUND**

4        Defendants are various airlines alleged to have agreed to fix, raise, maintain, and/or

5    stabilize air passenger travel, including associated surcharges, for international flights

6    between the United States and Asia/Oceania, in violation of section 1 of the Sherman

7    Antitrust Act, 15 U.S.C. § 1.  Plfs.' 2d Consolidated Amended Compl. ("Second CAC") (dkt.

8    741) ¶¶ 1-2.  Plaintiffs are a class of individuals who purchased from one or more of the

9    Defendants air transportation services that included at least one flight segment between the

10   United States and Asia/Oceania.  Id. ¶¶ 8-23.  The Second CAC alleges that, beginning no

11   later than January 1, 2000, Defendants and their co-conspirators agreed and began to impose

12   air fare increases, including fuel surcharge increases, that were in substantial lockstep both in

13   their timing and their amount.  See id. ¶ 74.

14       **A.    Procedural History**

15       In May 2011, the Court granted in part and denied in part Defendants' motions to

16   dismiss, reserving for summary judgment the question of whether the filed rate doctrine bars

17   Plaintiffs' claims.  Order Re Mot. to Dismiss (dkt. 467) at 13–14.  At the time, the Court

18   found that several factual matters were still unresolved, including which rates were actually

19   filed with the DOT, and whether the DOT believed that the air fares and surcharges were

20   covered by the filed rate doctrine.  Id. at 14; see also Opp'n (dkt. 885) at 4 (citing Tr. of Nov.

21   1, 2010 (dkt. 448) at 45).

22       Now before the Court are five individual motions for summary judgment, based solely

23   on the filed rate doctrine.[2]  See ANA Mot. (dkt. 724), China Airlines Mot. (dkt. 731), Air

24   New Zealand Mot. (dkt. 753), Philippine Airlines Mot. (dkt. 763), EVA Mot. (dkt. 792).

25   _____

26       [1] The filed rate doctrine does not bar Plaintiffs' claims for injunctive relief.  See Square D Co.

27   v. Niagra Frontier Tariff Bureau, Inc., 476 U.S. 409, 422 n.28 (1986).

28       [2] Several Defendants–Thai Airways (dkt. 830), Cathay Pacific (dkt. 919), Qantas Airways (dkt. 926) and Singapore Airlines (dkt. 927)–also filed motions for summary judgment, which they withdrew upon settlement.

*United States District Court*
*For the Northern District of California*

United States District Court
For the Northern District of California

Each individual motion lays out the regulatory facts specific to that Defendant.  All of the Defendants but ANA have also filed a Joint Memorandum, arguing that the filed rate doctrine bars all of Plaintiffs' claims for damages.  See Joint Memo. (dkt. 728).

The motions present an issue of first impression.  The Court must determine whether and how the filed rate doctrine, which has traditionally applied to utilities such as telecommunications and gas and power companies, applies to a "deregulated" international airline industry.[3]  Because the filed rate doctrine is a preemption doctrine that requires the Court to defer to congressional intent and agency expertise, the Court must examine whether Congress intended for the filed rate doctrine to apply to air fares and surcharges, and whether the DOT actually authorized the rates and surcharges at issue here.[4]

**B.    Legislative and Regulatory Background**

In 1958, Congress enacted the Federal Aviation Act ("FAA") to require every airline to establish and maintain "reasonable prices, classifications, rules, and practices related to foreign air transportation."  49 U.S.C. § 41501.  By definition, the word "price" includes any "fare or charge" for air transportation.  See 49 U.S.C. § 40102(a)(39).  The FAA tasked the DOT's predecessor agency, the CAB,[5] with "preventing unfair, deceptive, predatory or anticompetitive practices in air transportation."  See 49 U.S.C. §§ 40101(a)(9), 41310(e).  The FAA required every airline that engaged in foreign air transportation to file tariffs with the DOT in advance of their effective date.  49 U.S.C. § 41504(a) and (b).  It provided that the DOT could reject, and thus render void, a tariff that was not consistent with the statutory

---

[3] The Court is not persuaded that either Aloha Airlines, Inc. v. Hawaiian Airlines, Inc., 489 F.2d 203 (9th Cir. 1973) (which predates deregulation and involves a claim that Hawaiian Airlines had attempted to monopolize the inter-island air transportation system on the Hawaiian islands), or Pan American World Airways, Inc. v. United States, 371 U.S. 296 (1963) (which predates deregulation and involves a suit by the government alleging that Pan American had violated sections 1 and 2 of the Sherman Act by interfering with a competing airline's efforts to extend its flight routes in South America), answers these questions.

[4] As Plaintiffs point out, the Court does not have the benefit of a statement from the DOT about whether it understands the filed rate doctrine to apply in this case.  See Opp'n at 50 (citing Tran Decl. (dkt. 875) ¶¶ 3-6, Exs. 1-2).

[5] The CAB was abolished in January 1985 under the Civil Aeronautics Board Sunset Act of 1984 (98 Stat. 1703) and the Airline Deregulation Act of 1978 (92 Stat. 1744).  The Court will use "DOT" throughout this Order to avoid confusion.

3

United States District Court
For the Northern District of California

1  requirements or DOT regulations.  <u>See</u> 49 U.S.C. § 41504(c).  And it provided that the DOT

2  could conduct a hearing either on its own initiative or on a complaint to determine whether a

3  tariff was lawful.  <u>See</u> 49 U.S.C. § 41509(a).  The FAA also authorized the DOT to grant

4  antitrust immunity to certain airlines as "required by public interest," and in so doing, to

5  establish guidelines for the review of airline requests for immunity.  49 U.S.C. §§ 41308(b),

6  41309.  The DOT adopted extensive regulations to implement this congressional plan.

7  <u>See</u> 14 C.F.R. Part 221.

8       The parties differ dramatically in how they characterize the fifty years following the

9  enactment of the FAA.  Defendants assert that the DOT's regulatory regime "changed little

10  in more than 50 years," Joint Memo. at 3, while Plaintiffs counter that the regulatory scheme

11  has "undergone a massive change" that has fundamentally altered the DOT's oversight of the

12  airlines, Opp'n at 7.  Central to the parties' disagreement on this point is the impact of the

13  International Air Transportation Competition Act of 1979 ("IATCA").

14       The IATCA was one of a number of congressional acts passed in the 1970s and

15  1980s to increase competition and reduce federal regulation.  <u>See, e.g.</u>, <u>Square D v. Niagara</u>

16  <u>Frontier Tariff Bureau, Inc</u>, 760 F.2d 1347, 1355 (2d Cir. 1985).  The goal of the IATCA was

17  to "promote competition in international air transportation" through "maximum reliance on

18  competitive market forces and . . . competition . . . [and] encouragement, development, and

19  maintenance of an air transportation system relying on actual and potential competition."

20  IATCA, Pub. L. No. 96-192, § 2, 94 Stat. 35, 36 (1980).  Unlike the domestic airline

21  industry, which Congress fully deregulated through the Airline Deregulation Act of 1978

22  ("ADA"),[6] the IATCA did not fully deregulate the international airline industry.  Even

23

24

25

26

27  _____

28       [6] The ADA effectively removed the DOT's jurisdiction over domestic fares and the DOT ceased approving or accepting tariff filings on January 1, 1983.  <u>See</u> 14 CFR § 399.40; Tariffs for Post-1982 Domestic Travel (April 7, 1982), 47 FR 14892-01 ("the intent of the statute would be best fulfilled by reading it to prohibit tariff filings for transportation provided after the sunset date").  It is not directly relevant to the dispute at issue, although the parties compare it to the IATCA.

**United States District Court**
For the Northern District of California

Plaintiffs' expert[7] admits that Congress could not completely deregulate international fares without the cooperation of other sovereign nations, which could impose their own fare hikes and restrictions.  Levine Decl. ¶ 14; see also H.R. Rep. No. 96-602, at 1-2 (1979) at 2 ("there are differences between international and domestic aviation; the critical difference being that in domestic markets, a competitive environment can be established by actions of the U.S. Government, while in international markets, competition can be established only by agreement between the United States and one or more foreign governments.").

