**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| DONALD WORTMAN, individually and on behalf of all others similarly situated; WILLIAM ADAMS; MARGARET GARCIA; BRENDEN G. MALOOF; MICAH ABRAMS; MARTIN KAUFMAN; RACHEL DILLER; LORI BARRETT; CLYDE H. CAMPBELL; MATTHEW EVANS; THOMAS SCHELLY; MARK FOY; JASON GREGORY TURNER; STEPHEN GAFFIGAN; BRUCE HUT; DICKSON LEUNG; KEVIN MOY; RUFUS BROWNING; LOLLY RANDALL; CHRISTIAN DUKE; ANDREW BARTON; TRACEY WADMORE SMITH; MICHAEL BENSON; TORI KITAGAWA; WOODROW CLARK, II; JAMES EVANS; MEOR ADLIN; JUSTIN LABARGE; SCOTT FREDERICK; REIKO HIRAI; IREATHA DIANE MITCHELL; LARRY CHEN; DAVID KUO; DAVID MURPHY; TITI TRAN; ROBERT CASTEEL, III, *Plaintiffs-Appellees*, | No. 15-15362 <br><br> D.C. No. 3:07-CV-05634-CRB |
| v. | |

2          WORTMAN V. ALL NIPPON AIRWAYS

ALL NIPPON AIRWAYS,
                    *Defendant-Appellant.*

DONALD WORTMAN, individually and          No. 15-15364
on behalf of all others similarly
situated; WILLIAM ADAMS;                  D.C. No.
MARGARET GARCIA; BRENDEN G.               3:07-cv-05634-
MALOOF; MICAH ABRAMS; MARTIN              CRB
KAUFMAN; RACHEL DILLER; LORI
BARRETT; CLYDE H. CAMPBELL;
MATTHEW EVANS; THOMAS                     OPINION
SCHELLY; MARK FOY; JASON
GREGORY TURNER; STEPHEN
GAFFIGAN; BRUCE HUT; DICKSON
LEUNG; KEVIN MOY; RUFUS
BROWNING; LOLLY RANDALL;
CHRISTIAN DUKE; ANDREW BARTON;
TRACEY WADMORE SMITH; MICHAEL
BENSON; TORI KITAGAWA;
WOODROW CLARK, II; JAMES EVANS;
MEOR ADLIN; JUSTIN LABARGE;
SCOTT FREDERICK; IREATHA DIANE
MITCHELL; LARRY CHEN; DAVID
KUO; DAVID MURPHY; TITI TRAN;
ROBERT CASTEEL, III,
                    *Plaintiffs-Appellees,*

v.

CHINA AIRLINES; EVA AIRWAYS,
                              *Defendants-Appellants.*

Appeal from the United States District Court
For the Northern District of California
Charles R. Breyer, District Judge, Presiding

Argued and Submitted January 13, 2017
San Francisco, California

Filed April 14, 2017

Before:  J. CLIFFORD WALLACE, RICHARD R.
CLIFTON, and MILAN D. SMITH, JR., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.;
Partial Concurrence and Partial Dissent by Judge Wallace

## SUMMARY[*]

### Antitrust

Affirming the district court's partial denial of defendant airlines' motions for summary judgment, the panel held that the filed rate doctrine did not preclude a suit for antitrust damages challenging defendants' unfiled fares, fuel surcharges, or special "discount" fares.

The plaintiffs alleged that the airlines colluded to fix the prices of certain passenger tickets and fuel surcharges on flights between the United States and Asia, in violation of Section 1 of the Sherman Antitrust Act.

The filed rate doctrine prohibits individuals from asserting civil antitrust challenges to an entity's agency-approved rates. The panel held that the doctrine did not preclude plaintiffs' antitrust claims premised on unfiled fares because there were genuine issues of material fact as to whether the Department of Transportation effectively abdicated its authority over the unfiled air fares. The panel held that there were also genuine issues of material fact regarding the DOT's exercise of regulatory authority over fuel surcharges. Addressing one airline's "discount" fares, which differed in both price and terms from the airline's filed tariffs, the panel held that the district court did not err in declining to apply the filed rate doctrine given questions of fact regarding whether the discount fares constituted the same product as the fares actually filed.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Concurring in part and dissenting in part, Judge Wallace concurred in the bulk of the majority's opinion. He dissented from the majority's conclusion, in Section III, Subsection B of its opinion, that genuine issues of material fact remained as to whether the DOT effectively abdicated its authority over fuel surcharges that the defendants actually filed with the DOT. Judge Wallace wrote that the filed rate doctrine should not be expanded by the rule the courts must determine when an agency has "effectively abdicated" its authority, notwithstanding the actual filing of rates.

## COUNSEL

Gary J. Malone (argued), Ankur Kapoor, and Alysia Solow, Constantine Cannon LLP, New York, New York; Douglas R. Rosenthal, Richard O. Levine, and Aymeric Dumas-Eymard, Constantine Cannon LLP, Washington, D.C.; for Defendant-Appellant All Nippon Airways.

