Joseph W. Cotchett (36324)
Adam J. Zapala (245748)
Elizabeth T. Castillo (280502)
**COTCHETT PITRE & McCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Tel: (650) 697-6000
Fax: (650) 697-0577
jcotchett@cpmlegal.com
azapala@cpmlegal.com
ecastillo@cpmlegal.com

Michael D. Hausfeld
**HAUSFELD LLP**
1700 K Street, N.W., Suite 650
Washington, D.C. 20006
Tel: (202) 540-7200
Fax: (202) 540-7201
mhausfeld@hausfeldllp.com
sgassman@hausfeldllp.com

Michael L. Lehmann
Christopher L. Lebsock
Seth Gassman
**HAUSFELD LLP**
600 Montgomery Street
Suite 3200
San Francisco CA 94111
Tel: (415) 633-1908
Fax: (415) 358-4980
mlehmann@hausfeldllp.com
clebsock@hausfeldllp.com
sgassmann@hausfeldllp.com

*Interim Co-Lead Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE TRANSPACIFIC PASSENGER AIR TRANSPORTATION ANTITRUST LITIGATION | Case No. 3:07-cv-05634-CRB<br><br>**PLAINTIFFS' NOTICE OF MOTION; MOTION; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>Date: TBD<br>Time: TBD<br>Courtroom: 6<br>Judge: The Hon. Charles R. Breyer |

# <u>REDACTED PUBLIC VERSION</u>

**NOTICE OF MOTION AND MOTION**

TO THE PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that at the Court's convenience, before the Honorable Charles R. Breyer, District Judge, at the San Francisco Courthouse, 450 Golden Gate Avenue, Courtroom 6, 17th Floor, San Francisco, CA 94102, Plaintiffs will and hereby do move for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure.

Plaintiffs seek certification of the following two classes pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3):

> All persons and entities that directly purchased tickets for passenger air transportation from Japan Airlines International Company, Ltd. ("JAL") or All Nippon Airways Corporation, Ltd. ("ANA"), or any predecessor, subsidiary or affiliate thereof, that originated in the United States and included at least one flight segment from the United States to Japan between the period beginning February 1, 2005 and ending December 31, 2007. Excluded from the class are tickets exclusively acquired through award or reward travel or any tickets acquired for infant travel with a 90% discount. Also excluded from the class are purchases by government entities, Defendants, any parent subsidiary or affiliate thereof, and Defendants' or any other commercial airline's officers, directors, employees, agents, and immediate families ("Japan Class").

> All persons and entities that directly purchased *Satogaeri* fares from JAL or ANA or any predecessor, subsidiary or affiliate thereof that originated in the United States and included at least one flight segment to Japan and does not include travel to countries other than the United States and Japan between the period beginning January 1, 2000 and ending April 1, 2006. Excluded from the class are purchases by government entities, Defendants, any parent subsidiary or affiliate thereof, and Defendants' officers, directors, employees and immediate families. Also excluded are purchases of *Satogaeri* Special fares ("*Satogaeri* Class," and collectively with the Japan Class, the "Classes").

This motion is based on this Notice of Motion and Motion, the supporting Memorandum of Points and Authorities; the accompanying Expert Report of Dr. Russell Mangum III, Ph.D. Regarding Class Certification ("Mangum Rpt."); the Declaration of Adam Zapala; the Request for Judicial Notice and related exhibits; the [Proposed] Order Granting Plaintiffs' Motion for Class Certification; all exhibits and appendices to such documents; any papers filed in reply; any argument as may be presented; and all other matters of records in this matter.

1 | Dated: January 26, 2018 | Respectfully submitted,

2

3 | */s/ Adam J. Zapala*
Joseph W. Cotchett

4 | Adam J. Zapala
Elizabeth T. Castillo

5 | **COTCHETT, PITRE, McCARTHY, LLP**
Burlingame, CA 94010

6 | Tel: (650) 697-6000
Fax: (650) 697-0577

7

8 | Dated: January 26, 2018 | Respectfully submitted,

9 | */s/ Christopher L. Lebsock*
Michael P. Lehmann

10 | Christopher L. Lebsock
Seth R. Gassman

11 | **HAUSFELD LLP**

12 | 600 Montgomery Street Suite 3200San
Francisco CA 94111

13 | Tel: (415) 633-1908
Fax: (415) 358-4980

14

15 | Michael D. Hausfeld
**HAUSFELD LLP**

16 | 1700 K Street, N.W., Suite 650
Washington, D.C. 20006

17 | Tel: (202) 540-7200
Fax: (202) 540-7201

18

19 | *Interim Co-Lead Counsel for Plaintiffs*

20

21

22

23

24

25

26

27

28

**STATEMENT OF ISSUES PRESENTED**

1.     Whether the Classes purposed by Plaintiffs satisfy the requirements of Fed. R. Civ. P. 23 such that class certification is warranted.

2.     Whether Cotchett, Pitre & McCarthy LLP ("CPM") and Hausfeld LLP ("Hausfeld") should be appointed Co-Lead Counsel for the Classes.

3.     Whether Nancy Kajiyama, Brandon Maloof, Harley Oda, and Della Ewing Chow should be appointed as Class Representatives on behalf of the Japan Class.

4.     Whether Harley Oda, James Kawaguchi, and Shinsuke Kobayashi should be appointed as Class Representatives on behalf of the *Satogaeri* Class.

## TABLE OF CONTENTS

I.  INTRODUCTION .................................................................................................. 1

II. FACTUAL BACKGROUND ................................................................................ 2

    A.  The Common Economic Features of the Airline Industry ........................... 2

        1.  Pricing for Transpacific Travel: Base Fares and Surcharges. ......... 2

        2.  Japanese Carrier Defendants ........................................................... 3

        3.  Fare Structures For Transpacific Travel Are Nearly Uniform ....... 4

        4.  The Market for Transpacific Travel from the United States to Japan Is Susceptible to Conspiracy .............................................................. 5

    B.  Common Evidence of JAL's and ANA's Conspiracy to Fix Prices ......................... 6

        1.  Common, Direct Evidence of JAL and ANA's Conspiracy to Fix the Prices of Air Fuel Surcharges ........................................................ 6

        2.  Common, Direct Evidence of JAL and ANA's Conspiracy to Fix the Prices of Satogaeri Fares .................................................................. 9

III. ARGUMENT ...................................................................................................... 12

    A.  Legal Standard Governing Plaintiffs' Motion ......................................... 12

    B.  Plaintiffs Satisfy the Requirements of Rule 23(a) ................................... 14

    C.  This Action Meets the Requirements of Rule 23(b)(3) ............................ 16

        1.  Common Questions of Law and Fact Predominate ....................... 16

        2.  A Class Action Is Superior ........................................................... 22

IV. CONCLUSION ................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdeljalil v. General Elec. Capital Corp.,v. General Elec. Capital Corp.*,
   306 F.R.D. 303 (S.D. Cal. 2015) ................................................................1

*In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*,
   276 F.R.D. 364 (C.D. Cal. 2011) .............................................18, 19, 22

