Ankur Kapoor
Gary J. Malone
Harrison McAvoy
Yo W. Shiina
CONSTANTINE CANNON LLP
335 Madison Avenue, 9th Floor
New York, NY 10017
Telephone:     (212) 350-2700
Facsimile:     (212) 350-2701
Email: akapoor@constantinecannon.com

Douglas E. Rosenthal
J. Wyatt Fore
CONSTANTINE CANNON LLP
1001 Pennsylvania Avenue, N.W., Suite 1300N
Washington, DC 20004
Telephone:     (202) 204-3500
Facsimile:     (202) 204-3501
Email: drosenthal@constantinecannon.com

Jesse W. Markham, Jr.
1 Embarcadero Center, 5th Floor
San Francisco, CA 94111
Telephone:     (415) 422-4473
Email: jmarkhamlaw@gmail.com

*Counsel for Defendant All Nippon Airways Co., Ltd.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE TRANSPACIFIC PASSENGER AIR TRANSPORTATION ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | Case No. C 07-5634 CRB<br><br>MDL NO. 1913<br><br>**DEFENDANT ALL NIPPON AIRWAYS CO., LTD'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:      June 15, 2018<br>Time:      10:00 a.m.<br>Judge:     Hon. Charles R. Breyer<br>Courtroom: No. 6, 17th Floor |

**REDACTED PUBLIC VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1
2

# **TABLE OF CONTENTS**

3

TABLE OF CONTENTS ................................................................................... ii

TABLE OF AUTHORITIES ............................................................................ iii

NOTICE OF MOTION AND MOTION ............................................................ v

STATEMENT OF RELIEF REQUESTED ......................................................... v

MEMORANDUM OF POINTS AND AUTHORITIES ...................................... vi

STATEMENT OF ISSUES TO BE DECIDED .................................................. vi

SUMMARY OF ARGUMENT ........................................................................ vi

STATEMENT OF FACTS ................................................................................ 1

I.      Plaintiffs purchased their tickets indirectly through travel agents. ......................... 1

II.     JAL and ANA petitioned the Government of Japan for fuel surcharges to recover
        the rapidly escalating cost of fuel. .......................................................................... 5

ARGUMENT .................................................................................................. 8

I.      The indirect-purchaser rule bars Plaintiffs' *Satogaeri* Class damages claims because
        *satogaeri* tickets were purchased indirectly from travel agents. ........................... 9

        A.      Plaintiffs' claims require tracing the alleged overcharges from travel
                agents to passengers, which the indirect-purchaser rule prohibits. .............. 9

        B.      This case is analogous to *ATM Fee*, in which this Court applied the
                indirect-purchaser rule to bar claims that the defendants colluded on a
                price other than the price paid by the plaintiffs. ....................................... 12

        C.      It is irrelevant that title may not formally pass to travel agents. ............... 12

II.     *Noerr-Pennington* immunity bars Plaintiffs' Japan Class damages claims because
        those claims arise out of conduct petitioning the Government of Japan for
        regulatory action. ................................................................................................ 13

        A.      The Sherman Act does not reach domestic or foreign political processes.
                .................................................................................................................... 14

        B.      *Noerr-Pennington* prevents intrusion into the operation of government.. 14

        C.      Comity reasons further counsel for the application of *Noerr-Pennington*.
                .................................................................................................................... 16

        D.      ANA's petitioning for fuel surcharges qualifies for *Noerr-Pennington*
                immunity. ................................................................................................... 17

CONCLUSION ............................................................................................. 19

25
26
27
28

DEFENDANT ALL NIPPON AIRWAYS CO., LTD.'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:07-CV-05634 CRB

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*Alfred Dunhill of London, Inc. v. Cuba,*
    425 U.S. 682 (1976)....................................................................16, 17

4

*Am. Banana Co. v. United Fruit Co.,*
    213 U.S. 347 (1909)..............................................................................17

5

6

*Amarel v. Connell,*
    102 F.3d 1494 (9th Cir. 1996) ................................................. viii, 13, 14

7

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)................................................................................8

8

9

*Animal Sci. Prods. v. China Minmetals Corp.,*
    654 F.3d 462 (3d Cir. 2011)...................................................................13

10

*Animal Sci. Prods. v. Hebei Welcome Pharm. Co.,*
    138 S. Ct. 734 (2018)............................................................................16

11

12

*In re ATM Fee Antitrust Litig.,*
    No. C 04-02676 CRB, 2010 WL 3701912 (N.D. Cal. Sep. 16, 2010) ......... *passim*

13

*In re ATM Fee Antitrust Litig.,*
    686 F.3d 741 (9th Cir. 2012) ..................................................................9

14

15

*Carpet Grp. Int'l v. Oriental Rug Importers Ass'n,*
    227 F.3d 62 (3d Cir. 2000)....................................................................13

16

*Carpet Grp. Int'l v. Oriental Rug Importers Ass'n,*
    256 F. Supp. 2d 249, 266 (D.N.J. 2003) ................................................15

17

18

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)................................................................................8

19

*Coastal States Mktg. v. Hunt,*
    694 F.2d 1358 ......................................................................................15

20

*Del. Valley Surgical Supply Inc. v. Johnson & Johnson,*
    523 F.3d 1116 (9th Cir. 2008) ................................................................9

21

22

*E.R.R. Presidents Conf. v. Noerr Motor Freight, Inc.,*
    365 U.S. 127 (1961)....................................................................... *passim*

23

*Ill. Brick Co. v. Illinois,*
    431 U.S. 720 (1977)....................................................................... *passim*

24

25

*In re Int'l Air Transportation Surcharge Antitrust Litig.,*
    No. 06-01793 CRB (N.D. Cal. Dec. 19, 2011)......................................13

26

*Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.,*
    508 U.S. 49 (1993)................................................................................13

27

28

*Sanders v. Brown*,
    504 F.3d 903 (9th Cir. 2007) ................................................................17

*United Mine Workers of Am.v. Pennington*,
    381 U.S. 657 (1965)........................................................................ *passim*

*In re Vitamin C Antitrust Litig.*,
    837 F.3d 175 (2d Cir. 2016)................................................................16

**Statutes**

Sherman Act § 1, 15 U.S.C. § 1 ..................................................................8

Clayton Act § 4, 15 U.S.C. § 15 ................................................................9

