IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TRANSPACIFIC PASSENGER AIR TRANSPORTATION ANTITRUST LITIGATION<br><br>This Document relates to:<br>ALL ACTIONS | Case No. 3:07-cv-05634-CRB<br><br>MDL No. 1913<br><br>**ORDER GRANTING ATTORNEYS' FEES AND EXPENSES** |

Now pending is Plaintiffs' Motion for Attorneys' Fees and Reimbursement of Expenses ("Fees Mot. III") (dkt. 1307) filed in connection with its third and final settlement. The Court issues this Order to explain its rulings on the amount of fees it shall award and to request additional information from Plaintiffs' counsel prior to the award of expenses.

**I.  BACKGROUND**

On May 29, 2019, the Court granted preliminary approval of a third and final settlement between Plaintiffs and ANA, the last remaining defendant in this twelve-year litigation. See Second Am. Order Granting Prelim. Approval (dkt. 1306). The Court granted final approval of the settlement at the motion hearing on November 15, 2019.

The Court has already granted two rounds of attorneys' fees and expenses in the final settlement rounds preceding this third motion for fees. In connection with the first settlement, Plaintiffs' counsel sought $13,154,166, but the Court awarded $9,000,000 based on a net settlement fund of $31,181,800.27 (a 28.9% award). See Order Granting Mot. for Final Approval and Fees ("Fees Order I") (dkt. 1009) at 4. In connection with the second settlement, Plaintiffs' counsel sought $14,416,664.31, but the Court awarded

1  $11,038.071.51, based on a net settlement fund of $48,970,485.79 (a 22.5% award). See Order Granting Mot. for Fees ("Fees Order II") (dkt. 1252) at 6. Together, these approved settlements constitute 25% of the then-net settlement fund of $80,152,286.06. Id. at 2.

In its third fees motion, Plaintiffs' counsel seeks $18,647,081.15, representing 33% of the net settlement fund of $56,506,306.52 that it achieved pursuant to a settlement with defendant ANA; they also seek reimbursement of litigation expenses totaling $157,898.48. See Fees Mot. III at 1–2. Their gross settlement with ANA, $58 million, is reduced by $935,795 in notice expenses, $400,000 in claims administration expenses, $1,357,098.64 in unreimbursed litigation fund expenses, and $50,799.84 in unreimbursed fund expenses, but is supplemented by a $1,250,000 litigation vendor settlement.[1] Joint Decl. to Pls.' Fees Mot. III ("Joint Decl.") (dkt. 1307) ¶ 83. If the Court granted the third fee request as written, the total fee award (across all three rounds of settlement) would equal $38,685,152.66, or 28.31% of a total net settlement fund of $136,658,592.58. Joint Decl. ¶ 93.

## II. LEGAL STANDARD

A court may award reasonable attorneys' fees at the conclusion of a class action. Fed. R. Civ. P. 23(h). A district court has discretion to choose either the percentage of recovery method, where the prevailing attorneys are awarded a percentage of the common fund, or the lodestar method, where fees are calculated by multiplying the hours the attorneys reasonably expended on the litigation by the billing rate of the attorneys. See In re Wash. Pub. Power Supply Sys. Sec. Litig., 19 F.3d 1291, 1295–96 (9th Cir. 1994). Courts in the Ninth Circuit prefer to use the percentage-of-recovery method, but to cross-check the final figure with a lodestar calculation. See Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1050–51 (9th Cir. 2002).

The Ninth Circuit uses a benchmark of 25% to calculate attorneys' fees awarded

---

[1] Following resolution of a dispute with one of Class Counsel's litigation vendors, Settlement Class Counsel received $1.25 million, which counsel stated it would subtract from any requested reimbursement of litigation fund costs from the Court. See Mot. For Prelim. Approval (dkt. 1297) at 15; Fees Mot. III at 15.

2

under the percentage of recovery method. See Powers v. Eichen, 229 F.3d 1249, 1256 (2000). In some cases, however, the 25% benchmark is "inappropriate." See Vizcaino, 290 F.3d at 1048. Courts must explain why the award is appropriate, based on the facts of the case. Id. The Ninth Circuit has identified five factors pertinent to evaluating the reasonableness of a fee request, including (1) the results achieved, (2) the risks of litigation, (3) the skill required and the quality of the work, (4) the contingent nature of the fee and the financial burden shouldered by the plaintiffs, and (5) awards made in similar cases. See id. at 1048–50. The most important of these factors is the resulting benefit obtained for the class. See Order Granting Fees, In re Capacitors Antitrust Litig., No. 3:17-CV-03264-JD, 2018 WL 4790575, at *3 (N.D. Cal. Sept. 21, 2018).

