# EXHIBIT 8

# MEMO

DATE:       January 9,2023

FROM:       R. Sutton
            Xanadu Corp.

TO:         Rust Consulting

RE:         TransPacific Airline Claim

This office is in receipt of Rust Consulting's purported denial, made at the request of Class Counsel, with respect to our claim along with your December 27, 2022, clarification letter.

As Rust Consulting appears to be aware, it engaged in gross negligence with respect to the administration of our claim.  To date, it has failed to provide us with a copy of the envelopes showing why our original check and reissued check was returned.  Ironically, Rust Consulting took great effort to courier a copy of its determination and clarification using both overnight delivery and email service, but sent checks valued at several hundred thousand dollars via ordinary mail with no notification when they were returned.  The result is that nearly twenty-percent of all claimants either did not receive or did not cash their payment.  We believe that the failure to provide a copy of the returned envelopes constitutes a wilful attempt by Rust Consulting to conceal its malfeasance.

As repeatedly explained, our providing the 144 American Airline itineraries for a single month from July 2015 and August 2015 was not to seek payment in the action, but to demonstrate a sampling of the types of flights Xanadu Corp. involved itself in.  To be clear, we did not suggest that the flights fell within the settlement class.  Rather, providing the documents was in response to the absurd suggestion by Class Counsel that 1,337 tickets over a course of many years somehow constituted an incredibly large claim – especially in a case where audits were not conducted for claims under 1,000 tickets.  Furthermore, it is highly probable that a simple statistical analysis of the claim data for other corporate class members would place the number of tickets claimed by Xanadu well within the average range, rather than in the high range as was tacitly asserted by class counsel.

Furthermore, Xanadu's possession of the itineraries is sufficient to indicate its relationship to the exemplative quantity of flights taken.  No payment data is necessary because, as Rust Consulting noted, the flights were not submitted as claimed flights in the litigation and the circumstances of each project varied as to payment and reimbursement.  Our original declarations and supplemental material reiterated that the flights we claimed had costs borne by our enterprise.

As to Rust's assertion that it is unable to verify the methodology used, this again appears to be a clear violation of Rule 23(e)(2)(D) where different standards are

1

being applied to Xanadu Corp. than other claimants.  Specifically, Rust's declarations filed with the District Court exemplify a very different review process as to the other claimants.  Indeed, under those review procedures, our claim was approved and a check tendered to us.

With respect to Rust Consulting's assertion that we needed to provide data evidencing the dates when the information was destroyed also varies from the requirements demanded upon other claimants.  Nowhere in Rust's declarations does it mention this information was requested or relied upon as to any other claimant.  It is believed that the exact registries used were destroyed along with many other totally unrelated records that could have incurred liabilities to clients in the event that said data ended up in the hands of third parties.  It is not possible to provide an exact date because many records were destroyed over a period of several years.  Furthermore, there are additional records in storage that cannot be accessed in a timely or convenient fashion, so there is not a 100% certainty that the registries used relative to the airline data claims were in fact destroyed.  What is relevant is that it is not possible for the Company to provide those records at this late time, years after our claim was approved.

The name of the secretary that managed airline bookings and related data between 2002 and 2008 is Maria Sanchez.  After 2008 there were various secretaries in various years, among them Adriana Rodriguez, Priscilla Arias, Dayanna Hernandez, and Mariana Campos.  Style and quality of record keeping varied between the employees and they were given relative autonomy to manage records according to their various personal styles as long as they could retrieve data that was necessary at the time of their tenure.   Even if step by step records of destruction were provided, the issue lacks any form of relevancy to the matter at hand and would not have changed the predisposed result directed by Class Counsel.

Turning to Rust's assertion that, "[a]side from the claimed purchases on American Airlines, Corp Xanadu provided no documentation of purchases for any travel on other qualifying airlines to substantiate its claims," this statement is not in any way precise or accurate.  Documentation was in fact provided, that being in the form of a sworn statement (as was accepted by similarly situated clients).   Rust has no evidence that would indicate that the sworn statement made by the company officer with knowledge was in any way false or different in any way from the declarations submitted by other claimants.  On the contrary, Rust is simply providing excuses for cowering to the predisposition of Class Counsel.

