John Allen Roth, Esq.
Law Office of J. Allen Roth
805 Alexandria Street S.
Latrobe PA  15650
jroth@jarothlaw.com
(724) 686-8003

*Counsel for Objectors David*
*Gould and Xanadu Corp.*
*APPEARING PRO HAC VICE*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: TRANSPACIFIC PASSENGER AIR TRANSPORTATION ANTITRUST LITIGATION | ) Case No. 07-cv-05634-CRB<br>)<br>) MDL No. 1913<br>)<br>) OBJECTIONS TO PLAINTIFFS'<br>) FURTHER NOTICE REGARDING<br>) CORP. XANADU'S CLAIM<br>) (1374) AND TO THE PROPOSED<br>) ORDER GRANTING PLAINTIFFS'<br>) MOTION FOR SECONDARY<br>) DISTRIBUTION OF REMAINING<br>) SETTLEMENT FUNDS AND<br>) REQUEST FOR ATTORNEY FEES<br>) AND REIMBURSEMENT OF<br>) EXPENSES |

Xanadu Corp. ("Xanadu") and David Gould ("Gould"), collectively "Objectors," by and through their undersigned counsel, *pro hac vice,* objects to Plaintiffs' Further Notice Regarding Corp. Xanadu's Claim (Entry 1374) and the Proposed Order Granting Plaintiffs' Motion for Secondary Distribution of Remaining Settlement Funds and Request for Attorney Fees and Reimbursement of Expenses (Entry 1377):

## I.     The Proposed Order is Objectionable

At Entry 1353, pages 7 through 10, Xanadu Corp. objected to Class Counsel's attempt to relitigate the Final Determination approving its claim.  Class Counsel sought permission to re-audit the claim.  Over Xanadu's objections, this Court's Order at Entry 1358 stated, "Class

Counsel and Rust may audit/re-examine Corp. Xanadu's[1] claim, consistent with their obligation to pay only qualified claimants." Because it appeared that the Court simply delegated the decision on the claim to Class Counsel and Rust, Xanadu believed the Order at 1358 to be final and it took an appeal. *See* Entry 1360.

At the hearing held on November 4, 2022, this Court did not suggest it took control of Xanadu's claim and it did not set a review process or any standards as to Class Counsel's determinations. Nevertheless, Class Counsel told the Ninth Circuit that the Order from this Court constituted an interlocutory Order and that the Court intended to take some action over the claim. Based on this, Class Counsel sought to dismiss the appeal as interlocutory, which the Ninth Circuit granted. *See* Entry 1372.

Despite the fact that this Court did not take control of the claim other than grant authority to audit it after approval, Class Counsel propounded a Proposed Order at Entry 1377 that seeks to have this Court parrot various incorrect conclusions and standards. Signing this Order would make it appear as if a full evidentiary hearing occurred and that this Court is making the findings.

The following are some of the problems with the Proposed Order:

| PROPOSED ORDER LANGUAGE | REASON WHY THE LANGUAGE IS OBJECTIONABLE |
|---|---|
| The Court overrules the objections by Objector Corp Xanadu because Corp Xanadu did not establish that it had any qualifying purchases. In failing to do so, therefore, not only has it failed to establish that it is entitled to share in the settlement proceeds, but it has also failed to establish that it is a settlement class member. Courts considering class action settlements must verify that every class member has standing, and it is the class member's burden to establish standing. Non-class members have no standing to object to the settlement of a class action | Class Counsel does not suggest David Gould has no standing to object to the attorney fees and redistribution in this case. |

---

[1] The name of the corporation is Xanadu. When the corporate designator is added, in English, it is "Xanadu Corp." In Spanish, as demonstrated by Google Translate, it is "Corp. Xanadu" or *Corporacion Xanadu*. The original affiant for Xanadu primarily speaks Spanish as a citizen of Ecuador.

As to Xanadu, Class Counsel formulated the following test for claimants, which Rust Consulting was tasked to oversee.  That test was defined by the *Declaration of Joel K. Botzet*, Entry 1322-1, paragraph 15, "businesses that filed claims of less than 1,000 tickets were not audited.  In Xanadu's case, the claims administrator indeed audited the claim.  "Rust reviewed all responses supplied by the claimants from the 'Request for More Information' letters and determined responses to be acceptable support for the number of tickets claimed if any of the following documentation was provided:  a. Receipts showing ticket purchases; b. Cancelled checks; c. Credit card statements; d. Travel itineraries; e. Email confirmation of ticket purchases; and/or f. Affidavit or declaration attesting that the number of tickets claimed is accurate." *Id.* at 18.  Rust then passed the responses through a "Quality Assurance" review. *Id* at 20.

