IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TRANSPACIFIC PASSENGER AIR TRANSPORTATION ANTITRUST LITIGATION<br><br>This Document relates to:<br>ALL ACTIONS | Case No. 07-cv-05634-CRB<br><br>**ORDER DENYING MOTION FOR RECONSIDERATION** |

Before the Court is a motion for reconsideration filed by Xanadu Corp. and David Gould (collectively, "Xanadu"). As explained below, the Court denies the motion.

## I.  BACKGROUND

In August of 2022, Plaintiffs moved for a secondary distribution of the remaining settlement funds in this case. See Mot. for Secondary Distribution (dkt. 1347). Xanadu filed an objection. See Xanadu Obj. (dkt. 1353). The objection argued that Class Counsel sought too much money in fees,[1] that Class Counsel should have notified class members about their checks by email, that Class Counsel should have posted notice about their request for fees on the Chinese and Japanese versions of the litigation website, and that unclaimed funds should escheat to the state. Id. at 1–3, 5. The objection next complained that the claims administrator, Rust Consulting, had already approved Xanadu's claim and that "decades after the ticket purchases occurred, years after the claims were submitted,

---

[1] It incorrectly accused Class Counsel of seeking 55% of the remaining funds. Id. at 10. In fact, Class Counsel sought 18%. See Order Granting Plaintiffs' Motion for Secondary Distribution two days later. See Order (dkt. 1378) at 7.

and over one year since the issuance of Xanadu's Notice of Claim Final Determination, Class Counsel wants to completely audit and relitigate [Xanadu's] approved claim because the claimant's postal mail was returned and the claimant wanted the check reissued." Id. at 7. Xanadu asserted: "There exists no reason that the clamant should have to relitigate the approved claim at this juncture." Id. at 9. Plaintiffs responded, listing a number of reasons why Xanadu's claim aroused suspicion. See Reply (dkt. 1356).[2] Those reasons amply justified re-auditing Xanadu's claim. Accordingly, the Court ordered that "Class Counsel and Rust may audit/re-examine Corp. Xanadu's claim, consistent with their obligation to pay only qualified claimants." Order Setting Hearing (dkt. 1358). The Court subsequently directed Class Counsel to file an update on Rust's audit of Xanadu's claim. See Order Directing Filing (dkt. 1368).

Class Counsel updated the Court repeatedly on its review of Xanadu's claim. See 11/8/22 Notice (dkt. 1370); 12/7/22 Further Notice (dkt. 1371); 1/16/23 Further Notice (dkt. 1374). The 1/16/23 Further Notice included a detailed declaration from Joel Botzet, a program manager for Rust, explaining Rust's determination that "Xanadu did not provide the documentation needed to support its claim and is therefore due $0 in settlement

---

[2] For example: Xanadu's alleged 1,337 tickets are exclusively supported with a one-page affidavit, id. at 2; this is "highly unusual for a business, particularly one that purportedly purchased tickets . . . for its own use," id. at 4 (citing Castillo Decl. ¶ 7); Rust sent a determination letter to Xanadu's Wilshire Blvd. office on August 24 2021, which USPS returned as undeliverable; Rust emailed Corp. Xanadu, which confirmed that that address was correct, id. at 3; Rust mailed a check to Corp. Xanadu's Wilshire Blvd. office on March 17, 2022, which USPS returned as undeliverable, id.; on July 30, 2022, a Mr. Suica emailed Rust indicating that Corp. Xanadu had not received a check, and providing a new mailing address on Santa Monica Blvd, id.; on August 26, 2022, a Nicaragua-based attorney representing Corp. Xanadu emailed Class Counsel threatening legal action because Corp. Xanadu had not received a check, id. at 4; Class Counsel could not find any online presence for Corp. Xanadu, including on the California Secretary of State's Business Search website, id.; Class Counsel could find no records of actual employees for Corp. Xanadu, id.; Class Counsel learned that the Wilshire Blvd. and Santa Monica Blvd. addresses were both private rental mailboxes, id. at 5; alleged representatives of Corp. Xanadu have also referred to it as Xanadu Corp, id.; Corp. Xanadu appears to lack an email system; the email provided for its claim was corpxanadu@phreakmail.com, id.; Corp. Xanadu's phone number is a landline in Oregon and its use of a Nicaragua-based attorney is unusual, id.; mail to Corp. Xanadu was returned, id.; Class Counsel asked Corp. Xanadu for its company formation documents or to make a representative from Corp. Xanadu available, and it refused to do so, id.

benefits." Botzet Decl. (dkt. 1375) at ¶ 22; see also id. ¶¶ 18–23. Based on Botzet's sworn statement, the Court was persuaded that this was the correct conclusion, reached after a lengthy and fair process. Accordingly, the Court directed Class Counsel to file an updated proposed order granting the Motion for Secondary Distribution and reflecting Rust's conclusion as to Xanadu. See Order Directing Filing of Proposed Order (dkt. 1376). Class Counsel promptly complied. See Proposed Order (dkt. 1377). The Court adopted the Proposed Order in large part,[3] filing an Order Granting Plaintiffs' Motion for Secondary Distribution two days later. See Order (dkt. 1378).