Certainly the IATCA gave the DOT more discretion over tariff filing requirements.  See RJN Ex. 28 (Pub. L. No. 96-192 § 14, 94 Stat. at 40-42; S. Rep. No. 96-329, September 24, 1979) (dkt. 870-28) at *10.  It empowered the DOT to exempt air carriers engaged in international transportation from all statutes pertaining to economic regulation or the requirement to file fares.  49 U.S.C. § 40109(c).  The IATCA also limited the DOT's ability to grant antitrust immunity to carriers' agreements.  See 49 U.S.C. § 41308(b); RJN Ex. 14 (Int'l Air Transport Assoc. Tariff Conf. Proceeding July 6, 2006) (dkt. 870-14) at *78 ("In deregulating the airline industry, Congress drastically reduced the Board's authority to approve and immunize agreements between airlines" and "Congress explained that it made these changes . . . as part of its determination that airline service levels and fares should be controlled by competition, not by government regulation."); see also RJN Ex. 28 at *7 ("The antitrust laws remain fully applicable to any agreement not filed by the Board or even to approved agreements for which no specific section 414[8] is granted.").  It enabled the DOT to

---

[7]  Plaintiffs offer Michael Levine as an expert on the airline industry and deregulation.  Levine Decl. (dkt. 898) Att. A.  Defendants object to Levine's testimony, arguing among other things that he is not qualified to offer opinions on either Congress's or the DOT's intent, as he has never been a member of Congress and never worked at the DOT, only having worked at the CAB from 1965-1966 and 1978-79, and as a CAB consultant in 1977 and 1980.  See Reply (dkt. 917) at 19.  The Court recognizes Levine as an expert in the airline industry but not on Congress or the DOT's understanding of the antitrust laws or the filed rate doctrine.  Nor does the Court accept Levine's legal conclusions.  See, e.g., Levine Decl. ¶ 21.

[8]  Section 414 of the FAA provides that "Any person affected by an order made under sections 408, 409, or 412 of this Act shall be, and is hereby, relieved from the operations of the "'antitrust laws' . . . and of all other restraints or prohibitions made by, or imposed under, authority of law, insofar as may be necessary to enable such person to do anything authorized, approved, or required by such order."  Section 408 governs the DOT's control over consolidation, mergers and acquisitions; Section 409

United States District Court
For the Northern District of California

take "quick and effective countermeasures" against a foreign government that engaged in

discriminatory conduct.  Presidential Statement on Signing S. 1300 into Law (February 15,

1980).  And it continued to obligate the DOT to provide a regulatory process for consumers

to challenge unreasonable or anticompetitive rates before the agency.  14 C.F.R. § 302.501-

507, 14 C.F.R. 302.401-420.  In short, the Act reflected the reality that, though Congress

might have wished to deregulate international air fares, it could not do so fully or

unilaterally.  See H.R. Rep. No. 96-602, at 1-2 ("These policy statements contemplate that to

the maximum extent possible, reliance will be placed on competition, rather than on detailed

and burdensome government regulation . . . At the same time. . . . there will be a continuing

need to seek equal opportunity for our international airlines through negotiations and

regulatory actions.").

   The DOT did not change its practices immediately after the passage of the IATCA,

although it made various statements that bear on the subject of competition.  In 1988, the

DOT announced a proposed policy on the practice of rebating international fares, explaining

that it intended to no longer prosecute airlines that charged rates lower than their filed rates.

See RJN Ex. 21 (Statement of Enforcement Policy on Rebating) (dkt. 870-21) at 3

("technical rebating by itself, without competitive or consumer abuses amounting to

violations of other provisions or legal standards, will not result in enforcement action.").  It

noted that after passage of the ADA and IATCA, "many of the traditional tariff-adherence

rules were recast or replaced to accommodate the procompetitive policies of these statutes."

Id. at 2.[9]  In 1995, the DOT asserted that, as established in 1978, "our overall goal continues

to be to foster safe, affordable, convenient and efficient air services for consumers.  We

continue to believe that the best way to achieve this goal is to rely on the marketplace and

unrestricted, fair competition to determine the variety, quality, and price of air service."  RJN

---

governs interlocking relationships; and Section 412 governs pooling and other cooperative agreements.
Section 412(a) requires that every air carrier file a true copy of every agreement between carriers that
relates to "the establishment of transportation rates, fares, charges, or classifications."

   [9] Notably, the DOT withdrew this statement of proposed rulemaking in 2002.  See Withdrawal
of Proposed Rulemaking Action; Statement of Enforcement Policy on Rebating, 67 F.R. 72396-01.

United States District Court
For the Northern District of California

1   Ex. 22 (Statement of United States International Air Transportation Policy, May 3, 1995)

2   (dkt. 870-22) at 2.

3        The Court now looks to how the DOT, post-IATCA, regulated the three types of rates

4   at issue in this case: (1) air fare for flights originating from the United States;[10] (2) fuel

5   surcharges; and (3) ANA's special discount fares.

6          **1.**    **Air Fares**

7        The first type of rate at issue in this case is air fares.  In 1997, nearly 20 years after

8   the IATCA was passed, the DOT signaled its intent to detariff some air fares.  <u>See</u>

9   <u>generally</u> RJN Ex. 24 ("Exemption from Passenger Tariff-Filing Requirements in Certain

10   Instances," March 10, 1997) (dkt. 870-24).  The DOT explained:

12          Selectively exempting U.S. and foreign air carriers from the
     statutory and regulatory duty to file international passenger tariffs
13   would appear to be the next logical step in the <u>continuing</u>
     <u>evolution of a policy where we rely on market forces rather than</u>
14   <u>continual government oversight to set prices</u> for air
     transportation.  In many cases, tariffs continue to be filed in
15   markets where all prices have been effectively deregulated.  In
     others, market forces are usually sufficient to ensure that most
16   fares are reasonably priced without government intervention.
     Indeed, the <u>continued filing of passenger fares serves a</u>
17   <u>meaningful regulatory purpose only</u> in those markets where
     foreign government policies or actions seriously hinder
18   competitive forces, or <u>where we continue to supervise</u> normal
     economy fares.

19

20   <u>Id.</u> at 4 (emphasis added); <u>see also</u> <u>id.</u> ("We now question whether any purpose is served in

21   burdening U.S. and foreign carriers with continuing to file passenger fares for approval in

22   markets where pricing has been effectively deregulated by government agreement, and the

23   evolution of competitive market forces.").  In the same announcement, the DOT stated that

24   such a rule "[would] not materially lessen [the DOT's] ability to intervene in passenger

25   pricing matters should it be necessary."  Buschell Ex. E (dkt. 917-6) at 10763.  The DOT

26   asserted that it "has always had the statutory authority to take action directly against unfiled

27   ───────────────

28       [10] The Court dismissed with prejudice all of Plaintiffs' claims for alleged price-fixing on flights
     originating in Asia as barred by the Foreign Trade Antitrust Improvements Act.  Order Re Mot. to
     Dismiss at 12. Thus, the remaining claims are limited to flights originating in the United States.

United States District Court
For the Northern District of California

passenger fares and rules under a variety of circumstances" and "reserved the option . . . of reinstating the tariff-filing obligation . . . where consistent with the public interest." Id.

In July 1999, the DOT issued a final rule, finding that certain filings were "no longer necessary or appropriate." RJN Ex. 25 ("Exemptions From Passenger Tariff-Filing Requirements in Certain Instances," July 27, 1999) (dkt. 870-25) at 2. The rule created three filing categories–A, B, and C; Category C had the strictest filing requirements and Category A the most relaxed. Joint Memo. at 5-6 (citing RJN Ex. 25 at 47). The rule required that (1) airlines headquartered in Category C countries, and (2) airlines flying between the United States and Category C countries, file all air fares with the DOT. See id. at 5. The rule also required airlines to submit "normal" one-way economy fares to and from Category B countries.[11] Id.; Schwartz Decl. ¶ 22. The DOT imposed no filing requirement on airlines headquartered in Category A countries, except to the extent that those airlines flew between the United States and a Category B or C country. Joint Memo. at 5 (citing RJN Ex. 25 at 47). The A, B, and C categories approximately corresponded to the types of agreements a country had entered into with the United States. Levine Decl. ¶ 37. Countries that agreed to more favorable bilateral agreements (allowing multiple airlines to serve multiple city-pairs between the two countries, for example) were designated as Category A, while countries that did not (restricting the number of airlines that could serve a route and requiring that all fares be subject to review, for example) were designated as Category C. Id. ¶¶ 16-19. The DOT issued four additional "exemptions" between 1999 and 2012, which moved some countries away from Category C. See Schwartz Decl. ¶ 25.

During the class period, all Defendants used the Airline Tariff Publishing Company ("ATPCO"), a privately held fare clearinghouse, as an intermediary for filing air fares with the DOT. Bryant Decl. (dkt. 728) Ex. A at ¶ 10. ATPCO distributes air fares to various

---

[11] "Normal" fares are those with Economy Restricted and Economy Unrestricted fare types, which are a small subset of economy class fares that tend to have relatively few restrictions. Fare codes (also known as "booking codes" or "fare basis codes") are a way for the airlines to identify exactly what type of ticket a customer purchased. Schwartz Decl. (dkt. 886) at 4 n.3. Fare codes could indicate the week, day or time of the flight or a required minimum or maximum stay at a destination, among other factors. Id.