Tammy Tsoumas (argued), Jonathan J. Faria, and Jason Y. Kelly, Kirkland & Ellis LLP, Los Angeles, California; James H. Mutchnik, Chicago, Illinois; for Defendant-Appellant Eva Airways.

Steven N. Williams (argued) and Adam J. Zapala, Cotchett Pitre & McCarthy LLP, Burlingame, California; Michael P. Lehmann and Christopher L. Lebsock, Hausfeld LLP, San Francisco, California; for Plaintiffs-Appellees.

## OPINION

M. SMITH, Circuit Judge:

Defendants-Appellants All Nippon Airways (ANA), China Airlines, and EVA Airways (collectively, Defendants) challenge the district court's holding that the filed rate doctrine does not preclude Plaintiffs-Appellees' putative class action suit for antitrust damages based on allegations of collusion and price fixing. We have not previously addressed the application of the filed rate doctrine to airline fares and fees. For the reasons set forth in this opinion, we hold that, based on the record in this case, the filed rate doctrine does not preclude Plaintiffs' suit for antitrust damages challenging Defendants' unfiled fares, fuel surcharges, or "discount" fares. We therefore affirm the district court's partial denial of Defendants' motions for summary judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs claim antitrust violations by Defendants in connection with three categories of Defendants' charged rates: (1) unfiled fares, (2) fuel surcharges, and (3) special "discount" fares.

The DOT's present regulations require airlines to file their base-fare rates to differing extents, depending upon whether a particular airline is included within Country Category A, B, or C. Airlines headquartered in or traveling between the United States and a Category A country need not file any fares. Airlines headquartered in or traveling between the United States and a Category C country must file all fares. Finally, airlines headquartered in or traveling between the United States and a Category B country must file certain, but not all, of their fares. Those fares not

required to be filed are the "unfiled fares" at issue in this appeal.

In addition to charging base-fare rates, some airlines impose fuel surcharges, which are additional per-ticket fees based on the carrier's fuel costs. Prior to 2004, the DOT did not permit separate fuel surcharges. Rather, airlines were required to incorporate the cost of fuel into the base ticket price. However, in October 2004, the DOT lifted its prohibition on separate fuel surcharges. The parties dispute whether the DOT required filing of these newly allowed surcharges. Defendants argue that it did, citing a 1999 DOT statement that "all surcharges are to be filed," while Plaintiffs argue that the DOT's 1999 statement has no relevance to fuel surcharges given that the DOT did not permit fuel surcharges at the time the statement was made. In any event, the record reflects that regardless of whether the DOT required airlines to file fuel surcharges, in many cases airlines did file them.

Finally, Defendant ANA offers a number of special "discount" fares. These include the "Satogaeri" fares and the "Business Discount," "Biziwari," or "Buz-Wari" fares, all of which operate in the same manner: Specifically, ANA files the respective fares with the DOT, then authorizes certain travel agents to sell tickets with more restrictive terms to consumers for some amount less than the filed rate. This lesser amount constitutes the "net fare," which travel agents remit to ANA as payment for the ticket. The travel agent retains as a commission any difference between the net fare and the amount charged to the consumer.

The terms governing the fares actually filed by ANA differed substantially from the terms governing the discount fares. For instance, while one of ANA's publicly-filed fares

could be used for "circle trips"[1] and "double open jaw trips,"[2] the discounted version of that fare could not. The same public fare had a minimum stay of three days and allowed for a stopover in Japan and up to six transfers, while the discounted fare had no minimum stay, and did not allow stopovers or transfers. Some other of ANA's filed fares similarly differed from their discounted versions in regard to the types of trips permitted, maximum stay required, the amount of time in advance the ticket needed to be purchased, restrictions on stopovers, and applicable cancellation fees.

Plaintiff Donald Wortman filed a putative class action against Defendants on November 6, 2007, alleging that Defendants (as well as other airlines no longer in the suit) colluded to fix the prices of certain passenger tickets and fuel surcharges on flights between the United States and Asia, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. On November 23, 2009, Defendants filed motions to dismiss Plaintiffs' complaint, in part on the ground that the filed rate doctrine barred Plaintiffs' claims. The district court granted Defendants' motions in part on May 9, 2011, but denied their motions in regard to their assertion of the filed rate doctrine as a defense against claims for antitrust damages.

---

[1] "Circle trips" begin and end at the same point, but involve multiple stopovers.

[2] "Double open jaw" trips are those in which the origin and destination of the first flight are different from the origin and destination of the second, such that instead of traveling outbound from A to B and back from B to A, the customer travels outbound from A to B, but, then, on the second trip, from C to D.

On September 10, 2013, following over two years of discovery, Defendants moved for summary judgment, again on the basis of the filed rate doctrine. On September 23, 2014, the district court granted in part and denied in part Defendants' respective motions for summary judgment. The district court held that while the filed rate doctrine applied to bar Plaintiffs' antitrust damages claims based on actually-filed fares, the doctrine did not preclude Plaintiffs' claims regarding unfiled fares, fuel surcharges, or ANA's "discount" fares.[3] The district court then granted Defendants' respective motions to certify its order partially denying summary judgment for interlocutory appeal. We similarly granted Defendants' petitions for permission to appeal. *See* 28 U.S.C. § 1292(b).