*Amchem Prods. Inc. v. Windsor*,
   521 U.S. 591 (1997) ................................................................12, 16, 17

*Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*,
   133 S. Ct. 1184 (2013) .................................................................13, 16

*In re Apple iPod iTunes Antitrust Litig.*
   No. C 05-00037JW, 2011 WL 5864036 (N.D. Cal. Nov. 22, 2011) ...................18, 21

*In re Cathode Ray Tube Antitrust Litig.*,
   MDL. No. 1917, 2013 WL 5391159 (N.D. Cal. Sept. 19, 2013) ....................22

*In re: Cathode Ray Tube (CRT) Antitrust Litig.*,
   308 F.R.D. 606 (N.D. Cal. 2015) .............................................12, 18

*Cifuentes v. Red Robin Int'l, Inc.*,
   No. C-11-5635-EMC, 2012 WL 693930 (N.D. Cal. Mar. 1, 2012) ...............14

*In re Citric Acid Antitrust Litig.*,
   No. 95-1092, C-95-2963 FMS, 1996 WL 655791 (N.D. Cal. Oct. 2, 1996) ..........14, 15

*Comcast Corp. v. Behrend*,
   133 S. Ct. 1426 (2013) ...............................................................21

*In re Conseco Life Ins. Co. Life Trend Ins. Sales and Mktg. Litig.*,
   270 F.R.D. 521 (N.D. Cal. 2010) .................................................1

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
   No. M 02-1486 PJH, 2006 WL 1530166 (N.D. Cal. June 5, 2006) .............. *passim*

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) ...................................................13

*Gold v. Lumber Liquidators Inc.*,
   No. 14-CV-05373-TEH, 2017 WL 2688077 (N.D. Cal. June 22, 2017) ..................1

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   134 S. Ct. 2398 (2014) .................................................16, 20

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ........................................................................14

*Hawaii v. Standard Oil Co. of Cal.*,
  405 U.S. 251 (1972) ..........................................................................................12

*In re High Tech Employee Antitrust Litig.*,
  985 F.Supp.2d 1167 (2013) ...................................................................12, 18, 19

*Jimenez v. Allstate Ins. Co.*,
  765 F.3d 1161 (9th Cir. 2014) ........................................................................21

*In re Korean Ramen Antitrust Litig.*,
  No. 13-4115-WHO, 2017 WL 235052 (N.D. Cal. Jan. 19, 2017) .......................12, 14

*Levya v. Medline Indus., Inc.*,
  716 F (9th Cir. 2013) ........................................................................................21

*In re Lidoderm Antitrust Litig.*,
  No. 14-2521-WHO, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017).........................13

*Messner v. Northshore Univ. Health Sys.*,
  669 F.3d 802 (7th Cir. 2012) ...........................................................................16

*In re Nexium Antitrust Litig.*,
  297 F.R.D. 168 (D. Mass. 2013) ......................................................................21

*Nitsch v. Dreamworks Animation SKG Inc.*,
  315 F.R.D. 270 (N.D. Cal. 2016) ....................................................................12

*In re Online DVD Rental Antitrust Litig.*,
  No. M 09-2029 PJH, 2010 WL 5396064 (N.D. Cal. Dec. 23, 2010) .............12, 13, 17

*In re Optical Disk Drive Antitrust Litig.*,
  No. 3:10-md-2143 RS, 2016 WL 467444 (N.D. Cal. Feb. 8, 2016) ...............12, 13, 21

*Pulaski & Middleman LLC v. Google, Inc.*,
  802 F.3d 979 (9th Cir. 2015)............................................................................21

*Reiter v. Sonotone Corp.*,
  442 U.S. 330 (1979) ....................................................................................12, 17

*Ries v. Ariz. Beverages USA LLC*,
  287 F.R.D. 523 (N.D. Cal. 2012) .....................................................................13

*Robidoux v. Celani*,
  987 F.2d 931 (2d Cir. 1993) ............................................................................1

*In re Rubber Chems. Antitrust Litig.*
   232 F.R.D. 346 (N.D.Cal. 2005) ...........................................................................13

*In re Static Random Access Memory (SRAM) Antitrust Litig.,*
   No. C 07-01819 CW, 2008 WL 4447592 (N.D. Cal., Sept. 29, 2008) ............................. *passim*

*In re Tableware Antitrust Litig.,*
   241 F.R.D. 644 (N.D. Cal. 2007) ...........................................................................13

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
   267 F.R.D. 291 (N.D. Cal. 2010) .....................................................................12, 22

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
   267 F.R.D. 583 (N.D. Cal. 2010) ...........................................................................19

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.,*
   209 F.R.D. 159 (C.D. Cal. 2002).....................................................................14, 17

*In re Titanium Dioxide Antitrust Litig.,*
   284 F.R.D. 328 (D. Md. 2012) ..............................................................................17

*Tyson Foods, Inc. v. Bouaphakeo,*
   136 S. Ct. 1036 (2016) ...........................................................................16, 20, 21, 22

*In re Vitamin C Antitrust Litig.,*
   279 F.R.D. 90 (E.D.N.Y. 2012).............................................................................16

*Wal-Mart Inc. v. Dukes,*
   131 S. Ct. 2541 (2011) ........................................................................................20

*Wiesfeld v. Sun Chem. Corp.,*
   84 Fed. Appx. 257 (3d Cir. 2004) ...........................................................................1

*Wolin v. Jaguar Land Rover N. Am.,*
   LLC, 617 F.3d 1168 (9th Cir. 2010) .....................................................................14

*Wortman v. All Nippon Airways,*
   854 F.3d 606 (9th Cir. 2017).................................................................................21

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
   395 U.S. 100 (1969) ..............................................................................................17

1

**Rules**

2

Federal Rules of Civil Procedure

Rule 23.................................................................................................13, 22
Rule 23(a) ...................................................................................................13
Rule 23(a)(1) ..............................................................................................13
Rule 23(a)(2) ..............................................................................................14
Rule 23(a)(3) ..............................................................................................14
Rule 23(a)(4) ..............................................................................................15
Rule 23(b)(3) ........................................................................................*passim*
Rule 23(g).....................................................................................................23

3

4

5

6

7

8

**Other Authorities**

9

W. Rubenstein, *Newberg on Class Actions* § 20.52 (5th ed. 2012) ................................12

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), Plaintiffs, by and through interim co-lead counsel for the Classes, CPM and Hausfeld, submit this memorandum of points and authorities in support of their motion for class certification.

## I.   **INTRODUCTION**

Plaintiffs—purchasers of passenger air travel—filed this action in 2007 alleging that thirteen of the world's largest international airlines colluded to set base fares and fuel surcharges for transpacific air travel at supracompetitive levels. Fact and expert discovery have confirmed the existence, scope, and efficacy of the cartel, as well as its classwide impact on the members of the Classes. Plaintiffs eagerly look forward to a trial of their claims, but the present motion is focused on a procedural question: class certification.