**Rules**

Federal Rule of Civil Procedure 56 ...................................................... v, vii

**Other Authorities**

First Continental Congress, *Letter to the Inhabitants of the Province of Quebec* (Oct. 26,
    1774), *available at* The University of Chicago Press, http://press-
    pubs.uchicago.edu/founders/documents/v1ch14s12.html. ...................15

Office of the Historian, Bureau of Public Affairs, U.S. Dept. of State, Milestones in the
    History of U.S. Foreign Relations, Occupation and Reconstruction of Japan,
    1945-52, https://history.state.gov/milestones/1945-1952/japan-reconstruction. ...15

The Constitution of Japan, art. 16 (1946),
    http://www.japaneselawtranslation.go.jp/law/detail_main?id=174......................15

U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for International
    Enforcement and Cooperation* § 4.2.4 (Jan. 13, 2017)........................................16

P. Areeda & H. Hovenkamp, *Antitrust Law* (4th ed. 2014)..................................... *passim*

1

2

### NOTICE OF MOTION AND MOTION

3          PLEASE TAKE NOTICE that on Friday June 15, 2018 or as soon thereafter as the

4  matter may be heard, in the courtroom of the Honorable Charles R. Breyer, United States

5  District Court for the Northern District of California, 450 Golden Gate Ave., Courtroom 6,

6  17th Floor, San Francisco, California, Defendant All Nippon Airways Co., Ltd. ("ANA")

7  will move for an order granting summary judgment on all claims for damages in Plaintiffs'

8  Second Amended Consolidated Class Action Complaint ("SAC") (Nov. 22, 2013) (ECF

9  No. 741) pursuant to Federal Rule of Civil Procedure 56.

10         The motion is and will be based on (a) this Notice of Motion and Motion; (b) the

11  Memorandum of Points and Authorities; (c) the documents on file in this action; (d) the

12  Declaration of Ankur Kapoor dated May 7, 2018; and (e) such further evidence and

13  argument as the Court may permit.

14

### STATEMENT OF RELIEF REQUESTED

15         ANA respectfully requests that this Court grant ANA summary judgment, under

16  Federal Rule of Civil Procedure 56, on all of Plaintiffs' damages claims in the SAC.  For

17  the reasons discussed in the accompanying Memorandum of Points and Authorities, all of

18  Plaintiffs' damages claims against ANA are barred by the indirect-purchaser rule and

19  *Noerr-Pennington* immunity.[1]

20

21

22

23

---

24  [1] At the status conference on February 2, 2018, the Court granted ANA leave to make any
25  additional motion for summary judgment.  In 2013, ANA and the other defendants
   moved for summary judgment based on the filed-rate doctrine, a threshold issue which
26  would determine the available scope of any class which the plaintiffs sought to certify.
   ANA now moves for summary judgment on the merits of the plaintiffs' asserted class
27  claims against ANA.

28

DEFENDANT ALL NIPPON AIRWAYS CO., LTD.'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:07-CV-05634 CRB

## MEMORANDUM OF POINTS AND AUTHORITIES

## STATEMENT OF ISSUES TO BE DECIDED

### (Civil L.R. 7-4)

Whether Plaintiffs' claims for money damages against ANA are barred by the indirect-purchaser rule and *Noerr-Pennington* immunity, because those claims seek damages from ANA based on: (1) tickets purchased indirectly through travel agents; and (2) fuel surcharges which the Government of Japan allowed and determined upon ANA's and Japan Airlines' ("JAL's") petitions to the Government of Japan.

## SUMMARY OF ARGUMENT

1.    In *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), the Supreme Court held that entities which purchase a provider's product or service through a "middleman" or intermediary do not have standing to sue the provider under federal antitrust law.  This Court and the Ninth Circuit have applied *Illinois Brick*'s indirect-purchaser rule to bar claims where, as here, the plaintiffs allege a provider conspiracy to raise prices charged to intermediaries, which had the effect of increasing the prices charged by the intermediaries to the plaintiffs.  *In re ATM Fee Antitrust Litig.*, No. C 04-02676 CRB, 2010 WL 3701912 (N.D. Cal. Sept. 16, 2010), *aff'd*, 686 F.3d 741 (9th Cir. 2012).

Plaintiffs James Kawaguchi, Shinsuke Kobayashi, Harley Davidson Oda, Della Ewing-Chow, Nancy Kajiyama, and Brenden Maloof seek appointments as representatives of two classes of consumers who purchased tickets for travel from the United States to Japan on ANA or JAL.  Pls.' Mot. Class Cert., at iii, 1, 15 (Jan. 26, 2018) (ECF No. 1118-4).  Plaintiffs claim that ANA and JAL colluded on (1) so-called "*satogaeri*" fares ("the Satogaeri Class") and (2) fuel surcharges ("the Japan Class").  *Id.* at 1, 6-8. ███████

███████████████████████████████████████████

███████████████████████████████████████████

DEFENDANT ALL NIPPON AIRWAYS CO., LTD.'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:07-CV-05634 CRB

1    ████████████████    [Expert Report of Russell W. Mangum III, Ph.D. Regarding Class

2    Certification ¶ 185, at 85-86 (Jan. 26, 2018) (ECF No. 1119-2) ("Mangum Report").]

3        ANA and JAL provided *satogaeri* fares to travel agents on a "net fare" basis; ██████

4    ████████████████████████████████████    (Mangum Report ¶¶ 191, 194,

5    at 88.)  Plaintiffs acknowledge that ██████████████████████████████

6    ███████████████████████████████████████████████    [Mangum

7    Report ¶ 191, at 88) ████████████████████████████████████

8    ██████████████████████████████████████████████████████

9    ███████████████████████████████████████████.]

10       Plaintiffs claim that ANA and JAL colluded on the *satogaeri* net fares charged by

11   the airlines to travel agents and paid by travel agents to ANA and JAL.  (*Id.* ¶¶ 195-96, at

12   89; Declaration of Ankur Kapoor dated May 7, 2018 ("Kapoor Decl.") Ex. 1 (Deposition of

13   Russell W. Mangum III, Ph.D. (Mar. 27, 2018)) 205:14-17.) ████████████████

14   ██████████████████████████████████████████████████████

15       ████████    (*Id.* 205:18-206:07.) ████████████████████████████

16   ██████████████████████████████████████████████████████

17   ███████████████████████████████████████████████████

18   ██████████████    (*Id.* 210:11-213:17.)