Under Rule 23(h), class counsel are also "entitled to reimbursement of reasonable out-of-pocket expenses." Fed. R. Civ. P. 23(h); see Harris v. Marhoefer, 24 F.3d 16, 18–19 (9th Cir. 1994); Bergman v. Thelan LLP, No. 3:08-cv-05322-LB, 2016 WL 7178529, at *9 (N.D. Cal. Dec. 9, 2016). "To support an expense award, Plaintiffs should file an itemized list of their expenses by category, listing the total amount advanced for each category, allowing the Court to [assess] whether the expenses are reasonable." Hayes v. MagnaChip Semiconductor Corp., No.14-cv-01160-JST, 2016 WL 6902856, at *9 (N.D. Cal. Nov. 21, 2016).

### III. DISCUSSION

The Court will grant modified attorneys' fees as calculated below, and will grant expenses pending the resolution of outstanding questions regarding individual firm expenses and the litigation fund.

#### A. Modified Attorneys' Fees

The Court notes its decision-making process for the prior rounds of attorneys' fees and discusses the Ninth Circuit's five-factor test, supporting empirical data, and lodestar crosscheck in explaining its award of modified fees in this third round.

In its first Fees Order, the Court emphasized that the case "involved two rounds of motions to dismiss, filed by numerous defendants (one round prompting a 47-page Order

3

from the Court), a grueling discovery process (involving 65 depositions and almost 7 million pages in documents), and summary judgment (requiring a 60-page omnibus Opposition brief and resulting in an Order keeping the majority of claims in the case)." See Fees Order I at 3–4. The Court agreed that this was a "heavily litigated, complicated case" and acknowledged Plaintiffs' cited study from 2008 showing that awards of 30% were given in 11 of 16 antitrust cases with recoveries of less than $100 million.[2] Id. at 4. The Court noted that the settlement process "demanded . . . risky, challenging, and as-yet uncompensated work." Id. (internal citation omitted).

In its second Fees Order, the Court again considered the factors and returned to an overall benchmark rate of 25%. Fees Order II at 6. While Plaintiffs' challenging motion practice, protracted and grueling discovery, and difficult defense against summary judgment made this a complex case worth a near-30% fee in the first round, the second round "required far fewer hours [of work] than the work that came before it." Fees Order II at 5. Following the first round, Plaintiffs' work included defending the Court's denial of summary judgment in the Ninth Circuit following ANA's interlocutory appeal, preparing and defending briefs for final approval of the first round of settlements, and engaging in settlement discussions and mediations with second-round-settling defendants. Id. This totaled only 5,539.55 hours of work between rounds one and two of settlement, compared to 98,364.36 hours of work preceding the first round of approval and fees. Id. at 13–14. Also, prior to the first round of settlements, Plaintiffs contributed over $2 million to the litigation fund,[3] but had not needed to contribute additional funds since being granted $3

---

[2] Relevant to this final round of attorney fees, the same study stated that 6 or 7 out of 9 antitrust cases yielding recoveries between $100 million and $500 million awarded attorneys' fees of 30% or more. See Robert H. Lamde & Joshua P. Davis, Benefits from Private Antitrust Enforcement: An Analysis of Forty Cases, 42 U.S.F. L. Rev. 879, 911 tbl. 7B (2008). But importantly, because the study's "cases were not randomly selected, it is difficult to generalize from [their] conclusions." Id. at 908.

[3] Co-lead counsel established a Litigation Fund to fund the prosecution of the action. Plaintiffs had (prior to the first settlement) contributed $2,252,790 in assessments to the Litigation Fund and used $1,877,660.12 from the Fund to pay for necessary litigation costs and expenses prior to the first fees motion. See William Decl. to Fees Mot. I (dkt. 987) ¶¶ 79–80. Class Counsel incurred overall litigation costs and expenses totaling $2,807,699.73 prior to the first motion for fees, which the Court granted. See Fees Order I at 3 n.3.

4

million for "future expenses" following the first round. Id. Finally, the Court acknowledged empirical data indicating that "courts are less willing to go above the twenty-five percent benchmark when using the percentage of recovery method in larger settlements." Id. at 6.