That airline ticket copies, reservation numbers, or reservation confirmations for tickets from decades ago were not retained is not a deviation from ordinary business practices. This is why Rust repeatedly provided declarations to the Court that it accepted declarations in lieu of ticket data.   Once again, it is a relative certainty that a simple statistical analysis of the claim data in this very case would indicate that a very small percentage of acknowledged class members were able to provide actual ticket copies, reservation numbers, or reservation confirmations.  These statistics are not referred to because they would indicate, quite inconveniently as far as class counsel is concerned, that data provided by Xanadu was on a par with data provided by other claimants and accepted by Rust as valid, just as Xanadu's data was previously accepted by Rust as valid.   It is only because of a very demonstrable

conflict of interest that Xanadu's claim is being singled out at this late date through a predisposed decision.

As to documents that confirm the type of business Xanadu operates, this again does not appear in the declarations submitted by Rust as a requirement as to the other claimants. Regardless, Xanadu did not provide the advertisements because we were not able to readily locate data from over ten years ago. The relevance of this data to this claim is highly questionable.

Moving forward to the Parking Heater settlement where Rust Consulting datamined information in an objectionable manner without advising the court of its intent to do so, Xanadu reiterates it provided accurate information to Rust Consulting. It was correctly represented that Xanadu never owned property in the United States such as vehicles. Rust Consulting complains it asked Xanadu to explain why it filed a claim and received a settlement payment in the Parking Heaters settlement in 2019. Representations regarding the Company's lack of property holdings, including vehicles, in the United States, are believed to be accurate. With regards to parking heaters, research and inquiry regarding company records of prior activities were made and they indicate that the heaters were in fact purchased. Xanadu provided Rust Consulting with the purchase order. As demonstrated thereon, the heaters were purchased by Xanadu by its research specialist in California, James Banta, with respect to a project having nothing to do with vehicles. Mr. Banta was participating, with heavy investment from Xanadu's predecessor, a project that required the warming of equipment during frost temperatures and he suggested the heaters could be tested. Specifically, the heaters could provide several thousand BTU for nearly 24 hours on a single gallon of diesel fuel. This does not indicate that "property" or "vehicles" were maintained in the United States. While the relevance of this data to the purchase of airline tickets is highly questionable, Rust Consulting turned a blind eye to its receipt of the information. More problematic is that this information was datamined without the authorization of the United States District Court for the Eastern District of New York. Xanadu was made aware that the docket in the case revealed a public filing with the names of approved claimants, including Xanadu, but the information discussed on the call revealed that Rust Consulting and Class Counsel appeared to access address information that was not part of the public record. Rust Consulting and Class Counsel also looked at individual consumer claims data and suggested that Mr. Sutton personally made claims, which is believed to be an incorrect representation. Neither Rust Consulting nor Class Counsel notified the individual and corporate claimants that it breached their data or misused it in the Transpacific Case. Moreover, it appears that Rust Consulting and Class Counsel looked at this data specifically to attack Xanadu when it did not compare the data as to other claimants. Xanadu believes this violates Fed. R. Civ. Proc. 23(e)(2)(D) by creating a special standard and may be actionable generally for privacy related torts.

In conclusion, it appears clear that Rust Consulting's actions were predetermined, done at the behest of Class Counsel which already subjectively intended to deny the claim, and inappropriately directed that an extremely heightened standard be applied to Xanadu's claim to achieve the result they wanted. Xanadu believes that Class Counsel guided and instructed Rust Consulting to deny the claim. Therefore, Xanadu objects.

3

Finally, Xanadu Corp. requests that Rust Consulting preserve all evidence, communications, emails, documents, reports, investigations, checks, envelopes, etc. related to this matter, including communications with Class Counsel.  In addition, we are requesting the retention of records relating to the Parking Heater Settlement.

Xanadu reserves all of its rights and nothing herein constitutes consent to the extraordinary administrative procedure it has been subjected to.  Responding administratively through this extraordinarily burdensome procedure does not constitute a waiver of any right, remedy, or cause of action.

4