Xanadu met this test based on its declaration.  Rust approved the claim and it passed their "Quality Assurance Review."  However, because Rust mismailed Xanadu's check reissuance, Class Counsel learned of the claim during its fee request and heightened the burden of proof solely for Xanadu, requiring proof beyond what was expected of other claimants.

Xanadu provided a supplemental declaration, see Entry 1375-5, and participated in a Zoom call that other class members were not subjected to. It provided corporate history documents and an explanation to every point raised by Class Counsel as the reason to reopen Xanadu's claim.

Just because Class Counsel changed the standard of review and was predisposed to denying the claim does not eliminate standing.  On the contrary, one of Class Counsel's apparent goals in heightening the burden solely for Xanadu was to eliminate its objector standing.

| | |
|---|---|
| Corp Xanadu (claim number 0000144970) filed a claim to the settlements in this litigation. Rust audited Corp Xanadu's claim because the audit threshold established for businesses was 1,000 or more tickets. Corp Xanadu did not support any of its claimed ticket purchases with actual invoices or other corporate records. Instead, Corp Xanadu's alleged 1,337 claimed tickets are supported by a one-page Affidavit, executed by the alleged Secretary of Corp Xanadu, Carlos Suica, on October 2, 2020 in response to Rust's September 20, 2020 audit letter | This is incorrect.  Xanadu's claim was approved and passed the "quality review" procedure. A check was mailed.  The check was returned and Xanadu followed up and Rust sent it a second time.  That second check was mismailed by Rust. As shown by Entry 1375-4, which was concealed until the filing, Rust Consulting clearly mislabeled the check repeating the lines many times resulting in the visibility of the City, State, and Zip being blocked.  Rust then admitted it ignored Xanadu's email and did not process the request (see Entry 1375, paragraphs 15 and 17).  As the *Declaration of Joel K. Botzet*, Entry 1322-1, *paragraph 15-20* explained, the declaration was sufficient proof and actual invoices or corporate records were not required. |
| On September 30, 2022, at the direction of the Court (ECF No. 1358) and the request of Class Counsel, Rust requested additional documentation or information from Corp Xanadu to establish the legitimacy of its claim. | Class Counsel and Rust did not request additional documentation "at the direction of the Court."  On the contrary, this Court stated that Class Counsel and Rust "may" audit/re-examine the claim.  *See* Entry 1358.  Notably, none of the information Class Counsel dramatically used to cause that occurrence to happen formed a basis for the decision. |
| Rust has now completed reviewing the documents and information that Corp Xanadu provided by November 30, 2022 and has made a determination on Corp Xanadu's claim (ECF No. 1374). Specifically, Rust determined "there is $0 due in settlement benefits" to Corp Xanadu based on numerous factors, including, but not limited to: | Rust did not determine anything the second time. On the contrary, Rust granted the original claim and it passed their "quality review" process.  Class Counsel directed Rust as to how to proceed thereafter.  It is an open factual dispute as to the extent of Class Counsel's enmeshment within the second process.  Class Counsel asked 45 minutes of questions on the Zoom call and Rust only 15, as an example.  The transcript of that call has not been provided. |
| (a) The 144 American Airlines itineraries that Corp Xanadu provided for claimed ticket purchases between the dates of July 2015 and August 2015 did not verify that Corp Xanadu was the payor of the foregoing claimed ticket purchases. Thus, even though those purchases fell within a qualifying period for the settlement classes, Corp Xanadu provided no documentation (e.g., bank statements) that it paid for such purchases2 ; | As shown by Entry 1375-5, the American Airlines tickets which were for a small period of time (less than two months) were not submitted to be paid on. Rather, they were provided to demonstrate that Xanadu extensively engaged in international travel. |
| (b) During an interview with Rich Sutton, Corp Xanadu's CEO, he informed Rust that the documents used to determine the number of tickets claimed for American Airlines and the other airlines were destroyed. Without this information, Rust was unable to verify the methodology used to determine the number of ticket purchases claimed; | This differs from the standard of review applied to other claimants by Rust (which is why Xanadu's claim was original approved and passed the "quality review" procedure).  That standard of review is found in the *Declaration of Joel K. Botzet*, Entry 1322-1, paragraphs 15-20.  This finding constitutes a heightened standard that other claimants were not subjected to. |