Shortly thereafter, Xanadu filed both an Objection to the 1/16/23 Further Notice and Proposed Order ("PO Objections") (dkt. 1379), and a Motion Pursuant to Rules 59(b) and 60(b)(1) and (6) for Reconsideration of the Court's Order ("Mot. for Reconsideration") (dkt. 1380)[4]; see also Reply re Mot. for Reconsideration (dkt. 1382); Exhibits (dkt. 1383). Plaintiffs oppose the motion. See Opp'n to Mot. for Reconsideration (dkt. 1382); Sur-Reply re Mot. for Reconsideration (dkt. 1384).[5]

## II. LEGAL STANDARD

The Court presumes that Xanadu intends to invoke Rule 59(e) of the Federal Rules of Civil Procedure, and not Rule 59(b).[6] Rule 59(e) pertains to motions to alter or amend judgments. However, "a motion for reconsideration should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law." Orange St. Partners v. Arnold, 179 F.3d 656, 665 (9th Cir. 1999). The Court reviews the present motion for any clear error that it committed in its original order. "The clear error standard is significantly deferential and is not met unless the reviewing court is

---

[3] The Court awarded half of the attorneys' fees that Class Counsel requested. See id. ¶ 10.
[4] Although Xanadu's motion is called a Motion for Reconsideration, it does not rely on Civil Local Rule 7-9 (allowing parties to file a motion for leave to file a motion to reconsider any interlocutory order on any ground in Civil Local Rule 7-9(b)). See Mot.
[5] Plaintiffs request leave to file a sur-reply. Id. The Court grants leave.
[6] Rule 59(b) governs the time in which a motion for a new trial must be filed. Fed. R. Civ. P. 59(b).

3

left with a 'definite and firm conviction that a mistake has been committed.'" Cohen v. U.S. Dist. Ct. for N. Dist. of Cal., 586 F.3d 703, 708 (9th Cir. 2009) (quoting Concrete Pipe & Prods. v. Constr. Laborers Pension Tr., 508 U.S. 602, 623 (1993)).  A mistake occurs when the court's prior decision is "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." United States v. Hinkson, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc).  A clear error does not exist solely because "another reasonable judicial body 'would have arrived at a different result.'" J & J Sports Prods., Inc. v. Juanillo, C-10-01801 WHA, 2011 WL 335342, at *1 (N.D. Cal. Feb. 1, 2011) (quoting All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011).

Rule 60(b)(1) provides that a Court may relieve "a party"[7] from a final judgment, order, or proceeding in the case of "mistake, inadvertence, surprise, or excusable neglect." "The ordinary meaning of the term 'mistake' in Rule 60(b)(1) includes a judge's legal errors." Kemp v. United States, 142 S. Ct. 1856, 1862 (2022).  Rule 60(b)(6) provides for the same relief for "any other reason that justifies relief." "Rule 60(b)(6) has been used sparingly as an equitable remedy to prevent manifest injustice." United States v. Alpine Land & Reservoir Co., 984 F.2d 1047, 1049 (9th Cir. 1993).  "A movant seeking relief under Rule 60(b)(6) must show extraordinary circumstances justifying the reopening of a final judgment." Henson v. Fidelity Nat'l Fin., Inc., 943 F.3d 434, 443–44 (9th Cir. 2019) (internal quotation marks omitted).

### III. DISCUSSION

Xanadu's motion for reconsideration is quite short but explains that "[t]he basis for the reconsideration is found" in its objections to the proposed order.  Mot. for Reconsideration at 2 (incorporating by reference the PO Objections).[8]  Xanadu's

---

[7] As Plaintiffs point out, Xanadu is not a party to this litigation. See Opp'n to Mot. for Reconsideration at 3.

[8] The motion also suggests as an additional ground that Xanadu had inadequate time to respond to the 1/16/23 status update, which deprived it of its procedural due process rights. Id. at 2; see also Reply re Reconsideration at 4 ("Objectors have a due process right to lodge a response to the 'Notice.'"). Xanadu offers no legal authority in support of this point, and the Court is skeptical that a would-be class member indeed has a "due process right" to respond to a status update. However, assuming that Xanadu has such a right, the Court has now received and reviewed

4

objections do not warrant reconsideration.

First, "a motion to reconsider is not a vehicle permitting the unsuccessful party to 'rehash' arguments previously presented." Bailey v. Diaz, No. C 12-1414 CRB (PR), 2013 WL 6189183, at *1 (N.D. Cal. Nov. 25, 2013) (discussing Rule 59(e) motion). And simply disagreeing with a court's decision does not meet the definition of "mistake, inadvertence, surprise, or excusable neglect." See Buckley v. BMW of N. Am., No. 20-56397, 2022 WL 16756341, at *1 (9th Cir. Nov. 8, 2022) (citing Lemoge v. United States, 587 F.3d 1188, 1192–99 (9th Cir. 2009)) (discussing Rule 60(b)(1)). Many of the objections that Xanadu now makes to the proposed order are simply rehashes of the objections Xanadu made to the motion for secondary distribution. Compare PO Objections at 3 (Rust already approved Xanadu's claim and then unfairly required Xanadu to prove up its claim beyond what was required of other claimants) with Xanadu Obj. at 7–10 (Class Counsel wants to "relitigate the approved claim" and "treat [Xanadu] differently than the other claimants who went through Rust Consulting's process")[9]; PO Objections at 7 ("Rust merely placed a copy of the motion on their website and did not place it on the Chinese or Japanese language versions of the website. . . . Class Counsel could have simply sent an email to Class Members") with Xanadu Obj. at 2 ("Email costs nothing. . . . Neither Rust Consulting nor Class Counsel posted a notice on the Chinese or Japanese version of the website"); PO Objections at 8 ("turning over uncashed checks to the state is