**United States District Court**
For the Northern District of California

entities—from online travel agents like Expedia to government databases, including the Government Filing System ("GFS"). Opp'n at 17 (citing Schwartz Decl. ¶¶ 8, 14). An algorithm, based on the DOT's current category designations (A, B, or C) determines whether to "present" a fare within the database to the DOT. Id. at 18; Schwartz Decl. ¶ 16.[12] The DOT does not consider a fare to be "filed" until it is formally "presented," meaning that the fare has been selected by the ATPCO algorithm and flagged for the DOT to review. See Joint Memo. at 7; Bryant Decl ¶ 23. Once ATPCO presents the fare, DOT staff review it and enter an "action code" on the GFS filing to record any actions taken with respect to that filed rate. Id. The DOT uses seven different codes to designate what actions have been taken.[13] Joint Memo. at 8; Bryant Decl. ¶ 23. Though the airlines presented thousands of filings per day, DOT staff used fewer than ten log-ins to review the filings. Bryant Depo. (dkt. 887-5) at 213-15, 228-29.

Plaintiffs further contend that the DOT did not "evaluate the reasonableness" of the fares, but rather, used the filing requirement to press foreign governments to adopt more pro-competitive bilateral agreements. Opp'n at 13 (citing Levine Decl. ¶¶ 2(d), 6, 25 ("In no cases was the filing requirement used to actually evaluate reasonableness and I am not aware of any instance in which it was used to definitively and finally reject a rate."), 37, 40, 43, 45). Defendants conceded at the motion hearing that there is no direct evidence that the DOT evaluated rates for reasonableness. Tr. of Aug. 15, 2014 at 17. Indeed, the Court is aware of

---

[12]   Plaintiffs contend that many fares in GFS are listed as "private," meaning that they are viewable only by parties that have been approved by an airline to view those fares, such as the carriers' network of travel agents. Id. (citing to Schwartz Decl. ¶¶ 10, 13). Defendants dispute this, asserting that the DOT may view all of the fare and surcharge information in any ATPCO database, including GFS, regardless of whether ATPCO formally "presented" the fare or not. Joint Memo. at 7 n.12 (citing no evidence other than 14 C.F.R. § 221.180(b), which requires that the DOT be able to monitor all filed tariffs on a 24-hour a day, 7-day a week basis); Tr. of Aug. 15, 2014 (dkt. 938) at 29 (Defendants' counsel: "The DOT has access to the ATPCO database, and can see every fare that's in there.").

[13]   The DOT may designate the fare as: (1) "Acknowledged," if the DOT acknowledged the filing in its entirety; (2) "Approved," if DOT approved the filing in its entirety; (3) "ApprovedC," if the DOT approved the filing with comments; (4) "ApprovedX," if the DOT approved the filing, except as noted on individual fare, arbitrary, or text information; (5) "Disapproved," if the DOT disapproved the filing in its entirety; (6) "DisapprovedX," if the DOT disapproved the filing, except as noted on individual fare, arbitrary, or text information); (7) "Suspended," if the DOT suspended the filing in its entirety. Schwartz Decl. ¶ 23.

1  no evidence of a fare that was disapproved by the DOT based on its pricing level or

2  reasonableness.[14]

### 2.    Fuel Surcharges

4      The second type of rate at issue in this case is fuel surcharges.  A fuel surcharge is an

5  additional per-ticket fee based on the increased cost of fuel to the carrier.  In 1999, the DOT

6  issued a notice stating without any elaboration that "all surcharges are to be filed."  Buschell

7  Decl. Ex. C Attach. B (DOT Notice of Exemption from the Department's Tariff-Filing

8  Requirements, October 7, 1999) (dkt. 917-4) at 3.  Nonetheless, the DOT would not let

9  airlines charge fuel surcharges as separately stated charges until 2004.  See Tr. of Aug. 15,

10  2014 at 28, 31.  Indeed, the DOT confirmed in a 2004 letter to parties filing tariffs that

11  (stand-alone) fuel surcharges were prohibited prior to 2004.  See RJN Ex. 5 (Letter from Paul

12  Gretch, Dir. Office of Int'l Aviation, October 14, 2004) (dkt. 870-5) (explaining that the

13  DOT had barred filings of separate surcharges "consistent with longstanding [DOT] policy

14  that carriers should recoup fuel expenses through increases in their base fares").  That letter

15  went on to say that the policy against separate filing of surcharges "was established at a time

16  when the Department was regulating fares much more actively than is the case today, and we

17  were concerned that tariff surcharges could undermine our regulatory supervision of fare

18  levels."  Id.  The DOT explained in that 2004 letter that, in light of more competitive market

19  conditions, the "general prohibition of separate fare surcharges . . . is no longer necessary to

20  support the limited degree of pricing supervision that continues."  Id.  Plaintiff's expert

21  asserts that the DOT only disapproved certain fuel surcharges before October 2004 when the

22  DOT did not accept such filings.  See Schwartz Decl. ¶ 18.

23      As of October 2004, the DOT permitted, but did not require, airlines to file their fuel

24  surcharges separately from fares.  See RJN Ex. 5 ("carriers are free to file surcharges in

27  [14] But see Reply at 21 (citing Avent Depo. Ex. F (dkt. 917-7) at 16, 116-18, 124) (challenging Avent declaration stating that he was unable to find any DOT action to suspend or reject airfares
28  because Avent admitted in his deposition that he did not review either the AIR or ATPCO database and that he actually is aware of DOT actions on airfares and surcharges based on IATA proceedings).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

general rules tariffs.").[15]  Defendants did not always present their fuel surcharges to the DOT (even though they might have intended to, because of technical problems with ATPCO's algorithm), and many airlines filed their surcharges in the "YQ/YR" private database, to which DOT staff apparently did not have access.  Opp'n at 19, 35-36; Bryant Depo. at 264-65; Schwartz Decl. ¶ 15.

In November 2004, the DOT explained that it would no longer allow airlines to designate surcharges as "government-approved" in fare advertising.  See RJN Ex. 26 ("Notice of Disclosure," November 15, 2004) (dkt. 870-26) at 2.  In that announcement, the DOT stated that it could not "effectively monitor" fuel surcharges that are filed separately from "base fares."  Id.  It further stated that it would consider the separate listing of such charges in fare advertisements "an unfair and deceptive trade practice."  Id.

### 3.    ANA Discount Fares

The final type of rate at issue in this case is ANA's discount air fares (also known as "ethnic fares").  Plaintiffs allege that Defendant ANA coordinated with Japan Airlines[16] to set the rates of two such fares:[17] (1) Satogaeri or "homecoming" fares for Japanese people living in the United States, and (2) "discount business class fares," also known as "Biziwari" or "Buz-Wari" fares.[18]  ANA Mot. at 4.  ANA classified the Satogaeri fares as "B" and "M" class fares, and the discount business fares as "C" class fares.  Id. at 5.

ANA sold its discounted tickets through travel agents by first establishing a "net fare" or an amount below the filed rate of certain "B," "M," and "C" class fares.  Id.  ANA then entered into an agreement with the travel agent, whereby the agent would remit the net fare

---

[15]  Defendants's argument that the 2004 announcement "did nothing to change the filing requirements," Reply at 10, does not ring true.

[16]  Japan Airlines has settled with Plaintiffs.  See Mot. for Settlement (dkt. 900).

[17]  Plaintiffs also alleged that ANA coordinated with Japan Airlines to set the price of a third discount fare, Yobiyose fares, which were Asia-originating fares sold in the United States.  FAC (dkt. 493) ¶¶ 114-23.  The Court granted ANA's motion to dismiss Plaintiffs' claims based on the Yobiyose fares.  Order Re Mot. to Dismiss at 39-40.

[18]  ANA notes that the Complaint also referred to a published fare called "Business Value" or "Biz-Value," which ANA advertised and sold in 2006.  ANA Mot. at 6.  Despite its name, Business Value tickets were not discounted, and ANA contends that they were filed with DOT.  Id.

United States District Court
For the Northern District of California

to ANA and keep as commission any difference between the net fare and the amount paid by the customer.  Id.  ANA acknowledges that it did not file its "net fares" with the DOT, but it argues that these discounted fares are covered by the "B," "M," and "C" fare codes class fares that it did file.  See id. at 2.