## ANALYSIS

### I. The History and Application of the Filed Rate Doctrine

The filed rate doctrine is a judicially created rule that prohibits individuals from asserting civil antitrust challenges to an entity's agency-approved rates. The doctrine originated in *Keogh v. Chicago & Northwest Railway Co.*, 260 U.S. 156 (1922). The plaintiffs in that case sought damages under the Sherman Act, alleging that the rates charged by common carriers exceeded those that would be charged in a competitive market. *Id.* at 159–160. The rates in question, however, had been filed with, and approved by,

---

[3] Although the order is arguably susceptible to different readings, Plaintiffs acknowledged at oral argument that the district court's order did not implicitly or explicitly grant summary judgment in Plaintiffs' favor as to the unfiled fares, fuel surcharges, and discount fares. We treat the order as merely denying summary judgment in Defendants' favor as to these rates.

the Interstate Commerce Commission (ICC). *Id.* at 160. The Supreme Court held that the plaintiffs' suit was precluded, explaining that that

> [i]njury implies violation of a legal right. The legal rights of shipper as against carrier in respect to a rate are measured by the published tariff. Unless and until suspended or set aside, this rate is made, for all purposes, the legal rate . . . . The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier.

*Id.* at 163. The Supreme Court stated that the "paramount purpose" of this rule was to prevent "unjust discrimination" between consumers. *Id.*

The Supreme Court reaffirmed its *Keogh* holding six decades later, in *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409 (1986), once again applying the filed rate doctrine to bar shippers' challenges to carriers' filed rates. The Court rejected the plaintiffs' argument that Congress' stated intention to promote competition in the shipping industry, as set forth in the Motor Carrier Act of 1980, implied a private right to seek antitrust damages. *Id.* at 420. Rather, the Court held that absent a "specific statutory provision or legislative history indicating a specific congressional intention to overturn the long-standing *Keogh* construction," a private antitrust suit's "harmony with the general legislative purpose is inadequate" to justify deviation from the rule. *Id.*; *see also Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 135 (1990) ("Generalized congressional exhortations to 'increase competition' cannot provide the ICC authority to alter the well-established statutory filed rate requirements."). The

Court also noted that the filed rate doctrine is not properly characterized as antitrust "immunity," because other sanctions or equitable relief remain available. *Square D*, 476 U.S. at 422. Rather, the doctrine simply precludes treble damages based on a hypothetically lower rate. *Id.*

While the filed rate doctrine initially grew out of circumstances in which common carriers filed rates that a federal agency then directly approved, we have applied the doctrine in contexts beyond this paradigmatic scheme, and most frequently in the realm of energy rates. In *E. & J. Gallo Winery v. EnCana Corp.*, 503 F.3d 1027 (9th Cir. 2007), we considered a suit by customers against a natural gas supplier. The Federal Energy Regulatory Commission (FERC) had jurisdiction over the relevant transactions. *Gallo*, 503 F.3d at 1031. The defendants had not filed the challenged rates with FERC. *See id.* Rather, FERC had adopted a market-based approach to rate setting. *Id.* at 1041–42. We held that "to the extent Congress has given FERC authority to set rates under the [Natural Gas Act] and FERC *has exercised that authority*, such rates are just and reasonable as a matter of law and cannot be collaterally challenged under federal antitrust law or state law." *Id.* at 1035 (emphasis added). The question in that case was whether FERC had actually "authorized" the rates in question, the lack of a filing requirement notwithstanding. *Id.* at 1041 (citing *Pub. Util. of Snohomish Cty. v. Dynegy Power Mktg.*, 384 F.3d 756, 760 (9th Cir. 2004), for the proposition that "[t]he fundamental question . . . is whether, under the market-based system setting wholesale electricity rates, FERC is doing enough regulation to justify federal preemption of state laws."). In *Gallo*, we found that it had. 503 F.3d at 1042–43.

Specifically, we found that while Congress actively removed FERC's authority "to set prices for first sales," and thereby left "the determination of natural gas prices at the wellhead to market forces," *id.* at 1037, FERC continued to regulate rates by (1) determining ex ante that "no seller of natural gas could obtain market power and that market-based rates would be just and reasonable," (2) issuing "blanket certificates for sales" of natural gas, which only then suspended FERC's rate-filing requirements for those sales, and (3) monitoring the "operation of the market through the complaint process," *id.* at 1038 (internal quotation marks omitted); *see also Public Util. of Grays Harbor v. Idacorp*, 379 F.3d 641, 651 (9th Cir. 2004) (identifying ways in which FERC maintained regulation of market-based rates). We also found in a prior case that FERC "imposed various reporting requirements on sellers," and that the agency had "clearly stated its belief that these procedures satisf[ied] the filed rate doctrine." *Id.* at 1041 (quoting *Grays Harbor*, 379 F.3d at 651). FERC therefore had "not abdicated its responsibilities but ha[d] acted, albeit with a light hand, to authorize just and reasonable rates" such that the filed rate doctrine applied. *Id.* at 1042. We cautioned, however, that "a failure by FERC to *exercise* its statutory authority to approve rates would cast doubt on the underlying premise of the Filed Rate Doctrine." *Id.* at 1040 (emphasis added).