Here, Plaintiffs seek to certify two Classes related to ANA's involvement in the overarching conspiracy to fix prices on fares for transpacific travel.[1] The Japan Class seeks certification for purchasers from JAL and ANA of transpacific travel between the United States and Japan for flights originating in the United States. The *Satogaeri* Class seeks certification for purchases from JAL and ANA originating in the United States of so-called *Satogaeri* ethnic discount fares between the United States and Japan. Both Classes warrant certification.

The Supreme Court and countless lower courts within and without this District have recognized the long-standing principal that in Sherman Act horizontal price-fixing conspiracies, common proof of the antitrust violation undoubtedly predominates because it focuses not on the

---

[1] Plaintiffs have narrowed the classes identified in the operative complaint, which is consistent with their duties as class counsel. *Wiesfeld v. Sun Chem. Corp.*, 84 Fed. Appx. 257, 259 (3d Cir. 2004) ("[t]he District Court considered this revised class definition in its analysis, and we will do the same."); *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993) (holding that a court "is not bound by the class definition proposed in the complaint"); *Gold v. Lumber Liquidators Inc.*, No. 14-CV-05373-TEH, 2017 WL 2688077, at *3-4 (N.D. Cal. June 22, 2017) ("[G]iven that courts frequently allow plaintiffs to seek certification of narrowed classes without amending their complaint, and given that district courts are tasked with ensuring class definitions are properly tailored, it would not make sense to prohibit a plaintiff from narrowing their class definition."); *accord Abdelalil v. General Elec. Capital Corp.,v. General Elec. Capital Corp.*, 306 F.R.D. 303, 306 (S.D. Cal. 2015) (allowing plaintiffs to seek class certification of a narrowed proposed class without amending complaint); *In re Conseco Life Ins. Co. Life Trend Ins. Sales and Mktg. Litig.*, 270 F.R.D. 521, 530 (N.D. Cal. 2010) (same).

conduct of individual plaintiffs but on the conduct of the defendants—the participants in the cartel. In this regard, courts regularly rely on econometric models, including multiple regression analysis, and market analysis, such as those presented by Dr. Russell Mangum here, to demonstrate widespread antitrust impact to all or virtually all class members. Similarly, in price-fixing cases, courts often rely on aggregated damage models such as the one Plaintiffs have proffered here to measure the quantum of injury suffered by the Classes.

Accordingly, certification of the proposed Classes is warranted.

## II.      FACTUAL BACKGROUND

### A.      The Common Economic Features of the Airline Industry

#### 1.      Pricing for Transpacific Travel: Base Fares and Surcharges.

International passenger airlines, including transpacific route from the United States to destinations in Asia/Oceania, began the process of deregulation in 1979. While there remain certain trivial regulatory requirements,[2] as of at least 1999, Defendants could lawfully set their own prices, provided they did so without collusion. ████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████ *See* Declaration of Adam J. Zapala, Ex. 1 and 2 ("Zapala Decl."). █

████████████████████████████████████████████████████████████

████████████████████████████████████████ *See* Expert Report of Dr. Russell Mangum III, Ph.D. Regarding Class Certification ("Mangum Rpt.") ¶¶ 36-37, 97-98. ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ *See* Mangum Rpt. ¶¶ 38-39, 97-98.

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[2] For example, as a "Category C" country under Department of Transportation ("DOT") regulations, base fares between the United States and Japan on ANA and JAL had to be filed with the DOT.



*See id.* ¶ 51

*See id.* ¶ 111

*See id.* ¶ 112, Figures 3-4.

*See id.* ¶ 94.

*See id.* ¶ 95.

*See id.*

*See id.*

2.   **Japanese Carrier Defendants**

*See* Mangum Rpt. ¶ 20.

1

2

3 *See id.* ¶¶ 22, 25.

4

5 *See e.g.* Zapala Decl., Ex. 3.   Declaration of Shinzo Amagai ¶ 8

6 ("Amagai Decl.")

7

8

9

10 *See, e.g.*, Zapala Decl., Exs. 4-7.

11 **3.    Fare Structures For Transpacific Travel Are Nearly Uniform**

12

13

14

15

16 *See* Mangum Rpt. ¶ 123.

17

18

19

20 *See generally* Mangum Rpt. ¶¶ 124-147

21

22

23 *See* Mangum Rpt. ¶ 128 (Figure 9).

24 *See*

25 *id.* ¶ 141-142 (Figures 17-19).

26

27 [3] Fares agreed upon at IATA's "Tariff Coordinating Conference" receive antitrust immunity, and are therefore excluded from the Japan Classes. *See* fn. 6, *infra*.

28

4.      **The Market for Transpacific Travel from the United States to Japan Is Susceptible to Conspiracy**

The market for air passenger travel from the United States to Japan had several key features that made it susceptible to a successful conspiracy, including product homogeneity, sufficient control of the market, a lack of economic substitutes, barriers to entry, and mechanisms for enforcing the conspiracy.

**Product Homogeneity.** ██████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ *See* Mangum Rpt. ¶¶ 57-59. ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ *See id.*

¶ 59. ██████████████████████████████████████████████

██████████████████████████ *See id.* ¶ 57 ████████████████████

██████████████████████████████████████████████

**Market Control:** ██████████████████████████████████████

██████████████████████████ Mangum Rpt. ¶ 61. ████████████

██████████████████████ *See* Zapala Decl. Ex. 8. Declaration of Fusako Cahill, ¶ 8 ("Cahill

Decl."). ██████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ *See* Mangum Rpt. ¶ 63.

**Lack of Economic Substitutes.** ██████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████ *See* Mangum Rpt. ¶¶ 64-65. ████████████

████████████████████████████████████████████████████████████

██████████

**Barriers to Entry**. ████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ *See*

Mangum Rpt. ¶¶ 66-68. ██████████████████████████████████

███████████████████ *See id*. ¶ 68.

**Enforcement Mechanisms**. The airlines had ample opportunities to communicate not only

as a means of establishing the conspiracy, but also to enforce and monitor it. █████████

███████████████████████████████████████████████████████████

███████████████████████████████████ *See* Mangum Rpt. ¶¶ 69-88. In addition,

ATPCO, an organization jointly owned by some of the largest airlines in the world, provides airfare

data for more than 450 airlines in 165 countries, representing over 97 percent of commercial air

travel. *See* http://www.atpco.net/atpco/aboutoc.shtml. ████████████████████

████████████████████████████████████. *Id*. ¶¶ 89-90.

**B.     Common Evidence of JAL's and ANA's Conspiracy to Fix Prices**

This is an unusual case. Plaintiffs are not relying on mere circumstantial evidence of

opportunities to conspire, as in so many other cartel cases. Instead, in this case, there is direct

evidence of (a) JAL and ANA conspiring on implementation of fuel surcharges, and (b) JAL and

ANA conspiring on so-called "ethnic fares." That evidence is summarized below.

**1.     Common, Direct Evidence of JAL and ANA's Conspiracy to Fix the Prices of Air Fuel Surcharges**

At trial, Plaintiffs will introduce direct evidence of JAL and ANA's conspiracy to fix the

prices of fuel surcharges. Such evidence is common to the Class and supports granting class

certification in this action. For example:

- ████████████████████████████████████████████████████████

    *see* Zapala Decl., Ex. 9 (Yamasaki Dep. Tr. at 20:13 – 52:2);

---

[4] All future citations to Exhibit 9 of the Zapala Declaration are referred to herein as "Yamasaki Dep. Tr."