19       Plaintiffs have thus admitted that their Satogaeri Class claims are for indirect

20   purchases through travel agents, and that their theory of harm is that higher prices paid by

21   travel agents were passed on to Plaintiffs.  Those are precisely the type of damages claims

22   that *Illinois Brick*'s indirect-purchaser rule bars.  *See ATM Fee*, 2010 WL 3701912, at *2.

23       2.    The *Noerr-Pennington* doctrine provides antitrust immunity for the petitioning

24   of governmental action.  *E.R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S.

25   127 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965).  The

26   immunity derives both from the First Amendment right to petition the government and

27   from the fact that governmental action is beyond the Sherman Act's reach.  The Ninth

28                                         vii

1  Circuit and other circuits have applied *Noerr-Pennington* immunity to the petitioning of

2  foreign governments.  *E.g.*, *Amarel v. Connell*, 102 F.3d 1494, 1518 (9th Cir. 1996).

3       *Noerr-Pennington* immunity bars Plaintiffs' Japan Class claims for collusion on fuel

4  surcharges, because those claims arise out of ANA's and JAL's protected petitions to the

5  Government of Japan and from the Government of Japan's regulatory actions establishing

6  those fuel surcharges.  In response to drastically increasing fuel prices in the early 2000s,

7  first JAL and subsequently ANA petitioned the Japan Civil Aviation Bureau (JCAB) within

8  the Government of Japan's Ministry of Land, Infrastructure, Transport and Tourism

9  (MLIT) to allow fuel surcharges to compensate for the rise in fuel prices.  Although the

10  JCAB initially declined to allow fuel surcharges, JAL conducted a successful campaign to

11  persuade the JCAB to allow fuel surcharges as an effective means of addressing rapidly

12  escalating fuel costs.  During that process, the JCAB reached out to ANA in order to obtain

13  ANA's views, and then coordinated trilateral communications among the JCAB, JAL, and

14  ANA to determine the amount and timing of the fuel surcharges.  The JCAB mandated that

15  ANA and JAL prove that the fuel surcharges they collected did not exceed the actual

16  impact of higher fuel costs. The JCAB also instructed that ANA and JAL should have the

17  same fuel-surcharge levels for flights of comparable distance, e.g., Japan-Europe or Japan-

18  North America.  Such petitioning of a government for regulatory action—and the

19  government's action itself—are beyond the reach of antitrust law.

20       Because all of Plaintiffs' damages claims are barred as a matter of law, summary

21  judgment for ANA is warranted under Federal Rule of Civil Procedure 56.

22

23

24

25

26

27

28
DEFENDANT ALL NIPPON AIRWAYS CO., LTD.'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:07-CV-05634 CRB

1

<u>**STATEMENT OF FACTS**</u>

2

**I.    Plaintiffs purchased their tickets indirectly through travel agents.**

3

4      Plaintiffs purchased discounted, so-called "ethnic fares" from travel agencies

5 catering to Japanese nationals and Americans of Japanese descent living in the United

6 States. ████████████████████████████████████████

7 ████████████████████████████ (Mangum Report ¶ 185, at 85-86).  As

8 Plaintiffs' proffered expert economist admits, ████████████████████████

9 ████████████████████████████████████████████████

10 ████ (*Id.*)

11      Dr. Mangum's report lists the fares for which each Plaintiff is proposed as a class

12 representative.  (*Id.* ¶ 19, at 7-9.)  Each Plaintiff purchased those fares through travel

13 agencies.

14      Plaintiff James Kawaguchi, a representative for the proposed Satogaeri Class, in

15 June 2001 purchased a discounted ethnic fare from a travel agent instead of directly from

16 the airline, because the ethnic fare was cheaper.  [Kapoor Decl. Ex. 2 (Deposition of James

17 Kawaguchi (Jan. 31, 2014)) 61:17-62:18, 63:03-08; *id.* 110:01-23 ("Typically [travel

18 agents] were cheaper than any other websites that you can buy them through direct from

19 the airlines.").]  The travel agent, New Japan Travel Center—not ANA—charged him for

20 the discount fare; and he paid New Japan Travel Center directly.  (*Id.* 71:19-72:14.)

21      Plaintiff Shinsuke Kobayashi, another representative for the proposed Satogaeri

22 Class, also purchased his discount fares from travel agencies.  [Kapoor Decl. Ex. 3

23 (Deposition of Shinsuke Kobayashi (Feb. 21, 2014)) 48:10-18.]  Like Kawaguchi, he did so

24 rather than purchase directly from the airline, ANA, because the travel agent "had a

25 cheaper deal."  [*Id.* 48:04-22, 49:15-50:03 (2000 purchase from HIS Corp.); *see also id.*

59:06-25, 60:07-10, 60:18-22 (2003 purchase from IACE Travel); *id.* 66:24-67:02, 68:06-

26

27

28
                                     1

09, 69:04-09 (another 2003 purchase from IACE Travel).]  Kobayashi paid the travel agent directly in cash for each trip.  (*Id.* 123:03-18.)

Plaintiff Harley Oda, a representative for both the proposed Japan (fuel surcharges) and Satogaeri Classes, purchased the tickets for which he is claiming damages from Pali Tours & Travel in Honolulu.  [Kapoor Decl. Ex. 4 (Deposition of Harley Davidson Oda (Feb. 19, 2014)) 31:15-32:15, 36:18-37:04.]  He purchased those tickets through a travel agency and not directly from the airline because the travel agency's "business was right next . . . door to mine[], and they've been known to give decent prices."  (*Id.*)

Plaintiff Della Ewing-Chow, another representative for the proposed Japan Class, purchased a tour package from Kobayashi Travel Services, also in Honolulu, which included airfare, hotels, the tour itself, and some meals.  [Kapoor Decl. Ex. 5 (Deposition of Della Ewing-Chow (Jan. 21, 2014)) 27:03-07, 27:24-28:06, 30:15-19.]  She paid a single price to the travel agent for the tour package.  (*Id.* 30:22-25.)