In this third round of fees, the situation has changed again. Now, Plaintiffs' counsel have twice received compensation for their work, and have worked only about 5,132.25 hours since the Court granted final approval and fees in the second round of settlements.[4] Since that time, Plaintiffs' counsel engaged primarily in trial preparation, including preparation of an opposition to ANA's motion in limine regarding the admissibility of ANA's previous guilty plea.[5] See Joint Decl. ¶ 61. Plaintiffs' trial preparation involved "producing expert reports, exchanging exhibit and witness lists with ANA, and the many other tasks associated with trial preparation." Id. ¶ 82. Plaintiffs' counsel also participated in extensive mediation with ANA to reach the current settlement. See id. The parties settled approximately one month before trial. Id. ¶ 63.

### 1. Five-Factor Test

Analyzing counsel's work with respect to the five factors in part requires deciding how much of counsel's work to consider at this stage. Despite the rigors of trial preparation, the work Plaintiffs' counsel performed in this last round favors a downward adjustment in the award because it was not nearly as extensive as the work done in prior rounds. Furthermore, Plaintiffs' settlement in this round was not necessarily due to proportionally greater effort on their part. See Alexander v. FedEx Ground Package Sys., Inc., No. 05-CV-00038-EMC, 2016 WL 3351017, at *1 (N.D. Cal. June 15, 2016) ("It is not one hundred fifty times more difficult to prepare, try, and settle a $150 million case than it is to try a $1 million case.") (internal citations omitted).

---

[4] The total work submitted (which included work done through rounds one and two) for all Plaintiffs' counsel was 103,903.91 hours. Lebsock Decl. to Fees Motion II (dkt. 1228) ¶ 90. The total work submitted in this round (including work done through rounds one, two, and three) was 109,036.16 hours. Joint Decl. ¶ 89. The difference between these totals equals 5,132.25 hours.
[5] See Opposition to Motion In Limine (dkt. 1253).

5

It is still sensible, however, to consider the work that Plaintiffs' counsel has done prior to the second settlement and award of attorneys' fees in order to see how it fits among the factors. See Pearl Decl. (dkt. 1307) ¶ 34 (endorsing a lodestar figure that covers the entire case, since "work done at an early stage was still significant to the settlement that resulted with the final settling defendant[.]").

All of the following are notable examples of counsel's work with respect to ANA: (1) Plaintiffs responded to ANA's motion to dismiss[6] (2) Plaintiffs successfully moved to compel the deposition of ANA's CEO Osamu Shinobe in 2014[7]; (3) Plaintiffs fought ANA's individual motion, and others' motions for summary judgment on the filed rate doctrine, as well as later appeals[8]; (4) Plaintiffs opposed ANA and EVA's Petition for Writ of Certiorari to the Supreme Court[9]; (5) Plaintiffs fought another summary judgment motion by ANA regarding the Satogaeri Class[10]; and (6) Plaintiffs engaged in a "major responsive effort" to combat ANA's challenges to Plaintiffs' class certification for fuel surcharges and Satogaeri fares.[11]

This work speaks to two factors: counsel's risk and the contingent-fee nature of counsel's work. Some activities, such as compelling ANA's CEO's deposition and opposing the motions for summary judgment, occurred prior to the first award of fees. Others, such as opposing ANA's Petition for Writ of Certiorari and fighting summary judgment on the Satogaeri class, occurred between the first and second rounds of settlement. Still others, such as responding to ANA's challenges to class certification, occurred following the second settlement and award of fees. These phases of litigation demonstrate different levels of risk. The earlier activities—constituting the bulk of the litigation— were done totally on a contingency basis and were therefore the riskiest. The

---

[6] See Mot. To Dismiss by ANA, China Airlines, and Thai Airways (dkt. 304).
[7] Joint Decl. ¶ 30 (citing dkt. 867).
[8] Id. ¶¶ 44, 48. See ANA's Mot. For Summ. J. (dkt. 724); Omnibus Opp. to Summ. J. Mot. (dkt. 869).
[9] Id. ¶ 53.
[10] Id. ¶ 55. See Order Denying Summ. J. (dkt. 1194).
[11] Id. ¶¶ 56–59. See Order Certifying Class (dkt. 1224); See Order of USCA Denying Defs.' Appeal (dkt. 1278).