| | |
|---|---|
| (c) Rust requested, but Corp Xanadu did not provide, the date when the foregoing documents were destroyed and information to explain the difference in the records maintained for the years 2002 – 2008 and 2009 – 2015, including the names of the employees that maintained the records for these two time periods. Accordingly, Rust was not able to verify that the documentation ever existed to substantiate the ticket purchases claimed; | The Supplemental Declaration provided at Entry 1375-5 explained clearly that the 2015 records did not form the basis of Xanadu's claim, but were retained in connection with a dispute.  Xanadu testified to this during the Zoom call and explained it yet again.<br><br>The names of Xanadu's employees who "maintained" the records during the time periods served no purpose.  Nevertheless, after reading the predisposition provided by Rust, Xanadu again explained to Rust and provided the list of names. |
| (d) Aside from the claimed purchases on American Airlines, Corp Xanadu provided no documentation of purchases for any travel on other qualifying airlines to substantiate its claim; | This differs from the standard of review applied to other claimants by Rust (which is why Xanadu's claim was original approved and passed the "quality review" procedure).  That standard of review is found in the *Declaration of Joel K. Botzet*, Entry 1322-1, paragraphs 15-20. This finding constitutes a heightened standard that other claimants were not subjected to. |
| (e) Rust also asked Corp Xanadu to provide any marketing material and/or magazine ads for Corp Xanadu services to confirm the nature of Corp Xanadu's business, which Corp Xanadu never provided; | Xanadu could not locate 15 year old advertising. This burden of proof constitutes a heightened standard that other claimants were not subjected to. Other claimants were not asked for these documents as explained in the *Declaration of Joel K. Botzet*, Entry 1322-1, paragraphs 15-20. |
| (f) After Mr. Sutton represented that Corp Xanadu never owned any property in the United States, including vehicles, Rust asked Corp Xanadu to explain why it filed a claim and received a settlement payment in In re: Parking Heaters Antitrust Litigation in 2019 (this indirect purchaser plaintiff settlement, which Rust administered, paid monies to those who purchased an aftermarket parking heater for their commercial vehicles between October 1, 2007 and December 31, 2012). Corp Xanadu did not provide any explanation. | This is false and known to be false by Rust Consulting and Class Counsel. Specifically, during a Zoom call for which the transcript has not been provided, Class Counsel asked about parking heaters.  (Apparently, Rust breached data policies without informing the federal court in New York and provided Class Counsel claim information in that case even though it was not under their purview , including address information).<br><br>During the Zoom call, Xanadu advised that it had no vehicles or property.  It stands by that statement. |

|  | Xanadu provided Rust a copy of its purchase order for the Parking Heaters, which Class Counsel filed at Entry 1575-6. This demonstrates that Xanadu's predecessor, Trust Services SA, had James Arthur Banta (for TSSA) purchase 8 Airtronic heaters in 2010 at the Sacramento Reno Swap Meet "to be used for investigation of the frost protection hypothesis." After receiving this, Rust did not follow up with additional questions about the frost protection hypothesis, but at Entry 1575-8, Xanadu did attempt to clarify at page 4 that its research specialist, James Banta, engaged in an experiment having nothing to do with vehicles, but which the heaters were used to test warming of equipment during frost temperatures because they could run for nearly 24 hours on a single gallon of diesel fuel. |
|---|---|
| 5. In summary, Rust determined that Corp Xanadu is not a settlement class member because it does not have any valid claim to the net settlement funds. As Corp Xanadu is not a settlement class member, the Court need not consider its objections. | As stated, pursuant to the procedure outlined by *Declaration of Joel K. Botzet*, Entry 1322-1, paragraphs 15-20, including a quality control review, Xanadu's claim was approved. However, after Class Counsel directed Rust to reopen it, a heightened standard occurred. Notably, none of the reasons Class Counsel cited for opening the claim were listed as the reason for the denial. Rather, it is clear that Class Counsel imposed a higher standard of review that it did not impose on other class members. |
| The Court will nevertheless address the merits of all objections raised. The Court overrules the objections by Objectors Corp Xanadu, David Gould, and Kelly Overvold for several reasons:<br><br>(a) First, the Objectors received notice of the proposed secondary distribution and filed objections, directly contradicting their argument that Plaintiffs and Rust failed to provide reasonable notice of such distribution. Furthermore, Class Counsel already provided notice of each of the three rounds of settlements, which the Court approved (ECF Nos. 1009, 1259-1, 1318). There is no authority for the proposition that a comprehensive notice program pursuant to Federal Rule of Civil Procedure 23 is required when Class Counsel and the Court are simply seeking to redistribute uncashed settlement funds as part of the claims administration process. [citations omitted] | Rule 23(h) governs requests for attorney fees. There exists a strict notification process when Class Counsel seeks fees. Rule 23(h)(1) explains, "Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner." *See also Stair v. Thomas & Cook*, 254 F.R.D. 191, 203 (D.N.J. 2008).<br><br>  Rule 23(h)(2) explains that, "A class member, or a party from whom payment is sought, may object to the motion." Of course, without being aware of the motion, class members cannot object.<br><br>  Simply put, Class Counsel is required to submit their basis for attorneys' fees well before objections are due so that the class has a full and fair opportunity to address the claims made. *In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988 (9th Cir. 2010). Class members must be "allowed an opportunity to object to the fee 'motion' itself, not merely to the preliminary notice that such a motion will be filed." Id. at 993-94. |