---

Xanadu's objections. Moreover, as Xanadu represents that "counsel was in the process of the final edit [of the Objections to the PO] at the time this Court rendered the Order, which is why they were uploaded a few minutes after the Order," id. at 2, the Court has confidence that it has the benefit of Xanadu's complete thoughts on the proposed order.

[9] Xanadu complains repeatedly that Rust required more of Xanadu than it did of other claimants. See PO Objections at 3, 4, 5, 6, 8–13. This is likely true. See, e.g., Sur-Reply re Mot. for Reconsideration at 2 ("Rust's conclusion as to Corp Xanadu's claim was based on Rust's examination of Corp Xanadu's claim over several months, which included a Zoom interview with Corp Xanadu's CEO, Rich Sutton, on November 1, 2022, and all documents and information provided by Corp Xanadu by November 30, 2022."). But Rust did not do so in a vacuum. It did so after a number of irregularities raised suspicion about whether Xanadu was actually a class member, see Reply, and after the Court agreed that re-auditing Xanadu's claim was appropriate, see Order Setting Hearing. At that point, it would have been meaningless for Rust to subject Xanadu only to the original process in place for verifying claims. See Botzet Decl. (dkt. 1322-1) ¶¶ 15–20. Nor was Rust limited to the particular issues that raised its alarm in the first place.

a preferred method of dealing with it. . . . it will be permissible to submit those funds to the unclaimed property funds of those persons' respective states") with Xanadu Obj. at 5 ("any redistribution of funds without escheating domestic claimants' money violates public policy and is unlawful."). The Court has already analyzed those arguments and disagreed with Xanadu's position.

Second, to the extent that Xanadu's objections raise new issues, they do not change the Court's view of the motion for secondary distribution. For example, Xanadu asserts that "Rust mismailed Xanadu's check reissuance," PO Objections at 3, which was "concealed until the filing," id. at 4 (citing Botzet Decl. Ex. 4 (dkt. 1375-4)); see also Reply re Mot. for Reconsideration at 2 ("additional factual details came to light about the uncashed checks") (citing to Botzet Decl. Ex. 4). Xanadu leaps from its own "mismailed" check to suggesting that "in reality, Rust's checks"—plural—"were mismailed (see Entry 1375-4) and over 25% of claimants did not receive or did not cash their checks." PO Objections at 13; id. at 14 ("Rust Consulting Acted Negligently in Mailing Checks Using Faulty Software which Explains the Large Percentage of Unpaid Checks."). This is an unwarranted leap, based on a single check. Moreover, while the envelope for that single check only shows the addressee's names and street address (cutting off the city, state, and zip code), the envelope also shows that it was stamped "RETURN TO SENDER - TEMPORARILY AWAY - UNABLE TO FORWARD," suggesting that the missing city, state, and zip code were not the impediment to delivery. See Botzet Decl. Ex. Ex. 4; see also Botzet Decl. ¶ 12 (USPS returned due to no forwarding address). Beyond that, whether or not Rust properly addressed the envelope with the reissued payment, Rust undertook a re-audit of Xanadu's claim, with the Court's blessing, and reasonably concluded that Xanadu had failed to provide the documentation needed to support its claim. Xanadu's additional accusation that Class Counsel was inappropriately "enmesh[ed]" in the audit process, and motivated by its desire for increased attorneys' fees, is unsupported. And while Xanadu apparently has a plausible response to Rust's suggestion that it acted improperly in the In re: Parking Heaters settlement, see PO

Objections at 5–6, the Court's decision does not depend on Xanadu's actions in the In re: Parking Heaters settlement. See Order ¶ 4 (listing six subparts supporting Rust's conclusion,[10] of which the In re: Parking Heaters settlement was one).

Accordingly, Xanadu has failed to satisfy the demanding standards of Rules 59(e), 60(b)(1), or 60(b)(6).

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES the motion for reconsideration.

**IT IS SO ORDERED.**

Dated: January 25, 2023



CHARLES R. BREYER
United States District Judge

---

[10] Xanadu repeatedly states that "this Court's Order made findings of fact and conclusions of law," Mot. for Reconsideration at 2, and that it appears "as if a full evidentiary hearing occurred and that this Court is making findings," PO Objections at 2. Not so. The Court held that "Rust determined 'there is $0 due in settlement benefits' to Corp Xanadu," and it listed "numerous factors" upon which Rust based its decision. See Order ¶ 4.