The discounted fares differed in some ways from the "unrestricted economy class fares" that ANA filed with the DOT.  See Opp'n at 55 (citing Fukuda Depo. (dkt. 887-2) at 71-77, 83-84).  The Satogaeri and business discount fares had highly restrictive fare rules that did not apply to the unrestricted economy class fares.  Id.; Schwartz Decl. ¶¶ 29-39.  The unrestricted fares were fully refundable, re-routeable, and had no time limits for the return leg of the flight; in contrast, the discounted fares were non-refundable, non-re-routeable, and imposed strict time limits for the return leg of the flight.  Id.

## II.    LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is "material" only if it could affect the outcome of the suit under governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  A principal purpose of the summary judgment procedure "is to isolate and dispose of factually unsupported claims."  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Ind. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).

## III.   DISCUSSION

The filed rate doctrine is a judicial creation derived from principles of federal preemption.  E. & J. Gallo Winery, 503 F.3d at 1033.  "At its most basic, the filed rate doctrine provides that state law, and some federal law (e.g. antitrust law), may not be used to invalidate a filed rate nor to assume a rate would be charged other than the rate adopted by

United States District Court
For the Northern District of California

the federal agency in question."[19]  Transmission Agency of N. Cal. v. Sierra Pac. Power Co.,

295 F.3d 918, 929-30 (9th Cir. 2002).  The doctrine was first recognized in the context of

rates set pursuant to the Interstate Commerce Act, see Keogh v. Chicago & Nw. Ry. Co., 260

U.S. 156 (1922), but has since been applied in other contexts, including challenges to rates

set pursuant to the Natural Gas Act, the Federal Power Act, and the Communications Act.  E.

& J. Gallo Winery, 503 F.3d at 1033.  No court has considered whether the filed rate doctrine

applies to the international airline industry.

Where it applies, the filed rate doctrine bars claims for treble damages on the basis of

antitrust injury.  See Square D Co., 476 U.S. at 421-22.  In this Circuit, the essential question

in filed rate cases is not whether the rates were actually "filed," but whether the rates were

"authorized" by the relevant regulatory agency, or whether the agency was doing enough to

preempt federal antitrust laws.  See Carlin, 705 F.3d at 871, n.11 (citing E. & J. Gallo

Winery, 503 F.3d at 1040-43).  Thus, the doctrine does not apply where the agency "has

effectively abdicated its rate-making authority."  E. & J. Gallo Winery, 503 F.3d at 1040

(citing Pub. Utility Dist. No. 1 of Grays Harbor Cnty. Wash. v. IDACORP Inc., 379 F.3d 641

(9th Cir. 2004); Pub. Utility Dist. No. 1 of Snohomish Cnty. v. Dynegy Power Marketing,

Inc., 384 F.3d 756, 760 (9th Cir. 2004)).  It also does not apply where the agency has

"adequately expressed its disapproval" of the filed rates–something that has not happened

here.  See Carlin, 705 F.3d at 879.

Application of the filed rate doctrine in any particular case is not determined by the

culpability of the defendant's conduct or the possibility of inequitable results.  Carlin, 705

F.3d at 869.  Rather, courts decide whether to apply the filed rate doctrine based on three

---

[19]  The filed rate doctrine is also sometimes referenced as the "filed tariff doctrine," see, e.g., Davel Commc'ns, Inc. v. Qwest Corp., 460 F.3d 1075, 1084 (9th Cir. 2006), or the "Keogh doctrine," see, e.g., Cost Mgmt. Servs., Inc. v. Wash. Natural Gas Co., 99 F.3d 937, 943 & n.7 (9th Cir. 1996), after the case where it was first established, Keogh, 260 U.S. 156 (1922).  Carlin v. DairyAmerica, Inc, 705 F.3d 856 (9th Cir. 2012).

United States District Court
For the Northern District of California

1   underlying principles.[20] Id. at 867-68, 880.  First, the doctrine prevents courts from engaging

2   in price discrimination between consumers.  Id.  This "non-discrimination strand" would

3   prevent a court in California from awarding damages based on the state's consumer

4   protection law to the extent that consumers (or competitors) from other states could not

5   benefit from the same law.[21]  See id. at 882.  Second, the doctrine preserves the exclusive

6   role of regulatory agencies in approving rates, and keeps courts out of the rate-making

7   process.  Id.  This "nonjusticiability strand" recognizes that legislatively appointed regulatory

8   bodies have institutional competence to address rate-making issues, and that courts lack the

9   competence to set rates.  See id. at 880-81; Verizon, 377 F.3d at 1086.  Third, the

10  "preemption strand" avoids disruption of a congressional scheme for uniform price

11  regulation by preventing courts from undermining any such scheme.  Carlin, 705 F.3d at 880-

12  81 (citing Fax Telecommunicaciones, 138 F.3d at 489).

13        Originally, the filed rate doctrine arose in the context of a relatively stable paradigm.

14  A carrier would file a rate or tariff with a federal agency that regulated an industry under the

15  authority of a federal statute.  Carlin, 705 F.3d at 869.  Thereafter, the carrier (and its

16  customer) were not allowed to charge (or pay) a different rate for that service or product

17  other than the filed one.  Id.  In turn, the rate was not subject to challenge on antitrust, state

18  law or most other grounds.  Id.  Courts have recognized that, though this paradigm rarely

19  holds true today, the filed rate doctrine might still apply if its original purposes (non-

20  discrimination, nonjusticiability and preemption) remain valid.  See, e.g., id. at 880-83; E. &

21  J. Gallo Winery, 503 F.3d at 1048; Ting v. AT&T, 319 F.3d 1126, 1138-41 (9th Cir. 2003).

22        Defendants here move for summary judgment, asking the Court to apply the filed rate

23  doctrine to the filed and unfiled air fares, the fuel surcharges, and ANA's discount fares.

24

25        [20]  Some courts have recognized only two rationales for the filed rate doctrine: non-
    discrimination and justiciability. See, e.g., Verizon Del., Inc. v. Covad Commc'ns Co., 377 F.3d 1081,
26  1086 (9th Cir. 2004); Fax Telecommunicaciones, Inc. v. AT&T, 138 F.3d 479, 489 (2d Cir. 1998). In
    those cases, Courts typically define the nonjusticiability strand broadly to include the preemption issues
27  that are central to the third strand here.

28        [21]  The Ninth Circuit has held "that the principle of nondiscrimination still suggests the filed rate
    doctrine should be applied in class actions. . . ." Id. at 882.

1    Plaintiffs argue that Congress did not intend to exempt the rates from the antitrust laws, and

2    in the alternative, that the DOT effectively abdicated its regulatory authority over the rates.

3        **A.    Air Fares**

4        The Court turns its attention first to air fares.

5            **1.    Filed Air Fares**

6        As to the filed air fares, the Court concludes that Congress, through the FAA, gave the

7    DOT authority over all fares, 49 U.S.C. § 41504(a) and (b), and that Plaintiffs have not

8    identified any point at which Congress stripped the DOT of this authority, or at which the

9    DOT effectively abdicated this authority.

10            **a.    Congressional Intent**

11       Plaintiffs assert that Congress deregulated the airline industry and did not intend for

12   the filed rate doctrine to bar Plaintiffs' antitrust claims.  Opp'n at 7-15.  But Congress did not

13   fully deregulate the international airline industry, and its intentions as to the filed rate

14   doctrine are not known.

15       Plaintiffs assert that the IATCA "radically changed [the DOT's] authority to approve

16   and grant antitrust immunity to airline agreements," with a goal of making "the airline

17   industry subject to the same competitive and antitrust standards applicable to other industries,

18   as far as practicable."  RJN Ex. 14 at *36, 80.  This is the DOT's statement, not Congress's.[22]

19   But even so, there is an important distinction between antitrust immunity broadly speaking,

20   which bars private suits, criminal liability, and injunctive relief, and the filed rate doctrine,

21   which bars only private suits.[23]  See Square D Co., 476 U.S. at 421-22 ("Keogh simply held

22   that an award of treble damages is not an available remedy for a private shipper claiming that

_____

24       [22] Plaintiffs rely excessively on the DOT's rulemaking statements for the proposition that
     Congress intended to remove the DOT's jurisdiction over international air fares.  See, e.g., Opp'n at 9.

25   The statements are not determinative of congressional intent.  See Ting, 319 F.3d at 1136 (noting that
     Congress's purpose is the "ultimate touchstone" in a preemption analysis); see also Cain v. Air Cargo,

26   Inc., 599 F.2d 316, 320 (9th Cir. 1979) (holding that courts must examine congressional intent in
     enacting a regulatory regime in a specific industry to determine applicability of the filed rate doctrine).