We considered the filed rate doctrine in a wholly different context in *Carlin v. DairyAmerica, Inc.*, 705 F.3d 856 (9th Cir. 2013). That appeal arose from a putative class action brought by dairy farmers seeking monetary and injunctive relief due to the misreporting of pricing data to the United States Department of Agriculture (USDA), which affected the rates for raw milk set under Federal Milk Marketing Orders (FMMOs) pursuant to the Agricultural Marketing Agreement Act, 7 U.S.C. § 601 *et seq.  Carlin*,

705 F.3d at 864–66. We conceded that FMMO prices were not the paradigmatic "filed rates" contemplated in *Keogh* because (1) they consisted only of minimum prices, (2) they were not nationally uniform, and (3) FMMOs did not exist at all in some locations. *Id*. at 870. Nevertheless, we found "sufficient attributes which justify the application of the doctrine." *Id*. In particular, we reiterated our holding from *Gallo* that "meaningful review" by an agency is not a prerequisite to the application of the filed rate doctrine. *Id*. at 871. Rather, "the essential question [is] whether the market rates were *authorized* by the [agency]." *Id*. (emphasis in original). In other words, we must ask "whether the [agency] was doing enough regulation to justify federal preemption of state laws." *Id*. at 872 (citing *Gallo*, 503 F.3d at 1041). "[T]he USDA did possess the authority and did exercise it to address problems as to the agency-set minimum prices for raw milk." *Id*. at 873. Thus, the filed rate doctrine applied.

Nevertheless, despite the general applicability of the filed rate doctrine, we held in *Carlin* that the farmers' suit was not barred because the federal agency in question had effectively—if retroactively—rejected the FMMO prices as incorrect, and "the policy considerations behind the doctrine d[id] not justify applying the doctrine as a bar in [that] case." *Id*. at 874. In particular, calculating damages "would not [] involve the kind of 'hypothetical' speculation about agency decisions that *Keogh* forbids." *Id*. at 882.

We have also addressed a scenario in which the filed rate doctrine did not apply at all, in *Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003). There, we held that the filed rate doctrine did not bar a putative class action in which customers alleged that a telecommunication provider's new contract rates violated state contract and consumer protection laws, despite

the fact that the Federal Communications Act (FCA) required telecommunication carriers to file tariffs with the FCC. *Id.* at 1130. We explained that the Telecommunications Act of 1996 "fundamentally altered the [FCA's] regulatory scheme" by directing the FCC to "forbear from applying any regulation or any provision" where "enforcement of such regulation or provision [wa]s not necessary to ensure that [rates] . . . are just and reasonable" and nondiscriminatory, and where enforcement was neither necessary for consumer protection nor in the public interest. *Id.* at 1132 (quoting 47 U.S.C. § 160(a)).

The FCC promptly acted on its authority to forbear, explicitly stating that tariffs were no longer necessary due to market competition and that the filed rate doctrine would no longer apply. *Id.* at 1139 n.7. This new forbearance from requiring rate filings did not leave the market without some safeguards: The FCC retained a consumer complaint process as a means for consumers to seek a remedy for anticompetitive rates, and the FCC would not defer to the market where it determined the market to be "seriously flawed or not competitive." *Id.* at 1143–45.

As these cases illustrate, the focus of the filed rate doctrine has somewhat expanded beyond its original application, in which an agency's express approval of a rate precluded civil antitrust challenges to that rate. Nevertheless, our decisions make equally clear that this expansion is not without bounds. *See, e.g.*, *Carlin*, 705 F.3d 874.

## II. Regulation of the International Airline Industry

The Federal Aviation Act of 1958 (FAA), Pub. L. No. 85-726, 72 Stat. 731, established a regulatory structure for airline rates. The FAA gave the Civil Aeronautics Board—

which has since been replaced by the DOT—authority to approve or disapprove international airline rates in service to its responsibility for preventing "unfair, deceptive, predatory, or anticompetitive practices in air transportation." 49 U.S.C. §§ 41501, 41504.  The FAA required airlines to file all tariffs with the DOT, and authorized the DOT to hold hearings, either on its own initiative or upon consumer complaint, to determine the lawfulness of those rates. 49 U.S.C. §§ 41504(a)–(b), 41509(a).  The DOT implemented its authority through detailed regulations. *See* 14 C.F.R. Part 221.