1

2

████████ Yamasaki Dep. Tr. at 28:2-28:23 ████████

3

4

*see* Zapala Decl., Ex. 9;

5

*see* Zapala Decl., Ex. 10 (Nakano Dep. Tr. at 42:24 –

6

55:8);

7

8

Nakano Dep. Tr. at 144:1–146:15.

9

Substantial documentary evidence produced by JAL corroborates Yamasaki and Nakano's

10

testimony:

11

12

Zapala Decl.,

13

Ex. 11.

14

Zapala Decl., Ex. 12 (emphasis added).

15

*Id.*

16

Zapala Decl., Ex. 13.

17

18

:

19

20

21

Zapala Decl., Ex. 14 at 25

22

(JAL Interrogatory Responses). The Interrogatory response discusses

*Id.* at 26.

23

24

*See id.*

25

26

*See id.* at 26-28.

27

⁵ All future citations to Exhibit 10 of the Zapala Declaration are referred to herein as "Nakano Dep.
Tr."

28



ANA produced documentary evidence that further corroborates the JAL witnesses' testimony that JAL and ANA coordinated pricing on the fuel surcharge. For example,

The foregoing direct evidence of a conspiracy to fix prices on Transpacific travel is hardly surprising given the backdrop in which it occurred. As found by many major governmental antitrust regulators, including in the United States, the international airline industry has historically been rife

1   with collusion because of the existence of IATA[6] and regional Board of Airline Representatives

2   ("BAR") meetings.[7]

### 2. Common, Direct Evidence of JAL and ANA's Conspiracy to Fix the Prices of Satogaeri Fares

4   Direct evidence shows ANA also conspired to fix prices on discount fares, including

5   *Satogaeri* fares, issued to customers in the United States on routes to Japan.

---

[6] For example, Defendants and their co-conspirators used IATA Tariff Coordinating Conferences to engage in anticompetitive practices. Although Defendants received immunity to discuss IATA fare levels at IATA Tariff Coordinating Conferences, Defendants' antitrust immunity did not extend to non-IATA fares or fuel surcharges. Defendants nevertheless engaged in anticompetitive behavior with respect to these non-immunized fares. That is precisely why the DOT refused to continue granting immunity to IATA Tariff Coordinating conferences and found them to be inherently "anticompetitive." Indeed, on July 5, 2006, the DOT issued an "Order to Show Cause" regarding whether participants in IATA tariff conferences should continue to have antitrust immunity for rate setting at IATA conferences. *See* RJN, Ex. 2, *International Air Transport Association Tariff Conference Proceeding Order to Show Cause*, Department of Transportation, July 5, 2006 ("Order to Show Cause") pp. 7-8. DOT found that the "discussions [at the tariff conferences] must inevitably involve discussions of the fare levels set by individual airlines for their comparable [non-IATA fare] services. In addition, the IATA by-laws by their terms do not confine tariff conference discussions to fares that would be offered jointly by IATA members in markets where no on-line service is available, or to interlineable fares… Nothing precludes tariff conference participants from discussing each airline's own fares in markets where participants compete with each other." Order to Show Cause p. 33. In March 2007, the DOT issued its final order revoking antitrust immunity. *See* RJN, Ex. 3, *International Air Transport Association Tariff Conference Proceeding Final Order, Department of Transportation, March 30, 2007.* This more recent determination by DOT was by no means at odds with previous policy announcements by the U.S. government. For example, in 2006, DOT stated: "The [Civil Aeronautics] Board determined twenty-five years ago that the IATA by-laws' tariff conference provisions substantially reduced competition." *See* Order to Show Cause p. 16.

It is thus not surprising that the airlines first tried to implement fuel surcharge ("FSC") through IATA immunity. Specifically, the airlines sought to have resolution 001W implemented, which would have immunized their otherwise collusive conversations concerning a collective FSC. *See* RJN Ex. 4, DOT, Docket OST-2004 ¶¶ 12-13. Making matters worse, the discussion at IATA concerning implementation of a collective FSC led to further collusive and non-immunized discussions amongst the Defendants. *See* Mangum Decl. ¶¶ 93-98 (summarizing information concerning JAL and ANA).



[7] ... *See e.g.*, Zapala Decl., Ex. 34 ... Ex. 41 ... Ex. 42 ... Ex. 43

---

On December 6, 2010, ANA pleaded guilty to engaging in a conspiracy from at least as early as April 1, 2000 until at least April 1, 2004 to fix the prices of discounted fares sold here in the United States. *See* Zapala Decl. Ex. 34.Request for Judicial Notice ("RJN"), Ex. 1. Specifically, ANA pleaded guilty to "participating in a combination and conspiracy to suppress and eliminate competition by fixing unpublished passenger fares on tickets purchased in the United States . . . in violation of the Sherman Antitrust Act . . . ." *Id.* Fares subject to the ANA-JAL discount fare conspiracy included *Yobiyose*,[8] *Satogaeri*[9] and business class discount fares. *Id.* ANA further pled guilty selling roughly $59 million in price-fixed commerce (*i.e.*, discount fares) in the United States. *Id.* As stated in ANA's guilty plea, "[d]uring these discussions and meetings [with the other Japanese carrier], agreements were reached to fix unpublished passenger fares on tickets purchased in this Japanese ethnic travel market in the United States." *Id.*

In addition to the guilty plea, there is substantial documentary evidence in the case demonstrating JAL and ANA's conspiracy to fix the prices of *Satogaeri* and business discount fares. ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████. Zapala Decl., Ex. 14. JAL Interrogatory Response No. 10 ███████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ █████████████████████████████████████████████████ *Id.* ████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████ *See* Cahill Decl. (Zapala Decl. Ex. 8; Kamei Decl. (Zapala Decl. Ex. 23); Amagai Decl. (Zapala Decl. Ex. 3). ████

---

[8] *Yobiyose* fares were discount fares offered to the Japanese ethnic market in the United States for travel that originated in Japan and traveled to the United States. Plaintiffs are not seeking certification of a class that includes this type of fare.

[9] *Satogaeri* fares were discount fares offered to the ethnic market in the United States for travel originating in the United States and going to Japan. *Satogaeri* fares are included in this motion.

1    ███████████████████████████████████████████████████████████████

2    Zapala Decl., Ex. 14 at 7. For example:

3    •   ████████████████████████████████████████████████████

4        ████████████████████████████████████████████████████

5        ████████████████████████████████████████████████████

6        ████████████████████████████████████████████████████

7    •   ████████████████████████████████████████████████████

8        ████████████████████████████████████████████████████

9        ████████████████████████████████████████████████████

10       ████████████████████████████████████████████████████

11       ████████████████████████████████████████████████████

12       ████████████████████████████████████████████████████

13   •   ████████████████████████████████████████████████████

14       █████████████████████

15   •   The exhibits attached to the Cahill and Amagai declarations all evidence further collusive
         conduct by ANA and JAL on discount fares. *See id.*

16   •   Further documentary evidence produced by JAL demonstrates coordination between JAL
         and ANA. *See, e.g.*, Zapala Decl., Exs. 24-26 (Dep. Ex. 63 (JLMDL1913_0000451); Dep.