Plaintiff Nancy Kajiyama, another representative for the proposed Japan Class, purchased her discounted ethnic fares through HIS International Tours for her April 2002 and May 2006 trips.  [Kapoor Decl. Ex. 6 (Deposition of Nancy Kajiyama (Jan. 27, 2014)) 25:22-25, 26:09-15, 30:09-31:07, 33:20-34:16, 37:16-23.]  Ms. Kajiyama's father, whose estate Ms. Kajiyama represents, also purchased his discounted ethnic fares from HIS for his May 2005 and May 2006 trips.  (*Id.* 129:22-130:19.)

Plaintiff Brenden Maloof, another representative for the Japan Class, in September 2006 purchased from Orbitz the ANA business-class ticket for which he is claiming damages.  [Kapoor Decl. Ex. 7 (Deposition of Brenden Maloof (Jan. 31, 2014) 62:05-18, 63:17-20.]  Like the other Plaintiffs, he did so because of the price offered by Orbitz.  (*Id.*)  Orbitz also offered "20% Cash Back" on the booking.  [Kapoor Decl. Ex. 8 (Maloof Plane Ticket Receipt (Sep. 11, 2006)) at *8782.]

Plaintiffs concede that ███████████████████████████████ ████████████████ (Mangum Report ¶ 191, at 88.)  That occurs because ANA and

2



JAL both provided *satogaeri* fares to travel agents on a "net basis." ███████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████ [*Id.*

████████████████████████████████████████

█████████████████████████████████ ; *accord* Kapoor Decl.

Ex. 9 (Declaration of Isao Ono in Support of ANA's Mot. Summ. J. Based on the Filed

Rate Doctrine (Aug. 1, 2013)) ¶ 5 ("a 'net fare' [including a *satogaeri* net fare] . . . is the

amount the travel agent has to remit back to ANA.  The difference between the 'net fare'

and the corresponding published rate is the travel agent's commission").]

     According to a large travel agency catering to Japanese individuals living in the

United States, ████████████████████████████████

████████████████████████████████████████

████████████ [Kapoor Decl. Ex. 10 (Deposition of Kazuyuki Hirata, HIS Int'l

Tours (Jan. 22, 2014)) 58:02-18 (emphases added).] ████████████

████████████████████████ [Mangum Report ¶

189, at 87 (citing JAL employee characterizing United Airlines' *satogaeri* fares as

████████████████████).]  As a result, ██████

████████████████████████████████████████

████████████████████ [Kapoor Decl. Ex. 11 (Deposition

of Ken Sueishi, HIS Int'l Tours (Jan. 21, 2014)) 96:23-25, 110:20-111:17; *Id.* Ex. 10

(Hirata, HIS Int'l Tours) 30:02-05 █████████████████████

███████████████████████).]

      ██████████████████████████████████

████████████ [Kapoor Decl. Ex. 11 (Sueishi, HIS Int'l

Tours) 96:20-22.] ███████████████████████

████████████ (*Id.* 92:24-93:08.)  In fact, ██████

3

DEFENDANT ALL NIPPON AIRWAYS CO., LTD.'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:07-CV-05634 CRB

1

2

3 [Mangum Report ¶ 201, at

4 93; Kapoor Decl. Ex. 1 (Mangum) 213:22-215:04.]

5

6 [Kapoor Decl. Ex. 11 (Sueishi, HIS Int'l Tours) 95:02-09,

7 98:01-20.] (*Id.*

8 95:13-16.)  As JAL informed Plaintiffs' economist,

9

10 [Kapoor Decl. Ex. 12 (JAL Responses to Nov. 2, 2017 Follow-up Questions #5) at 2.]

11

12

13

14 [Kapoor Decl. Ex. 11 (Sueishi, HIS

15 Int'l Tours) 77:09-18, 110:20-111:17.]

16 (*Id.* 72:16-24; 110:20-111:17.)  As

17 Plaintiffs testified, they purchased their discounted fares from travel agents who offered

18 better prices than the airlines did directly, or because they purchased a tour package offered

19 by the travel agent which included the airfare as one of its elements. *See supra* at 1-2.

20        Critically, Plaintiffs have not alleged that ANA and JAL colluded with travel agents

21 to set the prices paid by passengers to travel agents for *satogaeri* tickets.

22

23 [Mangum Report ¶¶ 195-196, at 89 (claiming that

24

25 ).]  Plaintiffs' economist

26 confirmed this dispositive fact:

27

28





[Kapoor Decl. Ex. 1 (Mangum) 205:14-206:07.]

Therefore, ███████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████ [Mangum Report ¶ 199, at 92 ████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████);

Kapoor Decl. Ex. 1 (Mangum) 206:09-207:16 (█████████████
████████████████████████████████████████████████████
███████████); *see also id.* 210:11-213:17 █████████████
█████████.] Plaintiffs' economist ███████████████████████
███████████████████ (*Id.* 216:05-18.)

**II.    JAL and ANA petitioned the Government of Japan for fuel surcharges to recover the rapidly escalating cost of fuel.**

During the early 2000s, the global price of jet fuel began to rise significantly. However ██████████████████████████████████████████████████
█████████████████████████ [Kapoor Decl. Ex. 13 (Deposition of Gen Yamasaki, JAL (Jul. 24, 2012)) 68:23-68:25.]  As a result, ██████████████

5

1

2        ██████ (*Id.* 131:19-132:04.) █████████████████████

3        ████████████████████████████████████████

4        ███████████████████████████ (*Id.* 131:19-23.) ████████

5        ████████████████████████████████████████

6                                                          (*Id.*

7        122:10-25.) ████████████████████████████

8        [Kapoor Decl. Ex. 14 (Email from Mr. Yamasaki dated Sept. 7, 2004) at *990.]

9            ████████████████████████████████████

10       ████████████████████████████████████████

11       ████████████████████████████████

12       ██████████████████████████████ [*Id.* (correction added to

13       minor grammar and erroneous transcription issues); Kapoor Decl. Ex. 13 (Yamasaki)

14       131:23-132:07, 135:17-136:21.]  For example, ████████████████

15       ████████████████████████████

16       ███████████████████ [*See* Kapoor Decl. Ex. 15

17       ████████████████████████████████████████

18       ████████████████████████████████████

19       ████████████████████████████████████████

20       ████████████████████████████████████

21       ████████████████████████████████████

22       ████████████████████████████████████

23       █████████████████████████

24          ████████████████████████████

25       ██████████████ [Kapoor Decl. Ex. 13 (Yamasaki) 151:08-11.]  In

26       response, █████████████████████████████████

27                                              (*Id.* 132:14-

28
DEFENDANT ALL NIPPON AIRWAYS CO., LTD.'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:07-CV-05634 CRB



1    132:21.)