6

later activities occurred after counsel received fees and $3,000,000 in a future litigation fund, which seemed to have obviated all or most risk, to the extent that Plaintiffs would not continue to spend more than was in the fund.[12] Though Plaintiffs' fees expert asserts that all work to date was done on a contingency fee basis, see Pearl Decl. at 11, that is not the practical effect of the litigation, given the fees and reimbursements counsel have already received. Accordingly, the factors of risk and the contingent nature of the work (along with counsel's financial burden) militate in favor of a lower fee.

The balance tips the other way when considering two other factors: counsel's skill level and quality of work, and the results achieved (the most important factor). Each step of the 12-year litigation evidences counsel's skill and high quality of work.[13] And because it was not possible to know, in earlier rounds, that counsel's work with respect to ANA would result in the settlement ultimately achieved, it probably makes sense to consider the strength of all work retroactively. It is also the case that counsel achieved excellent results for the class—this last settlement, with one defendant, was the single largest settlement in the entire litigation.

As to the final factor, considering awards made in similar cases, it is helpful to consult the empirical data below, which suggests that a fee percentage lower than Plaintiffs' request is appropriate. It is nonetheless worth keeping in mind the complexity and duration of this antitrust action when comparing fee percentages in other cases. See, e.g., Order Granting Fees, In re Capacitors, 2018 WL 4790575, at *4 (granting $16,725,000 (25%) settlement in a "multi-year, international price-fixing cartel case against 22 sprawling Defendant corporate families based almost entirely in Japan.").

---

[12] The Court reasoned, in granting the second round of fees and expenses, that despite a $232,386.51 balance in Plaintiffs' litigation fund at the time, Plaintiffs theoretically still had either $1,147,324.60 or $717,211.94 in the litigation fund (depending on the inclusion of a recent $430,112.66 invoice, and rejecting outright Plaintiffs' untimely February 27, 2015 Nathan Associates, Inc. invoice of $914,938.09). See Fees Order II at 3–4. Despite Plaintiffs' hypothesis at the time that they would require "at least $1,000,000" in litigation fund expenses between that time and trial, the risks of loss appear to have been slight. See id. at 3.

[13] Plaintiffs fairly note that this was "an intrinsically difficult case due to the length and scope of the conspiracy and the complexities associated with proving antitrust impact and overcharges." Fees Mot. III at 9.

7

Though the reduced risk and difficulty of achieving later settlements supports a downward adjustment in attorneys' fees, Plaintiffs' counsel performed work involving ANA throughout the litigation, leading to the current settlement. This benefit to the class is significant—despite previous awards for the same overall work, and despite the relatively few hours worked since the second round of settlements.

### 2. Empirical Data

Nonetheless, empirical data indicates that larger settlement awards are generally associated with smaller percentage fees. Empirical studies are an "important additional data point in the determination of an appropriate award." Rodman v. Safeway, Inc., No. 11-CV-03003-JST, 2018 WL 4030558, at *5 (N.D. Cal. Aug. 23, 2018). One seminal study illustrates a strong inverse relationship between the size of a settlement and fee percentage awarded to counsel; for class action recoveries between 2009 and 2013 that were greater than $67.5 million, the average fee percentage awarded decreased to 22.3%. See id.; Theodore Eisenberg et. al., Attorneys' Fees in Class Actions: 2009–2013, 92 N.Y.U. L. Rev. 937, 948 (2017) (discussing data that may illustrate a "scaling effect" occurring in the award of increasingly large settlements).

Another study highlighting fee awards for federal class action settlements from 2006 to 2007 illustrates that settlements between $100 and $250 million received a mean fee percentage award of only 17.9% and a median percentage of only 16.9%, (based on a sample of 14); this supports the study's assertion that "fee percentages are strongly and inversely related to the size of the settlement," and that drop-offs in percentage awarded become even steeper for settlements above $100 million. See Brian T. Fitzpatrick, An Empirical Study of Class Action Settlements and their Fee Awards, 7 J. Empirical Legal Stud., 811, 837–38, 839 tbl.11 (2010).

Judge Koh has noted "persuasive evidence that 'the median attorney's fee award in a sample of 68 'megafund' class action settlements[14] over a 16-year period was 10.2%."