| | |
|---|---|
| (b) Second, the Objectors received notice of Plaintiffs' request for attorneys' fees and reimbursement of expenses and filed objections, directly contradicting their argument that Plaintiffs failed to provide reasonable notice of such request. Moreover, Class Counsel already provided reasonable notice to settlement class members of their fee requests in connection with each of the three rounds of settlements (ECF Nos. 986, 1227, 1307), and the deadlines to object to these requests have long passed. The pending request for attorneys' fees and reimbursement of expenses relates to Class Counsel's lodestar and expenses in connection with settlement administration between August 1, 2019 and July 31, 2022. Additionally, this Court invited Class Counsel to submit this request. Hr'g Tr. at 9:12-16 (Jul. 6, 2022). The amount of fees requested fall below the amount described in the settlement notice for the prior settlement round; | The entire class is entitled to reasonable notice, not just the objectors who had to rush to the Court.<br><br>The funds are not new funds brought into the Class, but are money that actually belongs to claimants who did not receive their checks from all three settlement rounds.  In other words, Class Counsel is seeking a reward for not assuring Rust Consulting used proper addressing for checks (see Entry 1375-4 demonstrating that Rust made so many pre-address lines of text that the City, State, and Zip was obscured resulting in non-delivery of Xanadu's check) and not contacting claimants through a simple email to advise them that their checks were returned.<br><br>As explained in the original objections, Rust merely placed a copy of the motion on their website and did not place it on the Chinese or Japanese language versions of the website.<br><br>Third, Class Counsel could have simply sent an email to Class Members at very little expenses advising of the request for attorney fees.  They did not need to conduct advertising since the claims period expired.  Instead, they did nothing to notify class members. |
| (c) Third, given the amount of the remaining uncashed settlement funds (i.e., $5,448,087.41), the Objectors' contention that such funds should escheat to the states is unsupported in the Ninth Circuit and in class actions generally—and is nowhere to be found in any of the settlement agreements at issue. See Hester v. Vision Airlines, Inc., No. 2:09-CV-00117-RLH, 2017 WL 4227928, at *2 (D. Nev. Sept. 22, 2017) ("[r]edistribution of unclaimed class action funds to existing class members is proper and preferred" because it "ensures that 100% of the [settlement] funds remain in the hands of class members" and because "class settlements rarely 'pay individual class members the full value of their claims'"); William B. Rubenstein, Newberg on Class Actions, § 12:30 (5th ed.) ("Redistribution is more likely to bring the class members closer to that value rather than to be a windfall."). | Class Counsel fails to understand that not turning the uncashed checks over to each state's Treasury as unclaimed property violates the law in most states.  Approving this conduct violates public policy.<br><br>As an example, California's Code of Civil Procedure Part 3, Title 10, Chapter 7 – Unclaimed Property Law. Section 1570 states that persons still have a duty to report unclaimed property regardless of the expiration of claim limits set by courts.  Section 1576 imposes penalties for not reporting unclaimed property.  Section 1577 requires a holder of unclaimed property to pay interest for failing to turn the funds over. "Common types of unclaimed property are bank accounts, stocks, bonds, uncashed checks, insurance benefits, wages, and safe deposit box contents." Malia M. Cohen, California State Controller, from: https://www.sco.ca.gov/upd_msg.html |