27

28       [23] No one knows this more than ANA, who pled guilty to criminal charges of price-fixing during
     the class period, but asserts the filed rate doctrine as a defense in this civil case.  See Opp'n at 58 (citing
     RJN Ex. 2 (ANA Plea) (dkt. 870-2) ¶ 4).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    the rate submitted to, and approved by, the ICC was the product of an antitrust violation.

2    Such a holding is far different from the creation of an antitrust immunity."). The Court will

3    not read abstract statements touting competition, or even less abstract statements expressing a

4    desire for the antitrust laws to apply, as proof that Congress intended that the filed rate

5    doctrine not apply,[24] particularly when the context is "other industries, as far as practicable."

6     RJN Ex. 14 at *80. After all, the filed rate doctrine applies to "other industries" as well.[25]

7         Moreover, while the IATCA empowered the DOT to exempt carriers engaged in

8    international air transportation from all statutes pertaining to economic regulation or the

9    requirement to file fares, 49 U.S.C. § 40109(c), it did not abolish the carriers' filing

10   requirements. Congress knows how to eliminate tariff filing requirements; it did so in the

11   ADA. See 14 C.F.R. § 399.40; Tariffs for Post-1982 Domestic Travel (April 7, 1982), 47 FR

12   14892-01. Detariffing was also the subject of Ting, 319 F.3d 1126, upon which Plaintiffs

13   rely heavily. Judge Tashima explained in Ting that in the early 1980's, the FCC tried to

14   prohibit tariff-filing, but courts rejected that effort as inconsistent with the terms of the

15   Communications Act. Id. at 1131-32. "[F]ollowing a 15 year effort to suspend tariff-filing

16   obligations for telecommunications carriers, the Commission was forced to wait for Congress

17   to act." Id. at 1132. The Telecommunications Act of 1996 "fundamentally altered" the

18   regulatory scheme by directing the FCC to "forbear from applying any regulation of that

19   chapter if it determined that such regulation was not necessary. . ." Id. "Finally armed with

20   the requisite congressional authorization, the FCC promptly" began rulemaking, and passed

21   an order of mandatory detariffing." Id. The FCC "stated on a number of occasions that one

22   of the major purposes of detariffing was to eliminate the filed rate doctrine and its harmful

---

24    [24] To be clear, the Court does not hold that Congress needs to have made an explicit statement as to the filed rate doctrine, only that the Court does not accept Plaintiffs' suggestion that Congress did

25    so. See, e.g., Opp'n at 8-13.

26    [25] Because of this distinction between antitrust immunity and the filed rate doctrine, the Court will not follow In re Ocean Shipping Antitrust Litigation, 500 F. Supp. 1235, 1240 (S.D.N.Y. 1980),

27    which predates all of the relevant case law in this Circuit, and which found that courts could not use the filed rate doctrine to grant "implied" antitrust immunity to commercial carriers when Congress had

28    already designated an "express" path to antitrust immunity for those same carriers in the same law. It is not correct to characterize the filed rate doctrine as a "repeal of the antitrust laws." See id. at 1241.

**United States District Court**
For the Northern District of California

1    effect on customers." Id. at 1145.  Congress also made that goal explicit.  See id. at 1139 n.7

2    (stating in Notice of Proposed Rule Making, "In addition, the absence of tariffs would

3    eliminate possible invocation by carriers of the filed rate doctrine.") (citing 11 F.C.C.R. 7,

4    141, at ¶ 31); see also id. at 1132 (Congress wanted "to provide for a pro-competitive,

5    deregulatory national policy framework . . . by opening all telecommunications markets to

6    competition.").  The filed rate doctrine did not apply in Ting because, empowered by

7    Congress, the FCC renounced its authority over tariffs.  Id. at 1146.

8           As Plaintiffs' expert acknowledges, Congress could not act on its own accord to

9    deregulate international air fares.  See Levine Decl. ¶ 14.  The IATCA did not purport to

10   abolish the DOT's tariff filing system, but merely gave the DOT the authority to calibrate its

11   filing requirements to reciprocate the restrictions that other countries imposed on domestic

12   airlines.  See id.  Indeed, far from removing the DOT's jurisdiction over filed rates, Congress

13   reaffirmed it.  See Pub. L. No. 96-192, § 14, 94 Stat. at 40-42 (explaining that the DOT

14   could, among other things, "suspend the operation of such tariff and defer the use of such

15   rate."); Statement on Signing S. 1300 into Law (Feb. 15, 1980).  The DOT required carriers

16   to continue to file all tariffs for twenty years after the IATCA was enacted, before partially

17   detariffing in 1999.  This is a far cry from the FCC's immediate and complete detariffing in

18   Ting, and belies any argument that the IATCA alone removed the DOT's authority.

19   Accordingly, the Court rejects Plaintiffs' argument that Congress did not intend for the filed

20   rate doctrine to apply to the filed air fares.

21                          **b.      Agency Action**

22          Plaintiffs next argue that the DOT did not review the filed air fares for reasonableness,

23   and thus, abdicated its regulatory authority over them.  Opp'n at 43-45; Levine Decl. ¶¶ 6

24   (explaining that the DOT used the filing requirements to negotiate more favorable bilateral

25   agreements with foreign countries), 47 ("filing tariffs during the class period of this case

26   didn't imply an expectation that the fares and surcharges they contained would be assessed

27   for reasonableness or subjected to any of the normal mechanisms that accompany tariff

28   filings for the purpose of facilitating regulation."); Tr. of Aug. 15, 2014 at 18 (Plaintiffs'

1    counsel: "There's no evidence in this record–we have not found any–to show that anything

2    DOT has done has any relationship whatsoever to just and reasonable rates."). Defendants

3    concede that there is no direct evidence that the DOT evaluated rates for reasonableness. <u>Id.</u>

4    at 17.  But, as Defendants were quick to add, it does not really matter. <u>Id.</u> at 16.

5        Abundant authority supports the proposition that meaningful review of rates is not

6    required for the filed rate doctrine to apply. <u>See, e.g.</u>, <u>Carlin</u>, 705 F.3d at 871-72 (meaningful

7    review is not a "<u>sine qua non</u>" for the applicability of the filed rate doctrine); <u>Wah Chang v.</u>

8    <u>Duke Energy Trading & Mktng, LLC</u>, 507 F.3d 1222, 1227 (9th Cir. 2007) ("laxness does

9    not indicate, much less establish, that [plaintiff] can turn directly to the courts for rate

10   relief"); Areeda on Antitrust ¶ 247a at 443 (4th ed. 2013) ("It need not have been actively

11   reviewed for accuracy or public interest considerations–indeed, it need not have been

12   reviewed at all in any meaningful sense.").  This Circuit has recognized that federal agencies

13   have wide latitude to determine the most effective way to carry out their charge from

14   Congress, and that acting with a "light hand" to authorize just and reasonable rates is not

15   abdication. <u>See, e.g.</u>, <u>E. & J. Gallo Winery</u>, 503 F.3d at 1039, 1042.

16       In the case at hand, the Court does not pretend that the DOT regulated the filed air

17   fares with anything other than a light hand. <u>See, e.g.</u>, RJN Ex. 15 (Aviation Enforcement and

18   Proceedings, November 6, 2012) (dkt. 870-15) at 5 (noting, "in the 34 years since the

19   passage of the [ADA], the Department has declined to use this authority to strike down fare

20   rules in foreign air transportation")[26]; Williams Decl. (dkt. 871) ¶¶ 10-17, Exs. 9-16 (no

21   Defendants could identify any fare disapproved by the DOT based on pricing or

22   reasonableness).  But it did regulate.  The DOT required the carriers to continue filing all

23   Class B and C fares, after IATCA and after 1999.  <u>See</u> RJN Ex. 25; <u>see also</u> RJN Ex. 24 at 4

24   ("continued filing of passenger fares serves a meaningful regulatory purpose only in those

25   markets where foreign government policies or actions seriously hinder competitive forces, or

26   <u>where we continue to supervise</u> normal economy fares.") (emphasis added).  It also might

27   _____

28       [26] <u>But see id.</u> (adding that "the Department is authorized pursuant to 49 U.S.C. § 41509 to cancel
     a rule that is unreasonable after notice and hearing," and that it declined to exercise that authority
     because there was no "specific evidence that [the challenged rates were] unreasonable.").