In the late 1970s, Congress passed legislation intended to increase competition and reduce governmental regulation in the airline industry.  The Airline Deregulation Act of 1978 (ADA) wholly deregulated the domestic airline market, leading the DOT to cease accepting tariff filings for domestic air carriers.  *See* 14 C.F.R. § 399.40; Tariffs for Post-1982 Domestic Travel (April 7, 1982), 47 FR 14892-01.  In the international airline market, however, Congress stopped short of full deregulation.  Under the International Air Transportation Competition Act of 1979 (IATCA), the DOT retained jurisdiction over international airline rates, but had increased discretion over filing requirements.  49 U.S.C. § 40109(c).  IATCA correspondingly decreased DOT's ability to grant antitrust immunity to fare agreements among carriers as part of Congress' "determination that airline service levels and fares should be controlled by competition, not by government regulation."  Int'l Air Transport Assoc. Tariff Conf. Proceeding July 6, 2006 at *78; *see also* 49 U.S.C. § 41308(b).  DOT continued to be responsible for providing a complaint process for consumers to challenge international air transport rates as anticompetitive.  14 C.F.R. §§ 302.501-507, 14 C.F.R. §§ 302.401–420.

In 1997, 20 years after the passage of IATCA, the DOT announced that, in keeping with "the continuing evolution of a policy where we rely on market forces rather than continual government oversight to set prices for air transportation," rate filing no longer served a purpose in competitive foreign markets. 62 Fed. Reg. 10758, 10760. Accordingly, in 1999, DOT issued a final rule creating its three Country Categories (A, B, and C), each with different filing requirements. 64 Fed. Reg. 40654; 14 C.F.R. § 293.10. As noted, *supra*, the rule required airlines flying between Category C countries and the United States, or that were "nationals" of a Category C country (*i.e.* those airlines headquartered in Category C countries), to file all tariffs with the DOT. 14 C.F.R. § 293.10(a)(1)(iii). Airlines headquartered in or flying to and from Category B countries had to file only their standard one-way economy fares with the DOT. 14 C.F.R. § 293.10(a)(1)(ii). Airlines headquartered in or flying to and from Category A countries were not subject to any filing requirements, except to the extent that they operated flights to or from Category B or C countries. 14 C.F.R. § 293.10(a)(1)(i). The Country Categories corresponded roughly to the strength of bilateral agreements between the United States and a particular country. 64 Fed. Reg. at 40656. The DOT stated that it "has always had the statutory authority to take action directly against unfiled passenger fares," and "reserve[s] the option of reinstating the tariff-filing obligation . . . where consistent with the public interest." 62 Fed. Reg. at 10763.

Airlines submit tariffs by filing them with the Airline Tariff Publishing Company (ATPCO), which acts as a private clearinghouse to distribute fares to various entities, including the Government Filing System (GFS) through which the DOT reviews filed fares. ATPCO filters submitted fares based on the DOT's country categories, and

flags certain fares to be "presented" to the DOT for review. The DOT does not consider a fare as filed until it has been so presented, and the DOT does not appear to have access to unpresented fares.

In 1999, the DOT required that "all surcharges . . . be filed." DOT Notice of Exemption from the Department's Tarriff-Filing Requirements, Dkt. OST-97-2050-14. However, the DOT prohibited airlines from charging separate fuel surcharges prior to 2004. In 2004, the DOT explained that the prohibition on fuel surcharges was "established at a time when the Department was regulating fares much more actively than is the case today, and [it was] concerned that tariff surcharges could undermine [its] regulatory supervision of fare levels." However, it stated that increasingly competitive market conditions rendered this prohibition "no longer necessary to support the limited degree of pricing supervision that continues."

As of October 2004, the DOT directed that "carriers [we]re free to file surcharges in general rules tariffs." The following month the DOT announced that carriers could no longer advertise surcharges as being "government-approved," stating that it could not "effectively monitor" fuel charges filed separately from base fares, and that listing separate surcharges as approved would constitute "an unfair and deceptive trade practice." 69 Fed. Reg. 65676, 65676–77.

### III.    Application of the Filed Rate Doctrine to International Airline Fares and Fees

#### A.    Application of the Filed Rate Doctrine to Unfiled Fares

We have previously applied the filed rate doctrine to circumstances in which the relevant rates were not literally filed. *See Gallo*, 503 F.3d at 1042; *Grays Harbor*, 379 F.3d at 651–52; *Wah Chung v. Duke Energy Trading*, 507 F.3d 1222, 1225 (9th Cir. 2007). In so doing, we have found that even though the regulating agency did not oversee rates via a filing system, the agency engaged in sufficient regulation through other means to satisfy the purposes of the doctrine. *See, e.g.*, *Gallo*, 503 F.3d at 1042. In the present instance, by contrast, we agree with the district court's determination that there were genuine issues of material fact as to whether the DOT effectively abdicated its authority over the unfiled air fares. Accordingly, we hold that the filed rate doctrine does not preclude Plaintiffs' antitrust claims premised on the unfiled fares.

The parties do not dispute that the DOT had the authority to regulate unfiled rates, only whether it actually did so. As in the energy rate context, the DOT maintains a consumer complaint process through which consumers may challenge a rate as unreasonable or anticompetitive. The maintenance of a consumer complaint process is not, however, dispositive. *See, e.g.*, *Ting*, 319 F.3d at 1143–44.