17       Ex. 271 (JLMDL1913_0000468); Dep. Ex. 98 (JLMDL1913_0000457).

18       Documentary evidence from ANA itself further corroborates JAL's documents and

19   testimony concerning collusion on *Satogaeri* fares. For example:

20   •   ████████████████████████████████████████████████████

21       ████████████████████████████████████████████████████

22       ███████████ Zapala Decl., Ex. 27.

23   •   ████████████████████████████████████████████████████

24       ████████████████████████████████████████████████████

25       ██████████████████████ Zapala Decl., Ex. 28.

26   •   ████████████████████████████████████████████████████

27       ███████████████████████████

28

Zapala Decl., Ex. 29, ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See, e.g.,*
Zapala Decl., Exs. 30-32.

•   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
        ▮▮▮▮▮▮ *See, e.g.,* Zapala Decl., Ex. 33.

## III.   ARGUMENT

### A.   Legal Standard Governing Plaintiffs' Motion

The Supreme Court has long recognized that private antitrust class actions are a vital component of antitrust enforcement. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979); *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 266 (1972). The Supreme Court has also noted that these vehicles are particularly well-suited for class certification, observing that Rule 23(b)(3)'s predominance requirement—usually the central focus of the class certification inquiry—is a test "readily met" in "certain cases alleging . . . violations of the antitrust laws." *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 625 (1997); W. Rubenstein, *Newberg on Class Actions* § 20.52 (5th ed. 2012) ("[C]ourts in nearly every circuit have quoted an earlier edition of the Treatise's conclusion that, as a rule, the allegation of a price-fixing conspiracy is sufficient to establish predominance of common questions."). "The very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist." *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02-1486 PJH, 2006 WL 1530166, at *3 (N.D. Cal. June 5, 2006) ("*DRAM*"). Consequently, "courts resolve doubts in these actions in favor of certifying the class." *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. C 07-01819 CW, 2008 WL 4447592, at *2 (N.D. Cal., Sept. 29, 2008);[10] *In re Online DVD Rental Antitrust Litig.*, No. M 09-2029 PJH, 2010 WL 5396064, at *3 (N.D. Cal. Dec. 23, 2010).

Following this paradigm, courts in this district have a long history of certifying classes in horizontal price-fixing cases.[11] Plaintiffs' claims in this action are similarly well-suited for

---

[10] All internal citations and quotations omitted and all emphases added unless otherwise noted.
[11] *See, e.g, In re Korean Ramen Antitrust Litig.*, No. 13-4115-WHO, 2017 WL 235052, at *2 (N.D. Cal. Jan. 19, 2017) (Orrick, J., certifying class of Korean ramen noodle purchasers); *In re Optical Disk Drive Antitrust Litig.*, No. 3:10-md-2143 RS, 2016 WL 467444 (N.D. Cal. Feb. 8, 2016)

certification. To obtain class certification here, Plaintiffs need only show that they satisfy the four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy—and Rule 23(b)(3)'s dual requirements of predominance and superiority. Fed. R. Civ. P. 23(a) and (b)(3).[12] Although courts must conduct a "rigorous analysis," which may require it to probe behind the pleadings to resolve the class certification question, *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980–81 (9th Cir. 2011), the merits of the Plaintiffs' case may be considered only to the extent necessary to determine if the requirements of Rule 23 are met, *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 133 S. Ct. 1184, 1194–95 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.").

As the Ninth Circuit explained in *Ellis*: "[t]he district court is required to examine the merits of the underlying claim in this context, only inasmuch as it must determine whether common questions exist; not to determine whether class members could actually prevail on the merits of their claims." 657 F.3d at 983 n.8; *see also ODD*, 2016 WL 467444, at *3 (quoting *Amgen*); *SRAM*, 2008

---

(Seeborg, J., certifying classes of ODD purchaers and purchasers of computers containing ODD purchasers); *Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270 (N.D. Cal. 2016) (Koh, J., certifying class of employees whose wages were suppressed due to a horizontal buyer's cartel); *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606 (N.D. Cal. 2015) (Conti, J., certifying class CRT and CRT product purchasers); *In re High Tech Employee Antitrust Litig.*, 985 F.Supp.2d 1167 (2013) (Koh, J., certifying class of employees whose wages were suppressed due to a horizontal buyer's cartel); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291 (N.D. Cal. 2010) (Illston, J., certifying classes of TFT-LCD and LCD product purchasers); *SRAM*, 2008 WL 4447592 (Wilken, J., certifying class of SRAM purchasers); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02-1486 PJH, 2006 WL 1530166 (N.D. Cal. June 5, 2006) (Hamilton, J., certifying class of DRAM purchasers); *Online DVD Rental*, 2010 WL 5396064, at *3 (Hamilton, J., certifying class of DVD rental purchasers); *Il Fornaio (America) Corp. et al. vs. Lazzari Fuel Co. LLC, et al.*, 3:13-cv-5197-WHA, (N.D. Cal.), ECF No. 138 (Alsup, J., certifying class of mesquite charcoal purchasers); *In re Tableware Antitrust Litig.*, 241 F.R.D. 644 (N.D. Cal. 2007) (Walker, J., certifying class of specialty tableware products purchasers); *Rubber Chems.*, 232 F.R.D. 346 (Jenkins, J., certifying class of rubber chemical purchasers).
[12] "As the Ninth Circuit recently explained, ascertainability (much less 'administrative ascertainability') is not a requirement under Rule 23." *In re Lidoderm Antitrust Litig.*, No. 14-2521-WHO, 2017 WL 679367, at *25 (N.D. Cal. Feb. 21, 2017) (citing *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1125 (9th Cir. 2017)).

**PLAINTIFFS' NOTICE OF MOTION; MOTION; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION; Case No. 3:07-cv-05634-CRB** 13

1  WL 4447592, at *5; *DRAM*, 2006 WL 1530166, at *9. Thus, while Plaintiffs are confident in their

2  evidence, its persuasiveness is ultimately a matter reserved for trial.

3      **B.    Plaintiffs Satisfy the Requirements of Rule 23(a)**

4      **Numerosity**. "While there is no fixed number that satisfies the numerosity requirement, as a

5  general matter, a class greater than forty often satisfies [Rule 23(a)(1)], while one less than twenty-

6  one does not." *Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, 536 (N.D. Cal. 2012). Relatedly,

7  where the precise size of a class is unknown, but "general knowledge and common sense indicate

8  that it is large, the numerosity requirement is satisfied." *SRAM*, 2008 WL 4447592, at *3.

9  ███████████████████████████████████████████████

10 ███████████████████████████████████████████████

11 ███████████████████████████████ Mangum Rpt. ¶ 8. These figures, and common sense,

12 dictate that the Classes are numerous.