2    ████████  [Kapoor Decl. Ex. 20 (Deposition of Atsushi Yabuki, ANA (Dec. 13, 2013))

3    37:13-21, 47:01-48:25.]

4    ████████████████████████████████████████████

5    ████████████████████████████████████████████

6    ████████  [Kapoor Decl. Ex. 13 (Yamasaki) 135:10–135:15.]  ████████████

7    ████████████████████████████████████████████

8    ████████  [Kapoor Decl. Ex. 16 (emails from Mr. Yamasaki dated Nov. 2-10, 2004).]

9    ████████████████████████████████████████████

10   ████████████████████████████████████████████

11   ████████████████████  [Kapoor Decl. Ex. 21 (Deposition of Katsuya Kato,

12   ANA (Jan. 28, 2014)) 68:03-69:04, 84:15-84:22.]  ████████████

13   ████████████████████████████████████████████

14   ████████████████████  (Kapoor Decl. Ex. 13 (Yamasaki) 154:10–

15   156:12.)

16   ████████████████████████████████████████████

17   ████████████████████████████████████████████

18   ████████████████████████████████████████████

19   ████████████████  (*Id.* 69:20-70:05.)  To do so, ████████████

20   ████████████████████████████  (*Id.* 135:04-08.)

21   ████████████████████████████████████████████

22   ████████████████████  [*Id.* 167:05-168:08; Kapoor Decl. Ex.

23   16 at *498); Kapoor Decl. Ex. 20 (Yabuki) 38:13-17 (corrected in errata at 4).]  ████

24   ████████████████████████████  (*Id.*)  ████████████

25   ████████████████████████████  (*Id.* 99:06-

26   100:24.)

27

28

DEFENDANT ALL NIPPON AIRWAYS CO., LTD.'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:07-CV-05634 CRB

████████████████████████████████████████

████████████████████████████████████████████

████████    [*See* Kapoor Decl. Ex. 17 (email chain among JAL employees dated May 26-27, 2005) at *688 ████████████████████████

███████████████████████████ ).] ████████████████

███████████████████████████    [Kapoor Decl. Ex. 18 (letter from MLIT to JAL dated June 20, 2005), at *488; *see also* Kapoor Decl. Ex. 20 (Yabuki) 48:10-25, 107:17-108:04 (████████████████████████████

██████████████████ .]

Finally, ████████████████████████████████

████████████████████████████████████

█████████████████████    [Kapoor Decl. Ex. 13 (Yamasaki) 183:05-21; Kapoor Decl. Ex. 19 (email among individuals at JCAB and JAL dated Dec. 27, 2005).] ██████████████████████████████

█████████████████    [Kapoor Decl. 20 (Yabuki) 49:01-49:07.]

## ARGUMENT

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is "'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party." *In re ATM Fee Antitrust Litig.*, No. C 04-02676 CRB, 2010 WL 3701912, at *4 (N.D. Cal. Sep. 16, 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)), *aff'd*, 686 F.3d 741.  A fact is material "only if it could affect the outcome of the suit under governing law." *Id.*

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Here, ANA has negated an essential element of Plaintiffs' Satogaeri Class

claims, namely: plaintiffs' standing to sue under federal antitrust law.  As indirect

purchasers, Plaintiffs' lack standing to assert their sole count under the Sherman Act § 1,

15 U.S.C. § 1.  *ATM Fee*, 2010 WL 3701912, at *2.  There is also no genuine dispute that

the fuel surcharges of which Plaintiffs complain were the result of ANA and JAL

petitioning the Government of Japan to allow those fuel surcharges and of the Government

of Japan's determining to allow them and dictating their amount.  Plaintiffs' Japan Class

claims are thus barred by *Noerr-Pennington* immunity.

**I.      The indirect-purchaser rule bars Plaintiffs' Satogaeri Class damages claims because *satogaeri* tickets were purchased indirectly from travel agents.**

**A.      Plaintiffs' claims require tracing the alleged overcharges from travel agents to passengers, which the indirect-purchaser rule prohibits.**

A "bright line rule emerged from *Illinois Brick*:  only direct purchasers have standing

under § 4 of the Clayton Act to seek damages for antitrust violations."  *In re ATM Fee*

*Antitrust Litig.*, 686 F.3d 741, 748 (9th Cir. 2012) (quoting *Del. Valley Surgical Supply Inc.*

*v. Johnson & Johnson*, 523 F.3d 1116, 1120-21 (9th Cir. 2008) (affirming summary

judgment for defendants)) (affirming summary judgment for defendants); *see Ill. Brick Co.*

*v. Illinois*, 431 U.S. 720 (1977).  In *Illinois Brick*, "[t]he Court reasoned that allowing

'indirect purchasers,' i.e., those entities to whom the direct purchaser passes on all or part

of the cost of the allegedly fixed price, to recover damages would introduce into antitrust

litigation substantial 'evidentiary complexities and uncertainties' over the apportionment of

overcharges between direct and indirect purchasers."  *ATM Fee*, 2010 WL 3701912, at *4

(quoting *Illinois Brick*, 431 U.S. at 732).

Here, the plaintiff-passengers purchased their discounted *satogaeri* fares from travel

agents because those fares were lower than what Plaintiffs could obtain directly from ANA

and JAL.  *Supra* at 1-2.  The travel agents determined the discounted prices paid by

Plaintiffs, while considering the prices being offered by competing travel agents.  [Kapoor

Decl. Ex. 11 (Sueishi, HIS Int'l Tours) 92:24-93:08, 96:20-22.] ▮▮▮▮▮▮▮▮▮▮

9

1

2

3     ████████████ [Kapoor Decl. Ex. 10 (Hirata, HIS Int'l Tours) 58:02-18.]  Plaintiffs

4     paid travel agents the ticketed amount, and thus are indirect purchasers from ANA and

5     JAL.

6          Critically, Plaintiffs do not claim that ANA and JAL colluded with travel agents to

7     set the prices paid by passengers to travel agents.  Plaintiffs allege collusion between ANA

8     and JAL only on the prices paid by travel agents to ANA and JAL.  [Mangum Report

9     ¶¶ 195-196, at 89 (claiming that ████████████████████

10    ████████████████

11    ███████████████ *id.* ¶ 191, at 88 (██████

12    ███████████████████

13    ████████████); Kapoor Decl. Ex. 1 (Mangum) 205:14-

14    206:07.]