---

[14] One special report defines a "megafund" case as one "with a recovery of $100 million to over

See Alexander v. FedEx Ground Package Sys., Inc., No. 05-CV-00038-EMC, 2016 WL 3351017, at *2 (N.D. Cal. June 15, 2016) (quoting In re High-Tech Emple. Antitrust Litig., No. 11-CV-02509-LHK, 2015 WL 5158730, at *13 (N.D. Cal. Sept. 2, 2015) (awarding 10.5% of $435 million combined antitrust settlements by using lodestar multipliers of 2.2 and 1.5 and conducting a percentage cross-check)). Judge Koh used an earlier iteration of the Eisenberg study, which covered class actions from 1993 to 2008. See High-Tech, 2015 WL 5158730, at *13; Theodore Eisenberg & Geoffrey P. Miller, Attorney Fees and Expenses in Class Action Settlements: 1993–2008, 7 J. Empirical Legal Stud. 248, 265 tbl.7 (2010).

However, in the later Eisenberg study, antitrust cases between 2009 and 2013 reflected mean and median percentage fee awards of 27% and 30%, respectively. This was, admittedly, in a sample of 19 cases where the mean recovery was roughly $500 million but the median recovery was roughly only $37 million—a settlement value very different from the instant case. See Eisenberg, 2009-2013, supra, at 951–52. The Fitzpatrick study, however, illustrates that federal antitrust class actions between 2006 and 2007 had mean and median awards of 25.4% and 25%, respectively (from a sample of 23 actions). See Fitzpatrick, supra, at 835 tbl.8.

The Court notes that while the data illustrates an inverse relationship between settlement size and percentage fees, the Ninth Circuit "has expressly rejected any hard rule that megafund cases are to be treated differently" based on this relationship. See In re Cathode Ray Tube Antitrust Litig., MDL No. 1917, 2016 WL 721680, at *42 (N.D. Cal. Jan. 28, 2016) (citing Vizcaino, 290 F.3d at 1047).

### 3. **Lodestar Crosscheck**

Beyond addressing the Ninth Circuit's five factors and looking to empirical data, the lodestar cross-check is the Court's important last step. The lodestar is particularly

---

$1 billion." See Special Master's Report at *42, In re Cathode Ray Tube (Crt) Antitrust Litig., No. 3:07-CV-5944 JST, 2016 WL 721680 (N.D. Cal. Jan. 28, 2016).

9

important as the net settlement fund is a megafund, and economies of scale at work here make the cross-check more salient. See Alexander, 2016 WL 3351017, at *2 ("[I]n megafund cases, the lodestar crosscheck assumes particular importance."). In applying the lodestar cross-check, this Court first will determine whether to (1) consider only hours worked between rounds two and three of settlement, and compare this to the requested amount (as this Court has done previously), (2) compare all hours worked to all fees awarded and requested, or (3) consider the lodestar ratio with respect to Plaintiffs' "unreimbursed lodestar." The Court begins with Plaintiffs' "unreimbursed lodestar" method.

Plaintiffs' approach calculated a lodestar amount by subtracting from their cumulative lodestar ($45,152,522) the amounts already awarded by the Court ($20,038,071.51) for an "unreimbursed" lodestar of $25,114,450.49. See Joint Decl. ¶ 92. Accordingly, their requested fee, $18,647,081.15, yields a lodestar ratio of 0.74. See id. Plaintiffs cite authority supporting this method. See Lobatz v. U.S. West. Cellular of Cal., 222 F.3d 1142, 1149–50 (9th Cir. 2000) (noting that district court did not determine that its first fee award grant was to compensate counsel for all hours worked up to the first settlement; concluding subsequently that "[b]y later calculating the lodestar value for the entire case and then subtracting the amount class counsel had previously been paid, the district court ensured that the . . . [award after a second settlement] only included those hours that class counsel had not been compensated for by the earlier attorney fee award."). Nonetheless, this method yields a result similar to simply calculating the cumulative lodestar ratio, and hence does not greatly alter the analysis. The lodestar ratio would be 0.86 if the Court simply compared all of the awarded and requested fees to Plaintiffs' overall lodestar running from the inception of the case.[15] The biggest difference would be if the Court calculated a lodestar considering only the hours worked since the second

---

[15] Awarded and requested fees ($9,000,000 + $11,038,071.51 + $18,647,081.15) divided by cumulative lodestar from inception of litigation ($45,152,522.00) equals 0.857.

10

settlement. This lodestar ratio would be 5.84.[16]

The Court will consider the lodestar ratio with respect to the cumulative lodestar—for simplicity and consistency, and in recognition of counsel's work as a whole at this stage. See Order Granting Fees, In re Capacitors, 2018 WL 4790575, at *6 ("Because the total work performed by counsel from inception of the case makes each settlement possible, courts typically base fee awards in subsequent settlements on all work performed in the case.").[17] "Indeed, when considering fee awards for subsequent settlements, courts typically calculate the lodestar multiplier by dividing (1) all past and requested fee awards by (2) all of counsel's time from inception of the case." Id.