| | |
|---|---|
| | Finally, turning over uncashed checks to the state is a preferred method of dealing with it. "To the extent the remaining funds represent uncashed checks that were made payable to specific claimants, it will be permissible to submit those funds to the unclaimed property funds of those persons' respective states of residence, as may be provided by the laws of those states." *See In re Optical Disk Drive Antitrust*, 3:10-md-02143-RS, Entry 3122 (N.D.Cal. Jan. 8, 2023)(denying class counsel's request to bulk escheat funds with California). |
| FOOTNOTE 3  Class Counsel requested attorneys' fees of 33%, and the Court granted 25%, in connection with the third and final round net settlement fund (ECF Nos. 1307 at 1 (motion), ECF No. 1314 at 14 (order)). The Court's award here of additional attorneys' fees of $1 million, or 18.355%, from the remaining settlement funds of $5,448,087.41, results in a fee award of 26.77% in connection with third and final round net settlement fund (i.e., less than the 33% noticed). | These are not "remaining settlement funds," but money that belongs to the over 25% of smaller claimants who did not receive their checks, received no notice that their checks were returned or not cashed, and whose checks were not delivered because of Rust Consulting's failure to properly address checks as shown by entry 1375-4. |
| 10. The Court awards attorneys' fees totaling $1 million in connection with Class Counsel's settlement administration work from August 1, 2019 through the secondary distribution and a cy pres distribution, if necessary, at the end of the litigation | The class did not receive reasonable notice of this request, the funds belong to the claimants who did not receive their money or notice, and this Court has not approved any *cy pres*.  This Court should not award attorney fees except for work actually done after all claimants are paid their approved payments, which did not happen as to 25% of the claimants. |
| 11. The Court directs Plaintiffs to pay the awarded fees and expenses from the remaining settlement funds of $5,448,087.41. | It is not "remaining settlement funds," but funds from claimants whose checks were not delivered or who did not cash their checks. |
| 13. If there are any further remaining settlement funds after the secondary distribution, assuming such funds will be economically infeasible to distribute, Plaintiffs shall propose an appropriate cy pres recipient with approval from the Court after the check void date for this secondary distribution. At that time, Class Counsel will also provide an update to the Court regarding the final resolution of Mr. Chekian's claims. | This Court stated, "in this case, payment to a Court-approved *cy-pres* would only take place for a 'tiny fraction of funds if money remains after paying Class members.'"2015 WL 3396829 *3 (N.D.Cal. May 26, 2015).  However, this is not what is happening. Class Counsel converted the uncashed checks from the claimants, did not notify them despite the cost-effectiveness of email, and seeks to redistribute and provide the leftover funds to *cy pres*. |

For the reasons above, Xanadu objects and Gould joins the objection as to the attorney

fees, lack of notice to claimants, and plan to redistribute.

II.   **Class Counsel's Subjecting Xanadu Corp. to a Heightened Standard of Review and Ultimate Conclusions Constitutes Error**

Class Counsel presented this Court with a potpourri of issues that it wanted to review during a re-audit including Xanadu's email, its corporate structure, why its check was not accepted (which we now know from Entry 1375-4 is because Rust Consulting's faulty addressing system omitted the City, State, and Zip from the visible area of the envelope), and speculation about Xanadu's phone number.

However, none of these things formed the basis for the decision. Rather, Class Counsel directed Rust to apply a completely different standard of review than that applied to other claimants pursuant to the *Declaration of Joel K. Botzet*, Entry 1322-1, paragraphs 15-20.

Specifically, under the prior standard that applied to every other claimant, a declaration appeared sufficient. Indeed, Rust approved Xanadu's claim and mailed the check. Xanadu's claim passed the "quality assurance" review described by Joel Botzet.

Apparently, the mail service erroneously stamped the first check closed box. However, Xanadu contacted Rust and asked for a reissue. The reissue envelope was returned as well, and it clearly is Rust's fault, see entry 1375-4 (having so much text on it that the City, State, and Zip was beyond the window's visible area). The record is clear that Rust received the check back and made no effort to correct its addressing error or contact Xanadu.

The record reflects that Xanadu followed up, but Rust ignored the email. When Xanadu's attorneys contacted Class Counsel, they took it upon themselves to demand a plethora of items not requested from other claimants and a Zoom call.

Despite knowing that the result was predisposed and that Class Counsel was guiding Rust, it participated in an hour-long Zoom call dominated by Class Counsel while Rust asked just a couple questions.

The decision of "Rust" (at the direction of Class Counsel) did not mention the topics Class Counsel raised to this Court. As shown, the predisposition provided by Rust invoked a heightened standard that other claimants were not subjected to. That standard did not include the declaration

that Rust clearly accepted from Xanadu and other claimants originally.  Rather, it demanded

copies of the records that formed the basis of Xanadu's internal spreadsheet.  This standard was

not demanded of other claimants.  Apparently, it needed to know when the documents were

destroyed; something impossible to provide as to records from 2010.  Notably, other claimants did

not need to provide this unless, of course, they asked for their money after Class Counsel decided

to seek a million dollar in fees from money that belongs to the people they are supposed to

represent.

The following Table demonstrates that Xanadu was improperly subjected to a heightened

standard with a predisposition:

| | |
|---|---|
| The original claim submitted by Corp Xanadu was for 1,337 tickets to the settlements in In re Transpacific Passenger Air Transportation Antitrust Litigation. On September 30, 2022, at the request of Class Counsel, at the direction of the Court, and after new information came to light, additional information was requested to establish the legitimacy of Corp Xanadu's claim for 1,337 tickets to the settlements in In re Transpacific Passenger Air Transportation Antitrust Litigation. | It is correct that Rust did not initiate any review, that it approved the claim and it passed the "quality assurance" review, and it was only opened at the "at the request of Class Counsel."<br><br>As to the "new information," none of the so called "new information" was cited in the predisposition decision.<br><br>The additional information requested was not asked of other class members and the standard applied to Xanadu differed vastly from that applied to other claimants per the *Declaration of Joel K. Botzet*, Entry 1322-1, paragraphs 15-20. |
| Final Determination:<br>After further review of the claim, including the additional documentation submitted by Corp Xanadu on October 18, 2022 and December 1, 2022, the Settlement Administrator has determined that Corp Xanadu has not provided the documentation needed to support its claim and is therefore due $0 in settlement benefits. | The burden of proof greatly exceeded that described in the *Declaration of Joel K. Botzet*, Entry 1322-1, paragraphs 15-20 which applied to other claimants.  Indeed, Rust approved Xanadu's claim and it passed the "quality assurance" review. Rust did not cite any of the information Class Counsel advised the Court as a reason for denying its claim.  On the contrary, the sole basis to deny the claim is the heightened standard selectively applied to Xanadu that differed from the *Declaration of Joel K. Botzet*, Entry 1322-1, paragraphs 15-20. |
| The Settlement Administrator has made the foregoing determination based on a number of factors, including, but not limited, to the following: The 144 American Airlines itineraries provided for | Xanadu repeatedly made clear to Rust and Class Counsel on the Zoom call and in writing that the 144 tickets, which encompass a single project during a period less than two months, were not |

| | |
|---|---|
| claimed ticket purchases between the dates of July 2015 and August 2015 did not verify that Corp Xanadu was the payor of the foregoing claimed ticket purchases. Thus, even though those purchases fell within a qualifying period for the settlement classes, Corp Xanadu provided no documentation (e.g., bank statements) that it paid for such purchases. | included in the claim submissions previously made.  Rather, Xanadu made it clear they provided them to demonstrate the involvement in Transpacific travel.  See Entry 1375-5, pages 8 and 9, paragraphs 56-60.<br><br>Paragraph 65, page 9, explains, "Xanadu only claimed flights taken between the years 2002 and 2008." *Id*.<br><br>As these tickets were not the basis of Xanadu's claims, and were provided to demonstrate the business activity, the payment data lacks any relevance. |
| During an interview with Rich Sutton, Corp Xanadu's CEO, he informed us that the documents used to determine the number of tickets claimed for American Airlines and the other airlines were destroyed. Without this information the Settlement Administrator is unable to verify the methodology used to determine the number of ticket purchases claimed; | As to the documents used to determine the number of tickets claimed, Xanadu did provide an internal spreadsheet summary.  However, the actual underlying ticket by ticket data, Xanadu did not retain as to tickets from 15 to 20 years ago.<br><br>As this litigation involves tickets that are decades old, Rust did not require this type of documentation from other claimants.  Obviously, most companies, including Xanadu, would not have the data.  This is why Rust only required declarations from other claimants, of which apparently Xanadu's was good enough until the intervention of Class Counsel and the heightened burden of proof placed upon it.  The proper burden of proof is found at *Declaration of Joel K. Botzet*, Entry 1322-1, paragraphs 15-20.  Xanadu's supplemental declaration (Entry 1375-5) at paragraph 64 explains, "Per normal business and record retention procedures, we do not currently have airline ticket copies, reservation numbers, or reservation confirmations for tickets from 15 to 20 years ago."  Paragraph 65 explains that Xanadu only claimed flights from 2002 through 2008. |
| Additionally, the Settlement Administrator requested the date when the foregoing documents were destroyed and information to explain the difference in the records maintained for the years 2002 – 2008 and 2009 – 2015, including the names of the employees that maintained the records for these two time periods. The requested information was never provided. | Xanadu did not have data showing when the information was destroyed or *if* it was actually destroyed.  Xanadu explained that it actually did not locate the documents.  As to the names of the persons, the data was totally non-relevant and meaningless.  Nevertheless, as shown by Entry 1375-8,page 3, the names of the persons who maintained the records from 2002 to 2008 was Maria Sanchez.  After 2008, various secretaries existed including Adriana Rodriguez, Priscilla Arias, Diayanna Hernandez, and Mariana Campos. How these names help Rust, or would have helped Rust, is baffling. |

| | |
|---|---|
| | Xanadu's supplemental declaration (Entry 1375-5) at paragraph 64 explains, "Per normal business and record retention procedures, we do not currently have airline ticket copies, reservation numbers, or reservation confirmations for tickets from 15 to 20 years ago." Paragraph 65 explains that Xanadu only claimed flights from 2002 through 2008. |
| Accordingly, the Settlement Administrator was not able to verify that the documentation ever existed to substantiate the ticket purchases claimed | During the Zoom call, Xanadu's agent testified that at the time of the claim, sufficient data existed. The claim form was actually submitted in 2015. Rust waited five years to begin audits. <br><br> Because this litigation involved flights from 2002 to 2008, and the claims period did not begin until a decade thereafter, Rust accepted declarations from claimants knowing that the records would not ordinarily exist. *Declaration of Joel K. Botzet*, Entry 1322-1, paragraphs 15-20. <br><br> At the direction of Class Counsel, Rust applied a heightened standard to Xanadu that did not comport with the *Botzet* Declaration's standard of review. |
| Aside from the claimed purchases on American Airlines, Corp Xanadu provided no documentation of purchases for any travel on other qualifying airlines to substantiate its claims; | As explained above, the documentation no longer exists. Because this litigation involved flights from 2002 to 2008, and the claims period did not begin until a decade thereafter, Rust accepted declarations from claimants knowing that the records would not ordinarily exist. *Declaration of Joel K. Botzet*, Entry 1322-1, paragraphs 15-20. <br><br> At the direction of Class Counsel, Rust applied a heightened standard to Xanadu that did not comport with the *Botzet* Declaration's standard of review. |
| The Settlement Administrator also asked Corp Xanadu to provide any marketing material and/or magazine ads for Xanadu Corp services to confirm the nature of Corp Xanadu's business, which Corp Xanadu has not provided. | Xanadu provided Rust and Class Counsel with a Declaration relating to the business activities. It simply does not have the marketing material from 20 years ago that was requested. *See* Entry 1375-5, page 4, paragraphs 22-23. <br><br> Rust did not request this material from any other claimant, only from Xanadu. The standard applied to other claimants is found in the *Declaration of Joel K. Botzet*, Entry 1322-1, paragraphs 15-20. |
| Finally, after Mr. Sutton represented that Corp Xanadu never owned any property in the United States, including vehicles, the Settlement Administrator asked Corp Xanadu to explain why it filed a claim | Regardless of the appropriateness of Class Counsel and Rust's breaching data from another settlement that Class Counsel had no purview over, Xanadu has no vehicles in the United States. It provided Rust with the purchase order from August 2010, |

| | |
|---|---|
| and received a settlement payment in the Parking Heaters settlement in 2019 (this settlement paid monies to those who purchased an aftermarket parking heater for their commercial vehicles between October 1, 2007 and December 31, 2012). Corp Xanadu did not provide any explanation. | which Rust publicly filed at Entry 1375-6.  The Purchase Order clearly states that the diesel heaters were used for investigation of a frost protection hypothesis by its researcher, James Arthur Banta in California.  After Rust propounded its insinuation, Xanadu clarified even further that the parking heaters were not used in connection with any vehicles. *See* Entry 1375-8. |

Most objectionable is the fact that Class Counsel represented to this Court that it desired Rust to reopen the claim – which was already approved and passed the "quality assurance" review – based on insinuations, speculation, and allegations made to the Court in its filings.  These speculative issues included Xanadu's corporate structure, its address, its used of "phreakmail.com" instead of a corporate email.  Xanadu addressed all of these issues, which were the crux of Class Counsel's specious concerns.  Specifically, Xanadu addressed its corporate structure, *see* Entry 1375-5, page 3-4, paragraphs 14-21, the domain name and the fact that it does have but simply did not use its corporate email, *id*, page 5, par. 26-32, why the mail was not delivered (which we now know was Rust's mismailing shown by Entry 1375-4,  *id* pages 6-7, pars. 33-44, non-registration with the California Secretary of State (Xanadu was a Costa Rican corporation that split into several Colorado corporations), *id,* pages 7-8, par. 45-48, its telephone number, *id* page 8, par. 49-51, the company's request for a check in the company name only, *id*, page 8, pars. 52-55.

Clearly, the basis to apply a heightened standard solely to Xanadu should have eviscerated with this information.  Instead, Class Counsel had Rust apply an impossible standard to Xanadu that it did not apply to other class members.

One reason most likely is that Xanadu objected to the entire administration of the check issuances on behalf of all class members.  Class Counsel is seeking attorney fees from money purportedly abandoned by claimants when, in reality, Rust's checks were mismailed (*see* Entry 1375-4) and over 25% of claimants did not receive or did not cash their checks.  Therefore, Class Counsel had the incentive to attempt to declare Xanadu a non-member of the class to take away its

standing.  It enmeshed itself in the process, with Class Counsel interrogating Xanadu for 45 minutes of a Zoom call while Rust had only 15 minutes of questions.  It directed Rust to apply a different standard.

If Rust was truly the decision-maker, before with respect to the claim it approved and which passed "quality assurance," then there would have been no need for Class Counsel to pull it by a leash to achieve the result it needed to impugn Xanadu's standing.  Rather, Class Counsel would have simply told Rust to apply the same standard it applied to other claimants, but to review its concerns– all of which were addressed.  Instead, Rust applied a heightened burden of proof to achieve Class Counsel's desired results.

Therefore, Xanadu objects to this conflict-ridden non-uniform approach.

## III.    Class Counsel Disclosed that Rust Consulting Acted Negligently in Mailing Checks Using Faulty Software which Explains the Large Percentages of Unpaid Checks.

As this Court knows, Xanadu's approved claim resulted in the mailing of a check that was returned to Rust Consulting ("Rust"), the claims administrator.  Xanadu Corp. reordered the check from Rust and they remailed it.  For the first time, Rust disclosed the envelope of the returned check.  As shown by Entry 1375-4, at least as to the Check to Xanadu, Rust's system repeated address lines over and over pushing the city, state, and zipcode to below the window making delivery impossible.

This gross negligence as to the handling of a six figure check reveals the reason why claimants must be contacted and told how to request a replacement check before Class Counsel is rewarded with more fees.

## IV.    Considering How Rust Consulting Misaddressed the Second Check to Xanadu, Contacting Claimants with Returned Checks or Uncashed Checks is Fair

We now see from Entry 1375-4 why some checks did not reach the claimants.  Indeed, 25% of claimants did not receive or did not cash their check.  Class Counsel believes this is normal and cites another case that they participated in and converted, without objection, money to

claimants who did not receive their check.  Class counsel should be embarrassed by its pattern of

disregard rather than trying to cite its past poor administration of claims to justify the present.

It appears more than simple:  Class Counsel and Rust Consulting maintain a fiduciary duty

to advise people by email who did not receive their payment or did not cash it.  Compare Class

Counsel's position with *In re Optical Disk Drive Antitrust,* 3:10-md-02143-RS, Entry 3122

(N.D.Cal. Jan. 8, 2023).  In that case, the district court granted more time so Class Counsel could

notify people who did not cash their checks and provide them with additional time to order a new

check.  The district court explained, "The settlement administrator reports that an unexpectedly

large number of checks distributed in the second round of settlement payments have gone

uncashed—[. . .] In the interest of maximizing the dollar amount returned to class members, the

settlement administrator requests an additional 60 days, during which efforts will be made to

contact those who have not cashed their checks, and in which checks will be reissued if

necessary."

In another case where Cotchett Pitre & McCarthy acted as Class Counsel, the same issue

came up.  Like this case, Class Counsel adamantly refused to agree to notify claimants when their

checks were returned despite an objection.  Objectors appealed and Class Counsel changed their

stance.  Class Counsel agreed that they would automatically resend checks if misaddressed or

where a new address could be located and that, if not, they would contact the claimant by email.

The Court found this benefitted the class.  In re:  Zoom Privacy, 2022 WL 16861661 (N.D. Cal.

Nov. 11, 2022).

In the present case, Class Counsel appears interested in minimizing payout to class

members.  This position is unfortunate considering the fiduciary duties to the class that Class

Counsel has.  *See*, *e.g., Staton v. Boeing Co.* 327 F.3d 938, 959 (9th Cir. 2003)( class counsel

ultimately owe their fiduciary responsibility to the class as a whole and are therefore not bound by

the views of the named plaintiffs regarding any settlement); *In re GMC Pick–Up Truck Fuel Tank*

*Prods. Liab. Litig.,* 55 F.3d 768, 801 (3d Cir.1995) ("Beyond their ethical obligations to their

clients, class attorneys, purporting to represent a class, also owe the entire class a fiduciary duty once the class complaint is filed").

It is often said that judges act as fiduciaries for absent class members. *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. 2009);  Reynolds v. Beneficial Nat'l Bank, 288 F.3d 277, 279–80 (7th Cir. 2002) ("We and other courts have gone so far as to term the district judge in the settlement phase of a class action suit a fiduciary of the class."); 4 WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 13:40 (5th ed. 2020) (noting that in class action litigation "the law requires the judge to act as a fiduciary" of absent class members).

This Court should not allow the 25% of claimants who did not receive their check – some because of Rust's errors as shown at Entry 1575-4 – or those who did not cash them because years passed from the claims period to the distribution period to lose their money.

## V.   **CONCLUSION**

Based on the above, the motion for second distribution and attorney fees must be denied. First, Xanadu needs to receive the funds so wrongfully mismailed by Rust considering that none of their allegations formed a basis for their decision and that they applied a different standard to its claim.  Second, Claimants with returned or unclaimed checks need to be notified and given the opportunity to receive their money.  Third, any money left should be provided to the proper state's unclaimed property fund.  Fourth, only if money remains, Class Counsel needs to notify class members by email that they intend to seek attorney fees.

Respectfully submitted,

*/s/ J. Allen Roth, Esq.*

_____

J. Allen Roth, Esq.

COUNSEL FOR OBJECTORS
DAVID GOULD AND XANADU
*PRO HAC VICE)*