United States District Court
For the Northern District of California

take the affirmative step of approving the filed rates, stamping "Approved" on the electronic record of the rates that were filed in the ATPCO system.  See Joint Memo. at 7-8; Bryant Decl. Ex. A ¶¶ 23-24.  The Court is not at liberty to question a federal agency's discretion in rate-making.  See, e.g., E. & J. Gallo Winery, 503 F.3d at 1039 (applying the filed rate doctrine to "resale" rates despite FERC's hands-off regulatory approach resulting in prices that were artificially high from market manipulation).

In deference to Congress's tariffing scheme, and to the DOT's action in authorizing rates, the Court finds that the filed rate doctrine applies to the filed air fares in this case.

### 2.    Unfiled Air Fares

The Court takes a different view of the unfiled air fares in this case.  The Court concludes that, empowered by the IATCA, the DOT effectively abdicated its authority over the unfiled air fares in 1999.  Put another way, while the DOT regulated the filed air fares with a light hand, the DOT did not regulate the unfiled air fares at all.

The Ninth Circuit explained in E. & J. Gallo Winery, 503 F.3d at 1040, that "so long as [the agency] 'continues to engage in regulatory activity' and has not effectively abdicated its rate-making authority, FERC's approval of market-based rates" has "the same preclusive effect on antitrust claims . . . as [its] approval of literally filed rates."  This Court asked Defendants at the motion hearing what evidence they could point to that the DOT continued to engage in regulatory activity vis-a-vis the unfiled air fares.  See Tr. of Aug. 15, 2014 at 9.  Defendants argued first that the DOT continued to require carriers to file all rates for twenty years after the enactment of the IATCA.  Id. at 10.  But that is evidence that the IATCA did not strip the DOT of its authority over rates (and that the DOT was not nearly as eager to detariff as was the FCC in Ting), not that the DOT never abdicated its authority.  Defendants argued next that the DOT issued four more notices of exemption since 1999, which detariffed still more fares.  Id. at 10-12; see also Schwartz Decl. ¶ 25.  But the Court agrees with Plaintiffs' characterization of such action: "That's not regulation.  That's deregulation."  See Tr. of Aug. 15, 2014 at 14.

United States District Court
For the Northern District of California

Defendants' best argument that the DOT continued to engage in regulatory activity was its last one: that when the DOT proposed exempting certain rates from filing in 1997, it claimed that doing so "will not materially lessen the Department's ability to intervene in passenger pricing matters should it be necessary" and that it "has always had the statutory authority to take action directly against unfiled passenger fares." See id. at 11; Buschell Ex. E at 10763. There are a few problems with this statement. First, it is difficult to believe. Given that the DOT had just ten log-ins in the ATPCO system to monitor the thousands of filed rates, see Bryant Depo. at 213-15, 228-29, it is improbable that the DOT could nonetheless effectively monitor thousands of rates that were never filed and to which it might have had no access, see Tr. of Aug. 15, 2014 at 5 (Plaintiffs' counsel represents that most of the rates at issue in this case were unfiled); Schwartz Decl. ¶¶ 10, 13 ("It is my understanding that DOT does not have access to fares included in the GFS private database"); but see Joint Memo. at 7 n.12 (citing no evidence other than 14 C.F.R. § 221.180(b), which requires that the DOT be able to monitor all filed tariffs on a 24-hour a day, 7-day a week basis). How could not seeing thousands of rates not materially lessen an agency's ability to intervene if those rates are improper? Second, in the same statement, the DOT also questioned "whether any purpose is served in burdening U.S. and foreign carriers with continuing to file passenger fare for approval in markets where pricing has been effectively deregulated by government agreement and the evolution of competitive market forces." See RJN, Ex. 24 at *4. The agency itself described Category A (the unfiled rates) as deregulated. Third, the statement was made before the class period, which began in 2000. Compare Buschell Ex. E with Second CAC ¶ 2. A better gauge of whether the agency "was doing enough regulation to justify . . . preemption," see Carlin, 705 F.3d at 872, during the class period is to look at what it was doing, rather than what it said it would do–as Plaintiffs noted at the hearing, the language the Ninth Circuit used in the Gallo case is "effectively abdicated," not "explicitly abdicated." Tr. of Aug. 15, 2014 at 23; E. & J. Gallo Winery, 503 F.3d at 1040.

In this Circuit, "light handed regulation" is sufficient to avoid abdication, and whether a rate is literally filed is not determinative of whether the filed rate doctrine applies. See E.

United States District Court
For the Northern District of California

& J. Gallo Winery, 503 F.3d at 1040, 1042 ("the principles underlying this doctrine preclude challenges to a wide range of [agency] actions, not just the act of literal rate filing."). Nonetheless, the actions the DOT took as to the unfiled air fares here constitute far less regulation than what courts have found sufficient in other cases.

In Grays Harbor, 379 F.3d at 651,[27] the Ninth Circuit noted that "the market-based regime established by FERC continues FERC's oversight of the rates charged.  FERC only permits power sales at market-based rates after scrutinizing whether 'the seller and its affiliates do not have, or have adequately mitigated, market power in generation and transmission and cannot erect other barriers to entry. . . .'"  There is no evidence here that the DOT scrutinized the various carriers' market power and barriers to entry.  The court in Grays Harbor also found that FERC's "oversight [was] ongoing, in this case requiring Idaho Power Company to provide notice of any change in status, to file an updated market analysis every three years, and to file various sales agreements and transaction summaries."  Id.  There is no evidence here that the DOT required the various carriers who no longer had to file air fares to submit anything.  In Grays Harbor, FERC had also notified the court that it believed those procedures satisfied the filed rate doctrine.  Id.  Here, despite the Court's having raised this same question at the hearing on the motion to dismiss, Defendants have apparently not solicited the DOT's views.  See Tr. of Nov. 1, 2010 at 45.

E. & J. Gallo Winery also emphasized the agency's ongoing oversight of the market. The Ninth Circuit there explained that FERC only permitted market-based rates "[a]fter determining that no seller of natural gas could obtain market power and that market-based rates would be 'just and reasonable,'" issuing blanket certificates, advising that "it would continue to 'monitor the operation of the market through the complaint process,'" and then actually acting to revoke Enron's certificate.  E. & J. Gallo Winery, 503 F.3d at 1038.  The

---

[27]  Grays Harbor is one of a number of cases that arise out of the California Energy Crisis of 2000-2001, when shortages of power and high electricity prices caused blackouts and general turmoil in the West Coast electricity markets.  See, e.g., E. & J. Gallo Winery, 503 F.3d 1027; Wah Chang, 507 F.3d 1222; Snohomish Cnty., 384 F.3d 756; California ex rel. Lockyer v. Dynegy, Inc., 375 F.3d 831 (9th Cir. 2004).  Plaintiffs generally alleged that defendant energy producers manipulated the market and restricted electricity supplies in order to cause artificially high prices in the market.

court there, too, noted that FERC had asserted that the filed rate doctrine would apply to the market rates.  Id. at 1041 (quoting and citing Grays Harbor, 379 F.3d at 648-51).  Again, there is no evidence here that the DOT either made so calculated a decision to permit market-based rates or that it took so active a role in monitoring the market after doing so.[28]

In their Reply brief, Defendants tout In re Hawaiian and Guamanian Cabotage Antitrust Litigation, 450 Fed. App'x 685, 688 (9th Cir. 2011), as an example of a court applying the filed rate doctrine to "a regulatory regime largely identical to the one at issue here."  See Reply at 12.  Cabotage is an unpublished memorandum disposition and therefore has no precedential value.  See Circuit Rule 36-3(a).  Assuming arguendo that it did, the Court agrees that it initially appears helpful to Defendants.  Cabotage pertained to Surface Transportation Board ("STB") regulations that required some shipping rates to be filed but exempted others from filing.  In re Hawaiian & Guamanian Cabotage Antitrust Litig., 754 F. Supp. 2d 1239, 1253 (W.D. Wash. 2010), aff'd 450 Fed. App'x 685.  The court concluded that the STB had exercised its authority to regulate rates sufficiently to trigger the filed rate doctrine "by choosing not to require the filing of rates but rather to monitor the rates through a complaint process."  Cabotage, 450 Fed. App'x at 688.[29]  Defendants point out that here, too, there is a regulation setting forth a complaint process for challenging the lawfulness of rates, that this complaint process still exists and has been updated as recently as 2000.  Reply at 14 (citing 14 C.F.R. §§ 302.501-507, 302.401-420; Buschell Decl. Ex. I at 6478-79).