We acknowledge that, unlike the FCC's affirmative disavowal of telecommunications regulation, the DOT has at least paid lip-service to the notion that it continues to exercise some oversight of unfiled rates. In particular, when the DOT first set forth its three-tiered filing scheme, it stated that the new system would "not materially lessen the

Department's ability to intervene in passenger pricing matters" because

> First, the review of [International Air Transport Association] passenger fare agreements will continue. Second, the Department has always had the statutory authority to take action directly against unfiled passenger fares and rules under a variety of circumstances. And third, the Department will reserve the option under the proposed rule of revoking the exemption, and thus of reinstating the tariff-filing obligation, with regard to a particular carrier or carriers, or for specific markets, where consistent with the public interest.

62 Fed. Reg. at 10763. Nevertheless, the evidence shows that the DOT's actual *actions* regarding unfiled fares have been minimal at best. Appellants point only to the 2005 reassignment of Argentina to a stricter Country Category as evidence of any ongoing regulation. Additionally, there remains some question regarding whether—despite the DOT's representation that it would maintain authority over unfiled fares—the DOT has the ability to actually access or review those fares. The DOT's only means of considering unfiled rates appears to be through (1) assessment of the strength of bilateral pricing agreements between the United States and a given country, and (2) consumer complaints. *See* 14 C.F.R. §§ 302.501–507, 302.401–420.

In short, there are genuine issues of fact as to whether the DOT has effectively abdicated the exercise of its authority to regulate unfiled fares. Accordingly, the district court did not err in denying summary judgment to Defendants as to

those fares based on the filed rate doctrine.  *See Gallo*, 503 F.3d at 1040 ("[A] failure by FERC to exercise its statutory authority to approve rates would cast doubt on the underlying premise of the Filed Rate Doctrine. . . .").

## B. Application of the Filed Rate Doctrine to Fuel Surcharges

As with unfiled fares, the parties do not contest that the DOT had authority to regulate fuel surcharges, but only whether it actually did so.  The district court did not err by finding that genuine issues of material fact regarding the DOT's exercise of regulatory authority over fuel surcharges precluded entry of summary judgment for Defendants.

The DOT did not permit airlines to impose fuel charges separately from base airfares prior to 2004, at which time the DOT appears to have permitted, but not required, airlines to file any such surcharges in their general rules tariffs. Admittedly, affording airlines the freedom to file surcharges, but not requiring them to do so, makes little sense—businesses are unlikely to expend time and money complying with optional regulations.  Thus Defendants argue that the DOT did actually require airlines to file fuel surcharges, and that the language "permitt[ing]" airlines to file surcharges in their general rules tariffs indicates discretion on the part of airlines regarding the procedural manner in which they file their fuel charges, not whether they file at all.  Defendants further argue that the DOT required filing of fuel surcharges pursuant to its 1999 rule notice stating that "all surcharges are to be filed."  The record reflects that some of the airlines involved in this appeal did,

or at least attempted to, file fuel surcharges during the class period.[4]

Application of the filed rate doctrine to fuel surcharges does not, however, turn on whether the DOT requires airlines to file those rates. Rather, summary judgment based on the application of the filed rate doctrine was inappropriate in light of the DOT's express statement that it lacks the ability to "effectively monitor" fuel surcharges. 69 Fed. Reg. at 65676–77. As we stated in *Gallo*, "a failure by [the agency] to exercise its statutory authority to approve rates [] cast[s] doubt on the underlying premise of the Filed Rate Doctrine." 503 F.3d at 1040.[5] In the context of fuel surcharges, the DOT may have intended to exercise some

---

[4] Some airlines privately filed fuel surcharges, but entered them into the database incorrectly such that they were not flagged to be presented to the DOT and thus were not considered "filed" within the meaning of the DOT's regulations.

[5] Notwithstanding *Gallo*'s instruction that actual filing does not end the filed rate doctrine inquiry, Judge Wallace cites *Gallo* and *Carlin* as establishing a "clear barrier" between filed and unfiled rates, such that an agency's failure to regulate is only relevant where the rate in question was not filed. We do not find this reading of *Gallo* and *Carlin* persuasive. On the contrary, while those cases may have dealt with rates not actually filed, their reasoning expressly invokes "the principles underlying [the] doctrine" to find that its application does not turn on "the act of literal rate filing." *Gallo*, 503 F.3d at 1040. Our opinion does not effect the unbounded expansion that Judge Wallace cautions against. Rather, it consistently applies the logic expressly set forth in our prior cases. To hold, as Judge Wallace advocates, that merely filing a rate triggers application of the doctrine in every circumstance, would permit carriers to avoid civil antitrust damages by filing rates even where the relevant agency has expressly stated that it cannot or will not engage in regulation. Such application of the doctrine completely untethers it from both its underlying justification and the reasoning of our prior decisions. We decline to adopt such a rule.

regulatory authority, insofar as it required surcharges to be filed. The DOT's intent in this regard is unclear given its lack of participation in this lawsuit. However, the evidence on record created a genuine issue of material fact as to whether the DOT retained the practical ability to do so. Inability to regulate, just as much as willful abdication, constitutes a "failure by [an agency] to exercise its statutory authority." *Id.* In accordance with the DOT's expression of its inability to regulate fuel surcharges, we decline to apply the filed rate doctrine to preclude Plaintiffs' claims regarding those surcharges.