13     **Commonality**. Rule 23(a)(2) requires that class members share common issues of law or

14 fact. Only one significant issue is necessary to satisfy the commonality prong. *Wolin v. Jaguar Land*

15 *Rover N. Am.*, LLC, 617 F.3d 1168, 1172 (9th Cir. 2010). Courts in this Circuit have repeatedly held

16 that this prong is satisfied where—as here—a price-fixing conspiracy is alleged. As Judge Hamilton

17 explained in *DRAM* "the very nature of a conspiracy antitrust action compels a finding that common

18 questions of law and fact exist." 2006 WL 1530166, at *3. Other common questions include whether

19 the Defendants' conduct resulted in widespread harm and overcharges and whether classwide impact

20 and aggregate damages can be measured using a common methodology.

21     **Typicality**. Rule 23(a)(3)'s "typicality requirement is satisfied if each class member's claim

22 arises from the same course of events that led to the claims of the representative parties and each

23 class member makes similar legal arguments to prove the defendant's liability." *Thomas & Thomas*

24 *Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 164 (C.D. Cal. 2002);

25 *see also SRAM*, 2008 WL 4447592, at *3. Class representatives' claims "need not be substantially

26 identical" to those of absent class members, *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th

27

28

1   Cir. 1998), as "[s]ome degree of individuality is to be expected in all cases," *Cifuentes v. Red Robin*

2   *Int'l, Inc.*, No. C-11-5635-EMC, 2012 WL 693930, at *5 (N.D. Cal. Mar. 1, 2012).

3          As with commonality, typicality is readily satisfied in horizontal price-fixing cases: "There is

4   substantial legal authority holding in favor of a finding of typicality in price-fixing conspiracy cases,

5   even where differences exist between plaintiffs and absent class members with respect to pricing,

6   products, and/or methods of purchasing products." *Korean Ramen*, 2017 WL 235052, at *18; *In re*

7   *Citric Acid Antitrust Litig.*, No. 95-1092, C-95-2963 FMS, 1996 WL 655791, at *3 (N.D. Cal. Oct.

8   2, 1996) ("Because plaintiffs and all class members share these claims and this theory [that

9   defendants conspired to fix prices], the representatives' claims are typical of all.").

10         Plaintiffs and the members of the Classes purchased transpacific passenger air travel directly

11  from JAL and ANA and claim the prices they paid were artificially inflated due to the Defendants'

12  cartel. Specifically, Nancy Kajiyama, Brandon Maloof, Harley Oda, and Della Ewing Chow

13  purchased tickets for travel originating in the United States going to Japan during the Japan Class

14  Period; Harley Oda, James Kawaguchi, and Shinsuke Kobayashi purchased *Satogaeri* fares during

15  the *Satogaeri* Class Period. *See* Mangum Rpt. ¶ 19. The potential class representative Plaintiffs'

16  claims are typical of the claims of the members of the proposed Classes, regardless of varied

17  purchasing channels, routes flown, and prices paid, because "they stem from the same event,

18  practice, or course of conduct that forms the basis of the claims of the class and are based on the

19  same legal or remedial theory." *Citric Acid*, 1996 WL 655791, at *3.

20         **Adequacy**. Plaintiffs also satisfy Rule 23(a)(4). Adequacy requires that Plaintiffs (1) have no

21  interests that are antagonistic to or in conflict with the interests of the class; and (2) are represented

22  by counsel able to vigorously prosecute the interests of the class. *SRAM*, 2008 WL 4447592, at *4.

23  The Plaintiffs' interests do not conflict with those of absent members of the Classes. The Plaintiffs

24  allege that all absent class members were injured by paying artificially inflated prices for

25  transpacific air travel during the relevant class periods. All Plaintiffs and absent class members seek

26  the same relief in the form of overcharge damages, and therefore share an identical interest in

27  proving Defendants' liability. Each named Plaintiff has actively participated in the litigation by

28

1    producing documents, answering interrogatories, and sitting for depositions. Additionally, as this

2    Court recognized in its leadership appointment process, CPM and Hausfeld have vigorously pursued

3    the litigation on behalf of Plaintiffs and the proposed Classes, including on appeal, and are prepared

4    to prosecute the litigation through trial and, if necessary, further appeals. *Id.*

5         **C.    This Action Meets the Requirements of Rule 23(b)(3)**

6         Additionally, Plaintiffs must satisfy the two requirements of Rule 23(b)(3), predominance

7    and superiority. That is, "[c]ommon questions must predominate over any questions affecting only

8    individual members; and class resolution must be superior to other available methods for the fair and

9    efficient adjudication of the controversy." *Amchem*, 521 U.S. at 615.

10        **1.    Common Questions of Law and Fact Predominate**

11        "The predominance inquiry asks whether the common, aggregation-enabling, issues in the

12   case are more prevalent or more important than the non-common, aggregation-defeating, individual

13   issues." *Tyson Foods, Inc. v. Bouaphak*eo, 136 S. Ct. 1036, 1045 (2016). The predominance inquiry

14   "does *not* require a plaintiff seeking class certification to prove that each elemen[t] of [her] claim

15   [is] susceptible to classwide proof." *Amgen*, 133 S. Ct. at 1196 (brackets and emphasis in original).

16   Instead, the inquiry focuses on whether the proposed class as a whole is "sufficiently cohesive to

17   warrant adjudication by representation." *Id.* at 1196-97. Nor does predominance require an absence

18   of individualized issues; the rule expressly permits the same, as long as they do not "overwhelm

19   [the] common ones." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2412 (2014); *see*

20   *also In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 109 (E.D.N.Y. 2012) ("[T]he existence of individual

21   defenses will not defeat predominance if a sufficient constellation of common issues binds class

22   members together."); *Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 815 (7th Cir. 2012)

23   ("Individual questions need not be absent. The text of Rule 23(b)(3) itself contemplates that such

24   individual questions will be present. The rule requires only that those questions not predominate over the

25   common questions affecting the class as a whole."). Accordingly, "[w]hen one or more of the central

26   issues in the action are common to the class and can be said to predominate, the action may be

27   considered proper under Rule 23(b)(3) even though other important matters will have to be tried

28

separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson*, 136 S. Ct. at 1045.

In this action, issues common to the Classes will predominate as to each element of Plaintiffs' Sherman Act claims: (1) proof of the violation, namely, proof that Defendants colluded to set base fares and fuel surcharges on the routes in question; (2) proof that the violation caused widespread antitrust impact (or the fact of injury) to all or virtually all members of the Classes; and (3) proof of the aggregate harm (or the quantum of injury) suffered by the Classes. Courts regularly find common proof of these elements predominate in direct purchaser horizontal price-fixing cases, because each element can be satisfied through generalized classwide proof. *Amchem*, 521 U.S. at 615; *see* note 2, *supra*; *Thomas*, 209 F.R.D. at 167 ("In price-fixing cases, 'courts repeatedly have held that the existence of the conspiracy is the predominant issue and warrants certification even where significant individual issues are present.'").