15         Plaintiffs' theory of competitive harm is that the higher, supra-competitive prices

16    paid by travel agents in turn caused travel agents to raise their prices to passengers.

17    [Mangum Report ¶ 199, at 92 ████████████

18    ████████████████████

19    ████████████); Kapoor Decl. Ex. 1 (Mangum)

20    206:09-207:16 (████████████████

21    ██████████████████); *see also id.*

22    210:11-213:17 (████████████████.]

23         The travel-agent testimony is that ███████████████

24    ████████████ [Kapoor Decl. Ex. 11 (Sueishi, HIS Int'l Tours)

25    92:24-93:08, 96:20-22.]  Instead of passing-on higher net fares, a travel agent could have

26    taken a lower margin on the sale and charged passengers the same price as when the net

27    fare was lower.  Plaintiffs' economist conceded that, ████████████████

28

10

1

2

[Kapoor Decl. Ex. 1 (Mangum) 216:19-218:06.] That question

3   would also vary from travel agent to travel agent. Such tracing of overcharges and

4   apportionment of damages throughout the chain of distribution is precisely what the

5   indirect-purchaser rules prohibits. *Ill. Brick*, 431 U.S. at 737-43; *ATM Fee*, 2010 WL

6   3701912, at *4, *11, *aff'd*, 686 F.3d at 748; IIA P. Areeda & H. Hovenkamp, *Antitrust Law*

7   ¶ 346, at 215 (4th ed. 2014) ("*Illinois Brick*'s fundamental concern" is with "tracing and

8   apportioning of damages").

9          The tracing and apportionment inquiry is even more complex in this case.

10

11

12                                                [Mangum Report ¶ 201, at 93; Kapoor

13   Decl. Ex. 1 (Mangum) 213:22-215:04.]

14                                                (Kapoor Decl. Ex. 11 (Sueishi, HIS

15   Int'l Tours) 95:02-09, 98:01-20.) Therefore, to assess whether there was any impact on

16   each travel agent's prices to passengers from the allegedly higher net fares, this Court

17   would have to assess: (1) the degree of travel-agent competition in each relevant

18   geographic market where *satogaeri* tickets were sold from January 2000 through March

19   2006; (2) the volume incentives and other commissions provided by each airline to each

20   travel agent in each relevant market; and (3) how all those factors impacted the prices

21   passengers paid to each travel agent.

22          As in *ATM Fee*, Plaintiffs' claims would require the Court "to engage in the

23   complicated task of 'trac[ing] the effects of the overcharge on the . . . prices, sales, costs,

24   and profits, and of showing that these variables would have behaved differently without the

25   overcharge.'" 2010 WL 3701912, at *11 (quoting *Illinois Brick*, 431 U.S. at 725).

26   Plaintiffs' claims are "too remote" and would "require this Court to grapple with the very

27   'evidentiary complexities and uncertainties' that the Court in *Illinois Brick* warned

28                                                11

DEFENDANT ALL NIPPON AIRWAYS CO., LTD.'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:07-CV-05634 CRB

against." *ATM Fee*, 2010 WL 3701912, at *11 (quoting *Illinois Brick*, 431 U.S. at 725), *aff'd* 686 F.3d at 748.

**B.      This case is analogous to *ATM Fee*, in which this Court applied the indirect-purchaser rule to bar claims that the defendants colluded on a price other than the price paid by the plaintiffs.**

*In re ATM Fee Antitrust Litigation* is instructive on how the indirect-purchaser rule bars Plaintiffs' claims here.  2010 WL 3701912, *aff'd* 686 F.3d 741.  There, the plaintiffs did "*not* allege that Defendants [large banks and an interbank network] have conspired to illegally fix the foreign ATM fee that Plaintiffs pay to their bank when they use a foreign ATM," but rather "assert[ed] that their banks pay an unlawfully inflated interchange fee and then pass the cost" on to the consumers.  *ATM Fee*, 2010 WL 3701912, at *2, *aff'd* 686 F.3d at 746-47.  This Court held that *Illinois Brick* barred the plaintiffs' claims because they "do not dispute that they pay the purportedly unlawful interchange fee only indirectly." *Id.* at *5, *aff'd* 686 F.3d at 749-50 ("Plaintiffs concede that they have never directly paid interchange fees.").  Similarly here, the plaintiff-passengers allege that airlines conspired to fix the price that *travel agents* paid and then passed along that higher price to the plaintiffs.  Plaintiffs concede that they do not pay the allegedly fixed net fares directly; the travel agents do.  Plaintiffs "therefore are not directly harmed by" the allegedly fixed net fares. *ATM Fee*, 2010 WL 3701912, at *2.  And Plaintiffs do not allege that the airlines and travel agents conspired to fix the prices paid by the passengers directly to the travel agents.

**C.      It is irrelevant that title may not formally pass to travel agents.**

Plaintiffs are indirect purchasers even where title for the plane tickets may not formally pass to the travel agents, because travel agents would not be subject to the indirect-purchaser bar.  "Denying standing because 'title' never passes to a broker is an overly lawyered approach that ignores the reality that a distribution system that relies on brokerage is economically indistinguishable from one that relies on purchaser-resellers."

IIA P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 345, at 183. "For example, if one travel agency deals in traditional brokerage arrangements for flights to the Superbowl while another buys tickets in a large block and resells them, those two agencies are competing in the sale of Superbowl travel notwithstanding the different characterizations of their vertical transactions." *Id.* ¶ 345, at 183-84.