So long as the total hours worked by Plaintiffs' counsel and hourly rates charged are reasonable, then this lodestar percentage, a multiplier of less than 1, is reasonable as well.[18]

### 4. Attorneys' Fees—Conclusion

Overall, in awarding fees at this stage, the Court balances the following:

- the reduced financial burden and risk Plaintiffs faced in reaching the third and final settlement (lowering the value);
- the challenges and risk Plaintiffs faced prior to the first settlement, a period of time that made up the bulk of the work and undoubtedly laid substantial groundwork for a successful settlement later on (raising the value);
- the risk undertaken in rigorously preparing for trial against the last holdout defendant up to one month before the trial date (raising the value);

---

[16] This is calculated with respect to the 5,132.25 hours of work done between rounds two and three of settlement (as calculated previously), and a lodestar amount of $3,190,707 (the difference between Plaintiffs' current total, $45,152,522.00, and their total pursuant to round two of fees, $41,961,815). See Fees Mot. II (dkt. 1227) at 1.

[17] The Court in its second Fees Order stated that it considered "most of [Plaintiffs' work done] in awarding Plaintiffs thirty percent of the net Settlement Fund in the first round of settlements; nonetheless, "the court, in its judgment looks at the overall settlement in determining the appropriate award." See Fees Order II at 5–6.

[18] See Joint Decl. Exs. 3–5. Hourly rates for attorneys at Cotchett, Pitre, and McCarthy, LLP ranged from $250 to $950. Joint Decl. Ex. 3. Hourly rates at Hausfeld, LLP ranged from $290 to as much as $1375. As mentioned, however, there is no detailed breakdown of the hours and rates in this last round of work—Plaintiffs provide only the 12-year total.

11

- the high overall settlement (including the settlement with ANA, the largest of the three), indicating an excellent benefit for the Plaintiff classes and confirming the skill and quality of counsel's work (raising the value);
- statistics illustrating the inverse relationship between size of settlement and percentage of recovery, especially in larger settlements (lowering the value);
- the difficulty of antitrust cases and particularly of this case (raising the value); and
- the reasonableness of the lodestar crosscheck value (raising the value, since the Court considered the cumulative lodestar figure).

As noted, there seemed minimal risk in the last settlement round, given Plaintiffs' prior successes, cooperation by defendants,[19] and reimbursement.[20] Nonetheless, the work as a whole reflects a high-risk, high-reward approach contributing to the final settlement. See Pearl Decl. ¶ 22(d) ("Contingent cases that must be tried or prepared for trial are always far riskier than cases that settle earlier in the process.").[21]

In light of these factors, the Court grants a reduced fee of $14,126,576.64, which equals 25% of the round three net settlement fund and yields total fees to Plaintiffs of $34,164,648.15—this represents 25% of the net award across all three settlements.[22] The reduced award results in an overall (cumulative) lodestar ratio of 0.76. This amount

---

[19] For instance, the eight settling parties between 2010 and 2014 executed settlement agreements with Plaintiffs providing for cooperation and payments. See Joint Decl. ¶¶ 64–71. The settlements were premised upon "each settling Defendant's agreement to provide cooperation to the Class[.]" See id. at ¶ 72. Later settlements were similar. See id. at ¶¶ 77–80.

[20] Just how much Plaintiffs had to lose depends on the current unreimbursed litigation fund expenses. If the current unreimbursed litigation fund expenses include a twice-rejected Nathan Associates, Inc., invoice, then in fact Plaintiffs spent only $442,160.55 in litigation fund expenses since the last round. See Joint Decl. Ex. 6. If so, then the expenses are covered by the $1.25 million settlement that Plaintiffs received in a vendor dispute. See Joint Decl. ¶ 97.

[21] Declarant Pearl framed the issue of risk by considering the litigation as a whole, instead of considering risk attendant to the last settlement round—this exercise is not as helpful in deciding how much risk Plaintiffs' counsel actually faced. See Pearl Decl. ¶ 22(a) ("If this Action had not been successful—if interim settlements had not been obtained—and Plaintiffs had been required to try the Action against all the Defendants and lost, Class Counsel would have lost far more than their total $45,152,522.00 lodestar . . .").