Despite superficial similarities, the regulatory regime in Cabotage differs from the regime here.  For one thing, Cabotage involved a different industry: cargo shipping between Hawaii and Guam, in which the two carrier defendants controlled nearly 100% of the trade, and, Plaintiffs represented to this Court, "95 percent of the rates at issue were pursuant to surcharges that were filed."  Cabotage, 450 Fed App'x at 687; Appellants Br., 2011 WL 2455536, at *3 (9th Cir. April 1, 2011); Tr. of August 15, 2014 at 19.  But more significantly,

---

[28]   See also Snohomish, 384 F.3d at 760-61 (describing extensive actions FERC took to "continue[] to oversee wholesale electricity rates").

[29]   The court specifically held that "The STB's regulation of rates in noncontiguous domestic trade parallels FERC's regulation of natural gas rates in Gallo."  Id.

**United States District Court**
For the Northern District of California

the complaint process there was robust and actually used.  Defendants in <u>Cabotage</u>

represented to the Circuit that the ICCTA (the applicable law) "<u>prevents</u> the STB from

exempting water carriers in the noncontiguous domestic shipping trade from the ICCTA's

rate reasonableness requirements," and that the STB had actually "considered complaints

challenging the reasonableness of rates."  Appellees Br., 2011 WL 2130612, at *30 (9th Cir.

May 23, 2011) (describing STB adjudication of Guam's challenge to reasonableness of rates

in the Guam trade lane).  Indeed, in the course of considering such rate challenges, the STB

had established a detailed approach for analyzing rate reasonableness "just like the market-

based analysis employed by FERC [in <u>Gallo</u>]."  <u>Id.</u> at *30.  STB: (1) "stated that it would

determine whether there was sufficient competition in the Guam trade to preclude the

exercise of market power"; (2) "would conduct a constrained-market pricing analysis,

looking at whether the carrier earns an overall return on investment that exceeds its cost of

capital"; and (3) "if it found the aggregate rate levels in effect on the earliest date covered by

the complaint to be unreasonable, it would apply the 'zone of reasonableness' to the

maximum lawful aggregate base rates for that date to increase the maximum lawful aggregate

rates for the subsequent years."  <u>Id.</u> at *30-31.  Given all of this regulatory activity, the

memorandum disposition had no trouble concluding both that the STB was "monitor[ing] the

rates through a complaint process" and that nothing suggested that "those aggrieved are

unable to challenge the underlying rates . . . through the complaint process."  <u>Cabotage</u>, 450

Fed App'x at 688-89.[30]

Here, there is no evidence that any consumer has ever used the complaint process to

challenge the reasonableness of any international air fare.  <u>See</u> Avent Decl. (dkt. 899)

¶ 2(d)[31]; <u>see also</u> <u>Ting</u>, 319 F.3d at 1043-44 (finding that filed rate doctrine did not apply

despite ongoing agency complaint process).  The Court is aware of no evidence that the DOT

---

[30] Plaintiffs in that case had also argued that meaningful agency review was required for the doctrine to apply–an argument the memorandum disposition rightly rejected out of hand.  <u>See</u> <u>id.</u> at 688.

[31] Defendants challenge this testimony, arguing that Avent contradicted himself at his deposition by admitting that he <u>is</u> aware of a customer who sought to challenge a fuel surcharge through the complaint process.  <u>See</u> Reply at 21.  Defendants fail to point to any contradiction as to air fares.

United States District Court
For the Northern District of California

has ever rejected as unreasonable any international air fare.  See RJN Ex. 15 ("In the 34 years since the passage of the [ADA], the Department has declined to use this authority to strike down fare rules in foreign air transportation."); see also Avent Decl. ¶ 2(a).[32]  It is not even clear to the Court that the DOT can, or ever did, access the unfiled air fares.  See Schwartz Decl. ¶¶ 10, 13 ("It is my understanding that DOT does not have access to fares included in the GFS private database.").  The Court therefore concludes that the DOT did not even engage in the minimal regulation that passed muster in Cabotage.

In short, the DOT effectively abdicated its authority over the unfiled air fares in 1999, and there is no evidence of any ongoing regulation of the unfiled air fares thereafter.  Accordingly, Defendants may not use the filed rate doctrine as a shield from civil liability.  See E. & J. Gallo Winery, 503 F.3d at 1040.  Though "the filed rate doctrine has been given an expansive reading and application in this Circuit," Carlin, 705 F.3d at 868, it cannot be read so expansively as to require deference to an agency that is not regulating.  Deference to agency inaction invites, and shelters, anticompetitive conduct.  See E. & J. Gallo Winery, 503 F.3d at 1050 (Fletcher, J., concurring) ("Without minimum standards for FERC oversight, the Filed Rate Doctrine threatens to come unmoored from its rationale of respecting the actions of a federal agency to which Congress has delegated authority.  Instead, I fear respect is being given to agency passivity, allowing anticompetitive and otherwise illegal actions to escape review.").  That cannot be the law.[33]

**B.     Fuel Surcharges**

For similar reasons, the Court also concludes that the filed rate doctrine does not apply to the fuel surcharges.  Despite disagreeing about the proper interpretation of the 1999 "all surcharges are to be filed" statement, see Buschell Decl. Ex. C Attach. B; Opp'n at 34 ("the

---

[32] The Court notes that Defendants challenge this testimony.  See Reply at 21.

[33] Nor is it the law that because foreign regulators approved some of the unfiled rates, the filed rate doctrine should apply.  See Joint Memo. at 16-17.  Defendants cite no authority so holding, and their argument that this Court should be the first forgets that the filed rate doctrine is grounded in principles of federal preemption and deference to agency decision making.  See E. & J. Gallo Winery, 503 F.3d at 1033.  The reasons that a court would defer to a federal agency's decision on how best to carry out its regulatory mission do not apply to foreign regulators.  This Court has no reason to assume that foreign regulators care about curbing anticompetitive conduct or have the authority to do so.

United States District Court
For the Northern District of California

1999 regulation cannot possibly be read to require the filing of fuel surcharges at a time

when they were expressly prohibited by the DOT."); Reply at 9 ("The phrase . . . does not

require an airline to impose any particular surcharge, let alone a surcharge affirmatively

prohibited by the DOT.  [It means] that, should an airline choose to impose a surcharge, that

surcharge must be filed."), the parties agree that the DOT did not permit airlines to file

separate surcharges until 2004, see Tr. of Aug. 15, 2014 at 28, 31.  Moreover, Plaintiffs

represented at the hearing that the 1999 statement "doesn't matter, because none of the

surcharges we're talking about took place until 2004." Id. at 31.  As of 2004, the DOT

permitted, but did not require, carriers to file surcharges in general rules tariffs.  See RJN Ex.

5.  It then promptly announced that it could not "effectively monitor" fuel surcharges, and

announced the designating such charges as "government-approved" would be "an unfair and

deceptive trade practice."  RJN Ex. 26.

      The Court sees no evidence that the DOT actively regulated fuel surcharges before

October 2004, when such surcharges were not permitted to be separately filed.  Nor does the

Court find that the DOT had any intention of regulating fuel surcharges after October 2004,

when it permitted their filing[34] but disclaimed any ability to monitor them, and threatened

carriers with enforcement action if they advertised that such rates were "government-

approved."  The Court is persuaded that the DOT did not want the fuel surcharges so

advertised because it "does not actually regulate the level of carriers' fuel surcharges and

does not substantively 'approve' such charges."  See Opp'n at 46.[35]  As with the unfiled air

fares, there is no evidence of any ongoing regulation of the fuel surcharges.  Accordingly, the

filed rate doctrine does not apply.  See E. & J. Gallo Winery, 503 F.3d at 1040.

//

//

---

[34] Plaintiffs also point to a good deal of evidence that Defendants did not effectively file many of their fuel surcharges at issue.  See Opp'n at 35-36.

[35] Providing some further support for this interpretation of the DOT's intentions is the DOT's failure to approve the carriers' 2003 request for immunity for collusive fuel surcharge rate setting. See RJN Ex. 9 (Application for Approval of Agreements by the Int'l Air Transport Assoc., Aug. 25, 2003) (dkt. 870-9); Opp'n at 16.

United States District Court
For the Northern District of California

1

**C.      ANA Discount Fares**

2      Finally, the Court will not apply the filed rate doctrine to ANA's discount fares.  ANA

3  asserts that those fares, which it did not file, are merely discounted versions of its filed fares,

4  because they relate to the same subject matter.  ANA Mot. at 18-19.  ANA argues that

5  Plaintiffs' claims therefore "require a finding that [they] should have paid hypothetical rates

6  below the filed rates . . . ."  Id.; Tr. of Aug. 15, 2014 at 40-41.  ANA goes on to argue that

7  "the filed rate doctrine absolutely bars [Plaintiffs' claims because they seek] to assume a rate

8  different from the filed rate."  Id.  Not so.[36]

9      ANA relies primarily on Maislin Indus., U.S., Inc. v. Primary Steel, Inc., 497 U.S. 116

10  (1990) (holding that the filed rate doctrine governs the legal relationship between the parties

11  even when the parties negotiate lower rates) and AT&T Corp. v. Central Office Tel., Inc.,

12  524 U.S. 214 (1998) (holding that the filed rate doctrine governs the legal relationship

13  between the parties even when the parties negotiate better service terms) as support for the

14  proposition that its discount fares are materially similar to the filed fares and are therefore

15  governed by the filed rate doctrine.  ANA Mot. at 19-23; ANA Reply at 10-11; Tr. of Aug.

16  15, 2014 at 39-42.

17      In Maislin, Quinn Freight Lines ("Quinn"), a motor common carrier and subsidiary of

18  Maislin Industries, U.S., Inc., negotiated a shipping rate with Primary Steel that was below

19  Maislin's filed rate.  497 U.S. at 122-23.  Maislin later billed Primary Steel for the difference

20  ───────────────

21      [36]  As an initial matter, Plaintiffs argue that ANA cannot even invoke the filed rate doctrine
  because: (1) it is judicially estopped, based on its criminal trial; (2) it waived its right to assert this

22  defense; and (3) the Department of Justice has disapproved of ABA's conduct.  Opp'n at 56-60.  Judicial
  estoppel generally prevents a party from prevailing in one phase of a case on an argument and then

23  relying on a contradictory argument to prevail in another phase.  Milton H. Greene Archives, Inc. v.
  Marilyn Monroe, LLC, 692 F.3d 983, 993 (9th Cir. 2012).  ANA pleaded guilty to price-fixing

24  "unpublished" passenger fares, including the Satogaeri and Biz-wari fares at issue in this case.  Opp'n
  at 57.  Plaintiffs note that the D.C. District Court stayed an award of damages against ANA "in light of

25  [the] pending civil action."  Id.; but see ANA Reply (dkt. 914) at 5 (ANA paid a $73 million fine).  But
  ANA is not taking inconsistent positions–it argues here that the doctrine applies to bar recovery as to

26  its fares, not that its fares were not the result of price-fixing.  Moreover, the filed rate doctrine applies
  regardless of the culpability of a defendant's conduct or the possibility of inequitable results.  Carlin,

27  705 F.3d at 869.  Plaintiffs next argue that ANA waived the filed rate defense by pleading guilty, and
  knowingly and voluntarily acknowledging that this litigation was the appropriate vehicle for resolving

28  the amount of ANA's financial exposure.  Opp'n at 58.  The Court does not find waiver here.  Nor is
  the Court persuaded that the DOJ is interchangeable with the DOT.  ANA is not barred from invoking
  the doctrine.

United States District Court
For the Northern District of California

between the filed rate and the negotiated rate and brought suit when Primary Steel refused to pay.  Id.  The International Chamber of Commerce ("ICC") found that, while the filed rate was not unreasonable, charging Primary Steel the full amount after the parties had negotiated a lower rate was an "unreasonable practice," and exempted Primary Steel from liability.  Id. at 123-24.  The Supreme Court stated that the statute at issue, "as it incorporates the filed rate doctrine, forbids as discriminatory the secret negotiation and collection of rates lower than the filed rate."  Id. at 130.  The Court held that strict adherence to the filed rate was required after the ICC deemed the filed rate reasonable, because doing otherwise would be contrary to clear Congressional intent.  Id. at 135-36 (citation omitted).

In Central Office, Central Office Telephone, Inc. ("COT") brought federal and state law claims for AT&T's failure to provide benefits promised in connection with a telecommunication services contract.  524 U.S. at 220-21.  The Ninth Circuit held that "the filed rate doctrine [was] inapplicable because [the] case [did] not involve rates or ratesetting, but rather involve[d] the provisioning of services and billing."  Id. at 223 (quotation omitted).  The Supreme Court reversed, holding that "[r]egardless of the carrier's motive–whether it seeks to benefit or harm a particular customer–the policy of nondiscriminatory rates is violated when similarly situated customers pay different rates for the same services."  Id. "Rates . . . do not exist in isolation.  They have meaning only when one knows the services to which they are attached."  Id.  The Court held that "[b]ecause [COT] ask[ed] for privileges not included in the tariff," its claims, as they related to AT&T's failure to provide additional privileges, were barred.  Id. at 226-28.

In both Maislin and Central Office, strict adherence to the rate and terms of the tariffs was required to avoid the potential for discrimination.  Courts have consistently refused to calculate a hypothetical rate other than the filed rate for a particular product, because doing so would require the courts to independently determine what is reasonable, contrary to the underlying principles of the filed rate doctrine.  See Carlin, 705 F.3d at 880-82; see also Cnty. of Stanislaus v. Pac. Gas & Elec. Co., 114 F.3d 858, 863 (9th Cir. 1997) (holding that courts may not entertain damage claims that assume a hypothetical rate different from the

27

United States District Court
For the Northern District of California

1    filed rate).  ANA argues that it simply wishes to extend this principle to the present case.

2    ANA Mot. at 19-23; Reply at 10-11; Tr. of Aug. 15, 2014 at 39-42.

3           Critically, the unfiled Satogaeri and discount business class fares at issue here have

4    lower rates than the filed fares, but also have more restrictive terms–a situation not

5    considered by the Supreme Court in either <u>Maislin</u> or <u>Central Office</u>.  <u>See</u> Schwartz Decl.

6    ¶¶ 28-39; Tr. of Aug. 15, 2014 at 38-39.  Enforcement of the filed fare here would entitle

7    ANA to the full rate of the filed fares, but it would also entitle the passengers to the filed

8    fare's unrestricted terms.  <u>See generally</u> <u>Maislin</u>, 497 U.S. at 116; <u>Central Office</u>, 524 U.S. at

9    214.  Because the flights took place between approximately 2000 and 2007, the filed terms

10   cannot be enforced.  <u>See</u> Second CAC ¶¶ 128-74.

11          ANA's reasoning would allow it to file its highest rate and least restrictive terms for

12   each class of fare, then sell passengers unfiled fares with far more restrictive terms–and hide

13   behind the filed rate doctrine so long as the rates charged were below the filed rate.[37]  This

14   would bar passengers' antitrust claims, while effectively barring enforcement of the filed

15   terms.  The Court rejects such logic.  The filed fares have materially different terms from the

16   unfiled, discounted, and more restrictive fares.  They are different products.  Accordingly,

17   Plaintiffs' claims as to the unfiled fares do not require a finding that the filed fares were

18   unreasonable or that Plaintiffs should have paid a hypothetical rate below the filed rate.  <u>See</u>

19   <u>Brown v. MCI WorldCom Network Servs., Inc.</u>, 277 F.3d 1166, 1171-72 (9th Cir. 2002)

20   (filed rate doctrine "precludes courts from deciding whether a tariff is reasonable, reserving

21   the evaluation of tariffs to the [DOT], but it does not preclude courts from interpreting the

22   provisions of the tariff.").  Therefore, the Court holds that the filed rate doctrine does not

23   apply to ANA's discount fares.

24   //

25   //

26   //

27

28       [37] Plaintiffs would contend that that is nearly what happened here.  <u>See</u> Opp'n at 55 (citing
     Fukuda Depo. at 71-77, 83-84; Schwartz Decl. ¶¶ 29-39).

1

**IV.    CONCLUSION**

2        For the foregoing reasons, the Court GRANTS Defendants' summary judgment

3  motions as to the <u>filed</u> rates (Class B and C air fares), and DENIES those motions as to the

4  <u>unfiled rates (Class A air fares), fuel surcharges, and ANA discount fares.</u>[38]

5        **IT IS SO ORDERED.**

6

7  Dated: September 23, 2014

8                                                CHARLES  R. BREYER

9                                                UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[38] The Court further rejects Plaintiffs' assertion that the Court cannot grant summary judgment on some rates while leaving others intact.  <u>See</u> Opp'n at 52.  <u>E. & J. Gallo Winery</u> does not support Plaintiffs' assertion.  In the case at hand, Plaintiffs' claims are not based on an index or any other compilation of air fares.  The Court does not now reach the issue of Defendants' joint and several liability or whether Plaintiffs have proven a conspiracy.  <u>See id.</u> at 52-53.

United States District Court
For the Northern District of California