### C. Application of the Filed Rate Doctrine to Discount Fares

The third category of fares for which the district court considered the application of the filed rate doctrine is that of ANA's "discount" fares—as relevant here, those fares that differ in both price *and* terms from ANA's filed tariffs. We acknowledge that the filed rate doctrine prohibits suits based not only on a difference between filed and actually-applied rates, *see Maislin*, 497 U.S. at 127, but also on any difference between filed and actually-applied terms, *AT&T Corp. v. Central Office Tel., Inc.*, 524 U.S. 214, 223–27 (1998). However, we have not previously considered the application of the filed rate doctrine to a situation in which both the rate *and* the terms deviate from those on file with the regulating agency. We face that situation now, and we conclude that the district court did not err in declining to apply the doctrine given the questions of fact regarding whether the discount fares constitute the same product as the fares actually filed.

In *Central Office*, the Supreme Court stated that "the policy of nondiscriminatory rates is violated when similarly situated customers pay different rates for the *same services*." 524 U.S. at 223 (emphasis added). In this case, the terms of

the unfiled discount tickets differed substantially from those of the filed fares. Moreover, the filed rate doctrine is grounded in the notion that courts should not be interpreting "reasonable" pricing when an agency has already approved a given rate, and the concomitant desire to avoid discriminatory pricing between customers. *Keogh*, 260 U.S. at 163–64. Neither of these justifications supports application of the doctrine to ANA's discount-fare scheme. In regard to the latter, the entire system of discount fares is premised on varied pricing between consumers—accompanied, of course, by differing terms. As to the former consideration, it is somewhat disingenuous to label the filed rates as "approved rates" for a corresponding discount fare since the service being purchased differs materially from that described in the filed tariff.

Economy class and business class fares are considered to be different products by the DOT, and are, accordingly, filed separately, despite the fact that each may apply to the same departure and arrival point. *See* 62 Fed. Reg. at 10760 (distinguishing between "economy" fares, which must be filed by Category B countries, and "promotional" or "premium" fares, which need not be filed by Category B countries). The district court did not err in denying summary judgment to Defendants as to these discount fares. Given the differences in both the prices and terms, a question of fact existed as to whether the DOT could effectively regulate the actual fares because they arguably constituted different products from the filed fares.

## CONCLUSION

The record as it currently stands indicates that the DOT has not exercised its authority to regulate unfiled airfares, fuel surcharges, or discount fares in a manner sufficient to justify the application of the filed rate doctrine. Should

additional evidence indicate a greater degree of regulation by the DOT than is currently reflected in the record, the district court is free to reassess whether the filed rate doctrine bars any of Plaintiffs' claims. Pursuant to 28 U.S.C. § 517, the United States may submit a statement in a case expressing its views on relevant issues in which it has an interest. *See, e.g.*, *Dept. of Fair Empl. and Hous. v. L. Sch. Admis. Council Inc.*, 896 F. Supp. 2d 849, 854 (N.D. Cal. 2012) (non-party United States entering statement of interest pursuant to 28 U.S.C. § 517); *Berglund v. Boeing Co., Inc.*, 02-193-AS, 2006 WL 1805965, at *1 (D. Or. June 22, 2006) (same). On remand, we urge the parties to solicit the DOT's views regarding its regulatory authority on the various rates here at issue.

We AFFIRM the district court's partial denial of Defendants' motions for summary judgment, and we REMAND this matter for further proceedings consistent with this opinion.

WALLACE, Circuit Judge, concurring in part and dissenting in part:

I concur in the bulk of the majority's well-reasoned opinion. I dissent, however, from the majority's conclusion that genuine issues of material fact remain as to whether the DOT effectively abdicated its authority over fuel surcharges that Defendants actually filed with the DOT.

In Section III, Subsection B, the majority discusses the second type of rate at issue in this appeal: fuel surcharges. In 1999, when the DOT implemented the category A, B, and C rate-filing system, the DOT explicitly stated that "all surcharges are to be filed." At the same time, however, the

DOT did not allow fuel surcharges to be filed separately from airfares. Instead, the DOT insisted that carriers should recoup fuel expenses through increases in their base fares. In 2004, the DOT changed this policy, and allowed, but did not require, airlines to file separate fuel surcharges.

The parties disagree vigorously as to what the record reflects regarding the filing of fuel surcharges. Defendants assert that they "are unambiguously required to file all surcharges, including fuel surcharges, with DOT. . . . While the district court concluded that DOT did not require fuel surcharges to be filed, that conclusion was simply incorrect." Plaintiffs, on the other hand, contend that Defendants "were never required to file them as a matter of law." Notwithstanding the factual disagreement over whether the DOT required the filing of surcharges after 2004, the record is also unclear as to whether Defendants actually filed them in a consistent manner.

In sorting through the record on the filing of fuel surcharges, the majority concludes that "summary judgment based on the application of the filed rate doctrine was inappropriate in light of the DOT's express statement that it lacks the ability to 'effectively monitor' fuel surcharges." For the fuel surcharges that were not actually filed, I agree with the majority's analysis, and assert that these unfiled surcharges should be treated the same as the unfiled airfares. Defendants have not pointed to any evidence indicating the DOT's regulation of unfiled fuel surcharges. Instead, Defendants merely assert that the DOT required all surcharges to be filed (which, as described above, is contested). Accordingly, I agree with the majority's holding that the filed rate doctrine does not bar, as a matter of law, antitrust challenges to unfiled fuel surcharges.

I conclude, however, that the majority is incorrect as to any fuel surcharges that were actually filed. In *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, the Supreme Court affirmed the filed rate doctrine's viability and held that the filed rate doctrine was not limited to instances in which "rates had been investigated and approved" but rather extended to instances "whenever tariffs have been filed." 476 U.S. 409, 417 n.19 (1986), *quoting Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 760 F.2d 1347, 1351 (2d Cir. 1985).

The facts and the Supreme Court's holding in *Square D* are not the same as in our case. Moreover, *Square D* merely made the assertion in a footnote that the filed rate doctrine bars claims "whenever tariffs have been filed." Nevertheless, this footnote from *Square D* is the closest the Supreme Court has come to answering the question of whether challenges to rates that were actually filed are permissible under the filed rate doctrine. The Supreme Court answered no to this critical question. Thus, I assert that the fuel surcharges that have actually been filed in our case fall under the umbrella of *Square D's* holding.

The majority's conclusion on this issue seems to rely solely on the DOT's statement that it lacked the ability to "effectively monitor" fuel surcharges. The DOT's statement, however, must be read in its full context. In 2004, the DOT stated:

> [T]he desire of carriers to pass on the higher cost of certain expenses discretely, such as insurance and fuel, has led to such expenses being filed separately from the "base" fare in tariffs, a situation that the Department cannot effectively monitor. . . . [T]he Enforcement Office will no longer allow the separate

listing of "government-approved" surcharges in fare advertising. We will consider the separate listing of such charges in fare advertisements an unfair and deceptive trade practice. . . .

69 Fed. Reg. at 65676–77. From this single statement, regarding "the separate listing of 'government-approved' surcharges in fare advertising," the majority formulates a genuine issue of material fact as to whether the filed rate doctrine is inapplicable to all fuel surcharges, whether or not they were filed. I assert that the majority reads far too much into the DOT's statement relating to advertising.

Accordingly, I would reverse the district court to the extent it held that Plaintiffs could challenge the literally-filed fuel surcharges. The existence of the rates that were actually filed, combined with the existence of the DOT's consumer complaint process, negates any issue of material fact as to whether the DOT effectively abdicated its authority to regulate actually-filed fuel surcharges.

When we create and expand judge-made doctrines, such as the filed rate doctrine, we must do so with an eye towards the lower courts' application of those doctrines. In *Gallo* and *Carlin*, we employed the "effective abdication" exception to the filed rate doctrine in situations when rates had not actually been filed.[1] This rule erected a clear barrier between

---

[1] The majority, in footnote 5, asserts that *Gallo* stands for the proposition that the filed rate doctrine's application "does not turn on 'the act of literal rate filing'" (Majority Opinion at n.5, *quoting Gallo*, 503 F.3d at 1040). The majority's statement is misleading. The full sentence from *Gallo*, from which the majority selectively clips, is: "Moreover, although the Supreme Court initially applied the Filed Rate

treatment of rates that had actually been filed versus those that had not. Here, the majority muddles that barrier, and expands the exception by adopting the rule that courts must determine when an agency has "effectively abdicated" its authority, notwithstanding the actual filing of rates. I fear this expansion has no limiting principle, and could lead to the crumbling of the filed rate doctrine, in contravention of the Supreme Court's guidance. Adhering to a rule—that the literal filing of rates means the filed rate doctrine applies—is more workable than the nebulous standard the majority has constructed here. Thus, I respectfully dissent from Section III, Subsection B of the majority opinion.

---

Doctrine to actual filed rates, courts have held that the principles underlying this doctrine preclude challenges to a wide range of FERC actions, not just the act of literal rate filing." *Id*. In essence, what *Gallo* conveys here is that while the filed rate doctrine has commonly applied only to actually-filed rates, its reach can expand even further, to scenarios in which rates have not been filed. In no way does *Gallo* suggest that the filed rate doctrine does not apply to actually-filed rates. Indeed, application to filed rates makes sense and is not "unbounded," because it allows the DOT to rely on complaints about a filed rate to exercise its supervision.