**Proof of the Violation:** If every absent class member were required to prove its claims individually at trial, each would have to put forward the same proof, revolving around the conduct of the Defendants: that each participated in a price-fixing cartel to collectively impose base fares and fuel surcharges for transpacific air passenger transportation originating in the United States for travel to Japan and that ANA and JAL each participated in a price-fixing cartel for *Satogaeri* fares for the *Satogaeri* Class. This is the same proof chronicled *supra*, namely: communications between Defendants, documents memorializing many of these communications, testimony of Defendants' employees about the industry and their price-fixing effort, and expert testimony about the susceptibility of the industry to collusion. This proof is common to the Classes and supports a finding of predominance. *See* note 2, *supra*.

**Proof of Impact**. Proof of antitrust injury requires a showing of some injury to "business or property" due to a Defendant's antitrust violations. *See Reiter*, 442 U.S. at 337-41; *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 126 (1969). This is not a high bar to clear, however. "Plaintiffs need only advance a plausible methodology to demonstrate that antitrust injury can be proven on a class-wide basis." *DRAM*, 2006 WL 1530166 at *9; *see also Online DVD Rental*,

2010 WL 53596064 at *9-11; *SRAM*, 2008 WL 4447592 at *5. The issue at class certification is whether "plaintiffs demonstrated that there is a way to prove a class-wide measure of [impact] through generalized proof." *Online DVD Rental*, 2010 WL 5396064 at *10 (quoting *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 100 (D. Conn. 2009)).

Classwide impact may be proven through factual evidence of the workings of the conspiracy, economic opinion concerning the structure and performance of the industry, as well as through econometric modeling showing widespread harm to the Classes. *See, e.g.*, *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 345-46 (D. Md. 2012); *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1192 (N.D. Cal. 2013). As Judge Conti recently explained, this "is a question of methodology, not merit," where courts "should avoid engaging in a battle of the experts." *CRT*, 308 F.R.D. at 625; *accord In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 373-74 (C.D. Cal. 2011) ("the Court is not supposed to decide at the certification stage which expert analysis or model is better."); *In re Apple iPod iTunes Antitrust Litig.* No. C 05-00037JW, 2011 WL 5864036, at *3 (N.D. Cal. Nov. 22, 2011) ("[t]he court cannot weigh in on the merits of plaintiffs' substantive arguments, and must avoid engaging in a battle of expert testimony"). Moreover, as Judge Lucy Koh recently observed in certifying a class of "high tech" employees, "the importance of [] statistical models is diminished in light of the extensive documentary evidence that supports Plaintiffs' theory of impact. In other contexts, courts have long noted that statistical and anecdotal evidence must be considered in tandem . . . . After all, class certification requires a holistic, qualitative assessment . . . ." *In re High-Tech Employees Antitrust Litig.*, 985 F.Supp.2d 1167, 1217 (N.D. Cal. 2013)

Here, Plaintiffs can demonstrate impact on all or virtually all members for both of the respective Classes. For the Japan Class, Plaintiffs present three types of classwide evidence of impact. *First*, there is contemporaneous evidence that each carrier increased its fuel surcharges in parallel with the other carrier based in the same country throughout the Class periods. *See supra*, at Mangum Rpt. ¶ 51. *Second*, Dr. Mangum concludes, based upon evidence of the structure of the international airline markets for travel between the United States and Japan that the conspiracy

1   caused classwide impact. And *third*, in addition to other widely accepted economic methodologies

2   found in Dr. Mangum's Report, Plaintiffs have set forth the gold standard for demonstrating

3   classwide impact: multiple regression analysis utilizing commonly-accepted econometric

4   techniques. Specifically, Dr. Mangum presents statistical evidence of classwide harm. Each of these

5   categories of evidence is sufficient to prove classwide impact—*i.e.*, each constitutes a "plausible

6   methodology" to prove generalized harm. Collectively, they easily satisfy the requirements of Rule

7   23(b)(3).

8          Economic analyses of industry structure is a well-recognized type of common proof that

9   many courts in price-fixing cases have relied on to find that antitrust injury is susceptible to

10  classwide proof within the meaning of Rule 23(b)(3).[13] Dr. Mangum demonstrates that during the

11  class period, airline travel from the United States to Japan was characterized by a number of

12  structural factors—a highly concentrated market, significant barriers to entry, communications

13  between competitors that allow for implementation, monitoring and operation of the cartel, among

14  other characteristics—that would have resulted in classwide impact. *See supra.*

15         In addition, Dr. Mangum performs a multiple regression analysis to test whether the

16  conspiracy's impact on the Japan Class can be measured empirically. Multiple regression analysis of

17  this type is a standard of antitrust practice. *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.*,

18  267 F.R.D. 583, 606 (N.D. Cal. 2010) ("*LCD II*"); *High-Tech Employees*, 985 F. Supp. 2d at 1212.[14]

19  Using transactional data from JAL and ANA, as well as information about Defendants' businesses

20  gleaned from the discovery record, Dr. Mangum created an econometric model that identifies and

21  quantifies the effect of the alleged conspiracy on prices members of the Japan Class paid for

22  transpacific travel from the United States to Japan. Dr. Mangum uses the period prior to the

23  implementation of the fuel surcharges—February 1, 2005—as a "benchmark" to compare

24

25  [13] *See, e.g., Auto Lighting*, 276 F.R.D. at 370-72.

26  [14] The merits of this methodology "will be adjudicated at trial based upon economic theory, data
    sources, and statistical techniques that are entirely common to the class." *SRAM*, 2008 WL 4447592,

27  at *6 (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 521 (S.D.N.Y.
    1996)).

28

conspiratorial and non-conspiratorial pricing. Mangum Rpt. ¶¶ 157-159 (explaining that the benchmark was chosen because it reflects a period where transpacific travel was "conceptually untainted by the [anticompetitive] misconduct"). Using data and information from the benchmark period, the models can determine a "but for" price during the Class period—*i.e.*, the price passengers would have paid for travel from the United States to Japan "but for" the conspiracy. That the actual prices are above the "but for" prices shows that members of the Classes have been harmed by the conspiracy. *Id*. ¶¶ 179-180. In other words, it is classwide proof of impact.

Further, the regression modeling for the Japan Classes have tremendous explanatory power. For the model on the Japan Class, over 97 percent of the variation in the observed itinerary prices can be explained by selected explanatory variables, such as cost and demand that control for factors economic theory would predict are affecting prices for transpacific travel from the United States to Japan. *See id*. ¶ 179. Dr. Mangum's models estimate an aggregate overcharge of 8.33 percent for the Japan Class. *See id*. ¶ 180. These results constitute evidence that the conspiracy led to members of the Japan Class paying higher prices for transpacific travel from the United States to Japan. The model thus demonstrates that, when controlling for economic factors that determine price, all or virtually all Japan Class members were impacted by the conspiracy.

Impact to all or virtually all *Satogaeri* Class members can also be demonstrated through an economic analysis, albeit through a different methodology used for the Japan Class because there is no suitable dataset from either the before or after period to use as a benchmark. Indeed, there is no data of any kind for much of the *Satogaeri* Class period. Mangum Rpt. ¶ 203.

Dr. Mangum finds an

15

overcharge of 9.1 percent for *Satogaeri* Fares—a number that is consistent with the amount that JAL

implied it would have to lower *Satogaeri* fares in 2000 if it had not reached an agreement with

ANA. Mangum Rpt. ¶¶ 206-207.[16] ███████████████████████ Dr. Mangum finds a similar

overcharge of 7.1 percent.

**Classwide Proof of Aggregate Damages**. Dr. Mangum's model not only demonstrates that

all or virtually all class members were impacted by the conspiracy, it can also be used to determine

damages on a classwide bases.[17] In order to calculate damages for the Japan Class, Dr. Mangum first

calculated the total fare by adding all the itinerary prices for the transpacific travel from the U.S. to

Japan charged by the Japanese carriers. He then applied the overcharge estimate on this amount, but

limited damages to the amount of surcharges because any inflation in the base rates would not be

recoverable to Plaintiffs under the filed rate doctrine. *Wortman v. All Nippon Airways*, 854 F.3d 606,

614 (9th Cir. 2017). *See* Mangum Rpt. ¶ 183. The results of model are that members of the Japan

Class paid $94 million in overcharges. For the *Satogaeri* Class, Dr. Mangum applied his overcharge

modeling, estimated classwide damage to range between $22.5 million to $28.9 million. *See*

Mangum Rpt. ¶ 211.

Any arguments that Defendants present regarding why they think Dr. Mangum's damages

modeling of the overcharge is flawed "may appropriately be considered by the trier of fact, and do

not rise to a level that would require denial of certification." *ODD*, 2016 WL 467444, at *4. And, as

---

[16] For all of the Classes, Plaintiffs need not prove that every absent class member was injured in fact, only that virtually all members of the Classes suffered injury on at least one transaction. *E.g.*, *Tyson Foods*, 136 S. Ct. at 1045 (affirming certification despite presence of 212 uninjured members, representing 6.33 percent of class). *Halliburton*, 134 S. Ct. at 2412 ("that the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate"); *Wal-Mart Inc. v. Dukes*, 131 S. Ct. 2541, 2553-54 (2011) ("the essential question" is "whether .5 percent or 95 percent" of the class was harmed); *In re Nexium Antitrust Litig.*, 297 F.R.D. 168, 180 (D. Mass. 2013) (existence of "uninjured class members [is] not fatal to class certification" (collecting cases)), *aff'd*, 777 F.3d 9 (1st Cir. 2015).

[17] It is well-established in this Circuit that "[d]uring the class certification stage, plaintiffs need not supply a 'precise damage formula,' but must simply offer a proposed method for determining damages that is not 'so insubstantial as to amount to no method at all.'" *iTunes*, 2011 WL 5864036, at *3 (quoting *Online DVD Rental*, 2010 WL 5396064, at *11); *see also SRAM*, 2008 WL 4447592, at *6; *DRAM*, 2006 WL 1530166, at *10. As the Supreme Court has emphasized, the proposed method "need not be exact" but "must be consistent with [the plaintiffs'] liability case." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013).

PLAINTIFFS' NOTICE OF MOTION; MOTION; AND MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION; Case No. 3:07-cv-05634-CRB          21

the Ninth Circuit has also recently reaffirmed, to the extent damage calculations may have individualized elements, that fact will not defeat class certification.[18]

Here, Dr. Mangum has presented a workable and widely accepted methodology for measuring classwide impact and damages. In doing so, moreover, Dr. Mangum has gone well beyond Rule 23's requirement that Plaintiffs merely identify a damage methodology that is not "so insubstantial as to amount to no method at all." On the contrary, Dr. Mangum has constructed models that can be applied to determine damages on a classwide basis for the Classes.[19]

### 2.   A Class Action Is Superior

Rule 23(b)(3) requires that a class action be "superior to other available methods for the fair and efficient adjudication of the controversy." "[I]f common questions are found to predominate in an antitrust action, . . . courts generally have ruled that the superiority prerequisite of Rule 23(b)(3) is satisfied." *LCD*, 267 F.R.D. at 314. Here, it would be incredibly inefficient to litigate the predominating common issues in individual proceedings, rather than on a class basis. "In antitrust cases such as this, the damages of individual direct purchasers are likely to be too small to justify litigation, but a class action would offer those with small claims the opportunity for meaningful redress." *SRAM*, 2008 WL 4447592, at *7; *Auto Lighting*, 276 F.R.D. at 375 (same). The prosecution of separate actions by individual class members would also create the risk of inconsistent rulings, and could result in prejudice to the Plaintiffs and absent class members. The

---

[18] *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1167 (9th Cir. 2014) (citing *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010)); *Pulaski & Middleman LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir. 2015); *Levya v. Medline Indus., Inc.*, 716 F,3d 510, 513-14 (9th Cir. 2013); *see also Tyson*, 136 S. Ct. at 1047 (critique of classwide model was "itself common to the claims made by all class members).

[19] There is no requirement that every single class member must show harm at the certification stage. *See Tyson*, at 136 S. Ct. at 1044-45, 1050 (affirming certification of class with uninjured class members and stating that whether some "methodology will be successful in identifying uninjured class members is a question that . . . is premature" at class certification and better addressed at the allocation stage); *In re Cathode Ray Tube Antitrust Litig.*, MDL. No. 1917, 2013 WL 5391159, at *5 (N.D. Cal. Sept. 19, 2013) ("Defendants' argument on this point is essentially that the IPPs must be able to prove at the class certification stage that every single (or basically every single) class member was injured by Defendants' conduct. This contention is wrong. The Court's job at this stage is simple: determine whether the IPPs showed that there is a reasonable method for determining, on a classwide basis, the antitrust impact's effects on the class members. . . . This is a question of methodology, not merit.").

cost that would be imposed on the judicial system and the parties by multiple individual trials would far exceed those of litigating this case as a single class action proceeding. Thus, "certification in this case would be far superior to, and more manageable than, any other procedure available for the treatment of the factual and legal issues raised by Plaintiffs' claims." *Id.*

IV.   **CONCLUSION**

For the foregoing reasons, the Plaintiffs respectfully request the Classes be certified, Plaintiffs be appointed as representatives of their respective Classes, and Hausfeld and CPM be appointed as Class Counsel pursuant to Rule 23(g).

Dated: January 26, 2018                              Respectfully submitted,

*/s/ Adam J. Zapala*
Joseph W. Cotchett
Adam J. Zapala
Elizabeth T. Castillo
**COTCHETT, PITRE, McCARTHY, LLP**
Burlingame, CA 94010
Tel: (650) 697-6000
Fax: (650) 697-0577

Dated: January 26, 2018                               Respectfully submitted,

*/s/ Christopher L. Lebsock*
Michael P. Lehmann
Christopher L. Lebsock
Seth R. Gassman
**HAUSFELD LLP**
600 Montgomery Street Suite 3200
San Francisco CA 94111
Tel: (415) 633-1908
Fax: (415) 358-4980

Michael D. Hausfeld
**HAUSFELD LLP**
1700 K Street, N.W., Suite 650
Washington, D.C. 20006
Tel: (202) 540-7200
Fax: (202) 540-7201

*Interim Co-Lead Counsel for Plaintiffs*