In *In re International Air Transportation Surcharge Antitrust Litigation*, this Court reasoned that Carnival PLC, a cruise line acting like a travel agent paying for airline tickets, may have standing as a direct purchaser under antitrust law even though Carnival paid for tickets issued in passengers' names. Order Denying Motion to Enforce at 4-5, *In re Int'l Air Transportation Surcharge Antitrust Litig.*, No. M 06-01793 CRB (N.D. Cal. Dec. 19, 2011) (ECF No. 385) (holding that Carnival was not a class member under the settlement agreement as a matter of contract law). *See also Carpet Grp. Int'l v. Oriental Rug Importers Ass'n*, 227 F.3d 62 (3d Cir. 2000) (plaintiff rug brokers had standing to challenge alleged illegal boycotts), *overruled on other grounds by Animal Sci. Prods. v. China Minmetals Corp.*, 654 F.3d 462 (3d Cir. 2011).

**II.    *Noerr-Pennington* immunity bars Plaintiffs' Japan Class damages claims because those claims arise out of conduct petitioning the Government of Japan for regulatory action.**

Plaintiffs' fuel-surcharge claims must be dismissed because "[t]hose who petition government for redress are generally immune from antitrust liability"—including those who petition foreign governments. *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993) (affirming summary judgment for antitrust-counterclaim defendant); *E.R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) (reversing judgment against defendants); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 669 (1965) (reversing judgment against defendants); *Amarel v. Connell*, 102 F.3d 1494, 1518, 1520 (9th Cir. 1996) (applying *Noerr-Pennington* immunity to petitioning of South Korean agency regarding U.S. rice exports). This rule includes

13

actions that "attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly." *Noerr*, 365 U.S. at 136. *Noerr-Pennington* immunity also applies to "the approach of citizens . . . to administrative agencies (which are both creatures of the legislature, and arms of the executive) and to courts." *Amarel*, 102 F.3d at 1518, 1520 (citation omitted).

### A.    The Sherman Act does not reach domestic or foreign political processes.

The Sherman Act is an antitrust statute designed "to regulate . . .business activity" and not "political activity" originating out of citizens "inform[ing] the government of their wishes . . . ." *Noerr*, 365 U.S. at 137. This reasoning applies even more forcefully to foreign governments. IB P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 274b3, at 391 ("the Sherman Act was not designed to correct failures in domestic political processes, and it was *certainly* not designed to correct failures in the political processes of foreign governments"). Further, *Noerr-Pennington* immunity exists because petitioning a government to produce "anticompetitive government action makes the government rather than the private party the 'cause' of the resulting restraint" and that is "no less true when the government responding to the petition is foreign rather than domestic." *Id.*

As demonstrated above, at 5-8, the fuel surcharges resulted from ANA and JAL's petitioning the Government of Japan to allow the fuel surcharges and from the Government of Japan's determination of their amounts, timing, and conditions. It is the Government of Japan and Japanese policy that have caused the claimed anticompetitive result. That political activity and "anticompetitive" government action are beyond the reach of the Sherman Act.

### B.    *Noerr-Pennington* prevents intrusion into the operation of government.

The right to petition is central to the operation of governments. In the United States, that "right of petition is one of the freedoms protected by the Bill of Rights" and courts do not "lightly impute to Congress an intent to invade these freedoms." *Noerr*,

---

14

365 U.S at 138.  Article 16 of The Constitution of Japan (1946) also grants every person "the right of peaceful petition for the redress of damage, for the removal of public officials, for the enactment, repeal or amendment of laws, ordinances or regulations and for other matters."[2]

Our Constitution does not extend freedoms such as the right of petition solely as a beneficence to citizens.  The right to petition also encapsulates a pragmatic theory of how government operates, whereby "oppressive officers are shamed or intimidated into more honorable and just modes of conducting affairs."  First Continental Congress, *Letter to the Inhabitants of the Province of Quebec* (Oct. 26, 1774), *available at* The University of Chicago Press; http://press-pubs.uchicago.edu/founders/ documents/v1ch14s12.html.  The importance of the right to petition to the operation of government is underscored by its inclusion in The Constitution of Japan, which was written by the Supreme Commander of the Allied Powers during the reconstruction of Japan after World War II.[3]

Petitioning benefits the operation of all governments.  Because each government may choose how its citizens may enlist its aid, seeking political actions "[are] not illegal simply because they were petitioning foreign, rather than domestic, government officers," *Carpet Grp. Int'l v. Oriental Rug Importers Ass'n*, 256 F. Supp. 2d 249, 266 (D.N.J. 2003) (granting *Noerr-Pennington* immunity for petitioning Pakistani government).  Further, the character of the government does not matter, as "every government, whether representative or not, is privileged to set the terms on which persons within its borders may seek its legislation, decrees, or other sovereign action."  IB P. Areeda & H. Hovenkamp Antitrust Law ¶ 274b3, at 393; *Coastal States Mktg. v. Hunt*, 694 F.2d 1358, 1367 (5th Cir. 1983)

---

[2] The Constitution of Japan, art. 16 (1946), http://www.japaneselawtranslation.go.jp/law/detail  main?id=174.

[3] "In 1947, Allied advisors essentially dictated a new constitution to Japan's leaders."  Office of the Historian, Bureau of Public Affairs, U.S. Dept. of State, Milestones in the History of U.S. Foreign Relations, Occupation and Reconstruction of Japan, 1945-52, https://history.state.gov/milestones/1945-1952/japan-reconstruction.

15

(affirming judgment for defendants) (the "political character of the government to which the petition is addressed should not taint the right to enlist its aid").

For those reasons, the federal antitrust agencies' policy and practice is not to challenge "genuine effort to obtain or influence action by foreign government entities," because "the principles undergirding this doctrine apply to the petitioning of foreign governments."  U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for International Enforcement and Cooperation* § 4.2.4 (Jan. 13, 2017) (citing with approval *Amarel*, 102 F.3d at 1520).

The Court should apply *Noerr-Pennington* here to prevent intrusion into the Government of Japan's determination that fuel surcharges were necessary for the industry it was regulating and into the process through which the Government of Japan made that determination.  One of the purposes of the *Noerr-Pennington* doctrine is to prevent just such an intrusion into the operation of government—foreign or domestic.

### C.  Comity reasons further counsel for the application of *Noerr-Pennington*.

A key purpose of *Noerr* is to prevent embarrassment of our own government and nothing would "embarrass our [foreign relations] more than an American court's declaring a foreign government's decision invalid because it was inadequately reasoned, inconsistent with its own law, or induced by the corruption or bribery of a foreign judge or official."  IB P. Areeda & H. Hovenkamp Antitrust Law ¶ 274b3, at 396-97.  Whereas "state and local governments within the United States . . . must yield" to federal policy in the case of inconsistency, in contrast "foreign governments are coordinate sovereigns" and need not yield.  *Id.*  "When foreign nations are involved . . . it is unwise to ignore the fact that foreign policy, reciprocity, comity, and limitations of judicial power are considerations that should have a bearing."  *In re Vitamin C Antitrust Litig.*, 837 F.3d 175, 184 (2d Cir. 2016) (citation omitted) (reversing judgment for plaintiffs), *cert. granted in part sub nom. Animal Sci. Prods. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 734 (2018).

DEFENDANT ALL NIPPON AIRWAYS CO., LTD.'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:07-CV-05634 CRB

1    Comity results in a "policy of foreclosing court adjudication" that involves "the

2    legality of acts of foreign states on their own soil that might embarrass the Executive

3    Branch of our Government in the conduct of our foreign relations." *Alfred Dunhill of*

4    *London, Inc. v. Cuba*, 425 U.S. 682, 697 (1976); *cf. also Am. Banana Co. v. United Fruit*

5    *Co.*, 213 U.S. 347 (1909) (even if defendant had induced the foreign government to act, the

6    resulting act that caused the plaintiff's injury was not the defendant's but the sovereign

7    decision of another country).  This Court should apply *Noerr-Pennington* immunity to

8    ANA, JAL, and the Government of Japan's actions because those actions involved the

9    Government of Japan's citizens exercising their constitutional right to petition their

10   government—a fundamental constitutional right in the United States and one which the

11   United States ensured would exist in The Constitution of Japan.

12        **D.    ANA's petitioning for fuel surcharges qualifies for *Noerr-Pennington***
13        **immunity.**

14        ANA's actions qualify for *Noerr-Pennington* immunity because "the restraint upon

15   trade . . . is the result of valid governmental action" by the Government of Japan.  *Sanders*

16   *v. Brown*, 504 F.3d 903, 914 (9th Cir. 2007) (citation omitted) (affirming dismissal).

17        Here, the record establishes that:

18   •   Initiated by JAL in August-September 2004, JAL and ANA petitioned the JCAB to

19       allow fuel surcharges to compensate for the rapidly rising cost of jet fuel;[4]

20   •   JAL provided the JCAB with publicly filed fuel-surcharge information outside of

21       Japan and with those countries' governments' positions on fuel surcharges,

22       including how they were determined (except for the United States which had yet to

23       allow fuel surcharges);[5]

24

25   _____

26   [4] Kapoor Decl. Ex. 13 (Yamasaki) 122:10-25.
     [5] *See* Kapoor Decl. Ex. 14 (email from Mr. Yamasaki); Kapoor Decl. Ex. 13 (Yamasaki)
27   131:23-132:07, 135:17-136:21; Kapoor Decl. Ex. 15 (presentation prepared by Mr.
     Yamasaki).

28                                            17

- JAL provided information to the JCAB to "successfully lead" the JCAB to allow fuel surcharges;[6]

- The JCAB agreed to allow the fuel surcharges despite having previously disallowed them in favor of higher airfares;[7]

- The JCAB required proof that the fuel surcharges did not exceed fuel costs, and developed a formula to determine the fuel surcharges;[8]

- The JCAB, with JAL's assistance, developed a process for evaluating requests to increase fuel surcharges and for determining when to abolish them;[9]

- The JCAB coordinated trilateral communications among the JCAB, ANA, and JAL in order to determine the amount and timing of fuel surcharges;[10] and

- The JCAB "instructed [ANA and JAL] to have one identical level" of fuel surcharges.[11]

JAL and ANA's petitions to the Government of Japan and the actions of the Government of Japan itself are thus the cause of the fuel surcharges of which Plaintiffs complain.  Therefore, *Noerr-Pennington* immunity bars recovery for Plaintiffs' fuel-surcharge claims and this Court should grant summary judgment for ANA.

---

[6] *See* Kapoor Decl. Ex. 14 (email from Mr. Yamasaki); Kapoor Decl. Ex. 13 (Yamasaki) 131:23-132:07, 135:17-136:21.
[7] *Id.* 132:14-132:21.
[8] *Id.* 69:20-70:05, 135:04-08, 167:05-168:08; Kapoor Decl. Ex. 16 (emails from Mr. Yamasaki) at *497-*480; Kapoor Decl. Ex. 20 (Yabuki) 38:15-38:17 (corrected in errata at 4).
[9] Kapoor Decl. Ex. 13 (Yamasaki) 135:10–135:15.
[10] Kapoor Decl. Ex. 20 (Yabuki) 37:13-21, 47:01-48:25, 99:13-17 (corrected at errata 10) ("[ANA-JAL agreement on the fuel surcharge level] was in the discussions through JCAB; it was not that ANA and JAL alone made an agreement and filed the application to JCAB.  There was an involvement of JCAB.").
[11] *Id.* 100:07-12.

18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**CONCLUSION**</u>

For the foregoing reasons, this Court should hold that Plaintiffs' remaining claims against ANA are barred by the *Illinois Brick* and *Noerr-Pennington* doctrines, and should therefore grant ANA's motion for summary judgment.

Dated: May 7, 2018          **CONSTANTINE CANNON LLP**

*/s/ Ankur Kapoor*
Ankur Kapoor
Gary J. Malone
Harrison McAvoy
Yo. W. Shiina
CONSTANTINE CANNON LLP
335 Madison Avenue, 9th Floor
New York, NY 10017
Telephone: (212) 350-2700
Facsimile: (212) 350-2701
Email: akapoor@constantinecannon.com

Douglas E. Rosenthal
J. Wyatt Fore
CONSTANTINE CANNON LLP
1001 Pennsylvania Ave., NW, Suite 1300 North
Washington, DC 20004
Telephone: (202) 204-3500
Facsimile: (202) 204-3501
Email: drosenthal@constantinecannon.com

Jesse W. Markham, Jr.
1 Embarcadero Center, 5th Floor
San Francisco, CA 94111
Telephone: (415) 422-4473
Email: jmarkhamlaw@gmail.com

*Counsel for Defendant All Nippon Airways Co., Ltd.*

19