[22] The total net settlement funds equal $136,658,592.58, and 25% of this value is $34,164,648.15. The Court has awarded $20,038,071.51 in fees in prior rounds. See Fees Mot. III at vii–2. The Court thus awards $34,164,648.15 minus $20,038,071.51 = $14,126,576.64 to award a blended rate of 25% of the total net settlement fund.

12

1  reflects the Vizcaino factors and the Ninth Circuit's benchmark, strikes a balance among
2  competing empirical data, and reflects the value of Plaintiffs' work across 12 years of
3  complex and challenging antitrust litigation.

### B. Expenses

Total expenses incurred by the litigation fund throughout the case were $6,341,702.95, of which the Court has reimbursed $4,984,604.31 to date.[23] Plaintiffs' counsel seeks $1,357,098.64 in unreimbursed litigation fund expenses. See Fees Mot. III at 15. Plaintiffs also seek individual firm expenses: $7,537.12 in out-of-pocket expenses incurred by Cotchett, Pitre, & McCarthy, LLP, between May 17, 2018 and July 31, 2019, and $43,262.72 in out-of-pocket expenses incurred by Hausfeld LLP in the same time. See Joint Decl. ¶ 95. The total unreimbursed litigation fund and individual firm expenses total $1,407.898.48. Id. at ¶ 96. These are offset by $1.25 million that a litigation vendor provided to Plaintiffs following settlement of a dispute. Id. at ¶ 97.

Overall, Plaintiffs seek $157,898.48 in unreimbursed expenses. See Joint Decl. ¶¶ 94–7. Plaintiffs properly filed categorized and itemized lists of litigation fund expenses and out-of-pocket individual firm expenses. See Joint Decl. Exs. 6-7. However, it is unclear whether, in their litigation fund expenses, Plaintiffs include a February 27, 2015 invoice from Nathan Associates, Inc., which the Court has twice rejected, since the summary of expenses is cumulative from March 28, 2008 to July 31, 2019.

Regarding individual firms' out-of-pocket costs covering May 17, 2018 to July 31, 2019 for Cotchett and Hausfeld: the expense categories are reasonable, but travel

---

[23] The Court awarded $1,877,660.12 in litigation fund expenses pursuant to the first round of settlements, $3,000,000 in future litigation fund expenses, also pursuant to the first round of settlements, and $106,944.19 in litigation fund expenses pursuant to the second round of settlements (the $106,944.19 was for an Epiq invoice that had been added to the first motion for fees via supplemental declaration, which the Court earlier rejected; the Court again rejected, however, a February 27, 2015 invoice of $914,938.09 from Nathan Associates). See Fees Order II at 3. Now, Plaintiffs' counsel have excluded, in the calculation of the requested litigation fund expense amount, $930,039.61 and $38,426.02 that the Court awarded as individual firm expenses pursuant to the first and second round of settlement, respectively. See Joint Decl. Ex. 6 n.2. Accordingly, their current request divides up the requested expenses into $1,357,098.64 for unreimbursed litigation fund expenses, and $50,799.84 in unreimbursed firm expenses. See Joint Decl. ¶ 96.

13

comprises the vast majority of expenses incurred for each firm and may be excessive as to Hausfeld. See Joint Decl. Exs. 7–8 (Cotchett's travel expenses totaled $2,760.87 (airfare and ground travel) and $2,269.04 (meals and lodging) while Hausfeld's cost $11,746.00 (airfare and ground travel) and $17,309.31 (meals and lodging)). The Hausfeld travel expenses might indeed be reasonable, but the expense lists do not take a sufficiently detailed approach for the Court to know. The Court requires further itemization of the Hausfeld travel expenses to ensure that these expenses are not excessive.

IV. **CONCLUSION**

For the foregoing reasons, the Court GRANTS attorneys' fees in the reduced amount of $14,126,576.635 (25% of the round three net settlement fund), and GRANTS the requested expenses, pending provision of the following information: (1) what the noted litigation vendor dispute and settlement was for, and its effect on the litigation fund (2) whether Plaintiffs' list of litigation fund expenses (in Exhibit 6 to the Plaintiffs' Joint Declaration) includes a previously-rejected February 27, 2015 invoice from Nathan Associates, Inc., and (3) a detailed itemization of travel expenses from Hausfeld.

**IT IS SO ORDERED.**

Dated: November 26, 2019

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE